**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| TENARIS S.A. and TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, <br><br> *Plaintiffs*, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br> *Defendant*. | Case No.: _____ |

## <u>DECLARATION OF THEODORE A. KITTILA (DE BAR NO. 3963)</u>

I, Theodore A. Kittila, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.       I am a member in good standing of the bar of the State of Delaware and a partner at the law firm of Halloran Farkas + Kittila LLP, counsel for Tenaris S.A. ("Tenaris") and Talta-Trading e Marketing Sociedade Unipessoal Lda. ("Talta") (collectively, "Plaintiffs") in the above-captioned matter.

2.       I make this declaration in support of Plaintiffs' Motion for an Order Authorizing the Issuance of a Writ of Attachment *Fieri Facias*, dated August 17, 2023 (the "Motion").

3.       I am providing notice of the Motion to the Bolivarian Republic of Venezuela ("Venezuela") by causing true and correct copies of the Motion and supporting documents to be sent via email and FedEx to:

a.       A. Thompson Bayliss, Esq., Abrams & Bayliss LLP, 20 Montchanin Road, Suite 200, Wilmington, DE 19807, bayliss@abramsbayliss.com, counsel for Venezuela in related matters, including Crystallex

International Corporation v. Bolivarian Republic of Venezuela, No. 17-mc-151 (LPS) (D. Del.) ("*Crystallex*");

b.  Stephen C. Childs, Esq., Abrams & Bayliss LLP, 20 Montchanin Road, Suite 200, Wilmington, DE 19807, childs@abramsbayliss.com, counsel for Venezuela in related matters, including *Crystallex*;

c.  George M. Garvey, Esq., Munger, Tolles & Olson LLP, 350 South Grand Avenue, 50th Floor, Los Angeles, CA 90071, george.garvey@mto.com, counsel for Venezuela in related matters, including *Crystallex*;

d.  Elaine J. Goldenberg, Esq., Munger, Tolles & Olson LLP, 601 Massachusetts Avenue NW, Suite 500 E, Washington, D.C. 20001, elaine.goldenberg@mto.com, counsel for Venezuela in related matters, including *Crystallex*;

e.  Adeel Mohammadi, Esq., Munger, Tolles & Olson LLP, 350 South Grand Avenue, 50th Floor, Los Angeles, CA 90071, adeel.mohammadi@mto.com, counsel for Venezuela in related matters, including *Crystallex*; and

f.  Donald B. Verrilli, Jr., Esq., Munger, Tolles & Olson LLP, 1155 F Street, NW, Seventh Floor, Washington, D.C. 20004, donald.verrilli@mto.com, counsel for Venezuela in related matters, including *Crystallex;*

4.  I am providing notice of the Motion to Petróleos de Venezuela, S.A. ("PDVSA") by causing true and correct copies of the Motion and supporting documents to be sent via email and FedEx to:

a.     Jamie Lynne Brown, Esq., Heyman Enerio Gattuso & Hirzel LLP, 300 Delaware Avenue, Suite 200, Wilmington, DE 19801, jbrown@hegh.law,

b.     Samuel Taylor Hirzel, II, Esq., Heyman Enerio Gattuso & Hirzel LLP, 300 Delaware Avenue, Suite 200, Wilmington, DE 19801, 300 Delaware Avenue, Suite 200, Wilmington, DE 19801, shirzel@hegh.law, counsel for PDVSA in related matters, including *Crystallex*;

c.     Kevin A. Meehan, Esq., Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, kmeehan@curtis.com, counsel for PDVSA in related matters, including *Crystallex*;

d.     Juan O. Perla, Esq., Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, jperla@curtis.com, counsel for PDVSA in related matters, including *Crystallex*; and

e.     Joseph D. Pizzurro, Esq., Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY 10178, jpizzurro@curtis.com, counsel for PDVSA in related matters, including *Crystallex*.

5.     I am providing notice of the Motion to non-party PDV Holding, Inc. ("PDVH") by causing true and correct copies of the Motion and supporting documents to be sent via email and FedEx to:

a.     Daniel D. Birk, Esq., Eimer Stahl LLP, 224 South Michigan Avenue, Suite 1100, Chicago, IL 60604, dbirk@eimerstahl.com, counsel for PDVH in related matters, including *Crystallex*;

b.     Alexandra M. Cumings, Esq., Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE

19899, acumings@mnat.com, counsel for PDVH in related matters, including *Crystallex*;

c.      Nathan P. Eimer, Esq., Eimer Stahl LLP, 224 South Michigan Avenue, Suite 1100, Chicago, IL 60604, neimer@eimerstahl.com, counsel for PDVH in related matters, including *Crystallex*;

d.      Samuel G. Hall, Esq., Willkie Farr & Gallagher LLP, 1875 K Street, N.W. Washington, DC 20006, shall@willkie.com, counsel for PDVH in related matters, including *Crystallex*;

e.      Lisa S. Meyer, Esq., Eimer Stahl LLP, South Michigan Avenue, Suite 1100, Chicago, IL 60604, lmeyer@eimerstahl.com, counsel for PDVH in related matters, including *Crystallex*;

f.      Michael J. Gottlieb, Esq., Willkie Farr & Gallagher LLP, 1875 K Street, N.W. Washington, DC 20006, mgottlieb@willkie.com, counsel for PDVH in related matters, including *Crystallex*;

g.      David J. L. Mortlock, Esq., Willkie Farr & Gallagher LLP, 1875 K Street, N.W. Washington, DC 20006, dmortlock@willkie.com, counsel for PDVH in related matters, including *Crystallex*;

h.      Kenneth J. Nachbar, Esq., Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899, knachbar@mnat.com, counsel for PDVH in related matters, including *Crystallex*;

       i.        Gregory M Schweizer, Esq., Eimer Stahl LLP, South Michigan Avenue, Suite 1100, Chicago, IL 60604, gschweizer@eimerstahl.com, counsel for PDVH in related matters, including *Crystallex*; and

       j.        Emily E. Sullivan, Esq., Eimer Stahl LLP, South Michigan Avenue, Suite 1100, Chicago, IL 60604, esullivan@eimerstahl.com, counsel for PDVH in related matters, including *Crystallex*.

6.      Attached as **Exhibit 1** is Plaintiffs' proposed writ of attachment *fieri facias* directed to PDVH.

7.      Attached as **Exhibit 2** is Plaintiffs' proposed *praecipe* in support of its request that the Clerk of the Court issue the writ of attachment *fieri facias*.

8.      Attached as **Exhibit 3** is a true and correct copy of the award entered against Venezuela in favor of Plaintiffs in the case captioned *Tenaris S.A. and Talta-Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/11/26, on January 29, 2016.

9.      Attached as **Exhibit 4** is a true and correct copy of the award entered against Venezuela in favor of Plaintiffs in the case captioned *Tenaris S.A. and Talta-Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/12/23, on December 12, 2016.

10.     Attached as **Exhibit 5** is a true and correct copy of the ICSID ad hoc committee's decision to dismiss Venezuela's application for annulment of the award entered against Venezuela in favor of Plaintiffs in the case captioned *Tenaris S.A. and Talta-Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/11/26, on August 8, 2018.

11.     Attached as **Exhibit 6** is a true and correct copy of the ICSID ad hoc committee's decision to dismiss Venezuela's application for annulment of the award entered against Venezuela in favor of Plaintiffs in the case captioned *Tenaris S.A. and Talta-Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/12/23, on December 28, 2018.

12.     Attached as **Exhibit 7** is a true and correct copy of the judgment the United States District Court for the District of Columbia entered against Venezuela and in favor of Plaintiffs in the case captioned *Tenaris S.A. et al. v. Bolivarian Republic of Venezuela*, 18-1371-CRC (D.D.C. 2020) on July 17, 2020, previously registered with this Court (D.I. 1).

13.     Attached as **Exhibit 8** is a true and correct copy of the judgment the United States District Court for the District of Columbia entered against Venezuela and in favor of Plaintiffs in the case captioned *Tenaris S.A. et al. v. Bolivarian Republic of Venezuela*, 18-1373-CRC (D.D.C. 2020) on July 17, 2020, previously registered with this Court (D.I. 1).

14.     Attached as **Exhibit 9** is a true and correct copy of the order of the United States District Court for the District of Columbia altering the judgment attached as Exhibit 8, dated November 5, 2021, previously registered with this Court (D.I. 1).

15.     Venezuela has made no attempt to pay Plaintiffs the amounts owed under the judgments attached as Exhibits 7-9 nor expressed any intention to pay.

16.     Attached as **Exhibit 10** is a true and correct copy of the Law Reforming the Statute Governing the Transition to Democracy to Reestablish the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela, enacted by the National Assembly of the Bolivarian Republic of Venezuela and published in the Legislative Gazette No. 66, dated January 3, 2023, with accompanying certified English translation.

17.     Attached as **Exhibit 11** is a true and correct copy of the Agreement adopted by the National Assembly of Venezuela on January 26, 2023 ratifying the existence of PDVSA's *ad hoc* Board to protect the foreign assets of Venezuela, published in the Legislative Gazette No. 68 dated February 2, 2023, with accompanying certified English translation.

18.     Attached as **Exhibit 12** is a true and correct copy of a National Assembly press release titled "The legitimate National Assembly received the management report issued by the PDVSA ad hoc Board of Directors" dated February 24, 2023, available at https://www.asambleanacionalvenezuela.org/noticias/an-legitima-recibio-el-informe-de-gestion-de-la-junta-administrativa-ad-hoc-de-pdvsa, with accompanying certified English translation.

19.     Attached as **Exhibit 13** is a true and correct copy of a National Assembly press release titled "National Assembly Clarifies CITGO Petroleum Situation" dated May 5, 2023, available at https://www.asambleanacionalvenezuela.org/noticias/an-legitima-aclara-situacion-sobre-citgo-petroleum, with accompanying certified English translation.

20.     Attached as **Exhibit 14** is a true and correct copy of the article titled "Venezuela appoints new gas vice president at state company PDVSA," published by Reuters on August 2, 2018, available at https://www.reuters.com/business/energy/venezuela-appoints-new-gas-vice-president-state-company-pdvsa-2023-08-02/.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 17, 2023 in Wilmington, Delaware.

*/s/ Theodore A Kittila*
Theodore A. Kittila (DE Bar 3963)
**HALLORAN FARKAS + KITTILA LLP**
5801 Kennett Pike, Suite C/D
Wilmington, Delaware 19807

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TENARIS S.A. and TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA, <br><br> *Plaintiffs*, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br> *Defendant*. | Case No.:  _____ |

## [PROPOSED] WRIT OF ATTACHMENT *FIERI FACIAS*

TO THE U.S. MARSHALS SERVICE, YOU ARE COMMANDED:

To serve this writ of attachment *fieri facias* on **PDV Holding, Inc., c/o its Registered Agent, Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801**, to attach all shares of stock and any other assets or rights incident to that stock ownership belonging or owing to Petróleos de Venezuela, S.A. ("PDVSA"), alter ego of Defendant and judgment debtor Bolivarian Republic of Venezuela, to satisfy judgments owed to the above-named Plaintiffs and judgment creditors Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal Lda. in the amount of (1) $256,375,009.12 plus post-judgment interest at the rate provided by 28 USC § 1961 calculated from the date July 17, 2020 until the amount is paid; and (2) $280,667,040.00 plus post-judgment interest at the rate provided by 28 USC § 1961 calculated from the date August 24, 2021 until the amount is paid.

**To the defendant's garnishee who is served this paper:**

The United States District Court for the District of Delaware requires, within 20 days after service of process, that you serve upon Theodore A. Kittila, DE Bar No. 3963, Halloran Farkas & Kittila LLP, 5801 Kennett Pike, Suite C/D, Wilmington, Delaware 19801, a verified answer. The verified answer shall specify what shares of stock and other assets or rights incident to that stock ownership belonging or owing to PDVSA you currently possess. **You must serve this verified answer within 20 days after this writ is served upon you, not counting the day that you received this writ.** Your failure to respond may result in a default judgment against you in an amount equal to the value of the property subject to the attachment, or in the amount of the judgment, whichever is less, with interests and costs. As the garnishee, you are to retain the items stated by you in your answer and hold these items until another order of this Court releases you from this obligation.

The amount of the judgments remaining owed and outstanding as of August 17, 2023 is $ 538,619,886.45.

_____
Clerk of Court

Issued: _____          Per Deputy: _____

*By Attorney Theodore A. Kittila, DE Bar No. 3963, Halloran Farkas & Kittila LLP, 5801*
*Kennett Pike, Suite C/D, Wilmington, Delaware 19801, (302) 257-2025*

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TENARIS S.A. and TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA,<br><br>                    *Plaintiffs*,<br><br>          v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br>                    *Defendant*. | Case No.:  _____ |

### [PROPOSED] PRAECIPE

TO:    Clerk of Court
        United States District Court
        844 North King St.
        Wilmington, DE 19801-3570

**PLEASE ISSUE** to the U.S. Marshals Service the writ of  attachment *fieri facias* filed with this Praecipe to attach all shares of stock and any other assets or rights incident to that stock ownership belonging or owing to Judgment Debtor, the Bolivarian Republic of Venezuela, to be served upon **PDV Holding, Inc., c/o its Registered Agent, Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801**.

August 17, 2023

*Of Counsel*:

Mark W. Friedman, Esq.*
William H. Taft V, Esq.*
Sarah Lee, Esq.*
Juan Fandiño, Esq.*
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, New York, 11001
Phone:  (202) 909 0000
Email:  mwfriedman@debevoise.com
            whtaft@debevoise.com
            slee1@debevoise.com
            jfandino@debevoise.com

(*Admission *pro hac vice* pending)

**HALLORAN FARKAS + KITTILA LLP**


*/s/ Theodore A. Kittila*  _____
Theodore A. Kittila (Bar No. 3963)
5801 Kennett Pike, Suite C/D
Wilmington, Delaware 19807
Phone:  (302) 257-2025
Email:  tk@hfk.law

*Attorney for Plaintiffs*

# **EXHIBIT 3**

# Exhibit A

## Part 1 of 2



INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE (202) 458 1534 | FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

**TENARIS S.A. AND TALTA – TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**

**v.**

**BOLIVARIAN REPUBLIC OF VENEZUELA**

**(ICSID CASE NO. ARB/11/26)**

I hereby certify that the attached document is a true copy of the Arbitral Tribunal's Award rendered in English and Spanish on January 29, 2016.

Gonzalo Flores
Acting Secretary-General

Washington, D.C., January 29, 2016

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**
WASHINGTON, D.C.

In the arbitration proceedings between

**TENARIS S.A. AND**

**TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**

(Claimants)

- and -

**BOLIVARIAN REPUBLIC OF VENEZUELA**

(Respondent)

**ICSID Case No. ARB/11/26**

# AWARD

*Members of the Tribunal*

Mr. John Beechey (President)
Mr. Judd L. Kessler
Mr. Toby T. Landau QC

*Secretary of the Tribunal*

Ms. Alicia Martín Blanco

Date of dispatch to the Parties:  29 January 2016

## REPRESENTATION OF THE PARTIES

**Representing Claimants:**

Mr. Nigel Blackaby
Mr. Alex Yanos
Ms. Caroline Richard
Mr. Jeffery Commission
Ms. Natalia Zibibbo
Mr. James Freda
Mr. Ricardo Chirinos
Ms. Guadalupe Lopez
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
United States of America

and

Mr. José Humberto Frías
D'Empaire Reyna Abogados
Edificio Bancaracas, P.H.
Plaza La Castellana, 1060
Venezuela

**Representing Respondent:**

Dr. Reinaldo Enrique Muñoz Pedroza
*Viceprocurador General de la República*
Dr. Felipe Daruiz
*Coordinador Integral Legal del Despacho del Procurador*
Dra. Erika Fernández
*Coordinadora de Juicios Internacionales*
*Procuraduría General de la República Bolivariana de Venezuela*
Av. Los Ilustres , c/c calle Francisco Lazo Marti,
Urb. Santa Mónica – Caracas
Venezuela

and

Dr. Ronald E. M. Goodman
Mr. Kenneth Juan Figueroa
Mr. Alberto Wray
Ms. Janis Brennan
Mr. Diego Cadena
Ms. Alexandra Kerr Meise
Dr. Constantinos Salonidis
Ms. Oonagh Sands
Foley Hoag LLP
1717 K Street, NW
Suite 1200
Washington, DC. 20006
United States of America

# TABLE OF CONTENTS

**Frequently Used Abbreviations and Acronyms** ..................................................................................................5

**A.  INTRODUCTION** ...........................................................................................................................6
    *1.  The Parties* ...............................................................................................................................6
    *2.  Nature of the Dispute and Relevant Treaties* ...........................................................................6
    *3.  The Arbitration Agreements* .....................................................................................................8

**B.  PROCEDURAL HISTORY** ...........................................................................................................11
    *1.  Commencement of Arbitration* ................................................................................................11
    *2.  The Arbitral Tribunal* ............................................................................................................11
    *3.  The First Session* ...................................................................................................................12
    *4.  Request for Bifurcation* .........................................................................................................12
    *5.  Written Submissions* ...............................................................................................................13
    *6.  Witness Statements and Expert Reports* ..................................................................................13
    *7.  Procedural Orders* .................................................................................................................14
    *8.  First Substantive Hearing* ......................................................................................................14
    *9.  Second Substantive Hearing* ..................................................................................................15
    *10.  Post-Hearing Submissions* .....................................................................................................15

**C.  RELEVANT FACTS** .....................................................................................................................16
    *1.  The Privatisation of the Venezuelan Steel Industry* ................................................................16
    *2.  Presidential Decree No. 3895* ...............................................................................................21
    *3.  The Nationalisation of SIDOR: Presidential Decree No. 6,058* ...............................................22
    *4.  The Nationalisation of Matesi* ...............................................................................................24
    *5.  Decree No. 6,796* ..................................................................................................................26
    *6.  The Expropriation of Matesi* ..................................................................................................29
    *7.  Decree No. 8,280* ..................................................................................................................29

**D.  SUMMARY OF THE PARTIES' POSITIONS** ............................................................................31
    *1.  Claimants' Case* ....................................................................................................................31
    *2.  Venezuela's Case* ...................................................................................................................33
    **3.  Principal Treaty Provisions** ..................................................................................................35
        a.  The Luxembourg Treaty ....................................................................................................35
        b.  The Portuguese Treaty .......................................................................................................38

**E.  JURISDICTION** ...........................................................................................................................40
    *1.  The Requirement of "Siège Social" / "Sede"* ........................................................................40
        a.  Venezuela's Case ...............................................................................................................40
        b.  Claimants' Case ................................................................................................................43
        c.  Analysis.............................................................................................................................47
            1.  The Meaning of "Siège Social" and "Sede" ...............................................................47
            2.  Other BITs ..................................................................................................................58

2

|   | 3. | Relevance of Municipal Law | 60 |
|   | 4. | Article 25 of the ICSID Convention | 69 |
|   | 5. | Nature and Application of the Test | 70 |
|   | 6. | Tenaris | 70 |
|   | 7. | Talta | 77 |
|   | 8. | Conclusion | 79 |

**2.** *Notification of Claimants' Claims* ............ 80
a. Venezuela's Case ............ 80
b. Claimants' Case ............ 82
c. Analysis ............ 83

**3.** *The Talta Loan and the Talta Off-Take Agreement* ............ 85
a. Venezuela's Case ............ 85
b. Claimants' Case ............ 90
c. Relevant Principles ............ 91
d. Analysis ............ 94
e. Conclusion ............ 98

**4.** *Alleged "Contractual Claims"* ............ 99
a. Venezuela's Case ............ 99
b. Claimants' Case ............ 100
c. Analysis ............ 100

**5.** *Conclusion on Jurisdiction Objections* ............ 104

**F.** **PRE-EXPROPRIATION CLAIMS** ............ 104

**1.** *Fair and Equitable Treatment / Discrimination Claim* ............ 105
a. The Matesi Plant ............ 105
b. The Complaint ............ 106
c. Terms of the Supply Contract ............ 107
d. Undisputed Facts ............ 109
e. Impact of the Pro-Rating ............ 110
f. Operation of the *Pro Rata* Mechanism ............ 111
g. Conclusions on Supply by CVG FMO ............ 124
h. Venezuela's Responsibility ............ 125
i. Conclusion ............ 138

**2.** *Protection and Security Claim* ............ 138
a. Claimants' Case ............ 138
b. Venezuela's Case ............ 139
c. Treaty Provisions ............ 142
d. Application of the Treaty Standard ............ 143
e. Conclusion ............ 146

**G.** **NATIONALIZATION AND EXPROPRIATION OF MATESI** ............ 146

**1.** *Claimants' Case* ............ 147

**2.** *Venezuela's Case* ............ 147

**3.** *Treaty Provisions* ............ 150

**4.** *The Procedure Leading to the Nationalisation of Matesi* ............ 151

**5.** *Failure to Comply with the Treaties* ............ 155

**6.** *Conclusion* ............ 160

**H.** **QUANTUM** ............ 162

**1.** *Claimants' Case* ............ 162

|   | 2. | Respondent's Case | 164 |

2. Respondent's Case .......................................................................................................... 164

3. Treaty Provisions ........................................................................................................... 165

4. Method of Valuation ...................................................................................................... 167
    a. Discounted Cash Flow ("DCF") ........................................................................ 168
    b. The "Market Multiples" Approach .................................................................... 170
    c. The Talta and Sidor Off-Take Agreements ...................................................... 171
    d. Best Evidence of the Value of Talta's Interest in Matesi ................................ 177

5. Actualisation of the Loss ................................................................................................ 182

I.     **COSTS** .......................................................................................................................... **190**

1. Claimants' Application for Costs .................................................................................. 190

2. Venezuela's Application for Costs ................................................................................ 194

3. Venezuela's Comments on Claimants' Submission on Costs ................................... 195

4. Analysis ........................................................................................................................... 197

J.     DECISION ....................................................................................................................... 201

**ANNEX I**   **Guide to Relevant Entities** ................................................................................ **204**

_____

## Frequently Used Abbreviations and Acronyms

| | |
|---|---|
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID Rules, or Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID, or the Centre | International Centre for Settlement of Investment Disputes |
| Luxembourg Treaty | Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments, signed on 17 March 1988, and in force as of 28 April 2004 |
| Portuguese Treaty | Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments, signed on 17 June 1994, and in force as of 11 May 1995 |
| The Treaties | The Luxembourg and Portuguese Treaties |
| Request or RFA | Request for Arbitration, 24 August 2011 |
| Claimants' Memorial | Claimants' Memorial, 24 August 2012 |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial, 10 May 2013 |
| Claimants' Reply | Claimant's Reply Memorial, 27 August 2013 |
| Respondent's Rejoinder | Respondent's Rejoinder Memorial, 5 December 2013 |
| C- | Claimants' Exhibit |
| R- | Respondent's Exhibit |
| CLEX- | Claimants' Legal Authority |
| RLA- | Respondent's Legal Authority |
| Transcript | Transcript of the hearings in January/February 2014 and July 2014. |

## A.    INTRODUCTION

**1.    THE PARTIES**

1.    The Claimants in this arbitration are as follows

(a)    Tenaris S.A. ("**Tenaris**"), a company incorporated under the laws of the Grand Duchy of Luxembourg, the registered office of which is situated at:

> 29, avenue de la Porte-Neuve
> 3rd Floor
> L-1855, 2227
> Luxembourg

(b)    Talta – Trading e Marketing Sociedad Unipessoal Lda ("**Talta**"), a company incorporated under the laws of the Portuguese Republic, the registered office of which is situated at:

> Rua da Alfandega 74-76
> 2o andar, sala H
> Funchal, 9000-059
> Ilha da Madeira
> Portugal

2.    The Respondent is the Bolivarian Republic of Venezuela ("**Venezuela**").

3.    The Claimants and Respondent are hereinafter collectively referred to as the "**Parties**".

**2.    NATURE OF THE DISPUTE AND RELEVANT TREATIES**

4.    According to Claimants' Request for Arbitration, Tenaris is a global supplier of steel tubes and related services for the world's energy industry and certain other industrial applications. Talta is Venezuela's only producer of stainless steel pipes for the oil and gas industry.[1]  Talta is wholly owned by Tenaris Investments S.a.r.l, which, in turn, is 100% owned by Tenaris.

---

[1] Transcript (English) Day 1, p. 38

5.     Through Talta, Tenaris held a 50.1997% shareholding in Matesi Materiales Siderurgicos S.A. ("**Matesi**"), a company established under the laws of Venezuela. Matesi produces high quality hot briquetted iron ("**HBI**"), a component used in the production of steel. Further details of the corporate links between the Claimant entities, and their respective interests in entities which feature in this arbitration, are set out in **Section C**, and **Annex I** below.

6.     By way of broad summary, Claimants assert that their use and enjoyment of their investment has been lost as a result of the "*indirect expropriation of their investments in, and pre-nationalisation interference with, their investments in Matesi*".[2] The Claimants' complaints break down into two broad categories: (a) pre-expropriation interference with the investment, and in particular discrimination in the supply of pellets to Matesi; and (b) the subsequent assumption of full managerial and operational control of Matesi by Venezuela in breach of Venezuelan law and due process, and without the payment of compensation.

7.     It is Claimants' case that Respondent's actions constituted a breach of:

(a)     the protections available to Claimant Tenaris under the Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments (the "**Luxembourg Treaty**")[3], and in particular Articles 3 and 4 thereof;  and

(b)     the protections available to Claimant Talta under both:

i.     the Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments (the

---

[2] Claimants' Memorial, para. 2
[3] Exhibit C-1. The Luxembourg Treaty was signed on 17 March 1988 and entered into force on 28 April 2004

7

"**Portuguese Treaty**")[4], and in particular Articles 2, 3 and 4 thereof; and

ii.  the Luxembourg Treaty, by reason of Talta's status as an entity effectively controlled by Tenaris.

8.  Claimants further assert that Respondent has been on notice of the dispute since 20 August 2009, when formal notice was given pursuant to the Treaties.[5] The Claimants maintain that attempts at amicable resolution within the periods stipulated by the Treaties have failed to result in a settlement.  While it is accepted by Respondent that notice of dispute was given by Claimants on 20 August 2009, the extent to which the claims advanced in this arbitration were the subject of the notice is in issue (see **Section E** below).

**3.  THE ARBITRATION AGREEMENTS**

9.  Article 9 of the Luxembourg Treaty provides:

"1.  Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be subject to written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party or by conciliation.

2.  In the absence of an amicable settlement within six months from the date of notification, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made the choice shall be final.
To this end, each Contracting State shall give in advance its irrevocable consent for the dispute to be submitted to this arbitration.

---

[4] Exhibit C-3. The Portuguese Treaty was signed on 17 June 1994 and entered into force on 11 May 1995
[5] Exhibit C-14: letter from Claimants to The Hon. Dr Rodolfo Sanz, Minister of Basic Industries and Mining

3.    In the event of recourse to international arbitration, the dispute shall be submitted to the International Centre for the Settlement of Investment Disputes (ICSID) established by the "Convention on the Settlement of Investment Disputes between States and Nationals of Other States", opened for signature in Washington on 18 March 1965.

If it is impossible to submit the dispute to ICSID, the investor shall have the option to submit the dispute to an ad hoc tribunal constituted under the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

......

5.    The arbitral tribunal will decide on the basis of the domestic law of the Contracting Party who is party to the dispute and in whose territory the investment is located, including its rules on conflicts of laws, the provisions of this Agreement, the terms of any specific agreement existing concerning the treatment of the investment, as well as the principles of international law.

6.    The award shall be determined solely on whether the Contracting Party concerned has breached an obligation under the present Agreement, and if there has been damage to the investor, shall fix the amount of compensation, which that Contracting Party shall pay to the investor.

7.    Arbitral awards shall be final and binding on the parties to the dispute. Each Contracting Party undertakes to execute the awards in accordance with their national law."

10.   Article 8 of the Portuguese Treaty provides:

"1.    Disputes regarding the application of this Agreement that arise between one of the Contracting Parties and an investor of another Contracting Party who has made investments in the territory of the former shall, to the extent possible, be resolved by means of amicable consultations.

2.    If the dispute cannot be resolved amicably within a period of six (6) months, starting from the date when consultations are commenced, the dispute may be submitted, at the choice of the investor:

a)    to local courts of the Contracting Party in whose territory the investment was made:

9

  b) to arbitration at the International Centre for the Settlement of Investment Disputes (ICSID), established by the Washington Convention of 1965, in the event that both Contracting Parties are parties thereto, or, if it is the case, to the additional facility rules for the administration of conciliation proceedings, arbitration and fact-finding by the ICSID Secretariat. If for any reason neither ICSID nor the Additional Facility Rules are available, the arbitration shall be carried (sic) under the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL).

3. The arbitral tribunal shall decide based on provisions of this Agreement, the relevant rules and principles of international law, the law of the Contracting Party in whose territory the investment was made and any specific agreements that refer to the investment.

4. Arbitral awards shall be final and binding on the Parties to the dispute and shall be executed in accordance with the national law of the Contracting Party in whose territory the investment was made.

5. In any event, the arbitral award shall only address whether the Contracting Party concerned has breached an obligation in this Agreement, and if such a breach has caused damage to the investor, and, if that is the case, the arbitral tribunal shall determine the amount of compensation that the Contracting Party shall pay to the investor for both damages.

6. The Contracting Parties undertake to refrain from submitting, through diplomatic channels, disputes that have been submitted to judicial procedures or international arbitration until these procedures are concluded, unless one of the Contracting Parties has not complied with the judgment or award of the Arbitral Tribunal, under the terms established in the respective decision or award."

_____

## B.   PROCEDURAL HISTORY

### 1.   COMMENCEMENT OF ARBITRATION

11.   On 24 August 2011, ICSID received a request for arbitration dated 24 August 2011 from Tenaris S.A. and Talta – Trading e Marketing Sociedad Unipessoal Lda against the Bolivarian Republic of Venezuela (the "**Request**" or "**RFA**").

12.   On 30 September 2011, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.  In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an Arbitral Tribunal as soon as possible in accordance with Rule 7(d) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

### 2.   THE ARBITRAL TRIBUNAL

13.   On 13 December 2011, Claimants requested that the Tribunal be constituted pursuant to Article 37(2)(b) of the ICSID Convention. Pursuant to ICSID Arbitration Rule 3, Claimants informed the Centre that they had appointed Mr Judd L. Kessler, a national of the United States of America, as arbitrator and proposed the appointment of a President of the Tribunal.  In accordance with ICSID Arbitration Rule 3(1)(b), Respondent was invited to appoint an arbitrator and to concur with the person proposed by Claimants or to propose another person as President of the Tribunal.   On 29 November 2011, Claimants requested the appointment of the arbitrator not yet appointed and the designation of the President of the Tribunal pursuant to Article 38 of the ICSID Convention. On 18 January 2012, Respondent appointed Mr Toby T. Landau, QC, a national of the United Kingdom, as arbitrator.  By letter dated 19 April 2012, the Parties agreed to the appointment of Mr John Beechey, a national of the United Kingdom, as President of the Tribunal.

14.   On 26 April 2012, the Secretary-General, in accordance with ICSID Arbitration Rule 6(1), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to

have been constituted on that date. Ms Alicia Martin Blanco, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

**3.    THE FIRST SESSION**

15.    The Tribunal held a first session with the Parties on 27 June 2012, at which, the Parties confirmed that the Members of the Tribunal had been validly appointed. They further agreed, *inter alia*, that the applicable ICSID Arbitration Rules would be those in effect from 10 April 2006; that the procedural languages would be English and Spanish; and that the place of proceedings would be the seat of the Centre in Washington, D.C.  The agreement of the Parties was embodied in Procedural Order No. 1, dated 14 August 2012.

**4.    REQUEST FOR BIFURCATION**

16.    Following the submission of the Claimants' Memorial on the Merits on 24 August 2012 (the "**Claimants' Memorial**"), Respondent sought a bifurcation of the proceedings, and a determination by the Tribunal as a preliminary matter of Respondent's objections to jurisdiction.

17.    Pursuant to a timetable set out at paragraph 13(f) of Procedural Order No. 1, as amended by Procedural Order No. 2, dated 25 October 2012, the Parties exchanged the following submissions:

(a)    Respondent's Request for Bifurcation dated 28 September 2012;

(b)    Claimants' Response to Respondent's Request for Bifurcation, dated 19 October 2012;

(c)    Respondent's Reply on Bifurcation dated 2 November 2012;

(d)    Claimants' Rejoinder to Respondent's Request for Bifurcation dated 12 November 2012;

(e)    Respondent's Counsel's letter dated 14 November 2012;

(f)    Claimants' Counsel's letter dated 21 November 2012.

18.    By its Procedural Order No.3 dated 5 December 2012, the Tribunal denied Respondent's request for bifurcation.

**5.    WRITTEN SUBMISSIONS**

19.    Thereafter, the Parties served the following submissions:

   (a)    Respondent's Counter-Memorial on Jurisdiction and Merits, dated 10 May 2013 (the "**Respondent's Counter-Memorial**");

   (b)    Claimants' Reply Memorial, dated 27 August 2013 (the "**Claimants' Reply**");

   (c)    Respondent's Rejoinder, dated 5 December 2013 (the "**Respondent's Rejoinder**").

**6.    WITNESS STATEMENTS AND EXPERT REPORTS**

20.    Witness statements and Expert reports have been filed by the Parties as follows:

   <u>On behalf of the Claimants</u>:

   (a)    Witness statements of Marcelo Malvassora, dated 24 August 2012 and 26 August 2013;

   (b)    Witness statements of Oscar Montero, dated 24 August 2012 and 22 August 2013;

   (c)    Witness statement of Angel Mario Tamez, dated 27 August 2013;

   (d)    Expert Valuation report by Compass Lexecon LLC (Manuel A. Abdala and Pablo T. Spiller), dated 24 August 2012, and a Supplemental Report dated 27 August 2013;

   (e)    Legal Opinion by Professor Andre Pruem (Luxembourg law), dated 23 January 2014;

   (f)    Legal Opinion by Professor Dr. Dario Moura Vicente (Portuguese law), dated 23 January 2014.

   <u>On behalf of the Respondent</u>:

   (a)    Witness statement of Ramon Cadenas, dated 23 April 2013;

13

(b)    Witness statement of Rawan Sabbagh, dated 2 May 2013;[6]

(c)    Witness statement of Marbeni Milagros Seijas Marcano, dated 4 May 2013;

(d)    Witness statement of Felix Luis Moya Bello, dated 22 November 2013;

(e)    Witness statement of Marilyn V. Bello Rodriguez, dated 3 December 2013;

(g)    Expert Valuation Report of Timothy H Hart, dated 8 May 2013; and a Supplemental Report, dated 3 December 2013;

(h)    Expert Technical Report of Dr Joseph J. Poveromo, dated 8 May 2013, and a Second Expert Technical Report, dated 3 December 2013;

(i)    Legal Opinion of Dr Henrique Iribarren Monteverde (Venezuelan Law), dated 25 March 2013;

(j)    Legal Opinion of Professors Pedro Maia and Tiago Duarte (Portuguese law), dated 28 November 2013;[7]

(k)    Legal Opinion of Professor Alain Steichen (Luxembourg law), dated 29 November 2013.

## 7.    PROCEDURAL ORDERS

21.    The Tribunal issued the following additional Procedural Orders:

(a)    Procedural Order No. 4, dated 17 April 2013;

(b)    Procedural Order No. 5, dated 9 January 2014;

(c)    Procedural Order No. 6, dated 22 January 2014;

(d)    Procedural Order No. 7, dated 30 January 2014.

## 8.    FIRST SUBSTANTIVE HEARING

22.    A Hearing was held at the premises of ICSID in Washington DC over six working days between Friday 31 January 2014 and Friday 7 February 2014.

---

[6] Mr Sabbagh's witness statement was subsequently withdrawn in circumstances described in correspondence dated 22 August 2013 and reflected in the Tribunal's Procedural Order of 16 September 2013.

[7] By its Procedural Order No. 5, the Tribunal admitted into the record the expert opinions of Professors Maia and Duarte and Professor Steichen and it further admitted into the record the witness statement of Ms Marilyn V. Bello Rodriguez, all of which had been the subject of objections raised by Claimants.

23. In the course of the Hearing, the Tribunal heard opening statements from the Parties, and testimony from the following witnesses and experts:

On behalf of the Claimants:
   Mr Oscar Montero (Day 2)
   Mr Angel Mario Tamez (Day 2)
   Mr Marcelo Malvassora (Days 2 & 3)
   Dr Manuel A. Abdala and Professor Pablo T. Spiller (Days 5 & 6)

On behalf of the Respondent:
   Mr Ramon Cadenas (Day 3)
   Ms Marilyn del Valle Bello Rodriguez (Day 3)
   Ms Marbeni Milagros Seijas Marcano (Day 3)
   Mr Felix Moya (Day 4)
   Professor Iribarren Monteverde (Days 4 & 5)
   Mr Joseph J. Poveromo (Day 5)
   Mr Timothy Hart (Day 6)

24. By agreement of the Parties, the factual record of the proceedings was closed on 5 February 2014, save for liberty to make a reasoned application to admit new factual material.[8]

## 9.   SECOND SUBSTANTIVE HEARING

25. Thereafter, a further hearing was held in London on 9 and 10 July 2014 to hear evidence from the Parties' respective experts on Portuguese and Luxembourg law.

## 10.   POST-HEARING SUBMISSIONS

26. The Parties filed Post-Hearing Briefs on 8 August 2014 and Costs Submissions on 28 November 2014.

---

[8] Transcript (English), Day 4, pp. 1080-1081.

27.     With leave of the Tribunal, Venezuela filed Comments on Claimants' Costs
        Submissions on 12 December 2014.

28.     The proceeding was closed on 21 December 2015.

                        _____

## C.     RELEVANT FACTS

29.     The Tribunal sets out below the basic facts that have led to this dispute.

30.     Further issues of fact are elaborated in the course of the analysis of jurisdiction
        in **Section E.** below, and the analysis of the substantive claims in **Section F.**
        below.

31.     Unless otherwise indicated, all statements of fact in each of these sections
        reflect the Tribunal's findings.

32.     Given the number of entities referred to in the course of this narrative, and for
        ease of reference, a list of "Relevant Entities" with brief descriptions is included
        at **Annex I** to this Award.

### 1.     THE PRIVATISATION OF THE VENEZUELAN STEEL INDUSTRY

33.     Between 1974 and 1993, the Venezuelan steel industry was primarily state
        owned. It was managed by CVG, a wholly state-owned entity, and its
        subsidiaries.[9] CVG is a dependency of the MIBAM, which, since 2011, has
        been known as the Ministry of Industry. One of CVG's subsidiaries was CVG
        Sidor, incorporated in 1964 by CVG and another state entity, CVG
        Electrificación del Caroni C.A., for the purpose of developing the Venezuelan
        iron and steel industry.

_____

[9] Request, para.11

16

34.   On 10 March 1992, the Venezuelan Congress enacted the Privatisation Law.[10]

35.   On 7 December 1994, by Decree No. 448, the Government of Venezuela provided for the *"initiation of the process for the privatisation of ... Companies held by [CVG]"*, including CVG Sidor.[11]

36.   In March 1995, the Venezuelan State entity, Fondo de Inversiones de Venezuela, was charged with the task of privatising companies in the iron and steel sector, including CVG Sidor.

37.   In November 1997, the Venezuelan Congress approved the execution of the sale and purchase agreement for the shares of CVG Sidor to Consorcio Siderurgica Amazonia Ltd., which, in turn, became a subsidiary of Ternium S.A., an affiliate of Tenaris. The privatised company was named Siderurgica del Orinoco C.A. ("**SIDOR**"). SIDOR became one of the largest integrated steel producers in Latin America (and the largest in the Andean region) as well as the continent's main finished steel exporter, with an increasing need for basic inputs such as hot briquetted iron ("**HBI**").[12]

38.   In the early 2000s, Tenaris, which was already a significant investor in the privatised Venezuelan steel industry, held a controlling stake in Venezuela's sole producer of seamless pipes, TAVSA. It also had a minority shareholding in the HBI producer, Comsigua.[13] It was looking for extra sources of HBI. In 2003, the South Korean concern, POSCO, decided to sell its HBI producing assets in Venezuela, which included a decommissioned HBI plant within two kilometres of SIDOR's plant and within 20 kilometres of the port of Palua.  At that time, SIDOR was also looking for additional HBI in order to be able to produce at full capacity.

---

[10] Exhibit C-18
[11] Exhibit C-19
[12] In the steel-making process, lump ore and iron pellets are first transformed into direct reduced iron ("**DRI**"), which is then mechanically compressed into brick-shapes known as hot briquetted iron or HBI.
[13] Claimants' Memorial, para. 25

17

39.     Built in the 1990s at a cost of over $370 million[14], PosVen was held out as the newest and most modern HBI plant in the world, and the plant with the third highest production capacity (1.5 million tons of HBI per year) world-wide.[15] It had been decommissioned in late 2001 following operational difficulties and a downturn in the steel market.

40.     Also among the assets was PosVen's 29% shareholding in COPAL, the operator of the Port of Palua, through which HBI products, including those made by PosVen (and, in due course, by Matesi), were shipped and of the capacity of which, PosVen had an entitlement to use approximately one third.

41.     In March 2004, SIDOR and Tenaris Global Services (B.V.I.) Limited ("**Tenaris Global**"), a wholly owned subsidiary of Tenaris, bid successfully for the assets of PosVen.[16]

42.     In April 2004, Tenaris Global and SIDOR incorporated a company in Venezuela, which was called Materiales Siderurgicos Masisa S.A. ("**Masisa**") and through which they would acquire the PosVen assets. Tenaris Global's 55% shareholding in Masisa was transferred to Talta, which already held the remaining 45% of the shares.[17] In August 2004, Masisa's name was changed to Matesi.[18] Talta continued to hold 50.2% of the shares and SIDOR acquired 49.8%.[19] Hereafter Masisa/Matesi is referred to as "**Matesi**".

43.     On 27 April 2004, an Asset and Sale Purchase Agreement was concluded between PosVen as Seller, Matesi as Purchaser, Tenaris Global Services S.A. (a company incorporated in Uruguay) and SIDOR, pursuant to the terms of which, the PosVen assets would be transferred to Matesi for US$120 million.[20]

---

[14] Exhibit C-68, p. 2
[15] Exhibit C-68, p. 5
[16] See Montero, para. 25
[17] Exhibit C-21, Articles of Incorporation of Matesi
[18] Exhibit C-22
[19] Exhibit C-13
[20] Exhibit C-23

44.     Among a number of conditions precedent to closing was a requirement that Matesi enter into contracts for the supply of raw materials crucial to the production of HBI with a number of state-owned entities on terms no less favourable than those enjoyed by PosVen. Among them was a long-term iron ore contract with a subsidiary of CVG, CVG Ferrominera del Orinoco, C.A. ("**CVG FMO**"), the monopoly supplier of iron ore. Matesi duly entered into a long-term (13 year) contract with CVG FMO for the supply of iron mineral and pellets on 17 June 2004.[21]

45.     On 8 July 2004, Matesi and PosVen executed a Sale and Purchase Agreement.[22] On the same day, SIDOR and Talta entered into an Investment Agreement. Pursuant to the terms of that agreement, SIDOR and Talta each confirmed that they would purchase the assets of PosVen, including its HBI plant, through Matesi. SIDOR and Talta also confirmed, first, the amount that each would invest in Matesi in order to permit it to commence operations and, second, that they would enter into Off-Take agreements under the terms of which, they would acquire Matesi's HBI.[23]

46.     The asset purchase and start-up costs of Matesi were financed in part by loans from Talta and SIDOR, including a loan for some US$60 million from Talta, which was the subject of a Loan Agreement between Matesi and Talta concluded that same day (the "**Talta Loan**").[24]

47.     On 9 July 2004, the Talta Off-Take Agreement was signed. Pursuant to its terms, Matesi undertook to sell 50.2% of its total output to Talta and Talta was obliged to purchase at least 30.12% of Matesi's production. In the case of the Off-Take agreement into which Matesi entered with SIDOR, Matesi was

---

[21] Exhibit C-25
[22] Exhibit C-24
[23] Exhibit C-73
[24] Exhibit C-74. The SIDOR Loan and Off-Take Agreements were entered into on or about the same day. Part of the Talta Loan was capitalised in 2004. The balance was reduced to some US$48 million (See Exhibits C-79 and C-67 at p. 6) The amount of the Loan now claimed to be outstanding is US$27.1 million

obliged to sell 49.8% of its total output to SIDOR and SIDOR was obliged to purchase at least 29.88% of Matesi's production.[25]

48. On 21 July 2004, Matesi entered into a 15-year gas supply contract with PDVSA Gas, S.A.[26] Pursuant to an assignment, it had already entered into an existing 20-year agreement with EDELCA for the supply of electricity on 8 July 2004.[27]

49. Matesi took possession of the HBI plant in August 2004. The plant was the subject of an initial US$7 million upgrade and refurbishment programme in order to render it operational, after having been 'mothballed' for three years. The upgrade included the acquisition and installation of a new transformer and the modification of the plant's cooling conveyor. Production at the Matesi HBI plant recommenced on 17 October 2004.[28]

50. In September 2004, Venezuela implemented Disposition No. 58 of 2 September 2004.[29] Pursuant to the terms of the Disposition, the approval of the Comisión de Administración de Divisas ("**CADIVI**") was required before foreign currency could be applied to the repayment of a foreign loan. CADIVI's own approval was conditional upon receipt of a certificate from the Ministry of Planning that the loan in question constituted a "*productive financing*" falling within the economic and social policies of Venezuela. In the event, although Matesi requested such certificate, none was ever forthcoming. Claimants contend that in the absence of the Ministry's certificate, CADIVI would not register Matesi's debt to Talta with the result that Matesi could not effect repayment.[30]

---

[25] Exhibits C-26 and C-27
[26] Exhibit C-77
[27] Exhibit C-72
[28] It is asserted by Claimants that by February 2005, Matesi was producing at some 80% of production capacity; that it was running at some 75% of capacity on average between February and April 2005; that in the first full year of production, it produced approx. 1 million tons of HBI; and that it was expected to increase production over time, contingent on receiving sufficient iron pellets and lump ore from CVG FMO pursuant to the Supply Contact. (See Claimants' Memorial, paras. 51-53).
[29] Exhibit C-80
[30] Claimants' Memorial, paras. 62 and 63

## 2.    PRESIDENTIAL DECREE NO. 3895

51.   Presidential Decree No. 3895 of 12 September 2005 required the renegotiation of: "*Agreements to Ensure the Supply of Raw Materials and Inputs*" intended to "*guarantee the supply of raw materials and semi-finished products produced by basic industries*"[31] One such agreement was Matesi's Supply Contract with CVG FMO.

52.   SIDOR was required to renegotiate its contract within a week or face nationalisation.[32] The amendment to Matesi's own Supply Contract included a 50% increase in the price of iron ore.

53.   In October 2005, MIBAM, CVG FMO and others concluded an Agreement to Ensure the Supply of Raw Materials and Semi-Finished Products for the Iron and Steel Sector.[33] For its part, CVG FMO "*guarantee[d] the supply of iron mineral to producers of semi-elaborated products*". Pursuant to Clause 7 of the Agreement, existing supply contracts were to be renegotiated within two months in conformity with the Agreement. Companies in the iron and steel sector, which did not agree to the renegotiated terms faced the threat of expropriation.[34]

54.   Matesi entered into a Declaration of Adherence dated 6 December 2005.[35]   Its own renegotiated supply contract with CVG FMO was concluded on 18 January 2006.[36] CVG FMO maintained that a price increase was necessary to: "*suspend the unfairness and inequality that [CVG FMO had] sustained following the increase in international prices of iron and steel*."[37] The effect of the renegotiation was that CVG FMO undertook to supply Matesi with the volume and quality of products that it required for a period of 12 years, subject to an increase of some 50% in the prices to be paid by Matesi. The renegotiated

---

[31] Exhibit C-28
[32] Claimants' opening presentation, Slide 24
[33] Exhibit C-29
[34] Exhibit C-32 and see also President Chavez's statement that SIDOR would be nationalised, if it did not adhere to the terms of the Steel Supply Agreement (Exhibit C-86).
[35] Exhibit C-30
[36] Exhibit C-31
[37] Exhibit C-24

contract also permitted CVG FMO to sell its own products to state ("Social Production") companies at lower prices than it offered to Matesi.

### 3. THE NATIONALISATION OF SIDOR: PRESIDENTIAL DECREE NO. 6,058

55. On 10 April 2008, pursuant to powers conferred on the President of Venezuela by the third Enabling Act approved by the National Assembly on 31 July 2007,[38] President Chavez announced that SIDOR was to be nationalised to: "*recuperate our steel industry in order to put it at the service of the development of our country.*"  By its Declaration of 10 April 2008, the National Assembly lent its support.[39] It did so in terms critical of international companies, including Ternium, a sister company of Claimants (which held a controlling stake in SIDOR), maintaining that it was necessary to:

> "defend the sovereignty of our basic industries against the attacks of transnational companies to take over our natural resources and to promote the recuperation of our strategic resources as a secure source of raw material for our national industries."[40]

56. A Presidential Decree, No. 6,058, implementing the decision was issued on 30 April 2008 (the "**Nationalisation Decree**").[41] The Decree, which had the "*Rank, Value and Force of Organic Law*", recorded that:

> "Article 1. For reasons of national convenience and in light of its relation with activities that are strategic for the development of the Nation, the industry of the transformation of the iron ore in the Guayana region is hereby reserved for the State, being this region a zone in which the largest portion of the iron reserves are concentrated, whose extraction has been reserved for the State since 1975.
>
> Article 2. The transformation of the commercial company SIDOR C.A., its subsidiary and affiliated companies, into State corporations in accordance with the provisions of Article 100 of the Organic Law on Public Administration, with a State shareholding of not less than 60% of its capital stock, is hereby ordered."

---

[38] Respondent's Counter-Memorial, para. 345
[39] Exhibit C-35
[40] Exhibit C-35
[41] Exhibit C-36

57. Pursuant to Article 5 of the Nationalisation Decree, Transition Commissions were to be established within seven days for each company subject to the Decree to ensure their transfer to state-controlled corporations by 30 June 2008. Private sector company shareholders, which were shareholders in the companies affected by the Decree, were required to: "*cooperate to achieve an orderly and safe operational transition*". The shareholders of SIDOR, its subsidiaries and affiliates (including Matesi in which SIDOR had a 49% shareholding) were afforded 60 days within which to agree terms and conditions upon "*their possible shareholding participation*" in those companies, which were to become state corporations with a State shareholding of not less than 60% (Article 6). The amount of compensation was to be fixed by a Technical Commission, composed of representatives of the State and of the shareholders, likewise within 60 days (Article 7). In fact, the Transition Commission of Matesi set up pursuant to the Nationalisation Decree was not established until 25 May 2009. (See paragraph 63 below).

58. Article 8 of the Nationalisation Decree provided that if no agreement for the transformation of the entity into a State-owned company had been reached within 60 days, then the State:

> "through [MIBAM] or any of its operationally decentralized entities, shall assume the exclusive control and operation of the same, for purposes of preserving the continuity of the activities carried out by the companies to which Article 2 refers."

59. Article 8 further provided that to the extent no such agreement had been reached:

> "the National Executive Branch shall decree the expropriation of the aforementioned shares in compliance with the provisions of the Law on Expropriation for Public and Social Utility. In no case shall lost profits or indirect damages be taken into account for the calculation of compensation or fair value for the aforementioned assets."

60. A Technical Commission for SIDOR was set up in May 2008. A Transition Commission (of which the Minister of MIBAM, Mr Sanz, was a member) was

established pursuant to Presidential Decree No. 6,066 dated 13 May 2008. [42] By July 2008, SIDOR was under state control. [43] Negotiations concerning the compensation terms for the nationalisation of SIDOR broke down in August 2008. President Chavez was reported as saying that:

> "Techint has been arrogant, so I say, we have to take all the companies that Techint has here and that Techint leave the country."[44]

61.     Meantime, since November 2007, Matesi had been in negotiation with its union (SINTRAMATS) about the terms of a new collective bargaining agreement. Matesi entered into a collective bargaining agreement on 22 August 2008.[45] Claimants maintain that Matesi accepted terms demanded by Venezuela under threat of nationalisation.

62.     That same month, Matesi received, for the first time, an official request from MIBAM to produce detailed figures for the previous ten years of production, together with national and international sales figures.[46]

### 4.     THE NATIONALISATION OF MATESI

63.     On 21 May 2009, in the course of a speech delivered nationwide on TV and radio, President Chavez announced his intention to nationalise Matesi and other HBI producers in Venezuela:

> "the [HBI] sector, nationalise it. There is nothing to be discussed. The company Matesi shall be nationalised."[47]

64.     Formal confirmation of the nationalisation of Matesi, and of the transfer of its shares to the Venezuelan government pursuant to the Nationalisation Decree of 2008, was set out in a letter from MIBAM Minister Sanz, dated 25 May 2009.[48] The Minister confirmed his (unilateral) appointment of a Transition

---

[42] Exhibit C-37
[43] Exhibit C-122
[44] Exhibit C-128
[45] Exhibit C-126
[46] Exhibit C-124
[47] Exhibits C-38 and C-143
[48] Exhibit C-39

Commission established pursuant to the Nationalisation Decree, whose task was to:

> "[direct, execute and successfully carry] out the entire transition process that will conclude with the transfer of [Matesi's] **shareholding** to the Venezuelan State."   (Emphasis added).

65.   One of the members of the Transition Committee appointed by the State was Mr Daniel Rodriguez, the leader of SINTRAMATS, Matesi's labour union (see also paragraphs 75-77, 82, 245, 433, 435, 448 and 473 below).  The representatives of Matesi were required to:

> "provide all the information relating to [Matesi's] operations, as well as its economic, administrative, productive, financial and labor situation with the aim to fully carry out the granted allocation within a peremptory time."

66.   By letter dated 29 May 2009, Claimants noted the decisions to nationalise Matesi and to designate a Transition Commission, pursuant to the Nationalisation Decree. Article 7 of that Decree required the Commission to establish the compensation to be paid to Matesi's shareholders within 60 days. Reserving their rights pursuant to Venezuelan and international law, Claimants nominated their representatives to the Technical Commission to be set up pursuant to Article 7 of Decree No. 6,058 and to be charged with the task of fixing the compensation to be paid for the taking of Matesi. However, no government representatives were ever nominated and no Technical Commission was ever constituted.[49]

67.   In the meantime, by letter to COPAL dated 28 May 2009, CVG FMO announced the transfer of the operations and administration of the Port of Palua to the State, also pursuant to the announcement of President Chavez made on 21 May 2009.[50]

---

[49] Transcript (English), Day 1, p.72
[50] Exhibit C-40

**5.     DECREE NO. 6,796**

68.     In the event, that process (namely, the nationalisation of the shares in Matesi pursuant to the April 2008 Nationalisation Decree) was not followed. Instead, by Presidential Decree No. 6,796, enacted on 14 July 2009, an order was made, in reliance upon Article 1 of the Nationalisation Decree (which reserved the iron ore transformation industry in the Guayana Region for the State), for the:

> "… acquisition of the **assets** of … [VENPRECAR, COMSIGUA Matesi and TAVSA], their subsidiaries and affiliates … with the aim of transforming [them] into State corporations in accordance with the provisions of Article 102 of the Decree with Rank, Value and Force of Organic Law on Public Administration …."[51]      (Emphasis added)

69.     The Decree, which has the "*Rank, Status and Force of Law in those matters that are Delegated in the Council of Ministers*", also established separate Transition and Technical Commissions dedicated to Matesi, albeit that a Transition Commission, but not a Technical Commission, had already been constituted pursuant to the Nationalisation Decree.

70.     Article 3 of Decree 6,796 contemplated that, once constituted, the Transition Commission would become part of Matesi's current Board of Directors:

> "immediately assuming operational control in order to guarantee the transfer and continuity of the activities [it carries] out. The private sector companies that are shareholders of [Matesi] shall cooperate to achieve an orderly and secure operational transition."

71.     Article 4 of the Decree provided:

> "A Technical Commission, composed of representatives of the State and of the private sector involved shall be established for purposes of agreeing upon the fair value to be paid, which commission shall function for a period of sixty (60) calendar days that may be extended, by mutual agreement, for sixty (60) additional consecutive days."

72.     Article 5 of the Decree provided:

---

[51] Exhibit C-42

26

"Upon the expiration of the period established in [Article 4] without an agreement for the transformation into a State company being reached, the Bolivarian Republic of Venezuela, through the agency of the Ministries or any of their operationally decentralized entities, indicated in Article 2 of this Decree, shall assume exclusive control and operation thereof in order to ensure the continuity of the activities carried out by the companies referenced in Article 1".

73. Further, the Decree provided that:

"Should no agreement be reached in the negotiation of the **assets**, the National Executive shall decree the expropriation thereof in compliance with the provisions of the Law on Expropriation Due to public or Social Utility. The Technical Commission can not in any way take into account lost profits nor indirect damages when calculating indemnification or in the valuation of the aforementioned assets."   (Emphasis added)

74. Thus, while the Transition Commission was to become part of Matesi's existing Board of Directors in order immediately to assume operational control and to guarantee the transfer and continuity of the company's activities, the Technical Commission was tasked with agreeing the compensation to be paid within 60 days, subject to any mutually agreed extension of a further 60 days. Absent such agreement, the state would assume control over Matesi.

75. On 16 July 2009, the Transition Commission, headed by Mr Rodriguez and established pursuant to the Nationalisation Decree, rather than any Commission yet to be appointed pursuant to Decree No. 6,796, began to make a series of new appointments including that of a Maintenance Manager and an Industrial Plant Manager. It "*dismissed, violently expelled and replaced Matesi's management*".[52]

---

[52] Request, para. 49 and see Exhibits C-43 and C-44

27

76.   Matesi subsequently gave notice to the President of the Transition Commission that it was no longer responsible for the plant, because Mr Rodriguez had seized complete control on behalf of the Transition Commission on 22 July 2009.[53]

77.   Notification of the establishment of a Transition Commission, pursuant to Decree No. 6,796 was issued to Matesi by Vice-Minister Hernandez of MIBAM on 23 July 2009. Matesi was informed that the Transition Commission, which was identical in its membership to the Transition Commission set up pursuant to the Nationalisation Decree, had joined the Management Board of Matesi with effect from 15 July 2009.[54] On 28 July 2009, the Transition Commission notified Matesi of the appointment of a new Production Manager and a new Maintenance Manager.[55] However, no Technical Commission pursuant to Decree 6,796 was ever constituted to determine compensation.

78.   On 12 August 2009, Matesi wrote formally to the Minister, MIBAM, to inform him that it had sustained losses in excess of US$600 million.[56]

79.   The formal transfer of the plant to the government of Venezuela took place on 17 August 2009, evidenced by the signing of Extrajudicial Inspection Minutes by an official of the Court of the Municipality of Caroni.[57] On the face of the Minutes, the government recorded that in compliance with Decree No.6,796, the Transition Commission appointed by the President was:

> "assuming operational control only and exclusively **over the assets and other goods** owned by Matesi in order to repair and put into operation the briquette production plant and this declaration does not imply an acceptance by the Commission or the Republic of [Matesi's] shares, bank accounts, commercial or financial debts, labor liabilities, contractual or other obligations … environmental or tax contingencies as well as any other obligations [of Matesi]."      (Emphasis added)

---

[53] Exhibit C-44
[54] Exhibit C-45
[55] Exhibit C-46
[56] Exhibit C-33
[57] Exhibit C-47

80. The government further:

> "recorded that [Venezuela], through the Transition Commission (representative of the Bolivarian Republic of Venezuela), does not assume the administration of [Matesi], in order to comply with [Decree No. 6,796], **it only and exclusively receives the assets of the aforementioned company**, given that its control and operation belong to its shareholders under the Commercial Code and therefore [Matesi] is responsible for its administration and control."    (Emphasis added)

81. For its part, Matesi protested that:

> "[it] did not participate in and does not ratify the report presented by [Vice-Minister Hernandez for MIBAM]."

82. Mr Rodriguez was subsequently appointed General Manager of Matesi. Although the company is now referred to as "Briqueteras de Venezuela" or "**BriqVen**", there has been no formal change of name, nor has a state corporation in that name been constituted to hold Matesi's assets.

## 6.    THE EXPROPRIATION OF MATESI

83. On 15 May 2010, President Chavez announced that Matesi was to be expropriated, because it had not proved possible to reach an agreement with Matesi's shareholders.[58]

84. The formal expropriation order was made pursuant to the Law for Expropriation in the Public or Social Interest of May 2002.[59]

## 7.    DECREE NO. 8,280

85. On 7 October 2010, the Venezuelan National Assembly declared that the assets of Matesi were of "*social purpose and public interest*".[60]  That declaration was followed on 14 June 2011 by Decree No. 8,280.

---

[58] Exhibit C-52: "We have been unable to achieve an amicable agreement with [Matesi's] owners. Therefore, we will expropriate Matesi. We cannot continue to play cat and mouse. I expect the Decree to expropriate and take control of Matesi."
[59] Exhibit C-53
[60] Exhibit C-54

86. Pursuant to the terms of the Decree, an order was made for the "*forced acquisition*" of: "*all of the movable and immovable **assets** and improvements presumptively owned or in possession of Matesi*" which were required: "*for the execution of the "BRIQUETERA DE VENEZUELA C.A." ["BriqVen"] project.*" (Emphasis added).

87. The expropriated assets, which were the subject of, and which were listed specifically in, the Decree, comprised itemised land and buildings of Matesi, together with:

> "structures, equipment (plant, vehicles, tools, miscellaneous equipment computers and software), inventory (consumables, spare parts, raw materials) belonging to [Matesi] and that are needed for [the BriqVen project] as well as the investment securities that [Matesi] possesses from [COPAL]".

88. These were to:

> "pass free of encumbrances or limitations to become property of [Venezuela] in accordance with the provisions of article 11 of the Law on Expropriation Due to Public or Social Utility." [61]

89. Specifically, Article 8 of the Decree required the Attorney-General to proceed to implement the expropriation and to transfer the assets.

90. On 14 July 2011, the Attorney-General announced by way of a press notice that he was establishing a Valuation Commission to determine the compensation to be paid for the expropriation of the Matesi assets pursuant to Decree No. 8,280. [62] The Attorney-General invited Matesi's owners to nominate their representative to the Commission within 30 days, failing which the judicial expropriation of Matesi's assets would be undertaken pursuant to the Expropriation Law. In the event that did not happen, and the steps provided for in Decree 8,280 and the Expropriation Law were not completed.

---

[61] Exhibit C-55
[62] Exhibits C-57 and C-58

91.     Following the State's takeover of Matesi, operations continue under the name of Briquetera de Venezuela ("**BriqVen**"). But title to Matesi's assets and shares has never been transferred to the State, and BriqVen has never been registered as a company.

### D.     SUMMARY OF THE PARTIES' POSITIONS

92.     The Tribunal has had the benefit of extensive and detailed written memorials and submissions; a full evidential record; and extensive oral submissions. It has carefully considered every argument raised, and all materials and evidence adduced, by all Parties. The Tribunal has chosen, however, not to set out a lengthy recitation of each side's case in this Award, but instead simply to outline the broad positions of the Parties in this **Section D**, and then to summarise some of the more significant points made, in the course of its analysis of jurisdiction (**Section E**), the substantive claims (**Sections F** and **G**) and quantum (**Section H**).

93.     In so far as any argument or evidence has not been specifically identified or recorded in the body of this Award, this does not mean that it has not been taken into full consideration.

### 1.     CLAIMANTS' CASE

94.     *Jurisdiction:*     It is Claimants' position that they have fulfilled all criteria to establish jurisdiction in this case. They have a legal dispute with Venezuela within the meaning of Article 25(1) of the ICSID Convention; the dispute arises directly out of an investment within the definitions of the Luxembourg and the Portuguese Treaties; Claimants satisfy the relevant nationality criteria; and the Parties have consented to arbitrate their disputes.

95.     *Substantive Claims:*     Claimants maintain that they, as investors, and their qualifying investments in Venezuela, are protected by the terms of the Luxembourg and Portuguese Treaties, and that by virtue of its conduct, Venezuela is in breach of its obligations thereunder.

96. In particular, it is the Claimants' case that Venezuela has breached:

    (a) **Articles 3** and **4** of the Luxembourg Treaty.

    (b) **Articles 2**, **3**, and **4** of the Portuguese Treaty.

97. In terms of remedies, Claimants seek:

    (a) Declarations by the Tribunal with respect to Venezuela's alleged breaches; and

    (b) Damages from Venezuela in the principal sum of US$299.3 million, as at the Valuation Date of 30 April 2008, "*or such other sum as the Tribunal determines will ensure full reparation*".

98. Claimants' principal damages claim of US$299.3 million comprises three elements:

    (a) US$235.9 million in compensation for the taking of Claimants' 50.2% equity stake in Matesi based on a Discounted Cash Flow valuation;

    (b) US$27.1 million in compensation for the taking of Talta's loan to Matesi; and

    (c) US$36.3 million in compensation for losses suffered by Matesi by reason of the alleged discriminatory supply of iron pellets by CVG FMO.

99. Claimants further seek pre-award interest on the sum of US$299.3 million in the amount of US$489.8 million from the Valuation Date to 31 December 2011 at a rate of 17.12% (being the WACC of Talta), and at a rate of 16.27% from 1 January 2012 to 31 July 2014 (being the adjusted WACC of Talta following changes to corporate income tax applicable to Talta in Madeira, Portugal), and thereafter until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation.

100. An additional claim is made for post-Award interest to be paid by Venezuela on both of the claimed sums of principal and interest at a rate of 16.27%, compounded annually, until such time as payment has been made in full or at such other rate and compounding period as the Tribunal determines will ensure full reparation.

101. Claimants seek further Declarations from the Tribunal to the effect that the awards of damages and interest are made net of applicable Venezuelan taxes and that Venezuela may not deduct taxes in respect of the payment of any such awards, together with an Order that Venezuela indemnify Claimants in respect of any double taxation liability that would arise in Luxembourg, Portugal or elsewhere that would not have arisen but for Venezuela's adverse measures.

102. Finally, Claimants seek such other relief as the Tribunal considers appropriate and an Order that Venezuela pay all of the costs and expenses of the arbitration, including Claimants' legal and expert fees, the fees and expenses of the Tribunal and ICSID's other costs.[63]

## 2.    VENEZUELA'S CASE

103. *Jurisdiction:*    Venezuela objects to the jurisdiction of the Tribunal to entertain the Claimants' claims. It maintains that:

(a)    Claimants have failed to establish that they have standing as investors for the purposes of the Luxembourg and/or Portuguese Treaties, in that they have failed to establish that they meet the requirement of "*siège social*" and "*sede*";

(b)    by their 20 August 2009 Notice of Dispute and accompanying memorandum, Claimants failed to give any, or any sufficient, notice of:

---

[63] Claimants also looked to Venezuela to pay for the fees and expenses of any experts appointed by the Tribunal, but no such expert has been appointed.

      i.    their Protection and Security Claims under the Luxembourg and Portuguese Treaties;

      ii.    their Fair and Equitable Treatment / Discrimination Claims under the Luxembourg and Portuguese Treaties;

    (c)   even if Claimants had standing and proper notice had been given, the Tribunal lacks jurisdiction under the Luxembourg and Portuguese Treaties to entertain the Claims concerning the Supply Contract, the Off-Take Agreements and the Talta Loan, because Claimants have failed to prove that they qualified as investments for the purposes of the Luxembourg and Portuguese Treaties; and

    (d)   the Tribunal lacks jurisdiction to entertain claims concerning pre-expropriation damages based upon any alleged breach of the CVG FMO Supply Contract.

104. A further jurisdictional objection was raised by Venezuela in its letter to the Tribunal of 28 September 2012, to the effect that Claimants should not be permitted to proceed jointly in this arbitration. The objection was formally withdrawn in the course of Respondent's Opening submissions at the hearing.[64]

105. *Substantive Claims:*   Without prejudice to its jurisdictional objections, Venezuela denies any breach on its part of the Fair and Equitable Treatment / Discrimination provisions of the Luxembourg and Portuguese Treaties, asserting that the acts of CVG FMO cannot be attributed to Venezuela; that CVG FMO did not, in any event, discriminate against Matesi in the distribution of pellets pursuant to the Supply Contract, whether by favouring other HBI producers or otherwise; and that Claimants have failed to meet the high threshold for establishing a breach of the international minimum standard of treatment.

106. Venezuela likewise denies any failure on its part to accord protection and security under the Luxembourg and Portuguese Treaties. It points, first, to what

---

[64] Transcript (English), Day 1, pp. 211-212

it contends was a failure by Claimants to satisfy the high burden of establishing that Venezuela had colluded or conspired with SINTRAMATS to seize or harm the Matesi plant and, second, to the interventions of the State Judiciary, which carried out two Judicial Inspections and granted Matesi a Protection Order and to that of the National Guard to protect the Plant.

107. Venezuela further maintains that the expropriation of Matesi was carried out in the exercise of its sovereign authority; that it complied with the requirements of international law; and that it did not violate Treaty requirements in respect of the payment of compensation.

108. So far as the damages claimed in respect of Matesi are concerned, Venezuela contends that Claimants have failed to establish any such entitlement: the basis of the claim is flawed and the valuation defective and inflated - as is the claim for interest. Nor is there any basis for the claimed tax indemnity.

109. In sum, Venezuela contends that the Tribunal has no jurisdiction over Claimants' claims, but to the extent that it determines that it does have jurisdiction, all of the claims should be rejected in their entirety.

110. Venezuela seeks compensation for all expenses and costs associated with its defence of the claims.

### 3. PRINCIPAL TREATY PROVISIONS

111. For convenience, the Tribunal sets out below the principal provisions of each treaty that are relied upon by the Parties:[65]

#### a. The Luxembourg Treaty[66]

"*Article 1: Definitions*

---

[65] The Tribunal has taken the English language text comprising part of RLA-113 (the Luxembourg Treaty) and RLA-114 (the Portuguese Treaty), both of which were used by both Parties for the purposes of the examination of the Legal Experts.
[66] RLA-113

1. The term "investors" means:

…..

(b) "Companies", that is to say, any legal person constituted in accordance with the laws of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg, and having its 'siège social' in the territory of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg respectively, as well as any legal person effectively controlled by an investor covered by paragraphs 1, (a) or (b);

that has made an investment in the territory of the other Contracting Party.

2. The term "investments" shall mean any kind of asset, or any direct or indirect contribution in cash, in kind or in services, invested or reinvested by an investor of one Contracting Party in the territory of the other Contracting Party in any sector of economic activity whatsoever" …

including

(b) … shares, equity participations and any other form of participation, including minority or indirect participation in companies constituted in the territory of one of the Contracting Parties….

(c) obligations, claims and rights to any benefit having an economic value linked to an investment.

*Article 2: Promotion of Investments*

1. Each Contracting Party shall promote investments in its territory by investors of the other Contracting Party and shall admit such investments in accordance with its laws.

2. In particular, each Contracting Party shall facilitate the conclusion and execution of licensing agreements and commercial, administrative or technical assistance agreements, to the extent that these activities are related to investments.

*Article 3: Protection of Investments*

1. All investments, whether direct or indirect, made by investors of one Contracting Party enjoy in the territory of the other Contracting Party, fair and equitable treatment according to international law.

2. Except for measures required for the maintenance of public order, such investments shall enjoy constant protection, which precludes any arbitrary or discriminatory measure that could hinder, in fact or in law, their administration, maintenance, use, enjoyment or disposal.

3. For all matters governed by this Agreement, investors of each Contracting Party shall enjoy, in the territory of the other Contracting Party, treatment no less favorable than that accorded by the former Contracting Party to its own investors or to investors of the most-favored nation.

4. However, this treatment and protection will not cover the privileges that either Contracting Party accords to investors of any third State by virtue of its participation or association in a free trade area, customs union, common market or any other regional economic organization of a similar nature.

*Article 4: Measures Depriving or Restricting Property*

1. Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization, nor any other measure whose effect is to directly or indirectly dispossess investors of the other Contracting Party of investments belonging to them in its territory, unless the following conditions are fulfilled:

   A) the measures are adopted for reasons of public purpose or national interest;

   B) the measures are adopted in accordance with legal procedures;

   C) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;

   D) they are accompanied by provisions for the payment of adequate and effective compensation.

2. The amount of the compensation shall correspond to the real value of the investments concerned on the day prior to the adoption or publication of the measure.

   The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest

shall be paid at the normal commercial rate from the date it is determined until the date of payment.

3.     Investors of one Contracting Party whose investments have suffered damage due to war or other armed conflict, revolution, a state of national emergency or revolt occurring within the territory of the other Contracting Party shall enjoy, from the other Party, treatment no less favorable than that accorded to its own investors or investors of the most favored nation as regards restitution, indemnification, compensation or other indemnification."

**b.     The Portuguese Treaty**[67]

"*Article 1*

1:     The term "investor" means
 …

          b)     Legal persons, including commercial companies and other companies or associations, that have their seat in one of the Contracting Parties and are constituted and function in accordance with the Laws of that Contracting Party.

(2):     The term 'investments' includes all types of assets and rights relating to investments made in accordance with the laws of the other Contracting Party, and specifically, but not exclusively including …

          (b)     Shares and other forms of participation in the capital or the economic results of companies;

          (c)     Credit rights related to money or any other obligation having an economic value …..

*Article 2*

1 –     Each Contracting Party shall promote, within its territory, investments made by the other Contracting Party and shall admit such investments in accordance with its legislation.

---

[67] RLA-114

38

2 – Each Contracting Party shall protect, within its territory, investments made in conformity with its laws and regulations by the investors of the other Contracting Party and shall refrain from adopting arbitrary or discriminatory measures that prevent the administration, manufacturing, use, usufruct, extension, alienation and disposal of its investments.

*Article 3*

1 – Each Contracting Party shall guarantee, within its territory, non-discriminatory, fair and equitable treatment, according to international law, to investments made by investors of the other Contracting Party.

2 – On matters governed by this Agreement, the treatment referred in paragraph 1 of this Article shall not be less favorable than that granted by a Contracting Party to investments made in its territory, in similar conditions by its own investors or by those of a third country.

3 – The provisions included in paragraphs 1 and 2 of this Article do not affect the current most favorable treatment or that granted in the future by a Contracting Party to investments by investors of third States by virtue of the following:

a) Participation in customs unions, free trade areas or other similar forms of economic cooperation or regional integration;

b) Agreements to avoid double taxation or any other tax instrument.

*Article 4*

Neither Contracting Party shall take measures that deprive, directly or indirectly, investors of the other Contracting Party of investments made by them, except if the following conditions are fulfilled:

a) that the measures are adopted for reasons of public purpose or national interest, in accordance with the legislation in force;

b) that the measures are non-discriminatory;

c) that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective

**39**

compensation; this compensation shall be based on the market value of the investment in question immediately prior to the moment when the measure was made public; compensation will accrue interest at the exchange rate applicable at the date on which the transaction becomes effective, in the territory where the investment is located; the lawfulness of the referenced measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

_____

## E.   JURISDICTION

112. Each of Venezuela's objections to jurisdiction is addressed in turn below.

113. As noted earlier, the Tribunal has considered carefully every argument advanced on behalf of each Party in the course of these proceedings, albeit not all points are set out in terms in the body of this Award.

### 1.   THE REQUIREMENT OF "*SIÈGE SOCIAL*" / "*SEDE*"

#### a.   Venezuela's Case

114. It is Venezuela's case that neither Tenaris nor Talta qualify as "*investors*" under the Luxembourg and Portuguese Treaties respectively, because Tenaris has no "*siège social*" in Luxembourg, and Talta has no "*sede*" in Portugal.

115. The relevant provisions of the two Treaties are as follows (with emphasis added):

The Luxembourg Treaty

"*Article 1: Definitions*

1.  The term "investors" means:
…..

(b)  "Companies", that is to say, any legal person constituted in accordance with the laws of the Kingdom of Belgium, the Grand Duchy of Luxembourg or the Republic of Venezuela, **and having**

40

> its 'siège social' in the territory of the Kingdom of Belgium, the **Grand Duchy of Luxembourg or the Republic of Venezuela respectively** and any legal person effectively controlled by an investor covered by paragraphs 1 (a) or (b)

> that has made an investment in the territory of the other Contracting Party."

The Portuguese Treaty

> "*Article 1*

> 1: The term "investor" means

> … b) Legal persons, including commercial companies and other companies or associations, **that have their seat [*sede*] in one of the Contracting Parties** and are constituted pursuant to and function in accordance with the Laws of that Contracting Party."

116. Venezuela maintains that in order to have standing to access arbitral jurisdiction under these Treaties, Claimants must demonstrate not only their respective incorporation, but also that each has its place of effective management in the jurisdictions of Luxembourg and Portugal respectively.

117. Since the establishment of a registered office is central to the act of incorporation, any other interpretation of the additional requirement that Claimants have their "*siège social*" or "*sede*" in Luxembourg and Portugal respectively would render that further condition redundant. This, in turn, would be contrary to the requirement that "*effet utile*" be given to all of the terms of a treaty. It is submitted by Venezuela that the addition of the "*siège social*" and "*sede*" condition, when added to that of incorporation, demonstrates an intention to limit a BIT's coverage by the inclusion of a genuine link between the individual putative claimant corporate entity and the national State – a link which could not be effected by formal requirements alone.

118. According to Venezuela, the concept of "*siège social*", a legal term of art, is "*fundamental*" to determining whether the Tribunal has jurisdiction over

Claimants' claims.[68] It contends, further, that on a proper interpretation in accordance with Article 31(1) of the Vienna Convention, and having regard to international law and investment treaty practice, consistent with the roots of the concept of "*siège reel*" in French civil law, the ordinary meaning of "*siège social*" connotes the place where the "*effective management*" of a company takes place. Venezuela says that neither Claimant has discharged its burden to prove that its place of effective management is in Luxembourg (in the case of Tenaris) or Portugal (in the case of Talta). Reliance on mere extracts from the Luxembourg and Portuguese Commercial Registries is insufficient. In particular, Venezuela contends that Claimants have failed the test set out in *Alps Finance v Slovak Republic*.[69]

119. With respect to the record in this case, Venezuela submits that there is no evidence that the Boards of the Claimant companies actually met in Luxembourg and Portugal respectively. Rather, industry analysis and other sources indicate that whilst Tenaris was constituted in Luxembourg, it was actually directed from Buenos Aires. Venezuela questions whether Tenaris even had an office in Luxembourg at all: it contends that such evidence as there is suggests a picture of two companies, neither of which has its effective management in Luxembourg or Portugal respectively.[70]

120. In its Rejoinder, in reliance on Tenaris S.A.'s Form 20-F, filed with the US Securities and Exchange Commission, Venezuela developed this submission further, asserting that Tenaris is an Argentine company, with 27,000 employees, billions of dollars of revenue and offices on the 26th and 30th floor of a 30-storey office block in Buenos Aires.

121. So far as Talta is concerned, Venezuela maintains that it, too, is an Argentine company, suggesting that Portuguese tax filings show income inconsistent with

---

[68] Respondent's Counter-Memorial, para. 131
[69] *Alps Finance and Trade AG v. Slovak Republic*, UNCITRAL, Decision on Jurisdiction, 5 March 2011, ("*Alps Finance*"); Respondent's Reply on Bifurcation, para. 15.
[70] Transcript (English), Day 1, pp. 251 and 252

a small office: Talta must, therefore, be managed by Tenaris and since that is an Argentine company, so must be Talta.

122. According to Venezuela, the reality is that Tenaris' connections with Luxembourg and those of Talta with Portugal are "*minimal*".[71]

123. On the basis that the criterion of "*siège social reel*" is controlling, argues Venezuela, it could not be right that a company constituted in Luxembourg, but having its central administration in a different country, which would not be governed by Luxembourg law and would not have Luxembourg nationality under Luxembourg law, would nonetheless be entitled to international law protections under the Luxembourg Treaty.[72]  And similarly for Portugal.

### b.    Claimants' Case

124. Claimants contend that the Tribunal has jurisdiction *ratione personae* over both Tenaris and Talta.

125. Their approach to the interpretation of the terms "*siège social*" or "*sede*" is as follows:

(a)    the terms employed in the Treaties must be interpreted under international rules of treaty interpretation, and in particular Article 31(1) of the Vienna Convention;

(b)    Articles 31(2), (3) and (4) of the Vienna Convention provide exceptions to this general rule, but they make no reference to the domestic law of a party. If the treaty provision itself does not reference the domestic law of a party, then the interpreter cannot rely upon domestic law to construe that provision under Article 31;

---

[71] Respondent's Counter-Memorial, paras. 172 and 173
[72] *Idem*, para. 141

(c)   if the interpreter wishes to confirm a meaning produced by Article 31(1), or if the application of Article 31(1) produces an ambiguous, obscure, manifestly absurd or unreasonable result, the interpreter may have recourse to:

> "supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion";

(d)   although there is no express reference to the domestic law of the parties among the supplementary means of interpretation, it is not expressly excluded either;

(e)   however recourse to domestic law would be inappropriate in this case. First, it is significant in the context in which the terms "*siège social*" and "*sede*" appear in the Treaties that they are the only terms in the definition of "investor" which are not expressly related to the State parties' domestic law. Second, there is no concept of "*siège social*" or "*sede*" in Venezuelan law and it would be wrong to interpret a Treaty provision by reference to the domestic law of only one of the parties to the Treaty.[73] Third, the governing law clauses at Articles 9(5) and 8(3) of the Luxembourg and Portuguese Treaties, respectively, constitute "*lex specialis*", which supersede the Vienna convention. And these provisions only allow for the application of the domestic law of the host State of the investment in addition to the terms of the Treaties and international law.

126.   Be that as it may, even if recourse to domestic law were permissible, according to Claimants, the outcome would be the same: there is no notion of "*sede*" under Venezuelan law[74] and concepts such as "*domicile*" are irrelevant for the purposes of interpreting the term "*sede*" under the Treaties. But assuming for a moment that Professor Iribarren's suggestion that "*domicile*" should be treated as an equivalent term for the purpose of interpreting the concept of "*sede*" in the

---

[73] *Patrick H. Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Award, 9 February 2004, para. 50
[74] Professor Iribarren confirmed that such a concept does not exist under Venezuelan law. (Transcript (English), Day 4, p. 1084)

Portuguese Treaty were correct[75], then, contend Claimants, it would follow that the term means the company's domicile specified in its articles of incorporation, that is to say, its statutory domicile or registered office. And they say that confirmation for that proposition is to be found at Article 203 of the Venezuelan Commercial Code:

> "The domicile of a company shall be the place specified in the company's articles of incorporation; if no place is specified, the domicile shall be the company's principal establishment."[76]

127. Under Luxembourg and Portuguese law the term "*siège social*" or "*sede*" ordinarily means statutory seat. And even if it were to mean "*siège reel*", the presumption that the "*siège reel*" and the statutory seat of each of the Claimants coincided would apply, unless rebutted by Venezuela. This presumption was said to be express in Article 2 of the Luxembourg Law of 10 August 1915 on Commercial Companies, and implicit in Article 3(1) of the Portuguese Code on Commercial Companies of 2007. It is Claimants' case that Venezuela has failed to establish any facts, which would rebut this presumption.

128. Finally in terms of approach, Claimants contend that Article 25 of the ICSID Convention does not influence the interpretation of the terms "*siège socia*l" or "*sede*" in the Treaties.

129. Claimants say that upon the basis of an interpretative exercise conducted pursuant to Article 31(1) of the Vienna Convention, and to such supplementary means of interpretation to which regard might properly be had pursuant to Article 32 of the Vienna Convention, the term "*siège social*" or "*sede*" must be construed as "*registered office*" or "*statutory seat*", and that the documents that they have provided[77] are sufficient to prove that Claimants have their seats in Luxembourg and Portugal respectively.

---

[75] Transcript (English), Day 4, p. 1112
[76] Exhibit C-167
[77] See *e.g.* Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, 21 June 2011 (Exhibit C-6); Permanent Certificate of Talta, 11 July 2011 (Exhibit C-9) and Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris Investments, 22 July 2011 (Exhibit C-10)

130. Claimants dismiss any suggestion that this case is analogous to *Alps Finance v Slovak Republic*: that was a very different case, which related to an entity which had been set up specifically in order to attempt to bring an abusive claim under a BIT. A Slovak company had assigned receivables to a Swiss corporation, which it had set up expressly for the purpose of bringing itself within the treaty. It was held to be neither an investor, nor to hold an investment.[78] In this case, there was a physical presence: there were offices, there were 'phone numbers, and there were people present. Tenaris and Talta had been established long before the investment in Matesi had been made, and they had had seats in Luxembourg and Portugal respectively from the dates of their respective incorporation.

131. Further, Claimants argue that their case is very similar to that considered by the ICJ in the *Barcelona Traction* case[79] and the basis upon which genuine links with a home state had been established in order to clear the way to bringing a claim. In that case, a company incorporated in Canada, carried on operations in Spain. It had Belgian shareholders. Belgium sought to initiate claims on behalf of its nationals in the ICJ. The ICJ denied the application, holding that only Canada had a right to exercise diplomatic protection on behalf of a Canadian incorporated company.

132. Claimants maintain that Venezuela's attempt to rely upon Tenaris' Form 20-F filing with the SEC[80] as evidence for its proposition that Tenaris is an Argentine corporation employing 27,000 people, 7,000 of them in Argentina, is misconceived. Quite apart from the fact that the Luxembourg Court of Appeal has ruled that the number and location of a company's employees are irrelevant considerations so far as the determination of the real seat of a company is concerned,[81] Form 20-F relates to Tenaris and all 25 of its "*consolidated*

---

[78] Claimants' opening statement, Slide 77
[79] *The Barcelona Traction, Light & Power Company Limited* (Belgium v. Spain), Second Phase: I.C.J. Reports 1970, Judgment, 5 February 1970 ("*Barcelona Traction*")
[80] Exhibit R-140
[81] Exhibit AP-27: Decision of the Court of Appeal of Luxembourg No. 37940 of 21 December 2011. Notwithstanding that the company in question had established a branch in Switzerland; that liability for payment of salaries, social security obligations and salary taxes existed in Switzerland; and that all of the equipment and property listed in the company's balance sheet were located at the Swiss branch, the

(Footnote continued on next page)

*subsidiaries*". Tenaris' sole function is to manage that portfolio of subsidiary companies. The addresses of its subsidiaries are set out in order to comply with listing requirements in the countries in which Tenaris is publicly traded, namely the United States, Italy, Mexico and Argentina. Tenaris' only office is its office in Luxembourg: it has no premises in Buenos Aires. Mr Malvassora's evidence to the Tribunal was that the Tenaris subsidiary, SIDERCA, was the only Tenaris entity to occupy space in Techint's 30-storey office block in Buenos Aires.[82]

133. As for Talta, Claimants dismiss the allegation that this is an Argentine company as:

> "Pure speculation and conjecture, not a single document has been submitted in support of such assertions."[83]

### c. Analysis

#### 1. The Meaning of "*Siège Social*" and "*Sede*"

134. It is common ground that the starting point for any interpretative exercise on the part of the Tribunal is Article 31(1) of the Vienna Convention on the Law of Treaties:

> "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

135. Venezuela asserts that the ordinary meaning of both "*siège social*" and "*sede*" must be taken to be "effective seat", or the location where "*the effective or principal or actual management of the company takes place*".[84] In contrast, the Claimants assert that the ordinary meaning of both terms must be taken to be "*registered office*" or "*statutory seat*", without any further requirement. Both sides have cited extensive materials in support of their position.

---

(Footnote continued from previous page)
real seat of the company was at its registered office in Luxembourg where it held shareholders' meetings and maintained its accounting records.
[82] Transcript (English), Day 3, p. 629
[83] Transcript (English), Day 1, p. 103.
[84] Respondent's Reply on Bifurcation, para. 13.

136. The principal authorities relied upon by Claimants for the proposition that "*siège social*" and "*seat*" have been taken to mean no more than registered office or statutory seat are as follows:

(a) C. Schreuer, Nationality of Investors: Legitimate Restrictions vs. Business Interests, 24(2) ICSID Review–Foreign Investment L.J. (2009), p. 522, opining that the requirement of a seat is a "*formal requirement[]*" that does not require "*genuine economic activity*"; [85]

(b) *Tokios Tokelės*, in which the tribunal held that relevant evidence of corporate seat included a:

> "registration certificate, statute of incorporation, and notices of payment of foreign investment registered by the respondent state."

and that:

> "a nationality test of *siège social* leads to the same result as one based on state of incorporation"[86]

(c) The *Barcelona Traction* case,[87] in which the ICJ held that only Canada had a right to exercise diplomatic protection on behalf of a Canadian incorporated company. The ICJ noted that the company was incorporated in Canada; that it had its registered office,[88] maintained its accounts and share registers and held its board meetings there; and that it was listed with the Canadian tax authorities. The company was held to have a close and permanent connection with Canada, irrespective of its commercial activities outside Canada (akin, according to Claimants, to the position of Tenaris and Talta in this case).

(d) *Total v. Argentina*, at para 57, where the tribunal used "registered office" as a shorthand definition of the term "*siège social*":[89]

---

[85] CLA-25
[86] *Tokios Tokelės v Ukraine*, ICSID Case No. ARB/02/18, Decision on Jurisdiction, 29 April 2004, para. 43 ("*Tokios Tokeles*")
[87] See FN 81, *supra*
[88] "*Registered office*" and "*siège*" were used co-terminously by the ICJ.
[89] *Total SA v Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Objections to Jurisdiction,

(Footnote continued on next page)

> "Total has submitted evidence that it was incorporated and constituted in accordance with the laws of France and maintains its registered office (*siège social*) in France."

137. Venezuela rebuts or distinguishes each of the authorities relied upon by the Claimants on this issue. For example, it has pointed out that:

(a) In *Barcelona Traction*, (as observed by Douglas[90]), the theoretical right of Canada to exercise diplomatic protection on behalf of the Barcelona Traction company was never actually disputed.

(b) As to *Tokios Tokelès*, in light of the wording of Article 1(2)(b) of the Ukraine-Lithuania BIT, the tribunal's analysis was *obiter dictum*. Nor is there any indication in the body of the tribunal's award of the arguments Ukraine raised to rebut the evidence submitted by Tokios or to establish that the *siège social* of the company was maintained in Ukraine.

(c) As to the jurisdictional award in *Total v. Argentina*, where the tribunal deemed the claimant company's maintenance of a registered office in France to be sufficient evidence that it had its *siège social* there, Venezuela points out that in that case, the point was actually conceded:

> "… Argentina **has not disputed** that the Claimant meets the requirement of being a French body corporate having its registered office in France in accordance with French law as required by Article 1.2(b) of the BIT.[283]".

138. Venezuela, for its part, has cited an extensive compilation of authorities and instances in international law and practice, which demonstrate that the terms "*siège social*" and "*seat*" may import a requirement of effective or actual management, or something more than simply the address of a registered office or statutory seat. By way of example:

---

(Footnote continued from previous page)
25 August 2006, para. 57.
[90] Z. Douglas, The International Law of Investment Claims (2009) at p. 22, at para. 44. (RLA-5)

49

(a) UNCTAD, *Scope and Definition*, in UNCTAD Series on Issues in International Investment Agreements (1999), p. 39: [91]

> "Generally speaking, 'seat of a company' connotes the place where effective management takes place."

(b) N. Rubins & S. Kinsella, International Investment, Political Risk and Dispute Resolution (2005), p. 409: [92]

> "… a juridical person may be considered a national of the State where it has its **effective** headquarters (or '*siège social*')" (emphasis added)

(c) M. Sornarajah, The International Law of Foreign Investment (2nd ed., 2010), p. 324: [93]

> "…the *siège social* theory … determines nationality by looking for the place where the seat of its **effective** management is located" (emphasis added)

(d) P. Sauvé, *Trade and Investment Rules: Latin American Perspectives*, United Nations (2006), p. 22: [94]

> "Some BITs combine the place of incorporation test with criteria focusing on a company's 'seat.' This test attributes the nationality of the place where the *siège social* is located. The 'seat of the company' often refers to the place of **effective** management decision-making, and as such, while more difficult to determine, reflects a more significant economic relationship between the corporation and the country granting nationality" (emphasis added)

(e) A. Diehl, The Core Standard of International Investment Protection (2012) p. 63: [95]

> "Under th[e] concept [of *siège social*], the **actual** management of a company determines its nationality" (emphasis added)

---

[91] RLA-17
[92] RLA-12
[93] RLA-14
[94] RLA-13
[95] RLA-4

(f)    E. Z. Jaramillo & A. Saldarriaga, et al., *Treaty Planning: Current Trends in international Investment Disputes that Impact Foreign Investment Decisions and Treaty Drafting* [in:] M. Á. Fernández-Ballesteros & David Arias eds., Liber Amicorum Bernardo Cremades 1207 (2010), p. 1222: [96]

> "The place of incorporation and the entity's seat or **principal** seat of business (*siège social*) are the most commonly used requirements" (emphasis added)

(g)    R. Thorn & J. Doucleff, *Disregarding the Corporate Veil and Denial of Benefits Clauses: Testing Treaty Language and the Concept of Investor* in: M. Waibel et al eds., The Backlash Against Investment Arbitration (2010), pp. 6-7: [97]

> "**Siège social** … connotes the place of **effective** management, and therefore reflects a more genuine link between the entity and the home country than the place of incorporation" (emphasis added)

(h)    Professor Brownlie, Principles of Public International Law (7th ed., 2008), p. 484,[98] who observes (in the context of diplomatic protection[99]) that the *siège social* criterion is intended to provide a:

> "guarantee that the grant of personality is **reasonable** and not a device for limiting the **proper** sphere of protection of other governments."  (emphasis added)

(i)    Dolzer & Stevens (1995), pp. 35-38, [100] who opine that Belgium-Luxembourg bilateral investment treaties rely on the concept of "seat (or *siège social*)," which the authors define as the place of:

> "**actual management** of a company," (emphasis added)

(j)    *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, at para 123:[101]

---

[96] RLA-9
[97] RLA-15
[98] RLA-3
[99] There is clearly a marked difference between diplomatic protection and investor-state treaty protection, and no basis to import the rules of one into the other (see, *e.g.*, Z. Douglas, The International Law of Investment Claims (2009), paras. 541 and 605-9).  But the references to materials here and below concerning diplomatic protection remain relevant simply in terms of the understanding of the term "*siège social*" itself.
[100] RLA-40

"the Tribunal's reading of the treaty language is further strengthened if one bears in mind that in twenty-four Kazakh BITs the Respondent has agreed to the same test as in the present one, the place of incorporation, while in ten other BITs it has added a requirement that the *siège social* or place of business be placed or "real economic activities" be conducted there."

(k)   Z. Douglas, The International Law of Investment Claims (2009), at p. 22 (para. 45): [102]

"… the practice of states …, in general, reveals that diplomatic protection is not exercised merely on the basis of incorporation.  In deciding whether or not to take up claims based on the corporate interests of their nationals, states are naturally preoccupied with the extent to which their own economy has been affected by the alleged violation of the host state.  Thus it is common for states to insist that the corporate interest comprises a dominant shareholding or beneficial ownership or a connection based on the *siège social* of the company. …"

139.  Venezuela also placed heavy reliance on the decision in *Alps Finance v Slovak Republic*,[103] which was the subject of extensive submissions by both sides. In that case, the Slovak Republic objected to the tribunal's jurisdiction under the Switzerland-Slovak Republic BIT, on the basis (*inter alia*) that the investor did not have a business seat in Switzerland, as required by the BIT in question. Venezuela cites the Slovak Republic's argument that "seat":

"has a precise meaning under the BIT, namely the principal place of an actual business" [104]

and that to prove that the Swiss corporate address was the "*nerve center*," Alps Finance:

---

(Footnote continued from previous page)

[101] *KT Asia Investment Group B.V. v. Republic of Kazakhstan*, ICSID Case No. ARB/09/8, Award, 17 October 2013

[102] RLA-5

[103] *Alps Finance*, see FN 73, *supra*

[104] *Alps Finance,* para. 88.

"had the burden to produce telephone records, rental agreements and rental payments, invoices, purchase orders, banking records, contracts for sale and services, utility bills or even witness statements."

Venezuela then notes that the investor (much like Claimants here), maintained that an extract from the commercial registry attached to its statement of claim sufficed to prove that it had a "seat" in Switzerland, from where it:

"… administers its business, it holds its headquarters, keeps proper books, rents its office and opens a bank account …"[105]

140. Importantly for Venezuela, the tribunal in *Alps Finance v Slovak Republic* concluded that the indicia relied upon by the investor were insufficient to establish the existence of a Swiss seat. According to the tribunal:

"Proof of a 'business seat', in the meaning of an effective center of administration of the business operations, requires additional elements, such as the proof that: the place where the company board of directors regularly meets or the shareholders' meetings are held is in [the home State's] territory; there is a management at the top of the company sitting in [the home State]; the company has a certain number of employees working at the seat; an address with phone and fax numbers are offered to third parties entering in contact with the company; certain general expenses or overhead costs are incurred for the maintenance of the physical location of the seat and related services …"[106]

141. But on a closer analysis, the *Alps* case provides no support at all for Venezuela's case. On the contrary, it appears to cut exactly the other way, and demonstrate that the terms in question are susceptible of different meanings in different contexts. Article 1(1)(b) of the Switzerland-Slovak Republic BIT (in issue in that case) provides as follows:

"The term "investor" refers with regard to either Contracting Party to […]

---

[105] *Alps Finance*, para. 117(i).
[106] *Alps Finance*, para. 217.

(b)     legal entities […] which are constituted or otherwise duly organized under the law of that Contracting Party and have their seat, together with real economic activities, in the territory of that same Contracting [P]arty."

142. It is immediately apparent that this is a differently worded provision to that in both the Luxembourg and Portuguese Treaties, and that – unlike here – the tribunal in the *Alps* case had to apply a "*real economic activities*" test, as specifically provided for in the treaty.

143. But more than this, the juxtaposition in Article 1(1)(b) of the Switzerland-Slovak Republic BIT of the two requirements of "*seat*" and "*real economic activities*", which are clearly expressed as separate and cumulative criteria, demonstrates that "*seat*" in this particular context must mean something other, and presumably less, than "*real economic activities*".

144. Having carefully considered the extensive submissions and voluminous materials provided by both sides on this issue, it is clear that neither term has been used in international law and practice as a consistent "legal term of art", with only one meaning.  On the contrary, the range of references upon which each side has relied indicates that these terms are susceptible of either a formal or substantive meaning.  As is well-established, a "*term may have a number of ordinary meanings*".[107] `In such circumstances, a tribunal must have regard to the "context" in which the terms appear, and the "object and purpose" of each Treaty, in order to determine which one of the possible ordinary meanings prevails.

145. Article 31(2) of the Vienna Convention provides that the "context" of a treaty includes its preamble, annexes and text. The latter includes:

"the remaining terms of the sentence and of the paragraph; the entire article at issue; and remainder of the treaty".[108]

---

[107] Mark E. Villiger, *The Rules on Interpretation: Misgivings, Misunderstandings, Miscarriage? The 'Crucible' Intended by the International Law Commission*, in The Law of Treaties Beyond The Vienna Convention (Enzo Cannizzaro ed., 2011), p. 109.
[108] Mark E. Villiger, Commentary on the 1969 Vienna Convention on the Law of Treaties (2009), p. 427.

146. The "object and purpose" of a treaty :

> "include a treaty's aims, its nature and its end."[109]

147. The key distinguishing feature of both Treaties in this case – unlike the treaty in cases such as (for example) *Tokios Tokeles* – is that the terms "*siège social*" and "*sede*" are used alongside other criteria that would ordinarily be encompassed by the term itself, namely:

-- "… *constituted in accordance with the laws of the Kingdom of Belgium, the Grand Duchy of Luxembourg or the Republic of Venezuela..*" in the Luxembourg Treaty, and

-- "… *constituted pursuant to and function in accordance with the Laws of that Contracting Party ...*" in the Portuguese Treaty.

148. Given this context, it is immediately apparent – as Venezuela has argued – that neither "*siège social*" nor "*sede*" can mean simply "*registered office*" or "*statutory seat*" in a purely narrow and formal sense, since neither term would then have any effective meaning. For a company to be "*constituted in accordance with the laws of … the Grand Duchy of Luxembourg*", it must have its registered office or statutory seat in Luxembourg. And for a company to be "*constituted pursuant to and function in accordance with the Laws of*" Portugal, it must have its registered office or statutory seat in Portugal.

149. This point was put in terms to all experts on Luxembourg, Portuguese and Venezuelan law, and no other conclusion was forthcoming. Only Claimants' Expert on Portuguese law, Prof. Moura Vicente, initially took issue with this point, stating in his Opinion that Portuguese law allows for the possibility that the place of incorporation and place of statutory seat do not coincide.[110] Indeed, this appeared to be the only substantive point, which Claimants advanced in

---

[109] per Villiger, *supra*.
[110] Legal Opinion of Professor Dr. Dário Moura Vicente, 23 January 2014, at paras. 37-40.

their response on this issue.[111] However, Prof. Vicente subsequently accepted that "*a company that is incorporated in Portugal must have its seat in Portugal.*"[112]  And on a proper analysis, as the Tribunal concludes, absent:

--   re-incorporation (*i.e.* in the case of an in-coming foreign company, per Article 3(2) of the Portuguese Code on Commercial Companies, in which case Portuguese law requires that the company be re-incorporated in Portugal, and establish a statutory seat in Portugal), or

--   accommodation by a foreign law (*i.e.* in the case of an out-going foreign company, per Article 3(4) of the Portuguese Code, which will depend upon the relevant foreign law allowing such a situation),

it is evident that Portuguese law does not accept that companies be incorporated in one place and have their statutory seat in another.

150. So if "*siège social*" and "*sede*" are to have any meaning, and not be entirely superfluous, each must connote something different to, or over and above, the purely formal matter of the address of a registered office or statutory seat.   And this leads one to apply the other well-accepted meaning of both terms, namely "effective management", or some sort of actual or genuine corporate activity.

151. This conclusion follows from the simple wording of each Treaty. But as articulated by Venezuela, it is also mandated by the well-established doctrine of "*effet utile*". According to this, the terms of a treaty must if possible be interpreted so that they do not become devoid of effect,[113] or as put by Venezuela:

---

[111] See *e.g.* Claimants' Post-Hearing Brief, para. 174.
[112] Transcript (English), Day 7, p. 2101:12-14 (Moura Vicente).
[113] See, *e.g.*, *Corfu Channel Case (Merits)*, Judgment, 9 April 1949, I.C.J. Reports 1949, p. 4 at p. 24 (RLA-24); *Case Concerning Application of the International Convention on the Elimination of all Forms of Racial Discrimination* (Georgia v. Russian Federation), Preliminary Objections, Judgment, 1 April 2011, para. 133. (RLA-22).

"… tribunals and courts [must] interpret the provisions of treaties in a manner to give full weight and effect consistent with the normal sense of the words and with the other parts of the text, and in a manner such that reason and sense will be accorded as much as possible to each part of the text."[114]

152. This canon of interpretation has frequently been applied in investor-state arbitrations. For example, in 1990, the tribunal in *AAPL*, citing the *Cayuga Indians* case, observed that:

"Nothing is better settled, as a canon of interpretation in all systems of law, than that a clause must be so interpreted as to give it a meaning rather than deprive it of meaning."[115]

153. As to "objects and purposes", the preamble to the Luxembourg Treaty notes that the Contracting Parties desire to "*strengthen their economic cooperation by creating favorable conditions for investments to be made by investors of [either] Contracting Party*" and that they consider the Treaty to have a "*beneficial influence*" on "*reinforcing confidence in the area of investment*". The Portuguese Treaty states that it is "*[m]otivated by the desire to intensify economic cooperation between the two States*" because "*the reciprocal promotion and protection of investments will contribute to […] economic prosperity*". There is clearly a policy decision to be made in the context of strengthening and promoting bilateral economic cooperation as to the class of investors that each Contracting State, acting as host, wishes to attract, and is willing to protect within the scope of each Treaty. Nothing in the evident objects and purposes of either Treaty suggests that a purely formal test of "registered office" or "statutory office" is required. And nothing suggests that a requirement of a genuine link would somehow undermine any object or purpose. On the contrary, if anything, requiring some genuine link with one Contracting

---

[114] Respondent's Counter-Memorial, para. 148.
[115] *Asian Agricultural Products*, at para. 40. See *also*, *Occidental Exploration and Production Company v. Republic of Ecuador*, LCIA Case No. UN3467, Final Award, 1 July 2004, para. 68 ("*The Tribunal agrees with both parties in that the proper interpretation of Article X must not result in rendering it meaningless. This is the conclusion that arises evidently from the Vienna Convention on the Law of Treaties in respect of interpretation*"); *Salini Construttori S.p.A. e Italstrade S.p.A. v. the Hashemite Kingdom of Jordan*, ICSID Case No. ARB/02/13, Decision on Jurisdiction, 9 November 2004, para. 95 ("*One is therefore hard pressed to see the usefulness of Article 9(2) as interpreted by the Claimants. Such an interpretation runs counter to the general principle of effectiveness ('effet utile') and for that reason also ought to be set aside*").

State would appear to be consistent with the bilateral / reciprocal nature of each Treaty. As the Tribunal explains at paras. 203-223 below, it has found, as a matter of fact, that incontrovertible evidence of such genuine links between Tenaris and Luxembourg and Talta and Portugal exists in this case.

154. *Conclusion:* In conclusion, in order to make sense of each provision, and ensure that each term is given meaning, the Tribunal determines that both "*siège social*" and "*sede*" in the Treaties in issue in this case mean the place of actual or effective management.

### 2. Other BITs

155. Claimants have submitted extensive materials charting the bilateral investment treaty practice of both Luxembourg (*i.e.* the Belgo-Luxembourg Economic Union) and Portugal, and emphasised that in the majority of cases, treaties have been concluded by Luxembourg with third states in which the term "*siège social*" has been used, and translated in an English version as "registered office", and treaties have been concluded by Portugal with third states in which the term "*sede*" has been used, and translated in an English version as simply "seat" or "main office".

156. Venezuela has maintained that the treaty practice adopted by the States of which Claimants assert nationality, far from being conclusive, is "*ultimately irrelevant,*"[116] and has invoked the *Guaracachi* case[117] as follows:

> "According to the Tribunal, the fact, invoked by the Respondent, that other BITs concluded by Bolivia explicitly exclude indirect investments is insufficient to support an a *contrario sensu* interpretation that only those BITs containing such an explicit reference cover indirect investments, since it is well accepted that this kind of argument is not on its own strong enough to justify a particular interpretation of a rule of law".

---

[116] Respondent's Post-Hearing Brief, para. 89.
[117] *Guaracachi America Inc. and Rurelec PLC v. The Plurinational State of Bolivia*, UNCITRAL PCA Case No 2011-137, Award, 31 January 2014.

157. Venezuela also argued, initially, that there is nothing in the Vienna Convention regime, which authorises an interpreter to construe the meaning of a treaty by reference to the provisions of other treaties concluded with third countries. But as the proceedings developed, it then accepted that investment treaties concluded between Luxembourg and Portugal with third parties were a relevant interpretative source under Article 32 of the Vienna Convention.[118]

158. The Tribunal considers that Luxembourg's and Portugal's respective treaty practice has potential relevance as a supplementary source only, under Article 32 of the Vienna Convention. It is not a primary source under Article 31, and it cannot be a starting point in the analysis.

159. In the Tribunal's view, there is nothing in the treaty practice of either Luxembourg or Portugal that is sufficiently conclusive as to undermine the analysis of "*siège social*" and "*sede*" set out above, and arrived at in the application of Article 31 of the Vienna Convention.

160. It is true that a proportion of Belgo-Luxembourg BITs translate "*siège social*" as "registered office."[119] But there are notable variations in this practice, such as (*e.g.*) Luxembourg's BITs with the Philippines (which was signed a mere two months before the signing of the Luxembourg-Venezuela BIT); the Czech Republic; and Rwanda, all of which translate "*siège social*" as "head office".[120]

161. Equally, Portugal's translation into English of "*sede*" as "main office" or "principal office" does not appear to assist the analysis (given that both "main office" and "principal office" may have a formal or substantive meaning). And

---

[118] Respondent's Rejoinder, para. 276: "The list of supplemental means in Article 32 is non-exhaustive; thus, it can include other treaties on the same subject matter (adopted before or after the treaty in question) that employ the same or similar terms").
[119] Claimants' Opening Statement, Slide 73. (And see also the Azerbaijan BIT at Slide 72).
[120] Agreement between the Government of the Republic of the Philippines and the Belgo-Luxemburg Economic Union, on the Reciprocal Promotion and Protection of Investments, signed on 14 January 1998, entered into force 19 December 2003, Art. I(1)(a)(ii)[,] (b) (RLA-143); Belgo-Luxembourg Economic Union and Rwanda, Convention concerning the reciprocal encouragement and protection of investments, signed on 2 November 1983, Art. 1(2)(a) (RLA-140); Agreement Between the Belgo-Luxembourg Economic Union and the Czechoslovak Socialist Republic Concerning the Reciprocal Promotion and Protection of Investments, signed on 1 August 1975, Art. 1(a)[,] (b) (RLA-138).

in any event, Portugal's treaty practice in this regard is inconsistent. For example, the BITs with Korea and Zimbabwe translate the same term as "principal place of business", [121] whereas Portugal's BIT with Bosnia Herzegovina uses the term "registered seat" ("*sede registrada*" in the Spanish version), instead of "*sede*".[122]

162. Ultimately, of course, each treaty has to be interpreted on its own account, on the basis of its own context and objects and purposes.[123]  Given the analysis under Article 31 of the Vienna Convention, the Tribunal has gleaned little assistance from this comparative exercise in this particular case.

### 3.  Relevance of Municipal Law

163. In interpreting the test in each Treaty, each side also took sharply different positions (as recorded above) as to whether the Tribunal should have regard to the way in which "*siège social*" and "*sede*" are understood as a matter of Luxembourg, Portuguese and Venezuelan law.

164. According to the Claimants, by Article 31(1) of the Vienna Convention, in interpreting the terms "*siège social*" or "*sede*", the Tribunal is restricted to the confines of each Treaty itself, as Article 31(1) admits of no other sources upon which reliance may be placed.  Articles 31(2), (3), and (4) provide exceptions to the general rule in Article 31(1), but these Articles make no reference to one party's domestic law. If the treaty provision itself does not reference the domestic law of a party, reliance cannot be placed upon domestic law to construe that provision under Article 31. It is only when an interpreter of a treaty wishes to confirm a meaning produced by Article 31, or if Article 31

---

[121] Agreement Between the Government of the Republic of Korea and the Government of the Portuguese Republic on the Mutual Promotion and Protection of Investments, signed on 3 May 1995, entered into force 11 August 1996, Art. 3(b) (RLA-142); Agreement Between the Government of the Portuguese Republic and the Government of the Republic of Zimbabwe for the Promotion and Mutual protection of Investments, signed on 5 May 1994, Art. 1(3)(b) (RLA-141).

[122] Agreement Between Bosnia and Herzegovina and the Portuguese Republic on the Mutual Promotion and Protection of Investments, signed in March 2002, entered into force 3 February 2009, Art. 2(a)(ii) (RLA-144).

[123] It might be noted in passing that, at the Hearing, Claimants' own Expert on Luxembourg law, Prof. Prüm, testified that he did not consider Claimants' treaty-practice argument as "*decisive as such*," but rather "*relevant*" only in terms of "*context*." Transcript (English), Day 8, pgs. 2208:20-2209:1 (Prüm).

produces an ambiguous, obscure or manifestly absurd or unreasonable result, that reference may be made to supplementary materials, as provided in Article 32 of the Vienna Convention. No supplementary material can be used as a "first step" for interpretation. And even then, according to the Claimants, no recourse whatsoever ought to be made by the Tribunal under Article 32 of the Vienna Convention to Luxembourg, Portuguese or Venezuelan domestic law.

165. The Tribunal accepts that the interpretation of the terms "*siège social*" or "*sede*" is a matter of international, not domestic, law. Whereas the concepts of "*citizen*" and corporate "*constitution*" in the Luxembourg Treaty, and "*national*" and "*constitution and functioning*" in the Portuguese Treaty, contain a specific and express *renvoi* to the domestic laws of the parties to the Treaties, the terms "*siège social*" and "*sede*" in the respective Treaties do not.

166. The Tribunal also accepts that no supplementary material is to be used as a first step for interpretation.

167. Having said this, the requirements in question here are, in substance, nationality requirements. The criteria of "*siège social*" and "*sede*" are both mechanisms to determine the nationality of a company, and as such whether or not the company qualifies for coverage by a Treaty. And nationality requirements are frequently (though not exclusively) applied in light of relevant domestic law. As noted by Professor Douglas:

> "The tribunal's jurisdiction *ratione personae* extends … to an individual or legal entity … which has the nationality of another of the contracting state parties in accordance with the relevant provision in the investment treaty **and the municipal law of that contracting state party** and, where applicable, Article 25 of the ICSID Convention.[124] (Emphasis added).

168. The position has been summarised by Sasson as follows:

> "Once the treaty criteria have been established, they must be applied pursuant to the relevant municipal law. In certain circumstances, municipal law has to be disregarded if the investment treaty refers to

---

[124] Z. Douglas, The International Law of Investment Claims (2009), p. 284 (RLA-129).

specific criteria to determine corporate nationality (such as Article 17 of the ECT).

…

This does not mean that investment tribunals' decisions will affect the recognition of nationality at the domestic level. But it does mean that investment tribunals must determine nationality for investment treaty purposes. To make such determinations, tribunals may need to assess the evidence adduced by the parties on the application of the relevant municipal law. To the extent that municipal law (including a municipal law determination on the precise matter at issue) clashes with principles of international law, international law must prevail."[125]

169. To this end, whilst the interpretation of the terms "*siège social*" and "*sede*" remains a matter of international law alone (there being no express *renvoi* to municipal law for either term), the Tribunal considers it appropriate at least to consider the municipal law of (in particular) Luxembourg and Portugal, by way of background to its interpretation.

170. Put in terms of Article 32 of the Vienna Convention, the Tribunal considers that in order to confirm the interpretation at which it has arrived pursuant to Article 31, it may have regard to municipal law (*e.g.* in order to ensure that the interpretation under Article 31 is not impossible, or unworkable as a practical matter). Indeed, as the Claimants themselves accept:

"… it is commonly understood that the list of sources in VCLT Article 32 is not exhaustive. Therefore, domestic law is not excluded *per se* from consideration."[126]

171. The Tribunal has had the benefit of extensive evidence and submissions on Luxembourg, Portuguese and Venezuelan law, and has carefully considered all of this material. Given its supplementary nature, it is not necessary to recount here all submissions and evidence in any detail, or indeed for this Tribunal to resolve every disagreement on the detailed operation of municipal law. Overall, the Tribunal has arrived at the firm conclusion that there is nothing as a matter of Luxembourg, Portuguese or Venezuelan law that causes it to re-consider the interpretation of "*siège social*" and "*sede*" to which the application of Article 31

---

[125] M. Sasson, Substantive Law in Investment Treaty Arbitration (Kluwer, 2010), p. 64.
[126] Claimants' Post-Hearing Brief, para. 194.

of the Vienna Convention gives rise. In particular, the Tribunal notes that notions of "effective seat", and the use of a substantive test for corporate nationality in certain circumstances, are entirely familiar to both Luxembourg and Portuguese law (being the municipal systems of most relevance to the issues of nationality in this case).

172. *Luxembourg Law:* As Prof. Steichen testified, Luxembourg law has adopted the theory of "effective seat" for purposes of the law applicable to corporations and their nationality.[127] This proposition was agreed by Prof. Prüm,[128] who stated that although the theory primarily purports to "*avoid that certain companies [would/could] be able to avoid Luxembourg law in an abusive way,*" it also covers situations where "*a company had its … statutory seat in Luxembourg and would transfer its real seat abroad.*"

173. Article 2 of the Luxembourg Company Law of 10 August 1915 (as amended) provides:

> Art. 2: "*Le domicile de toute societe commercial est situe au siège de l'administration centrale de la societe. L'administration central d'une societe est presume, jusqu'a preuve du contraire, coincider avec le lieu du siège statutaire de la societe.*"[129]

In English translation:

> "the domicile of a registered company is located at the seat of its central administration (head office).[130] Until evidence to the contrary shall have been finally brought, the central administration of the company is deemed to coincide with the place where its registered office is located."

174. Both Claimants' and Venezuela's Luxembourg legal experts agree that the unqualified term, "*siège social*" in the Company Law refers to the statutory seat or registered office.[131]

---

[127] Transcript (English), Day 8, p. 2126:9-2127:15 (Steichen).
[128] Transcript (English), Day 8, p. 2233:9-2234:19 (Prüm).
[129] Exhibit AP-6
[130] The footnote explains that the English language text of the amending EC Regulation 2157/2001 uses the term "head office", whereas the term "central administration" is used in a number of translations of laws of the financial sector and by the financial industry.
[131] Transcript (English), Day 8, p. 2123 (Steichen) and Transcript (English), Day 8, p. 2206 (Prüm); see also Steichen Legal Opinion, para. 21, and Prüm, paras. 11-15

175. Pursuant to Article 2 of the Company Law, a presumption is established that the "*real seat*" of a corporation coincides with its statutory seat, unless the contrary is proven.

176. It is common ground between the experts[132] that the "real seat" theory, as it is applied by the Luxembourg courts, is intended to preclude a company from seeking fraudulently to circumvent Luxembourg law. It is for that reason that the relevant provision of the Company Law is to be found within Section X of the Law, entitled "*Companies constituted in foreign jurisdiction*".

177. Article 159 provides:

> "Any company whose central administration (head office) is located in the Grand-Duchy shall be subject to Luxembourg law, even though the constitutive instrument may have been executed in a foreign jurisdiction.
> In case the domicile is located in the Grand-Duchy of Luxembourg, it is of Luxembourg nationality and Luxembourg law is fully applicable to it.
> In case the domicile of a company is located abroad but such company has in the Grand-Duchy of Luxembourg one or more locations where it conducts operations, the place of its most important establishment in the Grand-Duchy of Luxembourg, which it shall indicate for that purpose in the documents whose publication is required by law, shall constitute the secondary domicile of that company in the Grand-Duchy of Luxembourg. ……."

178. Both Prof. Steichen and Prof Prüm agreed that the test of "effective seat" was to be defined as:

> "the place where the company, in truth, operates in terms of its brains and its heart, …[w]here … the key decisions are being taken on a regular basis"

and that the elements indicative of the presence of an effective seat within the above meaning included: the places where the Directors meet; the place where

---

[132] Transcript (English), Day 8 p.2126 (Steichen), Legal Opinion of Prüm, para. 41

the Shareholders meet; and the place where the books and records of the company are being kept."[133]

179. Prof. Steichen also explained that interpreting Luxembourg law to require that a company have a "genuine link" with Luxembourg was consistent with Luxembourg's "open economy" policy.[134]

180. *Portuguese Law:* The only Portuguese legal provision defining the "*sede*" of a corporate entity is to be found at Article 159 of the Portuguese Civil Code as follows:

> "The seat of a corporate entity is the one designated in its bye-laws or, in the absence of such designation, the place in which its principal administration normally operates."[135]

181. The evidence before the Tribunal on behalf of both sides was that the interpretation of the unqualified term "*sede*" in this Code must be made with reference to Article 3(1) of the Commercial Companies Code, which adopts the qualified term "*sede efectiva*", and imports a concept of the principal and effective seat of the administration of a commercial corporation.[136]

182. Article 3(1) of the Commercial Companies Code provides as follows:

> "Commercial companies have as their personal law the law of the State where the main and effective seat of their administration is located. A company having its statutory seat in Portugal may, however, not oppose to third parties its submission to a law other than Portuguese law."[137]

183. In their Legal Opinion, Professors Maia and Duarte pointed to the following factual elements as being relevant to the determination of Talta's effective seat:

    (a)    the place where day-to-day management takes place or where those responsible for management act;

---

[133] Transcript (English), Day 8, p. 2129:5-8 and 2132:8-13 (Steichen). Transcript (English), Day 8, p. 2255:16-2256:8 (Prüm).
[134] Transcript (English), Day 8, p. 2136:1-2137:13 (Steichen).
[135] Exhibit DMV-26 and see Transcript (English), Day 7, p. 1977 (Maia)
[136] Maia/Duarte Opinion, paras. 7-12, 23, 25-26, 32; Transcript (English), Day 7, p. 1897:1-16 (Maia). Transcript (English), Day 7, p. 2057:17-20 (Moura Vicente).
[137] Exhibit DMV-19

(b)      the place where third parties have contact with the management of the company.[138]

184.  Two further elements were added in the course of their evidence at the hearing, namely:

(c)      the place where the managers meet; and

(d)      the place where documents belonging to the management of the company are kept.[139]

185.  For his part, Professor Vicente considered that the effective seat was determined by the place:

> "in which the main deliberations of [the company's] managing bodies are transformed into acts of [ordinary] management"

– although that was not necessarily the place where the managing bodies met.[140]

186.  *Venezuelan Law:*  The position with respect to Venezuelan law is less clear, albeit not such as to negate the interpretation to which Article 31 of the Vienna Convention gives rise.

187.  Venezuela's presentation of Venezuelan law rested upon the expert testimony of Professor Iribarren.  The Tribunal has given careful consideration to this evidence, in light of Claimants' submission that to the extent that the notion of "*domicile*" is relevant to the interpretation of the Treaties then it is clear, on the basis of Article 203 of the Venezuelan Commercial Code, that if a company has a registered office identified in its articles of incorporation (as is the case here), that place is the company's domicile for the purposes of Venezuelan law.

188.  The Tribunal notes Professor Iribarren's concession that he had not referenced Article 203 in his First Report[141] and his proposition that given the "*complexity*"

---

[138] Legal Opinion of Pedro Maia and Tiago Duarte, para. 32
[139] Transcript (English), Day 7, p. 1939
[140] Legal Opinion of Dario Mauro Vicente, para. 59 and see also Transcript (English), Day 7, pp. 2064-2065
[141] Transcript (English), Day 3, p. 1113

of the nature of the problem and the aspects of public law involved, there was, as he put it:

> "an interest to interpret the idea of domicile under Venezuelan law in a way that is not as straightforward or simple as stated under the Business Code."[142]

189. Professor Iribarren suggested that it was necessary to establish the "*real, actual reason underlying the activities of the company that has started [the] arbitration.*" To that end, he postulated a "*progressive interpretation of the law*" based upon the Constitution, such that the law was "*(a)dapt(ed) .... to the new times and to the interpretation under the Constitution*" and an application of the BITs in an "*abusive manner*" could be avoided.[143] That he achieved by an "*interpretative effort*" whereby Article 203 of the Commercial Code was interpreted jointly with Article 27 of the Civil Code.[144] Article 27 provides that the domicile of a natural person is their principal seat of business and interests. If the latter was not the seat designated in the act of incorporation, then applying a "*progressive interpretation of the Act*", "*we could conclude that the Claimants did not have any real reason in actual fact to bring forward this arbitration.*"[145]

190. For the reasons adumbrated by Claimants, the Tribunal has considerable difficulty with this proposition. First, it runs contrary to the clear terms of Article 203 in a manner contrary to Article 7 of the Venezuelan Civil Code:

> "Laws cannot be derogated from except by other laws and their disuse, custom or contradictory practice cannot be invoked against their observance, regardless how old and universal they are"[146]

Second, it contradicts Article 8 of the Venezuelan Commercial Code, which provides that the provisions of the Venezuelan Civil Code only apply to commercial companies where the Commercial Code is silent. Article 203 of the Commercial Code regulates the domicile of commercial companies and so

---

[142] *Idem*, p. 1086
[143] *Idem*, p. 1088
[144] Iribarren Second Legal Opinion, paras. 25 and 35
[145] *Idem*
[146] Exhibit HIM I-9

Article 27 of the Civil Code is inapplicable. Third, Article 203 is clear on its terms and so no "*interpretative effort*" is required – or appropriate.

191. The Tribunal has real difficulty, too, with the further suggestion, which emerged in the course of Professor Iribarren's cross-examination that the determination of the seat of a mercantile corporation could change depending upon whether the company was dealing with the State or with a private entity:

> "it could change if we apply the techniques and the interpretation under the Constitution and the progressive interpretation of the law to see the true economic reality underlying the legal matter at issue."[147]

192. In the course of an important and revealing exchange with a member of the Tribunal, Professor Iribarren confirmed that the starting point in his inquiry had been that:

> "… in arbitration …. one needs to go for the real reality, the underlying economic reality of the matter, and that is why it seems to me that perhaps some transnational companies that make investments in other countries might make abusive use of the form to the detriment of the underlying economic reality in its business existence." He confirmed, too, that that was also the end point of his inquiry.[148]

193. But the most telling point in terms of the weight to be attributed to his evidence, was Professor Iribarren's response to a series of questions focused upon his failure to draw attention to Article 28 of the Civil Code which, in contrast to Article 27, deals specifically with the domicile of partnerships, associations, foundations and corporations and provides that it shall be:

> "the place where its direction or management is located except otherwise provided by its Bylaws or special laws….."[149]

194. Professor Iribarren accepted that Article 28 referenced the specific issue of the domicile of civil companies by reference to the company's statutory domicile or

---

[147] Transcript (English), Day 4, p. 1109
[148] *Idem* at pp.1127-1129
[149] Exhibit HIM II-2

registered office, but he declined to accept that it was controlling as opposed to a complement to Article 27.[150] He continued:

> "I didn't mention it, because what I tried to clarify when I analyzed the case and the matter was, what is the underlying economic reality in the matter, and the underlying economic reality could make it such that neither Talta nor Tenaris had their main economic activity in Portugal or Luxembourg. The issue was how would a literal interpretation of these provisions we're discussing be prejudicial to the position of the Republic. That is what I tried to do in my first Report as well as in the second one on this issue."[151]

195. Beyond the inadequacies of Professor Iribarren's testimony, the Tribunal concludes that nothing in Venezuelan law undermines, impedes or renders unworkable the interpretation of the Treaties to which Article 31 of the Vienna Convention gives rise.

### 4. Article 25 of the ICSID Convention

196. Venezuela's assertion that the definitions of "*corporate investor*" in the Treaties should be interpreted in light of Article 25 of the ICSID Convention, which definition was to be understood to reflect domestic legal requirements for corporate nationality, was raised for the first time in the course of cross-examination of Professor Pruem.[152] The Tribunal does not consider that to be a point well taken. It takes the view, reflected in the decisions of other ICSID tribunals, notably in *Rompetrol v. Romania*[153] that the requirements and criteria to be fulfilled in order to qualify as a corporate investor shall be those set out in the applicable investment treaties and that there is no scope for importing additional conditions purporting to be based upon Article 25 of the ICSID Convention.

---

[150] Transcript (English), Day 4, p. 1119
[151] *Idem*, p. 1120
[152] Transcript (English), Day 8, pp. 2228-2229
[153] *Rompetrol v. Romania*, ICSID Case No. ARB/06/3, Decision on Respondent's Preliminary Objections on Jurisdiction and Admissibility, 18 April 2008, paras. 81-83. (RLA-137)

5.    Nature and Application of the Test

197. Having arrived at a meaning for both terms in the context in which they appear here, there is then a question as to the precise test that each imports.

198. In assessing whether Tenaris' and Talta's actual or effective management was located in Luxembourg and Portugal respectively, the Tribunal considers it critical to take into account the actual nature of each company, and its actual activities.

199. In so far as either entity is no more than a holding company, or a company with little or no day-to-day operational activities, its day-to-day "management" will necessarily be very limited, and so will its physical links with its corporate seat. Put another way, it would be entirely unreasonable to expect a mere holding company, or a company with little or no operational responsibility, to maintain extensive offices or workforce, or to be able to provide evidence of extensive activities, at its corporate location. And yet holding companies, and companies with little or no operational responsibility, have "management", and are certainly not excluded from the Treaties in this case. Indeed, countries such as Luxembourg and Portugal clearly consider it to their respective benefit to attract such companies, and to maintain a corporate regulatory regime that allows for them.

200. To this end, the Tribunal considers that the test of actual or effective management must be a flexible one, which takes into account the precise nature of the company in question and its actual activities. And it is with this in mind that the Tribunal has assessed the record in this case.

6.    Tenaris

201. Tenaris is no more than a holding company. And critically, by virtue of its Articles of Association, it is prohibited from engaging in industrial or commercial activities, which are undertaken by its operating subsidiaries. Its Articles of Association, dated 6 June 2007 provide as follows at page 002:

70

"[t]he company may not carry on directly any industrial activity or maintain a commercial establishment open to the public".[154]

202. Similarly, the Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, dated 21 June 2011, provides as follows, at page 0003:

"Description of Corporate Purpose: The purpose of the Company is to engage in all activities directly or indirectly associated with financial acquisitions, in any form whatsoever, in Luxembourg or foreign companies or in other commercial entities and in the administrative, management, control and development of activities thereof […]"[155]

203. As a holding company, Tenaris has over 25 subsidiaries. Its purpose is to engage in all activities directly or indirectly associated with financial acquisitions, in any form whatsoever, in Luxembourg or foreign companies or in other commercial entities in the administrative, management control and development of activities thereof. It has no operational activities of its own and its only function is to manage its portfolio of companies.

204. But Tenaris has a valid existence in Luxembourg in its own right as a holding company, and this is distinct from the existence and operation of its subsidiaries outside of Luxembourg. Accordingly, the Tribunal considers Venezuela's focus upon the extent of activity of, and net sales generated by, Tenaris' subsidiaries outside Luxembourg,[156] and the number of subsidiaries Tenaris has in countries other than Luxembourg,[157] is misconceived. It is Tenaris' own operation within Luxembourg that must be examined for the purposes of the Luxembourg Treaty.

205. With this in mind, the activity of "managing" Tenaris and its operations would necessarily be a relatively limited one. And on the evidence in this case, the "effective" centre for such activity was Luxembourg.

---

[154] Exhibit C-202
[155] Exhibit C-6
[156] See *e.g.* Respondent's Counter-Memorial, para. 172; Respondent's Rejoinder, paras. 15 and 197
[157] See *e.g.* Respondent's Rejoinder, para. 197

206. In terms of constitution and structure, the Tribunal notes, in particular, the following:

(a) an extract dated 21 June 2011 from the Luxembourg Registry of Commerce and Corporations confirms that Tenaris was incorporated in 2002, with its "*corporate headquarters*" ("*siège social*") located at 29 Avenue de la Porte-Neuve, L-2227 Luxembourg;[158]

(b) Tenaris' Articles of Association dated 6 June 2007[159] record as follows:

i. Article 1:  Tenaris is a:

"*societe anonyme* holding governed by these Articles of Association and by the laws and regulations of the Grand Duchy of Luxembourg governing business corporations and holding companies, and more specifically by the laws of August 10, 1915 and July 31, 1929, such as those laws were amended by subsequent laws and regulations."

ii. Article 3:

"The registered office "siège social" is established in Luxembourg-City"

iii. Article 9:

"The board of directors shall meet as often as required by the interests of the Company and at least four (4) times a year, upon notice by the chairman or by two (2) directors, either at the registered office or at any other place indicated in the notice …Board of directors meetings can be validly held by means of telephonic conference call, video conference or any other means genuinely allowing for the participation, interaction and intercommunication of the attending directors."

iv. Article 15:

---

[158] Exhibit C-6.  By 2008, the *siège social* of Tenaris had moved to 46a, avenue John F. Kennedy, but by the time of the June 2011 AGM, it had reverted to the former address at 29 ave de la Porte-Neuve. See para. 209 above.
[159] Exhibit C-202

"The annual general meeting shall meet each year *ipso jure* in the city of Luxembourg at the place indicated in the notices for meeting on the first Wednesday of June at 11.00 a.m. ….. The general meetings, including the annual general meeting, may be held in a foreign country whenever there occur circumstances of force majeure as determined by the board of directors in its discretion. In such event, the terms and conditions necessary to provide proper deliberations and publications will continue to be those provided for by the laws of Luxembourg."

v.   Article 19:

"The nationality of the company may be changed and the commitments of its shareholders may be increased only with the unanimous consent of all the shareholders and bondholders, if any…."

vi.   Article 20:

"Twenty (20) days before the general meeting, the shareholders may take cognizance at the registered office of the annual accounts and the report of the auditors."

vii.   Article 25:

"All points not covered by the present Articles of Association shall be governed by Luxembourg law.";

(c)   Tenaris' amended Articles of Association dated 2 May 2012[160] record that:

i.   Article 1:   Tenaris is:

"a *societe anonyme* governed by these Articles of Association and by the applicable laws and regulations of the Grand Duchy of Luxembourg."

ii.   Its Registered Office remained unchanged (Art. 3) as did the provisions of Arts. 9, 19 and 25;

iii.   Article 15:

---

[160] See Exhibit C-231. The Articles were amended pursuant to an EGM of the Company held in Luxembourg on 1 June 2011 the (incomplete) note of which is as Exhibit C-224.

"The annual general meeting shall meet each year in Luxembourg at the place indicated in the notices of meeting on the first Wednesday of May at 9.30 a.m. ….. The general Meetings, including the annual general meeting, may be held in a foreign country whenever there occur circumstances of force majeure as determined by the board of directors in its discretion. In such event, the terms and conditions necessary to provide proper deliberations and publications will continue to be those provided for by the laws of Luxembourg."

iv.   Article 20:

"Copy of the annual accounts, the auditor's report on such annual accounts and such other documents required by law shall be made available to shareholders in compliance with applicable law."

207.  Against this structure, and with respect to the actual management of Tenaris and its business in Luxembourg, there are a number of key points, as set out below.

208.  The office in Luxembourg is the only office of Tenaris worldwide.[161]

209.  Tenaris' annual general meetings of shareholders are convened at its Luxembourg "*siège social*".[162]

210.  The Minutes of the AGM in June 2009 do indeed show that it was convened at 46A ave. John F Kennedy in Luxembourg, as was the June 2010 AGM, while the June 2011 AGM was convened at the "*siège social*" at 29, ave de la Porte-Neuve.[163]

---

[161] Transcript (English), Day 1, pp.97-98
[162] Transcript (English), Day 1, pp.97-98
[163] See Exhibit C-224.  As noted by Prof. Prüm, and other Luxembourg legal commentators (*e.g.* J.P. Winandy, *Manuel de droit des sociétés*, 2011 ed., 2011, Exhibit AP-26, page EN 0003), the place where the shareholders' meetings take place is the "*most relevant criteri[on]*" and the "*really decisive factor*" for Luxembourg courts (Cross-Examination of Prof. Prüm, Transcript (English), Day 8, 2255:16-22; 2256:1-2).  This is also apparent from the *Caldwell* case - Decision of the District Court of Luxembourg, no. 107,744, 18 April 2008, Exhibit AP-21, page EN 0003; Decision of the Court of Appeal of Luxembourg, No. 33908, 21 October 2009, Exhibit AP-23, page EN 0004; Dismissal of the appeal of the *Cour de Cassation* of Luxembourg, No. 2795, 9 December 2010, Exhibit AP-25, page EN 0004.

211. Tenaris holds Board of Directors meetings at its registered office in Luxembourg. This transpired in the course of oral testimony, as for example in the testimony of Mr Oscar Montero:[164]

> "Q:      […] did you have a moment in which you had to go to Tenaris's offices?
>
> A:      Yes. The last joint venture that we announced between Tenaris and Ternium is an investment in Mexico for a thermoelectric plant, a $1 billion dollar investment. In November, I had to participate – even though I am not a member of Ternium's board, I often attend – and in that opportunity that investment was going to be discussed at the board, and I had to go to Luxembourg to discuss this investment, and also at Ternium's board. Afterwards, the Tenaris board meeting took place, also in Luxembourg where it has its seat".[165]

212. In this regard, Claimants (rightly in the Tribunal's view) dismiss the criticism raised at the hearing by Venezuela that there are no minutes of Tenaris' Board minutes in the record. They point out that the matter had never been raised by Venezuela in its pleadings, nor had it sought their disclosure as being documents:

> "intrinsically relevant to the question of the 'siège social' of the Claimants and the jurisdiction of the Tribunal."[166]

213. It is also clear from Tenaris Shareholders' Meeting Minutes, 2009-2011,[167] pages 0001, 0016, 0032 and 0046 that Mr Roberto Bonatti, a member of the Tenaris' Board of Directors, was physically present at each of Tenaris' shareholders' meetings held in Luxembourg between 2009-2011. The Claimants observed that that was:

> "unsurprising, considering that it is typical in the corporate world for a company to hold a board meeting immediately after the Shareholders' annual meeting."[168]

---

[164] Cross-Examination of Oscar Montero, Transcript (English), Day 2, p. 399:6-17
[165] Transcript (English), Day 2, p.399.
[166] See Request No. 5 of Respondent's Request for Documents dated 25 January 2013.
[167] Exhibit C-224.
[168] Claimants' Post-Hearing Brief, FN 542.

214. Tenaris keeps its books and records at its registered office in Luxembourg. This is prescribed in Article 20 of the company's Articles of Association of 6 June 2007,[169] and also confirmed in Shareholders' Meeting Minutes.[170]

215. The Auditors of Tenaris were PricewaterhouseCoopers in Luxembourg.[171]

216. Further, the Tribunal notes that the Respondent has been singularly unable to identify and demonstrate any other corporate seat for Tenaris, outside of Luxembourg.  It was not until its Rejoinder that it posited Argentina, but in the Tribunal's view this has no foundation.  In particular, the Respondent has been unable to point to any consistent acts of management of Tenaris itself (as distinct from its subsidiaries) taking place elsewhere.

217. To the extent that other criteria have been raised by Venezuela by reference to Luxembourg law, Claimants maintain that they are irrelevant and/or inaccurate, and the Tribunal agrees.   In particular, as set out above, the test to be applied in each Treaty here is ultimately one of international law, not Luxembourg law.  The points are noted below for completeness.

218. First, as to domicile and nationality of Tenaris' directors and CEO as a matter of Luxembourg law, Claimants note that the *Caldwell* case[172] made clear that nationality and residence of senior management do not constitute valid criteria of attachment – a proposition accepted by the Luxembourg legal experts of both Parties at the hearing.[173]

219. Second, the (inaccurate) assertion that Tenaris S.A. had 27,000 employees of whom 7,000 were in Argentina is irrelevant: the Court of Appeal of

---

[169] Exhibit C-202.
[170] Meeting Minutes, 2009-2011, pp. 0002, 0017, and 0033. (Exhibit C-224)
[171] Tenaris Shareholders' Meeting Minutes, 2009-2011, pp. 0010, 0011, 0026, and 0042 (appointing PwC S.a.r.l. as Tenaris' auditor). (Exhibit C-224)
[172] *Caldwell S.a.r.l v. State of the Grand Duchy of Luxembourg*: see FN 165, *supra* and Exhibits AP-21, AP-23, and AP-25.
[173] Transcript (English), Day 8, p. 2167 (Steichen); Transcript (English), Day 8, pp. 2249-2251 and pp. 2264-2265. And see also Exhibit AP-10: Decision of the District Court of Luxembourg in *Focant v. Bacci*.

Luxembourg has held that the number and location of any employees of a company are not relevant criteria.

220. Third, the contention that Tenaris S.A. occupied two floors of a 30-storey office block in Buenos Aries has been refuted by the evidence of Mr Malvassora.

221. Fourth, contrary to the suggestion that (tested by Luxembourg law) it does not maintain an office, or any adequate office, in Luxembourg, as already noted there is irrefutable evidence in the record that Tenaris does have a physical presence in Luxembourg, albeit that under Luxembourg law, there is no need for a company to own or rent premises in Luxembourg.[174]

222. Fifth, and again as already noted, Tenaris is a holding company prohibited by its Articles of Association from undertaking industrial or commercial activities, which are the province of its subsidiaries. Even if it were not the subject of such a prohibition, the Luxembourg Court of Appeal has determined that:

> "the principal establishment is the place where the heart and brain of the company is (sic) located. It must be distinguished from the company's seat of operations which corresponds to the place where the company pursues its industrial and commercial activities."[175]

223. In light of the matters set out above, the Tribunal is satisfied that Tenaris has complied in good faith with the Treaty requirement that it be both "*constituted in accordance with the laws of … the Grand Duchy of Luxembourg*" and that it have its "*siège social*" in Luxembourg.

### 7. Talta

224. As for Talta, the Tribunal notes that:

---

[174] See Exhibit AP-16: Law of 31 May 1999 published in the Journal Officiel du Grand-Duche de Luxembourg dated 21 June 1999. And as to Belgian law: see Exhibit AP-7: Wauwermans: "Manuel pratique des societes anonymes"
[175] See Exhibit AP-27: Decision No. 37940, dated 21 December 2011. And see also Exhibit AP-10: Decision of the District Court of Luxembourg dated 21 April 1971.

(a)  its Articles of Incorporation dated 5 June 2003 show that its first registered office was at Rua dos Murcas 88 3rd floor District of Se, Funchal[176];

(b)  the Permanent Certificate issued by the Commercial Registry of the Free Zone of Madeira[177] records that its Head Office ("*sede*" in the Portuguese original) is at Rua Alfândega no.74-76-2o andar, sala H 9000 058 Funchal Madeira;

(c)  Talta has no offices elsewhere in Portugal, or anywhere else outside Portugal;

(d)  two of its four Managers are resident in Portugal. Importantly, the joint signatures of Group A managers (De Sousa and Gouvea) and one Group B Manager (both Argentines) or the single signature of a member of the Board of Directors, if so authorised by General Meeting, are required to bind the company. As the company was structured, the signature of a Portuguese resident manager was necessary for every management decision taken by the company;

(e)  Talta holds out to third parties its Portuguese office contact details;

(f)  Talta's management records are kept in Portugal where its financial statements are subject to audit, and it retains auditors in Lisbon;

(g)  the Minutes of the Shareholders' meetings of 2010 and 2011 indicate that these meetings took place at an adjacent office in Funchal. [178] As pointed out by Claimants, Rua das Murças runs parallel to Rua da Alfândega. The address on Rua das Murças, indicated as the location of the shareholder meetings, is in the same building and a floor above the location of Talta's "*sede*" on Rua da Alfândega;

---

[176] See Exhibit C-170
[177] See Exhibit C-9
[178] Exhibit C-245 and see also Exhibit CLEX-66

(h) Talta has entered into a Sub-lease dated 27 May 2009 (entered into by Mr Sousa, the manager of Talta) of space in Rua da Alfandega, and an addendum sub-lease agreement of 20 October 2009 for an additional room "I" (for meetings) and a common entrance hall;

(i) Talta makes corporate filings at the Commercial Registry in Funchal;

(j) Talta files its tax returns with the Portuguese tax authorities in its capacity as a Portuguese resident (see *e.g.* Talta's tax filings for 2011 and 2012);

(k) Talta's managers have executed powers of attorney, including to their representatives in this arbitration, before a Portuguese Notary Public;[179]

(l) the SEC Filing 20-F for the year ended 2012,[180] which shows Talta as a "*trading and holding company*" incorporated in Funchal.

225. In light of the matters set out above, the Tribunal is satisfied that Talta has complied in good faith with the Treaty requirement that it be both "*constituted pursuant to and function in accordance with the Laws of*" Portugal, and that it have its "*sede*" in Portugal.

### 8. Conclusion

226. On the basis of the submissions and the evidence that it has received and reviewed above, and judged fairly against the nature of each company, the Tribunal concludes that it has jurisdiction *ratione personae* over Claimants: Tenaris has established that, in accordance with the terms of the Luxembourg Treaty, its "*siège social*" is in Luxembourg. Talta has likewise established that, in accordance with the terms of the Portugal Treaty, its "*sede*" is in Portugal.

---

[179] A number of these examples are the subject of the references collected at FN 627 of the Claimants' Post-Hearing Brief.
[180] Exhibit R-141

227. Tenaris is thus entitled to the protections afforded to an investor under the Luxembourg Treaty and Talta is both entitled to the protections afforded to an investor under the Portuguese Treaty and, by virtue of its standing as a wholly owned subsidiary of Tenaris, to those available to an investor under the Luxembourg Treaty, as well.

## 2. NOTIFICATION OF CLAIMANTS' CLAIMS

### a. Venezuela's Case

228. Venezuela objects that it did not receive proper notice of all of the substantive claims that are now pursued by the Claimants in this arbitration, and in particular the Fair and Equitable Treatment / discrimination claims, and the Protection and Security claims. Venezuela argues that this constitutes a failure on Claimants' part to fulfil the jurisdictional requirements of the Treaties.

229. Article 9(1) of the Luxembourg Treaty provides that:

"Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation....."

Article 9(2) continues:

"In the absence of an amicable settlement within six months from the date of the notification of the dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final."

230. There is no direct equivalent provision in Article 8 of the Portuguese Treaty to the express notification provision contained in Article 9 (1) of the Luxembourg Treaty, but Article 8(1) of the Portuguese Treaty does require an attempt to be made to resolve any disputes by "*means of amicable consultations*", and Article 8(2) provides for recourse to international arbitration (or the local courts of the Contracting Party in whose territory the investment was made):

"[s]hould the dispute not be solved by amicable means within a period of six (6) months counting from the beginnings of these consultations….."[181]

231. While Claimants point out that the Portuguese Treaty does not require the submission of any formal notice of dispute, Venezuela suggests that there was implicit recognition on Claimants' part of the need to give details in the terms of the memorandum submitted with the Notice of Dispute of 20 August 2009.[182] In that memorandum, Claimants stated that its purpose was to:

"provide detailed information on the dispute under the Luxembourg Treaty and the Portuguese Treaty concerning the nationalization of Matesi."

232. As a preliminary point, it is to be noted that there is no issue between the Parties that Claimants' Notice of Dispute of 20 August 2009 and the accompanying memorandum constituted sufficient notice of what Venezuela describes as Claimants' "*nationalization*" claims.

233. However, Venezuela objects that it did not receive notice of Claimants' Fair and Equitable Treatment / discrimination and Protection and Security claims.

234. First, and as to the former, it suggests that Claimants have resorted to an after-the-event re-characterisation of complaints raised in correspondence exchanged between Matesi and CVG FMO in 2006 in respect of alleged breaches of contractual obligations on the part of CVG FMO *vis-à-vis* Matesi, as the basis for a Treaty claim. In particular, Venezuela complains that prior to the filing of Claimants' Request for Arbitration, the issue of pellet allocation had been referred to as: "*contract disputes or questions of contract*".[183]

235. Second, it was a prerequisite to arbitration that the Parties should attempt to reach an amicable settlement. Such a pre-arbitration negotiation phase was a condition of Venezuela's consent to arbitral jurisdiction and Claimants failed to

---

[181] RLA-114
[182] Exhibit C-14
[183] Respondent's Post-Hearing Brief, para. 156

perfect that consent, so far as the Fair and Equitable Treatment / discrimination and Protection and Security claims are concerned. In particular, it was essential to any fulfilment of the requirement that the Parties seek to find an amicable solution of their disputes that the Parties should know what the matters were, which were said to give rise to the Treaty dispute(s). Venezuela referred to the holding of the Tribunal in *Burlington* that a claimant must "*articulate [its] disagreement with a reasonable degree of specificity*" in order to "*apprise Respondent of a dispute.*"[184]

236. Venezuela maintains, too, that were the Tribunal to deem the notice defective, as Venezuela contends is the case, it would be adhering to the "*recent trend*",[185] exemplified by the decision in the *Tulip* case, to interpret notice provisions strictly.

> b. Claimants' Case

237. In answer, Claimants say that:

(a) Venezuela had notice of all three claims (*i.e.* the Fair and Equitable Treatment / discrimination and Protection and Security claims, as well as the Expropriation claim);

(b) even if it did not have specific and separate notice of the Fair and Equitable Treatment / discrimination and Protection and Security claims, they were sufficiently related to the Expropriation claim that no such notice was required in respect of these claims; and

(c) notice and amicable settlement provisions have been considered by many international tribunals not to be strict jurisdictional requirements, particularly where there was active engagement by a State in a settlement

---

[184] *Burlington Resources, Inc. v Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010.
[185] Respondent's Post-Hearing Brief, para. 163. And see *Tulip Real Estate & Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28 ("*Tulip*"), Award, 10 March 2014: "Neither the Vienna Convention nor principles of customary international law enable the terms of State consent to jurisdiction to be redefined as merely directory or subject to unexpressed qualifications.".

effort. Accordingly, a failure to comply would not divest a tribunal of jurisdiction. However, it has also been suggested that these clauses provide a procedural opportunity to settle, and if a State does not take advantage of that opportunity, there are no jurisdictional consequences arising from a defect in any notice.[186]

238. In this case the principal documents upon which Claimants rely are:

(a) Claimants' letter dated 20 August 2009 addressed to MIBAM Minister Sanz;[187] and

(b) Claimants' subsequent letter to Minister Sanz dated 20 November 2009.[188]

c. Analysis

239. The communications comprising notice of the two disputed claims have been described as "*woefully inadequate*".[189] On analysis, the Tribunal is unable to agree.

240. Taking the letters in turn, the 20 August 2009 letter refers to interference in the normal administration of Matesi to the detriment of its business operations since the implementation of Decree no. 6,058, and to the fact that:

> "since 2004, **as detailed in our letter dated 12 August 2009**,[190] the Government has been obstructing Matesi's normal operation through various acts, including gross violations of its contractual obligations with respect to Matesi and accompanying this conduct with threats of nationalization". (Emphasis added)

241. In the 20 November 2009 letter, Claimants referred to:

---

[186] Transcript (English), Day 1, p. 134
[187] Exhibit C-14
[188] Exhibit C-51
[189] Respondent's Rejoinder, para. 131
[190] Exhibit C-33: Claimants' letter to Minister Sanz of 12 August 2009 makes specific reference to the allegedly inequitable distribution of pellets by CVG FMO and to the impact of the collective labour agreement.

> "losses … suffered before the issuance of Decree 6,058, due to the intervention measures of the Government in the transactions of Matesi that affected its economic situation. As an example, this included the suspension of the delivery of materials and the lack of action by the labor authorities of the Government regarding the abuses committed by members of the union organization, who instead were officially recognised by your Office by making them members of the Transition Committee for the taking over of control of Matesi."

242. It is apparent from the manner in which these letters are framed that any settlement negotiations with Venezuela were intended to encompass the totality of what Claimants perceived as the effect of Venezuela's interventions upon Matesi's business over a period going back to 2004. They were matters of which Claimants provided adequate identification, and of which, in any event, Venezuela was well aware. In the opinion of the Tribunal, these letters do articulate the disagreement with a reasonable degree of specificity as envisaged in *Burlington* and as elaborated (*e.g.*) in *Tulip*.

243. In *Tulip*, the relevant clause provided that a dispute could be referred to ICSID arbitration twelve months after it had arisen, having been the subject of attempts at amicable settlement in the meantime. The Tribunal found that:

> "the applicable legal standard is as stated by the tribunal in *Burlington Resources v. Ecuador*. In this regard, Article 8(2) does not require the investor to spell out its legal case in detail during the initial negotiation process. Nor does Article 8(2) require the investor, on the giving of notice of a dispute arising, to invoke specific BIT provisions at that stage. Rather, what Article 8(2) requires is that the investor sufficiently informs the State party of allegations of breaches of the treaty made by a national of the other Contracting State that may later be invoked to engage the host State's international responsibility before an international tribunal."[191]

244. In the Tribunal's view, this standard is satisfied here.

245. If the Tribunal were wrong about that, it is in no doubt that, whether or not the claims prove ultimately to be well founded, Claimants' Fair and Equitable

---

[191] *Tulip,* Decision on Bifurcated Jurisdictional Issue, March 2013, para. 57.

Treatment / discrimination and Protection and Security claims are closely related to their Expropriation claim, and that they arise out of substantially the same subject matter. The Fair and Equitable Treatment / discrimination claims centre upon an alleged attempt by Venezuela to starve Matesi of a key input in favour of companies in which the State held an interest, prior to the expropriation. This was in order to try to decrease the value of Matesi. All of this coincided with, and was said to be closely related to, threats of expropriation directed against the Techint companies. The Protection and Security claim arises out of an alleged failure by Venezuela to stop both the violence perpetrated by the Matesi trade union, which, Claimants say, was directed against the company following the promulgation of the Nationalisation Decree, and the violent actions of the government appointed Transition Commission, exacerbated by the appointment to the Commission of the leader of Matesi's trade union.

246. Consistent with the findings of the Tribunals in *CMS Gas Transmission Co. v. Argentina* and *Teinver v. Argentina*, the Tribunal is of the opinion that no separate notice of these claims is called for, and that the initial notice satisfies the amicable settlement requirement for multiple measures.[192]

### 3. THE TALTA LOAN AND THE TALTA OFF-TAKE AGREEMENT

#### a. Venezuela's Case

247. Venezuela does not dispute that Claimants' shareholding in Matesi constituted an "investment" for the purposes of the Luxembourg and Portuguese Treaties. However, it takes issue with the characterisation of both the Talta Loan and the Talta Off-Take Agreement as "investments" under each Treaty.

---

[192] *CMS Gas Transmission Co. v. Argentina*, ICSID Case No. ARB01/8, Decision on Jurisdiction, 17 July 2003, para. 109: "As long as [the alleged measures] affect the investor in violation of its rights and cover the same subject matter, the fact that they may originate from different sources or emerge at different times does not necessarily mean that the disputes are separate and distinct." (*"CMS Gas"*) *Teinver v. Argentina*, ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012, para. 125: "Given that the formal expropriation alleged does appear to be closely related to … [Argentina's regulatory measures], it appears reasonable to conclude that these two core issues are related to the point that they share the same subject-matter."

248.   *The Talta Loan:*          Pursuant to a Loan Agreement dated 8 July 2004,[193] Talta agreed to lend Matesi US$60,346,211:

> "to be applied for the payment of the purchase price for the acquisition of the assets located in Ciudad Guayana, Bolivarian Republic of Venezuela, which comprise the hot briquetting iron plant of Posven C.A. and for covering the cost necessary to cause such plant to restart operations."

249.   Provision was made for 20 equal consecutive semi-annual repayments (Article 2.02) and, at Article 2.06 (c), Matesi was required to:

> "seek to obtain the registration of the Loan and this Agreement with the Venezuelan exchange control authority (CADIVI) and to obtain authorisations from such authority to purchase from the Venezuelan Central Bank the Dollars required to make the payments required under this Agreement and the Note on such dates set forth in this Agreement."

250.   The loan was duly recognised in Matesi's books.[194]

251.   Matesi was subsequently precluded from making the requisite dollar repayments by reason of the implementation of Disposition no. 58 on 2 September 2004. Pursuant to the terms of the Disposition, Matesi was required to obtain approval from CADIVI before it could apply foreign currency to the repayment of the loan that it had received from Talta. CADIVI conditioned its own approval upon receipt of a certificate from the Ministry of Planning that the debt constituted a "productive financing" falling within the economic and social policies of Venezuela. No such certificate was ever forthcoming. Matesi was obliged to extend the calendar of payments in order to avoid a default and part of the loan was capitalised.[195]  However, as of 30 April 2008, a sum of US$27.1 million remained unpaid.

---

[193] Exhibit C-74
[194] Claimants' Reply Memorial, para. 169, and Second Compass Lexecon Report, para. 58.
[195] Transcript (English), Day 3, p. 823 (Bello). See also Transcript (English), Day 3, pp. 826 and 827

252. Venezuela contends that the Talta Loan had no value independent of Matesi's business[196] - indeed it was a legal fiction, because there was no repayment and no interest was collected. In effect, argues Venezuela, Talta seeks a double recovery as both a shareholder in, and lender to, Matesi.[197] Moreover, if the Talta Loan was an independent asset, it carried no risk other than the normal commercial risk of default for which the agreement established its own remedies – for example at Clause 2.03:

> "The Borrower shall pay interest on the unpaid principal amount of the Loan outstanding from time to time at a rate per annum equal at all times during each Interest Period to Libor plus 5.00% per annum, payable in arrears on each Payment Date and on the date the Loan is paid in full."[198]

253. Moreover, lender risk was measurable by reference to the interest rate attributable to the loan and in the event of non-payment, Talta's exposure was limited: Clause 6.09 provided that:

> "Nothing herein [the loan] shall be deemed or construed to make the Lender a surety or a guarantor of the Borrower or of any other shareholder or Affiliate of the Borrower or liable to meet any obligation of the Borrower or of any other shareholder or Affiliate of the Borrower."[199]

254. In the event of a default, Talta was to rank *pari passu* with all other present and future senior and unsubordinated debt,[200] and it was protected in the event of an expropriation by a right to immediate repayment. Clause 5.01 established as an "*event of default*":

> "Any authority asserting or exercising governmental or police powers in Venezuela or any Person acting or purporting to act under such authority shall have taken, authorized or ratified any action or series of actions for or resulting in: (1) the appropriate, requisition, condemnation, seizure, confiscation, expropriation or nationalization of all or substantially all of the shares of the Borrower or all or substantially all of the properties or assets of the Borrower."

---

[196] Hart Report, para. 89
[197] Respondent's Rejoinder, paras. 220-222
[198] Talta-Matesi Loan Agreement, § 2.03(a). (Exhibit C-74)
[199] *Idem*, § 6.09.
[200] *Idem*, § 3.01(f).

And in the case of an event of default:

> "the Lender may declare the entire unpaid principal amount of the Loan, all accrued and unpaid interest and all other amounts payable under the Agreement and the Note to be forthwith due and payable."[201]

255. *The Talta Off-Take Agreement:* Pursuant to the Off-Take Agreement of 9 July 2004,[202] Matesi agreed, for a period of 10 years from the date of its acquisition of Posven's assets, to sell 50.2% of its Produced Volume to Talta, and Talta agreed to take up 30.12% of the Produced Volume at cost plus 10%.

256. It is contended by Venezuela that the Off-Take Agreement is no more than a straightforward sale and purchase agreement – a commercial agreement entered into between two private entities.[203] Claimants' assertions that the Off-Take Agreement amounted to a contribution to the State, because it was one of the reasons for Talta's investment in Venezuela in the first place[204] and that it provided for continued supply to Matesi to enable it to operate and employ workers in Venezuela and ensure local supply of HBI were dismissed by Venezuela as being: "*so vague as to be meaningless.*"[205] According to Venezuela, such evidence and argument were insufficient to demonstrate that the Off-Take Agreement involved a genuine contribution, namely a commitment of capital, made with the expectation of a commercial return, which was both in the future and uncertain.

257. Furthermore, according to Venezuela, the argument that it involved investment risk, because it was: "*subject to operational and competitive risk that may have decreased the value of Matesi to its shareholders*" was misconceived: that was the sort of operational and competitive risk inherent in any commercial contract

---

[201] Idem, §5.01(k) et seq
[202] Exhibit C-27
[203] Respondent's Counter-Memorial, para. 191
[204] Claimants' Reply Memorial, para. 268
[205] Transcript (English), Day 1, p. 262

- and in this case, there was a guaranteed seller and a guaranteed buyer within the same corporate family.[206]

258. In short, this was not a situation in which Talta was paying money or contributing a meaningful asset while any returns were uncertain or dependent upon future profitability. On the contrary, all risks were capable of being minimized by contractual agreement.

259. Venezuela placed reliance, *inter alia*, upon the holding in *Joy Mining Machinery v Arab Republic of Egypt* that:

> "If a distinction is not drawn between ordinary sales contracts even if complex, and an investment, the result would be that any sales or procurement contract involving a State agency would qualify as an investment …. Yet those contracts are not investment contracts except in exceptional circumstances and are to be kept separate and distinct for the sake of a stable legal order." [207]

And the holding in *Romak S.A. v. The Republic of Uzbekistan* that:

> "An investment risk entails a different kind of plea, a situation in which the investor cannot be sure of a return on his investment and may not know the amount he will end up spending even if all relevant counterparties discharge their contractual obligations. Where there is a 'risk' of this sort, the investor simply cannot predict the outcome of the transaction." [208]

260. Venezuela maintained that in the case of the Off-Take Agreement, there was no involvement of the Venezuelan State, which derived no benefit from a commercial arrangement, subject to normal commercial terms, including provision for ICC arbitration in Montevideo, Uruguay and an application of UNIDROIT principles.[209]

---

[206] Respondent's Rejoinder, paras. 216 and 217
[207] *Joy Mining v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, 6 August 2004. (*"Joy Mining"*).
[208] *Romak v. Uzbekistan*, PCA Case No. AA 280, Award, 26 November 2009. (RLA-107)
[209] Exhibit C-27 at Art. 13.2.

261. Venezuela also dismissed Claimants' suggestion that the cover afforded by Article 1(2)(c) of the Luxembourg Treaty was "*automatic*" [210] and that, by application of Article 1 (2)(e), it extended to all "*contractual obligations*". In the submission of Venezuela, the protection of the Treaty extended to public law contractual concessions and this agreement was not such an instrument.

### b.   Claimants' Case

262. Claimants' submission is that both the Talta Loan and the Off-Take Agreement fall squarely within the definitions of "investment" contained in the Treaties (specifically within Art. 1(2)(c) of the Luxembourg Treaty) and that even if the Tribunal were to hold that one or both agreements did not constitute an investment for treaty purposes, then they were elements of a transaction, which had to be considered as a whole and which itself was an "investment".

263. For their part, Claimants maintained that the long term nature (10 years) of the commitment to a supply of HBI at cost-plus pricing manifested by the Off-Take Agreement was one of the drivers behind Talta's investment in Venezuela in the first place. The arrangements put in place for a long-term continued supply constituted a contribution to the State in that it secured the operation of the facility, the hiring of local employees and a market for locally supplied HBI. In these respects the Off-Take Agreement satisfied the Portuguese Treaty's definition of a right relating to investments or an obligation with economic value.

264. If that were wrong, Claimants urged upon the Tribunal the need to step back and consider the overall transaction, namely their qualifying investment in Matesi, of which, it was contended, both the Talta Loan and the Off-Take Agreement were integral parts. They relied upon the decisions in *Ceskoslovenska Obchodni Banka AS v Slovak Republic* [211]; *Mytilineos Holdings SA v. State Union of Serbia and Montenegro* [212]; and *Inmaris Perestroika Sailing Maritime Services*

---

[210] Respondent's Counter-Memorial, para. 187.
[211] *Ceskoslovenska Obchodni Banka AS v Slovak Republic*, ICSID Case ARB/97/4, 24 May 1999.
[212] *Mytilineos Holdings*

*GmbH et al v. Ukraine.*[213] Venezuela's reliance upon *Romak* was inapposite: this was not a transaction akin to a one-off commercial transaction for the sale of wheat; and its reliance upon the *Joy Mining* case was equally misplaced:

> "…the *Joy Mining* tribunal counseled in favor of using a transaction-based approach to the definition of investment, holding that '*a given element of a complex operation should not be examined in isolation because what matters is to assess the operation globally or as a whole […]*.' None of these tribunals used the formalistic test advocated by Venezuela here."[214]

### c. Relevant Principles

265. Before dealing with each of these disputed elements in turn, the Tribunal sets out the basis upon which it has conducted its analysis.

266. Article 25(1) of the ICSID Convention provides that:

> "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State … and a national of another Contracting State, which the Parties to the dispute consent in writing to submit to the Centre."

267. As is now routinely cited, in their Report on the ICSID Convention, the Executive Directors of the International Bank for Reconstruction and Development stated:

> "No attempt was made to define the term 'investment' given the essential requirement of consent by the parties, and the mechanism through which the Contracting States can make known in advance, if they so desire, the classes of dispute which they would or would not consider submitting to the Centre. (Article 25(4)."[215]

268. The relevant "mechanisms" in this case are the particular provisions of the applicable BITs in which "investments" are defined.

---

[213] *Inmaris Perestroika Sailing Maritime Services GmbH et al v. Ukraine*, ICSID Case No. ARB/8/08, Decision on Jurisdiction, 8 March 2010, para. 92.
[214] Claimants' Reply, paras. 174-175, citing *Joy Mining*, para 54.
[215] IBRD: Report of the Executive Directors on the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (1968), Sec V.27.

269. The Luxembourg Treaty provides, at Article 1(2), that:

> "The term 'investments' shall mean any kind of asset, or any direct or indirect contribution in cash, in kind or services, invested or reinvested by an investor of one Contracting Party in the territory of the other Contracting Party in any sector of economic activity whatsoever…"

270. Included within the definition are:

> "(b) … shares, equity participations and any other form of participation, including minority or indirect participation in companies constituted in the territory of one of the Contracting Parties….
>
> (c) obligations, claims and rights **to any benefit having an economic value linked to an investment.**" (Emphasis added).

271. Article 1(2) of the Portuguese Treaty provides that :

> "The term 'investments' includes all types of assets and rights relating to investments made in accordance with the laws of the other Contracting Party, and specifically, but not exclusively including …
>
> (b) Shares and other forms of participation in the capital or the economic results of companies;
>
> (c) Credit rights related to money or any other obligation having an economic value …"

272. These provisions are to be interpreted by reference to general principles of international law and Article 31 of the Vienna Convention (see para 134 above).

273. Venezuela emphasises the importance of the preambles to the Treaties, which, it contends:

> "[shed] light on the object and purpose of the contracting parties' respective obligations."[216]

The Preambles to the Luxembourg and the Portuguese Treaties (as quoted earlier in this Award) speak respectively to "*strengthen[ing] their economic*

---

[216] Respondent's Counter-Memorial, para. 181

*cooperation*" and "*intensify[ing] economic cooperation between the two States for their mutual benefit.*"

274. That does not seem to the Tribunal to be a controversial point, any more than is Venezuela's reliance upon Zachary Douglas' proposition that:

> "The notion of a *quid pro quo* between a foreign investor and the host state is the cornerstone for the system of investment treaty arbitration. In exchange for contributing to the flow of capital into the economy of the host contracting state, the nationals of the other contracting state … are given the right to bring international arbitration proceedings against the host contracting state and to invoke the international minimum standards of treatment contained in the applicable investment treaty."[217]

275. Venezuela takes the position that the mere fact that an asset or right, which is said to constitute an "investment", appears to meet the formal characteristics of an "'investment" prescribed in a BIT is insufficient; it must incorporate certain substantive features of an economic nature sufficient to distinguish it from a cross-border commercial transaction. As put by Douglas:

> "An investment in order to qualify for investment treaty protection must incorporate certain legal and economic characteristics. The economic characteristics derive from the common economic conception of foreign direct investment. In Rule 23 [of this Treatise], they are codified as the transfer of resources into the economy of the host state and the assumption of risk in expectation of a commercial return. The legal characteristics derive from the non-exhaustive examples of an 'asset' that constitute 'investment' in investment treaties and this forms the basis of Rule 22, which generalizes the requirement as the acquisition of property rights in the host state. It is essential that an investment have both the requisite legal and economic characteristics."[218]

276. That, too, is a proposition, which has informed the Tribunal's analysis in the context of the two disputed "investments". However, it is suggested by Claimants that what in fact Venezuela has sought to do is to elevate these general principles to a point that they somehow evolve into an overarching

---

[217] RLA-5, para. 335.
[218] *Idem*

concept of "investment", which purports to override the terms of the Treaties themselves. If that were the case, the Tribunal would have no difficulty in rejecting it. The express terms of Article 1(2) of both of the Treaties must be given due weight in accordance with Article 31 of the Vienna Convention, that is to say: "*in accordance with the ordinary meaning to be given to the terms of the treaty **in their context and in the light of its object and purpose**.*" That being the case, and while it accepts Claimants' submission that the listed examples in Articles 1(2) of the two Treaties are examples enumerating the different legal forms in which "investments" may manifest themselves, it would be equally inappropriate if the Tribunal were to seek to construe those terms without regard to the context in which they came to be made.

### d.    Analysis

277. The question for the Tribunal, properly framed, is whether each of the Talta Loan and the Talta Off-Take Agreement qualifies as an "investment" under the terms of the Treaties and the Convention in its own right and/or whether they constitute:

> "… interrelated transactions, each element of which, standing alone, might not in all cases qualify as an investment."

278. In particular, Claimants maintained that the test, as enunciated by the tribunal in *CSOB v Slovak Republic*, was as follows:

> " … a dispute that is brought before the Centre must be deemed to arise directly out of an investment even when it is based on a transaction, which, standing alone, would not qualify as an investment under the Convention, provided that the particular transaction forms part of an overall operation that qualifies as an investment."[219]

279. Venezuela emphasises the application by ICSID tribunals of a two-prong test to establish the existence of an investment in investor-State disputes. While bilateral investment treaties may confirm or restrict the notion of investment in the ICSID Convention they

---

[219] *CSOB v. Slovak Republic*, ICSID Case No. ARB/97/4, Decision of the Tribunal on Objections to Jurisdiction, 24 May 1999, para. 72.

"… cannot contradict the definition of the ICSID Convention … they cannot expand it in order to have access to ICSID… As long as it fits within the ICSID notion, the BIT definition is acceptable. It is not if it falls outside of such definition."[220]

280. In the opinion of the Tribunal, there is nothing in the language of the Luxembourg and Portuguese Treaties, which purports to deviate from the Convention notion of "investment".

281. Moreover, the Tribunal must consider whether or not the Talta Loan and the Talta Off-Take Agreement constitute "investments" in the context of a dispute in which Claimants' investment in Matesi is itself <u>acknowledged</u> to be an "investment" for the purposes of the Convention and the Treaties.

282. Notwithstanding that acknowledgement, Venezuela's attack upon the Talta Loan and the Off-Take Agreement is premised not least upon the contention that the acquisition of Matesi itself did not conform to what Venezuela suggested at the hearing was a "*key factor*", namely that "*the overarching plan [for the alleged investments taken as a whole] included a direct intentional benefit to the host State.*"[221] Rather than having any regard to the development of the economic or banking capacity of Venezuela, the objective of the purchase of the PosVen assets, including the Matesi plant, was the opportunity for Claimants to exploit in the open market a guaranteed supply of HBI produced by Matesi and purchased pursuant to the Off-Take Agreement on very favourable terms, which Claimants could then sell on at a considerable profit. In short:

"Rather than intending to invest in the host State to the direct benefit of the host State with the expectation of an investment level of return, the entire plan seems to be about engaging in commercial transactions for the purchase and sale of HBI through a corporate [family] structure."[222]

---

[220] *Phoenix Action Ltd. v. The Czech Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009.
[221] Transcript (English), Day 1, p. 268.
[222] *Idem*, p. 271.

283. The Tribunal considers that that proposition cannot be reconciled with the proposition that the acquisition of Matesi was an "investment" and, in any event, it begs the question as to the nature of the acquisition of Matesi.

284. In considering this issue, the Tribunal respectfully adopts the "combined effect" test referenced in the decisions in:

    (a)   *Mytilineos Holdings SA v. State Union of Serbia & Montenegro*,[223] in which the Tribunal had concluded that:

> "the combined effect of the [a]greements [was] clearly more than an ordinary commercial transaction";

    (b)   *Inmaris Perestroika Sailing Maritime Services GmbH et al v. Ukraine*[224] in which the Tribunal had held that:

> "It is not necessary to parse each component part of [an] overall transaction and examine whether each, standing alone, would satisfy the definitional requirements of the BIT and the ICSID Convention. For the purposes of this Tribunal's jurisdiction, it is sufficient that the transaction as a whole meets those requirements";

as well as the "integrity test" elaborated in the *CSOB* case.[225]

285. With these principles in mind, the Tribunal endorses the suggested "*holistic*" approach articulated by counsel for Claimants as follows:

> "… what was the investment of [Claimants]? Is there any element here, if you took it away, would have resulted in the investment not occurring? …[W]hat was the overall package that made [Claimants] invest in Venezuela? It was the ability to buy assets … They needed to finance that acquisition, so that was part of their ability to do that … [T]he business sense for it was to have a ready supply of what was essentially a raw material … the pellets which it could then export through the port. The combination of all that, together obviously with the Supply Agreement … all of these were linked together. If you took

---

[223] *Mytilineos Holdings.*
[224] *Inmaris Perestroika Sailing Maritime Services GmbH et al v. Ukraine,* ICSID Case No. ARB/08/8, Decision on Jurisdiction, 8 March 2010.
[225] See para. 277, *supra.*

one away, if there was no loan, then there would have been no money to bring these elements together and the Off-take agreement was essentially something that was of fundamental interest to them because that was then a market for what was occurring."

…

"… [W]e think the problem is if you start to looking in isolation of what specific links are you have to think what was the intention of the investor at the moment of the investment? And if they are all linked together in that way, is it an integrated investment undertaking? … It is not necessary to parse each component; it's [the] integrated investment, … [the] transaction as a whole."[226]

286. As to those submissions, the Tribunal notes Venezuela's contention that reliance on the cases cited by Claimants is misplaced, because they related to disputes in which a clear interest on the part of the respondent State could be identified. However, in this case, the investment in Matesi is a qualifying investment for the purposes of the Convention and the Treaties, and so that is not an objection that need detain the Tribunal.

287. *The Talta Loan:* As far as the Talta Loan is concerned, it is clear on the evidence before the Tribunal that, in the context of the Investment Agreement, the commitment by Talta to advance some US$60 million to finance the purchase of the PosVen assets and to contribute to the costs of their refurbishment was critical to the making of the investment in Matesi.

288. Mr Montero testified to the Tribunal that the Talta Loan was used to fund the start-up costs of the venture.[227] Mr Malvassora's evidence was that the Loan was a:

"productive financing which was necessary to reactivate the plant which for three years had been paralysed, would generate 300 jobs, pay taxes … an investment to reactivate an industry, which had been paralysed, which, … was within the strategic and social and economic plan of Venezuela."[228]

---

[226] Transcript (English), Day 1, pp.142-143.
[227] Transcript (English), Day 2, pp. 470-471.
[228] Transcript (English), Day 3, p.656.

289. The Tribunal accepts that evidence. It is satisfied that the Talta Loan was more than a mere facilitation of Claimants' purchase of HBI from Matesi, as Venezuela contended.[229] Its purpose was to provide for the acquisition of the PosVen assets and to be applied to start-up costs. In the opinion of the Tribunal, the Talta Loan qualifies as an "investment" in its own right under the terms of Articles 1(2) of the Luxembourg and Portuguese Treaties. But even if that were wrong, the Tribunal is satisfied that it was an essential element of Claimants' "investment" in Matesi.

290. *The Off-Take Agreement:*        So far as the Off-Take Agreement is concerned, Mr Montero emphasised the importance of the Off-Take Agreement to the Matesi "investment".  In answer to a question from a member of the Tribunal, he stated that it had been very important to the decision to acquire the plant. By avoiding a tie to a volatile market: "*one can remove a lot of problems and guarantee the financial continuity of the company.*"[230]

291. The Tribunal accepts Venezuela's submission[231] that the Off-Take Agreement is not an "investment" in its own right. Nor does it consider that the Off-Take Agreement would constitute an investment, if an holistic approach were adopted: despite the context in which it was concluded, it remains, in essence, a commercial agreement in respect of the purchase and delivery of product at a known price, and in such a manner that Talta took off-shore Venezuela the benefit of the profit of the on-sale in the open market.  To this end, the Tribunal considers that the Off-Take Agreement must be treated differently to the Talta Loan.

### e.      Conclusion

292. Accordingly, the Tribunal concludes that the Talta Loan constitutes an "investment" within the scope of the Luxembourg and Portuguese Treaties, and that accordingly it has jurisdiction to consider claims in respect of it.

---

[229] Respondent's Post-Hearing Brief, para. 121.
[230] Transcript (English), Day 2, p. 490.
[231] See Respondent's Post-Hearing Brief, paras. 192 – 199.

293. As for the Talta Off-Take Agreement, the Tribunal concludes that this was not an "investment" in its own right.

### 4. ALLEGED "CONTRACTUAL CLAIMS"

####      a.      Venezuela's Case

294. In this case the sole source of supply of raw material (iron ore in the form of pellets and lump ore) was CVG FMO, a Venezuelan State entity, which enjoyed a monopoly.  The Supply Contract was signed between Matesi and CVG FMO on 17 June 2004.[232]

295. It is Venezuela's case that Claimants' claims in respect of allegedly insufficient or discriminatory pellet supply by CVG FMO to Matesi constitute a contractual, rather than a treaty, dispute, which can only be resolved pursuant to the dispute resolution and forum selection clauses of the Supply Contract.  To this end, this Tribunal has no jurisdiction over the Claimants' claims in this regard.

296. Further, Venezuela contends that since CVG FMO acted in a commercial and private capacity as a seller of raw materials, the basis upon which it fulfilled its supply obligations was a matter of its exercise of the terms of the contract: it had not invoked sovereign prerogatives and hence, even if there had been a breach of CVG FMO's contractual obligations, Venezuela's liability under the Treaties could not have been implicated.

297. Venezuela emphasises in this regard that throughout the considerable correspondence in the record between Matesi and CVG FMO, the discussion was only ever of contractual obligations.  Indeed, even in its letter of 12 August 2009 to MIBAM, Tenaris alleged "*contractual violations*" on the part of CVG FMO. Furthermore, the valuation of loss and damage said to be attributable to

---

[232] Exhibit C-25

failures of adequate supply of pellets was based upon a contractual expectation.[233]

### b.  Claimants' Case

298. For their part, Claimants say that their claims – for discrimination arising out of breaches of the fair and equitable treatment and non-impairment clauses of the Treaties – are not claims for breach of the pro-rating provisions of the Supply Contract (a contract to which they are not party).

299. Rather, the underlying premise in the Claimants' case is that CVG FMO is a State entity with a sovereign monopoly over the supply of raw material; that Venezuela's responsibility is engaged in respect of the discriminatory treatment accorded by CVG FMO to Matesi, by operation of customary international law rules of attribution; that the conduct in question constituted a breach of Venezuela's obligations under the Treaties; and that Claimants' claim for damages for the diminution of the value of their shareholding is calculated based upon the customary international law rule of "full reparation", rather than any contractual measure.

### c.  Analysis

300. In assessing this objection, a clear distinction must be drawn between two enquiries:

(a)   Whether this Tribunal is entitled to hear and determine the Claimants' claims in respect of raw material supply.

(b)   Whether the Claimants' claims in respect of raw material supply actually constitute a breach of either Treaty, for which Venezuela is responsible.

301. As to (a), it is common ground that the Tribunal only has jurisdiction to hear and determine breach of treaty claims, not breach of contract claims.[234]  And so the

---

[233] See Respondent's Post-Hearing Brief, paras. 213-230

sole determinative question at the jurisdictional stage is: on the <u>assumption</u> that the Claimants' allegations are true, could such allegations amount to a breach of treaty, as opposed to a breach of contract?

302. This is an enquiry on a *prima facie* basis, which does not require the Tribunal actually to assess the allegations themselves, or address (b) above - as this would obviously be a merits issue, to which the Tribunal would only turn if it had jurisdiction.[235]

303. Much of Venezuela's argument here was actually concerned with (b), not (a). Hence, whether or not CVG FMO was in fact acting in a commercial and private capacity as a seller of raw materials; and whether or not its conduct actually engages Venezuela's responsibility, are key issues in determining whether or not there has been a breach of treaty. But they are not questions that will delimit the Tribunal's ability to hear such claims in the first place – *i.e.* the only enquiry at this stage.

304. In this case, Claimants have been very careful and very clear in identifying all claims in respect of the supply of raw material as breaches of treaty – not breaches of the Supply Contract. As summarised (*e.g.*) in their Reply:

> "In their Memorial, the Claimants described how Venezuela discriminated against Matesi in the supply of iron pellets necessary for HBI production in favor of state-owned enterprises and how this contradicted the Treaties' fair and equitable treatment and 'non-impairment' provisions. In particular, the Claimants stated that CVG FMO, an organ of the Venezuelan State, had a sovereign monopoly over supply and it abused its authority to discriminate against Matesi, thus reducing the value of the Claimants' shareholding. The Claimants also cited the late President Hugo Chávez making threats of discriminatory conduct regarding supply against the Claimants' holdings at around the same period as the defects in supply occurred.

(Footnote continued from previous page)
[234] There are no "Umbrella Clause" claims in this case (albeit such claims might be properly characterised as breaches of treaty in any event).
[235] *Case Concerning Oil Platforms (Islamic Republic of Iran v United States of America)* (ICJ Reports 803) Judgment, 12 December 1996, Separate Opinion of Judge Rosalyn Higgins, para. 32.

The Claimants also noted that Matesi entered into the CVG Supply Contract, which guaranteed a *pro rata* share of iron pellets based on its share of the total domestic annual pellet requirements. The Claimants, however, raised no claims of contractual breach at any point in their Memorial."[236]

…

"As stated in the Claimants' Memorial, the Venezuelan government had a *de jure* monopoly on Matesi's inputs of lump iron ore and iron pellets. CVG FMO, an organ of the Venezuelan state, controlled that monopoly. The Claimants noted that there was a state policy whose purpose was to effect the nationalization of the steel industry and reduce the value of Matesi at the time of the taking. Part of this policy, was the State's use of its monopoly over supply of iron pellets in a discriminatory fashion to favor state-owned companies, in contravention of the Treaties' provisions on fair and equitable treatment and non- discrimination."[237]

305. Indeed, Claimants could not have raised any claims for breach of contract in any event for the simple reason that they are not party to the Supply Contract.[238]

306. It follows that, since the only claims that are advanced are said to be breaches of the Treaties, such claims are properly brought before this Tribunal.

307. As to Venezuela's reliance on the existence of a contract dispute resolution provision in the Supply Contract, this takes matters no further. As confirmed by the *Vivendi I* Annulment Committee (and by numerous other tribunals):

"where the 'fundamental basis of the claim' is a treaty laying down an independent standard by which the conduct of the parties is to be judged, the existence of an exclusive jurisdiction clause in a contract between the claimant and the respondent state or one of its subdivisions cannot operate as a bar to the application of the treaty standard."

…

---

[236] Claimants' Reply, para. 176.
[237] Claimants' Reply, para. 178.
[238] CVG Supply Contract, 17 June 2004, p. 1. (Exhibit C-25)

# Exhibit A

## Part 2 of 2

"[a] state cannot rely on an exclusive jurisdiction clause in a contract to avoid the characterisation of its conduct as internationally unlawful under a treaty." [239]

308. Among the cases to reaffirm this approach, and by way of further example, in *Abaclat* the tribunal concluded that while there was a contractual obligation to bondholders to make payments on certain bonds, what had elevated the matter into a treaty claim was that Argentina's breach of that obligation had been brought about by the sovereign act of passing legislation, which "*had the effect of unilaterally modifying Argentina's payment obligations.*"[240]

309. But even aside from this basic proposition, there remains the simple point that, not being a party thereto, the Claimants could not have taken advantage of the dispute resolution provision in the Supply Contract in any event. In the course of their submissions, the Claimants observed that there was no basis to suggest that they might be able to avail themselves of any "group of companies" doctrine to trigger the dispute resolution provisions of the Supply Contract, and the application of such a doctrine to an arbitration clause governed by Venezuelan law was not developed at the Hearing.[241]

310. It follows that this Tribunal has jurisdiction to hear and determine Claimants' claims regarding supply of raw material, and that Venezuela's objections in this regard must be dismissed.

---

[239] *Compania de Aguas del Aconquija SA and Vivendi Univeral SA v Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, paras. 101 and 103. See similarly: *SGS Société Générale de Surveillance SA v Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Jurisdiction, 12 February 2010, paras. 125, 128, and 137–138; *Suez, Sociedad General de Aguas de Barcelona SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No. ARB/03/19 and *AWG Group Ltd v Argentine Republic*, UNCITRAL, Decision on Jurisdiction, 3 August 2006, paras. 41–45; *Jan de Nul NV, Dredging International NV v Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Decision on Jurisdiction, 16 June 2006, paras. 132–133; *Eureko BV v Republic of Poland*, Partial Award, 19 August 2005, paras. 92–114; *Impregilo SpA v Islamic Republic of Pakistan*, ICSID Case No. ARB/03/3 Decision on Jurisdiction, 22 April 2005, paras 286–290; *Azurix Corp. v Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Jurisdiction, 8 December 2003, paras. 75–79; *SGS Société Générale de Surveillance SA v Islamic Republic of Pakistan*, ICSID Case No. ARB/01/13, Decision of the Tribunal on Objections to Jurisdiction, 6 August 2003, paras. 146–155; *CMS Gas Transmission Company v Republic of Argentina*, ICSID Case No. ARB/01/8, Decision of the Tribunal on Objections to Jurisdiction, 17 July 2003, paras. 70–76.
[240] *Abaclat et al v. Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility 4 August 2011, para. 319
[241] Claimants' Post-Hearing Brief, para. 305, and Transcript (English), Day 1, p.276.

311. Having so concluded, in light of various arguments that were advanced on behalf of Venezuela in the course of the proceedings, the Tribunal also clarifies, in the words of the *Bayinder* tribunal, that while its jurisdiction is engaged here in respect of treaty claims only:

> "[The Tribunal] can and must [consider contract matters] to the extent necessary to rule on the treaty claims. It takes contract matters, including the contract's governing municipal law into account as facts as far as they are relevant to the outcome of the treaty claims. Doing so, it exercises treaty not contract jurisdiction. This approach is in conformity with international law and arbitral practice." [242]

312. Whether or not the Claimants are actually able to sustain their allegations with respect to the supply of raw materials is considered in **Section F.1** below.

## 5. CONCLUSION ON JURISDICTION OBJECTIONS

313. In light of the matters set out above, and save in respect of the Off-Take Agreement (see paragraph 291 above), the Tribunal finds that it has jurisdiction to hear and determine all of the Claimants' claims in this arbitration, and that each of Venezuela's objections in respect of the latter claims must be dismissed.

---

## F. PRE-EXPROPRIATION CLAIMS

314. The Claimants' substantive claims divide into two broad categories: claims arising out of conduct in the period up to the nationalisation of Matesi, and claims arising out of the nationalisation itself.

315. In this section, the Tribunal considers the former category, which comprises allegations of breach of the fair and equitable treatment / non-discrimination / non-impairment standard, and the protection and security standard.

---

[242] *Bayindir Insaat Turizm Ticaret ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, paras. 135-136.

316. Each set of claims is addressed in turn below.

## 1.   FAIR AND EQUITABLE TREATMENT / DISCRIMINATION CLAIM

317. It is the Claimants' case that Venezuela is in breach of the fair and equitable treatment / non-discrimination / non-impairment standard in both Treaties, by virtue of the fact that Matesi was the subject of discrimination in the supply of raw material by CVG FMO.

### a.   The Matesi Plant

318. The Matesi HBI plant comprised two reactors, which were designed to operate on a mix of lump ore and iron pellets. Each reactor was capable of producing 100 tons of HBI per hour, or 750,000 tons per year, giving a nominal capacity of 1.5 million tons a year.[243] The reactors used a mix of pellets (80%) and lump ore (20%), supplied through CVG FMO (TOPPCA).

319. Since the production of a ton of HBI requires approximately 1.6 million tons of pellets, lump ore and "fines", it would require some 2.4 million tons of iron ore, some 1.92 million tons (80%) of which comprised pellets, in order to achieve Matesi's nominal capacity of 1.5 million tons.

320. Were a reactor unable to operate at 50% capacity or more, Matesi would have to shut it down. It was essential therefore, that Matesi secure a reliable supply of feed materials for its reactors from one or both of the producers of pellets in Venezuela, CVG FMO and Sidor (its 49% shareholder). Sidor used much of its own production in its own steel production processes. To the extent that it had any excess pellets, it could release them to the market, but Matesi could not buy directly from Sidor: Sidor was obliged to sell to CVG FMO, which held a monopoly over sales of pellets to the four domestic HBI producers, Comsigua (in which Claimants held a minority shareholding)[244], Venprecar,

---

[243] Tamez Witness Statement, para. 12.
[244] Transcript (English), Day1, p. 39.

Minorca/OPCO (which was wholly owned by CVG and, since 2007, operated by CVG FMO), and Matesi.

321. CVG FMO was thus the sole source of supply to Matesi.

322. Claimants maintain that an agreement with CVG FMO was:

> "pivotal to [their] decision to invest in Matesi and was a condition precedent to [their] purchase of PosVen's assets."[245]

### b. The Complaint

323. The basis of Claimants' complaint is that CVG FMO discriminated against Matesi and in favour of other HBI producers in the supply of raw material. Claimants allege that State-owned Minorca/OPCO was the "*primary beneficiary*"[246] of CGV FMO's discriminatory conduct.

324. Venezuela maintains, first, that there was no discrimination against Matesi in the context of pellet distribution; and, second, that disputes over pellet distribution were commercial matters, which could, and should, have been handled through dispute resolution mechanisms in the contracts.

325. Further, according to Venezuela, Claimants have failed to show that CVG FMO was an organ or entity of the State exercising specific government authority when distributing pellets, or that it had had discriminatory intent.

326. Venezuela points out that it had an interest of its own in Matesi, which pre-dated nationalisation, as well as its interests in Comsigua, Venprecar and Minorca/OPCO, and that Claimants, through Tenaris, had a "*significant*" interest[247] in Comsigua.

327. Moreover, Venezuela contends that Matesi was reliant principally upon its own shareholders to take its supply. That dependency left it exposed, first because

---

[245] Claimants' Post-Hearing Brief, para. 18
[246] Claimants' Post-Hearing Brief, para. 69
[247] Respondent's Post-Hearing Brief, para. 219

SIDOR used its own direct reduced iron before turning to any other source, and financial difficulties had caused it to reduce its demand for Matesi-sourced HBI over the period 2005-2008. Second, because Matesi had been set up as a cost centre primarily to service the requirements of its corporate affiliates, such that it was not established in its own right in the export market, unlike Venprecar, Comsigua and Minorca/OPCO - all of which had had a long-term presence in the export market.

328. In any event, far from under-supplying Matesi, Venezuela maintains that the record at the Hearing demonstrated that Matesi had received an over-allocation of pellets between 2005 and 2008.[248]

### c. Terms of the Supply Contract

329. The Supply Contract provided, *inter alia*, as follows: [249]

> "**1.3:** Annual Basis for Nominal Capacity
>
> This is defined as the IRON ORE needs that the BUYER requires for Nominal Capacity of its REDUCTION PLANT, which amounts to 2,400,000 TONS of IRON ORE per year.
>
> …
>
> **2.1…** The volume to be supplied annually to the BUYER, except in the INITIAL YEAR and the following CALENDAR YEAR (corresponding to 2005), shall be fixed in accordance to the BUYER's requirements, the amount of the SELLER's annual availability of IRON ORE, and the annual availability of pellets for sale derived from the plant owned by Siderurgica del Orinoco (SIDOR) C.A. This total annual availability shall be distributed equitably and on a pro rata basis, when applicable, among the various HBI producers on the domestic market.
>
> The aforementioned pro rata distribution applies only when the sum of the total annual pellet requirements from all HBI producers on the

---

[248] *Idem*, paras. 221-225
[249] Exhibit C-25

domestic market exceeds the total annual availability of pellets for sale with such total annual availability of pellets being understood as the sum of the annual production of PELLETS by the SELLER plus the annual availability of pellets for sale from the plant owned by SIDOR and only in this case shall the proportional distribution take place **based on the estimated annual requirements for pellets of each of the HBI producers on the domestic market.**

A pro rata distribution in accordance with the above shall apply in the event of a shortage of LUMP IRON ORE.

**[CVG FMO] shall guarantee to [Matesi] the accuracy of the information provided by [CVG FMO] as well as compliance with equitable distribution among all of the HBI producers on the domestic market**. (Emphasis added)

**2.2:** The guaranteed distribution of PELLETS and LUMP IRON ORE to be supplied under the CONTRACT shall be (a)during the first seven (7) calendar years (including the INITIAL DELIVERY YEAR) eighty percent (80%) PELLETS and twenty percent (20%) LUMP ORE and (b) for the remaining term of the CONTRACT (after the first seven (7) CALENDAR YEARS), ninety ercent (90%) PELLETS and ten percent (10%) LUMP IRON ORE….

**2.3:** Before 1 October of each CALENDAR YEAR following the INITIAL DELIVERY YEAR, the BUYER shall notify the SELLER if it wishes to increase or decrease the volume of actual delivery for the following CALENDAR YEAR, by an amount that cannot exceed twenty percent (20%) of the volume for the year in progress such that the volume for the following CALENDAR YEAR shall not exceed 10% of the ANNUAL BASIS FOR NOMINAL CAPACITY (2,400,000 TONS). …..

**2.4:** The monthly volume of IRON ORE for the INITIAL DELIVERY YEAR that the SELLER commits to supply and the Buyer commits to accept and pay for the volumes supplied shall be that indicated below (figures shown in tons)

| IRON ORE | SEPT 04 | OCT 04 | NOV 04 | DEC 04 | TOTAL |
|---|---|---|---|---|---|
| PELLETS | 48,000 | 70,000 | 80,000 | 90,000 | 288,000 |
| LUMP | 12,000 | 18,000 | 20,000 | 22,000 | 72,000 |

**108**

IRON
ORE

| TOTAL | 60,000 | 88,000 | 100,000 | 112,000 | 360,000 |

For the following CALENDAR YEAR (2005), the requirement in
IRON ORE agreed between the BUYER and the SELLER is for
1,750,000 TONS, distributed as 1,400,000 TONS of PELLETS and
350,000 TONS of LUMP IRON ORE with the understanding between
the PARTIES that in the event of a shortage in the specified quantities
of IRON ORE to be supplied in the year 2005, the pro rata clause
indicated in item 2.1 of this Clause shall apply.

**2.5:** In the event that the BUYER is able to increase the nominal
capacity of the REDUCTION PLANT, it may request an increase in
the ANNUAL BASIS FOR THE NOMINAL CAPACITY, notifying
the SELLER in writing at least one (1) year in advance of the month
in which the increase will occur. Within three (3) months, the
SELLER shall inform the BUYER of its capacity to support the
requested increase. In any event, the SELLER shall supply the
requested increase only up to ten percent (10%) of the ANNUAL
BASIS FOR THE NOMINAL CAPACITY."

330. Clause 3 set out the physical and chemical specifications for the Pellets.

### d. Undisputed Facts

331. It is not in dispute that:

(a) in order to produce at its full nominal capacity of 1,500,000 tons of HBI
per year, Matesi required an annual supply of 2,400,000 tons of iron ore,
80% of which was to be in pellet form and the rest as lump iron ore.

(b) The initial annual quantities to be required and supplied would be limited
to some 70% of Matesi's base capacity, increasing over four years until
Matesi could call for 100% of the pellets it required to produce at full
capacity in 2008. That entitlement, in terms of tons of pellets, was as
follows, the second line showing the percentage of pellets required to
produce at 100% capacity:

| Sept 04 | Oct 04 | Nov 04 | Dec 04 | 2005 | 2006 | 2007 | 2008 |
|---------|--------|--------|--------|------|------|------|------|
| 48,000 | 70,000 | 80,000 | 90,000 | 1.4 mill. | 1.592 mill. | 1.784 mill. | 1.920 mill. |
| 30% | 40% | 50% | 56% | 73% | 83% | 93% | 100% |

(c)    As it was required to do from the second full year of the contract onwards, Matesi notified CVG FMO of its estimated pellet requirements for each calendar year three months before the start of the year in question. The annual requirements letters for 2006, 2007 and 2008 requested the full amounts to which Matesi was entitled as set out in the table above for those years.[250]

(d)    All of the pellet-using HBI producers had similar supply contracts with CVG FMO. And they included *pro-rata* provisions similar to Article 2.1 of the Matesi contract in their own agreements with CVG FMO.[251]

(e)    From May 2005 onwards, there was a shortage of pellets, which triggered the *pro-rata* provisions in the Supply Contract (and those of the supply contracts of the other producers).

### e.    Impact of the Pro-Rating

332. According to Matesi's Production Data, it had achieved approximately 80% of the plant's production capacity by February 2005 (some 100,000 tons). Between February and April 2005, monthly HBI production averaged approximately 75% of production capacity. In 2005, the plant's first full year of operation, it achieved just under 70% capacity, producing approximately one million tons of HBI,[252] notwithstanding a shortfall in the supply of iron pellets from CVG FMO in the second half of 2005. Claimants maintain that the shortfall, which began in

---

[250] The letters are in the record at C-179, C-196, and C-203 respectively
[251] See PVOI-1 (OPCO); PVOI-2 (Comsigua) and Amendment at PVOI-4; PVOI-3 (Venprecar) and Amendment at PVOI-5
[252] Claimants' Memorial, paras. 51 and 52

May 2005, was attributable to technical problems experienced at CVG FMO's plant.

333. In the course of 2007, the rate of supply from CVO FMG to Matesi was reduced to the point that it received 50% less iron pellets in 2007 than it had in 2006. It appears that Matesi was not receiving its *pro rata* share of available iron pellets either. On the basis of its own production data, Matesi's plant operated at less than 30% capacity in 2007.[253]

334. The situation deteriorated in 2008. Matesi maintains that in July 2008, it received no products at all from CVG FMO,[254] whereas it continued to supply HBI to SIDOR for which SIDOR failed to pay, incurring a debt of some US$ 5.9 million to Matesi.

**f.  Operation of the *Pro Rata* Mechanism**

335. Article 2.1 of the Supply Contract provides that with effect from 1 January 2006, the volume of iron ore to be supplied to Matesi:

> "…. shall be fixed in accordance to [Matesi's] requirements, the amount of [CVG FMO's] annual availability of IRON ORE, and the annual availability of pellets for sale derived from the plant owned by [SIDOR]. This total annual availability shall be distributed equitably and on a pro rata basis, when applicable, among the various HBI producers on the domestic market.
>
> The aforementioned pro rata distribution applies only when the sum of the total annual pellet requirements from all HBI producers on the domestic market exceeds the total annual availability of pellets for sale with such total annual availability of pellets being understood as the sum of the annual production of PELLETS by [CVG FMO] plus the annual availability of pellets for sale from the plant owned by SIDOR and only in this case shall the proportional distribution take place **based on the estimated annual requirements for pellets of each of the HBI producers on the domestic market.**" (Emphasis added)

---

[253] Claimants' Memorial, paras. 67-69 and Exhibit C-157
[254] Witness statement of Mr Malvassora, para. 65. And see Claimants' Memorial, para. 89

336. The clause continues:

> "**[CVG FMO] shall guarantee to [Matesi] the accuracy of the information provided by [CVG FMO] as well as compliance with equitable distribution among all of the HBI producers on the domestic market**." (Emphasis added)

337. The Parties differ in their interpretation of this provision, and specifically the operation of the *pro rata* mechanism. Claimants maintain that the entitlement should be calculated as follows:[255]

> Matesi's *pro rata* % share of pellets = Matesi's annual pellet requirement + total annual HBI Producers' pellet requirements

> Total national pellet availability = pellets produced by CVG FMO + excess produced by SIDOR

> Matesi's *pro rata* pellet allotment = Matesi's *pro rata* % share of pellets x total national pellet availability

338. A number of competing interpretations were advanced by Venezuela's witnesses and experts, although, following the withdrawal of the evidence of Mr Sabbagh, the disgraced former President of CVG FMO, no one else from CVG FMO appeared to give evidence before the Tribunal.[256] None of the alternatives advanced by Venezuela withstood scrutiny.

339. Dr Poveromo initially suggested that the *pro rata* allocation was based upon proven or historical production capacity, on the basis that CVG FMO would use that as:

> "sort of a test of the annual requirements" … "they wouldn't allocate pellets to someone who was asking for more pellets than FMO knew they could actually use."

---

[255] See Montero 1, para. 35; Montero 2, paras. 14-16 and Transcript (English), Day 2, pp. 464-466

[256] The Tribunal was informed that Mr Amais, CVG FMO's Sales Manager, with whom Matesi had frequent dealings, remains at the company. See Transcript (English), Day 4, p. 997 (cross-examination of Moya)

But he backed away from that position when he was shown the actual terms of Article 2.1, and it was pointed out to him that in none of the other supply contracts that he himself had produced was there reference to "*proven or historical production capacity*".

340. Nor, as a matter of fact, could Matesi point to any production history at the time that it had entered into the Supply Contract, as the plant had only been re-commissioned a matter of months before. Indeed, nor could it point to an unimpaired production history, since it had never enjoyed a full year of production unaffected by shortages or supply limitations.

341. Finally, Dr Poveromo proffered the remarkable observation that:

> "In the world of iron ore, a contract is not a contract": [while it] "defines the price, sets the terms, lists the specifications, in terms of volumes, it expresses an intention of the iron ore company to supply 'X' tons of iron ore per year and it expresses the intention of the steel company to consume or receive the same 'X' tons of iron ore every year."[257]

The Tribunal is not persuaded by the proposition that the terms of a commercial contract, negotiated at arms' length, should not be given proper deference and effect.

342. Mr Hart's evidence was inconsistent in two principal respects. First, he had not compared "like with like" when calculating Matesi's *pro rata* share of pellets. He (and Dr Poveromo) had used best ever historical production figures by reference to years in which there had been no shortage of pellets in the case of Comsigua, Minorca/OPCO and Venprecar, whilst reflecting in the calculations Matesi's actual production capacity in years affected by shortages.[258] Second, he applied this methodology only to the pre-expropriation discrimination claim period. When it came to the valuation of Claimants' equity stake in Matesi at the date of expropriation, he adopted much lower production capacities for

---

[257] Transcript (English), Day 4, pp. 1436 and 1437
[258] Hart 2nd Report, paras. 20 & 21 (and see also, Poveromo 2nd Report at para. 12, Table 2)

Matesi's competitors, thereby increasing Matesi's *pro rata* share up from 23% (2007) to 31% (2008).[259]

343. Of the factual witnesses proffered by Venezuela, it was Mr Moya whom Venezuela called upon primarily to address the pro-rating issue. The Tribunal recalls that Mr Moya was a former PosVen and Matesi employee. He had been Head of Logistics for Matesi, reporting to Mr Tamez (the Industrial Manager). Post nationalisation, he assumed the role of Manager of Processes at BriqVen. He testified to the effect that, first, he had notified CVG FMO of Matesi's requirements by reference to the operational state of its plant in the course of meetings held with CVG FMO when the weight of deliveries of pellets to Matesi was reconciled; and second, he had attended weekly and monthly meetings with CVG FMO at which all of the HBI companies were present and at which the *pro rata* distribution of pellets was agreed. Much of his written testimony was hearsay and unsupported by the documentary record.[260] And at the oral hearing, neither of his key propositions survived cross-examination.

344. Faced with the monthly pellet delivery logs signed by CVG FMO representatives and Mr Moya himself, Mr Moya conceded that they did not reflect the operational status of the Matesi plant: rather, the comments reflected the operational status of the CVG FMO plant:

> "Q. My question was different. My question was whether any of the logs we just looked at mentioned in the observations box the operating conditions of Matesi's plant?
>
> A. The operating conditions at the Matesi plant – I'm sorry, is the question whether I would write anything about the operating conditions at the Matesi plant? No. I wrote here in the comments what was happening at the Ferrominera plant."[261]

---

[259] *Ibid* at Tables 4 and 7

[260] Witness Statement of Moya, para. 6: "It is my understanding that [CVG FMO] allocated the amount of product by taking into account not only the order placed by each briquette company, but also the production conditions at the plant, and especially considering the production capacity of each briquette company."

[261] Transcript (English), Day 4, pp. 974 and 975. And see also Exhibit Hart I-A E, at pp. EN0001-0002, 0004, 0006-0012. And see also Exhibit C-308 (Mr Moya's October 2009 press statement): "*In 2006 Matesi produced over 750,000 tons and in 2007 over 400,000 tons not because its capacity would not allow it but because it was restricted by the supply problems at the [CVG FMO] pellet plant.*"

345. It became apparent that none of the emails exchanged with CVG FMO's Sales Department referred to the operational status of the Matesi plant either: Matesi was told what quantities of pellets it would receive by reference to "*current pellet availability*" and the operational conditions at the relevant pellet production plants:[262]

> "Q. Do any (sic) of these two emails mention the operating conditions at Matesi's plant or Matesi's pellet requirements according to its production plan?
>
> A. No, no reference is made to the conditions in these emails of the Matesi plant, of course."[263]

346. It was apparent, too, from his answers to questions from the Tribunal,[264] that Mr Moya was unaware of the basis upon which CVG FMO distributed pellets to Matesi and the other HBI producers, but on any view, CVG FMO could not have allocated pellets by reference to the operational status of the Matesi plant, if that information had never been communicated to, or recorded by, CVG FMO.

347. To the extent that meetings were held between CVG FMO and the HBI producers, Mr Moya's evidence changed in the course of his cross-examination. He initially adopted the line, which had been taken by Mr Sabbagh (albeit a line unsupported by any documentary record) that the HBI producers had met CVG FMO in general meetings to agree upon the *pro rata* distribution of pellets between them.[265] Subsequently, he conceded that each of the HBI producers had met separately with CVG FMO while representatives of their competitors waited their turn in the hallway outside[266] and that, in fact, as he told a member of the Tribunal, he had no information in respect of the quantities requested by other plants and the quantities with which they were supplied:

---

[262] See Witness Statement Moya, paras. 5 & 6 and Exhibits C-192, C-193, and C-194
[263] Transcript (English), Day 4, pp. 996-999
[264] Transcript (English), Day 4, pp. 981 & 982 and pp. 1069-1071
[265] *Idem*, p. 962
[266] *Idem*, p. 968

"Q. What types of information were you being provided with at the time about the quantities that were being requested by the other plants and amounts that were being sent to other plants?

A: I didn't have information about how much was sent to OPCO or to Comsigua because I didn't have access to their records. I said that it was being sent to them, it wasn't being sent to us, but I cannot say how much. I don't have any information or any place to get such information from."[267]

348. Whether or not any such general meetings took place – and on the basis of the evidence that it has heard, the Tribunal concludes that they did not – it seems counter-intuitive that competing HBI producers, faced with a supply shortage, would entertain any such voluntary waiver of their *pro rata* contractual entitlements to pellets in order to accommodate their competitors rather than pressing for those entitlements in full. The Tribunal notes, and accepts as the more likely scenario, Mr Malvassora's explanation that, in circumstances in which pellets were in short supply, each producer would require the full amount of materials to which it was entitled, because any allocation would be determined by each producer's *pro rata* share of the total requirements of all of the producers.[268]

349. In order to calculate Matesi's *pro rata* pellet allotment, the two variables are:

(a) Matesi's *pro rata* % share of pellets (ascertained by dividing Matesi's annual pellet requirement by the total quantity of available domestically produced pellets); and

(b) the total domestic pellet availability (*i.e.*, pellets produced by CVG FMO and excess pellets produced by SIDOR).

The *pro rata* allocation to Matesi is the result of multiplying Matesi's *pro rata* % share and the total domestic pellet availability.

---

[267] *Idem*, pp. 981 and 982
[268] Malvassora First Witness Statement, para. 25 and Malvassora 2nd Statement, paras. 14 and 15

350. Article 2.1 requires that the volume of supply be fixed by reference to Matesi's requirements and:

> ".... the amount of [CVG FMO's] annual availability of IRON ORE, and the annual availability of pellets for sale derived from the plant owned by [SIDOR]."

The Tribunal notes that Claimants' experts' assessment of the quantity of available pellets was derived from contemporaneous information published by IVES, the Venezuelan Steel Institute, obtained from CVG FMO and SIDOR, and from SIDOR's records establishing its own consumption of pellets (only excess SIDOR pellets being made available for sale to domestic HBI producers). Those calculations were adopted by Mr Hart for the purposes of his own calculations.[269]

351. On the basis of the evidence before the Tribunal, however, Matesi was never informed of the annual requirements/entitlements of its competitors,[270] albeit that pursuant to Article 2.1 of the Supply Contract, it was incumbent upon CVG FMO to:

> " ... guarantee to [Matesi] the accuracy of the information provided by [CVG FMO] as well as compliance with equitable distribution among all of the HBI producers on the domestic market."

352. In this regard, it is pertinent to note that, save for certain very late disclosure, the accuracy of which is contested, Venezuela has declined to produce records of the other HBI producers' historic requirements, albeit that it conceded that there were records in CVG FMO's possession.[271]

353. Be that as it may, there is other evidence available to the Tribunal, which in Claimants' submission, is indicative of "*obvious*"[272] discrimination against Matesi. It includes statistics from IVES, the Venezuelan Steel Institute, from

---

[269] First Expert Report, Compass Lexecon, para.74 and Tables XII and XIV and Exhibit CLEX-85 and Exhibit Hart I-3
[270] Transcript (English), Day 2, p. 631 (Malvassora); Malvassora 1st Witness Statement, para. 25 and Malvassora 2nd Witness Statement, para. 13
[271] Claimants' Post-Hearing Brief, paras. 49 and 50
[272] Transcript (English), Day 1, p. 51

which it would appear that on the basis of figures for 2005 and 2006 in respect of the total local supply of pellets and the total demand, there were shortages of supply against demand of 10% and 25% respectively.[273] However, Matesi sustained a shortfall of 15% in 2005 and 46% in 2006.[274] In 2007, Matesi received half of its 2006 supply and it was reduced to a production level of a quarter of its capacity. No statistics from the Venezuelan Steel Institute are available in respect of pellet demand for 2007, but it is known that the reduction of supply in the market that year was of the order of 35%. In 2008, there was a 3% increase in the availability of pellets over 2007, but Matesi's allocation was 59% down on that of the previous year.[275]

354. Claimants further point to the fact that the cutback in supply in 2007 coincided with the resumption by CVG FMO of its role as operator of OPCO/Minorca, the plant which was located within CVG FMO's own facilities.

355. The contemporaneous documentary record, including correspondence between Mr Moya and CVG FMO in 2006 and monthly log reports for June 2007 and March 2008, supports the proposition that other HBI producers were receiving supplies at the expense of Matesi.[276] Mr Moya further confirmed in the course of his evidence that CVG FMO would deliver pellets to Comsigua via the conveyor belt, which passed Matesi's plant on days when it was said that there were no available supplies for Matesi,[277] a point corroborated by Mr Tamez and by Mr Malvassora.[278] Mr Moya confirmed that he had been critical of CVG FMO's unequal distribution of pellets as between Matesi and Comsigua[279] and that he had recorded his complaints in respect of a disproportionate supply in

---

[273] Compass Lexecon First Report, Table XII
[274] Claimants' Opening Presentation, Slide 25; Exhibit R-156, pp. 0056-0098; Exhibit CLEX-85
[275] See FN 165 and 166, Claimants' Post-Hearing Brief
[276] See Exhibits C-305, C-306, C-307 and see also Exhibit Hart I-A E pages EN 0002 and EN 0012
[277] Transcript (English), Day 4, pp. 983 and 984
[278] Tamez Witness Statement, para. 36 (b) and Second Witness Statement Malvassora, para. 24(b). See also the redirect examination of Mr Malvassora at Transcript (English), Day 3, pp.711 and 712, in which he confirmed that other plants continued to receive supplies of pellets when they were stopped for maintenance, but Matesi: "… *experienced difficulties in getting [CVG FMO] to continue to deliver pellets during the stoppages.*"
[279] Transcript (English), Day 4, pp. 1054 and 1055

favour of Minorca/OPCO, which was based in the facilities of, and since May 2007 operated by, CVG FMO.[280]

356. Claimants contend, too, that between 2006 and 2007, Matesi's production was reduced by 44%, whereas Minorca/OPCO's declined by 20% and in 2007-2008, Minorca/OPCO was the only HBI producer to see an increase in output, rising by 15% against Matesi's decline of 35%.[281] Claimants maintain that the only plausible explanation for Minorca OPCO's relative success is that it was the beneficiary of preferential supply by CVG FMO.[282]

357. Venezuela did not produce any documentary evidence to rebut the claim with its Counter-Memorial or its Rejoinder, nor did it produce documents pursuant to the Tribunal's Disclosure Order of 21 August 2013. On 22 January 2014, nine days before the hearing however, it produced certain documents purporting to show the annual requirements of the various HBI producers, which it appeared had been in its possession since at least November 2013.[283]

358. This document production was the subject of substantial criticism on the part of Claimants,[284] not least because it proved to be deficient in a number of material respects.

359. Claimants have demonstrated that Venezuela's Information Charts purporting to show actual pellet allocation to the HBI producers[285] cannot be reconciled with the invoices produced in January 2014 in that the amounts shown as having been allocated by CVG FMO to the HBI producers do not tally with the total tonnage invoiced. Although the Information Charts are blank as to iron ore deliveries to Minorca/OPCO for the years 2007-2009, invoices subsequently produced indicate that 326,000 tons of material was invoiced to Minorca/OPCO in the period January-May 2007. That, Claimants point out, would account for

---

[280] *Idem* at pp. 981 and 982, and see also Exhibit C-103
[281] Claimants' Post-Hearing Brief, para. 72
[282] Exhibit C-249: email Mr Amaiz (CVG FMO) to Mr Soler (SIDOR), 7 August 2007
[283] Exhibit R-156, p. 0012
[284] See, *e.g.* Transcript (English), Day 1, p. 55
[285] Exhibit C-243

much of the difference between the total amount of pellets allocated by CVG FMO in the Information Charts and the total amount of pellets invoiced by CVG FMO.

360. Moreover there is no correlation between the total amount of domestic pellets invoiced by CVG FMO and the amount of domestically available pellets calculated by Professor Spiller and Dr Abdala by reference to the contemporaneous documents, and whose figures were adopted by Mr Hart. It would seem that significant quantities were simply not invoiced by CVG FMO: 24.75% of available pellets in 2007 and 63.81% of available pellets in 2008 are unaccounted for – rather more than the total pellets supplied to Matesi in the two years in question. The inference that Claimants invite the Tribunal to draw in the absence of records of pellet deliveries to Minorca/OPCO for the years in question and the unexplained increase in Minorca/OPCO production is that Minorca/OPCO received these supplies directly from CVG FMO, such that it received 1.47 times more pellets than Matesi in 2007 and 6.36 times as many in 2008, for all that it had some 66% of Matesi's nominal production capacity.

361. Letters, which Venezuela represented to the Tribunal[286] evidenced annual pellet requirements notified by Matesi, Minorca/OPCO, Comsigua and Venprecar between 2005 and 2008 in fact contain nothing in respect of Minorca/OPCO's requirement for 2008. Nor do the quantities referenced in the letters in respect of the HBI producers other than Matesi match the contractual pellet entitlements pursuant to their supply contracts. To the contrary, Claimants maintain that they have established that all of the producers were requesting supplies significantly in excess of the iron ore that they required to produce at 100% capacity. To the extent that CVG FMO was predicating *pro rata* shares based upon annual requirements that exceeded the HBI producers' respective contractual requirements, it was not operating pursuant to the terms of the supply contracts and Matesi suffered a reduction in its *pro rata* share as a result. It is Claimants' contention that based upon the annual requirement letters, it should have

---

[286] Letter to the Tribunal dated 22 January 2014 at p.2, para.(c)

received a *pro rata* share of 33.4% in 2007 and 34.4% in 2008, whereas, in fact, it received far less.[287]

362. A further issue identified by Claimants is that the disclosed invoices do not relate to iron pellet imports by Comsigua and Venprecar, but only to those of Minorca/OPCO between 2005 and 2008. And there are significant discrepancies between the invoiced amounts and those stated on the certificates.[288]

363. Venezuela's answer to these complaints is that, first, Matesi's problems were attributable to technical shortcomings, rather than to any discrimination against it in terms of supply allocation and, second, and in any event, Matesi sought to over order. Thirdly, it was the beneficiary of an illicit supply of pellets from SIDOR. It was suggested that in 2006, SIDOR was receiving outsized pellets for further refining, but rather than returning them to CVG FMO as it was obliged to do, SIDOR was delivering them to Matesi.[289]

364. However, the only fact witness proffered to address the variety of technical issues said to have impacted on Matesi's performance was Mr Cadenas, who purported to identify some dozen technical and operational problems at the Matesi plant. Mr Cadenas had led Matesi's electromechanical technical group between 2004 and 2009. He had a reporting line to the Maintenance Manager, Mr Alberti, who, in turn, was one of four employees who reported to Matesi's Industrial Manager, Mr Tamez.[290] It became apparent that none of the issues to which he had drawn attention related to equipment or processes for which he was responsible.[291] Mr Cadenas' evidence was supplemented by that of Dr Poveromo, but he conducted no independent investigation of his own into the technical status of the Matesi plant – and he purported to rely on the evidence of Mr Tamez as opposed to that of Mr Cadenas.

---

[287] Damages Revision Based on Newly Disclosed Documents by Venezuela (Spiller and Abdala) 6 February 2014 at Table II
[288] Claimants' Post-Hearing Brief, para. 84
[289] Transcript (English), Day 1, pp. 303-304
[290] Transcript (English), Day 3, pp. 730-732
[291] *Idem*, pp. 743, 752-757, 759 & 760 and 772

365. The allegations of technical deficiencies at Matesi were addressed in comprehensive and compelling fashion by Claimants' witnesses.

366. *PosVen Construction Issues:* It was pointed out that the issues which had led to the disputes between PosVen and its contractor, Raytheon, in 2001- 2002 had long been resolved by the time of the acquisition of the plant by Claimants,[292] and that, in any event, they were belied by the actual performance of the plant, which achieved 80% of capacity by February 2005 following an October 2004 start-up.

367. *Pellet Quality Issues:* Out of spec. pellets, which gave rise to channelling in the reactor had had to be pre-sieved in the yard as well as being subject to screening, but the principal issue remained one of supply rather than quality.[293]

368. *Cooling Conveyors:* Venezuela's witnesses (Messrs. Poveromo, Cadenas and Moya) maintained that the reason that Matesi had produced off-spec. briquettes (as Mr Malvassora conceded had been the case[294]) was because its cooling conveyors were defective. Prior to their replacement in July/August 2007, it was suggested that those quality problems would have limited Matesi's ability to market its products internationally. In fact, Mr Malvassora testified that the principal cause of Matesi's inability to produce briquettes to specification was the quality of the pellets that it received from CVG FMO.

369. *Heat Exchangers:* The leakage problem affecting the heat exchangers was detected in 2006. It reduced Matesi's production levels to some 70% in 2007 and 2008, but it only received sufficient pellets to produce at 22% in 2007 and at less than 10% of capacity in 2008.[295] Mr Tamez told the Tribunal that Matesi had made some temporary repairs, whilst it took steps to replace the heat exchangers. That involved the ordering of bespoke equipment with a substantial

---

[292] Transcript (English), Day 2, pp. 425, 435 & 436
[293] See Tamez Witness Statement, para. 26(i), and paras. 49-54; and Transcript (English), Day 2, pp. 511-513
[294] Transcript (English), Day 3, p.722
[295] Exhibit C-246 and Transcript (English), Day 2, p.594 and Transcript (English), Day 3, p. 693 and 694 (Malvassora)

delivery lead-time. Had the plant not been expropriated, the necessary remedial work would have been completed.

370. *VS2 loading and discharge valves and seals:* Claimants confirmed that there had been an issue with the valves, exacerbated by the fact that Matesi could not import from Tenova because of CADIVI problems. It had had to use locally made seals, which had a service life of some 1-2 months as against 18 months for the products, which Claimants would have wished to use. While the shortcomings in the valves gave rise to a constant replacement problem, the Tribunal was told that that had not affected productivity.[296]

371. Mr Tamez testified that the only limit on production had been the supply constraint: none of the technical problems raised by Venezuela had impacted production.[297] The Tribunal notes that, in fact, Matesi's production had closely tracked the supply of pellets that it received[298] and it accepts that had there been operational problems, then there would be a lag between supply and production. Both Mr Tamez and Mr Malvassora confirmed that Matesi had been obliged consistently to operate at the limits of its inventory.[299]

372. In contrast, Mr Moya sought to persuade the Tribunal that CVG FMO had:

> "always sent material based on [Matesi's] request and also based on a monthly schedule and based on the operational condition of [Matesi]".[300]

373. However, the Tribunal is unable to reconcile that assertion with:

(a)     Mr Moya's own statement to the press in October 2009 that:

> "in 2006, Matesi produced over 750,000 tonnes and in 2007, over 400,000, not because its capacity would not allow it, **but because it**

---

[296] Transcript (English), Day 2, p. 595
[297] Transcript (English), Day 2, pp. 542-543
[298] Claimants' Opening Presentation, Slide 33
[299] Transcript (English), Day 2, p. 497 (Tamez) and Transcript (English), Day 2, p. 594 (Malvassora)
[300] Transcript (English), Day 4, p. 953

was restricted by the pellet supply problems at the [CVG FMO] plant"[301] (emphasis added);

(b)    documentary evidence in the record that Matesi had been obliged to reduce production levels or to stop one or both reactors for want of pellets;[302]

(c)    his own internal and external correspondence;[303] and

(d)    the Diagnostic Report submitted to the Matesi Transition Commission in July 2009, which he signed and which confirmed that:

"the operations of the Matesi plant have been halted since November 2008. The unavailability of raw material has forced the plant to operate at less than half its capacity since 2007."[304]

### g.    Conclusions on Supply by CVG FMO

374.  On the basis of the record available to it, and having considered the failure by Venezuela to produce materially relevant documentation as outlined above, the Tribunal concludes that:

(a)    Matesi suffered a shortage of pellet supply in the course of its operations between 2005 and 2008;

(b)    technical issues at CVG FMO were a significant contributing factor to the disruption of supply;

(c)    such technical issues as Matesi might have faced were not material to its inability to produce to planned capacity; and

---

[301] Exhibit C-308 and see also Monthly Log for December 2007 at Exhibit Hart I-A E, p. E0005 and Exhibit C-211
[302] Exhibit C-211
[303] Exhibits C-304 and C-307
[304] Exhibit CLEX-78

(d)   there was a preferential supply by CVG FMO to other producers, notably Minorca/OPCO, at the expense of Matesi.

375.   Further, the Tribunal considers that the assessment of the reductions in Matesi's *pro rata* share in 2006 put forward by Professor Spiller and Mr Abdala (27.8% to 25.8% in 2006; 33.4% to 25.6% in 2007 and 34.4% to 25.7% in 2008) is to be preferred.

376.   On the basis of its findings set out above, the Tribunal concludes that Venezuela's submission that the evidence supports the contention that Matesi had received an over-allocation of pellets between 2005 and 2008 cannot be sustained.

377.   Finally, while the Tribunal notes the exchanges of correspondence cited in Venezuela's Counter-Memorial in respect of an asserted additional supply of pellets to Matesi from SIDOR in 2004, 2005 and 2006, it notes, too, Claimants' explanation that, in fact, what SIDOR was doing was returning to Matesi substandard pellets that it had received from CVG FMO under its *pro rata* share and which Matesi had sent to SIDOR for processing – a process known as "*maquila de finos*" – while still retaining title.[305]

378.   In the opinion of the Tribunal, the evidence points to a failure on the part of CVG FMO both properly to operate the pro-rating provisions of Article 2.1 of the Supply Agreement, and to meet its obligations to provide Matesi with information in respect of the status of supplies to other producers.

### h.   Venezuela's Responsibility

379.   The question for the Tribunal, however, is whether these are breaches of a commercial contract in respect of which, as Venezuela contends, Matesi/Claimants should have looked to CVG FMO for redress or whether, as

---

[305] Respondent's Counter-Memorial, paras. 280-283 and Respondent's Reply, paras. 85-86

Claimants contend, the international responsibility of the Venezuelan State is engaged.

380. Claimants maintain that Venezuela has breached its international treaty obligations of fair and equitable treatment, non-discrimination and non-impairment. In particular, through the vehicle of CVG FMO,[306] it discriminated against Matesi in terms of pellet supply with the intent to diminish the value of Claimants' interest ahead of a nationalisation of Matesi and the steel industry generally, which was already on the Venezuelan Government's agenda.[307]

381. Claimants assert that only the Venezuelan State could use governmental authority to modify contracts with a private party and that even if CVG FMO was not an organ of the State, it was exercising elements of governmental authority in regulating the supply of iron ore to Matesi. Its actions are therefore attributed to Venezuela under Articles 4 or 5 of the ILC Articles on State Responsibility (the "ILC Articles").[308]

382. For its part, Venezuela insists that it is not in breach of its treaty obligations and that CVG FMO is neither an organ of the State, nor an entity whose acts might be attributed to Venezuela. The Supply Contract was simply a commercial purchase and sale agreement. In any event, Venezuela maintains that there was no logic in a suggestion that it would have sought to discriminate among the various HBI producers when it held ownership stakes in all of them, including Matesi - even before the nationalisation of SIDOR, which took Venezuela's stake in Matesi to 49.8% in April 2008.[309]

383. *Treaty Provisions:* Article 3 of the Luxembourg Treaty provides that:

---

[306] In their notice letter of 20 August 2009, Claimants referenced alleged gross violations of contractual obligations on the part of Venezuela, which would suggest that Venezuela was regarded as one and the same as CVG FMO for these purposes.

[307] Claimants' Post-Hearing Brief, para. 332 (and see also Claimants' Reply, para. 217)

[308] *Idem*, para. 344. Exhibit CLEX-13: Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, Report of the International Law Commission on the work of its fifty-third session, 2001

[309] Respondent's Counter-Memorial, para. 261 and Respondent's Post-Hearing Brief, paras. 167 and 179

"1. All investments, whether direct or indirect, made by investors of one Contracting Party enjoy in the territory of the other Contracting Party, fair and equitable treatment according to international law.

2. Except for measures required for the maintenance of public order, such investments shall enjoy constant protection, which precludes any arbitrary or discriminatory measure that could hinder, in fact or law, their administration, maintenance, use, enjoyment or disposal.

3. For all matters governed by this Agreement, investors of each Contracting Party shall enjoy, in the territory of the other Contracting Party, treatment no less favourable than that accorded by the former Contracting Party to its own investors or to investors of the most favoured nation."

384. So far as the Portuguese Treaty is concerned, Article 3 provides:

"1. Each Contracting Party shall guarantee, within its territory, non-discriminatory, fair and equitable treatment, according to international law, to investments made by investors of the other Contracting Party.

2. On matters governed by this Agreement, the treatment referred [to] in paragraph 1 of this Article shall not be less favourable than that granted by a Contracting Party to investments made in its territory, in similar conditions by its own investors or by those of a third country."

385. *Discrimination Standard:* Venezuela maintains that the Luxembourg Treaty makes express reference to discriminatory measures only in the context of the constant protection provision. While it acknowledges that the Portuguese Treaty does include a specific guarantee of non-discriminatory, as well as fair and equitable, treatment of foreign investments, the fact that both Treaties reference such treatment as being "*in accordance with international law*" results in the applicable standard being that which derives from international law – namely the minimum standard of treatment of aliens and their property under customary international law. Venezuela suggests in its Rejoinder that it is "*well established that the ordinary meaning of the fair and equitable treatment standard clause worded this way*", *i.e.* by reference to the minimum standard, is a prohibition of intentional discrimination.[310]

---

[310] Respondent's Rejoinder, paras. 273 and 283

386. However, of the awards referenced by Venezuela and said to be "*worded this way*", (*i.e.*: "*fair and equitable treatment according to international law*"), Claimants pointed out that none, in fact, related to treaties with such a formulation.[311] The only relevant award referred to the Tribunal was in the *Tecmed* case, in which the tribunal held that the scope of the undertaking of fair and equitable treatment in the Spain – Mexico BIT resulted "*from an autonomous interpretation*" and not from the minimum standard of treatment.[312]

387. Claimants assert that language such as "'*under*' or '*according to*' international law" does not, of itself, convert a fair and equitable provision into one requiring only the international minimum standard, noting that in *Vivendi*, the tribunal found "*no basis for equating principles of international law with the minimum standard of treatment*".[313] Further, in the case of the Portuguese Treaty, non-discrimination is part and parcel of a fair and equitable treatment provision to be applied "*according to international law*".[314]

388. Notwithstanding the issue between the Parties as to whether or not the Treaty standard should be interpreted as an autonomous standard, both referenced the decision in the *Saluka* case as setting out the applicable test - namely:

> "any differential treatment of a foreign investor must not be based on unreasonable distinctions and demands, and must be justified by showing that it bears a reasonable relationship to rational policies not motivated by a preference for other investments over the foreign-owned investment."[315]

---

[311] *Idem*, para. 273
[312] *Tecnicas Medioambientales Tecmed S.A. v Mexico*, ICSID Case No. ARB(AF)/00/2, para. 155
[313] *Compania de Aguas del Aconquija SA and Vivendi Universal SA v Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007, para. 7.4.7 and citing, too: *Azurix Corp. v Argentine Republic*, ICSID Case No ARB/01/12, Award, 14 July 2006, para. 361 and *Suez, Sociedad General de Aguas de Barcelona SA and Vivendi Universal SA v. Argentine Republic*, ICSID Case No ARB/03/19, Decision on Liability, 30 July 2010, para. 185
[314] Claimants' Reply, paras. 210 and 211
[315] *Saluka Investments B.V. v The Czech Republic*, UNCITRAL, Partial Award, 17 March 2006, para. 307

In *Saluka,* it was held that the claimant bank had received markedly less fair treatment than other banks of similar size and market position without explanation or justification.

389. Both Claimants and Venezuela have also cited to the decision in *Unglaube* to support the proposition (Claimants) that:

> "in order to prevail regarding an allegation of discriminatory treatment a claimant must demonstrate that it has been subjected to unequal treatment in circumstances where there appears to be no reasonable basis for such differentiation"[316]

and (Venezuela) for the proposition that within that framework, decisions of a State will be afforded a "*considerable degree of deference*" and that it is necessary to establish behaviour:

> "sufficient to shock the conscience [or which is] improper or discreditable or which otherwise blatantly def[ies] logic or elemental fairness."[317]

390. In the opinion of the Tribunal, on the basis of the findings of fact that it has made in respect of the supply of pellets issue, there would be grounds for holding Venezuela in breach of its obligations to afford Claimants fair and equitable treatment **if** the actions of CVG FMO were properly to be imputed to Venezuela. Matesi was the subject of discriminatory treatment at the hands of CVG FMO and no reasonable justification has been advanced for the treatment that it received.

391. It would follow, too, that Venezuela would be in breach of its obligation not to impair Claimants' use and enjoyment of the investment pursuant to Article 3(2) of the Luxembourg Treaty (see above) and Article 2(2) of the Portuguese Treaty:

> "Each Party shall … refrain from adopting arbitrary or discriminatory measures that prevent the administration manufacturing use usufruct extension alienation and disposal of its investments."

---

[316] *Marion and Reinhard Unglaube v. Costa Rica*, ICSID Case Nos. ARB/08/1 and ARB/09/20, Award 16 May 2012, para. 262
[317] *Idem*, para. 258

392. But the critical question is one of attribution – *i.e.* whether the acts of CVG FMO in respect of the distribution of raw material can properly be attributed to the Venezuelan State, such as to engage the latter's international responsibility.

393. *Attribution:* Claimants argue that the liability of Venezuela is engaged because of the actions of CVG FMO, which they maintain is:

> "owned, directed and controlled by [Venezuela] and is not a State organ only by operation of law or formality alone".[318]

394. Claimants submit, first, that CVG FMO is an organ of the State for the purposes of Article 4 of the ILC Articles, and second, in the alternative, that its acts are attributable to Venezuela by reason of Article 5 of the ILC Articles.

395. Article 4 of the ILC Articles provides:

> "1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.
> 2. An organ includes any person or entity which has that status in accordance with the internal law of the State."

396. Professor James Crawford's commentary contains the following observations:

> "[A]rticle 4 covers organs, whether they exercise 'legislative, executive, judicial or any other functions'. This language allows for the fact that the principle of the separation of powers is not followed in any uniform way, and that many organs exercise some combination of public powers of a legislative, executive or judicial character. Moreover, the term is one of extension, not limitation, as is made clear by the words 'or any other functions'. It is irrelevant for the purposes of attribution that the conduct of a State organ may be classified as 'commercial' or as *acta iure gestionis*."[319]

397. Article 5 of the ILC Articles provides as follows:

> "Conduct of persons or entities exercising elements of governmental authority

---

[318] Claimants' Post-Hearing Brief, para. 339
[319] CLA-13, p. 41.

130

The conduct of a person or entity which is not an organ of the State …
but which is empowered by the law of that State to exercise elements of
the governmental authority shall be considered an act of the State under
international law, **provided the person or entity is acting in that
capacity in the particular instance.**"   (Emphasis added).

398.  The Notes to Article 5 include, at 3, the following statement:

"The fact that an entity can be classified as public or private according to
the criteria of a given legal system, the existence of a greater or lesser
State participation in its capital, or, more generally, in the ownership of
its assets, the fact that it is not subject to executive control—these are not
decisive criteria for the purpose of attribution of the entity's conduct to
the State. Instead, article 5 refers to the true common feature, namely that
these entities are empowered, if only to a limited extent or in a specific
context, to exercise specified elements of governmental authority."

399.  Claimants maintain that the fact that CVG FMO is a "*decentralized state entity*"
is sufficient of itself to meet the test of ILC Article 4.[320] The fact that CVG
FMO was created as a commercial entity, that it is subject to private law and
that it engages in commercial activity are not matters which go to its legal nature
as an organ of the Venezuelan State under Venezuelan law – a proposition,
which they say Professor Iribarren recognizes and which the Constitutional
Chamber of the Venezuelan Supreme Court has confirmed.[321]

400.  Claimants maintain that CVG FMO holds a governmental monopoly over a
critical natural resource and thereby exercises governmental authority. It
"*likewise*" forms part of the "*functionally decentralized pubic administration*" of
the Government of Venezuela and it is subject to the control of the Ministry of
Industry by reason of CVG's shareholding. Claimants draw attention to the fact
that CVG FMO's activities have been declared of public utility and public
interest pursuant to Article 3 of Decree Law no. 1531.[322] They suggest, too, that
Article 6 of its By-Laws requires it to implement its control of iron ore and

---

[320] Claimants' Rejoinder para. 259 and Iribarren Second Legal Opinion, para. 104
[321] Claimants' Post-Hearing Brief, para. 338
[322] Exhibit C-16

related products under the guidelines of the Ministry of Industry and pursuant to the directives of the President of Venezuela.[323]

401. For its part, Venezuela rejects any suggestion that CVG FMO is an organ of the State; that it exercises Governmental responsibility or authority; or that its actions are the result of State instructions or control.[324] It insists upon the fact that CVG FMO was established as a corporation. The (undisputed) fact that it is wholly owned by CVG does not make it an organ of the State any more, says Venezuela, than CVG itself. The powers of CVG over CVG FMO are no more than those of a shareholder.

402. Venezuela emphasises the fact that CVG FMO's relationship with Matesi was one born of contract - and the provision for *pro rata* distribution of pellets was intended to address the possibility of a pellet shortage which might otherwise interrupt the contractually agreed delivery arrangements.

403. Venezuela asserts that Claimants have produced no evidence to show how it is said that CVG influenced CVG FMO's performance of the Supply Contract, or to what extent, if at all, CVG supervised the performance of the Contract or acted on the instructions of the State.

404. In the submission of Venezuela, ILC Articles 4 and 5 are simply inapposite, because:

> "[t]he relationship between [CVG FMO] and the different briquette companies of the region was strictly contractual and commercial, consistent with the delivery of merchandise in return for payment."[325]

405. Claimants dismiss the suggestion that CVG was a mere shareholder, pointing out that under Decree No. 1531 it was responsible for formulating policies and guidelines for the commercialisation of CVG FMO's products and for setting prices. The Government was therefore "*intimately engaged in how the supply of*

---

[323] Claimants' Memorial, para. 192
[324] Respondent's Counter-Memorial, para. 233
[325] *Idem*, paras. 237-239

*pellets was priced on the market."*[326] Moreover, there was evidence of direct involvement of the State in the activities and operations of CVG FMO, notably in the form of a direct grant of some US$2 billion and the direct payment by the Ministry of Industry of CVG FMO workers' salaries.

406. The Tribunal has carefully considered all arguments put forward by each side, and the totality of the evidence on this issue. There is no doubt that CVG FMO is an entity wholly owned by Venezuela. Its By-Laws (Clause 5)[327] confirm that its shares:

> "belong to [Venezuela] which exercises its ownership through [CVG] and may not be alienated except by another legal entity wholly owned by the State of Venezuela, if this is decided by the President of the Republic at a Council of Ministers."

407. Responsibility for iron ore exploitation in Venezuela was vested in CVG pursuant to Decree No. 580 of 26 November 1974.[328]

408. CVG FMO was incorporated in December 1975 with its domicile in Guayana City, Bolivar State.

409. At the Ordinary General Meeting of CVG FMO's Shareholders, meeting no 14 held on 1 November 2006, a modification to Article 6 of the CVG FMO By-Laws was approved:

> "**to expand the commercial purpose, which is centred on a purely commercial activity**, taking into consideration the guidelines issued by the National Executive Branch, in line with the commitments taken by the Ministry of Industry and of the CVG for the purposes of developing the projects which will promote the centres of endogenous industrializing development and the creation of companies for social production, through the reorientation of raw materials…." (Emphasis added)

410. CVG FMO's By-Laws record, at Article 6 that:

> "the Purpose of the Company is to engage in the iron ore industry within the National Territory, as well as, the administration, direction,

---

[326] Claimants' Reply, para. 226
[327] By-laws of CVG FMO: 1 November 2006 (Exhibit C-99)
[328] Exhibit C-15

industrialization and, in general, the exploitation of the assets which became the property of CVG due to the provisions of Decree No. 580 …. And in accordance with the guidelines from the Ministry of Industry, in the exercise of powers it has by the Partial Reform of the Decree on the Organisation and Operation of the Central Public Administration, published … [on] 22 June 2006, received through the CVG, and in furtherance of the directives of the national government and the President of the Republic, oriented towards the development of the chains of production and towards social responsibility **as a State company**." (Emphasis added)

411. Article 6 continues:

"To fulfil its corporate purpose, the Company may engage in all types of activities, and especially on the following: mining, industrialization, marketing, transportation, research, chartering, shipping agency, customs agency, temporary storage or In Bond, and in general the storage and warehouse of all types of goods to be imported. Additionally, the Company may perform all legal acts and business related to the purpose described in this clause without limitation."

412. The Tribunal has considered the standing of CVG FMO in the context of Article 4 of the ILC Articles with these matters in mind. In this regard, the Tribunal has also taken account of the fact that:

(a) the iron ore monopoly was enjoyed by CVG rather than CVG FMO;

(b) while Claimants complain that CVG FMO had "*authority to alter administrative contracts unilaterally…*",[329] what happened in this case was that a price increase, which resulted in Amendment No.1 to the Supply Contract, was imposed by Presidential Decree No. 3895, and not at the initiative of CVG FMO;[330] and

(c) the activities of CVG FMO, specifically those in respect of the Supply Contract, are of a commercial nature. They have no bearing upon the legislative, executive, judicial or other functions of the Venezuelan State:

---

[329] Claimants' Post-Hearing Brief, para. 344.
[330] Exhibit C-28

there is no evidence before the Tribunal of any vesting of a combination of public powers in, much less, any exercise of such powers by, CVG FMO.

413. On the basis of all the materials available to it, the Tribunal concludes that CVG FMO is not an organ of the State for the purposes of ILC Article 4 of the ILC Articles.

414. The question then is whether CVG FMO was empowered by Venezuela to exercise elements of governmental authority, and was so acting in the case of the Supply Contract, and, specifically, the discriminatory supply of pellets, such that its actions might be attributed to Venezuela pursuant to Article 5 of the ILC Articles.

415. The Tribunal is mindful of Note 3 of the commentary to Article 5, as quoted at para 397above.

416. In the opinion of the Tribunal, the point here is susceptible of a short answer: there is no evidence that CVG FMO was exercising any element of government authority in respect of the allocation of pellets under the Supply Contract.[331] And Claimants' submission that CVG FMO exercises government authority in carrying out its monopoly over a natural resource is misconceived in that the monopoly is not that of CVG FMO but of CVG. The submission, in any event, is far too widely drawn for the purposes of Article 5 of the ILC Articles.

417. The Tribunal accepts Venezuela's case that CVG FMO had not been specifically empowered by the law of the State of Venezuela to distribute pellets, and that its corporate purpose was the marketing of iron ore, pellets and fines, which are activities of a private and commercial nature. Moreover, its obligations in the context of Matesi were obligations entered into pursuant to the Supply Contract, which was a commercial contract. To the extent that the

---

[331] See in this regard, para. 201 of Respondent's Post-Hearing Brief and the citation from the *Tulip* case to which attention is drawn.

actions of its principal shareholder CVG might be said to be relevant, there is nothing in the evidence to suggest that its oversight of CVG FMO went beyond the exercise of general supervision of a kind which international tribunals have determined would be insufficient for the purposes of attribution. The Tribunal notes and adopts the conclusion of the tribunal in *Hamester* that:

> "It is not enough for an act of a public entity to have been performed in the general fulfillment of some general interest, mission or purpose to qualify as an attributable act. In this regard the Tribunal shares the view expressed by the tribunal in *Jan de Nul*, when it stated that: "[w]hat matters is not the '*service public*' element, but the use of '*prerogatives de puissance publique*' or governmental authority." [332]

418. Issues in respect of CVG FMO's pellet supply, therefore, were matters for CVG FMO's account, and not such as to engage Venezuela's responsibility, and any recourse in this regard ought to have been pursued against CVG FMO under the Supply Contract.

419. In fact, it is evident that Matesi made no attempt to seek redress under the terms of the Supply Agreement, which provided for arbitration.[333] It was put to Mr Malvassora that over a period of months in 2006, Matesi complained to CVG FMO that the contract was not being performed and that Matesi was being harmed, and yet no further recourse was ever actually taken:

> "Why, then, not take the step of initiating a dispute-resolution process under the Contract? If you're in effect threatening CVG FMO throughout by saying that you are acting in breach of contract, and we are suffering a loss as a result, I'm a little bit unclear as to why, then, you wouldn't just go that one small step further from a threat, which is to say, actually, let's now resolve this under the contract.
>
> A: .... Toward the end of 2004, October, we started the operation; and by the beginning of 2005, we were obliged to signing (sic) a modification, an amendment to the contract for the supply of mineral ore, and have an agreement for assuring the supply of raw material,

---

[332] See *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, 18 June 2010, para. 202; *Jan de Nul v. Egypt* Decision on Jurisdiction 16 June 2006; and *Bayindir v Pakistan*, ICSID Case No. ARB/03/29, Award, 27 August 2009, para. 122.

[333] See Exhibit C-25, Article 12: somewhat confusingly, at para. 209 of its Post-Hearing Brief, Venezuela suggests that the operative arbitration clause is that of the Talta-Matesi Off-Take Agreement (Exhibit C-27)

which implied an increase in the price, there was a raise in the price.[334] Our provider was not a regular provider. It was a provider that depended or hinged on the Venezuelan State, applied the Venezuelan jurisdiction as well as it depended from laws and courts of Venezuela, and we received this expression of, let's call it, 'power', power on behalf of the Venezuelan State. At the beginning of 2005, when we had very little time of operation, even with certain threats of nationalisation, we did not deem that that was the correct pathway to follow. We believed that it was preferable to establish this exchange of letters in order to try to comply with the terms of the Contract, but we were not very successful."

420.  When pressed on the point that these exchanges had continued over a period of months without effect and that: "…. *the next step would be to indicate a process under the Contract, even negotiations under the Contract*", Mr Malvassora replied:

> "In keeping with the opinion of our legal counselors it seemed that it was not efficient to try to judicialize this claim, and this is why we followed the suggestions made by our legal counsels. The opportunities, the cases, where we were convened by the Executive Branch as a result of the decree which I mentioned, and which is part of the record, it was judged to be something worsening the conditions instead of improving them."[335]

421.  But that evidence was given in the context of the price increase, which had been imposed in 2005. In contrast, on the issue of any failure properly to operate the *pro rata* supply provisions of the contract or to provide information as to the requirements of other producers, no persuasive evidence has been put before the Tribunal which might demonstrate an intervention into the management of CVG FMO by Venezuela.  It was only the price increase that was imposed by Venezuela pursuant to Decree no. 3895, and it was then a matter for CVG FMO and the suppliers to amend their contracts to implement the legislative measure. Equally, there is no suggestion by Claimants that the price increase was unique to Matesi.

---

[334] See Exhibit C-28, Decree No. 3895 of 12 September 2005, and Amendment No.1 to the Supply Contract at Exhibit C-31
[335] Transcript (English), Day 3, pp. 717 & 718

422. In answer to further questions from the Tribunal, Mr Malvassora stated that Matesi had also raised complaints as to the chemical quality of the pellets supplied by CVG FMO, quite apart from issues about the level of supply itself. Matesi had also notified CVG FMO that it, Matesi, had received complaints from its own customers that briquettes that it had subsequently produced were off spec. Matesi had been obliged to settle a number of claims as a result. However neither the quality shortcomings in the pellets (in respect of which, Matesi had submitted a claim for compensation of some US$ 2.87 million),[336] nor reimbursement of any settlements made with its own customers, had ever been pursued with CVG FMO.

### i.    Conclusion

423. Having considered all of the evidence before it, and all of the submissions of the Parties, the Tribunal concludes that the shortcomings in the pellet supply from CVG FMO to Matesi (as outlined earlier) were matters for which CVG FMO was contractually responsible, and which ought properly to have been resolved pursuant to the dispute resolution provisions of the Supply Contract. There is no persuasive evidence, as a matter of fact, that these were acts and omissions in supply that were instigated or in any way directed by or motivated on behalf of the government, and there is no basis to attribute any of these acts or omissions to the Venezuelan State as a matter of law.

424. For all of the above reasons, it follows that the Claimants' case as to the alleged breaches by Venezuela of its obligations pursuant to Article 3(1) of the Luxembourg Treaty and Article 3(1) of the Portuguese Treaty must be dismissed.

## 2.    PROTECTION AND SECURITY CLAIM

### a.    Claimants' Case

425. In their Memorial and Reply Memorial, Claimants rely on events, notably serious labour unrest in the form of industrial action in November 2008 (after

---

[336] Exhibit C-181

the Nationalisation Decree), which prevented access to the plant and the holding against their will of some 20 members of its administrative staff in December 2008.

426. While what is described as the "*dispossession*" of Matesi was underway in July 2009, Claimants say that there were numerous cases of assault against its staff including assaults perpetrated by Mr Rodriguez.[337] In that context, Claimants assert that an expropriation that occurs in the face of pleas for protection amounts to a breach of this standard. They sought to contrast the situation addressed by the Tribunal in *Tecmed* (in which it was held that a government had "*reacted reasonably, in accordance with the parameters inherent in a democratic state*"[338]) with one in which, as they alleged, "*... there [was] no doubt that the Government of Venezuela was in collusion with the union to seize Matesi*" such that the Government's conduct amounted to "*fomenting violence against the Claimants' investment.*"[339]

### b. Venezuela's Case

427. In its Counter-Memorial, Venezuela contended that these allegations amounted to a claim that Venezuela had actively colluded with Matesi's labour union, SINTRAMATS, to harm and dispossess Matesi. It rejected the claim on the basis that:

(a) freedom of association was a fundamental democratic right enshrined in Venezuelan and international law;

(b) the labour unions and the State were wholly separate;

(c) Claimants had failed to demonstrate that the Government of Venezuela had not exercised due diligence in protecting their investment;

---

[337] Claimants' Reply Memorial, para. 243
[338] *Tecnicas Medioambllentales Tecmed S.A. v Mexico*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, para. 177
[339] Claimants' Memorial, para. 214

(d)     conspiracy and collusion were criminal acts under Venezuelan law; and

(e)     no evidence whatever had been adduced by Claimants to support their allegations of collusion.[340]

428.    Venezuela pointed out that there had been widespread labour unrest throughout the Guyana Region, and pay rates offered by Claimants and the Techint Group were a particular source of grievance. In fact, Matesi's existing Collective Labour Agreement had come to an end in late 2007, when negotiations for a new agreement began. The meetings between Matesi and SINTRAMATS were chaired by the Labour Inspectorate. Following an hiatus in the negotiations of some six months, the new Collective Labour Agreement was signed in July 2008.

429.    Venezuela notes that there were tensions, before and after the signing of the July 2008 Agreement, not least:

(a)     in November 2008, Matesi had imposed a production stoppage, citing the impact of the financial crisis on demand for HBI, coupled with the fact that SIDOR no longer required HBI – a stoppage which SINTRAMATS considered a breach of the new Collective Labor Agreement;

(b)     of the three categories of workers at Matesi, the least well paid, the Collective Labor Agreement workers, went seven months without salary between October 2008 and April 2009;

(c)     workers' shifts were reduced from three to one in November 2008; and

(d)     all "outsourced workers" had been made redundant when the work stoppage was introduced.

---

[340] Respondent's Counter-Memorial, para. 288

430. Following a decision of SINTRAMATS to declare its formal opposition to the shift reduction and redundancies[341] and a notification by Matesi to the Labor Inspectorate in November 2008, the Inspectorate intervened in order to attempt to conciliate. Venezuela points out that neither Matesi's management nor SINTRAMATS could be sure of the outcome of the Labor Inspectorate's intervention.[342]

431. After further interventions by the Ministry of Labour, the Ministry of Industry, the CVG and the National Guard, an amendment to the 2008 Collective Labor Agreement was signed in May 2009.[343]

432. Venezuela points, too, to the judicial intervention in February 2009 following SINTRAMATS escalation of industrial action, which had led to workers being prevented from entering the plant. A judicial inspection in February 2009 was followed by another in March 2009. In addition, and over the objections of SINTRAMATS, a Protection Order was issued by the Fifth Court of First Instance of the Bolivar State Criminal Judicial Circuit in Puerto Ordaz ordering the National Guard to:

> ".... Assign officers to protect the facilities of said company, stationing themselves at said place until the investigation stage is completed….."[344]

433. So far as events in July 2009 were concerned, Venezuela acknowledges that in May 2009 the Government had decided to nationalise Matesi: "*a company clearly paralysed by worker conflict*". The inclusion in the Transition Commission of Mr Rodriguez of SINTRAMATS was not a "*reward*" and even if Mr Rodriguez had been involved in any of the claimed acts of assault, they were not attributable to Venezuela any more than the appointment of Mr Rodriguez to the Transition Commission was proof of a desire on the part of the Government to support labour unrest or to collude with SINTRAMATS.

---

[341] Exhibit C-129
[342] Exhibit R-074
[343] Exhibit C-141
[344] Exhibit C-139

434. In short, Venezuela maintains that it had taken multiple steps to protect Matesi; that it had not acted to protect the interests of SINTRAMAT; and that there was no evidence to demonstrate any collusion on the part of Venezuela with SINTRAMATS, much less that any such collusion reduced the value of Matesi.[345]

435. As to Venezuela's case, Claimants dismiss these measures as "*deliberately ineffectual*"[346] on the grounds that:

(a) the Labor Inspector was a former legal advisor to SINTRAMATS and therefore his impartiality was in doubt;

(b) only two National Guardsmen had been dispatched to try to restore order;

(c) one of the judges who had sought to enter the plant for the purpose of a judicial inspection had been unable to enter the premises and the other had been detained by the protestors whereupon he had refused to return to the site; and

(d) Mr Rodriguez's "*violent propensities*" were well known to Venezuela, but nonetheless he had subsequently been appointed General Manager of BriqVen.[347]

### c. Treaty Provisions

436. Article 3(2) of the Luxembourg Treaty provides that:

> "Except for measures required for the maintenance of public order, such investments shall enjoy constant protection, which precludes any arbitrary or discriminatory measure that could hinder, in fact or law, their administration, maintenance, use, enjoyment or disposal."

437. Article 2(2) of the Portuguese Treaty provides that:

---

[345] Respondent's Counter-Memorial, paras. 323-324
[346] Claimants' Post-Hearing Brief, para. 350
[347] Claimants' Reply, para. 244

"Each Party shall protect, within its territory, investments made in conformity with its laws and regulations by the investors of the other Contracting Party and shall refrain from adopting arbitrary or discriminatory measures that prevent the administration, manufacturing, use, usufruct, extension, alienation and disposal of its investments."

### d.    Application of the Treaty Standard

438. It is common ground that the standard of constant protection relates principally to the physical protection of the investor and its assets. In a case in which a tribunal determined that a state could have taken precautionary measures, which fell within the normal exercise of the government's inherent powers and which could reasonably be expected to prevent the investor's loss, it was held that constant protection requires an "*objective standard of vigilance*" of which "*mere lack or want of diligence, without any need to establish malice or negligence*" can constitute a breach.[348]

439. The Tribunal accepts Claimants' submission that the obligation is not exclusively limited to physical protection from third parties. It has noted the decision of the Tribunal in *Biwater* that the obligation is not "*limited to a State's failure to prevent actions by third parties, but also extends to actions by organs and representatives of the State itself.*"[349] It has also noted the decision in *Frontier Petroleum* that: "*the host state is under an obligation to take active measures to protect the investment from adverse effects that stem from private parties or from the host state and its organs.*"[350]

440. While the underlying facts are also largely not in issue, there is a clear divergence of opinion between the Parties as to the efficacy of such measures as Venezuela took pursuant to its obligations of constant protection – a divergence manifest, too, in the accounts of Mr Malvassora and Ms Bello Rodriguez.

---

[348] *Asian Agricultural Products Ltd. v. Sri Lanka*, ICSID Case No. ARB/87/3, Final Award, 27 June 1990, para. 77
[349] *Biwater Gauff (Tanzania) Ltd. v United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award 24 July 2008, paras. 718 and 730
[350] *Frontier Petroleum Services Ltd v Czech Republic*, UNCITRAL, Final Award, 12 November 2010

441. However a question arises as to the extent to which it is necessary for the Tribunal to consider these matters in detail and to seek to reach a conclusion as to the true facts. In their Reply Memorial, the four matters, which form the central planks of Claimants' claim are advanced as examples of a failure on the part of Venezuela to protect their interests "*during the nationalisation process.*"[351] And at the hearing, it emerged that Claimants were seeking declaratory relief only - and that for events before the date of the expropriation:

> "[T]here is no separate damage claim associated with this claim, and Claimants seek a declaration in light of the failure to protect Matesi's assets against attack **before the expropriation took place** in light of the seriousness of the conduct and as part of the overall context of this dispute."[352] (Emphasis added)

442. Both Parties have agreed that the date of the expropriation or taking in this case is 30 April 2008, whereas all of the incidents, which are prayed in aid of this claim fall much later in time and specifically in November–December 2008 and July 2009. On that basis, Venezuela's submission that Claimants' request for relief in respect of the alleged late 2008 and July 2009 violations has become moot seems to the Tribunal to be self-evident.

443. In any event, on the evidence that is before it, the Tribunal rejects Claimants' contention that Venezuela failed to fulfil its Treaty obligations in the respects set out above, or that it colluded with SINTRAMATS to seize Matesi, or that it fomented violence against Claimants' investment.

444. First, Mr Montero pointed to a history of difficult labour relations even in the days of PosVen,[353] and Mr Malvassora accepted that the trigger for the conflict in 2008 had been the decision of the company to reduce shifts with the loss of night time working. It had had nothing to do with the decision to nationalise.[354]

---

[351] Claimants' Reply, para. 97
[352] Transcript (English), Day 1, p.165-166
[353] Transcript (English), Day 2, p. 385
[354] Transcript (English), Day 3, p. 659

445.  Second, the Labor Inspector against whom Claimants alleged bias, Mr Peña Guerra, had been appointed before the labour disputes at Matesi had arisen;[355] he had been the subject of a Motion for Recusal in November 2008, which had been accepted and the file had been transferred from Puerto Ordaz to Bolivar City;[356]and Mr Peña Guerra had, in fact, recused himself, as Mr Malvassora confirmed.[357]

446.  Third, Ms Bello testified that because Matesi was a basic industry company, the National Guard was always at hand.[358] That evidence was not challenged in cross-examination. Further, Claimants did not challenge Venezuela's contention that none of the alleged attacks on personnel in 2009 was reported to the National Guard.[359]

447.  Fourth, whether or not it is the case that SINTRAMATS "*spearheaded a radical and violent movement against Matesi's management*",[360] the evidentiary record supports the proposition that the Venezuelan authorities responded by organising two judicial inspections, by the intervention of the Ombudsman and subsequently by the making of a Protection Order which mandated the intervention of the National Guard. There is no persuasive evidence of any collusion between Venezuela and SINTRAMATS.

448.  Finally, it is suggested that the appointment of Mr Rodriguez to the Matesi Transition Commission by Minister Sanz on 25 May 2009[361] was a "*provocative act*" and a "*reward*". There is no conclusive evidence before the Tribunal that confirms either allegation. As Ms Bello and Mr Malvassora confirmed,[362] Matesi was not unique in having trade union representation on its Transition Commission. Further, and so far as the subsequent appointment of Mr

---

[355] Transcript (English), Day 3, p. 660
[356] Transcript (English), Day 3, pp. 661 & 662 (and see Exhibit R-155)
[357] Transcript (English), Day 3, p. 663
[358] Bello Witness Statement, paras. 22-23
[359] Respondent's Counter-Memorial, para. 321
[360] Claimants' Reply, para. 90(b)
[361] Exhibit C-39
[362] Bello Witness Statement, paras 24-26; Transcript (English), Day 3, p. 678 (Malvassora) – and see Exhibit R-81

Rodriguez as a "stop-gap" President of BriqVen is concerned, it appears that that appointment was not made by Venezuela: Mr Rodriguez was appointed by the employees of the company[363] and subsequently replaced in September 2013 by Mr Pablo Mora Zoppi.

### e. Conclusion

449. For these reasons, the Tribunal declines to make the declaration requested by Claimants, and its claims pursuant to Article 3(2) of the Luxembourg Treaty and Article 2(2) of the Portuguese Treaty must be dismissed.

---

## G. NATIONALIZATION AND EXPROPRIATION OF MATESI

450. The second category of claims advanced by Claimants arise out of the actual nationalisation of Matesi.

451. There is in this case no question but that Matesi was the subject of an expropriation:

> "No doubt about it, Venezuela nationalized Matesi."[364]

452. The process was initiated by President Chavez on 10 April 2008, when he announced that Venezuela's steel industry was to be taken back and put at the service of the country. That announcement, and the subsequent ratification of the decision by the National Assembly, was followed on 30 April 2008 by the publication of Decree No. 6,058, the "*Nationalisation Decree*." Pursuant to its terms, SIDOR and its subsidiary and affiliated companies, of which Matesi was one, were to be transformed into State corporations. There followed Decrees 6,796 (July 2009) and 8,280 (June 2011), which addressed the nationalisation and expropriation of Matesi itself. The relevant facts are set out at paras 67 to 90 above.

---

[363] Transcript (English), Day 1, p. 315 and see Bello Witness Statement, para. 24
[364] Transcript (English), Day 1, p. 230

1.   **CLAIMANTS' CASE**

453.  Claimants contend that Venezuela's nationalisation of Sidor and its subsidiaries in April 2008, and subsequently Matesi in May-August 2009 (followed in June 2011 by Decree 8,280 pursuant to the Expropriation Law)[365], amounted to an indirect expropriation of Claimants' investments, the prejudicial effects of which were compounded by Venezuela's attempt to reduce the compensation which otherwise ought to have been payable.

454.  One such effect of Venezuela's approach to the expropriation was that, having sought to take only the <u>assets</u> of Matesi, Venezuela avoided the debts of Matesi, and Claimants were left to deal with Matesi's creditors, among which was Talta.[366]

455.  Further, Claimants contend that the effects of these measures rendered the shares in Matesi, which Claimants still held, valueless: the productive assets of Matesi had been expropriated and the Claimants were left with an empty shell with liabilities, and no ability to generate income to meet those liabilities.

456.  Claimants contend, too, that Matesi's consequent inability to manufacture HBI and to generate income amounted to a further indirect expropriation of the Off-Take Agreement and the Talta Loan.

457.  Claimants rely upon Articles 4(1) and (2) of the Luxembourg Treaty, and on Article 4 of the Portuguese Treaty.

2.   **VENEZUELA'S CASE**

458.  Venezuela maintains that its expropriation of Claimants' investment was lawful and consistent with the framework that it had put in place - specifically, the special procedure established by the Nationalisation Decree (No. 6,058). That procedure posited either a negotiated transformation of SIDOR and its

---

[365] These events are described in more detail at paras. 54-81, *supra*.
[366] Exhibit C-47, p.5

subsidiaries into State enterprises within 60 days, or, failing that, the initiation of the expropriation procedure pursuant to the Expropriation Act.

459. In the opinion of its expert witness, Professor Iribarren, Venezuela had:

> "followed a strict procedure that was strictly in keeping with the law in this case."[367]

460. The process in his view was consistent with Article 115 of the Constitution, which provides that:

> "The right of ownership is guaranteed. All persons are entitled to the use, enjoyment, and disposition of their assets. Property shall be subject to any taxes, restrictions and obligations imposed by law for public benefit or in the public interest. Expropriation of any kind of property may only be declared for reasons of public benefit or public interest, through a final and conclusive judgment and timely payment of just compensation."[368]

461. According to Professor Iribarren, Decree No. 6,058 was in conformity with the limitations upon property rights set out in Article 115. It was also in conformity with Article 7 of the Law for Expropriation in the Public or Social Interest of 21 May 2002[369], which required that there be:

(a) a declaration of public utility;

(b) a declaration that the transfer of all or part of the property in question was essential to the pubic interest;

(c) a determination of compensation; and

(d) timely payment of compensation.[370]

---

[367] Transcript (English), Day 3, p. 1099
[368] Exhibit C-136
[369] Exhibit C-53
[370] Transcript (English), Day 3, p. 1095

462. Professor Iribarren suggested that there had been two statements of public utility (Decree No. 6,058, and the second in the form of the Declaration of the National Assembly in October 2010, which preceded Decree No. 8,280); the Attorney General had published notice of his intention to establish a Valuation Commission in July 2011; and but for the decision of Claimants not to participate in that procedure, an amicable settlement might have been reached.[371]

463. Venezuela dismisses Claimants' objections that, first, no Technical Commission was ever established within the prescribed 60 day deadline to agree upon the fair value to be paid for the shares in Matesi and, second, that the subsequent Decrees No. 6,796 and No. 8,280 anticipated the expropriation of the assets of Matesi, but not its shares.

464. As to the first point, Venezuela argues that Claimants never sought to remedy any alleged defect in the process by applying the terms of the Decrees themselves, or by means of such recourse as was available to them under Venezuelan law. Venezuela maintains that it has never denied Claimants' right to fair compensation: on the contrary, Claimants elected not to participate in the amicable settlement phase post-nationalisation, and instead made "*premature*" recourse to ICSID arbitration.[372]

465. As to the second point, Venezuela relies on Professor Iribarren's opinion that the distinction drawn between the shares of Matesi and its assets was, in reality, more apparent than real in the context of any eventual valuation of the investment:

> "But in any event, let me underscore that because of the general knowledge that I have regarding the expropriation practice within the Office of the Attorney General, even when a company is subject to the expropriation of the assets, when determining the fair value through the amicable settlement process at the Attorney General's Office, the liabilities of the company are taken into account for fair value."[373]

---

[371] Transcript (English), Day 3, p. 1096
[372] Respondent's Post-Hearing Brief, para. 354
[373] Transcript (English), Day 4, p. 1202

466. Further, the taking of control of the assets of Matesi prior to resolution of the fair price to be paid was to be regarded as an interim measure, intended to guarantee the continuation of the activity in the meantime.[374] According to Professor Iribarren, Article 8 of Decree No. 6,058, which was a "*special law*", which governed expropriation in Venezuela pursuant to Article 4 of the Expropriation Law ("*special loss*"), made it possible to take control of Matesi's assets in such a way prior to payment of a fair price, if:

> "administrative preventative measures in the context of an expropriation administrative process [were necessary] … to guarantee [the] continuation of the activity or the work which is being submitted to expropriation."[375]

## 3. TREATY PROVISIONS

467. Articles 4(1) and (2) of the Luxembourg Treaty provide as follows:

> "1. Each Contracting Party undertakes not to take any measure of expropriation or nationalization, nor any other measure whose effect is to directly or indirectly dispossess investors of the other Contracting Party of investments belonging to them in its territory, unless the following conditions are fulfilled:
>
> (a) the measures are adopted for reasons of public purpose or national interest;
>
> (b) the measures are adopted in accordance with legal procedures;
>
> (c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;
>
> (d) they are accompanied by provisions for the payment of adequate and effective compensation.
>
> 2. The amount of the compensation shall correspond to the real value of the investments concerned on the day prior to the adoption or publication of the measure.

---

[374] See Iribarren at Transcript (English), Day 3 p. 1099 and Respondent's Post-Hearing Brief, paras. 348-349. And see also Exhibit C-47
[375] Transcript (English), Day 3, pp.1098 and 1099

The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest shall be paid at the normal commercial rate from the date it is determined until the date of payment."

468. Article 4 of the Portuguese Treaty provides as follows:

"Neither Contracting Party shall take measures that deprive, directly or indirectly, investors of the other Contracting Party of investments made by them, except if the following conditions are fulfilled:

(a) that the measures are adopted for reasons of public purpose or national interest, in accordance with the legislation in force;

(b) that the measures are non-discriminatory;

(c) that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective compensation … based on the market value of the investment in question immediately prior to the moment when the measure was made public; compensation will accrue interest at the exchange rate applicable at the date on which the transaction becomes effective in the territory where the investment is located; the lawfulness of the referenced measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

## 4.   THE PROCEDURE LEADING TO THE NATIONALISATION OF MATESI

469. Under the terms of Decree No. 6,058, it was envisaged that:

(a)   the activities of SIDOR and its subsidiaries, including Matesi, would be transferred to the State by 30 June 2008;

(b)   Transition Commissions responsible for the transfer of each of the companies subject to Decree No. 6,058 would be constituted by the State within seven days of official publication of the Nationalisation Decree;

(c)   Technical Commissions comprising representatives of both the State and the affected companies were to be set up and to seek to agree on the compensation to be paid within 60 days;

151

(d)   if no agreement was reached so far as the transformation of the companies into State-owned enterprises was concerned within the 60 day period then control and operation of the companies would pass to the State and the expropriation of their shares would be effected in accordance with the Expropriation Law.

470.   However, the Tribunal finds that it was not until 25 May 2009 that Matesi was notified of the appointment of a Transition Commission pursuant to the Nationalisation Decree of 30 April 2008. The function of the Transition Commission was to direct, execute and successfully carry out "*the entire transition process that will conclude with the transfer of [Matesi's] shareholding to the Venezuelan State.*"[376]

471.   As noted at paragraph 66 above, although Matesi nominated its representatives to serve on the Technical Commission on 2 May 2009, no such Commission was ever set up and Venezuela never nominated its representatives.

472.   Two months later came the promulgation of Decree No. 6,796 by which President Chavez ordered the forced acquisition of Matesi's assets. The Decree set out a new procedure, which, while virtually identical to that of the Nationalisation Decree, involved:

(a)   the constitution by the State of a Transition Commission to take immediate operational control of Matesi the day following publication of the Decree;

(b)   the establishment of a new Technical Commission comprised of representatives of the State and of Matesi to agree on the compensation to be paid within 60 days for the expropriation of the assets; and in the event that no such agreement was reached within 60 days;

---

[376] Exhibit C-39

(c)   the assumption of exclusive control and operation of Matesi and the expropriation of the company (not the assets) pursuant to the Expropriation Law.

473.  But before any Transition Commission pursuant to Decree No. 6,796 had been put in place, the Decree No. 6,058 Transition Commission, which included among its members Mr Daniel Rodriguez, seized control of Matesi with what Matesi protested at the time was a demonstration of unnecessary violence and intimidation. [377] Notwithstanding those protests, the Ministry of Industry re-appointed the same individuals, including Mr Rodriguez, to a second Transition Commission established pursuant to Decree No. 6,796. [378]

474.  Although the takeover of Matesi's operations and offices was completed by 22 July 2009, the formal handover of the plant did not occur until 17 August 2009 in the course of an extrajudicial inspection. It is noteworthy that the Minutes of Extrajudicial Inspection were made only a month and three days after the date of Decree No. 6,796, which had provided for a 60-day period within which to reach an agreement for the transformation of Matesi into a State company.

475.  Although the takeover amounted to a complete takeover of Matesi's business, the Minutes of the inspection recorded that:

> "In compliance with Decree No. 6,796 ….. the Transition Commission assumes the operative control only and exclusively over the assets and other goods owned by [Matesi]…."

476.  The Minutes expressly excluded any acceptance by the Commission or Venezuela of, *inter alia*, any commercial or financial debts, contractual or other obligations of Matesi.   The Minutes also confirmed that the Transition Commission had "*only and exclusively*" received the assets of Matesi, as its control and operation belonged to its Shareholders and Matesi remained responsible for its operation and control. [379]

---

[377] Exhibits C-43 and C-44
[378] Exhibit C-45
[379] Exhibit C-47

477. Matesi's plant has been under State control since 17 August 2009, operating as Briqueteras de Venezuela ("BriqVen") and initially under Mr Rodriguez as its General Manager, but there has been no attempt formally to change the name of the company and no State corporation has been constituted to hold Matesi's assets as Decree 6,796 envisaged.[380] That situation led to "*absurd results*".[381]

478. Nearly two years later, on 14 June 2011, President Chavez promulgated Decree No 8,280, ordering:

  (a)    the forced acquisition of Matesi's assets;

  (b)    the Attorney General to carry out the expropriation process prescribed by the Expropriation Law such that title to Matesi's assets was finally transferred to the State.

479. An appraisal commission was established by the Attorney General to determine the compensation to be paid for the expropriation of the assets of Matesi targeted by Decree No. 8,280. The notice published by the Attorney called upon the owners of those assets to appear within 30 days and to provide evidence of their entitlement as well as to nominate an expert to serve as a member of the appraisal commission in the context of the non-compulsory amicable agreement phase. The notice made clear that should interested parties fail to observe the 30-day deadline, then the amicable agreement phase would be deemed to be at an end and compulsory expropriation of Matesi's assets would follow pursuant to the Expropriation Law.[382] That 30-day deadline expired on 13 August 2011. To date, the State maintains exclusive control and operation of Matesi's plant; there has been no request for judicial expropriation of Matesi; and no compensation has been paid.

---

[380] Claimants' Memorial, para. 123
[381] Transcript (English), Day 1, p.76
[382] Exhibits C-57 & C-58

480. As put by the Claimants, it is clear to the Tribunal that Matesi has been: "*left an empty shell, in a perpetual state of legal limbo*."[383]  Its productive assets have been taken and Claimants have been left with valueless shares.

## 5.  FAILURE TO COMPLY WITH THE TREATIES

481. Having carefully considered all of the materials before it, the Tribunal is persuaded that the simple failure on the part of Venezuela to pay compensation is sufficient to render the expropriation unlawful as a matter of Venezuelan law.[384]  It is noted that Article 115 of the Venezuelan Constitution requires expropriation to be carried out pursuant to a final and conclusive judgment and timely payment of just compensation, the latter being integral to and prior to the expropriation - according to Professor Araujo-Juarez upon whose opinion, Professor Iribarren himself relied.[385]  Further, Article 2 of the Expropriation Law likewise contemplates expropriation by way of final judgment and timely payment of fair compensation.  Further still, Article 11 of the Investment Law requires that the expropriation of investments, or measures having a similar effect may only be carried out after the applicable legal procedures have been followed and upon payment of prompt, just and adequate compensation.

482. The Tribunal notes Professor Iribarren's concessions that:

(a)  if the State occupies an asset such as permanently to deprive the owner of the right to use, enjoy and dispose of it without title to the asset being transferred to the State, that amounts to a "*measure equivalent to an expropriation*" for the purposes of Article 11 of the Investment Law; and

(b)  such occupation for three/four years without payment of compensation would constitute a breach of Article 11, since compensation had not been paid "*without delay*".[386]

---

[383] Claimants' Post-Hearing Brief, para.135
[384] *Burlington Resources Inc. v Republic of Ecuador*, ICSID Case ARB/08/5, Decision on Liability, 14 December 2012
[385] See Claimants' Post-Hearing Brief, FN. 349
[386] Transcript (English), Day 4, pp. 1140 and 1141

483. Professor Iribarren further confirmed that it was an imperative and non-discretionary requirement of Article 22 of the Expropriation Law that Matesi's assets should have been the subject of an expert appraisal even if the subject of the expropriation failed to participate in the amicable agreement process.[387]

484. The Tribunal also concludes that the taking over of Matesi's assets without the prior appraisal of the assets by the appraisal commission and the prior deposit with a court of the amount determined by the appraisal commission or a judicial order authorising the takeover, constituted a breach of Article 56 of the Expropriation Law. Although Professor Iribarren sought to suggest that those requirements could be ignored by reason of the terms of Article 8 of the Nationalisation Decree[388], he himself confirmed that the Expropriation Law was not supplanted by the Nationalisation Decree – to the contrary, the Nationalisation Decree specifically referenced the Expropriation Law, requiring the operation, use and utilisation of Matesi assets to be in conformity with Article 56.[389]

485. Importantly, the legal framework for the nationalisation of the steel industry was established by the Nationalisation Decree, which has the rank and force of law. It was superior to, and could not be contradicted by, Decrees No. 6,796 and No. 8,280, described by Professor Iribarren as decrees of sub-statute level.[390] Despite the fact that the Nationalistion Decree is controlling, it is clear on the facts set out above that critical aspects of the procedure set out in the Nationalisation Decree were not followed in the course of the nationalisation of Matesi, notably:

(a) a Transition Commission was not set up within seven days of the publication of the Nationalisation Decree on 19 May 2008 in conformity

---

[387] Transcript (English), Day 4, pp. 1209 & 1210. And see also pp. 1212 & 1213, at which Professor Iribarren confirmed that pursuant to Article 19 of the Expropriation Law, provision is made for a default appointment procedure in the event that a party fails to appear or make an appointment
[388] Transcript (English), Day 4, p. 1147
[389] Transcript (English), Day 4, p. 1147
[390] Transcript (English), Day 4, p. 1185

with Article 5 of the Nationalisation Decree. It was not until 25 May 2009 that Venezuela appointed its members;

(b)    the Transition Commission did not transfer Matesi's activities to the State within the deadline of 30 June 2008 pursuant to Article 5 of the Nationalisation Decree – at that point, the Transition Commission had not even been constituted;

(c)    contrary to Article 7 of the Nationalisation Decree, Venezuela failed to establish a Technical Commission. It never appointed representatives, whereas Claimants did so on 29 May 2009;

(d)    contrary to Article 8 of the Nationalisation Decree, Venezuela did not order the expropriation of Matesi's shares, but pursuant to Decrees No. 6,796 and No. 8,280, it ordered the expropriation of Matesi's assets.

486.    Nor did Venezuela follow the provisions of Decrees No. 6,796 and No. 8,280. The requirement for a second Technical Commission required by Article 4 of Decree No. 6,796 was never complied with.  Venezuela assumed control and operation of Matesi in July 2009 in contravention of the 60-day period within which the Parties were to seek to agree terms prescribed by Article 5 of Decree No. 6,796; expropriation of the company envisaged by Article 5 of Decree No. 6,796 was never ordered: instead, Venezuela issued Decree No. 8,280 ordering the expropriation of Matesi's assets; and the judicial expropriation process provided for in Article 8 of Decree No. 8,280 was not completed.

487.    It was suggested by Ms Seijas[391] and by Ms Marbeni, one of the highest ranking lawyers in MIBAM as of 2005 and Legal Consultant of MIBAM between May 2010 to December 2011, who had been one of those responsible for the legal aspects regarding the execution of Decrees No. 6,796 and No. 8,280, that the

---

[391] Seijas Witness Statement, para. 11 and see also Transcript (English), Day 3, p. 919

Matesi expropriation process was not yet over, but the initiation of the ICSID proceedings had "*paralysed*" it.[392]

488. Yet in April 2012, it appears from an internal document of the Attorney General's Office that the Ministry of Industry had instructed the Attorney General's Office to request the judicial expropriation of Matesi's assets, notwithstanding the fact of Claimants' notice of dispute and their intention to commence these arbitration proceedings.[393] Indeed, the Tribunal notes that in the *CEMEX* case, the fact that ICSID arbitration proceedings were on foot did not prevent Venezuela from pursuing the judicial expropriation process.[394] Professor Iribarren sought to suggest that the decision not to pursue the judicial process in Venezuela in this case was an exercise of discretion rather than a political decision:

> "the authorities in charge of conducting the expropriation deemed that they should not continue with the trial until this arbitration would be resolved. There was a discretional decision of [Venezuela] to avoid contradictory sentencing or decisions that might have a two-fold or double effect on the same issue."[395]

489. But having started from the position that Venezuela had "*followed a strict procedure that was strictly in keeping with the law in this case*", Professor Iribarren conceded in the course of his cross-examination that:

(a) he had little or no knowledge of the actual facts, and had made no enquiry to corroborate such facts as he relied upon;[396]

(b) the fact that Decree No. 6,796 had been promulgated in order to implement an expropriation of the assets rather than continuing to rely upon the Nationalisation Decree was the result of:

---

[392] Transcript (English), Day 2, p.85
[393] Exhibit R-147
[394] *CEMEX Caracas Investments B.V. and CEMEX Caracas II Investments B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/08/15. And see also Exhibit C-292: Decision of the Second Court of Administrative Litigation ("*CEMEX Case*") 30 November 2009
[395] Transcript (English), Day 4, p. 1230
[396] Transcript (English), Day 4, p. 1151 and pp. 1154-1157

> "a certain conceptual lack of order by different types of authorities, but in any event it all refers to the same procedure…
>
> I think the administration could have based itself on Decree 6,058, but it did not. It based itself on the other decree. That other decree applied in isolation and with the specific result that it had .. does not give it … strong enough coverage to the action taken by the administration. … It grounded its action on the Executive Decree and not the Decree Law, and so it did not apply things as I think it should have as per Decree 6,058. It did things otherwise, [which] in one way or another weakens or compromises the way in which the assets of this company were taken.";[397]

(c)   the Decrees upon which Venezuela relied had been drawn up in a *"somewhat disorderly way"*;[398]

(d)   notwithstanding his suggestion that in the course of the negotiation process initiated by the Attorney General, the practice would be to consider the liabilities of Matesi and the value of the shares, that the Notice (a *"highly significant"* document[399]) was very narrowly drawn by reference to a valuation of the assets of Matesi set out in Decree No. 8,280, and that *"The Commission that was created based on that Notice can only refer to these assets, the assets referred to here."*;[400] and crucially,

(e)   that if the Technical Commission stage of Decree No. 6,058 were not implemented then, aside from the question of any remedies in Venezuela, had an administrative court been informed that Article 7 of the Decree had not been complied with then:

> "the Act would have to be annulled because of the procedural violation and according to … Article 259 of the Constitution, [the judge] could order restoration of the legal situation that had been harmed through an order issued to the Competent Authorities to carry out the Decree as formally established."[401]

---

[397] Transcript (English), Day 5, pp. 1280 and 1281
[398] Transcript (English), Day 4, p. 1272
[399] Transcript (English), Day 4, p. 1285
[400] Transcript (English), Day 4, p. 1290
[401] Transcript (English), Day 4, p.1172 and 1173

490. Venezuela urges the Tribunal to have in mind that it is not axiomatic that a violation of a provision of domestic law constitutes an international wrong, and that an investor cannot assume that a lack of diligence in pursuing local remedies will have no bearing upon the success of any eventual treaty claim that it might seek to bring.

491. But in the Tribunal's considered view, this is not a mere administrative fault of the kind which caused the tribunal in *Generation Ukraine* to determine that it should decline jurisdiction on the basis of a failure on the part of an investor to undertake a "*reasonable - not necessarily exhaustive - effort … to obtain correction.*"[402] Nor is it a dispute of which it might fairly be said that the investor: "*[has] intentionally ignore[d] the remedies available under local law to resolve and correct the violations alleged by the … investor.*"[403]

492. In this case, Venezuela had put in place a "tailor made" process, which Venezuela itself then chose not to follow. It is one thing for Venezuela to argue that:

> "When international law requires that the procedures of local law be respected, it is referring to local law in its entirety, *i.e.*, the requirement also includes procedural remedies that the legal system provides to remedy violations of substantive rules"[404],

but quite another for it to suggest that the obligation to observe those requirements lies solely on the investor's shoulders.

## 6. CONCLUSION

493. In light of the evidence before it, the Tribunal is in no doubt that Venezuela failed to implement the procedures that it had put in place to effect the nationalisation of SIDOR and its subsidiaries and, specifically, Matesi. In so doing, Venezuela manifestly failed to conform with the requirements of the

---

[402] *Generation Ukraine, Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award, 16 September 2003
[403] Respondent's Post-Hearing Brief, para. 365
[404] Respondent's Post-Hearing Brief, para. 365

Venezuelan Constitution, the Expropriation Law and the Investment Law, to the extent that they address the issue of expropriation, and it failed, too, to ensure that the provisions of the Nationalisation Decree and those of Decrees No. 6,796 and No. 8,280 were consistent with one another and susceptible to be given full and consistent effect.

494. The Tribunal further concludes that the failure of Venezuela to observe the requirements of its own nationalisation legislation is sufficient to constitute a breach of Article 4(a) of the Portuguese Treaty, which has an explicit *renvoi* to Venezuelan domestic law through the language: "*in accordance with the legislation in force.*"

495. It is satisfied, too, that Venezuela has breached the requirement of Article 4(1)(b) of the Luxembourg Treaty to the extent that its conduct was not: "*in accordance with legal procedures*".

496. In the opinion of the Tribunal, this is a case akin to the *ADC/Hungary* case, in that the affected investor has not had:

> "a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard."[405]

497. Further, Venezuela has acted in breach of both Treaties in effecting an expropriation without "*provisions for the payment of adequate and effective compensation*" (per Article 4(1)(d) of the Luxembourg Treaty) or "*provisions that guarantee the payment of immediate, adequate and effective compensation*" (*per* Article 4(c) of the Portuguese Treaty).

---

[405] *ADC Affiliate Limited and ADC & ADMC Management Limited v Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006, para. 435

## H.    QUANTUM

498. Having concluded that Venezuela has expropriated Tenaris' and Talta Trading's investments in violation of Venezuelan law as well as the Luxembourg and Portuguese Treaties, the Tribunal is required to determine what compensation is due.  In so doing the Tribunal must consider the Parties' very different positions as to which assets or rights should be valued; the appropriate method for valuing them; the applicable rate of interest; and a number of other related issues.

499. The following analysis does not discuss claims related to the Talta Off-Take Agreement in its own right (as addressed in **Section E.3**), over which the Tribunal has declared it has no jurisdiction, or claims for pre-expropriation damages (as addressed in **Section F**), which the Tribunal has rejected.

## 1.    CLAIMANTS' CASE

500. Claimants argue that the proper standard of compensation in a case of unlawful expropriation is full compensation of all losses resulting from Venezuela's conduct.  Claimants refer first to the *Chorzów Factory* case and the principles set forth in the ILC Articles on State Responsibility.[406]  Claimants emphasise that the appropriate standard for valuing such assets is Fair Market Value - meaning the price that a willing buyer would pay and a willing seller would accept.

501. According to Claimants' experts, Messrs. Abdala and Spiller of Compass Lexecon, those values (with respect to only those claims recognised by the Tribunal) are:

(a)    US$ 235.9 million as compensation for the taking of Claimants' 50.2% equity stake in Matesi based, principally, on their Discounted Cash Flow ("DCF") analysis; and

---

[406]  *See* Claimants' Post-Hearing Brief, para 353.

(b)    US$ 27.1 million for the taking of Talta's loan to Matesi.

502.    In their detailed report, Claimants' experts rely principally on the DCF method. In making their calculations, they analyse both the actual performance of the Matesi plant as well as projections of likely future performance and revenues. These projected cash flows are then discounted back to the date of expropriation to arrive at a valuation of US$ 235.9 million for Talta's 50.2% interest in Matesi.

503.    In addition to using the DCF approach to valuation of the Matesi Plant, Claimants' experts present an alternate approach making use of "market multiples" from comparable publicly-traded companies.  In search of companies with substantial similarity to Matesi, they identified 29 companies, worldwide, whose main activity was HBI/DRI production.  Of these, eight were publicly traded as of 30 April 2008. [407]  This group was further winnowed down by Messrs Abdala and Spiller to five companies, and it is data relating to these entities, which are used for their market multiples analysis.  Their study compared median market multiples on two separate bases:  (1) market value to book value of equity and (2) market value to book value of assets.  Finally, they adjusted the market value of shares in these companies upward by applying a "control premium."  According to their report, experienced observers are in agreement that the *per unit* value of a single share or small group of shares is substantially less than the *per unit* value of an interest sufficiently large to control the company.  Regarding the question of how much this "control premium" is worth, Abdala and Spiller argue, and provide support for the use of, a 27% control premium with respect to the valuation of Talta's interest in Matesi.

504.    The result of the "market multiples" approach, as adjusted by this control premium, is a valuation ranging between US$ 196.4 to US$ 259.7 million – figures which, the report finds, *grosso modo*, support the earlier described DCF value of US$ 235.9 million.

---

[407]   Compass Lexecon First Expert Report, p. 87, dated 24 August 2012.

505. Messrs Abdala and Spiller also find that the proper pre-award interest rate is 17.12% from April 2008 to December 2011 and 16.27% from January 2012 to July 2014, representing Talta's weighted average cost of capital (WACC).[408]

## 2.   RESPONDENT'S CASE

506. Respondent's expert, Timothy Hart of Credibility International, reaches results, which are markedly different. Regarding the DCF approach, Mr Hart finds that with the assumed termination of the Off-Take Agreements, 100% of Matesi's historic sales are eliminated and that, as of 1 May 2008, Matesi starts with no customers, marketing and sales functions, or shipping contracts. Moreover, Matesi is 100% dependent upon CVG FMO/Sidor's pellet production, which has been in a multi-year decline. He further argues that Matesi has also had some of its own production problems – and that it is tied to the Off-Take Agreements with Talta and Sidor and is therefore limited to a sales margin of cost plus 7.5%.[409]

507. Mr Hart concludes that, taking a sober view of these realities, and building in an appropriate level of risk, the proper value of Claimants' shareholding interest in Matesi is US$ 0. Mr Hart finds that Matesi, in its brief period of operation, never established the positive free cash flow on which DCF valuation heavily depends. He also observes that Claimants also failed to demonstrate that Talta made a profit on the HBI.

508. Mr Hart then proceeds to perform two alternative DCF valuations. In so doing, he suggests, *inter alia*, that the forecasts used by Claimants' experts are largely speculative and unstable especially when they involve projections involving a period of more than five years. He further criticises the HBI prices used by Claimants, as well as Operating Expense assumptions and projected Capital Expenses. According to his two alternate DCF calculations, he finds support for his calculation of Matesi share value at US$ 0.

---

[408]   Claimants' Post-Hearing Brief, para. 450.
[409]   First Expert Report of Timothy H. Hart, February 2014.

509. With regard to the "market multiples" approach presented by Claimants' Experts, Mr Hart maintains that they did not use comparable companies – in part because the companies in question operate elsewhere in the world. Similarly, according to Mr Hart, the control premium adopted by Abdala and Spiller to create a putative value for Matesi may have theoretical validity, but is appropriate only in a very different country *e.g.*, India.

510. Finally, Respondent's expert is highly critical of the pre-award interest rate suggested by Abdala and Spiller. Mr Hart notes that the interest element, which Claimants seek actually exceeds their claimed damages for the value of the company. He points to what he believes to be a flawed weighted average cost of capital ("WACC") rate for both the pre- and post-award interest. The proper rate, according to Mr Hart is that of the 10-year U.S. Treasury bond, essentially a "no-risk" rate.

511. Mr Hart's bottom line is that Claimants' valuation of Matesi must assume the Off-Take Agreement's "in place" – as they were one day before the expropriation took effect. Therefore, he concludes that Claimants' shareholding in Matesi, with Off-Take Agreement prices in force, and accounting for an appropriate level of risk, is US$ 0.[410]

### 3. TREATY PROVISIONS

512. There can be no question concerning the right of Venezuela, pursuant to Article 4(1) of the Luxembourg Treaty and Article 4 of the Portuguese Treaty to expropriate the property of an Investor for a public or national purpose, in compliance with applicable legislative measures, in a non-discriminatory fashion, and accompanied by prompt and adequate compensation.

513. But where, as here, an expropriation is not carried out in accordance with these standards and others established in the Treaties and by customary international law, the responsible party shall be required to pay compensation.

---

[410] Second Expert Report of Timothy H. Hart, paras. 197-203 and Table 10.

514. Regarding the measurement and calculation of compensation, the language of the Treaties is as follows:

    (a)    Article 4.c of the Portuguese Treaty:

> ". . . this compensation shall be based on the market value of the investment in question immediately prior to the moment when the measure was made public; compensation will accrue interest at the exchange rate applicable at the date on which the transaction becomes effective, in the territory where the investment is located;"

    (b)    Article 4.2 of the Luxembourg Treaty:

> "2. The amount of the compensation shall correspond to the real value of the investments concerned on the day prior to the adoption or publication of the measure.
>
> The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest shall be paid at the normal commercial rate from the date it is determined until the date of payment."

515. The above language from the treaties is very similar to that contained in the ILC Articles,[411] which are currently considered to be the most accurate reflection of customary international law.

516. Article 36 of the ILC Articles provides as follows:

> "1. The State responsible for an internationally wrongful act is under an obligation to compensate for the damage caused thereby, insofar as such damage is not made good by restitution.
>
> 2. The compensation shall cover any financially assessable damage including loss of profits insofar as it is established."

---

[411] The Draft Articles on Responsibility of States for Internationally Wrongful Acts (2001) (CLA-13).

517. This Article relies, in turn, on the oft-quoted ruling of the PCIJ regarding reparation in the *Factory at Chorzów* case which reads, in relevant part, as follows:

> "The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[412]

### 4.   METHOD OF VALUATION

518. There is no dispute that the correct date of expropriation is 30 April 2008.[413]

519. The Parties' experts are also in agreement that Fair Market Value means the price that a willing buyer would buy and a willing seller would sell.[414]

520. Regarding the most desirable methodology for valuing the plant, there is – at least superficially – also some measure of agreement:

> "The parties and their experts agree that where arm's length transactions are unavailable, the value of an asset generally is determined best by its ability to generate future cash flows. Thus the appropriate (and agreed) methodology for measuring future income is the DCF method."[415]

521. The devil, alas, is in the detail. As indicated above, the Fair Market Value of Talta's interest in Matesi as determined by the DCF method ranges from US$ 239.0 million (Abdala / Spiller) to US$ 0 (Hart).

522. The Tribunal appreciates the efforts of the experts and believes that this adversary crossfire on the valuation of Matesi – while perhaps not entirely

---

[412] *Factory at Chorzów*, Merits, PCIJ, Series A, No. 17, 1928, p. 47. (CLA-1)
[413] *See* Claimants' Memorial, para. 258; First Expert Report of Timothy H. Hart, Sec. 8.4 at p. 38.
[414] Claimants' Post-Hearing Brief, para. 358; Cross-examination of T. Hart, Transcript (English), Day 6, p. 1660: 6-22; *see also Starrett Housing Corp. v. Iran* (Iran U.S. Claims Tribunal) Award No. ITL 32-24-1, 19 December 1983 4 Iran Claims Tribunal Reporter 122, para 18. (CLA-05)
[415] Claimants' Post-Hearing Brief para. 359; Compass Lexecon First Expert Report, paras. 31-35; First Expert Report of Timothy H. Hart, paras. 66-69.

efficient – does assist the Tribunal in understanding some of the key issues in determining damages.

523. The valuation of the 50.2% equity interest of Talta in Matesi, located, as it was, in Venezuela, in the particular market circumstances there prevailing, presents a number of serious challenges. In that context, the Tribunal has carefully considered both the DCF and "market multiples" approaches, as put forth and then critiqued by the Parties' respective experts and counsel. The Tribunal recognises that parties in investment cases may be prone to adopt dramatically contrasting approaches to the presentation of quantum issues in order to maximise a position – or to minimise that of the opposing party. Such a conflict can result in little or no engagement between the methodological arguments and valuation theories advanced by the opposing parties. In consequence, tribunals have based their findings upon other evidence and argument in the record introduced by each party in an attempt to arrive at a quantum determination in which they consider that they can have the requisite degree of confidence.[416] In so doing tribunals have, per force, sometimes made use of valuation procedures, which are generally acknowledged to be sound, but which differ from the principal valuation theories advanced by the parties. That is the position in this case in that, for the reasons set out below, the Tribunal has concluded that in the circumstances of this case, there are major flaws in the principal approaches adopted by both Claimants and by Venezuela.

### a. Discounted Cash Flow ("DCF")

524. The DCF approach is widely accepted and, where the circumstances for its use are appropriate, it has certain inherent advantages over other methods such as net book value or liquidation value. Rather than looking to more historical asset or accounting-based valuation methods, the DCF approach combines an established historical record of financial performance with the use of reasonable

---

[416] See, for example, *Tecnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, dated 29 May 2003 at paras. 186 and 195; *Khan Resources Inc., et al. v. Government of Mongolia*, UNCITRAL, Award on the Merits dated 2 March 2015 at para. 390; *Gemplus S.A., SLP S.A., Gemplus Industrial S.A. de C.V. v, The United Mexican States*, ICSID Case No. ARB(AF)/04/3, Award dated 16 June 2010 at paras. 13-73 and paras. 13-75; and *National Grid P.L.C. v. Argentine Republic*, UNCITRAL, Award dated 3 November 2008 at paras. 284-290

and reliable projections of future free cash flows. One situation in which DCF would clearly be preferred might be where, after a number of years of successful performance, a long-term concession contract (*e.g.*, for operation of an airport), or where a long-term supply contract, has been terminated. In such cases, the variables are limited and the likely free cash flows are not difficult to estimate with reasonable certainty.[417]

525. In the present case, for a number of reasons, including some mentioned in Mr Hart's report, the Tribunal does not consider the use of the DCF approach to be appropriate. While the existence of the Off-Take Agreements adds a layer of complexity, Matesi's history of operations runs only from start-up on 6 October 2004 to the initial decree providing for expropriation of Matesi's shares on 30 April 2008, a total of approximately 42 months.

526. Given the normal need for adjustments during the start-up period, the ups and downs of pellet production and delivery, and the brevity of operation of the plant under its owners, serious questions are presented in using the available data from this short, initial period to construct a DCF model. Similarly, the prospects for future supplies of pellets and iron seem even more problematic. In addition, the sharp decline in CVG FMO pellet production adds another obstacle to the reliable projection of Matesi's future free cash flow – and therefore also for the application of the DCF approach.

527. Finally, these uncertainties are compounded by other government interventions in the market place, as well as unstable inventories and shortages of a wide range of products in the Venezuelan market. It is not appropriate for this Tribunal to express itself, either positively or negatively, on the policies of the government of Venezuela. It observes, simply that general economic conditions in Venezuela as well as the business situation at Matesi did not, at the time of expropriation – or later – give rise to the likelihood that Matesi's free cash flows could be projected with reasonable certainty.

---

[417] *See*, for example, *ADC v. Hungary*, First Award, 2 October 2006, paras. 506-07; *CMS v. Argentina*, Final Award of 12 May 2005; *see generally* Ripinsky, op. cit, Ch. 6, Sec. 6.2.2.

### b.     The "Market Multiples" Approach

528. Turning to the "market multiples" approach, the Tribunal has studied carefully the alternate approach of Claimants' experts, in which they attempt to identify other companies dedicated principally to HBI/DRI production and which might readily be compared to Matesi, in terms of market value of publicly traded shares either to book value of equity or book value of assets.  The Tribunal has also considered carefully the treatment of this approach by Respondent's expert – who, again, making use of the same approach, reaches strikingly different conclusions.

529. The methodology and logic of this "market multiples" analysis is certainly sound in principle, but the Tribunal considers that this approach, as applied to Matesi, does not adequately take account of the unique market circumstances of Matesi, or of Venezuela during the period in question.  In broad terms, commentators have often commented on the difficulty of identifying genuinely similar companies for comparison.[418]

530. Thus while some arbitral tribunals have accepted the "market multiples" approach,[419] its acceptance by arbitral tribunals has been quite limited.  For example, the tribunal in *CMS v. Republic of Argentina* rejected the proffered comparison between the value of TGN, a private company in which CMS owned shares, and several similar companies, which were publicly traded.  In rejecting this comparison the tribunal endorsed an expert's opinion that:

> "Market capitalization in illiquid markets such as Argentina is not the most adequate method to value companies"

and it noted that there were

> "significant differences between TGN and those companies regarding asset levels, business segments, financing policy and other issues."[420]

---

[418]  *See* S. Ripinsky and K. Williams, Damages in International Investment Law, (BIICL, 2008) at p. 215-6; *see also*, M. KANTOR, *Valuation for Arbitration:  Compensation Standards, Valuation Methods and Expert Evidence* (Kluwer Law International, Aalphen aan den Rijn, 2008 pp. 119-30).

[419]  *E.g.*, *CME v. Czech Republic*, Final Award of 14 March 2003 (*"CME"*).

[420]  *CMS v. Argentina*, Final Award of 12 May 2005, para. 412.

531. This same line of argument has been developed in this case by Respondent's expert, Mr Hart.[421]

532. As the Tribunal has indicated above, in the context of the DCF method, the uncertainties presented in the Venezuelan market at the time of the expropriation presented complex circumstances which render comparisons of the value of Matesi with even ostensibly similar companies in other countries very difficult indeed. The Tribunal is not persuaded that the five companies selected by Claimants' experts as most comparable to Matesi (all of which operate in India and which make somewhat different products with different technologies) provide reliable guidance to the Tribunal on the basis of which it might proceed to achieve a satisfactory finding of value in this case.[422]

### c. The Talta and Sidor Off-Take Agreements

533. Before leaving the subject of the DCF and "market multiples" approaches to valuation, the Tribunal does not wish to pass over without comment the arguments of the Parties with respect to the Talta and SIDOR Off-Take Agreements and how, if at all, the Off-Take Agreements impact the fair market value of Matesi. The Tribunal has determined that the Talta Off-Take Agreement *per se*, does not constitute an "investment" for purposes of supporting an independent line item requiring compensation for expropriation, but the Talta Off-Take Agreement was obviously designed by Claimants with some care in relation to the corporate structure to which Matesi was affiliated. As indicated above, the Talta Off-Take Agreement appears to have been a crucial element in the decision to invest in Matesi, because without it (and the foreign currency revenues it assured), the financial viability of Matesi would have been called into question. Similarly, the Sidor Off-Take Agreement created a significant measure of stability in terms of sales within the Venezuelan market. The question then arises whether the Off-Take Agreements are a significant element in terms of valuation of Matesi – and, if so, how?

---

[421] First Expert Report of Timothy H. Hart, pp. 67-70
[422] *Op. cit.* paras. 162-164

534. Claimants have argued that the Off-Take Agreements made a significant contribution to lowering the level of risk associated with a volatile market. The Talta Off-Take Agreement assured the sale of much of the production for hard currency in markets considered less volatile.[423] According to Claimants, both Off-Take Agreements provided a readily identifiable cash flow which potential lenders – probably including Talta itself – found comforting.

535. Respondent, however, maintains that the Talta Off-Take Agreement is simply one of several features which demonstrate that Matesi was established as little more than a "cost centre" which, by virtue of transfer pricing, allowed its owners to shift much of the profit on its products to lower tax jurisdictions. The maximum revenue obtainable under these agreements was cost plus 10%, with each party responsible for paying whatever taxes accrued to it.[424] In addition, Respondent has argued, with strong support from its expert on valuation, Mr Hart, that when attempting to value Matesi's value to a willing buyer, language from both the Luxembourg and Portuguese Treaties requires that the amount of compensation shall correspond: "*to the real value of the investments concerned on the day prior to the adoption or publication of the measure,*"[425] or: "*the market value of the investment in question immediately prior to the moment when the measure was made public.*"[426]

536. Because the Off-Take Agreements were in place immediately prior to the expropriatory act, Venezuela insists that Matesi must be valued with the Off-Take Agreements in place, which would result in a significant negative drag on Matesi's potential market value. Respondent's expert points out that, due in part to the Off-Take Agreement pricing arrangements, Matesi actually incurred losses in its first three years of operation; that only the buyers (*i.e.* Talta and Sidor) had the right to terminate the Off-Take Agreements (except for very

---

[423] See paras. 246-263, *supra,* for more detail on the background and purpose of the Off-Take Agreements.
[424] For an earlier brief description of these arguments, see paras. 254-263, *supra.*
[425] Luxembourg Treaty, Article 4.2 (Exhibit C-01)
[426] Portuguese Treaty, Article 4 c) (Exhibit C-03)

limited exceptional situations which, it is argued, do not pertain here); and that Matesi had no record of sales outside the Off-Take Agreements – presumably a negative element which could not fail to be noticed and evaluated by a hypothetical buyer. [427]

537. On the basis of the approach to valuation adopted by the Tribunal in the following section, the Tribunal considers that this aspect of the dispute between the Parties has become essentially moot. Nevertheless, because the views of the Parties on this issue are widely disparate and have been argued with considerable intensity, the Tribunal considers that some further comment is appropriate.

538. The question presented is how the treaty language "*the day before*" or "*the date immediately prior*" is to be construed in the circumstances of this case. The starting point, once again, must be the (previously cited) rules set forth in Article 31(1) of the Vienna Convention, which reads, in relevant part as follows:

> "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

539. Again as noted earlier, the preambles of the Treaties in this case state that their purpose is (respectively) to: "*...strengthen … economic cooperation by creating favorable conditions for investments …*" [428] and: "*... to intensify economic cooperation … and to maintain fair and equitable conditions for making investments by investors of each contracting party …*" [429] The Treaties also make reference to the reciprocal promotion of investments helping to contribute to the economic prosperity of the two states [430] and: "*… the beneficial influence that an agreement of this nature can have on improving business contacts and reinforcing confidence in the area of investment.*" [431] The Tribunal finds that

---

[427] Respondent's Post-Hearing Brief, paras 400-440.
[428] Luxembourg Treaty, preamble. (Exhibit C-01)
[429] Portuguese Treaty, preamble. (Exhibit C-03)
[430] Portuguese Treaty, preamble. (Exhibit C-03)
[431] Luxembourg Treaty, preamble. (Exhibit C-01)

these statements of purpose, while clear, are too broad and general to provide the needed guidance on the specific issue before it.

540. The Parties themselves seem to be in agreement concerning the purpose of the language concerning "*the day before*" or "*the date immediately prior to the expropriation measure.*" In its Counter-Memorial, the Respondent states the following:

> "… the Treaties establish that the investment value will be determined beginning from the date immediately prior to the expropriation measure. This is logical from the perspective of compensation, as the objective is to compensate the investor for the net revenue it would have received in the absence of State measures. Claimants themselves emphasize this basic theory,"[432]

541. The Tribunal agrees fully with this general statement of the purpose of the treaty language. Further, it is clear that the agreed date of expropriation in this case is 30 April 2008, and that "*the day before*" is 29 April 2008.

542. But the specific question presented here is: what scope is to be given to the words "*the day before*" or "*the date immediately prior*" in the context of the situation here? Do these words speak only to "*when*" the investment's value is to be determined *i.e.* as of what date? Or must these words be construed, as Respondent suggests, also to import specific directions to the Tribunal as to "*how*" the expropriated entity should be valued *i.e.* in the present case, to require that Matesi be valued with the Off-Take Agreements in place?

543. As is well known, fair market value may be determined in a number of different ways depending on the circumstances of each enterprise. As a result, there can be no single standard for the fairness by which compensation is to be determined.[433] To determine the market value of property in any particular case, an endless variety of different factual issues may be presented. Each tribunal must, thus, attempt to give meaning both to the words of the treaty regarding the

---

[432] Claimants' Memorial, para. 228.
[433] The Guidelines On The Treatment of Foreign Direct Investment (Guidelines) including the report to the development committee on legal framework for the treatment of foreign investment, published in 7 ICSID Rev.-FILJ 295 (1992).

putative valuation date, as well as to the standard set forth in Article 36 of the ILC Articles,[434] and the ruling of the PCIJ in the *Chorzów* case, *i.e.*:

"that reparation must, so far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[435]

544. Article 32 of the Vienna Convention provides that where the analysis of the treaty language pursuant to Article 31:

"(a) leaves the meaning ambiguous or obscure, or (b) leads to a result which is manifestly absurd or unreasonable,"

recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty (*travaux preparatoires)* and the circumstances of its conclusion. To this end, under Article 32, the Tribunal is free to examine further evidence from the Parties to clarify the intended scope of these phrases. However, neither Party has presented evidence indicating that this or a similar issue was raised during the preparatory work for the Treaties, or the circumstances under which they were concluded.

545. In the absence of such additional evidence, the Tribunal considers that the purposes of the Treaties are best served by construing the treaty language in question to allow the market value of the expropriated property to be determined, as far as possible, "*to compensate the investor for the net revenue it would have received in the absence of State measures.*"[436] This purpose, the Tribunal finds, is best served by construing the "*day before*" or the "*real value on the date immediately prior …*" to prescribe "*when*", but not "*how*", to determine the fair value of Talta's ownership interest in Matesi. Indeed, other than making its argument on the "*plain language*" of the Treaties, Respondent does not put forth any rationale in terms of policy or purpose to support its interpretation.

546. In addition, the Tribunal has examined the facts of the case before it in practical business terms. It notes that, prior to the expropriation, both Sidor and Matesi

---

[434] *See* FN 413, *supra* (CLA-13)
[435] *Factory at Chorzów*; *see* FN 414, *supra*.
[436] See para. 539, *supra*

175

had been controlled by Ternium S.A. and Talta, both affiliates of their parent and beneficial owner, the Techint Group.[437] The Parties are in agreement that prior to the expropriation, the Off-Take Agreements with Sidor and Talta had two purposes: (1) to guarantee that at least 60% of Matesi's production each year would be sold under the Off-Take Agreements and (2) that the Off-Take Agreement arrangement would allow the bulk of the economic profits from Matesi's HBI output to flow directly to Matesi's affiliates. These profits were to be obtained, of course, by means of a further mark-up of Matesi's products when they were sold to unaffiliated purchasers in the international market place.[438] Clearly, these Off-Take Agreement arrangements were made for the benefit of the owners of both Talta and Sidor, who would thereby ultimately reap additional profits.

547. Venezuela has now nationalised both Matesi and Sidor. It is, therefore, presumably, free to sell Matesi's products to whomever it wishes, at whatever price prevails in the world market, retaining all of the resulting profits for itself - as would be its right.[439]

548. If this were to occur, while, at the same time, the Tribunal had substantially restricted the Market Value of Matesi by insisting that, for purposes of valuation, the Off-Take Agreements remain in force, the business reality would be to award a gratuitous and unwarranted bonus to Respondent for its unlawful act. The Tribunal, thus, cannot accept Respondent's argument that it is required to value Matesi as if the Off-Take Agreements remained in place.

549. The Tribunal finds that there is, in any event, a more appropriate approach to the valuation of Talta's ownership interest in Matesi, which does not require that it consider further the alleged impact of the Off-Take Agreements.

---

[437] Claimants' Memorial, para. 22
[438] Normally allowing the final sale to be made from a lower-tax jurisdiction.
[439] Claimants' Post-Hearing Brief, para. 364.

176

### d. Best Evidence of the Value of Talta's Interest in Matesi

550. Having carefully examined the submissions and evidence presented in support of the proposed use of the DCF and the "market multiples" approaches to the valuation of Talta's interest in Matesi, and having concluded that both approaches are inappropriate in this case, the Tribunal notes that both Parties have made reference to another valuation method - albeit both have also expressed reservations about it.

551. Claimants, in their Post-Hearing Brief, indicate that there is agreement between the Parties that the Claimants are entitled to the Fair Market Value of the assets Venezuela has taken. Claimants state:

> "The test is market-based: The only question before this Tribunal is how much a willing buyer would pay for the asset if it was being sold on the open market in an unfettered sale … "[440]

552. A few paragraphs later, Claimants state:

> "As for the best method to determine Fair Market Value of the Claimants' equity interest in Matesi, the parties and their experts agree: where arm's-length transactions are unavailable, the value of an asset generally is determined best by its ability to generate future cash flows. Thus, the appropriate (and agreed) methodology for measuring future income is the DCF method. **But where the results of arms-length transactions between a willing buyer and a willing seller are available, leading commentators are in agreement that the agreed price deserves particular respect as evidence of the value of the asset in question.**" (Emphasis added).

553. Similarly, Respondent's Expert, Mr Hart, fully concurs in the definition of Fair Market Value and the significance of the completion of an arm's length sale transaction.[441]

554. Ripinsky indicates in this regard:

---

[440] Claimants' Post-Hearing Brief, para 353; Claimants' Opening Presentation, Transcript (English), Day 1, pp. 182:14-22 and 183:1-14.
[441] First Expert Report of Timothy H. Hart, para. 62-63.

> "Where there is an active market for a particular asset, tribunals will generally have little difficulty in establishing its value. Here no formal theory of value is needed. We can take the market's word for it."[442]

555. To the same effect Kantor's treatise on valuation for arbitration states:

> "The best evidence of a company's value, or course, may be the actual price received in an arm's-length transaction for the sale of an interest in that very business. As the U.S. Tax Court has stated, while listed market prices are the benchmark in the case of publically traded stock, recent arm's-length transactions generally are the best evidence of fair market value in the case of an unlisted stock."[443]

556. Numerous arbitration tribunals have endorsed this approach.[444]

557. In examining the suitability of the agreed price as an adequate expression of Fair Market Value, the transaction must satisfy at least the following conditions:

    (a)   Both buyer and seller must be willing and able, neither acting under compulsion.

    (b)   The transaction must be at arm's length.

    (c)   The transaction must take place in an open and unrestricted market.

    (d)   Both buyer and seller must have reasonable knowledge of the relevant facts. [445]

---

[442] Ripinsky and Williams, Damages in International Investment Law (British Institute for International and Corporative Law, 2008) Sec. 6.2.1 at p. 189.
[443] M. Kantor, Valuation for Arbitration (Wolters Kluwer: The Netherlands, 2008) at 17, 18 (citing *Estate of James Waldo Hendrickson v. Comm'r, T.C. Memo* 1999-278, 1999 Tax. G. Memo, LEXIS 318 at 42).
[444] See, *e.g.*, *Enron Corporation and Ponderosa Assets, L.P. v. Republic of Argentina*, ICSID Case No. ARB/01/3, Award, 22 May 2007, paras. 387-388.
[445] Ripinsky and Williams, *op. cit.*, p. 184 (referring to the definition of Market Value in the Glossaries of the American Society of Appraisers and the Guidelines of the International Valuation Standards Committee.); Kantor *op. cit.*, at p. 18.

558. Sales of expropriated property, which satisfy these conditions have been accepted as adequate evidence of market value by numerous arbitral tribunals.[446]

559. In the present case, the Tribunal has examined the sale of the Matesi plant from the viewpoint of both the seller and the buyer.

560. The seller, Posven, with involvement of its parent and principal shareholder POSCO, appears to have made a painful business decision to dispose of an almost-new plant, built at considerable expense and employing the latest in HBI manufacturing technology. The plant had operated only from March to August of 2001, when Posven discontinued operations. The testimony and documentary evidence contain only a brief and superficial explanation of the reasoning of the owners in making this decision to sell. The reasons given were (1) that POSCO had made a change in strategy; (2) that Posven was experiencing "*certain operating difficulties*"; and (3) that the steel markets were going through a depression.[447]

561. At a meeting of Posven's shareholders on 23 December 2002, it was decided to liquidate Posven. Pursuant to that decision, Merrill Lynch was engaged as Financial Advisor. Consequently the Matesi plant was offered for sale in January 2004.[448]

562. The involvement of Merrill Lynch in the sale process provides significant assurance that sales information on the plant was made available, broadly, to potentially interested parties in the HBI and steel business worldwide. The record does not indicate how many offers were presented, but it appears clear that the offer from Tenaris and Sidor was the offer most favorable to Posven.

563. The buyers, Tenaris Global (later Talta) and Sidor, must certainly have been aware of the status of the Matesi plant prior to the official offer to sell in January

---

[446] Ripinsky citations from p. 184, FN 9.
[447] Posven Executive Summary, p. 1. (Exhibit C-68)
[448] *Ibid.*

179

of 2004. Given the involvement of Merrill Lynch in the process, they were surely aware of the likelihood of competing offers for the plant. In March 2004, they were, in fact, declared the successful bidders. Both Sidor and Tenaris Global were affiliates of the Techint Group, a large, successful and sophisticated investment group, heavily involved in the Latin America steel industry, and certainly capable of looking out for its own business interests.

564. A final consideration, which deserves comment is that both parties have mentioned, in passing, that the plant was sold as part of a liquidation, leaving open the possibility that this was a distress or "*fire*" sale. If so, under the criteria cited at para. 557(a) above, the transaction might be considered a sale "*under compulsion*," rather than a sale reflecting Fair Market Value.

565. But a careful look at the evolution of the Matesi sale – and the time line involved – leads the Tribunal to conclude otherwise. Posven stopped its operations in Venezuela in August 2001. The decision to liquidate Posven was made in December 2002 – some 16 months later. This decision led to the engagement of Merrill Lynch as Financial Advisor for the sale, which, in turn, resulted in the solicitation of offers in January 2004, and the sale itself in March 2004. The Tribunal considers that the elapsed time from the cessation of Posven's operations in August 2001, to the eventual sale of the plant in March 2004, and each of the steps leading up to the sale, indicates a carefully considered business decision by Posven and its shareholders.

566. Having considered all of the evidence before it, the Tribunal is satisfied that the resulting transaction was freely entered into by the buyers and seller, at arm's length, in a reasonably open market, with both the seller and the buyers having reasonable knowledge of the relevant facts and other market circumstances. The Tribunal is, thus, satisfied that the agreed price of US$ 60.2 million for Talta's 50.2% interest in Matesi is an appropriate reflection of the Fair Market Value of Talta's interest in the Matesi plant.[449]

---

[449] The Tribunal is aware that, in appropriate circumstances, market transactions such as this one can be combined with DCF or other income-based approaches. It has considered making use of such a

(Footnote continued on next page)

567. The Tribunal recognises that the sale price reflects a transaction, which took place in 2004, and that a sale closer to the date of expropriation would likely be more fair and more reliable. Matesi, of course, operated the plant in rather complex business circumstances, from 17 October 2004[450] until 30 April 2008, receiving the financial benefit of those operations such as they were. The Tribunal has considered whether the agreed price should be adjusted, either upward for inflation or downward for depreciation. The evidence before it does not, however, provide a viable basis for making such an adjustment. The Tribunal, therefore, with some reluctance accepts the agreed price of US$ 60.2 million, without adjustment. The Tribunal does acknowledge, however, that the nationalization of the entire steel industry — as well as general market conditions affecting both the investment climate, and the availability of supplies and other aspects of HBI production — have contributed to an environment in which the traditional approaches to establishing fair market value confront serious difficulties. We have concluded, nevertheless, that Claimants have established with reasonable certainty, the value of their interest in the expropriated company. In these circumstances, the Tribunal does recognize, however, that, if we were to compare the determined value of $60.2 million (for Talta's interest) with the Fair Market Value of an interest in a genuinely similar facility elsewhere, the value we have determined in this case is probably quite depressed.

568. Turning briefly to the issue of the Talta Loan, the Tribunal has given careful consideration to the arguments of Respondent to the effect that this loan was non-performing, or was never intended to be repaid, or that the US$ 27.1 million remaining as unpaid on Matesi's books should not be considered an investment – or, if it is, it should be excluded from the calculation of compensation, because it amounts to double counting.

---

(Footnote continued from previous page)

hybrid approach, but in light of the data available in the record, has concluded that this method could not readily be adapted to the situation presented here.

[450]  See para. 48, *supra*

569. As set out earlier, the Tribunal has concluded that, pursuant to the Investment Agreement, Talta had committed to advance an additional US$ 60 million partially to finance the purchase of the Posven assets and to contribute to the costs of refurbishment.[451]  It is thus satisfied that the outstanding balance of the Talta Loan – whether it is considered still to be a loan or, instead, a contribution to the equity of Matesi – represents a legitimate investment by Talta for which Talta must be compensated.

570. To calculate the total amount due as compensation for Claimants' loss, we must begin with the determined value of Talta's interest in Matesi (US$ 60.2 million) and add the value of the Talta loan (US$ 27.1 million) — which results in a total value of Claimants' loss of US$ 87.3 million.[452]

## 5.   ACTUALISATION OF THE LOSS

571. Because the expropriation took place on 30 April 2008, more than seven years ago, the next issue to be resolved is the method for actualising the loss, *i.e.*, adding interest at an appropriate rate *per annum* to reflect the time value of money, from the date of expropriation to the date of the award.  The positions of the Parties on this issue again differ greatly.

572. Claimants maintain that the appropriate rate of capitalisation for both pre- and post-award interest is the Claimants' opportunity cost.  This rate, according to Claimants, should be equal to Talta's weighted-average cost of capital ("WACC").  As calculated by Messrs Abdala and Spiller, that rate would be 17.12% from April 2008 to December 2011; and 16.27% thereafter.[453]  Claimants also maintain that their opportunity cost is most appropriately reflected in an award of compound interest.  Alternatively, Claimants point to the Portuguese Treaty language which prescribes:

---

[451]  See para. 247, *supra*.
[452]  Coincidentally, Respondent's Expert, Mr Hart (though applying his own approach to valuation on the DCF method) arrives at a very similar figure of US$ 87,054,550 for Talta's share in Matesi.  *See* Second Hart Report (Exhibit 4); Hart Cross-Examination Transcript (English), Day 6, p. 1681.
[453]  Claimants' Post-Hearing Brief, para. 435.

"interest at the exchange rate applicable at the date on which the transaction becomes effective in the territory where the investment is located".[454]

573. For its part, Venezuela maintains that the use of a WACC is not appropriate because it reflects an *ex ante* risk factor for an operating company, not a commercial measure of the time value of money. Respondent maintains that no investment tribunal has adopted a WACC for this purpose. Respondent, instead, favours a no-risk rate. Respondent also argues strongly against the application of compound interest.[455]

574. Consistent with the objective that:

"reparation must, so far as possible, wipe out all the consequences of an illegal act and re-establish the situation which would, in all probability have existed if that act had not been committed,"[456]

arbitral tribunals have increasingly sought to adjust the calculation of pre-award interest to better reflect business reality.

575. As stated in the ILC Articles:

"1. Interest on any sum payable under this chapter shall be payable when necessary in order to ensure full reparation. The interest rate and mode of calculation shall be set so as to achieve that result.

2. Interest runs from the date on which the principal sum should have been paid until the date that the obligation is fulfilled."[457]

576. The commentary to the ILC Articles explains:

"There is no uniform approach, internationally, to questions of quantification and assessment of amounts of interest payable. In practice, the circumstances of each case and the conduct of the parties strongly affect the outcome. . ."[458]

---

[454] Portuguese Treaty Article 4, RLA-114; Claimants' Post-Hearing Brief, para 435.
[455] Respondent's Counter Memorial, para. 484-487; Respondent's Rejoinder, paras. 471-472.
[456] *Factory at Chorzów, see*, FN 414 *supra*; ILC Articles, Article 38(1) (CLA-13).
[457] ILC Articles, Article 38.
[458] Commentary to Article 38, para. 10, footnotes omitted; *see also* Ripinsky, *op. cit.* at p. 365.

577. While the rationale and rate of interest applied by investment tribunals has varied widely, a consensus appears to have evolved around the principle of the claimant's opportunity cost.  In the words of the UNCC General Council, the rate of interest should be:

> "sufficient to compensate successful claimants for the loss of use of the principal amount of the award."[459]

This language, however, leaves much to be desired in terms of specific guidance.

578. One well-recognised approach in determining the applicable interest rate was established by the Iran-US Claims Tribunal in *Sylvania Technical Systems v. Iran*[460] where it focused on developing a rate:

> "based approximately on the amount that the successful claimant would have been in the position to have earned if it had been paid in time and thus had the funds available to invest in a form of commercial investment in common use in its own country."

579. Such an approach was also adopted in *Santa Elena*, though without specifying the rate used or the investment instrument from which the rate was to be derived.[461]

580. Other distinguished tribunals and authorities have favoured use of a "*borrowing rate*,"[462] or:

> "not the rate associated with corporate borrowing but the interest rate the amount of compensation would have earned had it been paid after the expropriation."[463]

581. As stated in other words by one distinguished investment arbitration tribunal:

> "The case law elaborated by international arbitral tribunals strongly suggests that in assessing the liability due for losses incurred, the interest becomes an integral part of the compensation itself."[464]

---

[459] Decision of the UNCC Governing Council, "Awards of Interest," 4 January 1993, S/AC.26/992/1b/para. 1.

[460] *Sylvania Technical Systems v. Iran*, Award, 27 June 1985, 8 Iran-US CTR 298.

[461] *Compañía del Desarrollo de Santa Elena v. Costa Rica*, ICSID Case No. ARB/96/1, Award, 17 February 2000, para. 104.

[462] J. Gotanda, "Awarding Interest in International Arbitration" (1996) 90 AJIL 40 at 59-61.

[463] *Siemens A.G. v. Argentina*, ICSID Case No. ARB/02/8, Award, 6 February 2007, para. 396.

582. If the rationale for the choice of interest rate were Claimants' opportunity cost, it would seem, logically, that Claimants should present – and the Tribunal consider – evidence on the rate of return on investment, which has been achieved by the Claimants over an extended period.[465]  While the rationale for this approach may be appealing, the Tribunal will adopt a more conservative approach to this question, which relies on finding an interest rate which would reflect the cost to the Claimants to borrow (*i.e.*, replace) the amounts expropriated.

583. The Tribunal agrees with reasons indicated by Respondent that the use of the WACC, developed by Claimants' experts as part of its DCF analysis, is not appropriate.  The Tribunal has also rejected the no-risk rate suggested by Respondent.

584. As indicated earlier, the Portuguese Treaty, in Article 4C, calls for:

> "interest at the exchange rate applicable at the date on which the transaction becomes effective, in the territory where the investment is located."[466]

The Luxembourg Treaty language simply refers to:

> "a reasonable commercial rate."[467]

585. The Tribunal takes note of this Treaty language, but considers that, in both Treaties, such language is directed to lawful expropriations rather than an unlawful expropriation with which the Tribunal is concerned in this case.

---

(Footnote continued from previous page)
[464]  *Asian Agricultural Products Ltd. v. Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990.
[465]  Though such evidence was not presented in this case, publicly available Annual Report data for Tenaris indicated that shareholders' equity increased from US$ 1.7 billion in 2002 to US$ 12.8 billion in 2012 – an impressive growth record; *see also National Grid v. Republic of Argentina*, UNCITRAL, Award of 3 November 2008, paras. 264-265.
[466]  *See* para. 110, *supra*.
[467]  *Ibid*.

185

586. In examining the use of an appropriate "*borrowing rate*," the Tribunal notes that Claimants (making reference to the language of the Portuguese Treaty) have argued that the interest rate should be equivalent:

> "to the rate Venezuela would have had to pay to borrow money in April 2008 (9.75%)."[468]

587. Taking a different approach, Respondent's expert, Mr Hart, compares the 6-month LIBOR and 10-year Treasury rates (in the neighbourhood of 4% in 2008). He discusses the use of such rates in other awards which are then supplemented by a factor covering political risk and other macroeconomic factors (Country Risk Premium).[469] Following the reasoning of Respondent's expert, the combination of a 4% "*no risk rate*" with a Country Risk Premium of 4.6% would yield an 8.6% "*borrowing rate*." Comparing this rate with the 9.75% borrowing rate for the government of Venezuela propounded by Claimants, the Tribunal concludes that 9% is a reasonable and fair rate for pre-award interest.

588. With regard to the simple interest *versus* compound interest issue (also disputed between the Parties in this case), arbitral tribunals have increasingly accepted the commercial realism of compound interest in approximating the value lost by an investor, and in ensuring "*full reparation for the injury suffered as a result of an internationally wrongful act.*"[470]

589. Practice on this issue is still somewhat diverse. While many authorities rejecting the grant of compound interest are now somewhat dated (*e.g.* the *Norwegian Shipowners' Claims*,[471] and the *British Claims in the Spanish Zone of Morocco*[472]), or specific to the practice of the US-Iran Claims Tribunal[473],

---

[468] Claimants' Post-Hearing Brief, para. 435.

[469] Hart Supplementary Report, paras. 186-7.

[470] J. Crawford, The International Law Commission's Articles on State Responsibility. Introduction, Text and Commentaries (2002), p. 239; *National Grid v. Republic of Argentina*, UNCITRAL, Award, 3 November 2008 , para. 294, including FN 121; *see also PSEG Global v. Republic of Turkey*, ICSID Case No. ARB/02/5; *Siemens v. Republic of Argentina*, ICSID Case No. ARB/02/8; For a very thorough, though not exhaustive, review of ICSID precedents on this subject, *see, Compania de Aguas de Aconguija et al. v. Republic of Argentina*, ICSID Case No. ARB/97/3, para. 9.2.4 and especially FN 432.

[471] *Norwegian Shipowners' Claims* (*Norway v. United States of America*), R.I.A.A. Volume I (13 October 1922), p. 341 (RLA-076).

[472] *British Claims in the Spanish Zone of Morocco* (1925) 2 R.I.A.A. 616, 650 (RLA-077).

more recent authorities still reflect a degree of caution on this issue. For example, in his Third Report on State Responsibility, Professor Crawford summarised the practice of international courts and tribunals, and cautioned against the indiscriminate application of compound interest:

> "... although compound interest is not generally awarded under international law or by international tribunals, special circumstances may arise which justify some element of compounding as an aspect of full reparation. Care is however needed since allowing compound interest could result in an inflated and disproportionate award, with the amount of interest greatly exceeding the principal amount owed."[474]

590. Accordingly, a number of tribunals in recent years have determined that simple interest should be applied.[475]

---

(Footnote continued from previous page)

[473] *E.g. Starrett Housing Corp., Starrett System Inc., Starrett Housing Int'l Inc. v. The Government of the Islamic Republic of Iran Banck Markazi Iran, Bank Omran, Bank Mellat*, Award No. 314-24-1, (14 August 1987), para. 370 (RLA-095); *McCollough & Co. Inc. v. The Ministry of Post, Telegraph and Telephone, the National Iranian Oil Co., and Bank Markazi*, Case No. 89 (Award No. 225-89-3, 22 April 1986), para. 114 (RLA-092); *Sylvania Technical Systems Inc. v. The Government of the Islamic Republic of Iran*, Award No. 180-64-1 (27 June 1985), p. 15 (RLA-091) ("*the Tribunal has never awarded compounded interest*"); *R.J. Reynolds Tobacco Co. v. The Government of the Islamic Republic of Iran and the Iranian Tobacco Co. (ITC)*, Partial Award, Award No. 145-35-3 (6 August 1984), p. 8 (RLA-090); *Anaconda-Iran Inc. v. The Government of the Islamic Republic of Iran and the National Iranian Copper Industries Co.*, Interlocutory Award, Award No. ITL 65-167-3 (10 December 1986), para. 142 (RLA-094); *Int'l Systems & Controls Corp. v. National Iranian Gas Co., National Iranian Oil Co. and the Islamic Republic of Iran*, Award No. 464-494-3, 23 January 1990, para. 123 (RLA-097).

[474] ILC, Third Report on State Responsibility, p. 50 (RLA-046).

[475] *E.g. RosInvestCo.UK Ltd. v. Russian Federation*, SCC Case No. V079/2005, Final Award, 12 September 2010, para. 692 (RLA-108) (simple interest on the overnight interbank offered rates of London (LIBOR)); *Saipem Sp.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/07, Award, 30 June 2009, para. 212 (simple interest at a rate of 3.375% *per annum*);
*Duke Energy Electroquil Partners & Electroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, para. 491 (the tribunal applied interest at the mere lending rate of the *Banco Central de Ecuador*); *Desert Line LLC v. The Republic of Yemen*, ICSID Case No. ARB/05/17, Award, 6 February 2008, para. 298 (simple interest of 5%); *Archer Daniels Midland Co. and Tate & Lyle Ingredients Americas Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/04/05, Award, 21 November 2007, para. 300 (simple interest for U.S. Treasury bills); *CMS Gas*, para. 471 (simple interest on U.S. Treasury bills to those dated prior to the award date, and the arithmetic mean of the rate of the treasury bills of the U.S. for the last six months taken semi-annually); *Occidental v. Republic of Ecuador*, LCIA Case No. UN3467, para. 217 (pre-judgment simple interest at 2.75% and post-judgment simple interest at 4% beginning 30 days after the award until payment). *CME*, paras 641, 647 (simple interest at 10%); *Marvin Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002, para. 211 (simple interest on the Mexican Treasury Certificates); *Autopista Concesionada de Venezuela CA (Aucoven) v. Venezuela*, ICSID Case No. ARB/00/5, Award, 23 September 2003, paras. 387, 397 (simple interest on the average lending rate of five principal banks in the country).

591.  But, as recognized by Prof. Dolzer and Schreuer, the practice of recent tribunals shows a trend toward compounding interest as more in accord with commercial reality.  In their words:

> "The practice of tribunals shows a trend toward compounding interest…While some tribunals have rejected compound interest, it has been accepted in the majority of recent decisions."[476]

592.  In addition, depending on the circumstances of the case and the conduct of the parties, tribunals have also, in many recent investment cases, determined that interest should be compounded annually, semi-annually, quarterly or monthly.[477]

---

[476]  Dolzer and Schreuer, *Principles of International Law (2d Ed.),* Oxford University Press: New York 2008) citing: *Atlantic Triton v. Guinea,* Award, 21 April 1986, 3 ICSID Reports 13, at 33, 43; *Compania del Desarrollo de Santa Elena SA v. Costa Rica,* ICSID Case No. ARB/96/1, Award, 17 February 2000, paras. 104, 105; *Metalclad v. Mexico,* ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000, para. 128; *Emilio Agustín Maffezini v. Kingdom of Spain,* ICSID Case No. ARB/97/7, Award, 13 November 2000, para. 96; *Wena Hotels Ltd v. Arab Republic of Egypt,* ICSID Case No. ARB/98/4, Award, 8 December 2000 *("Wena Hotels v. Egypt"),* para. 129; *Middle East Cement v. Egypt,* ICSID Case No. ARB/98/4, Award, 12 April 2002, para. 174; *Pope & Talbot Inc. v. Government of Canada,* UNCITRAL, Award in Respect to Damages, 31 May 2002, para. 90 *("Pope & Talbot"); Tecmed v. United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, para. 196; *MTD v. Chile,* ICSID Case No. ARB/01/7, Award, 25 May 2004, para 253(4); *Azurix v. Argentina,* ICSID Case No. ARB/01/12, Award, 14 July 2006, paras. 439-40 *("Azurix v. Argentina"); ADC v. Hungary,* ICSID Case No. ARB/03/16, Award, 2 October 2006, para. 522; *PSEG v. Turkey,* ICSID Case No. ARB/02/5, Award, 19 January 2007, para. 348; *Enron v. Argentina,* ICSID Case No. ARB/01/3, Award, 22 May, 2007, paras. 451-2; *Compañía de Aguas del Aconquija, SA & Vivendi Universal v. Argentina,* ICSID Case No. ARB/97/3, Award, 20 August 2007, paras. 9.1.1-9.2.8; *BG Group v. Argentina,* Final Award, 24 December 2007, paras. 456-7; *Sempra v. Argentina,* ICSID Case No. ARB/02/16, Award, 28 September 2007, paras. 483-6; *OKO Pankki v. Estonia,* ICSID Case No. ARB/04/6, Award, 19 November 2007, paras. 343-56; *Continental Casualty v. Argentina,* ICSID Case No. ARB/03/9, Award, 5 September 2008, paras. 306-16; *Bernardus Henricus Funnekotter and others v. Republic of Zimbabwe,* ICSID Case No. ARB/05/6, Award, 22 April 2009, paras. 141-6; *Waguih Elie George Siag and Clorinda Vecchi v. Arab Republic of Egypt,* ICSID Case No. ARB/05/15, Award, 1 June 2009, paras. 594-8; *Impregilo v. Argentina,* ICSID Case No. ARB/07/17, Award, 21 June 2011, paras. 382-4.

[477]  *Azurix v. Argentina,* Award, 14 July 2006, 43 ILM 262 (compounded semi-annually), *Pope & Talbot,* 7 ICSID Rep 143 (compounded quarterly), *PSEG Global Inc., The North American Coal Corporation and Konya Ilgin Elektrik Uretim ve. Ticaret Limited Sirketi v. Republic of Turkey,* ICSID Case No. ARB/02/5, Award, 19 January 2007 (compounded semi-annually); *Sempra Energy International v. Argentine Republic,* ICSID Case No. ARB/02/16, Award, 28 September 2007*("Sempra Energy v. Argentina")* (compounded semi-annually); *Wena Hotels v. Egypt,* 6 ICSID Rep 67(compounded quarterly); *Wena Hotels v. Egypt,* ICSID Case No. ARB/98/4, Decision on the Application for Annulment, 28 January 2002;*Marion Unglaube and Reinhard Unglaube v. Republic of Costa Rica,* ICSID Case Nos. ARB/08/1 and ARB/09/1, Award, 16 May 2012 (compounded semi-annually*); Bermardus Henricus Funnekotter and others v. Republic of Zimbabwe,* ICSID Case No. ARB/06/6 (compounded semi-annually*); Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia,* ICSID Case Nos. ARB/05/18 and ARB/07/15 (compounded semi-annually); *National Grid*

(Footnote continued on next page)

593. The circumstances of the present case indicate that, beginning in 2008, Venezuela put in place not one, but a series of inconsistent laws and decrees directed to the expropriation of Matesi but, as indicated at paras. 481-496 *supra,* failed to follow or implement them. From 30 April 2008 until 13 August 2011, no judicial or administrative process to establish a value for Talta's interest in Matesi was implemented.[478] Claimants have, therefore, as of the present date, been unlawfully deprived of their investment without compensation (or a viable process for determining compensation) for more than seven years.

594. Accordingly, the operative rate for actualising the damages to the date of the Award shall be 9% compounded semi-annually. On this basis the interest component, calculated on the loss of US$ 87.3 million, from 30 April 2008 to 29 January 2016, will be US$ 85,501,213.70, for a total compensation amount of US$ 172,801,213.70.

595. Similarly, Claimant has specifically requested[479] and is entitled to, post-award interest which the Tribunal recognizes as another important element of quantum in order to attempt to eliminate, as far as possible, the effects of the unlawful taking. While there are sometimes reason to calculate pre- and post-award interest differently, tribunals have also, in a number of cases chosen not to consider pre- and post-award interest separately but have instead awarded interest, for example, from the date of an expropriation or other key event, running until the payment in full of the award.[480] In the present case, based on the same reasoning indicated in paras. 571-594 supra regarding pre-award

---

(Footnote continued from previous page)

*P.L.C., v. Argentine Republic,* UNCITRAL, Award, 3 November 2008 (compounded semi-annually); *Railroad Development Corporation (RDC) v. Republic of Guatemala,* ICSID Case No. ARB/07/23, Award, 29 June 2012 (compounded semi-annually); *Rumeli Telekom A.S. and Telsim Mobil Telekomikasyon Hizmetleri A.S. v. Republic of Kazakhstan,* ICSID Case No. ARB/05/16, Award, 29 July 2008 (compounded semi-annually); See also *Phillips Petroleum Co. Venezuela Ltd (Bermuda) and ConocoPhillips Petrozuata B.V.(The Netherlands) v. Petroleos de Venezuela S.A. (Venezuela),* ICC Case No. 16848/JRF/CA (C-16849/JRF), Award, 17 September 2012 (compounded monthly)(**CLA-58**)

[478] para. 478, *supra*

[479] See para. 100 *supra*

[480] Ripinsky and Williams, *op.cit.* at 387; Tribunals adopting this approach include those in *Vivendi Universal v. Argentina,* ICSID Case No. ARB/97/3, Award, 20 August 2007, Section 9.2 *et. seq.*; *Tecmed v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, paras. 196-7; *PSEG v. Turkey*, ICSID Case No. ARB/02/5, Award, 19 January 2007, para.351

interest, the Tribunal concludes that post-award interest should continue to be paid at the same 9% rate compounded semi-annually, from the date of the award until payment in full of all sums due. The Tribunal has considered whether, in the circumstances of this case, it would be appropriate to afford Venezuela a short grace period within which payment of all sums found to be due to Claimants, including pre-Award interest, may be made without the addition of post-Award interest. The Tribunal decides that such a short grace period would be appropriate. Accordingly, provided payment of all sums due is made by Venezuela within six (6) months of the date of this Award, no post-Award interest shall be paid. For the avoidance of any doubt, the Tribunal emphasizes that the grace period is to be applied strictly and it is not subject to any extension. If no, or no full, payment is made within it, then post-Award interest on all sums remaining due to Claimants at the end of the grace period shall run from the date of this Award.

---

## I. COSTS

1. CLAIMANTS' APPLICATION FOR COSTS

596. By their Costs Submissions dated 28 November 2014, Claimants sought the recovery of their costs "*in their entirety*"[481] from Venezuela, together with interest from the date on which such costs had been incurred until the date of their payment by Venezuela.

597. Those costs amount to some US$ 7,971,727.39 and € 194,673.37, comprising:

    (a) advances on the fees and expenses of the Tribunal and the administrative fees of ICSID made by Claimants amounting to US$ 925,000;

---

[481] Claimants' Costs Submissions, 28 November 2014, para. 2

(b) the reasonable travel and other expenses incurred by Claimants' witnesses and representatives (US$ 43,080.21);

(c) the fees and disbursements of Freshfields Bruckhaus Deringer US LLP in the sum of US$ 5,219,291.57;

(d) US$ 137,254.14 for the fees and disbursements of Claimants' Venezuelan Counsel, D'Empaire Reyna Abogados and € 52,187.23 for the fees and disbursements of their Portuguese Counsel, Morais Leitao, Galvao Teles, Soares de Silva;

(e) the fees and expenses of Compass Lexecon, Claimants' valuation experts of US$ 1,381,526.36;

(f) the fees and expenses of Claimants' legal experts, Professors Prüm and Vicente of € 142,486.14; and

(g) the fees and disbursements of FTI, Claimants' graphics and technology consultant, of US$ 40,575.11.

598. Article 61(2) of the ICSID Convention provides that:

"In the case of arbitration proceedings, the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expense, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

599. Claimants maintain that in exercising its discretion in the discharge of its obligation to assess costs and in order to ensure that any award of costs reflects the circumstances of the case, the Tribunal should have regard, *inter alia*, to the merits of the claims, the length and complexity of the proceedings and the conduct of the parties – not least, whether a party has obstructed the proceedings or needlessly prolonged them. Claimants maintain that there is ample precedent

in investment arbitration cases, were the Tribunal to consider that a costs order should be made to sanction unlawful, dilatory or other improper conduct.[482]

600. In this case, Claimants submit that in circumstances in which:

(a) they have been obliged to engage in lengthy and expensive proceedings by reason of an unlawful expropriation of their investments without any compensation; and

(b) Venezuela has failed to comply with its international obligations,

an award of costs in their favour is not only appropriate but it would:

> "serve the purpose of disincentivising the illegal conduct that gave rise to these proceedings."[483]

601. In addition, Claimants point to the following particular examples of conduct by Venezuela in the course of the arbitration, which they judge to be worthy of sanction in costs, namely:

(a) bad faith production and withholding of documents, citing in particular: (i) the history of the disclosure of documentation in respect of the annual iron pellet requirements of the HBI producers, culminating in (ii) its production of 300 new documents on the eve of the January-February 2014 hearing;

(b) the submission at the stage of the filing of Venezuela's Rejoinder Memorial of the witness statement of Ms Marilyn Bello Rodriguez and of the expert reports of Professors Steichen, Maia and Duarte. Claimants maintain that the filing of the experts' reports in particular at so late a stage in the proceedings required them to obtain further expert evidence

---

[482] Claimants have drawn attention to the decisions on costs by the Tribunals in *Liberian Eastern Timber Corporation v. Republic of Liberia*, ICSID Case No. ARB/83/2, Award, 31 March 1986, p. 378 and *Olguin v. Republic of Paraguay*, ICSID Case No. ARB/98/5, Award, 26 July 2001, para. 85
[483] Claimants' Costs Submissions, para. 7

and led directly to the need for a further unscheduled hearing to hear the Parties' legal experts. It was held in July 2014, six months after the conclusion of the final hearing and added to the cost of, and delay in, the proceedings;

(c)    the circumstances of the withdrawal of the evidence of Mr Sabbagh and its purported replacement by the evidence of Mr Moya; and

(d)    the "*untimely*" introduction of evidence, some of it after the closure of the record in the arbitration and without prior leave of the Tribunal in January and July 2014; the application made late on 8 August 2014, the date for the filing of Post-Hearing Briefs, to introduce into the record the Award in ICSID Case No. ARB(AF)11/1, *Nova Scotia Power Inc. v. Venezuela* and the subsequent supplemental briefing; and the submission with Venezuela's Post-Hearing Brief of further evidence in the form of additional Luxembourg and Portuguese investment treaties, which had not previously been on the record. The submission was said to have been made without prior leave of the Tribunal and notwithstanding that the issue of Luxembourg's and Portugal's investment treaty practice had been raised by Claimants in submissions in response to Venezuela's bifurcation request of September 2012. Claimants had been obliged to respond to each such intervention and, and in the case of the additional investment treaty material, to file additional documents in order to address what they regarded as an incomplete or misleading submission.

602.  Claimants conclude that:

> "Venezuela's unlawful conduct has given rise to the significant costs of these proceedings and its tactics have needlessly added to the efforts and costs of the Tribunal and the Claimants. The Claimants should not be made to bear the cost of such conduct."[484]

---

[484] *Idem*, para. 9

2.    VENEZUELA'S APPLICATION FOR COSTS

603.  For its part, Venezuela maintains that if its objections to jurisdiction, which it believes to be "*dispositive of all claims asserted by Claimants*"[485], were upheld, it should be reimbursed for all costs related to the arbitration. But for Claimants' insistence that the proceedings not be bifurcated, such that the jurisdictional disputes and the merits were heard together in January 2014 with a subsequent hearing of the jurisdictional experts in July 2014, the costs and expenses attendant upon the preparation and defence of a joint proceeding on jurisdiction and merits would have been avoided.

604.  Venezuela further maintains that if its jurisdictional objections were unsuccessful, it would still prevail on the merits. It would therefore be entitled to the recovery of "*all reasonable costs*"[486], amounting to US$ 6,870,028.82 and made up as follows:

      (a)    US$ 5,154,811.60 in respect of the fees of Venezuela's Counsel, Foley Hoag LLP;

      (b)    US$ 1,174,370.96 in respect of the fees of legal and other experts engaged by Venezuela in the arbitration; and

      (c)    "*administrative costs*", including:

             "all costs and expenses related to document production, legal research, travel, translations and other miscellaneous administrative matters".[487]

605.  The above costs of which Venezuela seeks recovery exclude administrative costs paid separately by Venezuela to the Centre.[488]

---

[485] Respondent's Costs Submission, 28 November 2014, para. 1
[486] *Idem*, para. 2
[487] *Idem*, para. 3(3)
[488] Certification of Marybeth Celorier dated 28 November 2014.

3.  VENEZUELA'S COMMENTS ON CLAIMANTS' SUBMISSION ON COSTS

606.  Following the exchange of costs submissions, and pursuant to leave granted by the Tribunal on 2 December 2014, Venezuela submitted comments upon the Claimants' Submission by letter dated 12 December 2014.

607.  Venezuela protested that Claimants had used their costs submissions as a vehicle to reargue both procedural points and matters going to the merits, "*many of which have already been rejected by the Tribunal*". Venezuela contended that any such attempt by Claimants to reargue their position "*should be rejected out of hand*".[489]

608.  Venezuela rejected all of the complaints identified in the Claimants' submission (see para 595 above).  It maintained that far from constituting conduct worthy of sanction in an award on costs, Venezuela had:

> "acted in good faith and to the best of its ability to respond to Claimants' requests and the Tribunal's orders, while exercising its right to a full defense and preserving its fundamental right to be heard".

609.  In Venezuela's submission, there was no basis for a departure from "*ICSID tradition*",[490] which, as explained by Venezuela, meant that ICSID tribunals customarily applied the "*international law tradition*" that costs lie where they fall:

> "absent egregious, unlawful or frivolous conduct by one of the parties". [491]

610.  Venezuela submitted that no such conduct was evident in this case. The Tribunal had not found at any point in the proceedings that Venezuela had acted in bad faith or that its requests or submissions were frivolous.  To the contrary, every action, which Claimants sought to criticise had been an action "*taken in good faith in exercise of [Venezuela's] fundamental right to defense.*" Were Venezuela to be punished for undertaking a thorough and proper defence to the

---

[489] Foley Hoag LLP letter 12 December 2014, para.1
[490] *Idem*, para. 4
[491] *Idem*, para. 6

allegations made against it, the exercise of its fundamental right to a defence and its right to be heard would be put a risk.[492]

611. As to the specific complaints raised:

(a) Claimants had had ample opportunity to respond to documentation going to pellet production in their Reply Memorial and at the hearing: neither at the hearing itself, nor in their Post-Hearing Brief had Claimants demonstrated that the documents had been produced other than in good faith or that they were other than an "*accurate reflection*"[493] of pellet allocation and distribution. Venezuela rejected as "*specious*"[494] the suggestion that it had failed to produce evidence of the annual pellet requirements that all the HBI producers made to CVG FMO or evidence of CVG FMO's actual iron pellet deliveries to each of the HBI producers. Rather, Venezuela suggested that Claimants were seeking to have it both ways in that they complained, first, that Venezuela had failed to comply with their document requests and, second, when it did produce documents, after a great deal of time and effort had been devoted to obtaining them from CVG, it was criticised for making a "*clear effort … to prejudice the Claimants shortly before the hearing*";[495]

(b) there was no scope for further complaint, so far as the witness statement of Ms Bello and the expert reports of Professors Steichen, Maia and Duarte were concerned: they had been admitted by the Tribunal after it had afforded the Parties a full opportunity to explain their positions and it did so on the basis that it recognised the materials as being responsive "*to matters raised in Claimants' Reply Memorial*".[496] Claimants had been afforded ample opportunity through allowances for expanded cross-examination (Ms Bello), the filing of rebuttal expert reports after the

---

[492] *Idem*, para. 11
[493] *Idem*, para. 14
[494] *Idem*, para. 15
[495] *Idem*, para. 16
[496] *Idem*, para. 20

submission of Venezuela's Rejoinder and a separate hearing of the legal experts;

(c)     the substitution of Mr Moya's evidence for that of Mr Sabbagh had caused the Claimants no prejudice. It was admittedly more limited in its scope, but it went to the substance of the pellet scarcity issue and the attempt to effect an equitable distribution of the locally produced pellets at the relevant time. That said;

> "the substitution … in accordance with the Tribunal's express authorisation and in keeping with [Venezuela's] right to be heard, in no way implied any delay in the arbitral proceeding nor did it prejudice Claimants".[497]

(d)     Venezuela maintained that there were complete answers to all three discrete complaints. As to the first, the submission of documents made by Venezuela on 31 January 2014 was the subject of an agreement reached between the Parties and notified to the Tribunal on 2 February 2014 and the submission of 7 July 2014 had been the subject of a ruling by the Tribunal on 9 July when all but one of the documents proffered by Venezuela had been admitted onto the record.  As to the second, the *Nova Scotia* decision had been admitted by the Tribunal pursuant to an application by Venezuela and its request that the Parties have an opportunity to comment upon it.  And as to the third, the investment treaty materials were legal authorities submitted in direct response to an enquiry raised by a member of the Tribunal.[498]

## 4.     ANALYSIS

612.  The Tribunal accepts the proposition advanced by Claimants that generally in international arbitration, the term "*expenses*" is deemed to include the fees, disbursements (including travel expenses) of legal counsel and experts, together with the travel costs and disbursements of witnesses and representatives of the parties to the dispute. In light of the basis upon which the Parties to this

---

[497] *Idem*, para. 25
[498] *Idem*, paras. 27,  28 & 29

arbitration have framed their respective costs submissions, it is clear that that much is uncontroversial.

613. Venezuela's application for its costs is premised primarily upon the success of its jurisdictional objections. Alternatively, it says that even if, contrary to its expectations, those jurisdictional objections were not to be upheld by the Tribunal, it would succeed on the merits. In the event, the Tribunal has determined that it does have jurisdiction to hear most of the claims referred to arbitration by Claimants and, to a considerable extent, Claimants have prevailed on the merits, too. They have made good their principal claim – to which much of the arbitration was devoted – that Venezuela's expropriation of their investment was unlawful and that Venezuela has failed to make any, or any meaningful, attempt to compensate Claimants for that expropriation.

614. Accordingly the question of any entitlement on the part of Venezuela to look to Claimants for recovery of any of its costs is moot.

615. The question then arises whether the Tribunal should adopt what Venezuela has described as the "*international law tradition*"[499] (see para 607 above) and allow the costs to lie where they fall, or whether it should conclude that there has been conduct which might properly be described as "*egregious, unlawful or frivolous*" on the part of Venezuela sufficient to cause the Tribunal to depart from the usual rule.

616. The Tribunal has considered with care the complaints raised by Claimants as to the conduct of these proceedings by Venezuela and to the detailed responses set out in Venezuela's Comments on Claimants' Submission on Costs dated 12 December 2014.

---

[499] *See EDF Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, para. 322: "… *the traditional position in investment arbitration, in contrast to commercial arbitration, has been to follow the public international rule which does not apply the principle that the loser pays the costs of the arbitration and the costs of the prevailing party. Rather, the practice has been to split the costs evenly, whether the claimant or the respondent has prevailed.*"

617. It has done so, in particular, having regard to the approach of the tribunals in:

    (a)   *Oemer Debe and Serdar Elhueseyni v. Romania*:

> "[n]one of the factors that would clearly justify cost allocation (such as unreasonable argument, exaggerated claim, or obstructionist tactics) was present in this arbitration"[500];

    (b)   *AES Summit Generation Ltd and AES-Tisza Eroemu Kft v. Republic of Hungary*:

> "It is the view of the Tribunal that no frivolous claim was filed in the proceeding and that no bad faith was observed from the parties. … Consequently, the Tribunal concludes that each party should bear its own costs and expenses and share equally in the costs and charges of the Tribunal and the ICSID Secretariat."[501]

618. The Tribunal concludes that even if Claimants' objections were sustained, the conduct about which complaint is made would not reach the high bar set by previous ICSID tribunals and subject to which, a party might be sanctioned in costs.

619. Certainly this is not a case in respect of which any comparison with the *Liberian Eastern Timber* case is apposite. In that case, the tribunal concluded that a departure from the usual rule was justified, because:

> "This decision is based largely on Liberia's procedural bad faith. Not only did Liberia fail to partake in these arbitral proceedings, but it has also undertaken judicial proceedings in Liberia in order to nullify the results of this arbitration."[502]

620. Aside from the conduct of Venezuela in the course of the proceedings, the Tribunal has also considered whether there are other circumstances to which it should have regard in the exercise of its discretion, and which might warrant an allocation of costs as between the Parties.

---

[500] *Oemer Debe and Serdar Elhueseyni v. Romania,* ICSID Case No. ARB/10/22, Award, 5 September 2013, paras. 270-271
[501] *AES Summit Generation Ltd and AES-Tisza Eroemu Kft v. Republic of Hungary,* ICSID Case No. ARB/07/22, Award 23 September 2010 at para.15.3.3
[502] See FN 2 check *supra* and FN 11, Respondent's Comments on Claimants' Costs Submissions

621. There is ample authority for directing that a prevailing party should have been paid by the opposing party its costs and expenses (including legal and expert fees) as well as its share of the cost of the proceeding, on those issues on which it has prevailed.[503] And there is also ample authority for directing that each party should pay its own expenses and that the fees and expenses of the members of the tribunal, as well as the costs of the Centre should be divided evenly.[504]

622. The Tribunal recalls that whilst the Claimants have succeeded in this case in establishing an illegal expropriation, and have secured a substantial award in their favour, they have not been entirely successful. The Tribunal has found against them in respect of all pre-expropriation claims. These claims, including alleged breaches of the Fair and Equitable Treatment standard and discrimination, and alleged breaches of the Protection and Security standard, were the subject of extensive written and oral submissions, as well as factual and expert evidence and much time was spent on them at the main hearing.

623. Taking this into account, and in the circumstances of this case, the Tribunal concludes that the fairest disposition on costs is that they should lie where they fall.

624. Accordingly, the Tribunal determines that Claimants and Venezuela shall each bear 50% of the fees and expenses of the Tribunal and the Centre. However, the Tribunal notes that in the absence of any payment by Venezuela, Claimants have paid in full the third advance on costs requested by the Centre on 20

---

[503] *E.g. EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, 8 October 2009; *Waste Management Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, 30 April 2004, para. 183 ("*There is no rule in international arbitration that costs follow the event. Equally, however, the Tribunal does not accept that there is any practice in investment arbitration (as there may be, at lease de facto, in the International Court and in interstate arbitration) that each party should pay its own costs. In the end the question of costs is a matter within the discretion of the Tribunal, having regard both to the outcome of the proceedings and to other relevant factors.*").

[504] See *e.g. Methanex Corp. v. United States of America*, Ad hoc – UNCITRAL Arbitration Rules, Final Award of the Tribunal on Jurisdiction and Merits, 3 August 2005; *International Thunderbird Gaming Corp. v. United Mexican States*, Ad hoc – UNCITRAL Arbitration Rules, Award, 26 January 2006.

October 2015 in the amount of US$450,000. The Tribunal further notes that any balance in the account will be reimbursed by ICSID to the Parties in proportion to the payments advanced to ICSID. Consistent with its determination that Claimants and Venezuela shall bear the fees and expenses of the Tribunal and the Centre on an equal footing, the Tribunal orders Venezuela to pay Claimants such sum as shall represent half of the fees and expenses of the Tribunal and the Centre paid out of the third advance payment, which should have been paid by Venezuela, but was, in fact met in its entirety by Claimants. The amount of that payment shall be determined as soon as all invoices have been received and ICSID is in a position to issue a final financial statement. The Tribunal further considers that the Claimants are entitled to interest at the same 9% rate compounded semi-annually, from the date of the Award until payment in full of this sum, subject only to a grace period of six (6) months from the date of this Award, within which Venezuela may make payment in full of this sum without incurring post-Award interest. If no, or no full, payment is made within it, then post-Award interest on any portion of this sum that remains unpaid at the end of the grace period shall run from the date of this Award. There shall be no other order with respect to the Parties' legal fees, expenses and other claimed costs.

## J.    DECISION

625. Accordingly, having carefully considered all of the documentary evidence, testimony and submissions presented to the Tribunal, and having heard Counsel, the Tribunal **DECIDES, ORDERS, DIRECTS AND DECLARES** that:

1.    The Tribunal has jurisdiction to hear and determine all of the Claimants' claims in this arbitration, save in respect of the Off-Take Agreement.

2.    With the exception of claims submitted pursuant to the Off-Take Agreement, all of Venezuela's objections to jurisdiction are dismissed.

3.    Claimants' claims pursuant to Article 3(1) of the Luxembourg Treaty and Article 3(1) of the Portuguese Treaty are dismissed.

4. Claimants' claims pursuant to Article 3(2) of the Luxembourg Treaty and Article 2(2) of the Portuguese Treaty are dismissed.

5. Venezuela has breached its obligations pursuant to Articles 4(1)(b) and 4(1)(d) of the Luxembourg Treaty and Articles 4(a) and 4(c) of the Portuguese Treaty.

6. Venezuela shall pay Claimants the sum of US$87,300,000 (eighty-seven million, three hundred thousand US Dollars) for its breaches of the Treaties.

7. Venezuela shall pay pre-award interest on the sum of US$87,300,000 from the Valuation Date (30 April 2008) to the date of this Award at a rate of 9% per annum, compounded at six-monthly rests, in the sum of US$ 85,501,213.70 (eighty-five million, five hundred one thousand, two-hundred and thirteen US Dollars and seventy cents).

8. Subject only to a grace period of six (6) months from the date of this Award, within which Venezuela may make payment in full of all sums due to Claimants pursuant to this Award without incurring post-Award interest, Venezuela shall pay interest at the rate of 9% per annum, compounded at six-monthly rests from the date of this Award until payment in full, on all sums, including any sum payable by Venezuela under article 10 of this *Dispositif*, due to Claimants pursuant to this Award and remaining unpaid at the end of the said grace period.

9. Damages awarded pursuant to this Award and all accrued interest shall be paid to Claimants in full and net of any applicable Venezuelan tax, duty or other charge.

10. Save that the fees and expenses of the Tribunal and the costs attributable to the use of the services of the Centre shall be borne as to 50% by Claimants and as to 50% by Venezuela, and that pursuant to that determination, Venezuela shall pay Claimants half of the fees and expenses of the Tribunal and the Centre financed through the third advance payment, no Order for costs is made.

_____
Mr. Judd L. Kessler
Arbitrator
Date: 12 January 2016

_____
Mr. Toby T. Landau QC
Arbitrator
Date: 15 January 2016

_____
Mr. John Beechey
President of the Tribunal
Date: 19 January 2016

# ANNEX I

## GUIDE TO RELEVANT ENTITIES

| | |
|---|---|
| Compañía Operadora del Puerto de Palua C.A. ("**COPAL**") | The operator of the Port of Palua, through which, HBI products, including those made by PosVen (see below) and Matesi (see below) were shipped. |
| Consorcio Siderúrgica Amazonia Ltd ("**CSA**") | A subsidiary of Ternium S.A., an affiliate of Tenaris and Talta, to which shares in CVG Sidor (see below) were sold upon privatisation in November 1997. |
| Corporación Venezolana de Guayana ("**CVG**") | A dependency of MIBAM (see below). |
| CVG Ferrominera Orinoco CA ("**CVG FMO**") | A subsidiary of CVG, holding a monopoly in Venezuela over the production and sale of lump ore and iron pellets (the first stage in steel production). |
| CVG Siderúrgica del Orinoco C.A. ("**CVG Sidor**") | A subsidiary of CVG. Re-named Siderurgica del Orinoco C.A ("**SIDOR**") upon privatisation (see CSA above), SIDOR is the largest producer of semi-finished and finished steel products in Venezuela. Venezuela continued to maintain a significant shareholding in SIDOR post-privatisation. |
| Electrificación del Caroni C.A. ("**EDELCA**") | The state supplier of electricity. |

| | |
|---|---|
| Materiales Siderúrgicos Masisi S.A. ("**Matesi**") | Incorporated on 23 April 2004.[505] SIDOR held 45% of Matesi's shares and Tenaris Global (BVI) Ltd, a wholly owned subsidiary of Tenaris, the remaining 55%, which shareholding was transferred to Talta on 2 July 2004. As a result of share capital increases, the eventual shareholding participations in Matesi were 49.8003% (SIDOR) and 50.1997% (Talta). |
| MIBAM | The Venezuelan Ministry of People's Power for Basic Industries and Mining – since 2011, the Ministry of Industry. |
| Petróleos de Venezuela S.A. ("**PDVSA**") | The state-owned oil and gas company, which was responsible for the transformation of lump ore and iron pellets into direct reduced iron ("**DRI**") – the second stage in steel making. The DRI was then mechanically compressed into brick-shapes known as hot briquetted iron ("**HBI**") of which Venezuela was the leading producer world-wide. |
| PDVSA Gas S.A. | A wholly-owned subsidiary of PDVSA, which supplies gas to the steel industry |
| PosVen C.A. ("**PosVen**") | The Venezuelan subsidiary of the South Korean concern, POSCO, which was acquired by SIDOR, Talta and Matesi. PosVen owned a decommissioned HBI plant within two kilometers of SIDOR and was also a shareholder in COPAL (see above). |
| Techint Group | A major international conglomerate and one of the world's leading suppliers of steel pipe, used in the oil and gas industry. Claimants are members of the Techint Group. Tenaris S.A. is a holding company with subsidiaries and manufacturing centres worldwide. Talta, likewise a holding company, is wholly owned by Tenaris. |

---

[505] Exhibit C-21

# EXHIBIT 4

# Exhibit A



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document, "**Laudo**" is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English (US).

_____
Aurora Landman

Sworn to before me this
May 21, 2018

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**INTERNATIONAL CENTRE FOR SETTLEMENT OF
INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE (202) 458 1534 | FACSIMILE (202) 522 2615
WWW.WORDLBANK.ORG/ICSID

## <u>CERTIFICATE</u>

**TENARIS S.A. AND TALTA - TRADING E MARKETING SOCIEDADE
UNIPESSOAL LDA.**

**V.**

**BOLIVARIAN REPUBLIC OF VENEZUELA**

**(ICSID CASE NO. ARB/12/23)**

    I hereby certify that the attached document is a true copy of the Arbitral Tribunal's Award rendered in Spanish on December 12, 2016.

[Signature.]

Meg Kinnear
Secretary General

Washington, D.C., May 1, 2018

**International Centre for Settlement of Investment Disputes**
Washington, D.C.

IN THE PROCEEDING BETWEEN

**TENARIS S.A.**

and

**TALTA - TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA**

(Claimants)

-and-

**THE BOLIVARIAN REPUBLIC OF VENEZUELA**

(Respondent)

**ICSID Case No. ARB/12/23**

---

# AWARD

---

*Members of the Tribunal*
Prof. Juan Fernández-Armesto, President
Mr. Enrique Gómez Pinzón, Arbitrator
Prof. Brigitte Stern, Arbitrator

*Secretary of the Tribunal*
Ms. Alicia Martín Blanco

*Assistant to the Tribunal*
Ms. Mélanie Riofrio Piché

Date of dispatch to the Parties: December 12, 2016

## REPRESENTING THE PARTIES

Representing the Claimants:

Mr. Nigel Blackaby
Ms. Noiana Marigo
Ms. Caroline Richard
Mr. Jeffery Commission
Ms. Natalia Zibibbo
Ms. Maria Julia Milesi
Mr. Ricardo Chirinos
Ms. Guadalupe Lopez
Ms. Ankita Ritwik
Freshfields Bruckhaus
Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
United States of America

Mr. José Humberto Frías
D'Empaire Reyna Abogados
Edificio Bancaracas, P.H.
Plaza La Castellana, 1060
Venezuela

Representing the Respondent:

Dr. Reinaldo Enrique Muñoz Pedroza,
*Attorney General of the Republic*
Dr. Felipe Daruiz
*Coordinator of International Trials of the Office
of the Attorney General of the Republic
Attorney General of the Republic*
Av. Los Ilustres c/c calle Francisco Lazo Martí
Urb. Santa Mónica, Caracas
Venezuela

Mr. Paul Reichler
Mr. Kenneth Figueroa
Ms. Mélida Hodgson
Ms. Janis Brennan
Mr. Alberto Wray
Mr. Diego Cadena
Mr. Constantinos Salonidis
Ms. Gisela Paris
Ms. Patricia Cruz Trabanino
Mr. Benjamin Guthrie
Ms. Madeleine Rodriguez
Ms. Manuela de la Helguera
Foley Hoag LLP
1717 K Street, N.W.
Washington, D.C. 20006
United States of America

2

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 15
II.     PROCEDURAL HISTORY ..................................................................................... 16
III.    RELIEF SOUGHT BY THE PARTIES .................................................................. 23
        1.   The Claimants' Requested Relief ................................................................... 23
        2.   The Respondent's Requested Relief ............................................................... 25
IV.     INTRODUCTION ..................................................................................................... 26
V.      OBJECTIONS TO JURISDICTION ....................................................................... 28
        1.   Lack of Consent ................................................................................................. 28
        1.1  Tenaris-Tavsa ..................................................................................................... 29
             A.    Venezuela's Position ............................................................................. 29
                   a.   Lack of Acceptance After the Required Negotiation ................. 29
                   b.   Failure to Perfect Consent .......................................................... 29
             B.    Tenaris' Position ................................................................................... 30
                   a.   Prior Negotiations ........................................................................ 30
                   b.   Perfected Consent ........................................................................ 30
             C.    Decision of the Arbitral Tribunal ....................................................... 30
                   a.   Prior Negotiations ........................................................................ 31
                   b.   Matching Terms ........................................................................... 31
        1.2  Talta-Comsigua .................................................................................................. 33
        1.3  Tenaris-Comsigua .............................................................................................. 35
             A.    Venezuela's Position ............................................................................. 35
             B.    Tenaris' Position ................................................................................... 37
             C.    The Arbitral Tribunal's Decision ........................................................ 38
                   a.   Context ......................................................................................... 40
                   b.   Object and Purpose ...................................................................... 42
                   c.   Good Faith ................................................................................... 42
             D.    Coda ...................................................................................................... 43
        2.   Lack of an Effective Seat ................................................................................. 45
        2.1  The Parties' Position ......................................................................................... 45
        2.2  Decision of the Arbitral Tribunal ..................................................................... 48
             A.    The BITs require an Effective Seat ...................................................... 50
                   a.   "Seat," "Statutory Seat," and "Effective Seat" under International Law ....... 51
                   b.   The Correct Interpretation of the BITs ....................................... 52
             B.    Effective Seat Determining Factors ..................................................... 54
             C.    The Claimants' Evidence ..................................................................... 54
                   a.   Meeting of Management Organs ................................................. 54
                   b.   Place of Business Management .................................................... 55
                   c.   Book-Keeping .............................................................................. 56
             D.    The Respondent's Evidence .................................................................. 56
             E.    Assessment of the Evidence ................................................................. 57
                   a.   Meeting of Management Organs ................................................. 57
                   b.   Place of Business Management .................................................... 58

    (i)  Offices ................................................................. 59

    (ii)  Employees ............................................................ 60

    (iii)  Business Activities .............................................. 60

    (iv)  Management ......................................................... 61

    (v)  Contact information ............................................ 62

   c.  Company's Books ........................................................ 61

  3.  Defects in the Tavsa Notice ....................................................... 62

**VI.  EXPROPRIATION ............................................................................... 63**

  1.  Factual Background ................................................................... 63

   A.  The Claimants ...................................................................... 63

   B.  The Claimants' Investment ................................................. 64

    a.  Tavsa .............................................................................. 64

    b.  Comsigua ....................................................................... 66

   C.  The Nationalization of the Guayana Iron and Steel Sector ...... 67

    a.  Decree 6058 ................................................................... 67

    b.  Decree 6796 ................................................................... 69

   D.  Takeover of the Expropriated Assets ................................. 72

    a.  Tavsa .............................................................................. 72

    b.  Comsigua ....................................................................... 72

  2.  The Parties' Positions regarding Tavsa ..................................... 73

   A.  The Claimants' Position ...................................................... 73

    a.  Breach of Venezuelan Law ........................................... 74

     (i)  The Constitution and LECUPS ................................ 74

     (ii)  Nationalization Decree ............................................ 74

     (iii)  Implementing Decree .............................................. 75

    b.  Failure to Pay Compensation ........................................ 75

   B.  The Respondent's Position .................................................. 76

    a.  Compliance with the Law ............................................. 76

     (i)  Venezuelan Law ...................................................... 76

     (ii)  International Law ...................................................... 77

    b.  Fair Compensation under the BIT ................................. 77

  3.  The Parties' Positions as regards Comsigua ............................. 78

   A.  The Claimants' Position ...................................................... 78

    a.  The Expropriation of the Investment in Comsigua ....... 79

    b.  Venezuela Did Not Pay Compensation for the Comsigua Expropriation ...... 80

   B.  The Respondent's Position .................................................. 80

    a.  There Was No Expropriation ......................................... 80

    b.  The Failure to Pay Compensation is Justified ............... 81

  4.  The Arbitral Tribunal's Decision .............................................. 82

  4.1  The BITs ............................................................................... 82

  4.2  Tavsa and Comsigua have been the Subject of Expropriation ...... 84

   A.  Comsigua-Specific Features ............................................... 86

    a.  The Decision to Expropriate Comsigua ........................ 86

    b.  The Forced Acquisition of the Expropriated Assets ...... 87

   B.  Compensation for the Expropriations ................................. 88

   C.  Conclusion .......................................................................... 88

   D.  The Respondent's Counter-Arguments ............................... 88

|  |  | a. | Exclusion from the Scope of Application of the Implementing Decree | 88 |
|  |  | b. | Unchanged Value | 89 |
| 4.3 | LACK OF PAYMENT |  |  | 91 |
|  | A. | The Lack of a Judgment Ordering Payment |  | 92 |
|  | B. | The Claimants' Alleged Obstruction |  | 94 |
|  |  | a. | Tavsa's Compensation | 94 |
|  |  | b. | Comsigua's Compensation | 95 |
|  | C. | Payment as a BIT-Compliance Element for the Expropriation |  | 95 |

**VII. QUANTUM** ............................................................................................ **98**

**VII.1. THE VALUATION DATE** .............................................................. **102**
|  | 1. | Tavsa | 102 |

**VII.2. TAVSA'S VALUE** ........................................................................... **105**
| 1. |  | The Claimant's Valuation | 105 |
|  | 1.1 | DCF | 105 |
|  |  | A. | Revenue | 105 |
|  |  |  | a. | Tube Production | 105 |
|  |  |  | b. | Projected Price | 106 |
|  |  | B. | Expenditures | 108 |
|  |  |  | a. | Opex | 108 |
|  |  |  | b. | Taxes | 109 |
|  |  |  | c. | Capex | 109 |
|  |  |  | d. | Changes in Working Capital | 110 |
|  |  | C. | Terminal Value | 110 |
|  |  | D. | Discount Rate | 110 |
|  |  |  | a. | Return on Equity | 111 |
|  |  |  |  | (i) | Rate of Return on Risk-Free Assets | 111 |
|  |  |  |  | (ii) | Market Risk Premium | 111 |
|  |  |  |  | (iii) | No Need for a Size Premium | 112 |
|  |  |  |  | (iv) | Beta | 112 |
|  |  |  |  | (v) | Country Risk Premium | 113 |
|  |  |  | b. | Cost of Debt Financing | 113 |
|  |  |  | c. | Capital Structure | 113 |
|  | 1.2 | Market Multiples Approach | 114 |
| 2. |  | The Respondent's Valuation | 117 |
|  | 2.1 | The DCF Approach | 117 |
|  |  | A. | Revenue | 118 |
|  |  |  | a. | Production | 118 |
|  |  |  | b. | Price | 119 |
|  |  | B. | Expenditures | 119 |
|  |  |  | a. | Costs of Goods Sold | 119 |
|  |  |  | b. | Sales, General, and Administrative Costs | 120 |
|  |  |  | c. | Capex | 120 |
|  |  |  | d. | Changes in Working Capital | 121 |
|  |  | C. | Discount Rate | 121 |

a.   Risk-Free Rate ....................................................... 122
b.   Equity Risk Premium .......................................... 122
c.   Beta .......................................................................... 122
d.   Country Risk Premium ........................................ 123
e.   Size Premium ........................................................ 123
2.2   Market Multiples .............................................................. 124
2.3   Other Value Indicators ................................................... 125
3.   The Arbitral Tribunal's Decision ................................. 126
3.1   DCF .................................................................................... 126
A.   Tube Production .......................................................... 126
a.   Annual Production ............................................... 127
b.   Labor Cost Adjustment ...................................... 128
B.   The Price of Tubes ...................................................... 129
a.   Pricing Formula ................................................... 129
b.   The International Price Reference ................... 130
(i)   Management Forecasts ................................. 131
(ii)   Commercial Contracts .................................. 131
C.   Expenditures ................................................................ 132
a.   Opex ......................................................................... 132
b.   Capex ....................................................................... 133
c.   Working Capital .................................................... 134
d.   Technical Assistance Contract .......................... 135
D.   WACC .............................................................................. 136
a.   Risk-Free Rate ....................................................... 136
b.   Market Premium ................................................... 137
c.   Beta .......................................................................... 137
d.   Country Risk Premium ........................................ 138
e.   Size Premium ........................................................ 139
3.2   COMPARISON: OTHER APPROACHES .............................. 141
A.   Return on Investment ................................................ 141
B.   Market Multiples ........................................................ 142
a.   The Experts' Positions ........................................ 142
b.   The Arbitral Tribunal's Decision ..................... 143
C.   Comparable Transactions .......................................... 145
a.   Construction of a Plant in Mexico ................... 145
b.   Purchase of a Plant in Indonesia ..................... 146
VII.3.   COMSIGUA'S VALUE ............................................... 147
1.   The Claimant's Value Assessment ............................... 147
1.1   DISCOUNTED CASH FLOWS ............................................. 147
A.   Revenue ......................................................................... 147
a.   Iron Production ..................................................... 147
b.   Projected Price ...................................................... 148
B.   Expenditures ................................................................ 148
a.   Opex ......................................................................... 148
b.   Capex ....................................................................... 149
c.   Others ...................................................................... 149
C.   Terminal Value ............................................................ 149
D.   Discount ........................................................................ 149
1.2   MARKET MULTIPLES APPROACH ................................... 151
1.3   OTHER RELEVANT TRANSACTIONS ............................... 153
A.   Repurchase of Shares ................................................. 153

        B.    Comsigua's Management's Recommendation .................................. 153
        C.    Expropriation of Venprecar and Orinoco Iron ............................ 154
    2.    The Respondent's Value Assessment ............................................ 154
    2.1    Discounted Cash Flows .......................................................... 154
        A.    Price ............................................................................ 155
        B.    Discount Rate ................................................................. 155
    2.2    Market Multiples Approach ..................................................... 156
    2.3    Other Value Indications ......................................................... 157
        A.    Comsigua's Management's Recommendation .................................. 157
        B.    Share Repurchase ............................................................. 158
        C.    Expropriation of Venprecar and Orinoco Iron ............................ 158
    3.    The Arbitral Tribunal's Decision ............................................. 159
    3.1    Discounted Cash Flows .......................................................... 159
        A.    Discount Rate ................................................................. 159
            a.    WACC or Return on Equity ................................................ 159
            b.    Rate .................................................................... 160
        B.    Comsigua's Value ............................................................ 162
    3.2    Other Approaches ............................................................... 162
        A.    Market Multiples ............................................................. 162
        B.    Comparable Transactions ..................................................... 164
            a.    The Purchase of IFC's Shares ............................................ 164
            b.    The Value of Venprecar and Orinoco Iron .................................. 165
            c.    The Purchase of the Japanese Shareholders' Shares ....................... 165
                (i)    Offered Price ....................................................... 166
                (ii)   Interest ........................................................... 167
                (iii)  Discount ........................................................... 167
                (iv)   Bond ............................................................... 168
                (v)    Minority Share Discount ............................................ 169
VIII. INTEREST ........................................................................ 172
    1.    The Claimants ................................................................ 172
    2.    The Respondent ............................................................... 173
    3.    The Arbitral Tribunal's Decision ............................................. 174
IX.    TAXES .......................................................................... 176
    1.    The Parties' Positions ....................................................... 176
    2.    The Arbitral Tribunal's Decision ............................................. 177
        A.    The Claim for Venezuelan Taxes ............................................ 177
        B.    The Claim for Taxes in the Country of Residence .......................... 178
    3.    Article 5 of the Luxembourg BIT .............................................. 179
        A.    The Claimants' Position ................................................... 179
        B.    The Respondent's Position ................................................. 180
        C.    The Arbitral Tribunal's Decision .......................................... 181
            a.    The Correct Version of Article 5.3 ..................................... 181
            b.    Interpretation of Article 5.3 .......................................... 183
                (i)    Ordinary Meaning ................................................... 183

    (ii) Context, Object and Purpose ..................................................... 184
  c. Additional Argument ........................................................................ 184
**X.** **COSTS** .................................................................................................... **185**
 1. The Claimants' Position ........................................................................ 185
 2. The Respondent's Position ................................................................... 185
 3. The Arbitral Tribunal's Decision ......................................................... 185
  A. Cost Awarding Criteria ..................................................... 186
  B. Application of the Costs-Follow-The-Event Rule .............. 187
   a. Costs of the Proceeding .......................................... 187
   b. Defense Expenses .................................................... 188
**XI.** **SUMMARY** ............................................................................................ **191**
 1. Jurisdiction ............................................................................................ 191
  A. Lack of Consent ................................................................ 191
  B. Lack of an Effective Seat ................................................. 193
  C. Notification Defects ......................................................... 193
 2. Expropriation ......................................................................................... 193
 3. Compensation Due ................................................................................ 194
  A. Tavsa's Value Assessment ............................................... 195
  B. Comsigua's Value Assessment ........................................ 195
 4. Other Decisions ..................................................................................... 196
**XII.** **DECISION** ............................................................................................. **198**

# DEFINED TERMS

| | |
|---|---|
| **Abdala/Zadicoff** | Report by Messrs. Manuel A. Abdala and Pablo D. López Zadicoff of COMPASS LEXECON, LLC, of October 18, 2013. |
| **Abdala/Zadicoff II** | Report by Messrs. Manuel A. Abdala y Pablo D. López Zadicoff of COMPASS LEXECON, LLC, of January 27, 2015. |
| **Affected Companies** | The companies affected by the Nationalization Decree; specifically, Sidor and its subsidiaries and affiliates. |
| **Álvarez** | Witness statement of Javier Martínez Álvarez, of January 27, 2015. |
| **Arbitration Rules** | ICSID Rules of Procedure for Arbitration Proceedings |
| **BITs** | The Luxembourg BIT and the Portuguese BIT, collectively. |
| **CI** | The Claimants' Memorial on the Merits, submitted on October 21, 2013. |
| **CII** | Response to Bifurcation Request, submitted by the Claimants on December 16, 2013. |
| **CIII** | Counter-Memorial on Jurisdiction, submitted by the Claimants on June 16, 2014. |
| **CIV** | The Claimants' Reply, of January 27, 2015. |
| **Comsigua** | Complejo Siderúrgico de Guayana C.A. |
| **Comsigua Notice** | Notice from Tenaris and Talta to the Republic of Venezuela, of December 2, 2011, of the existence of a dispute under the Luxembourg BIT concerning their investment in Comsigua. |
| **Constitution** | The 1999 Constitution of the Bolivarian Republic of Venezuela. |
| **Costs of the Proceeding** | Costs of the proceeding related to the Centre and the arbitrators' fees. |
| **CPI** | Consumer price index. |
| **CV** | Post-hearing Brief, submitted by the Claimants on September 11, 2015. |
| **CVG** | Corporación Venezolana de Guayana |
| **CVG Sidor** | CVG Siderúrgica del Orinoco, C.A. |
| **CVG Tubos** | CVG Tubos Industriales y Petroleros, S.A. |
| **CVI** | Claimants' Brief of September 2, 2016. |
| **Defense Expenses** | Fees and expenses of attorneys, witnesses, expert witnesses, and other representatives. |
| **Denunciation** | The denunciation of the ICSID Convention by the Republic of Venezuela on January 24, 2012 |
| **Expropriated Assets** | Assets belonging to the Affected Companies. |
| **FET** | Fair and equitable treatment |
| **H 1** | Claimants' Opening Statement, Hearing held on June 15-22, 2015. |
| **H 2** | Respondent's Presentation, Hearing held on June 15-22, 2015. |
| **H 3** | Presentation of Report by Messrs. Manuel A. Abdala and Pablo D. López Zadicoff of COMPASS LEXECON, LLC, Hearing held on June 15-22, 2015 |
| **H 4** | Presentation of Report by Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL, Hearing held on June 15-22, 2015. |

| | |
|---|---|
| **Hart I** | Report by Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL, of October 21, 2014. |
| **Hart II** | Report by Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL, of April 13, 2015. |
| **HBI** | Hot-briquetted iron. |
| **Hearing** | The Hearing held on June 15 to June 22, 2015. |
| **ICJ** | International Court of Justice |
| **ICSID Convention** | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, of March 18, 1965. |
| **ICSID or Centre** | International Centre for Settlement of Investment Disputes. |
| **Implementing Decree** | Decree No. 6796, issued by President Hugo Chávez on July 14, 2009, implementing the Nationalization Decree |
| **Japanese Shareholders** | Comsigua's Japanese Shareholder collectively holding a 73.37% shareholding. |
| **Joint Report** | Joint Report by both Parties' experts, of August 21, 2015. |
| **Larez** | Witness statement of Pedro José Larez, of January 15, 2014 |
| **LECUPS** | Law on Expropriation by Reason of Public or Social Interest, published in Official Gazette No. 37,475, of July 1, 2002. |
| **Luxembourg BIT** | Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments, signed on March 17, 1998 |
| **MEP** | The Ministry of the People's Power for Energy and Oil |
| **MIBAM** | The Ministry of the People's Power for Industry. |
| **Nationalization Decree** | Decree No. 6058 with the Rank, Value and Force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region, issued by President Hugo Chávez on April 30, 2008 |
| **Partnership Agreement** | Strategic partnership agreement between CVG and Tamsa of October 9, 1998. |
| **PDVSA** | PDVSA Industrial S.A. |
| **PDVSA Industrial** | PDVSA Industrial S.A. |
| **Portuguese BIT** | Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments, signed on June 17, 1994. |
| **PPI** | Producer price index. |
| **Pre-Condition** | Condition imposed upon the investor to negotiate for six months prior to submitting the dispute to the selected forum. |
| **Prosperi** | Witness Statement of Ricardo Prosperi, of January 26, 2015. |
| **Prüm** | Legal Opinion of Prof. André Prüm, of January 23, 2015. |
| **Reasonable Defense Expenses** | Expenses that are critical to a reasonable defense of the Claimants' case. |
| **Reinisch I** | Legal Opinion of Prof. August Reinisch of March 31, 2014 |
| **Reinisch II** | Legal Opinion of Prof. Reinisch of October 12, 2014. |
| **Request for Arbitration** | The Request for Arbitration registered by the Centre on August 21, 2012 |
| **RI** | Objections to Jurisdiction and Request for Bifurcation submitted by the Respondent on November 25, 2013 |
| **RII** | Memorial on Jurisdiction submitted by the Respondent on |

| | |
|---|---|
| | April 1, 2014 |
| **RIII** | Counter-Memorial on Jurisdiction and the Merits submitted by the Respondent on October 21, 2014 |
| **RIV** | Rejoinder on Jurisdiction and the Merits submitted by the Respondent on April 14, 2015. |
| **RV** | Post-Hearing Brief submitted by the Respondent on September 11, 2015. |
| **RVI** | Respondent's Brief of September 30, 2016. |
| **Schreuer I** | Legal Opinion of Prof. Christoph Schreuer of June 10, 2014 |
| **Schreuer II** | Legal Opinion of Prof. Christoph Schreuer of January 19, 2015 |
| **Secretariat** | ICSID Secretariat-General |
| **Sidor** | Sidor C.A. |
| **T** | Hearing Transcript |
| **Takeover Commissions** | Commissions created under the Nationalization Decree, in charge of taking control of Tavsa and Comsigua and ensuring their transition into state-owned companies. |
| **Takeover Meeting** | Meeting held by Comsigua on June 17, 2011, formalizing the end of Comsigua's nationalization process, and whereby the State took and seized control of Comsigua's Expropriated Assets |
| **Talta or Claimant** | Talta-Trading e Marketing Sociedade Unipessoal LDA. |
| **Tamsa** | Tubos de Acero de México S.A. |
| **Tavsa** | Tubos de Acero de Venezuela S.A. |
| **Tavsa Notice** | Notice from Tenaris to the Republic of Venezuela, of November 20, 2009, of the existence of a dispute under the Luxembourg BIT concerning its investment in Tavsa. |
| **Tenaris or Claimant** | Tenaris S.A. |
| **Ternium** | Ternium S.A. |
| **USD** | Dollars of the United States of America |
| **VCLT** | Vienna Convention on the Law of Treaties, of May 23, 1969 |
| **Venezuela, the Republic or Respondent** | The Bolivarian Republic of Venezuela |
| **Villarroel I** | Witness Statement of Wilfredo J. Villarroel R., of October 15, 2014 |
| **Villarroel II** | Second Witness Statement of Wilfredo J. Villarroel R., of April 7, 2015 |

## CASE-LAW CITATIONS

| | |
|---|---|
| ***ADF*** | *ADF Group Inc. v. United States of America,* ICSID Case No. ARB/(AF)00/1, Award of January 9, 2003 |
| ***AES*** | *AES Summit Generation Ltd and AES-Tisza Erömü Kft v. The Republic of Hungary,* ICSID Case No. ARB/07/22, Award of September 23, 2010 |
| ***Alpha*** | *Alpha Projektholding v. Ukraine,* ICSID Case No. ARB/07/16, Award of November 8, 2010 |
| ***Alps Finance*** | *Alps Finance and Trade v. The Slovak Republic,* UNCITRAL, Award of March 5, 2011 |
| ***Amoco*** | *Amoco Int'l Finance Corp. v. Islamic Republic of Iran,* Partial Award No. 310-56-3 of July 14, 1987 |
| ***Barcelona Traction*** | *Barcelona Traction, Light and Power Co., Ltd. (Belgium v. Spain),* Merits, Second Phase, Judgment of February 5, 1970, I.C.J. Reports 1970 |
| ***Burlington*** | *Burlington Resources Inc. v. Republic of Ecuador,* ICSID Case No. ARB/08/5, Decision on Liability of December 14, 2012 |
| ***ConocoPhillips*** | *ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V. and ConocoPhillips Gulf of Paria B.V. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/07/30, Decision on Jurisdiction and Merits of September 3, 2013 |
| ***EDF*** | *EDF Ltd. v. Romania,* ICSID Case No. ARB/05/13, Award of October 8, 2009 |
| ***Chorzów*** | *Case concerning the Factory at Chorzów,* PCIJ, Series A, No. 17, p. 29, September 13, 1928 |
| ***Kılıç*** | *Kılıç İnşaat İthalat İhracat Sanayi Ve Ticaret Anonim Şirketi v. Turkmenistan,* ICSID Case No. ARB/10/1, Award of July 2, 2013 |
| ***Liberian Eastern Timber*** | *Liberian Eastern Timber Corporation v. Republic of Liberia,* ICSID Case No. ARB/83/2, Final Award of March 31, 1986 |
| ***MCI Power*** | *MCI Power Group L.C. & New Turbine Inc. v. Republic of Ecuador,* ICSID Case No. ARB/03/6, Award of July 31, 2007 |
| ***Mondev*** | *Mondev v. United States of America,* ICSID Case No. |

ARB(AF)/99/2, Award of October 11, 2002

*Montijo*                    *Montijo case,* (U.S.A. v. Colombia), Award of 1875

*Murphy*                     *Murphy Exploration and Production Company International v. Republic of Ecuador,* ICSID Case No. ARB/08/4, Award on Jurisdiction of December 15, 2010

*Noble Venture*              *Noble Venture v. Romania,* ICSID Case No. ARB/01/11, Award of October 12, 2005

*OI European*                *OI European Group B.V. v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/11/25, Award of March 10, 2015

*Olguín*                     *Olguín v. Republic of Paraguay,* ICSID Case No. ARB/98/5, Award of July 26, 2001

*Ömer Dede*                  *Ömer Dede and Serdar Elhüseyni v. Romania,* ICSID Case No. ARB/10/22, Award of September 5, 2003.

*Phoenix*                    *Phoenix Action, Ltd. v. The Czech Republic,* ICSID Case No. ARB/06/5, Award of April 15, 2009.

*Plama*                      *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award of August 27, 2008

*Roberts*                    *Harry Roberts v. United Mexican States (U.S.A. v. Mexico),* Decision of the Mexico / USA General Claims Commission of November 2, 1926.

*Saluka*                     *Saluka Investments BV v. The Czech Republic,* UNCITRAL, Partial Award of March 17, 2006

*Saur*                       *SAUR International SA v. Republic of Argentina,* ICSID Case No. ARB/04/4, Award of May 22, 2014

*Siemens*                    *Siemens A.G. v. The Argentine Republic,* ICSID Case No. ARB/02/8, Award of January 17, 2007

*Sistem Mühendislik*         *Sistem Mühendislik Insaat Sanayi ve Ticaret AS v. Kyrgyz Republic*, ICSID Case No. ARB/(AF)/06/1, Award of September 9, 2009

*Spyridon Roussalis*         *Spyridon Roussalis v. Romania*, ICSID Case No. ARB/06/1, Award of December 7, 2011

*Tattler*                    *Tattler (U.S.A. v. Great Britain),* 6 R.I.A.A. 48, Award of December 18, 1920

*Tenaris*                    *Tenaris S.A. and Talta – Trading e Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela,*

13

ICSID Case No. ARB/11/26, of January 29, 2016

*Tidewater*   *Tidewater Inc., Tidewater Investment SRL, Tidewater Caribe, C.A., et al. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Award of March 13, 2015

*Tokios Tokelés*  *Tokios Tokelés v. Ukraine,* ICSID Case No. ARB/02/18, Decision on Jurisdiction, April 29, 2004

*Tulip*    *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Award of March 10, 2014

# I.   INTRODUCTION

1.   On August 21, 2012, the Secretariat-General ["**Secretariat**"] of the International Centre for Settlement of Investment Disputes ["**ICSID**" or "**Centre**"] registered a request for arbitration ["**Request for Arbitration**"] from Tenaris S.A. ["**Tenaris**"] and Talta-Trading e Marketing Sociedade Unipessoal LDA ["**Talta**"] [collectively, "**Claimants**"], against the Bolivarian Republic of Venezuela ["**Venezuela,**" "**Respondent,**" or "**Republic**"].

2.   This dispute concerns the alleged expropriation of the Claimants' investments in two iron and steel companies in Venezuela. In their Request for Arbitration, the Claimants relied on the provisions of the Agreement between the Government of the Republic of Venezuela and the Belgium-Luxembourg Economic Union for the Reciprocal Promotion and Protection of Investments, signed on March 17, 1998 ["**Luxembourg BIT**"], and the Agreement between the Government of the Republic of Venezuela and the Government of the Portuguese Republic for the Reciprocal Promotion and Protection of Investments, signed on June 17, 1994 ["**Portuguese BIT**"], collectively referred to as ["**BITs**"].

3.   The Claimants are represented in these proceedings by the Freshfields Bruckhaus Deringer US LLP law firm, with offices at 700 13th Street NW, 10th floor, Washington D.C. 20005, specifically by attorneys Nigel Blackaby, Caroline Richard, Noiana Marigo, Jeffery P. Commission, Natalia Zibibbo, Ricardo Chirinos, María Julia Milesi, Guadalupe López, and Ankita Ritwik. The Claimants are also represented here by José Humberto Frías, of the D´Empaire Reyna Abogados law firm, with offices at Edificio Bancaracas, P.H., Plaza La Castellana, 1060, Venezuela.

4.   The Respondent is represented by the Foley Hoag LLP law firm, with offices at 1717 K Street, N. W, Washington, D.C. 20006, specifically by attorneys Paul Reichler, Kenneth Figueroa, Mélida Hodgson, Janis Brennan, Alberto Wray, Diego Cadena, Constantinos Salonidis, Gisela Paris, Patricia Cruz Trabanino, Benjamin Guthrie, Madeleine Rodriguez, and Manuela de la Helguera.

5.   The Claimants and the Respondent shall be collectively referred to as "**Parties**." A full list of the Parties' representatives and their respective mailing addresses has been included in the cover page of this Award.

# II.  PROCEDURAL HISTORY

6.   The Centre received the Claimants' Request for Arbitration on July 20, 2012. The Secretary-General registered the Request for Arbitration on August 21, 2012, pursuant to Article 36(3) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ["**ICSID Convention**" or "**Convention**"]. In the registration notice, the Secretary invited the Parties to proceed, as soon as possible, to constitute the Arbitral Tribunal in accordance with Rule 7(d) of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings ["**Arbitration Rules**"].

<u>Constitution of the Tribunal and First Session</u>

7.   Through a letter dated February 19, 2013, the Claimants asked that the Tribunal consist of three arbitrators, one appointed by each party and the third one, set to preside over the Tribunal, appointed by mutual agreement of the Parties, pursuant to Article 37(2)(b) of the ICSID Convention. In that same letter, the Claimants appointed Mr. Enrique Gómez-Pinzón, a national of the Republic of Colombia. On February 22, 2013, the Parties were informed that Mr. Enrique Gómez-Pinzón had accepted his appointment.

8.   On March 15, 2013, the Respondent appointed Professor Brigitte Stern, a national of the French Republic. On March 22, 2013, the Parties were informed that Professor Stern had accepted her appointment.

9.   On July 16, 2013, the Parties notified the Centre they had agreed to appoint Professor Juan Fernández-Armesto, a national of the Kingdom of Spain, to act as President of the Tribunal. On July 18, 2013, the Parties were informed that Professor Fernández-Armesto had accepted his appointment.

10.  On July 18, 2013, the Secretary-General notified the Parties that the three members of the Tribunal had accepted their respective appointments and the Tribunal was thus deemed to be constituted, and the proceedings begun, on said date, pursuant to Arbitration Rule 6. Ms. Alicia Martín Blanco, Legal Counsel at ICSID, was appointed Secretary of the Tribunal.

11.  The Tribunal's first session and preliminary procedural consultation with the Parties took place on September 12, 2013, by telephone conference call. In addition to the three Members and the Secretary of the Tribunal, the following individuals participated in the call:

For the Claimants:

| | |
|---|---|
| Ignacio Hellmund | Tenaris S.A. |
| Nigel Blackaby | Freshfields Bruckhaus Deringer US LLP |
| Caroline S Richard | Freshfields Bruckhaus Deringer US LLP |
| Jeffery P Commission | Freshfields Bruckhaus Deringer US LLP |

For the Respondent:

| | |
|---|---|
| Manuel Enrique Galindo | *Office of the Attorney General of the Republic* |
| Magaly Gutierrez Viña | *Office of the Attorney General of the Republic* |
| Yarubith Escobar | *Office of the Attorney General of the Republic* |
| Ronald E.M. Goodman | Foley Hoag LLP |
| Ignacio Torterola | Foley Hoag LLP |
| Diego Cadena | Foley Hoag LLP |

12. The Parties' agreements and the Tribunal's decisions concerning the matters discussed at the first session and preliminary procedural consultation were recorded on Procedural Order No. 1, issued on October 2, 2013. Among other things, said Procedural Order provides that the Tribunal was constituted in accordance with the ICSID Convention and the Arbitration Rules, and that the members of the Tribunal submitted their respective signed declarations pursuant to Arbitration Rule 6(2); it also memorializes the Parties' agreement on the following subjects: that the Parties raised no objection to the appointment of any of the Tribunal's members and, therefore, the Tribunal was properly constituted; the application of the Arbitration Rules of April 2006; agreements as to the languages of the proceedings, including the Parties' agreement that the Award be issued in Spanish only; and the procedural schedule.

13. In accordance with the procedural schedule, as amended upon the Parties' agreement on October 15, 2013, the Claimants submitted their Memorial on the Merits on October 21, 2013.

<u>Bifurcation and Subsequent Joining of the Proceedings</u>

14. On November 25, 2013, the Respondent submitted a request seeking to have two objections to jurisdiction ruled upon as a preliminary issue. The Claimants submitted their comments on the Respondent's request for bifurcation on December 16, 2016.

15. On January 15, 2014, the Tribunal issued its Decision on the Request for Bifurcation. In its Decision, the Tribunal agreed to the bifurcation of the *ratione temporis* objection, and invited the Parties to agree on a procedural schedule for the bifurcated proceedings. Having received the Parties' proposals, on February 10, 2014 the Tribunal established a procedural schedule for the bifurcated proceedings.

16. On April 1, 2014, the Respondent filed its Memorial on Jurisdiction.

17. On June 16, 2014, the Claimants filed their Counter-Memorial on Objections to Jurisdiction.

18. After several exchanges of correspondence in connection with the hearing on jurisdiction that was initially scheduled to begin on July 14, 2014, on July 2, 2014 the Parties jointly asked the Tribunal to join the bifurcated objections to jurisdiction to the proceedings on the merits.

19. On July 10, 2016, the Tribunal notified the Parties that it had accepted, on a *pro tem* basis, their agreement to join the jurisdiction and merits stages, reserving, however, the right to revise its decision. Moreover, the Tribunal confirmed the new dates of the procedural schedule and the lifting of the stay of the merits proceedings since July 2, 2014, in accordance with the Parties' agreement. The procedural schedule dates were reviewed again, with the dates set for the hearing standing unchanged.

### The Pre-Hearing Joined Proceedings

20. After consultation with the Parties, the Tribunal confirmed the dates for the hearing on August 12, 2014.

21. In accordance with the revised procedural schedule, the Respondent submitted its Counter-Memorial on Jurisdiction and the Merits on October 21, 2014.

22. On November 5, 2014, the President proposed to the Parties that Ms. Mélanie Riofrío Piché, an associate at Armesto & Asociados, be appointed Assistant to the Tribunal, and requested their approval. On November 17, 2014, the Parties confirmed they had no objection to Ms. Riofrío Piché being appointed Assistant to the Tribunal.

23. On December 31, 2014, the Secretary of the Tribunal transmitted to the Parties an additional declaration by Mr. Gómez-Pinzón. The Parties confirmed they had no objections to the content of the additional declaration submitted by Mr. Gómez- Pinzón on December 31, 2014 and January 15, 2015, respectively.

24. On January 27, 2015, the Claimants submitted their Reply Memorial.

25. On April 14, 2015, the Respondent submitted its Rejoinder.

26. On May 18, 2015, the Parties submitted their respective lists of the opposing party's witnesses and experts they intended to examine at the hearing.

27. On May 22, 2015, the Parties submitted a draft procedural order including their points of agreement on the organization of the hearing, as well as those points on which no agreement had been reached. On the same date, through simultaneous separate communications, the Parties submitted their comments on the points on which no agreement had been reached.

28. On May 27, 2015, the Tribunal informed the Parties that, since they had reached an agreement on the majority of the relevant issues, a pre-hearing telephone conference call would not be necessary.

29. On May 27 and 28, 2015, the Parties notified the order in which their witnesses would be called at the hearing.

30. On June 2, 2015, the Tribunal issued Procedural Order No. 2, containing the Parties' procedural agreements and the Tribunal's decisions on the disputed issues in connection with the organization of the hearing.

31. On June 3, 2015, the Claimants requested that several new documents, as well as additional passages from documents already on the record, be placed on the case record.[1] On June 9, 2015, the Respondent submitted its observations on the Claimants' request, and requested leave to correct one of its own exhibits. On June 8, 2015, the Claimants requested permission to introduce a new document. The Respondent replied to the Claimants' request on June 10, 2015.

32. The Tribunal ruled on June 11, 2015. Given the approaching date of the hearing and considering the need for the Parties to be certain as to which documents had been allowed and which ones rejected prior to the hearing, in its ruling the Tribunal announced its decision without stating detailed reasons. Moreover, the Tribunal invited the Parties to state whether they wished to be provided with detailed reasoning for the Tribunal's ruling. The Respondent requested such statement of reasons on June 12, 2015. Moreover, on June 12 and 14, 2015, the Respondent requested leave to submit certain additional documents.

<u>The Hearing</u>

33. The hearing on jurisdiction and the merits was held on June 15 through 22, 2015, excluding June 20 and 21, 2015. In addition to the Tribunal, the Secretary of the Tribunal and the Assistant to the Tribunal, the following individuals were in attendance at the hearing:

Representing the Claimants:

| | |
|---|---|
| Ignacio Hellmund | Tenaris S.A. |
| Nigel Blackaby | Freshfields Bruckhaus Deringer US LLP |
| Noiana Marigo | Freshfields Bruckhaus Deringer US LLP |
| Caroline S Richard | Freshfields Bruckhaus Deringer US LLP |
| Jeffery P Commission | Freshfields Bruckhaus Deringer US LLP |
| Natalia Zibibbo | Freshfields Bruckhaus Deringer US LLP |
| Ricardo Chirinos | Freshfields Bruckhaus Deringer US LLP |
| Guadalupe López | Freshfields Bruckhaus Deringer US LLP |
| María Julia Milesi | Freshfields Bruckhaus Deringer US LLP |
| Ankita Ritwik | Freshfields Bruckhaus Deringer US LLP |
| Stephen Maurer | Freshfields Bruckhaus Deringer US LLP |
| Angelica Rodriguez | Freshfields Bruckhaus Deringer US LLP |
| Deborah Blake | Freshfields Bruckhaus Deringer US LLP |
| Amy Cattle | Freshfields Bruckhaus Deringer US LLP |
| Matthew Weybrecht | Freshfields Bruckhaus Deringer US LLP |
| José Humberto Frías | D'Empaire Reyna Abogados |

---

[1] In addition, on June 5, 2015, the Parties submitted simultaneous communications introducing new legal authorities into the case record.

| Filipe Vaz Pinto | Morais Leitão, Galvão Teles, Soares da Silva &Associados |

Representing the Respondent:

| Felipe Daruiz Ferro | *Procuraduría General de la República* |
| Ronald E.M. Goodman | Foley Hoag LLP |
| Kenneth Juan Figueroa | Foley Hoag LLP |
| Mélida Hodgson | Foley Hoag LLP |
| Luis Parada | Foley Hoag LLP |
| Alberto Wray | Foley Hoag LLP |
| Janis Brennan | Foley Hoag LLP |
| Gisela Paris | Foley Hoag LLP |
| Alexandra Kerr Meise | Foley Hoag LLP |
| Christina Beharry | Foley Hoag LLP |
| Diego Cadena | Foley Hoag LLP |
| Constantinos Salonidis | Foley Hoag LLP |
| Benjamin Guthrie | Foley Hoag LLP |
| Patricia Cruz Trabanino | Foley Hoag LLP |
| Madeleine Rodríguez | Foley Hoag LLP |
| Manuela de la Helguera | Foley Hoag LLP |
| Anna Toubiana | Foley Hoag LLP |
| Kathryn Kaninowski | Foley Hoag LLP |
| Anna Avilés-Alfaro | Foley Hoag LLP |
| Pedro Ramírez | Foley Hoag LLP |
| Oscar Norsworthy | Foley Hoag LLP |
| Jennipher Izurieta | Foley Hoag LLP |
| Carmen Roman | Foley Hoag LLP |
| Peter Hakim | Foley Hoag LLP |

Claimants' Witnesses and Experts:

| Javier Martínez Álvarez | Witness |
| Luis Francisco Roberts | Witness |
| Ricardo Prosperi | Witness |
| André Prüm | Expert |
| Dário Moura Vicente | Expert |
| Christoph Schreuer | Expert |
| Manuel A. Abdala | Expert |
| Pablo D. López Zadicoff | Expert |
| Andrés Casserly | Expert, Compass Lexecon |
| Daniela Repetto | Expert, Compass Lexecon |

Respondent's Witnesses and Experts:

| Pedro Larez | Witness |
| Wilfredo Villarroel | Witness |
| Alain Steichen | Expert |

| Pedro Maia | Expert |
| Tiago Duarte | Expert |
| August Reinisch | Expert |
| Timothy Hart | Expert, Credibility International |
| Ken Kratovil | Expert, Credibility International |
| Rebecca Vélez | Expert, Credibility International |

34. During the hearing, new exhibits and legal authorities were added to the record. Moreover, at the hearing and upon the Tribunal's invitation, the Parties agreed that their respective damages experts would submit joint damages models.

### Post-Hearing Joined Proceedings

35. On June 29, 2015, the Parties sent in a schedule with the agreed-upon dates for the submissions concerning the models, post-hearing briefs, and costs submissions.

36. On June 30, 2015, the Claimants submitted a communication concerning certain questions asked and documents requested by the Tribunal at the hearing. The Respondent submitted observations on the Claimants' communication on July 14, 2015.

37. On July 17, 2015, the Tribunal transmitted to the Parties the reasons for its decision of June 11, and ruled on the outstanding requests. The Parties submitted the new documents allowed by the Tribunal on July 22, 2015.

38. On July 22, 2015, the Tribunal issued Procedural Order No. 3, concerning post-hearing procedural matters.

39. On July 30 and 31, 2015, the Parties proposed changing certain dates on the procedural schedule. On August 5, 2015, the Tribunal informed the Parties it had no objections to the proposed changes.

40. The Parties submitted corrected and agreed-upon versions of the transcripts on July 31, 2015.

41. On August 21, 2015, the quantum experts submitted the joint models requested by the Tribunal, as well as a memorandum explaining the different options and functionalities, including the experts' notes.

42. The Parties submitted their respective post-hearing briefs on September 11, 2015.

43. On October 2, 2015, the Parties filed their respective costs submissions.

### Submissions and Evidence on the Seat and Taxes

44. On August 5, 2016, the Tribunal asked the Parties to submit new allegations and evidence regarding various issues identified by the Tribunal.

45. Pursuant to the schedule agreed-upon by the Parties for this purpose, the Claimants submitted their brief and exhibits in response to the Tribunal's request on September 2, 2016, the Respondent submitted its response on September 30, 2016, the Claimants submitted their reply on October 10, 2016, and the Respondent submitted its rejoinder on October 20, 2016.

Closing of the Proceedings

46. The Tribunal declared the proceedings closed on November 15, 2016.

# III.  RELIEF SOUGHT BY THE PARTIES

1.  THE CLAIMANTS' REQUESTED RELIEF

47.  In CI,[2] CIV[3] and CV,[4] the Claimants request that the Tribunal:

> "(a) DECLARE that Venezuela has breached Articles 3 and 4 of the Luxembourg Treaty;
>
> (b) DECLARE that Venezuela has breached Articles II, III and IV of the Portuguese Treaty;
>
> (c) ORDER Venezuela to pay the Claimants the sum of US$ 243.7 million (as of April 30, 2008)[5] for its breaches of the treaties, which includes the sum of US$ 213.2 million[6] in respect of Tenaris' investment in Tavsa and US$ 30.5 million in respect of Claimants' investment in Comsigua, or such other sum as the Tribunal determines will ensure full reparation;
>
> (d) ORDER Venezuela to pay pre-award interest on (c) above in the sum of US$ 471.1 million[7] from the Valuation Date to September 11, 2015[8] at a rate of 15.69% (being the WACC of Tavsa, amounting to US$ 410.77 million[9]) and 15.96% (being the WACC of Comsigua, amounting to US$ 60.35 million[10]) per annum and thereafter until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;
>
> (e) ORDER Venezuela to pay post-award interest on (c) and (d) at a rate of 15.69% (being the WACC of Tavsa) and 15.96% (being the WACC of Comsigua) per annum as at the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;
>
> (f) DECLARE that: (i) The award of damages and interest in (c), (d) and (e) is made net of applicable Venezuelan taxes; and (ii) Venezuela may not deduct taxes in respect of the payment of the award of damages and interest in (c), (d) and (e);

---

[2] CI, para. 235.

[3] CIV, para. 321.

[4] CV, para. 319.

[5] In CI, the sum was USD 244.7 million. This item was subsequently changed to USD 243.7 million in CIV, and thus remained in CV.

[6] In CI, the sum was USD 214.2 million. This item was subsequently changed to USD 213.2 million in CIV and thus remained in CV.

[7] In CI, the sum was USD 298.2 million. This item was subsequently changed to USD 405.4 million in CIV and to USD 471.1 million in CV.

[8] In CI, the date was October 15, 2013. This date was subsequently changed to January 15, 2015 in CIV and to September 11 in CV.

[9] In CI, the sum was 260.2 million. This item was subsequently changed to USD 353.5 million in CIV and to USD 410.55 million in CV.

[10] In CI, the sum was USD 38 million. This item was subsequently changed to USD 51.9 million in CIV and to USD 60.35 million in CV.

(g) ORDER Venezuela to indemnify the Claimants in respect of any double taxation liability that would arise in Luxembourg, Portugal or elsewhere that would not have arisen but for Venezuela's adverse measures;

(h) AWARD such other relief as the Tribunal considers appropriate; and

(i) ORDER Venezuela to pay all of the costs and expenses of this arbitration, including the Claimants' legal and expert fees, the fees and expenses of any experts appointed by the Tribunal, the fees and expenses of the Tribunal and ICSID's other costs."

48. The Claimants note that:[11]

"To the extent this Tribunal concludes that Tenaris's investments in Tavsa have been indirectly expropriated and the Tribunal awards compensation using a valuation date of April 30, 2008, then Tenaris will have been made whole and it will not be necessary for the Tribunal to consider whether Venezuela has breached the fair and equitable treatment provision of the Luxembourg Treaty. If, however, the Tribunal uses a 2009 valuation date, it will be necessary for the Tribunal to consider whether Venezuela's measures following the enactment of the Nationalization Decree 6058 breached the fair and equitable treatment clause of the Luxembourg Treaty and if so, establish compensation at a date prior to Venezuela's breaches of that Treaty."[12]

"To the extent this Tribunal concludes that Claimants' investments in Comsigua have been indirectly expropriated and the Tribunal awards compensation using a valuation date of April 30, 2008 in a principal amount not less than the *pro rata* sum attributed to each of the minority Japanese Shareholders (i.e. US$24.1 million), then it will not be necessary for the Tribunal to consider whether or not Venezuela has separately breached the fair and equitable treatment, non-discrimination and/or the most-favored-nation (MFN) clauses in the Treaties. If the Tribunal concludes that Claimants' investments in Comsigua have not been expropriated, or calculates compensation for expropriation in an amount less than the *pro rata* share attributed to the Japanese Shareholders, then it should proceed to address Claimants' claim under the non-discrimination and/or MFN clauses and order the payment of compensation to the Claimants for their shares in Comsigua at the *pro rata* sum attributed to each of the minority Japanese Shareholders. If the Tribunal concludes that the Claimants' investments in Comsigua have been expropriated but uses a 2009 valuation date, it will be necessary for the Tribunal to consider whether Venezuela's measures following the enactment of the Nationalization Decree 6058 breached the fair and equitable treatment clauses of the Treaties, and if so, establish compensation at a date prior to Venezuela's breaches of the Treaties."

---

[11] CV, para. 321.
[12] CV, para. 320.

49. The Claimants request that the Tribunal dismiss Venezuela's objections to the jurisdiction of the Centre and the competence of the Tribunal. In CIII,[13] they request that the Tribunal:[14]

> "(a) Reject Venezuela's *Ratione Temporis* jurisdictional objection and all other new objections advanced by Venezuela in its Memorial on Jurisdiction in their entirety [...];
>
> (b) Award such other relief as the Tribunal considers appropriate;
>
> (c) Order Venezuela to pay all of the costs and expenses associated with this jurisdictional round of submissions, including the Claimants' legal fees, the fees and expenses of the legal expert retained by the Claimants, and the fees and expenses of the Tribunal and ICSID's other costs."

## 2. THE RESPONDENT'S REQUESTED RELIEF

50. In RII,[15] the Respondent requests that the Tribunal rule that the Centre lacks competence and the Tribunal lacks jurisdiction over the Claimants' claims. Subsequently, in RIII[16] and RIV,[17] the Respondent requests the Tribunal:

> "1) to find that the Tribunal has no jurisdiction over the Claimants' claims and that such claims are inadmissible;
>
> 2) if the Tribunal decides that it has jurisdiction to hear this dispute, to find that the Bolivarian Republic of Venezuela has not violated the commitments undertaken in the Bilateral Investment Treaties with Portugal and Luxembourg; and
>
> 3) to order the Claimants to pay the costs and expenses of this arbitral proceeding and to compensate the Republic for the expenses incurred in its defense."

51. In RV, the Respondent adds the following:[18]

> "In the unlikely event that the Tribunal considers that there is liability, [the Respondent asks] that it deny the claim for damages because Claimants have failed to prove their existence, grounds or amount in the terms required by International Law."

---

[13] CIII, para. 101.
[14] CIII, para. 101. [Irrelevant in English version.]
[15] RII, para. 103.
[16] RIII, para. 494.
[17] RIV, para. 458.
[18] RV, p. 130.

# IV.  INTRODUCTION

52.  The core dispute[19] arises from the alleged expropriations[20] of the Claimants' investments in two Venezuelan companies: a steel tube manufacturer (Tubos de Acero de Venezuela S.A. ["**Tavsa**"]) and an iron manufacturer (Complejo Siderúrgico de Guayana C.A. ["**Comsigua**"]). In addition, these companies are alleged to have suffered (as per the Claimant's claims) unfair and inequitable treatment. This second argument is raised subsidiarily to the expropriation claim, as the compensation sought for the expropriation would also cover the compensation due on account of such unfair and inequitable treatment.

53.  The Claimants are members of the Techint Group, an international conglomerate operating in the steel industry, consisting of several groups of companies, including Tenaris (the first Claimant) and Ternium S.A. ["**Ternium**"].

54.  Tenaris is a Luxembourg holding company,[21] with 26 main subsidiaries, and it is listed in the main stock exchanges in the United States, Italy, Argentina, and Mexico.[22] It has two wholly-owned subsidiaries that are relevant to this arbitration:

-  Talta:[23] the second Claimant and a Portuguese company.[24] Talta – and, indirectly, Tenaris – holds 7.58% of Comsigua's stock – one of the two allegedly expropriated companies.

-  Tubos de Acero de México S.A. ["**Tamsa**"]:[25] a Mexican company holding 70% of Tavsa's stock[26] – the second company the Claimants contend was expropriated.

55.  The Respondent is the Bolivarian Republic of Venezuela; it denies having breached the BITs, and it therefore rejects any damages claim. Venezuela also raised as a preliminary objection the Tribunal's lack of jurisdiction over this dispute.

---

[19] Subsidiarily, the Claimants also claim to have suffered other breaches of the BITs.
[20] Strictly speaking, Venezuela acknowledges Tavsa's expropriation and only challenges Comsigua's. For ease of reference, the Arbitral Tribunal will jointly refer to the "alleged expropriations."
[21] Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, May 24, 2012, Exhibit C-6.
[22] Tenaris S.A., 2014 Annual Report, Exhibit R-116, p. 31.
[23] Talta, and indirectly Tenaris, also acquired a 50.2% shareholding in Orinoco Iron, Materiales Siderúrgicos S.A. (Matesi), another Venezuelan HBI producer. Such investment and its alleged subsequent expropriation are the subject-matter of a separate ICSID arbitration: *Tenaris S.A. y Talta – Trading e Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/26).
[24] Permanent Certificate of Talta, May 18, 2012, Exhibit C-8.
[25] Shareholders Registry of Tamsa, July 6, 2012, Exhibit C-22.
[26] Certificate of Commercial Registry of Puerto Ordaz of CVG Tubos, November 23, 1998, Exhibit C-85, p. 8; Strategic Partnership Agreement, October 9, 1998, Exhibit C-19, clause 2.1.

56.    There is a significant portion of the factual background of this Award that is shared by both companies, Tavsa and Comsigua, as well as both investors, Tenaris and Talta, respectively. Where so, the Award will jointly refer to the companies or the "investment," as well as the "Claimants" in the plural. However, whenever the facts and/or arguments impact one or the other company differently, the Award will address Tavsa and Comsigua separately, and will refer to Tenaris and Talta, respectively, as the relevant Claimant.

57.    The Arbitral Tribunal will approach its analysis of the case as follows: it will first examine the three jurisdictional objections asserted by Venezuela (**V.**); next, it will address the Claimants' main claim, namely the alleged expropriation of their investments by the Bolivarian Republic (**VI.**), and will make a decision on the compensation quantum (**VII.**). Finally, the Arbitral Tribunal will render its award on interest, taxes, and costs (**VIII-X.**) and will provide a summary of all previous findings (**XI.**). The final section will contain the Award's decision (**XII.**).

# V.   OBJECTIONS TO JURISDICTION

58.   Venezuela has raised three objections to the Arbitral Tribunal's jurisdiction:

- The first one concerns a lack of consent (**1.**);

- The second one, the lack of a corporate seat (**2.**); and

- The third and final one, defects in the notice of the dispute (**3.**)

## 1.   LACK OF CONSENT

59.   In investment arbitrations under a bilateral investment treaty, consent to arbitration is expressed successively: first, the State formalizes an offer to submit to arbitration in the BIT; then, the investor accepts that offer – and such acceptance may take any one of several forms. Once the investor has expressed its acceptance, consent to arbitration has been perfected.

60.   Where the concerned State is Venezuela, the process whereby consent is perfected becomes complicated as a result of the fact that, on January 24, 2012, Venezuela denounced the Convention.

61.   Denunciation of the Convention is governed by Articles 71 and 72:

> "Article 71. Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice."

> "Article 72. Notice by a Contracting State pursuant to Article[…] 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary."

62.   Article 71 provides that a State's denunciation of the Convention does not take effect until six months after receipt thereof by the World Bank; this rule means that, until July 24, 2012 (six months after denunciation) the Convention remained in full force and effect with respect to Venezuela. The Claimants filed their Request for Arbitration on July 20, 2012 and, therefore, prior to the expiration of such term.

63.   Moreover, Article 72 contains a specific rule since, in order for the Convention to apply to a denouncing State, even within the six-month period mentioned in Article 71, "consent to the jurisdiction of the Centre" must have been given prior to the denunciation.

64.   There is a certain amount of debate as to whether "consent to jurisdiction" in Article 72 of the Convention refers to the consent perfected by the State and the investor (as argued by the Respondent) or rather it is to be read only as the

State's unilateral offer to arbitrate. The Claimants contend that such debate is moot, since, irrespective of the preferred interpretation, in any event they had already validly given their consent prior to the Denunciation.[27]

65. The issue to determine here is then whether the Claimants accepted the offer to arbitrate made by Venezuela prior to its Denunciation. The case for each Claimant and its investment will be addressed separately.

## 1.1 TENARIS-TAVSA

### A. **Venezuela's Position**

66. Venezuela raises two arguments to have this Tribunal decline its jurisdiction:

- As its main argument, it maintains that acceptance of arbitration could have taken place only after the pre-arbitration negotiation period (**a.**); and

- In the alternative, it contends that consent to arbitration was never perfected due to the inconsistency between the terms of the offer and the terms of the acceptance (**b.**)

### a. **Lack of Acceptance After the Required Negotiation**

67. Pursuant to Article 9.1 and 9.2 of the Luxembourg BIT:

> "1. Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party by conciliation.
>
> 2. In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final.
>
> To this end, each Contracting Party shall give its irrevocable consent in advance to the submission of any dispute to such arbitration."

68. The Respondent argues that Tenaris should have issued its acceptance at the end of the six-month negotiation period, running as from the date of the notice of dispute, provided, however, that it had engaged in good-faith negotiations with Venezuela[28] – which did not happen.

### b. **Failure to Perfect Consent**

69. Venezuela also raises a subsidiary argument.

---

[27] CV, para. 145; T., p. 128:3–7.
[28] RIII, para. 188.

70. On November 20, 2009, Tenaris sent the Ministry of the People's Power for Energy and Oil ["**MEP**"] notice of the existence of a dispute under the Luxembourg BIT concerning the expropriation of its investment in Tavsa ["**Tavsa Notice**"].[29] In such notice, Tenaris reserved its right to institute arbitration proceedings upon the expiration of the six-month negotiation period beginning on the date of the notice or earlier, insofar as the negotiations were futile.[30]

71. According to the Bolivarian Republic, this reservation of rights causes the terms of the acceptance to arbitration not to be identical to those of the offer to arbitrate.[31] And this inconsistency in their terms would mean that consent to arbitration was not perfected,[32] as such consent would be flawed.[33]

### B.    Tenaris' Position

72. Tenaris denies the validity of the two arguments put forth by Venezuela.

#### a.    Prior Negotiations

73. Following the Tavsa Notice, Tenaris claims to have repeatedly expressed to Venezuela its desire to engage in negotiations, as evidenced by the discussions and meetings that took place, as well as the correspondence sent over that period.[34]

74. The Claimant maintains that, by the time Venezuela submitted its Denunciation, on January 24, 2012, Tenaris had more than observed the six-month negotiation period.

#### b.    Perfected Consent

75. Tenaris contends that the reservation in the Tavsa Notice merely reflects the language of Article 9.1 of the Luxembourg BIT, which requires that the parties, "as far as possible," endeavor to amicably settle their dispute, as well as extended arbitration practice, where it is established that negotiations need not be continued in the event of "futility."[35]

76. The Claimant further argues that it was not until this arbitration that Venezuela first brought the contents of the Tavsa Notice into question.[36]

### C.    Decision of the Arbitral Tribunal

---

[29] Notice of Dispute from Tenaris to Venezuela, November 20, 2009, Exhibit C-9. Venezuela received such Notice on November 26, 2009; attached to the notice was a detailed memorandum of the dispute.

[30] Tavsa Notice, Exhibit C-9, pp. 4, 5.

[31] Venezuela refers to the following paragraph of the Tavsa Notice: "In this context, Tenaris [...] reserve[s] from now on [its] right to initiate an arbitration upon expiration of the six-month negotiations period following the date of this letter or even earlier to the extent that the conduct of the Government determines the exhaustion of such period would constitute a ritualism or formalism deprived of any usefulness." Exhibit C-9.

[32] RV, para. 40; T., p. 1593:5–7 (Reinisch).

[33] RIII, para. 189.

[34] CV, para. 122.

[35] T., pp. 113:14–114:5; pp. 1658:18–1660:1.

[36] CV, para. 121.

77. The Arbitral Tribunal agrees with Tenaris on the two points at issue.

### a. Prior Negotiations

78. Venezuela initially argued that acceptance was to take place after negotiating in good faith for six months, and that this requirement had not been satisfied here. After the evidence produced by the Claimant, showing its contacts with Venezuela through discussions, letters and meetings over the course of more than two years, the Respondent seems to have dropped this argument in its later pleadings.

79. In any event, the Arbitral Tribunal agrees with Tenaris: the Claimant did fulfill its duty to negotiate for six months before submitting the dispute to arbitration. And it did repeatedly bring the dispute before the Government, expressing its desire to reach an amicable settlement; so follows from the following evidence:

- The letters of May 29, 2009,[37] August 17, 2009,[38] February 26, 2010,[39] and May 3, 2010;[40]

- The Tavsa Notice, of November 20, 2009;[41]

- The meetings of March 25, 2010,[42] April 27, 2010,[43] May 27, 2010,[44] February 9, 2011,[45] September 27, 2011,[46] October 5, 2011, and November 29, 2011;[47]

80. The Bolivarian Republic has not disproven its opponent's evidence.

81. The Tribunal finds that, when Venezuela denounced the Convention on January 24, 2012, the six months of required conciliation attempts as from the Tavsa Notice of November 20, 2009 had more than elapsed.

### b. Matching Terms

82. Venezuela claims that, in the Tavsa Notice, Tenaris had changed the terms of Venezuela's offer to submit to arbitration, thereby creating an inconsistency between offer and acceptance that allegedly kept consent from being perfected.

83. The argument is unconvincing.

---

[37] Exhibit C-60.
[38] Exhibit C-70.
[39] In the letter from Mr. José Frías (Tenaris) to the Venezuelan Ministry of the People's Power for Energy and Oil, addressed to the attention of Mr. Ángel Núñez (PDVSA Industrial), of February 26, 2010, Tenaris invites PDVSA Industrial to meet in order to go over the value of the compensation for its Tavsa shareholding. Exhibit C-191; Prosperi, para. 13.
[40] In the letter from Mr. José Frías (Tenaris) to the Venezuelan Ministry of the People's Power for Energy and Oil, of May 3, 2010, the Claimants stated that in no way did the appointment of additional members to Tavsa's technical commission entail a modification, alteration, or interruption of the negotiations period provided for in the Luxembourg BIT. Exhibit C-150; Larez, para. 18, Prosperi, para. 13. CII, para. 91; Exhibit C-60; Exhibit C-70; Exhibit C-150
[41] Exhibit C-9.
[42] Prosperi, para. 13.; T., pp. 117:18–120:6.
[43] Exhibit C-149.
[44] Exhibit C-149; Prosperi, para. 13.
[45] Prosperi, para. 15.
[46] Prosperi, para. 20.
[47] Exhibit C-149.

84.   In executing the Luxembourg BIT, Venezuela gave its consent for the dispute to be submitted to ICSID,[48] subject (as per its claim) to one condition: that the six-month period for prior negotiations be observed.

85.   In the Tavsa Notice, Tenaris agreed to settle the dispute before ICSID:[49]

> "The Luxembourg Treaty states the consent of the State of Venezuela to have any such dispute resolved by means of international arbitration, in particular under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID"), <u>which consent has also been hereby given by Tenaris and Tavsa LLC to resort to arbitration in the unfortunate event that the dispute cannot be amicably settled.</u>[50]

86.   The terms of the offer to arbitrate and the terms of Tenaris' acceptance are thus perfectly consistent: Venezuela offered arbitration and Tenaris (and Tavsa) "also gave their consent to resort to arbitration."[51]

---

[48] Luxembourg BIT, Article 9.2 *in fine* and Article 9.3.
[49] Exhibit C-9, p. 5.
[50] Underlined by the Tribunal.
[51] The Tribunal is paraphrasing.

<u>Reservation of Rights</u>

87. However, Venezuela has focused on the final portion of the phrase following Tenaris' consent, where Tenaris makes a reservation of rights:

> "In this context, Tenaris and Tavsa LLC <u>hereby reserve their right to institute arbitration</u> once the period of six months from the date hereof has expired, or <u>even earlier</u> to the extent that the Government's conduct causes the exhaustion of such period to be a ritualism or formalistic requirement devoid of any use." [52]

88. Does this reservation of rights change the above conclusion that consent had been perfected?

89. It should first be noted that Tenaris never resorted to such reservation since, *de facto*, it did observe the six-month negotiation period.

90. Even if it had not observed that period, however, the inclusion of the above reservation would not have entailed a material modification of the offer, since, by including its reservation, Tenaris merely adhered to an accepted principle of investment arbitration, reflected in the Luxembourg BIT itself: negotiations are to take place "as far as possible,"[53] and, where any attempt at negotiating is futile, this period need not be exhausted.[54] It should be further noted that never had the Bolivarian Republic – until the commencement of this arbitration – called Tenaris' attention to the discrepancy it is now bringing up, which confirms that, *in tempore insuspecto*, Venezuela did not detect any irregularity in the Tavsa Notice.

\* \* \*

91. <u>To conclude</u>, the Arbitral Tribunal rejects the first jurisdictional objection raised against Tenaris: by the date of the Denunciation, Tenaris had accepted the terms of Venezuela's offer to arbitrate, and had fulfilled its duty to negotiate for no less than six months.

## 1.2 TALTA-COMSIGUA

92. As regards Comsigua, Venezuela argues that consent to arbitrate was subject to one condition being satisfied: that Talta, the owner of the investment, negotiated in good faith for six months. Consent could not be perfected before that period ended.[55]

93. For its part, Talta claims to have satisfied this requirement, because the Portuguese BIT provides that the six-month negotiation period runs as from the first negotiation, which, in this case, took place in 2010.[56]

94. The Arbitral Tribunal agrees with Talta.

---

[52] Underlined by the Tribunal.
[53] Luxembourg BIT, Article 9.1.
[54] Schreuer I, para. 63.
[55] RIV, para. 191.
[56] CV, para. 125; Schreuer I, para. 49.

95. The Portuguese BIT does not call for notification of the dispute, and it very clearly establishes that the six-month period for negotiations runs as from the commencement of the negotiations:[57]

> "Should the dispute not be solved by amicable means within a period of six (6) months, underlined from the beginning of these consultations, it may be submitted, at the choice of the investor: [...]."[58]

96. The timeline is as follows:

- Talta made its first request to negotiate on June 28, 2010;[59]

- One year and a half later, on December 2, 2011, Tenaris and Talta sent the Ministry of the People's Power for Industry ["**MIBAM**"] a notice of the existence of a dispute under the Luxembourg and Portuguese BITs with respect to their investment in Comsigua ["**Comsigua Notice**"].[60] In this Notice, Tenaris and Talta once again expressed their willingness to reach an amicable settlement of the dispute and stated their consent to submit the dispute to ICSID arbitration if no amicable solution was reached within the time period prescribed in the BITs;[61]

- The Denunciation took place on January 24, 2012, effective July 24, 2012.

- The Request for Arbitration was filed on July 20, 2012.

97. Pursuant to the Portuguese BIT, the six-month negotiation period runs from "the beginning of these consultations." The facts leave no room for doubt: when Talta sent the Comsigua Notice, it had more than fulfilled its duty to negotiate for six months (and, at the time, Venezuela had not yet denounced the Convention). Accordingly, Talta did validly perfect its consent to arbitration when it sent the Comsigua Notice on December 2, 2011, before the Denunciation.

\* \* \*

98. The Arbitral Tribunal could end its analysis here, after having verified that Talta, which is the direct holder of Comsigua's shares, consented to arbitration in the required time period and manner.

99. However, the Tribunal is aware that the Claimants' *petitum* as regards Comsigua is framed as compensation for the benefit of both Claimants (not just Talta),[62] which requires that the Arbitral Tribunal also verify consent by Tenaris as a co-

---

[57] Portuguese BIT, Article VIII.2.
[58] Underlined by the Tribunal.
[59] Prosperi, paras. 18-22; Villarroel II, para. 8.
[60] Venezuela received such Notice on December 5, 2011, and, as was the case with the Tavsa Notice, this Notice was also accompanied by a detailed memorandum of the dispute. Notice of Dispute from Tenaris and Talta to Venezuela, December 2, 2011. Exhibit C-10, Annex, sections 6(a), (b).
[61] Comsigua Notice, Exhibit C-10, p. 3.
[62] See para. 47 *supra*: The Claimants request that the Tribunal "(c) ORDER Venezuela to pay the Claimants the sum of US$ 243.7 million (as of April 30, 2008) for its breaches of the treaties, which includes the sum of US$ 213.2 million in respect of Tenaris' investment in Tavsa and US$ 30.5 million in respect of Claimants' investment in Comsigua, or such other sum as the Tribunal determines will ensure full reparation."

34

claimant.

**1.3  TENARIS-COMSIGUA**

100.  The case of Tenaris, as an indirect owner of Comsigua, is more complex because the Luxembourg BIT differs from the Portuguese BIT (discussed in the preceding section).

101.  Article 9 of the Luxembourg BIT provides as follows:[63]

> "1. Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor. As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party by conciliation.
>
> 2. In the absence of an amicable settlement <u>within six months from the date of notification of dispute</u>, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final."

102.  *Pro memoria*: Tenaris and Talta sent the Comsigua Notice on December 2, 2011. The six-month period began (as required by the Luxembourg BIT) at the time of the Comsigua Notice and, therefore, it ended on June 2, 2012. By then, Venezuela had already denounced the Convention – its Denunciation took place on January 24, 2012.

103.  Venezuela argues that consent to arbitration may not be perfected until the required negotiation period has expired, and that Tenaris never actually got to perfect consent to arbitration in connection with its investment in Comsigua.

104.  For its part, Tenaris argues the opposite, and claims that consent was perfected by means of the Comsigua Notice, and that the negotiation period is merely a procedural requirement: until said period expires, the investor is prevented from filing a request for arbitration, but this waiting period does not affect the perfecting of consent given prior to that.

105.  The Respondent and the Claimants have submitted expert opinions by two investment arbitration experts, namely Professors August Reinisch and Christoph Schreuer, respectively, who have provided their opinion in support of each Party's position, which will be summarized next (**A.** and **B.**). Then, the Arbitral Tribunal will reach a decision (**C.**).

**A.  <u>Venezuela's Position</u>**

106.  The Respondent has relied on the opinion of Prof. Reinisch.[64]

---

[63] Underlined by the Tribunal.
[64] Opinion of March 31, 2014 ["**Reinisch I**"], and opinion of October 12, 2014 ["**Reinisch II**"].

107. It is the expert's opinion that, once the Convention has been denounced, only those rights and obligations which have already arisen from previously-perfected mutual consent to ICSID arbitration escape the effects of such denunciation. Consent is perfected when the investor accepts the State's arbitration offer.[65] Because in this case the Denunciation took place on January 24, 2012, consent to arbitration should have been perfected prior to such date.[66]

108. Prof. Reinisch analyzes the two actions through which Tenaris might have expressed its consent to arbitration: the Comsigua Notice and the Request for Arbitration; he then concludes that neither one perfected consent.

<u>The Comsigua Notice</u>

109. Prof. Reinisch acknowledges that, as a general principle, the investor can accept an arbitration offer made by a State in a BIT at any time between that BIT's effective date and the State's Denunciation of the Convention.[67] The expert also accepts that the Luxembourg BIT contains no provision establishing when consent to arbitration is to be deemed perfected.[68]

110. The above notwithstanding, in his opinion, in order for an acceptance of the offer to arbitrate to be valid and cause consent to be perfected, it must satisfy all of the requirements established in the offer itself.[69] In this case, it is the expert's opinion that the offer was conditional upon the satisfaction of one requirement: the Luxembourg BIT requires that a six-month negotiation period be observed after the notice before being able to choose an arbitration forum and submit the dispute to arbitration.[70] The expert maintains that, had consent been perfected via that notice, the investor would have been deprived of that right to elect a forum, once the required negotiations had ended.[71]

111. The expert reaches this conclusion by performing a literal interpretation of the Luxembourg BIT,[72] from which he concludes that acceptance of the arbitration offer is subject to a process consisting of three successive steps:[73]

- First, a notice of a dispute;

- Second, a mandatory six-month negotiation period;

- Third, the choice of submitting the dispute to either the appropriate courts of the State or international arbitration.

112. For that reason, it is the expert's opinion that the consent to arbitration expressed by Tenaris in the Comsigua Notice could not be perfected until the negotiation

---

[65] Reinisch I, para. 40.
[66] Reinisch I, paras. 46, 47.
[67] Reinisch II, para. 75.
[68] Reinisch II, para. 48.
[69] Reinisch II, para. 75.
[70] Reinisch I, para. 55.
[71] Reinisch II, para. 69.
[72] Reinisch II, para. 52.
[73] Reinisch II, para. 55.

36

period had expired (second step).[74] According to the expert, the observance of the negotiation period is a true jurisdictional requirement, not a mere procedural obstacle affecting just the admissibility of the complaint.[75]

113. Because in this case Tenaris gave its consent to arbitration in the Comsigua Notice and such consent would not be effectively perfected until six months later, *i.e.* on June 2, 2012, Tenaris would be left without ICSID protection since, by then, Venezuela had already denounced the Convention.[76]

<u>The Request for Arbitration</u>

114. Tenaris filed its Request for Arbitration on July 20, 2012, more than six months after the Denunciation. The expert maintains that, had the Request perfected the investor's consent, such perfecting would have taken place after the Denunciation and would thus be ineffective.[77]

**B. <u>Tenaris' Position</u>**

115. The Claimant relies on the opinion of Prof. Schreuer.[78]

116. According to this expert, there is an ongoing debate as to whether the negotiation period is a jurisdictional requirement (because it affects consent) or a procedural one (because it affects the admissibility of the complaint).[79]

117. It is his view that, in this case, that discussion is moot: the debate is of consequence where the investor has ignored the prior negotiations requirement and skipped directly forward to arbitration.[80] Here, Tenaris has indeed observed the negotiation period. According to Prof. Schreuer, where this is the case, tribunals have found it unnecessary to rule on the legal nature of the requirement to negotiate[81].

118. In any event, it is Prof. Schreuer's opinion that, even though it is true that investors will often consent to arbitration in the request for arbitration, this does not mean that an investor cannot do so any earlier. Were it to decide to accept the State's offer at an earlier point in time, this would be the date on which consent would have been perfected.[82] Prof. Schreuer is not persuaded that the Luxembourg BIT is intended to preserve, at all costs, the investor right to choose the forum to which it will be submitting its complaint until after the six months of negotiations. Even more so when such right would disappear upon the State denouncing the Convention.[83]

119. The expert argues that Venezuela gave its consent to arbitration in the

---

[74] Reinisch I, para. 55.
[75] Reinisch I, para. 58.
[76] Reinisch I, para. 61.
[77] Reinisch I, paras. 50, 51.
[78] Opinion of June 10, 2014 ["**Schreuer I**"] and opinion of January 19, 2015 ["**Schreuer II**"].
[79] Schreuer I, para. 28.
[80] Schreuer I, para. 29.
[81] Schreuer I, para. 30.
[82] Schreuer I, para. 32.
[83] Schreuer II, para. 37.

Luxembourg BIT and that such offer could be accepted by the investor at any time;[84] the only thing that was subject to the observance of the negotiation period was the possibility of instituting arbitration[85] (the third step in Prof. Reinisch's terminology),[86] such that, if the negotiations ended in a settlement, the arbitration complaint could be avoided.[87]

120. In this case, Tenaris accepted the arbitration offer by sending the Comsigua Notice on December 2, 2011, and it was then that consent to arbitration was perfected. Accordingly, by the time Venezuela denounced the Convention on January 24, 2012, consent had already been perfected. There is thus no obstacle to the Centre's jurisdiction.[88]

121. Prof. Schreuer brings up one final argument: demanding that consent be perfected after the notice of dispute would do nothing but serve as an incentive for States to avoid being sued and thus sidestep the obligations they undertook upon executing the BIT by merely denouncing the Convention.[89]

## C. The Arbitral Tribunal's Decision

122. The jurisdiction of this Arbitral tribunal arises from the consent to ICSID arbitration expressed by both the State and the investor. Such consent is formalized via a two-phase process: the State first gives consent through the offer contained in the BIT, and it is the investor who then accepts that offer. The Parties are in disagreement as to whether the arbitration consent between the Venezuelan State and Tenaris was perfected before or after the State denounced the Convention.

### The Bolivarian Republic

123. Venezuela's consent is contained in Article 9.2 *in fine* of the Luxembourg BIT:

> "To this end, each Contracting Party shall give its irrevocable consent in advance to the submission of any dispute to such arbitration."

124. Even though the word "*otorgará*" seems to point to consent being given in the future, the Parties have not brought into question the fact that, by ratifying the Luxembourg BIT, Venezuela actually gave its consent;[90] therefore, the above-quoted provision should be read in the present tense ("gives"). This conclusion is consistent with the French version of the Luxembourg BIT, which uses the term "*donne*"[91] (present tense). To avoid any doubts, it should be noted that, as per the final provision, negotiations were carried out in French.[92]

---

[84] Schreuer I, para. 50.
[85] Schreuer I, para. 51.
[86] Schreuer II, para. 38.
[87] Schreuer I, para. 50.
[88] Schreuer II, para. 95.
[89] Schreuer II, para. 42.
[90] CIII, para. 17; RII, para. 26.
[91] Art. 9.2 Luxembourg BIT (French version): "*À cette fin, chacune des Parties contractantes donne son consentement anticipé et irrévocable à ce que tout différend soit soumis à cet arbitrage.*"
[92] Final provision of the Luxembourg BIT: "Done in Brussels, on March 17, 1998, in three original copies, each one in the Spanish, French, and Dutch language, all three being equally authentic. In the event of discrepancies, there shall be taken into consideration the fact that negotiations were carried out in French."

Tenaris

125. In its Comsigua Notice of December 2, 2011, Tenaris accepted the State's arbitration offer and chose ICSID as the arbitration forum:[93]

> "To this end, the Applicants hereby express their consent to submit the Dispute to an international arbitration tribunal of the International Centre for Settlement of Investment Disputes (ICSID), pursuant to Article 9 of the Luxembourg Treaty […]."

126. *Prima facie,* consent to arbitration was perfected on December 2, 2011: there was an offer by the State that was accepted by the investor, and such acceptance took place prior to the Denunciation.

Article 9.2 of the Luxembourg BIT

127. Prof. Reinisch, however, brings up a possible exception to this preliminary conclusion, which he bases upon the initial phrase of Article 9.2 of the Luxembourg BIT:

> "2. In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. […]."

128. Both experts are in agreement that Article 9.2 sets a requirement: the investor must negotiate for six months as from the date of notice prior to submitting the dispute to the chosen forum ["**Pre-Condition**"].

129. The experts disagree as to the moment when the investor may choose an arbitration forum and thereby perfect consent to arbitration:

- According to Prof. Schreuer, the investor may opt at any moment, even before the Pre-Condition has been satisfied, because the Pre-Condition is merely a requirement for the admissibility of the complaint; this applied to the case at hand, it is Prof. Schreuer's opinion that the Comsigua Notice, where Tenaris chose arbitration, amounted to the valid perfection of consent to arbitration, as it took place prior to Denunciation.[94]

- Prof. Reinisch seems to acknowledge that Tenaris could not institute arbitration proceedings without first having attempted to negotiate for six months; but, according to the expert,[95] the Pre-Condition also affects consent to arbitration, since the investor may not opt for arbitration until the Pre-Condition has been met.[96]

130. This is about interpreting Article 9.2 of the Luxembourg BIT. Any BIT interpretation is governed by the Vienna Convention on the Law of Treaties

---

[93] Underlined by the Tribunal.
[94] Schreuer I, para. 95.
[95] Reinisch II, para. 46.
[96] Reinisch II, para. 9(e).

["**VCLT**"], whose relevance is accepted by both Parties, as its contents represent a compilation of customary international Law;[97] and, specifically, by Article 31 thereof. Said provision requires that any term of a treaty be interpreted in its context, in the light of its object and purpose, and in good faith:[98]

### a.   Context

131.   The Arbitral Tribunal must interpret the disputed paragraph of Article 9.2 within its context in the BIT.

The Requirements of Article 9

132.   Article 9 of the Luxembourg BIT lays down four requirements to be met by an investor prior to filing a complaint:

- That the investor give notice of the existence of the dispute in writing, in a sufficiently detailed memorandum:

   "Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor."

- That the Parties attempt to amicably resolve the dispute through negotiations:

   "As far as possible, the parties shall endeavor to settle the dispute amicably by negotiation, where necessary seeking expert advice from a third party by conciliation."

- That the investor chooses one of the two forums offered by the State – the ordinary jurisdiction of the host State or international arbitration – and that such choice be final:

   "the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration. Once made, the choice shall be final." [

- That the investor not submit the dispute to the chosen forum before six months of negotiations, as from the date of the notice of dispute:

   "In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, either to the competent jurisdiction of the State in which the investment was made or to international arbitration."

133.   Prof. Reinisch is right in his statement that Article 9 of the Luxembourg BIT establishes the following *iter*:

---

[97] Reinisch I, para. 24; M. Villiger, "Commentary on the 1969 Vienna Convention on the Law of Treaties," (2009) 875; *Tokios Tokelés*, para. 27; *Noble Venture*, para. 50; *Mondev*, para. 43.
[98] "A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

- <u>First</u>, notice of a dispute;

- <u>Second</u>, negotiations for at least six months (the "Pre-Condition");

- <u>Third</u>, submission of the dispute to arbitration, at the investor's discretion, once the Pre-Condition has been satisfied.

134. It is also true, however, that Article 9 of the Luxembourg BIT simplistically condenses into a mere three paragraphs a reality that is usually much more complex. And this was indeed so in the case at hand:

- The State did not first hear about the dispute upon receiving the Comsigua Notice in December 2011; in fact, Venezuela had already created a commission to negotiate the compensation owed to the Claimants back in October 2009,[99] and such negotiations had extended for the two years up to the Notice.

- In the Comsigua Notice, the investor did not just give its express consent, but it also exercised its option choosing ICSID arbitration.

- Following the Notice, negotiations extended for over six more months.[100]

- After that period, the investor filed the Request for Arbitration before its chosen forum.

135. Reality does not then track the normal *iter* provided for in Article 9 of the Luxembourg BIT. In the Comsigua Notice, Tenaris did not just give consent, but it also chose arbitration; and the question is then whether such was a valid choice or, on the contrary, the BIT only allows consent to be perfected and the choice made after the Pre-Condition has been satisfied.

<u>The Correct Interpretation of Article 9.2</u>

136. Article 9.2 of the BIT provides that, following the required notice that a dispute has arisen, a six-month period needs to elapse before the investor is allowed to submit the dispute to its forum of choice ("In the absence of an amicable settlement within six months from the date of notification of dispute, the dispute shall be submitted, at the investor's option, [to the courts or arbitration]"). However, the BIT does not include a prohibition keeping the investor from expressing its consent and choosing arbitration at the same time it gives notice of the dispute. There is no indication either that the negotiations are to be considered a condition precedent for consent to be effective. It is therefore preferable to read, by interpreting the BIT in its context, the investor as being authorized to simultaneously express its three statements of intention (notify the dispute, express its pure consent and choose ICSID arbitration).

137. Moreover, this interpretation is the only one that gives full meaning to the final phrase of Article 9.2: "once made, the choice shall be final." The phrase seems

---

[99] Exhibit R-46.
[100] See para. 96 *supra*.

41

to refer to an investor who decides to exercise its choice in advance, at the same time as it gives notice of the dispute: only in this case of advance exercise of the choice is it necessary for the provision to specify that the decision will be final.

**b. Object and Purpose**

138. The second interpretation criterion proposed by Article 31 of the VCLT means that, when interpreting a treaty, the reading that is most consistent with the object and purpose the States had in mind when approving the treaty should prevail.

139. Article 9 is intended to give investors a choice between two forums: the jurisdiction of the host State or international arbitration. The interpretation the Bolivarian Republic advocates for would mean that the investor could only make that choice and express its consent after giving notice of the existence of a dispute and negotiating for a period of six months – but not any earlier. Such an interpretation would hinder negotiations and foster surprising behavior: the State would be in the dark as to which forum has been selected by the investor until it is served with a complaint. On the other hand, the contrary interpretation serves the purpose of notifying the State of the selected forum and paving the way for subsequent negotiations.

**c. Good Faith**

140. The third interpretation criterion gives prevalence to that treaty interpretation which best fits the requirements of good faith.

141. The reading favored by Venezuela would postpone perfection of consent and incentivize the States' unfair behavior: it would allow them to, once they have been notified of a dispute and aware that the investor intends to submit the dispute to ICSID arbitration, denounce the Convention for the sole purpose of escaping their obligations.

142. This last interpretation criterion also favors the treaty interpretation advocated for by the Claimants.

\* \* \*

143. <u>To conclude</u>: by approving the Luxembourg BIT, the Bolivarian Republic expressed its "irrevocable consent in advance" to submit disputes with protected investors to international arbitration (including ICSID arbitration), provided, however, that such investors accepted the offer and chose arbitration. In the event of a dispute between an investor and Venezuela, Article 9 of the Luxembourg BIT (when correctly interpreted) allows the investor to express its consent in advance and, at the same time, opt for ICSID arbitration.

144. On December 2, 2011, Tenaris sent Venezuela the Comsigua Notice, notifying it of the existence of a dispute, stating its consent to submit the dispute to arbitration, and choosing ICSID arbitration. This course of action was in line with Article 9 of the Luxembourg BIT and perfected the parties' intention to resolve their dispute through ICSID arbitration. Because the Notice predates the

Denunciation, which took place on January 24, 2012, consent was validly perfected before Venezuela decided to withdraw from the Treaty. After the Notice, Tenaris fulfilled its obligation to engage in negotiations for at least six months, and filed its Request for Arbitration once such period had expired.

### D. Coda

145. The experts for both Parties have cited many decisions discussing the pre-requirements to be satisfied by an investor prior to instituting arbitration proceedings. The issue debated in those decisions is whether their satisfaction is set up as an essential obligation the nonfulfillment of which entails the tribunal's lack of jurisdiction or, rather, it is framed as a mere procedural requirement that may be skipped by the investor.[101]

146. The decisions in question are actually irrelevant because they do not address the issue that is fundamental in the case at hand: what is the effect of the Convention's denunciation during the negotiation period, when the investor, in notifying the dispute, had already given consent and exercised its choice, and, later on, observes the mandatory negotiation period and waits until it has expired to institute arbitration proceedings.

147. The above notwithstanding, for the sake of an exhaustive discussion, the Arbitral Tribunal will analyze the main cases relied upon by the Respondent, which allegedly support its position that the State's consent to arbitration is subject to the observance of the negotiation period provided for in the treaty:[102]

148. (i) The Respondent relies on two decisions (*Kılıç* and *Dede*), according to which the State's offer to arbitrate is conditional. In fact, they both refer to the requirement that, prior to filing an arbitration complaint, the investor exhaust its local remedies;[103] this conclusion cannot be extended to the prior negotiations requirement, as there are significant differences between the two: local courts are a forum alternative to and exclusive of arbitration, and it is understandable that a State should wish to ensure that its courts have been given a chance to resolve the dispute before giving its consent to international arbitration.

149. (ii) The other two cases relied upon, which do indeed address the prior negotiations requirement (*Murphy* and *Burlington*), only mention that this requirement is not a procedural rule that may be sidestepped by the investor but, rather, it is an essential requirement that the claimant needs to satisfy before being allowed to file a request for arbitration with ICSID;[104] both decisions are

---

[101] By all, *Murphy*, para. 149.

[102] Reinisch I, paras. 56 *et seq.*

[103] *Kılıç*, para. 6.1.4. *Dede*, paras. 176, 188.

[104] *Murphy*, para. 149: "*This Tribunal finds the requirement that the parties should seek to resolve their dispute through consultation and negotiation for a six-month period does not constitute, as Claimant and some arbitral tribunals have stated, "a procedural rule" or a "directory and procedural" rule which can or cannot be satisfied by the concerned party. To the contrary, it constitutes a fundamental requirement that Claimant must comply with, compulsorily, before submitting a request for arbitration under the ICSID rules.*" *Burlington*, para. 49: "*[…] the requirement that the parties should seek for a six-month period does not constitute, as Claimant and some arbitral tribunals have stated, 'a procedural rule' or a 'directory and procedural' rule which can or cannot be satisfied by the concerned party. To the contrary, it constitutes a fundamental requirement that Claimant must comply with, compulsorily, before submitting a request for arbitration under the ICSID rules.*"

entirely irrelevant to the case at hand, where the investor did observe the six months of prior negotiations before instituting arbitration proceedings.

150. (iii) Lastly, Venezuela brings up a case (*Tulip*) where the tribunal finds that prior negotiations are an essential element of the Respondent State's consent to arbitration, and that observance of the negotiation period is a "pre-condition to the jurisdiction" of the tribunal.[105]

151. Even assuming that the interpretation in *Tulip* is the correct interpretation, it would lead to a conclusion that the Bolivarian Republic only agreed to submit disputes to arbitration subject to the condition precedent that, after notice of the dispute, the investor had negotiated for a period of six months. What the *Tulip* decision fails to address, however, is whether, if the condition precedent is satisfied (as was the case here, since the investor filed its request for arbitration once the negotiation period had expired), such fulfillment has *ex tunc* effects and, therefore, the effects of the State's consent should be deemed to apply as from the date it was originally given. Because this issue was not addressed in *Tulip*, that decision is not relevant to the instant case.

---

[105] *Tulip*, para. 72: "*a pre-condition to the jurisdiction of this Tribunal.*"

## 2. LACK OF AN EFFECTIVE SEAT

152. In order for a legal entity to qualify as an investor, the BITs impose certain requirements as to the location of its seat. Venezuela's second jurisdictional objection is that neither Tenaris nor Talta satisfy these requirements.

153. The issue is whether the BITs merely require that the investor have its "**Statutory Seat**" (meaning that its bylaws merely mention that the company's seat is in Luxembourg or Portugal) or they also require that it have its "**Effective Seat**" there (*i.e.* that its corporate organs *de facto* manage the company's business from the territory of Luxembourg or Portugal):

- It is the Respondent's view that the BITs require an Effective Seat; it maintains that both companies have their effective seat in Argentina;

- On the other hand, the Claimants argue that their Effective Seat is the same as their Statutory Seat and, in any event, it is located in Luxembourg and Portugal.

154. Article 1(b) of the Luxembourg BIT provides as follows:[106]

"The term "investors" means:

[…] b) companies, that is to say, any legal entity organized in accordance with the laws of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg and <u>having its seat</u> in the territory of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of <u>Luxembourg</u>, respectively […]."

155. The case with the Portuguese BIT is similar. Article I(1)(b) reads:[107]

"The term 'investor' means:

[…] b) Legal entities, including commercial companies and other companies and associations that <u>have their seat</u> in one of the Contracting Parties and are organized and operate in accordance with the law of that Contracting Party."

## 2
## 2.1 THE PARTIES' POSITION

156. The parties have submitted reports by experts in both Luxembourg Law and Portuguese Law regarding the subject of the seat:

- For Luxembourg Law, Tenaris has submitted a legal opinion by Prof. André Prüm, of the University of Luxembourg,[108] and the Bolivarian Republic has requested Prof. Alain Steichen, also of the University of Luxembourg, to prepare two legal opinions;[109]

---

[106] Underlined by the Tribunal.
[107] Underlined by the Tribunal.
[108] Opinion of January 23, 2015 ["**Prüm**"], para. 1.
[109] Opinion of October 17, 2014 ["**Steichen I**"], and opinion of April 13, 2015 ["**Steichen II**"].

- For Portuguese Law, the Claimants' expert is Prof. Dário Moura Vicente, of the University of Lisbon,[110] and the Respondent has submitted two opinions, by Profs. Pedro Maia and Tiago Duarte, of the University of Coimbra and the New University of Lisbon, respectively.[111]

<u>Venezuela's Position</u>

157.  According to Venezuela and its expert's opinion, the term "*sede social*" in Spanish or "*siège social*" in French should be interpreted in accordance with domestic Law. As per the Law of Luxembourg, *sede social* is to be an Effective Seat (or real seat)[112] and it corresponds with the central administration of the company.[113] And, as per Portuguese Law, "*sede*" corresponds with the Effective Seat, which is the place where the "brains" of the company are located.[114]

158.  The Respondent contends that Tenaris has failed to establish that, on the date when the dispute arose – November 2009 – it had its Effective Seat in Luxembourg,[115] which would disqualify it as a protected investor under the Luxembourg BIT; and that Talta has also failed to establish that it had its Effective Seat in Portugal,[116] and it would thus not be a protected investor under the Portuguese BIT.[117]

159.  In Venezuela's opinion, the Effective Seat, or real seat, of Tenaris is located in Argentina:[118]

- A quick Internet search reveals that Tenaris is the holding company for the Italian-Argentine Techint group, which is managed from Argentina;[119]

- Several directors of Tenaris reside in Argentina, and it is thus impossible for them to be making actual shareholder and Board decisions from Luxembourg;[120]

- The Argentine Republic espoused Tenaris' interests in an anti-dumping case before the WTO.[121]

160.  Talta is also alleged to have its Effective Seat in Argentina, as it is there that several of its board members reside.[122]

<u>The Claimants' Position</u>

---

[110] Opinion of January 27, 2015 ["**Moura Vicente**"], para. 3.
[111] Opinion of October 17, 2014 ["**Maia/Duarte I**"], and opinion of April 13, 2015 ["**Maia/Duarte II**"].
[112] RV, para. 56; T., p. 1275:3–9.
[113] RIV, para. 196. RII, para. 227.
[114] RIV, para. 196; RII, para. 225.
[115] RV, para. 62.
[116] RV, para. 81.
[117] RV, paras. 77 *et seq.*
[118] RI, para. 39; RIV, paras. 231-234; RV, paras. 93 *et seq.*; T., pp. 131–133. RV, para. 93.
[119] RI, p. 38.
[120] RV, para. 94; Exhibit R-113.
[121] The Respondent explains that, in order for the State of Argentina to decide to take up the claim and go to the WTO, there needs to exist a nationality connection between the private party and the State, RIV, paras. 231-234.
[122] RV, para. 94; Exhibit R-113.

161. Venezuela's argument that the term *"siège social"* or *"sede"* is to be interpreted in the light of domestic Law is, in the Claimants' opinion, entirely nonsensical. Because the terms are found in BITs, they are to be interpreted under international Law and the rules of the VCLT.[123] This interpretation leads to the conclusion that *"siège social"* and *"sede"* are synonymous with "Statutory Seat" or "registered office."[124] According to the articles of association of Tenaris and Talta, such seat is located in the cities of Luxembourg[125] and Funchal,[126] respectively.

162. But, even agreeing that the seat requirement is to be interpreted in the light of domestic Law, the answer would be the same:

163. (i) Under Luxembourg Law, *"siège social"* is equal to real seat, which is *iuris tantum* presumed to be the registered office, or Statutory Seat.[127] It is thus up to Venezuela to knock this presumption down and establish that Tenaris' effective seat is located elsewhere – which it has not managed to do because the real or Effective Seat of Tenaris is in Luxembourg:

- The only office Tenaris has anywhere in the world is a 905m$^2$ floor space at 29 on Avenue de la Porte-Neuve in Luxembourg,[128] as stated on Tenaris' official website;[129]

---

[123] T., p. 141:11–12; CIV, paras. 129, 155; CV, para. 148. RV, paras. 164-168.

[124] T., p. 141:13–15, CIV, paras. 136, 152-154; CV, para. 147.

[125] Tenaris S.A.'s Articles of Association, May 2, 2012, Exhibit C-197, pp. 2-1.

[126] CIV, para. 187.

[127] Luxembourg Company Law, Exhibit AP-6, Article 2(3); CIV, paras. 165-166; Prüm, paras. 35-41; T., p. 1358:1-4.

[128] The extract of the Luxembourg Registry of Commerce for Tenaris uses the same words as the Luxembourg BIT, stating that its *"siège social"* is located at 29 Avenue de la Porte-Neuve, Luxembourg. H 1, slide 114; CV, para. 150; Commercial Lease Agreement between Continental Real Estate Company and Ternium Investments S.à.r.l., October 1, 2010, Exhibit R-61, p. 2; Sublease Agreement between Ternium Investments Sàrl and Tenaris Investments Sàrl, December 6, 2010, Exhibit R-62, pp. 3, 8. Before 2011, Tenaris leased office space at its previous *"siège social"* in Luxembourg, at Avenue John F. Kennedy; Rent and Service Agreement between ATEAC Luxembourg and Tenaris, September 29, 2004, Exhibit C-159.

[129] Tenaris' website, Exhibit C-209; letter from Tenaris to the SEC, October 1, 2010, CRED-61; power of attorney granted by Tenaris, August 8, 2010, Exhibit C-121; Form 20-F for 2010 by Tenaris, Exhibit C-200.

-    Tenaris' shareholder meetings and board meetings are held at its Luxembourg office[130] and Tenaris' accounts are audited by PWC in Luxembourg.[131]

164. (ii) <u>Under Portuguese Law</u>, seat means "Effective Seat," which is the Statutory Seat, unless otherwise proven.[132] Venezuela has not established that Talta has its Effective Seat outside of Portugal, since, as a matter of fact, all relevant factors to determine its Effective Seat point to Portugal:[133]

-    Its managing bodies meet in Portugal;

-    Its ordinary day-to-day management takes place in Portugal;

-    Talta's contact data as provided by it to third parties feature Portugal;

-    Talta's corporate books are kept in Portugal.

## 2.2 DECISION OF THE ARBITRAL TRIBUNAL

165. In order for an ICSID tribunal to have *ratione personae* jurisdiction, it is necessary for the requirements laid down in Article 25 of the Convention and those established in the relevant BIT to be cumulatively satisfied. In the words of the *Phoenix* tribunal:[134]

> "At the outset, it should be noted that BITs, which are bilateral arrangements between two States parties, cannot contradict the definition of the ICSID Convention. In other words, they can confirm the ICSID notion or restrict it, but they cannot expand it in order to have access to ICSID. A definition included in a BIT being based on a test agreed between two States cannot set aside the definition of the ICSID Convention, which is a multilateral agreement. As long as it fits within the ICSID notion, the BIT definition is acceptable, it is not if it falls outside of such definition."

<u>The ICSID Convention</u>

166. Article 25 of the ICSID Convention governs the jurisdiction of the Centre and provides as follows:

> "(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State [...] and a national of another Contracting State [...].
>
> (2) "National of another Contracting State" means:
>
> [...]

---

[130] Minutes of Tenaris S.A.'s Ordinary Board of Directors Meeting, Exhibit C-193; Minutes of Tenaris S.A.'s Annual Shareholders' Meeting, Exhibit C-196; T., pp. 503:14–504:15; 218:13–19; Exhibit C-208, T., pp. 2150:18–2150:20; 2152–2153; 2054:1–2054:20.
[131] Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, May 23, 2012, Exhibit C-6, p. 5; Minutes of Tenaris S.A.'s Annual Shareholders' Meeting, Exhibit C-196, pp. 6-7.
[132] Decision of the Court of Appeals of Porto, March 25, 2010, DMV-22.
[133] CIV, paras. 189, 191; RV, paras. 161-163; CV, p. 379.
[134] *Phoenix*, para. 96.

(b) Any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration [...].

167. This provision thus bases the jurisdiction of ICSID tribunals on a <u>nationality</u> test: where the investor is a legal entity, as is the case here, its nationality needs to be different from that of the respondent State.[135] States are free to add additional requirements (not, however, to impose lesser requirements). The Convention thus uses nationality as a jurisdiction attribution factor.

168. In the instant case, neither Party has brought into question the fact that Tenaris and Talta have a nationality different from that of the Respondent and that Article 25 of the Convention has thus been complied with.

<u>The BITs</u>

169. Each of the BITs includes rules that are relevant to establish the Tribunal's *ratione personae* jurisdiction:

170. Article 1(b) of the Luxembourg BIT provides:

"The term 'investors' means: [...]

b) companies, that is to say, any legal entity organized in accordance with the laws of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of Luxembourg and <u>having its seat</u> in the territory of the Republic of Venezuela, the Kingdom of Belgium or the Grand Duchy of <u>Luxembourg</u>, respectively [...]."

171. And Article I(1)(b) of the Portuguese BIT confirms:

"The term 'investor' means: [...]

b) Legal entities, including commercial companies and other companies and associations that <u>have their seat</u> in one of the Contracting Parties and are organized and operate in accordance with the law of that Contracting Party."

172. The Parties are in disagreement as to whether the BITS merely require that the investor companies have their Statutory Seat in Luxembourg or Portugal (a legal requirement: the mere mention in the bylaws that the company's domicile is in that country, which is very clearly satisfied) or that they have their Effective Seat there (a factual requirement: the company's organs must manage the company's business from the territory of Luxembourg or Portugal):

- It is the Respondent's view that the BITs require an Effective Seat, and it argues that both companies have theirs in Argentina (not Luxembourg or Portugal);[136]

- On the other hand, the Claimants argue that their Effective Seat matches

---

[135] With the exception, pursuant to Article 25(2)(b) *in fine,* that the contracting parties have extended jurisdiction to legal entities subject to "foreign control."
[136] RIV, paras. 231, 234.

their Statutory Seat and, in any event, they are located in Luxembourg and Portugal.[137]

173. From a theoretical standpoint, the Tribunal will side with the Bolivarian Republic: it will arrive at the conclusion that the BITs require that the companies' Effective Seat (rather than just their Statutory Seat) be located in Luxembourg or Portugal (**A.**).

174. This theoretical conclusion having been established, the Tribunal will next analyze and assess the evidence provided by the Parties, and will find for the Claimants: Tenaris and Talta actually have their respective Effective Seats in Luxembourg and Portugal, as required by the applicable rules (**B.-E.**).

## A.    **The BITs require an Effective Seat**

175. The BITs use terms different from those used in Article 25 of the Convention: instead of referring to different nationalities, they focus on the cumulative satisfaction of two requirements:

-    The Luxembourg BIT requires that the claimant be a legal entity "organized in accordance with the laws of the Grand Duchy of Luxembourg" and "having its seat in the territory of the Grand Duchy of Luxembourg"; while

-    The Portuguese BIT requires (in virtually identical terms) that the claimant be "organized and operate in accordance with the Law" of Portugal and "have its seat" in Portugal.

### The Organization Requirement

176. The <u>first requirement</u> is then that the claimant companies "be organized" in accordance with the domestic law.[138]

177. Neither Party has questioned that Tenaris is organized in accordance with the law of Luxembourg, and Talta is organized in accordance with the law of Portugal. The requirement is then considered satisfied.

### The Seat Requirement

178. However, the BITs do not just require that the Claimants be organized in accordance with the domestic Law; they add, *expressis verbis,* a <u>second requirement</u>: that the "*sede*" of the legal entity be located in Portugal or Luxembourg.

179. Tenaris' bylaws state that the company's "*siège social*" is located in Luxembourg, and Talta's state that its *sede social* is located in Funchal. The respective provisions read:

---

[137] CIV, paras. 126 *et seq.*

[138] The Portuguese BIT adds "and operate," but this additional specification is redundant, as a company's operation is governed by the same legal system as its organization.

50

> *"Le siège social est établi à Luxembourg-Ville."*[139]

> *"A sociedade tem a sede social na Rua da Alfândega, número setenta e quarto – setenta e seis, segundo andar, sala H, freguesia da Sé, concelho do Funchal."*[140]

180. However, the BITs require that the "seat" be located in Portugal or Luxembourg, which brings up the question whether the Treaty is referring to the Statutory Seat or the Effective Seat (**b.**). Before delving into this question, however, it is first necessary to clarify the concepts of "seat, "Statutory Seat," and "Effective Seat" under international Law (**a.**).

### a. "Seat," "Statutory Seat," and "Effective Seat" under International Law

181. International Law does not have its own concept of "seat," let alone "Statutory Seat" or "Effective Seat." This terminology was developed within the various domestic Law systems, and it was only later on that it was brought into the realm of international Law. Therefore, in order to give the term some content, we need to resort to the generally-accepted rules under the different domestic legal systems (in the words of the International Court of Justice in *Barcelona Traction*)[141] or the "general principles of law recognized by civilized nations" (which are a source of international law under Article 38 of the Statute of the International Court of Justice).

182. In the Tribunal's opinion, these rules are not overly broad and come down to:

- The acknowledgment that there really is a difference between Statutory Seat and Effective Seat; domestic law systems generally distinguish the two concepts, even though they do not always attribute the same legal consequences to the existence of either one or the other type of Seat within their territory;

---

[139] Exhibit C-197.
[140] Exhibit C-186.
[141] *Barcelona Traction*, para. 50: *"It is to rules generally accepted by municipal legal systems which recognize the limited company whose capital is represented by shares, and not to the municipal law of a particular State, that international law refers."*

-  The principle that, upon a company being organized, only its Statutory seat is known, as it is the one stated on the company's bylaws (since the company will not yet have started its business operations from its Effective Seat), and

-  The conclusion that the Effective Seat matches the place where, in factual terms, the company's administration takes place.[142]

### b. The Correct Interpretation of the BITs

183.  The BITs refer to "seat," without specifying whether this means the investor's Statutory Seat or its Effective Seat.

184.  The practice when it comes to this issue in international investment treaties is varied. Certain treaties only require that the company that expects to enjoy the treaty's protection have been organized in accordance with the law of their national State.[143] On the contrary, other treaties establish additional requirements. An extreme case, for instance, is Article 1(1)(b) of the Treaty between Switzerland and the Slovak Republic,[144] which adds a two-fold requirement:

> "legal entities [ … ] which are constituted or otherwise duly organized under the law of that Contracting Party and have their seat, together with real economic activities, in the territory of that same Contracting Party."

185.  The BITs between the Bolivarian Republic and Luxembourg and Portugal, respectively, take a middle-of-the-road position: they do not merely require that the companies be organized in accordance with domestic Law, but also require that the companies have their "seat" in that State. How is the concept of "seat" to be interpreted?

186.  The BITs are international treaties and are to be interpreted in accordance with the rules of international Law. Moreover, the BITs do not include a *renvoi* for the terms "*sede*" and "*siege social*" (as opposed to the organization requirement), which reinforces the conclusion that the applicable interpretation criteria should be those of international Law.

187.  Article 31 of the VCLT orders that a treaty

> "be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

188.  The VCLT establishes three interpretation criteria:

---

[142] UNCTAD Series on issues in International Investment agreements, UNCTAD/ITE/IIT/11 (Vol. II), 1999, RLA 5 p. 39: *"The seat of a company may not be as easy to determine as the country of organization, but it does reflect a more significant economic relationship between the company and the country of nationality. Generally speaking, "seat of a company" connotes the place where effective management takes place."*
[143] For instance, the BITs signed by the Bolivarian Republic of Venezuela with the United Kingdom, of August 1, 1996 (Article 1(d)); with Canada, of July 1, 1996 (Article 1(g)), with Italy, of June 1990 (Article 1(2)(b)), among others.
[144] Which was the basis for the *Alps Finance* case, mentioned by the parties.

- <u>The ordinary meaning of terms</u>: the first interpretation criterion set forth in this provision is of little use here, since the concept of "seat" has several ordinary meanings, including, precisely, those of Statutory Seat and Effective Seat.

- <u>Context</u>: the "seat" requirement is preceded by a previous requirement, *i.e.* the "organization" requirement; a company intending to secure the BIT's protection must not just be organized in accordance with the relevant domestic Law but also have its seat in that State. The "seat" requirement is to be interpreted having regard to the fact that it is included in addition to the "organization" requirement.

- <u>Object and purpose</u>: this principle is closely connected to the *effet utile* principle,[145] the interpretation principle that requires that priority be given to that interpretation which gives meaning to each of the words used in the treaty over any other interpretation that would leave a word without application.[146]

189. Applying the last two interpretation principles, and in the light of the rules of international Law on the concept of seat – set out above, the necessary conclusion is that the concept of "seat" in the BITs cannot just refer to the Statutory Seat, in a formal sense, but must refer to the Effective Seat, the place where the company's corporate activity is really centralized. A failure to adopt this interpretation would render the BITs' requirement of a "seat" in addition to the place of "organization" superfluous: any company organized in Luxembourg or Portugal is legally required to have their bylaws state that its Statutory Seat is located in the respective territory. It is only by reading the BITs as referring the Effective Seat of the investor company that the term "seat" has its own meaning.

* * *

190. <u>To sum up</u>, the Tribunal concludes that, irrespective of the terminology used and the inaccuracies in the translation of these concepts, the references to *"sede"* (or *"siège social"*) in the BITs are to be read as references to the Effective Seats of the investor companies, the places where their corporate business is *de facto* managed.

---

[145] Which requires that Treaties be interpreted *"so as to give them their fullest weight and effect consistent with the normal sense of the words and with other parts of the text and in such a way that a reason and a meaning can be attributed to every part of the text."* Gardiner: *Treaty Interpretation*, Oxford University 2008, p. 149.
[146] Cassese, A.: *International Law*, Oxford University 2002, p. 143.

53

## B.   **Effective Seat Determining Factors**

191. The conclusion that the reference to a "seat" in the BITs is a reference to their Effective Seat having been established, there is still the *quaestio vexata* to be answered: what does Effective Seat mean?

192. As already noted, international Law does not have its own concept of "Effective Seat." To give the term content, it is not the domestic Law of a given jurisdiction that must be resorted to but the generally-accepted rules under the various municipal legal systems that must be used.[147] To do this, the Tribunal must recognize special relevance to the municipal legal systems that are more closely related to the case at hand: Luxembourg and Portuguese Law.

193. The experts in Luxembourg and Portuguese Law brought in by both Parties are in agreement that there are three factors in the two legal systems that define a company's Effective Seat:[148]

- The place where shareholder meetings and board meetings are carried out;[149] the place where they are held is relevant;

- The place where management tasks take place, the place where the company has contact with its clients,[150] where it signs its main contracts, and where its financial activities are carried out;

- The place where the company's books are kept and deposited;

194. Next, the Arbitral Tribunal will analyze the evidence produced by each Party in support of the Effective Seat of each Claimant.

## C.   **The Claimants' Evidence**

195. The Claimants have produced the following evidence to establish that the Effective Seats of Tenaris and Talta are located in Luxembourg and Portugal, respectively:

### a.   **Meeting of Management Organs**

196. As per Tenaris' bylaws, its annual shareholders' meeting is to be held in Luxembourg.[151] It has been established that, at the time Tenaris consented to arbitration, in 2009, and filed its Request for Arbitration, in 2012, Tenaris held its annual shareholders' meeting in Luxembourg, which is also its registered office, and it was also there that all meetings were held in the interim period.[152]

---

[147] See para. 181 *supra*.
[148] Steichen I, para. 21; Prüm, para. 44.
[149] Moura Vicente, para. 21.
[150] Maia/Duarte I, para. 121.
[151] Exhibit C-197, Article 15.
[152] CVI, Annex D.

197. As to Talta, it has filed minutes and extracts of decisions made at the meetings of its sole member (Tenaris), all of them held at its statutory seat in Madeira.[153]

198. As regards Board meetings, between 2009 and 2012, Tenaris has established that:

-    22 meetings[154] were held by telephone, as allowed under the law of Luxembourg, pursuant to which they are deemed to have been held in Luxembourg, its statutory seat;[155]

-    14 meetings[156] were held in person, eight of which were held in Luxembourg, with the remainder held in Mexico, Argentina, the U.S. or Italy – which, as explained by the Claimants, were the countries were Tenaris' stock was listed and where most of its subsidiaries' business was concentrated.[157]

199. Talta has also submitted minutes of the meetings of its *Conselho de Gerência*, always held in Madeira.[158]

### b.    Place of Business Management

200. As per the lease agreements, between 2004 and 2011, Tenaris leased office space in a business center on Avenue John F. Kennedy, Luxembourg;[159] since then, it has rented (and shares with another four subsidiaries) a 905 $m^2$ office space on Avenue de la Porte Neuve, in the City of Luxembourg, for close to EUR 34,000 in monthly rent.[160] Tenaris has stated it has no other office, other than its Luxembourg office, anywhere in the world.[161]

201. Talta has also demonstrated it leases space office[162] with the right to use a meeting room[163] for a monthly sum of EUR 875. It has also established that, of its four managers, two reside in Portugal and that binding Talta requires the signature of two managers, with at least one of them being Portuguese.[164]

---

[153] CVI, Annex B. Exhibit C-195.
[154] CVI, Annex C, pp. 5, 7, 9, 13, 17, 21, 25, 29, 31, 37, 41, 45, 49, 53, 55, 59, 61, 63, 65, 67, 69, 73.
[155] CVI, para. 22, Annex C. Prüm, para. 44.
[156] CVI, Annex C, pp. 1, 3, 11, 15, 19, 23, 27, 33, 35, 39, 43, 47, 51, 71.
[157] CVI, para. 22.
[158] CVI, Annex A, Exhibit C-194.
[159] Exhibit C-159.
[160] Exhibit R-61.
[161] CV, para. 150.
[162] Exhibit R-29.
[163] Exhibit R-49.
[164] Moura Vicente, para. 46. CIV, para. 191.

202. The letterhead on Tenaris' letters[165] and its website[166] use the statutory seat as contact information; the same is true of Talta.[167]

### c. Book-Keeping

203. Tenaris is on record with the Registry of Commerce of Luxembourg,[168] and its accounts are audited by PwC in Luxembourg.[169] Talta is registered with the *Registro Mercantil da Zona Franca de Madeira*, and the certificate issued by said registry's *Escriturário Superior* de la *Conservatória*[170] lists Talta's every entry from the time of its organization in 2003 up to the issue of the certificate in 2012, including appointments and removals of *gerentes*, the audit and deposit of its annual accounts, and the change of its physical seat to another site in Madeira.

### D. The Respondent's Evidence

204. On the other hand, the Respondent argues that the Claimants have their Effective Seat in Argentina, because:

- Argentina espoused the interests of Tenaris in an anti-dumping case before the WTO, which points to the existence of a significant connection between the Claimants and Argentina;[171]

- Most of Tenaris' employees are in Argentina;[172]

- Tenaris' President and CEO resides in Argentina, as do most members of its Executive Group and several members of its Board of Directors;[173]

- Two managers of Talta reside in Argentina.[174]

205. In Venezuela's opinion, the above facts point to the companies' Effective Seats being in Argentina; however, the Respondent has failed to submit any evidence that no activity at all is performed at the Statutory Seats.

206. As to the Claimants' evidence, the Bolivarian Republic argues that, far from proving that the members of Tenaris' Board physically met in Luxembourg,[175] such evidence rather establishes that most of the Board meetings took place outside of Luxembourg.[176]

---

[165] Exhibit C-121.
[166] Exhibit C-209.
[167] Exhibit C-120.
[168] Exhibit C-6.
[169] Exhibit C-6, p. 5.
[170] Exhibit C-8.
[171] RIV, para. 233.
[172] RIV, para. 249.
[173] RIV, para. 249.
[174] RV, para. 81.
[175] RVII, para. 28.
[176] RVII, para. 26.

### E.    <u>Assessment of the Evidence</u>

207. The Arbitral Tribunal has reviewed the evidence accompanying the experts' reports and is of the opinion that Portuguese Law does create a presumption that the Effective Seat matches the Statutory Seat. So is stated by Prof. Pinheiro,[177] whose opinion has been relied upon by both Parties' experts:[178]

> "Because the statutory seat is usually located in the country of organization, this means that, as regards these legal entities, the seat doctrine determines that, in principle, the place of the statutory seat and the place of the seat of administration match. This warrants a presumption that the company has the seat of its administration in the State of its statutory seat. Applying this presumption, in the absence of proof that the seat of administration is in a different State, the Law of the statutory seat applies."

208. The above said, the Tribunal has carefully analyzed and assessed the evidence provided by the Parties and concludes that it is not persuaded that Tenaris and Talta have its Effective Seat in Argentina, and it is its view that their Effective Seats match their Statutory Seats:

### a.    **Meeting of Management Organs**

209. There is no evidence that Tenaris' and Talta's management organs run the companies from Argentina:

210. Tenaris has submitted minutes that show that its shareholder meetings were held in Luxembourg,[179] and Talta, that its sole member held the meetings in Portugal; as to their Boards:

- In the four years between consent to arbitration and the Request for Arbitration, Tenaris' Board met 22 times via teleconference, 14 times physically; of these 14, 8 meetings were held in Luxembourg, 2 in Mexico and 1 in Argentina and 1 in the U.S.;[180] the evidence that links Argentina to Tenaris' Board meetings is minimal; the preponderance of the evidence points to the meetings being held in Luxembourg.

- Talta's Board always met in Portugal; there is no evidence pointing to a different place other than Portugal, as the effective seat of Talta's management.

211. Even though the Respondent argues that the President and CEO of Tenaris, Paulo Rocca, and other members of Tenaris' Board reside in Argentina, there is no evidence that the Board's decisions are made there, given the evidence that the Board's meetings took place mostly in Luxembourg, and that Mr. Rocca was present at all such meetings; in fact, the only three members that have ever participated in a meeting by teleconference are Messrs. Serra Puche,[181] Vogel[182]

---

[177] MD-24. Luís de Lima Pinheiro, *Direito internacional privado*, vol. II, *Direito de conflitos. Parte especial* (3° ed., Almedina, Coimbra, 2009), p. 135.
[178] MD-24; Moura Vicente, footnote 20.
[179] CVI, Annex D.
[180] See para. 198 *supra*.
[181] CVI, Annex C, pp. 1, 15, 71.

57

and Monti,[183] the former two being Mexican nationals and holding relevant offices in other Mexican companies, and joining the conference from Mexico, and Mr. Monti, who joined in from Italy.

212. Venezuela has also stated that the holding of Board meetings in ways other than by physical presence would in itself be an indication that Tenaris' administration was not being run from Luxembourg. The Arbitral Tribunal disagrees. The Respondent's own legal expert has acknowledged the validity of meetings held via telecommunication, under the law of Luxembourg.[184] And such domestic legal system applies a presumption that meetings held by telecommunication are deemed to have been held at the statutory seat.[185]

213. Even if this were not so, however, there is no evidence that would link Tenaris' actual administration precisely to Argentina.

214. And, as far as Talta is concerned, its bylaws require that all decisions binding the company be made by at least one of its two Portuguese managers – there is then no indication either that its decisions were made in Argentina.

**b.** **Place of Business Management**

(i)    Offices

215. There is no evidence that Tenaris or Talta occupy offices in Argentina, and there is evidence that they do so in Luxembourg and Portugal, respectively, as shown by the lease agreements.

216. However, Venezuela has called the relevance of the submitted evidence into question: the Republic notes that Tenaris' lease agreement was signed under the name of Ternium, with which Tenaris shares office space, and the 905 m$^2$ of leased space would be insufficient for a company the size of Tenaris.[186] As to Talta, Venezuela calls attention to the small size of the rented space and small number of hired staff.[187]

---

[182] CVI, Annex C, p. 15.
[183] CVI, Annex C, p. 35.
[184] Steichen II, p. 16.
[185] Article 64(bis)(3) of the Law of August 25, 2006 (AP-20): "A meeting held remotely by way of such means of communication shall be deemed to have been held at the seat of the company." [English translation.]
[186] RV, para. 64.
[187] RV, para. 81.

217. None of these arguments is persuasive:

- Tenaris and Ternium are two related companies (as Tenaris holds a 11.46% interest in Ternium),[188] both share the same 905 m² office space, which Ternium has partially subleased to the Tenaris group;[189] that the lease agreement is formally in Ternium's name, and that Tenaris Investment S.à.r.l. – a wholly-owned subsidiary of Tenaris[190] - acts as the sub-lessee does not undermine the conclusion that Tenaris' effective seat is in Luxembourg and matches its statutory seat.

- Talta is a holding company – as will be discussed below – and this is compatible with a small office space and a small number of staff.

(ii) <u>Employees</u>

218. The Respondent argues that most of Tenaris' employees are in Argentina.[191]

219. This argument is weak, as the (many) Argentine workers are hired by Siderca, an Argentine subsidiary of Tenaris, not by Tenaris itself.[192] The fact that a subsidiary with its own legal-entity standing, located in Argentina, has a large number of employees is irrelevant for the purposes of determining where its parent company's Effective Seat is located.

(iii) <u>Business Activity</u>

220. There is no evidence either that the business activity of Tenaris and Talta and their relations with their clients are run from Argentina. Both companies are holding companies and, as such, they manage their shareholding portfolio, but do not carry out business activities with clients. In their public information, both companies provide their Statutory Seat as contact information.

221. In particular, the Arbitral Tribunal disagrees with Respondent's expert Prof. Maia, who contends that Talta is not a holding company but a company engaged in iron trade. The expert bases his opinion on two incorrect arguments:[193]

222. (i) In the *relatório* of the business carried out in 2012, Talta states that its

---

[188] T., p. 603.
[189] Exhibit R-62.
[190] Exhibit C-200, p. 56.
[191] RIV, para. 249.
[192] CV, para. 157.
[193] T., pp. 1437 *et seq.*

"normal business is related to the trade of iron, residue, and hot-briquetted iron."[194]

223. However, the expert fails to take into consideration the fact that the *relatório* also states that Talta holds interests in eight companies[195] – all of them apparently related to the iron and steel industry – and that its sales are the result of brokerage in the purchase of goods between companies in the group.[196] This confirms that the company is a holding company engaged in iron trade through its investee companies.

224. (ii) In its registration certificate[197] Talta is categorized under the business code for purchase and trade of minerals and iron, whereas a holding company would appear under a different code; moreover, in order to be a holding company, it should be subject to the special regime of Decree-Law 2012/94.[198]

225. It is possible, as noted by the expert, that Talta does not meet the requirements set by Portuguese law in order to be registered as a holding company under Decree-Law 2012/94, but this is actually not the point: the point here is not to determine whether Talta has been formally registered as a holding company, but to verify whether it carries out business activities vis-à-vis third parties at a place other than its Statutory Seat. And the evidence on the record shows that Talta's business is limited to the holding of interests in other companies and a brokerage role in the purchase of goods between its investee companies, and there is no proof that these activities were performed outside its Statutory Seat.

(iv) Management

226. Venezuela stresses the fact that two of Talta's managers reside in Argentina.[199]

227. This is true. Talta has a Board consisting of four *gerentes*, two of whom are registered as residing in Argentina, while the other two reside in Portugal.[200] Those residing in Argentina are Group A managers, and the Portuguese managers are Group B managers. In order to bind Talta, the joint signature of one Group A and one Group B manager is required.[201] Therefore, the Arbitral Tribunal finds no indication that would point to the Effective Seat being in Argentina, rather than Portugal.

---

[194] Exhibit C-202. [English translation.]
[195] Dalmine S.p.A., Filettature Attrezzature Speciali Tubolari (FAST) S.r.L, Siprofer AG, Silcotub S.A., Energy Network S.r.L, Tenaris Qingdao Steel Pipes, Ltd, and Tenaris Qingdao Trading Limited.
[196] "[...] brokerage in the purchase of goods is carried out with related companies [...]," "[...] more than 99% of its trade receivables come from related companies."
[197] Exhibit C-8.
[198] T., p. 1446 (Maia).
[199] RV, para. 81.
[200] Exhibit C-8.
[201] Exhibit C-8, p. 7: "Form of obligation: by joint signature of Group A Manager and one Group B Manager."

(v)   Underline{Contact Information}

228.   In addition, in their relations with third parties, both Tenaris and Talta provide their offices in Luxembourg and Portugal as contact information.[202] The Respondent has not provided any evidence that shows that contact with third parties takes place in Argentina.

**c.   Company's Books**

229.   It is undisputed that Tenaris' and Talta's accounts are audited by Luxembourg and Portuguese companies, respectively. As regards Talta's accounts, as per its registration certificate, they are published on and deposited with the *Registro Mercantil da Zona Franca de Madeira*.[203]

* * *

230.   The Arbitral Tribunal concludes that it has not been established that Tenaris and Talta have their Effective Seats in Argentina; rather, the evidence points to their Effective Seats being in Luxembourg and Portugal, respectively, and, therefore, the Tribunal dismisses the objection to its *ratione personae* jurisdiction raised by the Bolivarian Republic.

---

[202] Exhibits C-120, 121, 209.
[203] Exhibit C-8.

3. **DEFECTS IN THE TAVSA NOTICE**

231. Article 9.1 of the Luxembourg BIT requires that:

> "Any dispute between an investor and the other Contracting Party concerning the application of this Agreement shall be the subject of a written notification, accompanied by a sufficiently detailed memorandum, from the investor."

232. As its last objection, Venezuela contends that the Arbitral Tribunal has no jurisdiction over the claims for the alleged breaches of the obligation to confer fair and equitable treatment to investments in connection with Tavsa, as this claim was not included in the Tavsa Notice, as required by Article 9.1 of the Luxembourg BIT.[204]

233. This argument need not be analyzed by the Arbitral Tribunal. Tenaris asserts its claim for unfair and inequitable treatment as a subsidiary claim to its main claim, which is the claim for Tavsa's expropriation. The Claimant has expressed this in very clear terms:[205]

> "To the extent this Tribunal concludes that Tenaris's investments in Tavsa have been indirectly expropriated and the Tribunal awards compensation using a valuation date of 30 April 2008, then Tenaris will have been made whole and it will not be necessary for the Tribunal to consider whether Venezuela has breached the fair and equitable treatment provision of the Luxembourg Treaty. If, however, the Tribunal uses a 2009 valuation date, it will be necessary for the Tribunal to consider whether Venezuela's measures following the enactment of the Nationalization Decree 6058 breached the fair and equitable treatment clause of the Luxembourg Treaty and if so, establish compensation at a date prior to Venezuela's breaches of that Treaty."

234. The Arbitral Tribunal is already in a position to say that its analysis of the merits of the case will be that Venezuela did indeed indirectly expropriate Tenaris' ownership in Tavsa. The main claim having been allowed, there is no need to address the subsidiary one.

---

[204] RIV, paras. 267-273.
[205] CV, para. 320.

62

# VI. **EXPROPRIATION**

235. The Claimants' main claim is that Venezuela has unlawfully expropriated Tenaris' investment in Tavsa (**2.**) and Tenaris' and Talta's investment in Comsigua (**3.**), in breach of Articles 4 and IV of the Luxembourg and Portugal BITs, respectively.

236. Prior to delving into the analysis of these claims, it is necessary to provide a detailed account of the facts of the case (**1.**).

## 1. FACTUAL BACKGROUND

237. The Arbitral Tribunal will now provide a brief summary on the Claimants (**A.**), their investment (**B.**), the allegedly expropriatory measures, (**C.**) and the takeover (**D.**).

### A. The Claimants

238. The Claimants are members of the Techint Group, an international conglomerate in the steel industry, consisting of several groups of companies, including Tenaris (the first Claimant) and Ternium S.A. ["**Ternium**"].

239. Tenaris is a Luxembourg company[206] listed on the main stock exchanges in the United States, Italy, Argentina, and Mexico.[207] Its business consists in the manufacturing of pipes, which it handles indirectly through many subsidiaries created in different countries. Two wholly-owned subsidiaries are relevant to this arbitration:

- Talta:[208] the second Claimant, and a company organized under the laws of Portugal.[209] Talta and, indirectly, Tenaris, hold a 7.58% shareholding in Comsigua – one of the two allegedly-expropriated companies.

- Tubos de Acero de México S.A. ["**Tamsa**"]:[210] a Mexican company, it was acquired by Tenaris and has a 70% shareholding in Tavsa[211] – the second allegedly-expropriated company.

---

[206] Extract of the Luxembourg Registry of Commerce and Corporations for Tenaris, May 24, 2012, Exhibit C-6.
[207] Tenaris S.A., 2014 Annual Report, Exhibit R-116, p. 31.
[208] Talta and, indirectly, Tenaris, also acquired a 50.2% interest in the stock of Orinoco Iron, Materiales Siderúrgicos S.A. (Matesi), another Venezuelan HBI producer.
[209] Permanent Certificate of Talta, May 18, 2012, Exhibit C-8.
[210] Shareholders Registry of Tamsa, July 6, 2012, Exhibit C-22.
[211] Certificate of Commercial Registry of Puerto Ordaz of CVG Tubos, November 23, 1998, Exhibit C-85, p. 8; Strategic Partnership Agreement, October 9, 1998, Exhibit C-19. Clause 2.1.

240. Then, Ternium, another Luxembourg company in the Techint Group, engaged in the production of steel, holds 59.7% of the stock of Sidor C.A. ["**Sidor**"], one of the leading Venezuelan iron and steel companies.[212]

241. The Claimants' corporate structure is as follows:[213]



Source: CI, p. 11, 14; RIII, p. 22.

## B. The Claimants' Investment

242. The Guayana region, in the south of Venezuela, is an area rich in natural resources, particularly iron ore.

### a. Tavsa

243. Between the 1970s and 1990s, the Guayana steel industry was in the hands of the State, more specifically of Corporación Venezolana de Guayana ["**CVG**"] and its subsidiaries.[214] In the 1990s, the Government of Venezuela began the process of privatizing the steel industry in that region.[215]

---

[212] Ternium 2007 Annual Report, CRED-52, p. 5.
[213] H 1, slide 10; H 2, slide 16, Hart I, figure 3-1; Ternium 2007 Annual Report, CRED-52, p. 5; Tenaris 2008 Annual Report, CRED-26, pp. 137, 149; Exhibits C-22, C 28, C 30.
[214] CI, para. 11.
[215] CI, para. 13.

244. The first companies to be privatized included a CVG subsidiary called CVG Siderúrgica del Orinoco, C.A. ["**CVG Sidor**"],[216] one of the largest iron and steel companies in Latin America.

245. CVG Sidor had two production lines: one for steel, and another one for seamless steel tubes. Because the production and sale of seamless steel tubes is a business closely connected to the oil business and independent of the global market for iron and steel products, the Government decided to split up the two business lines and privatize them separately:[217]

- The steel business was placed in the hands of Sidor, where Ternium became a shareholder,[218] Ternium being, along with Tenaris, one of the two groups of companies in the Techint Group.

- The production of seamless steel tubes was transferred to a new CVG subsidiary by the name of Tubos Industriales y Petroleros, S.A. ["**CVG-Tubos**"],[219] which was also privatized, and where Tamsa (a subsidiary of Tenaris, one of the Claimants) became the holder of a 70% interest. Once privatized, the company's name was changed to Tubos de Acero de Venezuela S.A. (**Tavsa**).[220]

246. Physically, Tavsa remained located within Sidor's premises, and Sidor provided it with all the necessary supplies in order for it to be able to manufacture the tubes, as done prior to the split.

247. The privatization of CVG-Tubos took place through a strategic partnership agreement ["**Partnership Agreement**"][221] executed on October 9, 1998 between CVG and Tamsa. In addition to transferring control from CVG, the Partnership Agreement required Tamsa to devise a plan for investments in Tavsa, divided into two phases:

- The modernization program (Phase I): Phase I consisted in modernizing Tavsa's plant an increasing its production capacity to 65,000 tons per year in a period of 24 months.[222] Phase I investments were estimated at USD 25 to 30 million.[223] On October 18, 2000, Tavsa notified CVG that its plant capacity had increased to 65,000 tons, and it thus considered its Phase I obligations fulfilled.[224]

---

[216] Exhibit C-16.
[217] Strategic Partnership Agreement between CVG and TAMSA, October 9, 1998, Exhibit C-19, clause 1.1 (2).
[218] CI, para. 15.
[219] Exhibit C-18.
[220] Certificate of Commercial Registry of Puerto Ordáz of CVG Tubos, November 23, 1998, Exhibit C-85, pp. 3, 9, 26; Tavsa's Articles of Incorporation, Exhibit C-34.
[221] Strategic Partnership Agreement, October 9, 1998, Exhibit C-19, clause 2.1.
[222] The modernization program consisted in improving the efficiency of CVG-Tubos, increasing its production capacity up to 65,000 metric tons of finished tubes. See Exhibit C-19, clause 2.1 Definition of Modernization Program.
[223] Strategic Partnership Agreement, October 9, 1998, Exhibit C-19, clause 3.2.
[224] Letter from Tavsa to CVG, October 18, 2000, Exhibit C-157, p. 1; Tavsa 2000 Financial Statements, CLEX-8, p. 39; Minutes of Tavsa's Board of Directors' meeting, April 11, 2001, Exhibit C-221, p. 1; Exhibit R-12. H 1, slide 13.

- The expansion program (Phase II): Phase II was set to commence after 18 months from the execution of the Partnership Agreement, provided that both parties reached an agreement within a period of 90 days; the failure to reach an agreement would result in its cancellation.[225] On April 11, 2001, CVG and Tamsa decided to cancel Phase II, as the conditions precedent had not been fulfilled and because the market conditions did not justify those investments.[226] Phase II was never implemented.[227]

248. Between 2002 and 2005, Tenaris acquired 100% of Tamsa's stock,[228] and, therefore, Tamsa's 70% shareholding in Tavsa.

**b. Comsigua**

249. Comsigua is one of the leading Venezuelan producers of hot-briquetted iron ["**HBI**"], which is used as a supply in steel production. It was created in the late 1980s as a joint venture between a Japanese company (Kobe Steel Limited) and CVG Ferrominera Orinoco C.A., another CVG subsidiary. Initially, its shareholders also included other investing companies of various nationalities,[229] which would later on progressively leave the project.

250. In 1995, Comsigua opened up to new investors, and this is how it was joined by Tamsa (a Tenaris subsidiary) with a 6.92% interest.[230] In 2007, Tamsa transferred to Talta (another Tenaris subsidiary and a co-claimant in this arbitration) its shares in Comsigua.[231]

251. Almost at the same time as Tamsa acquired its interest in Comsigua, there were other inward and outward changes in its shareholding structure: two of its initial investors assigned their stock to Kobe Steel Limited and another three Japanese companies [collectively, "**Japanese Shareholders**"].[232] Two years later, another investor left. And, finally, in May 2007, the last one of those investors left.[233]

---

[225] Partnership Agreement, Exhibit C-19, clause 4.2.2.

[226] Minutes of Tavsa's Board of Directors' meeting, April 11, 2001, Exhibit C-221, p. 11; H 1, slide 18; CLEX-8, p. 57.

[227] Minutes of Board of Directors' meeting, April 11, 2001, Exhibit C-221, pp. 1, 11; Tavsa 2000 Financial Statements, Exhibit CLEX-8, p. 57.

[228] See Tenaris 2002 Annual Report, March 6, 2003, Exhibit C-20, p. 62; Tenaris 2003 Annual Report, March 2, 2004, Exhibit C-21, p. 120; Shareholders Registry of Tamsa, July 6, 2012, Exhibit C-22, p. 1.

[229] The other companies that participated in this agreement were: Oregon Steel Mills, with 13.84%; Hanbo Steel Co. Ltd., with 13.84%; Acciaierie e Ferriere Lombarde Falck S.p.A., with 6.92%; International Finance Corporation, with 8.70%; Comsigua Project Shareholders' Agreement, June 14, 1995, Exhibit C-40, Article 2.1(f); Addendum to the Comsigua Project Shareholders Agreement, Exhibit C-82.

[230] Comsigua Project Shareholders' Agreement, June 14, 1995, Exhibit C-40, Article 2.1(f); Addendum to the Comsigua Project Shareholders Agreement, Exhibit C-82.

[231] Acknowledgement and Consent to the Transfer of Shares and Assignment of Contracts from Tamsa to Talta, March 16, 2007, Exhibit C-41, Article 1(a). Tenaris had acquired 100% of Talta, see Tenaris 2004 Annual Report, CRED-20, p. 136.

[232] RIII, paras. 25, 26.

[233] See Comsigua Financial Statements as of December 31, 2007 and 2008, September 8, 2009, Exhibit C-42, pp. 46, 47. C-42Bis, pp. 46, 47.

252. Comsigua's shareholding structure was thus in the hands of:[234]

  - <u>Private investors</u>: four Japanese Shareholders (who, in spite of not holding a majority position individually,[235] together added up to 73.37%) plus Talta, with its 7.58% interest.

  - <u>A State company</u>: CVG Ferrominera Orinoco C.A., with its 19.05% interest.

## C. <u>The Nationalization of the Guayana Iron and Steel Sector</u>

253. The expropriation of Tavsa and Comsigua took place, according to the Claimants, through the takeover of the two companies as part of the process for the nationalization of the entire iron and steel sector in the Province of Guayana, formalized through two Decrees: No. 6058 (**a.**) and No. 6796 (**b.**).

### a. Decree 6058

254. On April 30, 2008, the then-President of the Republic, Hugo Chávez, issued "Decree No. 6058 with the rank, value and force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region,"[236] whereby the iron industry in the Guayana region was reserved to the State of Venezuela ["**Nationalization Decree**"]:

> "Article 1. For reasons of national convenience and in light of its relation to activities that are strategic for the development of this Nation, the iron ore transformation industry in the Guayana region is hereby reserved to the State, as this is an area holding the largest iron deposit, the exploitation of which has been reserved to the State since 1975."

255. In addition, the Nationalization Decree also transformed business company Sidor and its subsidiaries and affiliates ["**Affected Companies**"] into State-owned companies:

> "Article 2. There is hereby ordered the transformation of business company SIDOR C.A., its subsidiaries and affiliates into State-owned companies in accordance with the provisions of Article 100 of the Organic Law on the Public Administration, with a State shareholding of no less than 60% of its capital stock."

256. The activities of the Affected Companies were declared to be public-use and social-interest activities:

> "Article 3. As a consequence of the order in Article 1, there are hereby declared to be of public use and social interest the activities carried out by

---

[234] RIII, p. 17.
[235] The one with the largest interest was Kobe Steel Limited, at 35.48%.
[236] Decree No. 6058 with the rank, value and force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region, April 30, 2008, published in Official Gazette No. 38,928, May 12, 2008, Exhibit C-50.

business company SIDOR C.A. and its subsidiary and affiliate companies, as well as the works and services required to perform such activities."

257. The State declared itself the holder of the stock of the Affected Companies:

"Article 4. Through the Ministry of the People's Power for Basic Industries and Mining or any of its functionally-decentralized entities, the Republic shall hold the public sector's shareholding in the new State-Owned Companies created as a result of the transformation referred to in Article 2 […]."

258. Within a period of seven days, there would be created a commission to join the board of the Affected Companies:

"Article 5. The Republic […] shall establish, within the seven days following publication of this Decree […] a Transition Commission at the companies referred to […], which shall be incorporated into the current board of SIDOR C.A., for the purpose of guaranteeing the transfer of control of all of their activities to the State-owned companies. This transfer process shall conclude on June 30, 2008. […]."

259. And another commission would be established in order to agree on the fair price and the terms and conditions of the potential shareholding:

"Article 7. A Technical Commission shall be established, composed of representatives of the State and the private parties involved, for the purpose of agreeing upon the fair price to be paid, to operate for a period of sixty (60) consecutive days extendable by mutual agreement."

"Article 6. The private sector entities that are currently shareholders in the iron and steel sector corporations mentioned in article 2 shall be given a period of sixty (60) consecutive days, as from the date of publication of this Decree with the Rank, Value and Force of Organic Law in the Official Gazette of the Bolivarian Republic of Venezuela, in order to agree upon the terms and conditions of their possible shareholding in the new State-owned companies."

260. Following 60 days without an agreement being reached for the transformation of the Affected Companies into State-owned companies, the Republic would take over control and the exclusive operation of the Affected Companies, ordering the expropriation of their shares, pursuant to the Law on Expropriation by Reason of Public or Social Interest ["**LECUPS**"], providing for payment of compensation:

"Article 8. Upon expiry of the period established in Article 6 without an agreement for the transformation into a State-owned company having been reached, the Republic […] shall assume control and the exclusive operation of the companies, for the purpose of maintaining continuity in the activities carried out by the companies referred to in Article 2.

In the event that no agreement is reached for the transformation into State-owned companies, the National Executive Branch shall decree the expropriation of the aforementioned shares, pursuant to the provisions of the Law on Expropriation by Reason of Public or Social Interest. For the calculation of compensation or the fair price of the abovementioned assets, in no event shall lost profits or indirect damages be taken into account."

261. On May 21, 2009, the President of the Republic explicitly announced the nationalization of Tavsa and Comsigua, in the following words:[237]

"The hot briquetted-iron sector, nationalize it. There is nothing to be discussed. The company [...] Comsigua, [...] Tubos Tavsa – nationalize them."

262. The President's words were followed, on May 25, 2009, by the establishment of two commissions in charge of taking over control of Tavsa[238] and Comsigua[239] and guaranteeing their transition into state-owned companies ["**Takeover Commissions**"], which had been created under the Nationalization Decree.

263. On May 29, 2009, Tenaris expressed its opposition to Tavsa's nationalization, notwithstanding which it stated it would cooperate in the transition process, and appointed its representatives.[240]

**b.    Decree 6796**

264. On July 14, 2009, soon after the Takeover Commissions were set up, President Chávez issued Decree No. 6796 ["**Implementing Decree**"], completing the Nationalization Decree:[241]

"Whereas,

by means of Article 1 of the [Nationalization] Decree [...] the iron ore transformation industry in the Guayana Region was reserved to the State."

265. Even though the Nationalization Decree provided that the Affected Companies would become state-owned (Article 4), the Implementing Decree implemented this order in a slightly different manner: the State would not be acquiring title to the shares, but title to the assets of the Affected Companies [ "**Expropriated Assets**"] instead; the shareholders would thus remain the formal owners of the

---

[237] Aló Presidente video of May 21, 2009, *"Taller de trabajo hacia la transformación socialista de las empresas básicas Ciudad Guayana, estado Bolívar"*: *"El sector briquetero, nacionalícese. No hay nada que discutir. La empresa [...] Comsigua, [...] Tubos Tavsa – nacionalícense,"* Exhibit C-218; *"Chávez nacionaliza varias empresas metalúrgicas,"* El Universal, May 22, 2009, Exhibit C-56; Witness Statement of Javier Martínez Álvarez, para. 44.
[238] Letter No. 230/09 from Minister of Industry Rodolfo Sanz to Tavsa, May 25, 2009, Exhibit C-58. [It was indeed based on Decree 6058 -Tavsa: "In my capacity as Minister [...] and on the basis of Decree No. 6058 [...] transition committee [...] Tavsa."
[239] See Letter No. 233/09 from the Minister of Industry, May 25, 2009, Exhibit C-57. "Based on Decree No. 6058 [...] and pursuant to the President's decision to proceed with the full statization of Complejo Siderúrgico de Guayana S.A. (Comsigua), I have appointed the following individuals to the transition Committee [...]."
[240] Letter from Tenaris to the Minister of Industry, May 29, 2009, Exhibit C-60; Martínez Álvarez, para. 50.
[241] First whereas clause: "Whereas, by means of Article 1 of the Decree with the Rank, Value and Force of Organic Law on the Organization of Companies Operating in the Iron and Steel Sector in the Guayana Region, the iron ore transformation industry in the Guayana Region was reserved to the State."

stock, while the Expropriated Assets, which are the underlying basis of the business activity, would be acquired by the State:

> "Article 1: Article 1: <u>There is hereby ordered the acquisition of the assets of business companies</u> […] Complejo Siderúrgico de Guayana S.A. (Comsigua), […] Tubos de Acero de Venezuela S.A. (Tavsa), their subsidiaries and affiliates domiciled in the national territory, whose purpose relates to the transformation of iron ore, with the aim of transforming them into State companies […]."[242]

266. A commission would be created for each company, to join their Boards in order to immediately take over their operations:

> "Article 3. On the day following the date of publication of this Decree in the Official Gazette of the Bolivarian Republic of Venezuela, the Bolivarian Republic of Venezuela shall establish a Transition Commission for each of the companies referred to in Article 1, as applicable, to join the existing Boards of each such company, immediately taking over operational control, in order to guarantee the transfer and continuation of the company's activities […]."

267. The forced acquisition of the Expropriated Assets entitled the shareholders of Tavsa and Comsigua to monetary compensation. In order to agree on such compensation – called the *justiprecio* – there would be created a specific commission for a period of 60 days (which could be extended for another 60 days), consisting of representatives of the State and the shareholders:

> "Article 4. There shall be created a Technical Commission, consisting of representatives of the State and the private parties involved, in order to agree on the fair price, set to work over a period of sixty (60) consecutive days, which period may be extended by mutual agreement for another sixty (60) consecutive days."

268. Once said period had expired without an agreement having been reached, the Republic would take over control and operation of the "companies" (consisting of the Expropriated Assets), under LECUPS, paying a fair price:

> "Article 5. Upon expiry of the period established in the preceding article without an agreement for the transformation into a State-owned company having been reached, the Bolivarian Republic of Venezuela, acting through the Ministries or any of its functionally-decentralized entities, referred to in Article 2 hereof, shall assume, as applicable, the exclusive control and operation of the companies, in order to maintain continuity in the activities carried out by the companies referred to in Article 1.
>
> In the event that no agreement is reached in the negotiations over the assets, the National Executive Branch shall decree the expropriation of said companies, pursuant to the provisions of the Law on Expropriation by Reason of Public or Social Interest. In no event shall lost profits or indirect

---

[242] Underlined by the Tribunal.

damage be taken into account for the calculation of compensation or the fair price of the aforementioned assets."

269. The entity that carried out the forced acquisition of the Expropriated Assets was PDVSA Industrial S.A. ["**PDVSA Industrial**"], a subsidiary of PDVSA.[243] This was done pursuant to the provisions of the Implementing Decree:

- <u>Takeover Commissions</u>: On July 27, 2009, a new Takeover Commission was set up at Comsigua,[244] and an identical commission was set up at Tavsa on August 7, in charge of taking control on behalf of Venezuela.[245]

- <u>TAVSA Compensation Commission</u>: On August 7, 2009, there was set up Tavsa's Technical Commission,[246] whose members were given a period of 60 days, which could be extended for another 60 days, to set the compensation. On August 17, 2009 Tenaris confirmed its representatives.[247] On October 28, 2009, PDVSA Industrial asked for a deadline extension to set compensation; the deadline was moved to December 29, 2009.[248]

- <u>Comsigua Compensation Commission</u>: For Comsigua, the Compensation Commission in charge of negotiating the amount of compensation was not appointed until October 8, 2009.[249] The following year, on June 18, 2010, there was created a new commission in charge of negotiating the acquisition of the interests in Comsigua and another three companies.[250]

---

[243] Larez, para. 3. Petróleos de Venezuela S.A (PDVSA) is a corporation created by the State of Venezuela in 1975.

[244] Comsigua Share Transfer Agreement, May 20, 2011, Exhibit C-72, Clause 9.1.

[245] Tavsa's transition commission consisted of the five members of the initial commission (see para. 258), along with additional members from PDVSA Industrial. See letter from PDVSA to Tavsa, August 7, 2009, Exhibit C-69; Exhibit R-58.

[246] Letter from PDVSA to Tavsa, August 7, 2009, Exhibit C-69. Tenaris ratified its representatives at the technical commission provided for in Article 7 and Article 4 of Decrees 6058 and 6796, respectively. See letter from Tenaris to PDVSA Industrial, August 17, 2009, Exhibit C-70, pp. 1-2; Álvarez, para. 58. Later on, on May 3, 2010, Tenaris added a number of members to the technical commission. See letter from Tenaris' José Frías to the Ministry of Industry, May 3, 2010, Exhibit C-150.

[247] Exhibit C-70.

[248] T., pp. 688:11–689:3 (Larez); CV, para. 63. Action Memorandum from L. Pulido (PDVSA Industrial) to R. Ramirez (PDVSA), October 28, 2009, Exhibit R-51.

[249] Minutes of meeting of Transition Commission, October 8, 2009, Exhibit R-46.

[250] H 1, slide 50; Exhibit R-105; T., p. 66, Letter No. 275/10 from Minister Khan Fernández (MIBAM) to Vice Minister I. Hernández, June 18, 2010, Exhibit R-105. In charge of negotiating the acquisition of commercial companies Venezolana de Prerreducidos del Caroní C.A (VENPRECAR), Comsigua and Matesi and their subsidiaries or affiliates, all companies related to the iron industry and relevant in the transformation process.

### D. Takeover of the Expropriated Assets

270. In compliance with the Nationalization and Implementing Decrees, the Bolivarian Republic did take control of the Expropriated Assets whose forced acquisition had been decided upon. However, takeover took place differently at each of the two Affected Companies, Tavsa (**a.**) and Comsigua (**b.**)

### a. Tavsa

271. On November 16, 2009, PDVSA Industrial (acting on behalf of the Republic) took control of Tavsa's management and operations, and all Expropriated Assets belonging to said company were handed over.[251] The State thus formally fulfilled the order in Article 1 of the Implementing Decree, for the forced acquisition of the Expropriated Assets.

272. It is undisputed that Venezuela has not paid any compensation at all for the expropriation of Tavsa's assets.

### b. Comsigua

273. For Comsigua, the forced acquisition of the Expropriated Assets took place on June 17, 2011, when the State, through an administrative decision, appointed the company's new President, and Comsigua's management – which used to be in private hands – was now occupied by new managers appointed by the Government.[252] At that moment, Comsigua's Expropriated Assets were placed at the State's disposal, and the State then took control of the company's business activity.

274. As regards compensation, facts are a little more complicated than they are for Tavsa, as certain shareholders have actually been paid compensation.

275. *Pro memoria*, Comsigua's private shareholders were, basically, two: three Japanese Shareholders, on the one hand, and Talta, on the other.

276. The Compensation Commission created under the Nationalization and Implementing Decrees soon split up to negotiate with the Japanese Shareholders and Talta separately.[253] The outcome of those negotiations was mixed:

- The Japanese Shareholders were successful in their negotiations, and reached a compensation agreement with the Venezuelan State, which the parties formalized in the form of a "share assignment agreement." The compensation reached USD 200 million.[254]

---

[251] Record of the Transfer of exclusive Control and Operation of Commercial Company Tavsa, Tubos de Acero de Venezuela S.A., November 16, 2009, Exhibit C-71, p. 4.
[252] Exhibit R-64.
[253] Exhibit R-41; Exhibit R-46; CRED-59.
[254] Comsigua Share and Asset Assignment Agreement, May 20, 2011, Exhibit C-72, clauses 1.1, 3. T., p. 65. H 1, slide 49.

-   However, in spite of engaging in negotiations with the State, Talta/Tenaris did not reach an agreement and have been paid no compensation.

\* \* \*

277. The factual background thus narrated, the Arbitral Tribunal will now analyze the parties' position as regards the expropriations of Tavsa (**2.**) and Comsigua (**3.**), and will then state its decision (**4.**).

## 2.    THE PARTIES' POSITIONS REGARDING TAVSA

278. It is a fact that Venezuela expropriated Tavsa's assets. The only disputed issue between the Parties is whether such expropriation breached Article 4 of the Luxembourg BIT,[255] which provides as follows:

> "1. Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization or any other measure with the effect of directly or indirectly dispossessing the investors of the other Contracting Party of the investments belonging to them in its territory, unless the following conditions are fulfilled:
>
> a) the measures are adopted for reasons for public purpose or national interest;
>
> b) the measures are adopted in accordance with legal procedures;
>
> c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;
>
> d) they are accompanied by provisions for the payment of adequate and effective compensation.
>
> 2. The amount of the compensation shall correspond to the real value of the investment concerned on the day prior to the adoption or publication of the measures.
>
> The compensation shall be paid in convertible currency. It shall be paid without undue delay and shall be freely transferable. Interest shall be paid at the normal commercial rate from the date of its determination to the date of payment.
>
> [...]."

### A.    The Claimants' Position

279. The Claimants argue that, pursuant to Article 4.1(b) of the Luxembourg BIT, expropriation measures must be taken "in accordance with legal procedures;"[256] this obligation requires observing the domestic Law procedures (**a.**). [257] Article

---

[255] CIV, para. 194. The Parties are not in agreement either as to the compensation that is due; that, however, is a matter to be discussed in a specific section.
[256] Exhibit C-1bis, Article 4(1)(b).
[257] CV, paras. 204 *et seq.*

4.1(c) and 2 requires that the State pay compensation upon expropriation (**b.**). According to the Claimants, both requirements have been disregarded in this case.

### a. Breach of Venezuelan Law

280. In the Claimants' opinion, the Respondent's expropriation measures breached the following instruments of Venezuelan law:

- The 1999 Constitution of the Bolivarian Republic of Venezuela ["**Constitution**"] and LECUPS (**i.**);

- The Nationalization Decree (**ii.**); and

- The Implementing Decree (**iii.**).

(i)   The Constitution and LECUPS

281. The Claimants argue that Venezuela breached Article 115 of the Constitution and Article 2 of LECUPS,[258] as it physically took over Tavsa's assets without enforcing a final judgment and without paying fair compensation.[259] And it does not seem to intend to do so since, as of today, Venezuela has yet to complete the expropriation and compensation procedure, even though more than seven years have elapsed since the issue of the Nationalization Decree and the Forced Acquisition of Tavsa's Assets.[260]

(ii)   Nationalization Decree

282. Venezuela did not follow the procedures provided for in the Nationalization Decree:[261]

- It failed to set up the Takeover Commission for Tavsa within the period prescribed in Article 5 (May 19, 2008), only doing so a year later: May 25, 2009;[262]

- It failed to transfer control of Tavsa's activities to the State on the date prescribed in Article 5, *i.e.* June 30, 2008;[263]

- It failed to set up the Compensation Commission in charge of negotiating the fair price for Tavsa's nationalization provided for in Article 7;[264]

- It failed to follow the expropriation procedure prescribed in LECUPS, as required in Article 8:[265] it did not order the formal expropriation of Tavsa's

---

[258] CIV, para. 220; CV, para. 209.
[259] CIV, para. 220; H 1, slides 73, 74.
[260] Exhibit C-71.
[261] CIV, para. 224.
[262] CI, para. 135; CIV, para. 224 (a); CV, paras. 52, 90, 211(a); Exhibit C-57 (Comsigua); Exhibit C-58 (Tavsa).
[263] Exhibit C-50, Article 5.
[264] CV, para. 211.
[265] Exhibit C-50, Article 8.

shares upon the failure to reach an agreement within a period of 60 days.[266]

(iii)  Implementing Decree

283.  According to the Claimants, the Respondent also failed to comply with the provisions of the Implementing Decree:

-  It failed to set up the Takeover Commission within the period prescribed in Article 3: July 15, 2009;[267]

-  The Government unilaterally extended the period for Tavsa's Compensation Commission to December 29, 2009, without Tenaris' agreement, and it formally took control of the assets prior to the expiration of such period (November 16, 2009);[268]

-  The period set for Tavsa's Compensation Commission having expired without an agreement having been reached on the subject of fair price, Venezuela failed to comply with Article 5, as it did not commence court expropriation proceedings.[269]

### b.  Failure to Pay Compensation

284.  It is undisputed that Tenaris never received any compensation at all for the expropriation of Tavsa's assets.

285.  The Claimants contend that the mere constitution of a commission and the establishment of a negotiation process are not enough to discharge the obligations provided for in the Luxembourg BIT:

-  Venezuela is required to try to reach an agreement on the compensation due; in this case, PDVSA Industrial, which was appointed to represent Venezuela in the negotiations, refused to meet with Tenaris' legal representatives,[270] in spite of their attempts to reach an agreement;[271]

-  The BIT requires payment of compensation which, in addition, needs to be adequate; Venezuela never set out to pay adequate compensation, as it made no provision to cover lost profits.[272]

286.  Not only does the failure to pay compensation breach Venezuela's domestic rules on the subject; it also violates Articles 4.1(d) and 4.2 of the Luxembourg BIT, which require that the State pay "adequate and effective" compensation "without undue delay."[273]

287.  The Claimants bring up decisions by previous arbitral tribunals that found that

---

[266] Exhibit C-68, Article 1
[267] CV, para. 212 (a).
[268] CV, para. 212 (b).
[269] Exhibit C-68; CIV, para. 228.
[270] CV, para. 86.
[271] CIV, para. 213.
[272] CIV, para. 212.
[273] CV, para. 199.

the failure to pay compensation renders expropriation unlawful: *Burlington*,[274] *Siemens*,[275] and *ConocoPhillips*;[276] as well as *OI European*, where the tribunal found that, as there was no plausible explanation, a delay of over four years – in the case at hand almost eight years have elapsed – in paying compensation entails the nonfulfillment of the requirement to pay compensation without undue delay.[277]

## B.    The Respondent's Position

288. Venezuela acknowledges having expropriated Tavsa's assets but contends no unlawful expropriation claims, as put forth by Tenaris, are in order.[278] According to the Respondent, the expropriation was done according to Law (**a.**) and, in addition, it also satisfied the requirements of the Luxembourg BIT as regards payment of fair compensation (**b.**).

### a.    Compliance with the Law

289. The Respondent denies any violation of Venezuelan Law (**i.**) or international Law (**ii.**) in the course of the expropriation.

#### (i)    Venezuelan Law

290. As per the Bolivarian Republic's claims, Tavsa's expropriation was done under the Nationalization Decree, as supplemented by the Implementing Decree:[279]

- The Nationalization Decree refers generally to Sidor's subsidiaries but, because it does not expressly mention Tavsa, it had no direct effects on it;

- By contrast, the Implementing Decree contains the supplementary provisions through which the nationalization of Sidor's subsidiaries could be carried out, including Tavsa, which is expressly mentioned in this second Decree.[280]

291. The Respondent denies that the Decrees violate any Venezuelan law provision: Article 8 of the Nationalization Decree allowed the occupation of Tavsa's assets prior to completion of the judicial expropriation proceedings, in order to ensure continuity in the companies' operations. It is the Bolivarian Republic's contention that Article 8 of the Nationalization Decree is valid, as its contents actually amount to an interim measure, as recognized by Venezuelan court decisions.[281] And such interim measure is compatible with:

---

[274] The tribunal found that Ecuador's failure to pay compensation to Burlington for its expropriatory actions did, by itself, render the expropriation unlawful, *Burlington*, paras. 543-45.
[275] The tribunal found that no compensation had been paid, and the expropriation did not satisfy the requirements of the applicable treaty and, therefore, it was unlawful, *Siemens*, para. 273.
[276] The tribunal found that a State's compensation offer that is inconsistent with the criterion laid down in the investment treaty renders the expropriation unlawful, *ConocoPhillips*, paras. 398-401.
[277] *OI European,* paras. 422-426.
[278] RV, para. 131.
[279] RIII, para. 283.
[280] RIII, para. 287.
[281] RV, para. 132; RIV, paras. 285-286.

- The constitutional guarantee, as the interim measure will end upon completion of the expropriation proceedings with the issue of a court judgment;[282] and, in any event, the alleged unconstitutionality of the interim measure should have been raised before the Venezuelan court system, which was not the case; therefore, as long as it is not ruled unconstitutional, the mechanism laid down by the Nationalization Decree stands fully valid and compliance with it is mandatory;[283]

- The LECUPS regime, as the regime established by the Nationalization Decree, which has the rank of an organic law and is more specific on the subject, prevails.[284]

(ii)  International Law

292.  The Respondent argues that Tavsa's nationalization procedure complied with the due process requirements under international Law:

- Tenaris was notified sufficiently in advance: the Government's intention to take control of Tavsa's assets was stated both in the Implementing Decree and, even earlier still, in Letters Nos. 233/09 and 230/09;[285]

- Tenaris was afforded the right to be heard: Tenaris itself acknowledges as much when claiming to have participated in Tavsa's Takeover and Compensation Commissions;[286]

- Even though Tenaris could have exercised the administrative and judicial remedies available to it under Venezuela's domestic law, it chose not to do so.[287]

293.  Venezuela admits that the process extended beyond the time periods provided for in the Nationalization Decree, but explains that such extension was justified by the complexity of the matters at issue, in addition to delays attributable to Tenaris itself.[288] In any event, Venezuela argues that these minor violations of its domestic Law do not amount to an internationally wrongful act.[289]

**b.  Fair Compensation under the BIT**

294.  The Bolivarian Republic denies that the failure to pay compensation does, *per se*, render the expropriation unlawful,[290] as argued by Tenaris. From the

---

[282] RIV, para. 285-287; RV, para. 132.
[283] RIV, para. 287.
[284] RIII, para. 286.
[285] Letter from PDVSA Industrial to Tavsa, August 7, 2009, Exhibit C-69. RIII, para. 316.
[286] CI, paras. 90-92, cited in RIII, para. 318.
[287] RIII, paras. 319-321.
[288] RV, para. 133
[289] In support of its position, the Respondent brings up *ADF*, where the tribunal noted that something more than a mere illegality or lack of authority under domestic law is required in order to hold that a decision or measure is inconsistent with the requirements of customary international Law; *ADF*, para. 190. The Respondent also relies on *Saluka*, where the tribunal established that a bilateral investment treaty may not be interpreted as penalizing each and every violation of the multiple rules and regulations Government action is subject to that could normally be pursued by the investor before the local courts and tribunals, *Saluka*, para. 133.
[290] RIII, para. 309

Respondent's standpoint, what is required under Article 4.1(d) of the Luxembourg BIT is that the expropriatory measures be accompanied by appropriate mechanisms to ensure the payment of fair, effective, and timely compensation, with the commencement of a court proceeding to that end not being an essential requirement.[291]

295. Venezuela has indeed commenced expropriation proceedings under the Implementing Decree,[292] and those proceedings are still pending. When completed, there will be a court judgment ordering the decreed transfer of title and payment of fair compensation.[293] And this has not yet happened because Tenaris hindered the expropriation proceedings with its early filing of a Request for Arbitration,[294] which, according to the Bolivarian Republic, is one more demonstration of Tenaris' uncompromising attitude, devoid of good faith, as, at the time, it prevented an agreement on compensation from being reached.[295]

296. As to the specific allegation that Venezuela failed to provide for compensation for lost profits, without which compensation would not be "adequate" as required by the BIT, it is the Respondent's view that the fair price due for an expropriated asset is one thing, and compensation for a wrongful act is an entirely different matter.[296] According to the Respondent, expropriation is a State prerogative, not a wrongful act, and, in this regard, the Implementing Decree specifies that compensation will equal the real value of the expropriated asset, and nothing further.[297]

### 3. THE PARTIES' POSITIONS AS REGARDS COMSIGUA

297. The main item of relief sought by the Claimants is that the Tribunal rule that Venezuela breached Articles 4 and IV of the Luxembourg and Portugal BITs, respectively, both provisions having equivalent contents. In their opinion, Venezuela has unlawfully expropriated their investment in Comsigua.[298] The Respondent denies any such expropriation.[299]

298. The Parties' arguments are, for the most part, the same as put forth in connection with Tavsa. For this reason, the Tribunal refers back to paragraphs 279-296 *supra* and, in this section, it will only provide an account of the additional arguments the Parties have asserted specifically in connection with Comsigua.

### A. The Claimants' Position

299. The Claimants argue that Venezuela indirectly expropriated their investment in Comsigua, without paying compensation and in breach of its domestic Law.

---

[291] RIII, paras. 298-304.
[292] RIII, paras. 304 *et seq.*
[293] RV, para. 131.
[294] RIII, paras. 297, 311.
[295] RIII, para. 311.
[296] RIII, para. 308.
[297] RIII, para. 307.
[298] CI, paras. 125 *et seq.*
[299] RIII, para. 276.

a.     **The Expropriation of the Investment in Comsigua**

300.   The Claimants argue that Venezuela expropriated their investment in Comsigua,[300] as a result of the Nationalization Decree and the Implementing Decree:

-     The Nationalization Decree ordered the nationalization of the entire steel industry in the Guayana region, including all of Sidor's affiliates, Comsigua being one of them;[301] and, in spite of the fact that the Nationalization Decree provided for direct expropriation,[302] Venezuela subsequently issued the Implementing Decree, where, rather than ordering the acquisition of Comsigua's shares, it ordered an "acquisition of assets," thereby rendering the expropriation an indirect one;[303]

-     Later on, pursuant to these two Decrees, Venezuela took Comsigua's assets as its own, and took control of its administration,[304] thereby interfering with the Claimants' property rights;[305]

-     With the exception of the Japanese Shareholders, the Bolivarian State has not paid compensation to any shareholder of the four HBI manufacturing companies that were nationalized by virtue of those Decrees.[306]

301.   The Claimants also argue that, since the Takeover Commission was tasked with transforming Comsigua into a socialist iron and steel corporation, their shares in Comsigua lost all value.[307] In their opinion, nobody would pay for a minority interest in a State-controlled company that remains "subject to nationalization through two Decrees."[308] However, prior to the nationalization, when Comsigua was privately managed and its aim was to maximize the investors' returns,[309] the Claimants could have easily transferred their interest to another minority shareholder or a third party.[310]

302.   The Claimants maintain that case law is consistent that measures which actually destroy an investment or deprive the investor of the use or enjoyment of its investment, including a deprivation of all or a substantial portion of the economic benefit of its property, are as expropriatory as the formal taking of title to the investors' assets.[311] And, therefore, Venezuela should compensate the

---

[300] CIV, para. 195.
[301] CI, para. 127. CV, paras. 112 *et seq.*
[302] CI, para. 131.
[303] CI, para. 131.
[304] CV, para. 111.
[305] CV, para. 192
[306] CV, para. 110.
[307] CIV, para. 198.
[308] CIV, para. 70.
[309] CV, para. 191
[310] T., p. 569:4–22.
[311] In support of its position, Talta relies on the *Spyridon Roussalis* decision: "indirect expropriation may occur when measures result in the effective loss of management, use or control, or a significant depreciation of the value, of the assets of a foreign investor," *Spyridon Roussalis,* para. 327. Moreover, Talta also brings up *Alpha*: "it is recognized in international law that measures taken by a State can interfere with property rights to such an extent that these rights are rendered so useless that they must be deemed to have been expropriated, even though the State does not purport to have expropriated them and the legal title to the property formally remains with the original owner," *Alpha,* para. 408.

Claimants for the fair value of their investment.[312]

**b.    Venezuela Did Not Pay Compensation for the Comsigua Expropriation**

303.  The Claimants have not been paid any compensation for their investment in Comsigua, which renders the expropriation unlawful:

-    Venezuela took over Comsigua without offering an immediate and prior payment, as required by the BIT. Even though certain discussions were had concerning some possible compensation, the investor was never presented with a formal offer.[313]

-    In any event, that potential compensation expressly left lost profits out, and compensation was thus not adequate as required by the BIT:[314] the fair market value required by the BITs is the price a hypothetical "willing buyer" would pay; this buyer would have assessed the price based on the expected future profits.[315]

304.  In addition, the Claimants argue that Venezuela expropriated their investment in Comsigua in a discriminatory manner, as it did pay compensation to the Japanese Shareholders but not to Talta.[316] This would be another argument to label the expropriation unlawful.[317]

**B.    The Respondent's Position**

305.  Venezuela denies all of these allegations.

**a.    There Was No Expropriation**

306.  The Respondent acknowledges taking control of Comsigua; it does, however, contend that it did so without nationalizing, expropriating or in any way affecting Talta's shareholding.[318]

307.  First, neither of the two Decrees had expropriatory effects:

-    The Nationalization Decree did not affect Comsigua, as the only companies that were nationalized were Sidor and its subsidiaries, and Comsigua does not qualify as such.[319]

-    The sole purpose of the Implementing Decree was to transfer control of certain companies (including Comsigua) to the State; this goal was attained through the purchase, by CVG (a state-owned company), of 73% of

---

[312] CI, para. 132.
[313] CIV, para. 246.
[314] CV, para. 201.
[315] *Sistem Mühendislik*, para. 189.
[316] CI, paras. 143 *et seq.*
[317] CI, para. 144. In support of its position, Talta contends that the two BITs prohibit expropriation from being discriminatory. The Claimant believes that *Saluka* applies here, as the tribunal there stated that "non discrimination requires a rational justification of any differential treatment of a foreign investor," *Saluka*, para. 460.
[318] RIII, para. 275.
[319] RIV, para. 274.

Comsigua's stock from the Japanese Shareholders.[320] Once in control, there was no longer any need for the State to expropriate Comsigua,[321] or, therefore, affect Talta's shares; in consequence, the Implementing Decree ceased to apply to Comsigua.[322] The Respondent notes that neither Decree forces the Government to carry out the planned expropriation where, as was the case with Comsigua, the company can be transformed into a state-owned company through the acquisition of a majority share interest.[323]

308. Second, Talta's situation has not been affected: it had a 7.58% minority interest in Comsigua prior to the State's acquisition of the majority interest, and it continues to hold the same percentage shareholding today[324] in a company that remains in operation, generating cash flows,[325] and where Talta may exercise each and every right arising from its shareholding. There are then no reasons to assume, as expected by the Claimants, that their shares in Comsigua have no value at all[326] because no one would be willing to purchase them.[327]

309. Third, as regards the argument that Venezuela discriminated against Talta relative to the Japanese Shareholders, the Bolivarian Republic denies this allegation: nothing in the language of Article 6 of the Implementing Decree requires that an agreement be reached with all of a company's shareholders.[328] The Decree's only requirement is that every shareholder in Comsigua be afforded the opportunity to negotiate an agreement, an opportunity Talta was indeed given, but turned down.[329]

### b. The Failure to Pay Compensation is Justified

310. The Bolivarian Republic argues that Talta refused to engage in negotiations to sell its stock along with the other Japanese Shareholders.[330]

311. Later on, Venezuela offered the Claimants the same price per share of stock it had offered to the Japanese Shareholders.[331] However, the Claimants did not accept this proposal, as they expected to close a deal that would encompass all of their Venezuelan interests and, in particular, the compensation they were seeking in connection with Matesi's expropriation.[332]

312. And because, upon a failure to reach a global agreement for all of their interests, the Claimants felt they were covered by the BITs, which protected their investment (which was not the case with the Japanese Shareholders, who had no BIT in place with Venezuela).[333]

---

[320] RIV, para. 275. T., p. 252:4-13.
[321] R V, para. 116.
[322] RV, para. 119.
[323] RV, paras. 120, 121.
[324] RIII, para. 278.
[325] RIII, para. 276; Villarroel, para. 10; RIII, para. 279.
[326] RIV, para. 278.
[327] RV, para. 117.
[328] RV, para. 120.
[329] RV, para. 120.
[330] RIV, para. 276.
[331] Prosperi, para. 22.
[332] RIV, para. 276; Exhibit C-153; T., pp. 581:19–582:7 (Prosperi); RV, para. 124.
[333] The Respondent claims that this was established with the testimony of Mr. Prosperi, T., p. 581:10–18.

4. **THE ARBITRAL TRIBUNAL'S DECISION**

313. First of all, the Tribunal will go over the rules established in the BITs on the subject of expropriation (**1.**). Then, it will summarize the circumstances in which Tavsa's and Comsigua's expropriations took place (**2.**), and will determine whether these two expropriations breached the provisions of the BITs (**3.**).

## 4.1 The BITs

314. The BITs forbid the State from adopting expropriation or nationalization measures, as well as measures tantamount to such, unless certain requirements are satisfied:

Luxembourg BIT

Art. 4.1:

"Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization or any other measure with the effect of directly or indirectly dispossessing the investors of the other Contracting Party of the investments belonging to them in its territory, unless the following conditions are fulfilled:

a) the measures are adopted for reasons for public purpose or national interest;

b) the measures are adopted in accordance with legal procedures;

c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;

d) they are accompanied by provisions for the payment of adequate and effective compensation."

Portuguese BIT

Article IV.1:

"Neither Contracting Party shall take measures that deprive, directly or indirectly, the investors of the other Contracting Party of the investments made by them, except if the following conditions are fulfilled:

a) that the measures are adopted for reasons of public purposes or national interest, in accordance with the legislation in force;

b) that the measures are not discriminatory;

c) that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective compensation; this

82

compensation shall be based on the market value of the investment in question immediately prior to the moment at which the measures was made public; compensation will accrue interest at the exchange rate applicable at the date in which the transaction becomes effective, in the territory where the investment is located; the lawfulness of the referred measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

315. The term "*medida*," which is not defined in the BITs, should be interpreted in the broadest possible manner. So is inferred from the very language of the Treaties, which add the indefinite adjective "*ninguna*" and the generic plural "*medidas*" to highlight its broad scope.

316. Therefore, the term covers all kinds of administrative, legislative or judicial actions by any of the branches of the Bolivarian Republic, and prohibits any such actions resulting in expropriation, nationalization, or a tantamount measure.

317. "Expropriation" takes place when, exercising a sovereign power, the State takes a measure that deprives the investor of its investment, taking away control of or title to that investment. Therefore, loss of title to the goods or assets is not a requirement. It is sufficient for the investor to lose control of its investment.

318. "Nationalization" is a concept similar to expropriation, with the peculiarity that it usually affects entire sectors of an economy, whose exploitation the State has decided to reserve to itself.

319. Each BIT refers to tantamount measures in different but synonymous terms ("any other [measure] whose effect is to dispossess the investors directly or indirectly" or any "measure which indirectly denies... the investors... the investments").

320. These are legislative, judicial or administrative actions of a State that significantly interfere with the use and enjoyment of the investment, to an extent such that its value is destroyed, without, however, depriving the investor of title and control.

321. The prohibition to take measures of expropriation or nationalization or tantamount measures is not an absolute one. The BITs do allow them, provided that the State fulfills certain requirements:

- That they serve a public purpose;

- That they are taken in accordance with legal procedures;

- That they are not discriminatory; and

- That they are accompanied by provisions for the payment of compensation, which must be adequate and effective, and be based on the market value of the investments prior to their becoming public, and the payment of which must be effected without undue delay, in a freely transferrable currency, accruing interest.

**4.2    TAVSA AND COMSIGUA HAVE BEEN THE SUBJECT OF EXPROPRIATION**

322.    Venezuela acknowledges it indirectly expropriated Tenaris' investment in Tavsa:[334] indeed, all of Tavsa's assets have become the property of the Bolivarian Republic, even though Tenaris still holds title to Tavsa's shares, with Tavsa having become a mere shell company, deprived of all of its assets and its business activities.[335]

---

[334] RV, para. 131.
[335] See para. 271 *supra.*

### A.    <u>Comsigua-Specific Features</u>

323. The Bolivarian Republic, however, denies having expropriated the Claimants' assets in Comsigua.[336]

324. The Arbitral Tribunal does not agree.

325. The facts prove otherwise: the Venezuelan State made a decision to nationalize all of Comsigua's assets (**a.**), and it did indeed carry out its decision, depriving the Claimants of their investment in Venezuela (**b.**).

### a.    The Decision to Expropriate Comsigua

326. In issuing the Nationalization Decree in 2008, President Chávez formalized the decision to nationalize the iron and steel sector in Guayana – which Comsigua was a part of:

> "Article 1. For reasons of national convenience and in light of its relation to activities that are strategic for the development of this Nation, the iron ore transformation industry in the Guayana region is hereby reserved to the State, as this is an area holding the largest iron deposit, the exploitation of which has been reserved to the State since 1975."

327. One year later, President Chávez publicly confirmed Comsigua's nationalization in a speech broadcast on television on May 21, 2009 before a group of workers of the iron and steel sector, who cheered their approval:[337]

> "The hot briquetted iron sector – nationalize it; there is nothing to be discussed. The company [...] Comsigua, [...] Tubos Tavsa, nationalize them."

328. The President's announcement was followed by another decree, the Implementing Decree, elaborating on the Nationalization Decree and ordering the acquisition of the assets of four iron and steel companies, including Tavsa and Comsigua:

> "Article 1. There is hereby ordered the acquisition of the assets of business companies [...] Complejo Siderúrgico de Guayana S.A. (Comsigua), [...] Tubos de Acero de Venezuela S.A. (Tavsa), their subsidiaries and affiliates [...] with the aim of transforming them into State companies [...]."

329. It should be noted that, pursuant to the Implementing Decree, the target of the expropriation was the set of assets owned by Comsigua ("Expropriated Assets"), which were necessary to carry out the company's business activity – not the shares held by the investors in this company.

---

[336] RV, para. 115.
[337] Exhibit C-56.

### b.    The Forced Acquisition of the Expropriated Assets

330.  *Pro memoria*: A few months after the Implementing Decree came into effect, and relying on it, Venezuela formally took control of the Expropriated Assets from Tavsa.[338] Such takeover was formalized via the so-called "Record of Transfer" of November 16, 2009.[339]

331.  For Comsigua, control over the Expropriated Assets was transferred two years later, on June 17, 2011. On such date, the following decisions were made:[340]

-    First, Minister José Khan, who, in turn, served as President of the state-owned CVG (a shareholder of Comsigua), issued an executive decision in the form of resolution number 041- 11, whereby Iván Nicolás Hernández Rojas was appointed new President of Comsigua;[341]

-    Second, at the Shareholders' Meeting that was held on that very same day,[342] there was ratified the forced appointment of the new President of Comsigua;[343]

-    Third, those who had thus far occupied management positions at Comsigua resigned from their offices.[344]

332.  The minutes of the Shareholders' Meeting expressly acknowledges that it is then that Comsigua's nationalization was completed, using language such as:

> "We are handing the Company's management over to those who are coming to take our place as a result of Comsigua's *Nationalization* […]."[345]

> "The natural consequence of the *Nationalization* of Comsigua was the termination of the contracts between the Company and its shareholders for the sale of HBI and technical support […]."[346]

333.  The Tribunal thus finds that, on June 17, 2011, the State took the Expropriated Assets and took control of Comsigua's business activity.

---

[338] "consistently with Decree 6796 [...]."
[339] Exhibit C-71.
[340] Exhibit R-64.
[341] Exhibit R-64, p. 1.
[342] Exhibit R-64.
[343] Exhibit R-64, p. 11: "It is hereby decided: To appoint Mr. Iván Hernández President of the Company and Chairman of the Board."
[344] Exhibit R-64, p. 11: "It is hereby decided: To acknowledge and record the resignation of those who, having been appointed, designated, proposed and/or elected by the [Japanese Shareholders], since the last shareholders' meeting, have been in charge of managing the assets of the Company up to June 17, 2011."
[345] Exhibit R-64, p. 9. Italics in original.
[346] Exhibit R-64, p. 10. Italics in original.

### B. Compensation for the Expropriations

334. Venezuela has not paid any compensation for the expropriation of Tavsa's assets, nor does there seem to have been any serious negotiations on the subject.

335. The situation is somewhat different as regards Comsigua. In this case, the State did commence negotiations with the private shareholders in order to agree on the compensation due them:

- Negotiations with the Japanese Shareholders were successful and the compensation was formalized through the so-called "Share and Asset Assignment Agreement,"[347] pursuant to the Nationalization Decree and the Implementing Decree:

> "[...] an agreement has been reached to enter into this share sale contract, pursuant to Decrees Nos. 6058 and 6796 [...]."

- Talta was also made a compensation offer,[348] on terms similar to those of the compensation paid to the Japanese Shareholders, which, for the reasons discussed in paragraphs 377-380 *infra,* never actually became a reality.

### C. Conclusion

336. The Arbitral Tribunal concludes that the Bolivarian Republic took for itself all of the assets of Tavsa and of Comsigua and took control of the business activity these companies had been engaged in so far, which resulted in the expropriation of Tenaris' and Talta's investment in Venezuela. Tavsa and Comsigua have been reduced to just two shell companies whose assets now belong to Venezuela and whose business activity is carried out by the State.

337. This expropriation may be labeled indirect (as done by the Claimants), because both investors continue to hold formal title to their shares in the two companies whose assets have been the subject of expropriation.

### D. The Respondent's Counter-Arguments

338. In response to this conclusion, the Respondent has raised two counter-arguments:

#### a. Exclusion from the Scope of Application of the Implementing Decree

339. The Implementing Decree explicitly ordered the nationalization of Comsigua's assets – Venezuela does not deny this fact. However, Venezuela suggests that the Implementing Decree no longer applies to the Claimants' investment in Comsigua. The argument is somewhat complicated: the Bolivarian Republic suggests that the Decree will not apply to the Claimants' investment in Comsigua because Venezuela has already achieved its goal of converting Comsigua into a state-owned company. It did so by acquiring the majority shareholding that used to be held by the Japanese Shareholders. Venezuela

---

[347] Exhibit C-72.
[348] CRED-59.

88

argues that, once Comsigua's nationalization was achieved, it was no longer necessary to enforce the Nationalization Decree as against the Claimants to secure title to their shares in Comsigua.[349]

340. The argument might perhaps be relevant if expropriation or nationalization required that the State take title to the shares of the company that owns the assets that are used to carry out the business' activity.

341. But this is not the case.

342. What is relevant in order to determine whether an expropriation or nationalization took place is whether the State took control (the so-called "taking") of the company or the assets of the investor.[350] Where there is a taking, whether formal title to the stock is transferred to the State is irrelevant.[351]

343. In the instant case, the Implementing Decree provided that the target of the expropriation would be all assets of Comsigua – not the shares owned by its shareholders. On June 17, 2011, Venezuela completed the company's nationalization, appointing its new President and taking the Expropriated Assets via an administrative decision. Following this taking of all of its assets and its entire business activity, Comsigua became a mere empty shell, without any business or corporate activity of its own.

344. To conclude, in spite of formally retaining title to their shares, the Claimants have suffered an expropriation of their investment in Comsigua, as the assets and business activity of Comsigua have been taken by, and are now the property of, the State.

**b.    Unchanged Value**

345. The Bolivarian Republic has put forth a second argument: the Claimants' investment in Comsigua has remained unchanged before and after the Decrees.[352] On the contrary, the Claimants deny this: in their view, after Comsigua's nationalization as a result of the Nationalization Decree and the Implementing Decree, the value of their investment[353] and rights[354] as shareholders has been destroyed.

---

[349] R III, para. 278.
[350] A. Reinisch, "The Oxford Handbook of International Investment Law" (Ed. C. Schreuer *et al.*), Oxford University Press, 2008, p. 421: "*As opposed to direct expropriation, which involves the taking of property, indirect expropriation may occur when measures short of an actual taking 'result in the effective loss of management, use or control, or a significant depreciation of the value of the assets of a foreign investor.'*"
[351] UNCTAD, Taking of Property, Series on issues in international investment agreements, New York, Geneva, United Nations, 2000, p. 4: "*The taking of property by Governments can result from legislative or administrative acts that transfer title and physical possession. Takings can also result from official acts that effectuate the loss of management, use or control, or a significant depreciation in the value, of assets.*"
[352] RIV, para. 278.
[353] CV, para. 194.
[354] CV, paras. 192, 193.

346. The Arbitral Tribunal agrees with the Claimants.

347. The value of a business investment channeled through a company set up in the host State is equal to the value of the investor's rights as a shareholder. The Tribunal has verified that the Claimants have lost the entire value of their investment in Comsigua, as they have been deprived of their shareholder rights since June 17, 2011:

- The President of the company has been appointed by an executive decision of a Minister, not the shareholders;

- Since then, no shareholders' meeting has been called and no annual financial statements have been prepared.[355]

348. The Claimants have thus been deprived of any possible involvement in the business activity or corporate life of Comsigua or the possibility of benefitting from them. Tenaris and Talta were the owners of an investment that consisted in them being shareholders in a Venezuelan company that carried out a business activity. As a result of the State's intervention, they have become shareholders in a shell company, which gives its owners no voting or monetary rights.

<u>The Value of their Interest in Comsigua</u>

349. The Arbitral Tribunal shares the Claimants' view that their shareholding in Comsigua is currently valueless.

350. The Claimants contend that, prior to the Decrees, they could have sold their shares to any of the other minority shareholders or a third party[356] (as done by minority shareholder IFC a year prior to the effective date of the Nationalization Decree).[357]

351. The former option is now off the table, as Talta is Comsigua's sole minority shareholder; and the latter option is virtually non-existent, given the evisceration of the shareholders' decision-making and monetary rights. The only possible buyer would be the State itself; however, in spite of having gotten to the point of making an offer, in the end the State decided not to proceed with the purchase of the Claimants' stock in Comsigua, which destroyed the only possibility that was *de facto* left to the Claimants in order to be redressed for the expropriation.

352. <u>In short</u>, the implementation of the Decrees had the effect of neutralizing the value of the Claimants' investment in Comsigua, by leaving their voting and monetary rights associated with the investment devoid of any content.

---

[355] T., pp. 568–570.
[356] T., p. 569:4–22.
[357] *Pro memoria*: IFC sold its 8.70% interest in Comsigua, Exhibit C-40; Exhibit C-82.

**4.3    LACK OF PAYMENT**

353. Having determined that Venezuela indirectly expropriated the Claimants' investment in Tavsa and Comsigua, the Arbitral Tribunal will need to determine whether such expropriations were lawful.

354. It is worth going over the content of the BITs at this point:

Article 4.1 of the Luxembourg BIT:

"Each Contracting Party undertakes not to adopt any measure of expropriation or nationalization or any other measure with the effect of directly or indirectly dispossessing the investors of the other Contracting Party of the investments belonging to them in its territory, unless the following conditions are fulfilled:

a) the measures are adopted for reasons for public purpose or national interest;

b) the measures are adopted in accordance with legal procedures;

c) they are neither discriminatory nor contrary to a specific commitment concerning the treatment of an investment;

d) they are accompanied by provisions for the payment of adequate and effective compensation."

Article IV.1 of the Portuguese BIT:

"Neither Contracting Party shall take measures that deprive, directly or indirectly, the investors of the other Contracting Party of the investments made by them, except if the following conditions are fulfilled:

a) that the measures are adopted for reasons of public purposes or national interest, in accordance with the legislation in force;

b) that the measures are not discriminatory;

c) that the measures are accompanied by provisions that guarantee the payment of immediate, adequate and effective compensation; this compensation shall be based on the market value of the investment in question immediately prior to the moment at which the measures was made public; compensation will accrue interest at the exchange rate applicable at the date in which the transaction becomes effective, in the territory where the investment is located; the lawfulness of the referred measures and the amount of compensation may be submitted for review pursuant to the applicable legal procedure."

355. In other words, the BITs provide, in equivalent terms, that a measure needs to be accompanied by provisions for the payment of adequate and effective compensation, to be made immediately, without undue delay.

91

356. One of the Claimants' core arguments is that, even though more than seven years have elapsed since the expropriation,[358] they have received no compensation at all,[359] in breach of Articles IV and 4 of the BITs.

357. *Prima facie,* the Arbitral Tribunal agrees with the Claimants: a delay of more than seven years in the payment of compensation does not constitute "immediate" payment, in the words of Article IV of the Portuguese BIT.[360] Article 4 of the Luxembourg BIT further requires that payment be made without "undue delay;" and, in this case, Venezuela has wielded two excuses for the delay, which the Tribunal will now analyze: the inexistence of a judgment ordering payment of the fair price (**A.**); and the Claimants' obstruction tactics (**B.**). Lastly, the Respondent also maintains, as a subsidiary argument, that the lack of payment does not render the expropriation unlawful (**C.**).

## A.    The Lack of a Judgment Ordering Payment

358. The Bolivarian Republic admits that every expropriation goes hand in hand with the obligation to pay compensation. It argues, however, that it has not paid any such compensation because no judgment has been issued by the court in charge of the expropriation proceedings ordering payment of the fair price.[361]

359. This argument must fail.

360. The judicial expropriation procedure is governed by Articles 23 *et seq.* of LECUPS. To sum up, the contentious proceedings in place for expropriation are as follows:

> The expropriating entity files an expropriation request with the judge or magistrates[362] (Article 23). The judicial authority sets a period for the interested parties (Article 26) to be able to file their answer to the request (Article 28), along with the relevant evidence (Article 30). Once the evidentiary stage is complete, the judge will open the stage for presentation of the case, to extend for no more than 60 days; the judge will then ask the parties to submit their reports, and after that, within a period no to exceed 30 days, the judge will render judgment (Article 32) ruling on the need to acquire all or a part of the property.
>
> Once it has been ruled that it is necessary to expropriate, the judge will summon the parties to a conciliation hearing (Article 34) and, should no settlement be reached, the judge will appoint a Valuation Commission to determine the asset's fair price (Article 35). Once such fair price has been set, the expropriating entity must deposit the sum with the court (Article 45). Once the fair price has been deposited, the judge will issue a copy of the expropriation judgment and order formal handover of the asset to the requesting entity (Article 46).

361. A judge may never order the expropriating entity to deposit the fair price value

---

[358] CV, para. 204.
[359] CV, paras. 201, 413.
[360] See also *OI European*, para. 425.
[361] RVI, para. 138.
[362] The Civil Trial Court in the jurisdiction where the asset is located or the First Contentious-Administrative Court when the Republic is the party seeking expropriation (Article 23).

unless a judicial proceeding has been instituted. And, pursuant to Article 23 of LECUPS, such proceeding is commenced by the expropriating entity. In this case, there is no evidence that the expropriating entity – the Bolivarian Republic – has commenced any such proceeding. Therefore, Venezuela has not done the bare minimum in order for a judgment to be rendered at some point ordering payment of the fair price.

362. The Bolivarian Republic may not escape its liability for an internationally wrongful act by relying on its own inaction.[363]

### Venezuela's Counter-Arguments

363. The Bolivarian Republic has tried to sidestep the lack of a court proceeding by attributing it:

364. (i) Mainly, to the slow nature of the "administrative handling" of the issue.[364]

365. The Claimants maintain that Venezuela has not even commenced the judicial expropriation proceeding,[365] and Venezuela has produced no evidence that would refute such allegation. In order for a proceeding to be slow, it is necessary that, at the very least, it has been commenced; in this case, however, rather than slowness, there seems to be complete inaction on the part of Venezuela.

366. (ii) Subsidiarily, to the investors' inaction.[366]

367. Venezuela suggests it is the Claimants who should have initiated the expropriation proceeding, thereby making up for the inaction of the Administration. The Bolivarian Republic argues that the Claimants could have relied on Article 9 of the Organic Law on Administrative Litigation, under which the contentious-administrative judicial organs may act in the event that an authority fails to take a step they are statutorily required to take.[367]

368. The Respondent further notes that other tribunals have taken into consideration if the investors used the resources available to them under domestic law when determining whether the State committed an international wrong.[368]

369. The arguments are not convincing: Article 23 of LECUPS provides, without exception, that it is the State who must institute the judicial expropriation proceedings. Venezuela's suggestion that it should have been the Claimants who started the judicial expropriation action against themselves makes absolutely no sense: under Venezuelan law, every citizen is entitled to step in for the Administration in the event of the latter's inaction, and institute contentious-administrative proceedings, but is under no obligation to do so.

---

[363] *Nullus commodum capere de sua injuria propria*, which stems from the principle of good faith. This has been a well-established principle since the first relevant cases in Public International Law: *Montijo*, *Roberts*, *Tattler*, *Chorzów*.
[364] T., p. 274:8–13; RV para. 138.
[365] CV, para. 206.
[366] T., p. 274:8–13; RV para. 138.
[367] Article 9.1: "Contentious-Administrative organs shall have jurisdiction over the authorities' failure or refusal to produce an act they are by law required to produce."
[368] RV, para. 135.

**B.** **The Claimants' Alleged Obstruction**

370. The State's second argument is that it was the Claimants who hindered each and every conciliation effort attempted by Venezuela in connection with the payment of compensation:

**a.** **Tavsa's Compensation**

371. The Respondent argues that, by sending the Tavsa Notice and subsequently instituting this arbitration, Tenaris thwarted any negotiation attempt.[369]

372. Said argument is not reasonable.

373. Negotiating compensation was the only task entrusted to the Compensation Commission, which consisted of members appointed by the State and by Tenaris. The Compensation Commission was tasked with arriving at a compensation solution within a period of 60 days, which could be extended for another 60 days upon the parties' mutual agreement.[370] Until the negotiation period had ended, the State could not take over control and the exclusive operation of Tavsa, as per Article 5 of the Implementing Decree.[371]

374. In actuality, the State appointed its members on August 7, 2009,[372] and Tenaris did as much 10 days later.[373] With the first 60-day negotiation period having expired unsuccessfully, on October 28, 2009 the State requested that the period be extended to December 29, 2009.[374] However, well before this extension expired, and without waiting for a compensation agreement, the Government forcefully took over Tavsa.[375]

375. Four days after takeover, the Claimant sent the Tavsa Notice, making the Bolivarian Republic aware of the existence of a dispute between them.

376. Given the evidence on the record, it is the Arbitral Tribunal's view that the Tavsa Notice and the failure of the negotiations are a consequence of the Bolivarian Republic's decision to prematurely take over Tavsa.

---

[369] T., pp. 249:19–250:6.

[370] Article 5 of the Implementing Decree.

[371] "Upon expiry of the period established in the preceding article without an agreement for the transformation into a State-owned company having been reached, the Bolivarian Republic of Venezuela, acting through the Ministries or any of its functionally-decentralized entities, referred to in Article 2 hereof, shall assume, as applicable, the exclusive control and operation of the companies, in order to maintain continuity in the activities carried out by the companies referred to in Article 1. In the event that no agreement is reached in the negotiations over the assets, the National Executive Branch shall decree the expropriation of said companies, pursuant to the provisions of the Law on Expropriation by Reason of Public or Social Interest. In no event shall lost profits or indirect damage be taken into account for the calculation of compensation or the fair price of the aforementioned assets."

[372] Letter from PDVSA to Tavsa, August 7, 2009, Exhibit C-69. Tenaris ratified its representatives at the technical commission provided for in Article 7 and Article 4 of Decrees 6058 and 6796, respectively. See Letter from Tenaris to PDVSA Industrial, August 17, 2009, Exhibit C-70, pp. 1-2; Álvarez, para. 58. Later on, on May 3, 2010, Tenaris added a number of members to the technical commission. See Letter from José Frías of Tenaris to the Ministry of Industry, May 3, 2010, Exhibit C-150.

[373] Exhibit C-70.

[374] T., pp. 688:11–689:3 (Larez); CV, para. 63. Action Memorandum from L. Pulido (PDVSA Industrial) to R. Ramirez (PDVSA), October 28, 2009, Exhibit R-51.

[375] Record of the Transfer of exclusive Control and Operation of Commercial Company Tavsa, Tubos de Acero de Venezuela S.A., November 16, 2009, Exhibit C-71, p. 4.

### b. Comsigua's Compensation

377. The negotiations over Comsigua's compensation went on much further than Tavsa's. Indeed, the Bolivarian Republic even made the Claimants an offer on terms equal to those offered to the Japanese Shareholders.[376] This offer was even put down in writing, since its materialization required ministerial approval.[377]

378. Each Party has an entirely different recollection of why this offer did not succeed:

- Witness Wilfredo Villarroel, Comsigua's Coordinator of Administration starting June 2011,[378] claims that Tenaris suddenly made the possibility of an agreement regarding Comsigua conditional upon a global agreement covering compensation for Matesi[379] (another HBI manufacturer that was nationalized)[380] as well;

- For his part, Ricardo Prosperi, Tenaris' General Manager for the Andean Region since February 2010,[381] states that Tenaris was willing to accept the offer made in connection with Comsigua, and attributes the offer freeze to the change in the Ministry in charge of handling the negotiations (MIBAM to the Ministry of the People's Power for Energy) and a family tragedy suffered by a high Government official.[382]

379. Having carefully examined the testimony and expert evidence produced in this case, the Arbitral Tribunal is inclined to recognize greater probative value to the Claimants' witness, as it is not for nothing that he is the witness who was directly involved in the events.[383]

380. The Tribunal thus finds that the negotiations were frustrated due to reasons outside the Claimants' control.

* * *

381. The Respondent's excuses for its lack of payment having been rejected, there is still one subsidiary argument that remains to be analyzed: the mere lack of payment of compensation does not render the expropriation unlawful.

### C. Payment as a BIT-Compliance Element for the Expropriation

382. According to Venezuela, what is decisive for an international wrong is not whether the State paid compensation or instituted court proceedings to assess such compensation,[384] but whether provisions were in place in order for

---

[376] Exhibit R-68.
[377] CRED-59.
[378] Villarroel I, p. 1.
[379] Matesi Materiales Siderúrgicos S.A.
[380] Villarroel I, para. 1213.
[381] Prosperi, para. 5.
[382] Prosperi, paras. 22 – 25.
[383] Prosperi, paras. 22 *et seq.*; T., p. 764:18.
[384] RII, para. 304.

compensation to be promptly made,[385] which is what is required by Article 4.1(d) of the Luxembourg BIT.[386] The Respondent relies on *Amoco*[387] in support of its position.

383.  The Luxembourg BIT distinguishes the requirement that provisions be included in the relevant law or decree that guarantee payment of compensation, on the one hand, from the obligation that payment of compensation be effected without undue delay, on the other:

- Provisions on the payment of compensation:

  Article 4.1.d) of the Luxembourg BIT: "[…] they are accompanied by provisions for the payment of adequate and effective compensation."

- Payment of compensation:

  Article 4.2 of the Luxembourg BIT: "… Compensations shall be paid without undue delay and shall be freely transferrable."

384.  Accordingly, Venezuela's position is unacceptable: the Republic cannot avoid the consequences of its lack of payment by relying upon the mere existence of expropriation measures that did make provision for the payment of compensation. What is relevant here is not that the legislative measure provides for the right to compensation, but that it has been effectively satisfied.

385.  Irrespective of the above, the Arbitral Tribunal has analyzed the *Amoco* case, which the Respondent relies on in support of its position, and finds that the facts of that case are entirely unrelated to the case at hand:

- In *Amoco,* the Iranian law that governed expropriation processes burdened the affected party with initiating the mandatory administrative proceedings to claim for compensation.[388] According to such law, there was no need to involve any judicial authority.[389] The Arbitral Tribunal found that the legal provisions that governed payment of compensation were adequate, with judicial involvement not being necessary,[390] and that the claimant had just elected not to be involved in that proceeding and not to claim compensation in the administrative proceedings.[391]

- This case is completely different: Venezuelan law provides that the expropriation proceedings are to take place before a judicial authority, instituted by the expropriating entity; therefore, the judge's involvement is a result of its own law, and it was the State (not the Claimants) who, disregarding its legal obligation to institute the judicial expropriation proceedings, frustrated the possibility that a judge would order payment of fair price.

---

[385] RII, para. 300.
[386] RII, para. 298.
[387] Exhibit RLA-84.
[388] *Amoco*, paras. 134, 137.
[389] *Amoco*, para. 137.
[390] *Amoco*, para. 137.
[391] *Amoco*, paras. 76, 134.

* * *

386. <u>To sum up</u>, the Arbitral Tribunal concludes that the expropriation of Tavsa's and Comsigua's assets entailed a violation of Articles IV and 4 of the BITs, as Venezuela failed to fulfill its obligation to pay compensation without undue delay.

# VII. <u>QUANTUM</u>

387. Having concluded that Venezuela expropriated the Claimants' investments in Tavsa and Comsigua in violation of Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT, the Tribunal must now address the issue of *quantum*.

388. The decision, as regards the compensation quantum, is as follows: the Arbitral Tribunal will address the relevant valuation date as a preliminary issue (**VI.1.**); it will then determine the value of each of the expropriated companies: Tavsa (**VI.2.**) and Comsigua (**VI.3.**). Lastly, it will make a decision on the subject of interest (**VI.4.**).

389. Prior to that, however, a few paragraphs are in order as an introduction.

<u>The Parties' Positions</u>

390. The Claimants have requested the following relief:

"[That the Tribunal]

(c) ORDER Venezuela to pay the Claimants the sum of US$243.7 million (as of April 30, 2008) for its breaches of the Treaties, which includes the sum of US$213.2 million in respect of Tenaris's investment in Tavsa and US$30.5 million in respect of Claimants' investment in Comsigua, or such other sum as the Tribunal determines will ensure full reparation;

(d) ORDER Venezuela to pay pre-award interest on (c) above in the sum of US$471.1 million from the Valuation Date to September 11, 2015 at a rate of 15.69% (being the WACC of Tavsa, amounting to US$410.77 million) and 15.96% (being the WACC of Comsigua, amounting to US$60.35 million) per annum and thereafter until the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation;

(e) ORDER Venezuela to pay post-award interest on (c) and (d) at a rate of 15.69% (being the WACC of Tavsa) and 15.96% (being the WACC of Comsigua) per annum as at the date of the Tribunal's Award, compounded annually, or at such other rate and compounding period as the Tribunal determines will ensure full reparation."

391. In other words, the Claimants are seeking to be paid the value of their investments in Tavsa and Comsigua, plus pre- and post-Award interest.

392. Venezuela, on the other hand, argues that the Claimants have not satisfied their burden of proof as regards the quantum of the damages.[392]

Applicable Law

393. The consequences associated with a violation of Articles 4 of the Luxembourg BIT and IV of the Portuguese BIT are provided for in the articles themselves:

> "The amount of the compensation shall correspond to the real value of the investment concerned on the day prior to the adoption or publication of the measures."[393]

> "[...] [T]his compensation shall be based on the market value of the investment in question immediately prior to the moment at which the measures was made public."[394]

394. Thus, both BITs require that the quantum of compensation be equal to the "real value" and the "market value" of the expropriated asset, calculated on the date immediately preceding that on which the expropriation took place (or was made public). The Parties agree that the terms "real value" and "market value" are equivalent[395] and refer to the money price a hypothetical buyer would be willing to pay a hypothetical seller, where

- Both parties are interested in completing the transaction, but not required to do so;

- Both parties are acting in good faith, in accordance with market practices;

- In an open, unrestricted market; and

- Both parties have reasonable knowledge of the subject-matter of the contract and the market conditions.[396]

395. In addition, the Claimants have asserted their right to full reparation, which is the compensation standard under international Law.

396. It is an undisputed principle of customary international Law that the victim of a wrongful act of the State is entitled to receive full reparation, as if the wrongful act had never taken place.[397] In expropriation cases, full reparation equals the market value of the expropriated assets, taken to mean the value the owner of the assets could have obtained, had the assets been sold on a date immediately preceding that of the State's taking, or the date when the intention to expropriate became public knowledge (causing the assets' market value to fall).[398]

---

[392] RIV, para. 338.
[393] Luxembourg BIT, Article 4.2.
[394] Portuguese BIT, Article IV.1.c).
[395] CIV, para. 203, RIV, paras. 342 *et seq*.
[396] CI, para. 180.
[397] *Chorzów*, p. 47. In the same vein, the Draft Articles on the Responsibility of States for Internationally Wrongful Acts: Report of the International Law Commission, Fifty-Third Session, Chapter IV, commentary to Article 34, 5, U.N. GAOR, 56° Ses., Supplement No. 10, U.N. Doc A/56/10 (2001).
[398] World Bank (eds): "Legal Framework for the Treatment of Foreign Investment. Report to the Development Committee and Guidelines on the Treatment of Foreign Direct Investment," 31 I.L.M. (1992), 1382.

397. Therefore, in practical terms, the rules on compensation established in the BITs lead to the same results as the application of the general principles of international Law.[399]

Evidence of the Market Value of Tavsa and Comsigua

398. Evidence of the quantum of compensation has been very abundant: it covers close to 500 pages, more than 250 exhibits, along with spreadsheets, tables and charts and one day and a half of expert witness examinations. Of such evidence, the most important piece is, without question, the expert reports:

- The Claimants have hired the services of Messrs. Manuel A. Abdala and Pablo D. López Zadicoff of COMPASS LEXECON, LLC ["**Abdala/Zadicoff**"], who submitted two expert reports – one of October 18, 2013 ["**Abdala/Zadicoff I**"] and another one of January 27, 2015 ["**Abdala/Zadicoff II**"];

- Venezuela, on the other hand, entrusted Mr. Timothy H. Hart of CREDIBILITY INTERNATIONAL ["**Hart**"] with quantifying the damage; the expert also submitted two reports: one of October 21, 2014 ["**Hart I**"] and another one of April 13, 2015 ["**Hart II**"].

- Then, on August 21, 2015, both Parties' experts jointly prepared an additional report on the value of Tavsa, focusing on those aspects on which their positions diverged ["**Joint Report**"], which was submitted along with a spreadsheet containing several expandable interactive options to allow the Arbitral Tribunal to be able to opt between the suggestions of one or the other expert.

399. The Arbitral Tribunal warns that, given the scale of the allegation and evidence on the subject of damages, the Tribunal's summaries of the experts' positions are not intended to be exhaustive. In order to make this the easiest explanation to follow, the Arbitral Tribunal has elected to highlight here just those arguments it has found most significant, which does not mean it has not carefully analyzed everything that has been submitted to it by the experts.

---

[399] The Tribunal takes note of the fact that Venezuela argues that the applicable standard to calculate the compensation due is contained in the BITs themselves (RVI, paras. 162 *et seq.*), while it is the Claimants' contention that the applicable compensation standard is the one provided by customary international Law (CVI, para. 226). However, both Parties agree that, for the main damages quantum, the result would be the same irrespective of which standard is used. CVI, para. 232; RVI, para. 161.

Allocation of Compensation between the Claimants

400. The Claimants have submitted their *petitum* jointly: Venezuela must pay both Claimants the sum of USD 213.2 million for Tenaris' investment in Talta and USD 30.5 million for both Claimants' investment in Comsigua; it must also pay both Claimants the interest already accrued and to accrue on those amounts. However, the Claimants have not specified the proportion in which such award will be allocated between them.

401. The Arbitral Tribunal has ruled out a 50%/50% allocation, since this would allow Talta, which is not an investor in Tavsa, to be paid compensation for the expropriation of an investment that is not its own. The appropriate solution is for each company's compensation to go to the respective investor.

402. Tavsa's compensation is then to be paid in full to Tenaris. Comsigua's compensation, however, creates more serious doubts. Both Claimants are investors in Comsigua: Talta is the direct investor, and Tenaris is also an investor but only indirectly, as it is the 100% owner of Talta: the complaint could have been filed individually, either by Talta or by Tenaris. Because it was jointly filed, and no allegation has been made by a party, the Tribunal does not have a rule to determine how to allocate the compensation among them; therefore, the award will be paid to the direct investor in Comsigua, namely Talta. Tenaris, as Talta's sole owner, will then do as it sees fit with the money thus received.

## VII.1.                          THE VALUATION DATE

403. Both BITs establish that compensation is to be set as of the day preceding that on which the expropriatory measure became public knowledge.[400]

404. The Parties' experts have conflicting positions on the date of the expropriatory measure: the Claimants' experts argue that expropriation took place on the date of the Nationalization Decree, April 30, 2008; whereas the Respondent's expert advocates for May 20, 2009, which is the day prior to the public announcement of Tavsa's and Comsigua's nationalization by President Chávez.

## 1.   TAVSA

405. As regards Tavsa, the Respondent itself has acknowledged that the expropriation was carried out pursuant to the Nationalization Decree, as supplemented by the Implementing Decree;[401] there is then no question that the expropriatory measure took place on April 30, 2008.

### The Respondent's Counter-Argument

406. The Respondent's expert has argued that Tenaris, in its filings with the U.S. Securities and Exchange Commission, suggested that the date on which, for accounting purposes, its investment in Venezuela was affected was May 2009.[402]

407. Experts Abdala/Zadicoff, however, consider that the fact that Tenaris waited until May 2009 to have its financial statements reflect the situation of its investments in Venezuela is not significant in order to determine the valuation date, due to a number of reasons:[403]

- Until the formal change of control of the company took place, there was no obligation to reclassify the investment;[404]

- The book value of Tenaris' investments in Venezuela did not reflect their market value, and there was thus no need to reduce the book value of its investments; therefore, the fact that in May 2009 they decided to have their accounts reflect this impairment in value only shows that Tenaris is guided by prudence; it does not, however, rule out the fact that the investments had already been impaired earlier.

408. The Arbitral Tribunal agrees with Tenaris:

---

[400] Luxembourg BIT, Article 4.2, and Portuguese BIT, Article IV.1(c).
[401] RIII, paras. 284 *et seq.*
[402] Hart I, para. 70.
[403] Abdala/Zadicoff II, para. 18.
[404] T., p. 827.

- First, because nowhere do the BITs link the determination of the date for compensation to the investors' accounting records; and

- Second, because the Claimants have supplied two plausible reasons for such accounting behavior, which is not incompatible with the fact that the expropriation took place a year earlier.

409. The Arbitral Tribunal confirms that the Nationalization Decree of April 30, 2008 was a measure with expropriatory effects on Tavsa and, therefore, in accordance with the literal meaning of the BITs, the valuation date for the compensation due is the day before the date of that measure, *i.e.* April 29, 2008.

410. However, because using full months for calculation purposes is more convenient, the Claimants' experts have used as the valuation date a day later, April 30, 2008, and the Arbitral Tribunal will allow this simplification (which results in a very slight reduction in value).

## 2. COMSIGUA

411. As regards Comsigua, conversely to the case with Tavsa, Venezuela has not explicitly acknowledged its expropriation. It has been this Arbitral Tribunal that determined that both companies shared a similar fate: their assets were expropriated as a result of the Nationalization Decree and the Implementing Decree.[405] Therefore, the date of publication of the expropriation measure is, just like for Tavsa, April 29, 2008 and, due to reasons of convenience, it will be April 30, 2008.

The Respondent's Counter-Argument

412. Venezuela argues that the Nationalization Decree does not apply to Comsigua, because it is not Comsigua, but Sidor instead, that it mentions explicitly.[406] This argument is not persuasive:

413. (i) The Nationalization Decree ordered the nationalization of the entire iron ore transformation industry in the Guayana region – the sector Comsigua operates in;

414. (ii) The Nationalization Decree ruled the activities of Sidor "and its subsidiaries and affiliates" to be of public use and social interest, and ordered its transformation into a State-Owned Company.

415. The Arbitral Tribunal has no doubt that Comsigua was an affiliate of Sidor because, as agreed by the Respondent itself, "affiliates" are those companies that are subject to common ownership,[407] and, in this case, Comsigua was an affiliate of Sidor, as it was owned by Tenaris and Sidor was owned by Ternium, and both Tenaris and Ternium are members of the Techint Group[408] – the ultimate parent of both was therefore the same.

---

[405] See para. 336 *supra*.
[406] RIII, para. 288.
[407] RIV, para. 355, and the reference to Exhibit R-109.
[408] CI, para. 58.

416.  (iii) The Respondent itself acknowledged on several occasions that the Nationalization Decree applies to Comsigua:

-   The MIBAM Minister appointed its representatives to the Compensation Commission, relying expressly on the Nationalization Decree:[409]

    > "In my capacity as Minister of [MIBAM] and based on Decree No. 6058 [...] and pursuant to the President's decision to proceed with the full statization of Complejo Siderúrgico de Guayana S.A. (Comsigua) [...]."

-   Respondent's witness Villarroel, an advisor to the Compensation Commission, acknowledged the following facts:[410]

    > "In May 2009, following the decision to nationalize COMSIGUA and in accordance with Legal Decree 6.058 of April 30, 2008, a [...] transition commission was created [...]."

-   The share sale agreement between the State and the Japanese Shareholders mentions both the Nationalization Decree and the Implementing Decree as the legislation under which the sale transaction was being carried out:[411]

    > "[...] an agreement has been reached to enter into this share sale contract, pursuant to Decrees Nos. 6058 and 6796 [...]."

-   In this arbitration, Venezuela has admitted that Tavsa's expropriation took place as a result of the Nationalization Decree,[412] even though, as regards the applicability of the Decree, Tavsa and Comsigua are similar companies: they are both companies in the Guayana iron and steel sector, they are both owned by Tenaris, and therefore affiliates of Sidor, and they both had their Takeover Commissions created based on the Nationalization Decree.[413] There is then no reason to accept the applicability of the Decree to Tavsa and – arbitrarily – deny such applicability to Comsigua.

417.  Venezuela cannot now act in a manner inconsistent with its own previous actions[414] and claim that the Nationalization Decree does not apply to Comsigua. Therefore, the Arbitral Tribunal is reaffirmed that the valuation date for the purpose of Comsigua's compensation is set by the Nationalization Decree, *i.e.* April 30, 2008.

---

[409] Exhibit C-57.
[410] Villarroel I, para. 3.
[411] Exhibit C-72.
[412] RV, para. 132: "Venezuela has explained that the measure [occupation of Tavsa's premises] was authorized by Decree 6058 [...]."
[413] See para. 262 *supra*.
[414] The principle of *non venire contra factum proprium*, in Roman law tradition, or *estoppel,* in the common-law tradition.

# VII.2.                    TAVSA'S VALUE

418. The Arbitral Tribunal will now summarize the Claimant's position (**1.**), and the Respondent's position (**2.**), and, lastly, it will make a decision as to the value of Tavsa (**3.**).

## 1.  THE CLAIMANT'S VALUATION

419. Experts Abdala/Zadicoff have estimated the value of Tavsa using a DCF approach (**1.**), and compared it using market multiples (**2.**). The experts prefer the former method, as it best reflects the income-generating capacity of the asset that is being valued.[415] In any event, the results arrived at by the two methods are similar and stand in the ballpark of USD 300 million,[416] valued as of April 30, 2008.

## 1.1  DCF

420. Basically, this valuation approach consists in:[417] estimating the future revenue stream (**A.**) and deducting expenses off it (**B.**). The experts assume that the net cash flows will be generated in perpetuity, increasing from 2017 onwards at a growth rate (**C.**). The cash flows are discounted at the appropriate discount rate (**D.**) to the valuation date.[418]

421. It should be noted here that the DCF method is not about estimating the cash flows actually received by Tavsa after being expropriated, but about estimating, with the knowledge available as of the valuation date (when the expropriation became public knowledge), the income to be obtained and costs to be incurred in coming years.

### A.  Revenue

422. Tavsa's revenue is determined by:[419] the expected volume of production of seamless steel tubes (**a.**) multiplied by their projected price (**b.**).

#### a.  Tube Production

423. Abdala/Zadicoff state that, as of the expropriation date, Tavsa's annual production capacity was 80,000 tons of tubes,[420] and they estimate that, between 2008 and 2010, annual production would progressively increase to reach up to 72,000 tons; this maximum production level means that Tavsa would be producing at maximum capacity, at a utilization rate of 90% (80,000 * 90% = 72,000), as budgeted for 2008 – 2009.[421]

---

[415] Abdala/Zadicoff I, para. 8. Unless otherwise indicated, the Tribunal refers to the English language report.
[416] Abdala/Zadicoff I, Table I.
[417] Abdala/Zadicoff I, paras. 56, and 112.
[418] The determination of the valuation date is addressed in a separate section.
[419] Abdala/Zadicoff I, para. 118.
[420] Abdala/Zadicoff I, para. 123.
[421] Abdala/Zadicoff I, para. 124.

424. According to experts Abdala/Zadicoff, this estimate is completely reasonable: Tavsa's production constantly expanded between 2002 and 2007, with the company more than doubling its initial production levels. Once the 2006 and 2007 conflicts were over, the experts are convinced that the growth rate would have been greater still, in line with Tavsa's management's expectations.[422] A production level of 72,000 tons per year is what management expected for 2008 and 2009, and it matches the production level reached in the first quarter of 2007.[423]

425. Experts Abdala/Zadicoff start from the premise that Tavsa would obtain the necessary inputs to attain such production levels, and do not doubt the credibility of this hypothesis: Tavsa would require 91,000 tons of ingots per year, a quantity greater than provided for in the contract with Sidor by only 1%; this 1% could be obtained from the stock Tavsa had piled up as of the valuation date.[424]

426. Abdala/Zadicoff do not find it necessary to apply greater adjustments to these forecasts to reflect potential supervening production problems, as they contend it is a basic feature of the DCF method to predict the best cash flow scenario and reflect residual risks through the discount rate.[425]

427. Experts Abdala/Zadicoff assert that Tavsa would be able to sell 100% of its production since it was and continues to be the only seamless tube manufacturer in Venezuela – a country with significant demand for this product.[426] As of the valuation date, PDVSA would acquire basically 100% of production – in line with the nationalization of the oil and gas sector[427] – and there are no reasons to assume that this trend would change.[428]

**b.    Projected Price**

(i)    <u>May-December 2008</u>

428. For the period May-December 2008, experts Abdala/Zadicoff use real sale prices (USD 2,350 per ton), since there was a significant backlog of orders as of the valuation date.[429]

---

[422] Abdala/Zadicoff II, para. 25.
[423] Abdala/Zadicoff II, para. 27.
[424] Abdala/Zadicoff II, para. 28.
[425] Abdala/Zadicoff II, para. 29.
[426] Abdala/Zadicoff II, para. 30.
[427] Abdala/Zadicoff II, para. 33.
[428] Abdala/Zadicoff II, para. 32.
[429] Abdala/Zadicoff II, para. 38(a).

(ii)   2009 – 2013

429.   As of the time of the expropriation, Tavsa would sell almost its entire production to the state-owned PDVSA.

430.   The price agreement with PDVSA that was in place until 2008 provided that the sales price would be set on the basis of the price applied in the previous period, adjusted on a monthly basis per fluctuations in the international reference prices. However, given the upward trend in such international prices, in 2008 PDVSA and Tavsa started to negotiate a new pricing system that would cushion the impact of international price fluctuations.[430]

431.   The proposed pricing formula (which would end up being accepted that very same year) was as follows:[431]

$$P_t \;=\; 30\,\% \times P_{t-1} + 70\% \times P_{t-1} \times \left[\frac{PPL_{t-1}}{PPL_{t-2}}\right]$$

where:

$P_t$     is the price in month $t$
$P_{t-1}$   is the price in month $t-1$
$PPL_{t-1}$ is the reference price published by Pipe Logix for month $t-1$
$PPL_{t-2}$ is the reference price published by Pipe Logix for month $t-2$

432.   This formula means that international prices ($PPL$) are weighed at 70%.

433.   Even though, as of the valuation date, the above formula was still in the process of being negotiated, the experts use the assumption that Tavsa would have introduced this pricing mechanisms in its new contracts with PDVSA (*de facto*, its sole customer[432]) starting in 2009;[433] and they thus apply said formula to estimate the future sales price.

434.   The difficulty in applying the formula to obtain a long-term estimate is that Pipe Logix (a provider of market information for pipes[434]) does not post price predictions for periods beyond one year ahead. Therefore, experts Abdala/Zadicoff chose to substitute the Pipe Logix prices with those posted by Metal Bulletin Research for hot rolled coils ["**HRC**"].[435] The experts highlight the fact that, historically, the seamless steel tube prices published by *Pipe Logix* and HRC prices have evolved at the same pace.[436]

(iii)   2013 – 2017

---

[430] Abdala/Zadicoff I, para. 119.
[431] Abdala/Zadicoff I, para. 120.
[432] Abdala/Zadicoff II, para. 40.
[433] Abdala/Zadicoff I, para. 121.
[434] Abdala/Zadicoff I, para. 119 and footnote 114.
[435] Abdala/Zadicoff I, para. 121.
[436] Abdala/Zadicoff II, para. 42.

435. From 2013 on, the experts estimate that prices will evolve in line with the U.S. producer price index ["**PPI**"].[437]

436. Abdala/Zadicoff do not accept the criticism (discussed further below) that their price forecasts do nothing but extend the pricing bubble that existed in late 2007 and early 2008. The experts' counter-argument is that their forecast (based on the projections by other analysts in this sector) estimates an initial price increase, followed by a fall, as was predictable as of the valuation date.[438]

## B. <u>Expenditures</u>

437. In order to derive a cash flow, the experts deduct operating expenses (opex) (**a.**), taxes (**b.**), and capital expenditures (capex) (**c.**) and apply adjustments to reflect changes in working capital (**d.**).

### a. Opex

438. Production costs consist of the materials required to manufacture the tubes, as well as the energy consumed in the production process.[439] Supplies (including electricity and gas)[440] came fully from Sidor, and the contract with this company established the applicable price, which was to be reviewed every two years. The experts estimated that the prices of these supplies would evolve as follows:

- Steel billets and related supplies, based on the expected evolution of the HRC price;[441] the experts note that it is standard practice to provide for a certain decrease in the costs of steel, in line with the reduction in Tavsa's revenue;[442]

- The costs of other materials, as well as the costs of energy, based on the 2007 costs in *bolívares,* adjusted as per the expected evolution of the Venezuelan PPI.[443]

439. As regards the costs of the production plant personnel, these evolve in line with the Venezuelan consumer price index ["**CPI**"].[444] The experts further note that, if tube production were estimated below 72,000 tons per year, there would be a lower number of personnel and labor costs should be reduced.[445]

---

[437] Abdala/Zadicoff I, footnote 117.
[438] Abdala/Zadicoff II, para. 43.
[439] Abdala/Zadicoff I, para. 127.
[440] Abdala/Zadicoff I, footnote 124.
[441] Abdala/Zadicoff I, para. 130.
[442] Abdala/Zadicoff II, para. 46.
[443] Abdala/Zadicoff I, para. 131.
[444] Abdala/Zadicoff I, para. 133.
[445] Joint Report, para. 8.

440.  The commercial costs category covers a whole range of costs:

-  Taxes: Tavsa's revenue is subject to two different taxes: a tax on invoicing and the so-called "social contribution;"[446]

-  Freight and extraordinary expenses, which would evolve based on the Venezuelan PPI;[447]

-  Administrative staff expenses, estimated at the 2007 sum, increased by the Venezuelan CPI.[448]

441.  As to technical assistance costs, experts Abdala/Zadicoff found it reasonable to estimate that, in 2008, Tavsa would have no longer required this type of support services.[449] In the preceding 10 years, Tavsa and Tamsa had been bound by a technical assistance contract[450] that expired in 2008. Tavsa would have chosen not to renew that contract, thereby saving on this additional cost.

442.  In the Joint Report, experts Abdala/Zadicoff introduce the following nuance: the technical assistance contract would have generated a revenue stream for Tamsa (and, therefore, for Tenaris), which it was deprived of as a result of the expropriation. Therefore, if the hypothesis that the contract was cancelled is rejected, the contract would remain in force and Tamsa would have been deprived of such revenue and, therefore, they would be seeking separate compensation for Tenaris for the loss of such contract.[451]

### b.  Taxes

443.  Tavsa's income is subject to three different taxes: on science and technology (0.5% of gross income), anti-drug tax (1% of EBIT minus interest) and corporate income tax (34% net of the anti-drug tax).[452]

### c.  Capex

444.  The estimation of capital expenditures is marked by the hypothesis that Tavsa will not be increasing its production capacity. Hence, the only costs that are expected are those related to the depreciation of fixed assets, to maintain the pre-established maximum capacity.[453] The experts note that they have had the cost items include extraordinary repairs, totaling USD 3.1 million per year, thus keeping Tavsa from having to invest additional amounts.[454]

---

[446] Abdala/Zadicoff I, para. 134.
[447] Abdala/Zadicoff I, para. 134.
[448] Abdala/Zadicoff I, para. 136.
[449] Abdala/Zadicoff I, para. 137.
[450] CLEX-56.
[451] Joint Report, para. 14 and footnote 5.
[452] Abdala/Zadicoff I, para. 140.
[453] Abdala/Zadicoff I, para. 139.
[454] Abdala/Zadicoff II, para. 57.

445. In their second report, following the criticisms of expert Hart, the experts decided to introduce a change to increase depreciation levels from 2017 onwards, such that these have now changed from USD 0.6 to 1.5 million.[455]

**d. Changes in Working Capital**

446. The Claimants' experts have looked at the 2005 – 2007 period, and determined that trade receivables amount, on average, to 70 days' revenue, while accounts payable are estimated as 70 days over total yearly expenses. Inventory is calculated as 100 days of costs of goods sold.[456]

447. Applying the above estimates, working capital stands at 10 days of annual revenue.[457]

**C. Terminal Value**

448. Terminal value is estimated as the value of the 2017 revenue stream, increased at 2.4% in perpetuity. The 2.4% growth rate is consistent with U.S. inflation expectations.[458] Non-discounted terminal value is almost USD 350 million.[459] This means 30% of the total enterprise value.[460]

**D. Discount Rate**

449. The discount rate used by the experts is the WACC, as per the following formula:[461]

$$WACC = W_D \cdot k_D \cdot (1 - t) + W_E \cdot k_E$$

where:
$W_D$   is the weight of debt financing in the capital structure
$k_D$   is the cost of debt
$W_E$   is the weight of equity in the capital structure
$k_E$   is the cost of equity

---

[455] Abdala/Zadicoff II, para. 58.
[456] Abdala/Zadicoff I, para. 142.
[457] Abdala/Zadicoff I, para. 143.
[458] Abdala/Zadicoff I, para. 144.
[459] CLEX-2, FCF, Terminal Value without the discount factor.
[460] T., p. 974:12–13.
[461] Abdala/Zadicoff I, para. 170.

450. Next is a summary of the experts' estimates for each one of the above parameters:

### a.    Return on Equity

451. This cost is calculated, per the CAPM,[462] as the sum of the rate of return on risk-free assets (**i.**), the country-risk rate (**ii.**) and the product of the beta factor (**iv.**) by the market risk premium (**v.**).[463] According to the Claimants' experts, no size premium is to be included (**iii.**). The return on equity is, as per the experts, 17.8%.[464] Each component will be addressed separately:

### (i)    Rate of Return on Risk-Free Assets

452. In practice, this rate is measured based on the yield of either 10-year or 30-year U.S. bonds. The experts used 10-year bonds, as these represent a long-term investment and are less sensitive to unexpected inflation changes.[465]

453. The average yield of these bonds, calculated on the basis of bonds maturing in the 12 months up to April 30, 2008, is 4.29%.[466]

### (ii)    Market Risk Premium

454. The goal is to measure the additional returns an investment needs to yield as a result of the investor taking on a risk higher than the risk entailed by a risk-free investment.[467]

455. The experts have estimated this premium based on the historical 1928 – 2007 indexes published by Prof. Damodaran[468] and calculating the geometric average, which is 4.79%.[469] Abdala/Zadicoff advocate for the use of a geometric average over an arithmetic average, as the latter is normally used only for short-term projects.[470]

456. The experts contend that the premium calculated in this manner is in the range of, or even slightly above, what experts recommend (about 3.5%).[471]

---

[462] Capital Asset Pricing Model.
[463] Abdala/Zadicoff I, para. 173.
[464] Abdala/Zadicoff I, para. 191.
[465] Abdala/Zadicoff I, para. 176.
[466] Abdala/Zadicoff I, para. 176.
[467] Abdala/Zadicoff I, para. 177.
[468] Abdala/Zadicoff II, para. 98.
[469] Abdala/Zadicoff I, para. 177.
[470] Abdala/Zadicoff II, para. 94.
[471] Abdala/Zadicoff II, paras. 95, 96.

(iii)   <u>No Need for a Size Premium</u>

457.   In the view of Abdala/Zadicoff, adding a premium to account for Tavsa's size is not advisable, for several reasons:[472]

-   First, there is disagreement amongst authors as to the need to apply a size premium, even for companies in the U.S., let alone for companies outside of that country;[473]

-   Second, Tavsa is a company that can be considered very large for the Venezuelan market; the fact that it is a small company relative to U.S. companies is something that is already reflected in the country-risk premium.

(iv)   <u>Beta</u>

458.   Beta is the coefficient that reflects the company's profits' volatility relative to market risk. Therefore, information on beta coefficients is obtained from a stock market analysis; however, in the experts' opinion, stock market information from emerging economies should not be used, as it tends to increase the beta as a consequence of its volatility and unreliability.[474] Therefore, the experts recommend estimating the beta based on data for comparable companies operating in a developed economy, as the U.S. economy, and applying the required adjustment to reflect that the investment in question is an investment in a developing economy, with higher economic and political volatility, and to reflect specific regulatory features.[475]

459.   The experts have chosen Morningstar SIC code 331, which includes companies in steel works, blast furnaces and rolling and finishing mills.[476] The beta that is derived through simple regression between the share return and the market return is a "raw" beta, to which the experts apply a "reversion-to-one" adjustment.[477] This adjustment is due to the belief that, in the long term, all projects should tend to behave like the market, with, therefore, a beta of one;[478] and the applicable formula is as follows:[479]

$$Adjusted\ Beta = 0.67\ x\ Raw\ Beta + 0.33$$

460.   A second adjustment also needs to be applied, to unleverage the betas of companies in the sample and releverage them,[480] using an optimal capital structure for the relevant industries and the tax rate applicable in Venezuela (34%).[481] The result is a beta of 1.86.[482]

---

[472] Abdala/Zadicoff II, para. 101.
[473] Abdala/Zadicoff II, para. 102.
[474] Abdala/Zadicoff I, para. 178.
[475] Abdala/Zadicoff I, para. 179.
[476] Abdala/Zadicoff I, para. 180.
[477] Abdala/Zadicoff I, para. 181.
[478] Abdala/Zadicoff I, footnote 157.
[479] Abdala/Zadicoff I, para. 181.
[480] Abdala/Zadicoff I, para. 182.
[481] Abdala/Zadicoff I, para. 183.
[482] Abdala/Zadicoff I, para. 183.

(v)   Country Risk Premium

461.  This premium represents the additional return an investor will ask for to invest in a company in Venezuela as compared to a company in a more stable economy like, for instance, the U.S.[483]

462.  The approach used by the experts to calculate this premium is the sovereign debt approach. The experts thus compare the spread between the yield of 5-year USD-denominated Venezuelan bonds and that of U.S. Treasury bonds with a similar maturity period. Venezuelan data is obtained from J.P. Morgan's Emerging Markets Bond Index.[484] The resulting premium is thus 4.6%.[485]

**b.   Cost of Debt Financing**

463.  This cost is calculated as the sum of the risk-free rate of return plus the country-risk premium, plus the industry-risk premium. The industry-risk premium is derived from the figure calculated by Prof. Damodaran for steel works in the U.S. in 2008, and stands at 1.5%.[486] Added to the above premiums and rate, this results in a before-tax cost of debt of 10.4% and an after-tax cost of debt of 6.9%.[487]

**c.   Capital Structure**

464.  There is no information on the capital structure of Venezuelan companies with a risk profile like Tavsa's. Faced with this situation, the Claimant's experts elect to use the capital structure of comparable SIC 331 companies, which is the code used in calculating the beta. The experts thus arrive at a debt-to-equity ratio of 23.9%.[488]

\* \* \*

465.  Once the above factors are input into the formula, the resulting WACC is 15.69%.[489]

466.  After discounting annual cash flows between May 2008 and December 2017 to the valuation date, the experts initially arrive at a value of USD 214 million; there is then added to this value the discounted terminal value, which is USD 91.9 million; the total is USD 305.9 million.[490] After the capex change introduced by the experts in their second report, that values goes down to USD 304.6 million.[491] As of the valuation date, Tavsa had no outstanding financial liabilities,[492] and the experts thus made no additional calculations to assess that

---

[483] Abdala/Zadicoff I, para. 184.
[484] Abdala/Zadicoff I, para. 185.
[485] Abdala/Zadicoff I, para. 187.
[486] Abdala/Zadicoff I, para. 189.
[487] Abdala/Zadicoff I, para. 189
[488] Abdala/Zadicoff I, para. 190.
[489] Abdala/Zadicoff I, para. 191.
[490] Abdala/Zadicoff I, Table III, p. 28.
[491] Abdala/Zadicoff II, para. 59.
[492] Abdala/Zadicoff I, para. 145.

value.

467. Because Tenaris held a 70% interest in Tavsa, that percentage needs to be applied to the total value, thus arriving at the value of its investment: USD 213.2 million.[493]

## 1.2 MARKET MULTIPLES APPROACH

468. This approach consists in identifying companies comparable to Tavsa and calculating the average of the EV[494]/EBITDA,[495] EV/Sales and EV/BVA[496] multiples as of April 30, 2008.[497]

469. The experts used two sources for their comparable data: the list of steel tube manufacturers compiled by Lloyd's Register Group Limited and companies listed under SIC code 3317 (steel pipe and tubes), provided that they were engaged in the manufacturing of seamless tubes and were publicly traded. The sample came down to seven companies.[498] Abdala/Zadicoff find no conceptual difficulty in using companies located outside of Venezuela, as what the market multiples approach requires is that the reference companies' economic characteristics be reasonably similar to those of the company that is being valued, and that they are exposed to similar risks.[499]

470. The data obtained for the above parameters were as follows:[500]

---

[493] Abdala/Zadicoff II, para. 59.
[494] Enterprise Value.
[495] Earnings Before Interest, Taxes, Depreciation and Amortization.
[496] Book Value of Assets.
[497] Abdala/Zadicoff I, para. 65.
[498] Abdala/Zadicoff I, para. 193.
[499] Abdala/Zadicoff II, para. 109.
[500] Abdala/Zadicoff I, Table V.

114

| Name | Location | EV / EBITDA | EV / Sales | EV / BVA |
|---|---|---|---|---|
| Multiples as of April 30, 2008 | | | | |
| Anhui Tianda Oil Pipe Co. | Hong Kong | 9.47 | 1.43 | 1.58 |
| Sanyo Special Steel Co. | Japan | 5.84 | 0.74 | 0.84 |
| SC TMK-ARTROM S.A. | Romania | 14.08 | 1.51 | 1.04 |
| Tubos Reunidos S.A. | Spain | 8.14 | 1.76 | 1.43 |
| Vallourec S.A. | France | 6.48 | 1.81 | 1.95 |
| Tenaris S.A. | Argentina | 10.27 | 3.47 | 2.28 |
| Gandhi Special | India | 4.43 | 1.80 | 2.20 |
| Median | | 8.14x | 1.76x | 1.58x |
| Average | | 8.39x | 1.79x | 1.62x |

471.  The above multiples are applied to Tavsa's EBITDA and sales as of December 31, 2007, and its BVA as of April 30, 2008.[501]

Control Premium

472.  In addition, the experts apply a correction to the above value to reflect the control premium for the Claimant's controlling interest in Tavsa. With a 70% stake, the Claimant had the capacity to influence the future of the company, and that control has a price. According to the experts, it is sufficiently documented in the literature that, when a buyer obtains a control position in a company, that buyer pays a price above market price for that position.[502]

473.  In the following table, the experts have summed up the control premium figures mentioned by the most reputed authors:[503]

---

[501] Abdala/Zadicoff I, para. 66.
[502] Abdala/Zadicoff I, para. 195.
[503] Abdala/Zadicoff I, para. 201.

115

| Author | Control Premium | | |
|---|---|---|---|
| Rudenno (2009) | 15% | - | 30% |
| Damodaran (2005) | 15% | - | 20% |
| Hanouna, Sarin and Shapiro (2001) on Damodaran (2005) | 20% | - | 30% |
| Barclay and Holderness (1989, 1991) on Damodaran (2005) | 10% | | |
| Nicodano and Sembenelli (2000) | 27% | | |
| Mikkelson and Regassa (1991) on Holderness (2003) | 9.2% | | |
| Chang and Mayers (1995) on Holderness (2003) | 13.6% | | |
| Dyck and Zingales (2004) | | | |
| Argentina | 27% | | |
| Brazil | 65% | | |
| Chile | 18% | | |
| Colombia | 27% | | |
| Mexico | 34% | | |
| Peru | 14% | | |
| Venezuela | 27% | | |

474. The experts have added empirical data for control premiums in Latin American countries. They thus arrive at the conclusion that the appropriate control premium in this case is 27%. Accordingly, the data derived through the multiples approach is to be multiplied by 1.27.[504]

475. The following tables summarize the results obtained:[505]

| Valuation as of April 30, 2008 (US$ millions) | | |
|---|---|---|
| EV to Sales | | |
| Tavsa's Sales Revenue | [a] | 141.5 |
| EV/Sales Ratio | [b] | 1.8x |
| Tavsa's Enterprise Value | [c] = [a] x [b] | 249.4 |
| less Financial Debt | [d] | - |
| Tavsa's Implied Value of Equity | [e] = [c] - [d] | 249.4 |
| Control Premium | [f] | 27% |
| Value of Equity for Controlling Stakes | [g] = [e] x [f] | 316.8 |
| Market Value of Equity to Claimants | [h] = [g] x 70% | 221.8 |

| Valuation as of April 30, 2008 (US$ millions) | | |
|---|---|---|
| EV to EBITDA | | |
| Tavsa's EBITDA | [a] | 31.3 |
| EV/EBITDA Ratio | [b] | 8.1x |
| Tavsa's Enterprise Value | [c] = [a] x [b] | 254.9 |
| less Financial Debt | [d] | - |
| Tavsa's Implied Value of Equity | [e] = [c] - [d] | 254.9 |
| Control Premium | [f] | 27% |
| Value of Equity for Controlling Stakes | [g] = [e] x [f] | 323.8 |
| Market Value of Equity to Claimants | [h] = [g] x 70% | 226.6 |

---

[504] Abdala/Zadicoff I, para. 202.
[505] Abdala/Zadicoff I, Tables VI, VII, and VIII on pp. 34 and 35.

116

| Valuation as of April 30, 2008 (US$ millions) | | |
|---|---|---|
| **EV to Book Value of Assets** | | |
| **Tavsa's BV of Assets** | [a] | 158.5 |
| **EV/Book Value of Assets Ratio** | [b] | 1.6x |
| **Tavsa's Enterprise Value** | [c] = [a] x [b] | 251.0 |
| *less Financial Debt* | [d] | - |
| **Tavsa's Implied Value of Equity** | [e] = [c] - [d] | 251.0 |
| *Control Premium* | [f] | 27% |
| **Value of Equity Adjusted for Control** | [g] = [e] x [f] | 318.8 |
| **Market Value of Equity to Claimants** | [h] = [g] x 70% | 223.2 |

476.  The value of Tenaris' investment in Tavsa is estimated at USD 226.6 million (EV/EBITDA),[506] USD 221.8 million (EV/Sales)[507] and USD 223.2 million (EV/BVA)[508] – on average, USD 223.8 million as of April 30, 2008.[509]

## 2.  THE RESPONDENT'S VALUATION

477.  Expert Hart takes issue with the fact that the opposing party's experts consistently chose the most optimistic possible scenario, instead of looking for a more balanced approach that would represent the viewpoints of a hypothetical buyer and a hypothetical seller.

478.  Hart criticizes the calculations of Abdala/Zadicoff under the two approaches: the DCF methodology (**1.**) and the market multiples methodology (**2.**). In his second report, the expert adds the construction of a new plant and the purchase of stock in a different company as references to estimate Tavsa's value (**3.**).

### 2.1  THE DCF APPROACH

479.  The expert accepts the discounted cash flows approach as a valid methodology to assess the value of a company, but disagrees on certain assumptions used by Abdala/Zadicoff.

480.  The first assumption he takes issue with is the valuation date; however, the Arbitral Tribunal has already ruled on this issue, agreeing with the Claimant: the valuation date is April 30, 2008.

481.  Even though in his first reports Hart framed his criticism from the perspective of a valuation as of May 2009, he also ran an alternative calculation as of April 2008, estimating the discount rate as of such date. Moreover, both at the Hearing and in the Joint Report, he elaborated on his position regarding the value of Tavsa as of April 2008. His main points of disagreement with Abdala/Zadicoff are summarized next:

---

[506] Abdala/Zadicoff I, Table VI, p. 34
[507] Abdala/Zadicoff I, Table VII, p. 34.
[508] Abdala/Zadicoff I, Table VIII, p. 35.
[509] Abdala/Zadicoff I, para. 68.

### A. <u>Revenue</u>

482. Hart rejects the assumptions underlying the revenue estimates of the opposing experts: he is critical of the production estimates, and also disagrees on the price estimated by Abdala/Zadicoff.

### a. Production

483. Hart is surprised that his colleagues assumed that Tavsa would produce at 90% of its capacity in perpetuity, and that it would never run into constraints in the availability of the supplies needed to reach such capacity level, since:

- In 1999, the company's utilization rate was 25%,[510] standing at 50% on average until 2007;[511]

- In his opinion, blaming labor conflicts for the historical failure to reach a 90% productivity rate and expecting that such conflicts will disappear in the future is very naive,[512] because any hypothetical buyer would have taken into consideration potential labor conflicts and their impact on production:[513] labor problems and technical and operating failures have been a frequent occurrence in the Venezuelan steel industry;[514] indeed, the contract between Tavsa and Sidor mentioned possible delays, failures and omissions caused by strikes, lockouts and energy shortages.[515]

- Under the Tavsa-Sidor contract, Sidor was required to supply up to 90,000 tons of steel per year – assuming a sales level requiring larger quantities would be entirely unsupported.[516]

484. However, expert Hart acknowledges that, in 2005, Tavsa increased its capacity from 65,000 to 80,000 tons, but explains that it did so by increasing work shifts, which went from 12 to 15, and adds that an increase in the number of shifts intended to increase capacity is not a feasible solution that is sustainable in the long term, as it causes excessive wear and tear in the company's resources[517] – in fact, the effects of such wear and tear began to be felt in 2007, as Tavsa had to invest millions of dollars in mechanical repairs.[518]

---

[510] Hart I, Figure 8.1.
[511] Hart I, para. 164.
[512] Hart II, para. 131.
[513] Hart II, para. 129.
[514] Hart I, para. 165.
[515] Hart I, para. 165.
[516] Hart I, para. 169.
[517] Hart II, para. 129.
[518] Hart II, para. 130.

118

485. In the Joint Report, the expert suggests an annual production level of 50,748 tons of tubes.[519]

### b. Price

486. Expert Hart reveals irregularities in Abdala/Zadicoff's calculations:

- They apply a pricing formula that never got to be agreed upon;[520]

- Then, they deviate from the formula, and use a different reference for international prices;[521]

- However, they only use this alternative reference up to 2013, after which they raise the prices based on the inflation forecasts, but there is no reason to keep the international pricing bubble in place.[522]

487. Hart believes that Abdala/Zadicoff took advantage of the fact that the 2007 price was part of a bubble to derive an inflated future projection. However, any hypothetical buyer would have understood that every long-term project is subject to ups and downs, and would have allowed for the possibility of a price decrease;[523] and, in any event, the buyer would have taken into consideration the price's past history.[524]

488. In the Joint Report, Hart provides an estimation as of April 2008 using the Canaccord Adams projections weighted at 70/30 (as negotiated between PDVSA and Tavsa), in order to facilitate a comparison to Abdala/Zadicoff's proposal.[525]

### B. Expenditures

489. The expert structures his criticism into the following major groups.

### a. Costs of Goods Sold

490. The expert criticizes the opposing experts' estimates. It is his view that the data observation period is too short, as it covers little more than one year (January 2007 – May 2008), when the acceptable choice would have been to use a period of five years.[526] He further notes that, for certain expenses, the experts decided on shorter periods for the sole purpose of reducing costs and thus inflating the damages amount.[527] Finally, he takes issue with the opposing experts having altogether neglected to account for certain costs, such as maintenance and repair costs, which got to be somewhat significant in 2007.[528]

---

[519] Joint Report, para. 7.
[520] Hart I, para. 178.
[521] Hart I, para. 182.
[522] Hart I, para. 183.
[523] Hart II, para. 141.
[524] Hart II, para. 152.
[525] Joint Report, para. 23.
[526] Hart I, para. 187.
[527] Hart I, para. 188.
[528] Hart I, para. 189.

491. In his second report, Hart reviewed the data for the costs incurred in the period 2006 – 2008 and found a correlation between the cost of ingots (input) and the sales price;[529] and was thus able to estimate Tavsa's gross margin at 34% from 2009 onwards.[530]

### b. Sales, General, and Administrative Costs

492. Tavsa also incurs fixed and semi-fixed costs associated with:[531]

- Technical Assistance: Hart sees no reason to reject an extension of the technical assistance contract between Tavsa and Tamsa after the expiration of its original duration in 2008; if such contract were not extended, then it is possible that Tavsa would also incur costs as a result of taking over the service itself or finding another third-party provider.[532]

- Sales Expenses: these include social fund provisions, invoicing tax and transportation costs, but should not include extraordinary expenses, as these are already reflected in the direct production costs. Transportation costs are also included; however, the expert is unable to verify the figures used by Abdala/Zadicoff, as they have not proven that these are the rates actually paid for transportation.[533] In his second report, Hart estimates that, on average, social fund provisions and commissions between 2006 and 2008 stood at 5.37% and 2%, respectively.[534]

- Administrative Expenses: Abdala/Zadicoff took the 2007 costs and projected them, increasing them by the Venezuelan CPI; however, the expert fails to understand why they did not engage in a more exhaustive analysis, covering a longer period of time, and why they have not justified that these expenses are tied to the CPI.[535] In his second report, Hart estimates the average for these expenses between 2006 and 2008 at USD 1.3 million.[536]

### c. Capex

493. It is Hart's view that Abdala/Zadicoff's assumptions are not realistic: it is not possible for a plant producing at maximum capacity not to need additional investments[537] beyond the depreciation of its fixed assets;[538] in addition, it is a fact that an industrial plant's maintenance costs will tend to grow (not decrease) over time.[539]

---

[529] Hart II, para. 166.
[530] Hart II, para. 168.
[531] Hart I, para. 193.
[532] Hart I, para. 194.
[533] Hart I, para. 195.
[534] Hart II, paras. 171, 172.
[535] Hart I, para. 196.
[536] Hart II, para. 174.
[537] Hart I, para. 202.
[538] Hart I, para. 201.
[539] Hart I, para. 202.

494. The expert believes that, given the USD 7 million in extraordinary repair costs,[540] a hypothetical buyer would have increased investments to the amount necessary to maintain the desired production level (which, according to Abdala/Zadicoff, is 80,000 tons per year[541]), with no need to resort to additional extraordinary repairs.[542] Hart has estimated investments based on the average for 2006 – 2008, increased by the inflation rate up to 2013.[543]

### d. Changes in Working Capital

495. The expert does not seem to find the data estimated by Abdala/Zadicoff reliable, as they set operating cash as 10 days of revenue. Considering the time required to convert inputs into cash and the credit problems in 2008, Hart argues that the opposing experts' suggestion is aggressive.[544]

496. Hart also points out that 10 days of revenue in 2007 would equal almost USD 4 million. Since Tavsa had almost USD 15 million as operating cash, this would mean it would have USD 14 million in excess cash. The expert is not sure how to reconcile this assumption with the fact that, in 2008, Tavsa owed Sidor close to USD 9 million.[545]

497. In his second report, Hart estimates the average working capital in 2006 – 2008 at 34%, and finds this figure to be a reasonable estimate up to 2013.[546]

### C. <u>Discount Rate</u>

498. Hart arrives at the following WACC of Tavsa as of April 30, 2008:

|  | As of April 30, 2008[547] |
|---|---|
| Risk-free rate | 4.5% |
| Market risk premium | 6.2% |
| Beta | 2.2 |
| Country risk premium | 4.6% |
| Size premium | 2.73% |

---

[540] Hart II, para. 178.
[541] Hart II, para. 177.
[542] Hart II, para. 178.
[543] Hart II, para. 179.
[544] Hart I, para. 203.
[545] Hart I, para. 204.
[546] Hart II, para. 180.
[547] Hart I, Annex 7.

| Cost of equity | 25.45% |
|---|---|
| Cost of debt | 10.4% |
| Tax rate | 34% |
| After-tax cost of debt | 6.86% |
| Debt/Enterprise value | 19.27% |
| Equity/Enterprise value | 80.73% |
| WACC | 21.87% |

499. The expert slightly disagrees on some of Abdala/Zadicoff's assumptions, such as the capital structure, but agrees to perform his alternative WACC calculation in line with the opposing experts' proposal; in other cases, he categorically disagrees and chooses new assumptions and new calculations. Only the latter cases will be summarized in this section:

### a. Risk-Free Rate

500. Abdala/Zadicoff choose to equate the risk-free rate to the yield of 10-year U.S. Treasury bonds (not 30-year bonds), as 10-year bonds are more liquid and less sensitive to inflation changes, a view that is supported by other authors. However, Hart claims to have checked the sources cited by the opposing experts and found that, in a more recent edition of such sources, they change their view and go for bonds with a longer maturity period.[548]

501. In any event, Hart shows his preference for 20-year bonds, which, he claims, are the bonds which are commonly used in valuation exercises and are the ones used by Morningstar to determine the long-term risk-free rate[549] which, thus calculated, as of April 30, 2008, was 4.5%.[550]

### b. Equity Risk Premium

502. The opposing parties have calculated the geometric average of historical data, based on the opinion of two well-respected authors. Hart contends that the newer editions of those authors' works show that they have preferred arithmetic averages.[551] Using the arithmetic average, the equity risk premium goes up to 6.2%.[552]

### c. Beta

503. Abdala/Zadicoff apply Bloomberg's "reversion-to-one" adjustment to the beta. Hart, however, disagrees. The expert explains that this adjustment is recommended only when it can be reasonably accepted that, in the long term, the company's products and clients will diversify and, therefore, the company's risk will tend to converge with the market risk. However, for Tavsa, this is not a reasonable assumption, as there is no indication that its products will change, or its client mix expand: rather, it

---

[548] Hart I, para. 247.
[549] Hart I, para. 248.
[550] Hart I, para. 249.
[551] Hart I, paras. 251, 252, 253.
[552] Hart I, para. 255.

seems everything will remain as is.[553]

504. The above does not mean that Hart is not advocating for an adjustment to the beta coefficient; he prefers the adjustment performed by Morningstar for SIC 331 companies in March 2008,[554] under the hypothesis that, in the long run, a company's beta will move towards the beta of the peer group:[555]

| | |
|---|---|
| Leveraged beta | 2.25 |
| Adjusted leverage beta | 2.17 |
| U.S. debt/equity | 0.239 |
| U.S. tax rate | 40% |
| Unleveraged beta | 1.9 |
| Optimal debt/equity structure | 23.9% |
| Venezuelan tax rate | 34% |
| Beta | 2.2 |

**d. Country Risk Premium**

505. In the Joint Report, expert Hart mentions that 4.6%, which is the premium over the "pure discount bond," does not necessarily reflect the full country risk. The expert would be willing to accept any value between the premium over the pure discount bond up to 14.75%, which is the country risk premium used in the *Tidewater* award.[556]

**e. Size Premium**

506. Expert Hart finds it necessary to perform a size adjustment, as the comparable companies used to estimate the beta were larger than Tavsa;[557] specifically, they were mid-cap companies, where Tavsa is viewed as "micro-cap."[558] The difference between the mid-cap size premium and the micro-cap size premium is 2.73%.[559]

\* \* \*

---

[553] Hart I, para. 257.
[554] Hart I, para. 259.
[555] Hart I, para. 258.
[556] Joint Report, para. 22.
[557] Hart I, para. 261.
[558] Hart I, para. 264.
[559] Hart I, para. 264.

507. With the above corrections applied to the discounted cash flows model, the resulting value for Tenaris' stake in Tavsa as of April 30, 2008 is USD 36.9 million, which is the result of adding to the USD 44.8 million cash flows a terminal value of almost USD 8 million, and applying the 70% factor.[560]

## 2.2 MARKET MULTIPLES

508. The expert also provided his opinion on the subsidiary method to assess Tavsa's value, which he calls the "guideline public company analysis."[561]

509. Abdala/Zadicoff selected seven comparable companies, but Hart does not believe that all seven are comparable, as they include Vallourec S.A. – a company with worldwide operations and sales 6,000 times higher than Tavsa's, which disqualifies it as a comparable.[562]

510. In addition, the opposing experts did not use homogenous data. For some companies, they used the twelve months up to March 31, 2008; for others, they used the data on their yearly statements as of December 31, 2007. To assess the debt level, they used data as of June 30, 2008.[563]

511. The next step, as per this method, should have been a normalization of the financial statements of both the comparable companies and the target company. However, Hart contends that the opposing experts did not perform such normalization, which is completely inappropriate, as a hypothetical buyer would not have just assessed a single year of sales, let alone 2007, which had very high sales.[564]

512. Regarding the four ratios selected by the opposing experts, Hart made the following observations:[565]

- The use of the EV/sales ratio is not recommended, except for companies with little to no history and without the capacity to generate positive cash flows;

- The EV/BVA ratio is usually measured using the firm's book value, not the book value of the assets.

513. Lastly, the expert disagrees on the 27% control premium. First, Hart argues that, for an adequately-managed company, there should not be a difference in the value of majority interests vis-à-vis minority interests.[566] Second, the expert asserts that a generic control premium should not be used; instead, the premium should be quantified based on facts and circumstances specific to the company that is being valued, its industry, its country and the global economy;[567]

---

[560] Joint Report, Tavsa 2008 Spreadsheet, selecting all values as suggested by Credibility, applying the *Tidewater* country risk premium; application of the rate in the *Tidewater* award would push the value down to USD 29.5 million.
[561] Hart I, para. 208
[562] Hart I, para. 211.
[563] Hart I, para. 212.
[564] Hart I, para. 213.
[565] Hart I, para. 214.
[566] Hart I, para. 240.
[567] Hart I, para. 242.

however, in this case the opposing experts simply took the control premium mentioned in a study based on four acquisitions in unspecified sectors in Venezuela.[568]

## 2.3 OTHER VALUE INDICATORS

514. Hart refers to the new plant built by Tenaris in Mexico and the purchase of a majority stake in a plant in Indonesia. He claims both transactions show that Hart's proposed value of USD 43.3 million is in line with reality.[569]

### New Plant in Mexico

515. In September 2008, Tenaris announced the construction of a seamless tube plant in Mexico, with a capacity of 450,000 tons per year (Tavsa has 14% of that capacity) at a cost of USD 850 million.[570] Applying these figures to Tavsa, 70% of its value, built anew, would be USD 85.9 million. However, it would still be necessary to apply a correction factor to reflect Tavsa's current status, which can be between 25% and 50%, and, therefore, its value would be USD 43 to 64.5 million.[571]

### Transaction in Indonesia

516. In February 2009, Tenaris acquired a 77.45% shareholding in a seamless tube manufacturer in Indonesia. The company's annual capacity is 12,000 tons, and the price paid for it was USD 93.6 million. Extrapolating these figures to Tavsa, the 70% interest would be worth USD 35.5 million.[572]

\* \* \*

517. Lastly, Hart brings up the following point: Tamsa paid USD 11.7 million for a 70% interest in Tavsa in 1999, and spent USD 41.9 million in capital expenditures and maintenance. Moreover, it received USD 32 million from the technical assistance contract and commissions.[573] In other words, were the Arbitral Tribunal to award compensation in a sum around the ones suggested by the Claimants would be earning a return of 400% to 500% on their investment.[574]

---

[568] Hart I, para. 241.
[569] Hart II, para. 197.
[570] Hart II, para. 195.
[571] Hart II, para. 195.
[572] Hart II, para. 196.
[573] Hart II, para. 217.
[574] Hart II, para. 218.

### 3. THE ARBITRAL TRIBUNAL'S DECISION

518. Even though both experts agree that Tavsa's value is to be calculated through a DCF methodology (**1.**), the Arbitral Tribunal will also rule on other proposed approaches, for comparison purposes (**2.**).

### 3.1 DCF

519. As regards the compensation due for Tavsa's expropriation, the experts are in agreement that the best way to calculate such compensation is through the discounted cash flows method.

520. It was made clear at the Hearing that the points of disagreement between the experts as regards the value assessment were really four[575] – even though all four are major points: tube production (**A.**), tube price (**B.**), certain costs (**C.**) and WACC (**D.**).

521. At the end of the Hearing, the Arbitral Tribunal asked both Parties' experts to engage in the following joint exercise, to the extent possible:[576] they were to prepare a spreadsheet where the Arbitral Tribunal would be able to choose, from drop-down options, between the two opposite positions for each conflicting assumption (or even choose a third option) and where, as per the options selected by the Tribunal, Tavsa's value would be automatically recalculated.[577] The Arbitral Tribunal also invited the experts to summarize the reasons for their disagreement in a brief report. The experts complied with the request through the so-called Joint Report.[578]

522. Next, the Arbitral Tribunal will rule on each of the four points of disagreement.

### A. Tube Production

523. The goal here is to determine, from the perspective of a hypothetical buyer in April 2008, the estimated quantity of tubes Tavsa could produce in the future, from the two options proposed by the experts (**a.**). And, should the Tribunal choose the lower quantity, whether labor costs need to be adjusted (**b.**).

---

[575] The Arbitral Tribunal is aware that there are more points of disagreement between the experts; however, the ones that account for virtually the entire difference in value are four, and these are the only ones which, for efficiency concerns, the Arbitral Tribunal will address next.
[576] T., pp. 1228:13–1229:13.
[577] The exercise was two-fold: for a valuation date as of April 2008, and also as of May 2009. Because the Arbitral Tribunal has already decided that the valuation date will be April 2008, in this section of the Award it will only refer to those calculations which are relevant to said valuation date.
[578] Joint Report.

126

### a.    Annual Production

524.    The two options proposed by the experts are 72,000 or 50,748 tons of tubes per year:

-    The 72,000 figure the Claimant advocates for is based on the assumption that, in the future, Tavsa would operate at its maximum production capacity (80,000 tons of tubes per year), at a utilization rate of 90%, which results in 72,000 tons per year. These had been the production estimates used by Tavsa's management for 2008/2009.[579]

-    The 50,748 figure estimated by the Respondent is the result of averaging production in the last three years.[580]

525.    It is the Arbitral Tribunal's view that it is more likely that a hypothetical buyer would have rejected the Claimant's estimate and chosen the Respondent's estimate instead:

526.    The projected 72,000 tons per year find support only in Tavsa's management's budget for 2008/2009. The Arbitral Tribunal does not think a hypothetical buyer would have recognized that much creditability to this estimate, since:

-    Tavsa's management's estimates were not usually too on point; for instance, in their 2007/2008 budget, they made provision for 80,860 tons per year, of which only one half were actually produced (43,250 tons).[581]

-    Even though the company's production level had been on the rise since 2002, historical production peaked in 2007, at 55,189 tons[582] – thus, far from the 72,000 tons that are now being projected; Abdala/Zadicoff have stated that, at the time of expropriation, Tavsa produced 80,000 tons of pipes per year,[583] while expert Hart has claimed that that level was never actually reached.[584] Abdala/Zadicoff have referred to the 2007 financial statements as evidence; the Tribunal has reviewed those statements and found that 2007 production was 55,189 tons,[585] a figure that, far from proving the reliability of the estimated 72,000 tons, refutes it.

-    Tavsa never managed to reach a utilization rate of 90% either; in fact, its historical utilization peaked at 75% in 2005.[586]

[579] CLEX-36.
[580] Joint Report. Tavsa 2008 Joint Model, Revenues, Credibility.
[581] CLEX-36, p. 47.
[582] H 3, slide 11. Abdala/Zadicoff I, para. 91.
[583] Abdala/Zadicoff I, para. 123.
[584] H 4, slide 16.
[585] CLEX-8, p. 201.
[586] Abdala/Zadicoff I, p. 49.

527. In contrast, the proposed 50,748 annual tons have a very solid basis: it is the average real production over the last three years. A hypothetical buyer would have chosen to project a production level in line with historical production, and would have dismissed the Claimant's estimates as pure speculation.

### The Claimant's Counter-Arguments

528. (i) The Claimant has pointed to labor conflicts in the past as the cause of the company's low production level; these conflicts went away in 2008, when Tavsa came to an agreement with the unions.[587]

529. The argument is not convincing, because the problems with the workers marked 2006 and they might have been the reason why production was limited to 56,700 tons that year;[588] this does not, however, explain the fall in production in all other years, with production far from the yearly 72,000 tons projected by Tavsa's management for the future. And the experts have not identified any production improvement introduced in 2008 that could justify the sudden increase in production.

530. (ii) The Claimant's experts have also mentioned that PDVSA had publicly announced its intention to substitute tube imports with domestically-manufactured tubes.[589] Indeed, in a presentation dated October 2007,[590] PDVSA had stated its intention to double the consumption of supplies in the oil sector and cut down imports to favor local supplies, which would increase up to 70% (as compared to the 41% existing at the time).[591]

531. PDVSA's statement is recorded in a slide presentation, where the increase in domestic procurement from 41% to 70% is described as a "challenge" and a "goal to be reached through adequate public policies." The presentation does not define what these policies will be and does not constitute a firm supply commitment. PDVSA's presentation is too generic to convince a hypothetical buyer that the production increase projected by the Claimant was feasible and that any increased production would have PDVSA as a buyer.

#### b.    Labor Cost Adjustment

532. Lastly, the Claimant argues that, if a yearly production level below 72.000 tons was used as an assumption, this would call for a reduction in labor costs, readjusting labor to the new estimated production level.[592] Specifically, were production set at 50,748 tons, as suggested by the Respondent, labor costs should go down, proportionately, by 30%.[593]

---

[587] Abdala/Zadicoff II, para. 26.
[588] Abdala/Zadicoff II, para. 26.
[589] H 3, slide 7.
[590] CLEX-84.
[591] CLEX-84, p. 26. T., p. 920.
[592] Joint Report, para. 8.
[593] Joint Report, para. 8. Tavsa 2008 Joint Model, Summary Table, Labor Size Reduction.

533. The Arbitral Tribunal has verified that the proposed adjustment is correct,[594] that the adjustment to the cash flows model should only apply to the variable portion of labor costs (a function of production), and that the Claimant has considered that 50% of labor costs are variable; all hypotheses seem reasonable.

534. Accordingly, the Arbitral Tribunal has decided to apply the 30% adjustment to variable labor costs.

* * *

535. <u>To conclude</u>, the Arbitral Tribunal has agreed that the reasonable estimate of future annual production be set at 50,748 tons, as suggested by the Respondent; it has also agreed, however, that variable labor costs should be proportionately reduced, as requested by the Claimant.

### B. The Price of Tubes

536. The next aspect to be determined is how to estimate the price of the tubes (**a.**) and, once a calculation formula has been decided on, what a specific parameter should be within that formula (**b.**).

#### a. Pricing Formula

537. The Parties' experts disagree as to the manner in which the future price is to be estimated:

- It is the Claimant's view that the formula Tavsa was in the course of negotiating with PDVSA when the expropriation took place should apply;

- On the contrary, the Respondent believes that, because no agreement had yet been reached regarding that formula, it should be disregarded, and suggests using the historical price average, increased by the CPI, instead.

538. It is the Tribunal's opinion that the issue is not so much whether the formula that was being negotiated with PDVSA had or had not been actually agreed upon as what the best indication of the future price of the tubes would be, in the eyes of a hypothetical buyer. Because PDVSA was Tavsa's only customer at the time of the expropriation and none of the experts has identified any reasons to believe this was bound to change, the reasonable solution would be to assume that the future price would be the one agreed upon with PDVSA.

539. Again, the most sensible solution is to assume that, in the future, PDVSA and Tavsa would apply the pricing formula they were then negotiating, because, as the sole customer, PDVSA had significant bargaining power, and the negotiated formula was beneficial to it as it mitigated its concern that the price would be driven up by the upward trend observed in international markets (in fact, a few months after the expropriation, Tavsa and PDVSA agreed on the new formula).

---

[594] (72,000 – 50,748)/72,000.

540. In contrast, there is no basis at all to assume that, in the future, Tavsa and PDVSA would be completely altering the price calculation formula and agreeing on a formula based on the average price paid between 2006 and 2008, increased by inflation, as suggested by the Respondent.[595]

**b.    The International Price Reference**

541. Therefore, the Arbitral Tribunal has decided that the formula to set the future price will be the one Tavsa was negotiating with PDVSA at the time of its expropriation. *Pro memoria*, the formula is as follows:

$$P_t = 30\% \times P_{t-1} + 70\% \times P_{t-1} \times \left[ \frac{PPL_{t-1}}{PPL_{t-2}} \right]$$

$P_t$     is the price in month $t$
$P_{t-1}$   is the price in month t-1
$PPL_{t-1}$  is the reference price published by Pipe Logix for month t-1
$PPL_{t-2}$  is the reference price published by Pipe Logix for month t-2

542. As per the formula, the international reference price (weighted at 70%) is the price published by Pipe Logix; however, Pipe Logix is an index that tracks global sales of seamless tubes,[596] and only projects prices one year ahead, which is why it is not valid for longer-term projections.

543. It is then necessary to substitute the international reference to Pipe Logix with a different index. Here, the experts engage in debate as to the best substitute:

-    The Claimant suggest projecting the prices of HRC (the main component of seamless tubes) published by Metal Bulletin Research; whereas

-    The Respondent[597] finds it better to use the HRC prices published by Canaccord.

544. To choose between these two price forecasts, the Respondent's expert has relied on the recommendations issued by the Society for Mining, Metallurgy and Exploration, contained in a letter addressed to the United States Securities and Exchange Commission.[598] In that letter, the Society recommends that the prices of raw materials be estimated based on the short- and long-term projections issued by the company's management (**i.**), and requires that a "competent person" verify that such projections are in line with historical prices or commercial contracts (**ii.**).[599]

---

[595] Hart II, para. 158.
[596] T., p. 834.
[597] In its subsidiary claim, as its primary position is that the price is to be determined as the historical average, increased by the CPI.
[598] CRED-44.
[599] Hart I, para. 125: "Commodity prices used for the determination of Mineral Reserves should be based on forward-looking estimates reflecting management's reasonable short- and long-term expectations as supported by available evidence. The basis for the selected prices must be justified and supported by appropriate documentation. The Competent Person must ascertain that these prices are consistent with historical prices or with sales agreements and marketing determinations."

(i)    Management Forecasts

545.    In this case, both Parties agree that Tavsa used the Metal Bulletin Research price forecasts as basis for its own future price estimations.[600]

546.    There is no evidence that Tavsa's management ever used the prices published by Canaccord to derive their future price estimates.[601]

(ii)    Commercial Contracts

547.    The Society for Mining, Metallurgy and Exploration's assessment guideline also points to the prices provided for in commercial agreements, as indicative of the adequacy of the future estimates.

548.    The Claimant has produced a historical contract (from 1997) between Sidor and CVG Tubos (Tavsa's predecessor)[602] where Metal Bulletin is defined as follows:

> "A prestigious U.S. weekly publication specializing in the behavior of the global market for iron and steel products. Metal Bulletin is widely used as a valid reference to determine and project the prices of iron and steel products."

549.    And in the long-term HBI supply contract between Comsigua and Tamsa,[603] the price reference is the change in the prices of three raw materials, as per Metal Bulletin.[604]

550.    The Respondent, however, has not produced any commercial contract mentioning Canaccord Adams.[605]

---

[600] T., p. 1171.
[601] T., pp. 1176, 1177.
[602] CLEX-12.
[603] CLEX-16.
[604] Article 3.1 on the fixed per-ton price.
[605] T., pp. 1176, 1177.

* * *

551. Basically, both the forecasts of Tavsa's management and the historical commercial agreements support the reliability of the Metal Bulletin Research price estimates.

<u>The Respondent's Counter-Argument</u>

552. Expert Hart has argued that Canaccord Adams's forecasts are more consistent with historical prices and, therefore, should be preferred.

553. The Arbitral Tribunal disagrees.

554. The premise to be validated is to be framed as follows: would a hypothetical buyer deciding to project future prices based on historical prices consider the Canaccord Adams forecasts or the Metal Bulletin Research ones to be more reliable?

555. In the Arbitral Tribunal's opinion, the answer favors Metal Bulletin Research, as it has already been established in the above paragraphs that this is a reference publication in the industry, whereas Canaccord Adams is an investment bank that publishes prices for the iron and steel industry, as well as for other sectors,[606] and was chosen by expert Hart because he had knowledge of past reports and considered them to be "good and informative."[607] Expert Hart has not persuaded the Arbitral Tribunal that, irrespective of its predictive reliability, Canaccord Adams would be a price reference publication for a hypothetical buyer.

**C.  Expenditures**

556. Under this heading, the Tribunal must determine which one is the more reliable projection of opex (**a.**), capex and depreciation (**b.**), working capital (**c.**) and the existence or inexistence of a technical assistance contract (**d.**).

**a.  Opex**[608]

557. The Claimant's experts estimate the opex based on the 2007 costs,[609] adjusted as per the expected inflation.

558. Expert Hart disagrees because, as compared to the historical average, the costs projected by Abdala/Zadicoff are significantly lower. At the Hearing, Hart argued that Tavsa's gross margin between 2002 and 2008 stood at around 20% in 2002, grew year after year and peaked at 45% in 2006, thereafter declining to 20% in 2008; the average would be 35%, while the margin arrived at based on Abdala/Zadicoff's cost projections exceeds 45%.[610] Hart suggests using the opex

---

[606] T., pp. 1175, 1176.
[607] T., p. 1176.
[608] The cost of steel is not included.
[609] Tavsa 2008, Joint Model, Compass Lexicon.
[610] H 4, slide 18. Figures are estimates.

average between 2005 and 2007,[611] increasing it every year based on the expected U.S. PPI.[612]

559. The methodology used by the experts is similar, as they both increase the previous year's costs by inflation. The difference lies in the starting point – the 2008 costs:

- The Claimant derives such costs by increasing the previous year's costs by inflation, while

- The Respondent calculates the average for the last three years.

560. If the projection consists in increasing the previous year's costs, the Arbitral Tribunal sees no reason to deviate from this (since Tavsa's costs are stable over time)[613] for 2008: that year's costs are also to be calculated by increasing the 2007 costs to account for inflation.

561. The Arbitral Tribunal thus accepts the opex calculation as proposed by the Claimant.

**b. Capex**

562. The experts' positions are as follows:

- Abdala/Zadicoff calculate 2008 depreciation based on the 2007 depreciable assets[614] and the following year's depreciation based on the preceding year's; lastly, they equate capex to each year's depreciation,[615] consistently with the assumption that Tavsa will not be making additional investments.

- Hart, however, calculates the historical average for 2006 and 2007 capex, applies the PPI and thus arrives at the capex for 2008, based on which he calculates depreciation.[616]

563. The Arbitral Tribunal considers both hypotheses to be plausible, and neither one incorrect. However, the Arbitral Tribunal must choose one (it will, however, note at this point that its decision will not have a significant impact on Tavsa's value).

564. The Tribunal will use the approach used by the Claimant, which finds support in the opinion of Prof. Damodaran – who is a highly-respected asset valuation expert and whose opinion is constantly referred to by both Parties' experts. Prof. Damodaran states that, for projects of indefinite duration (as is the case here), capex should approach depreciation.[617] The Claimant's proposal perfectly fits

---

[611] Tavsa 2008 Joint Model, Credibility Opex.
[612] Tavsa 2008 Joint Model, Production and Commercial Costs, Credibility.
[613] T, p. 1008 (in reference to stable margins).
[614] Even though 2007 was a year with extraordinary results, this does not have an impact on depreciation.
[615] Tavsa 2008 Joint Model, Capex & Depreciations, FCF.
[616] Tavsa 2008 Joint Model, Capex & Depreciations, FCF.
[617] "As a simple rule of thumb, when projects have infinite life, the capital maintenance expenditures should approach depreciation." Cf. Damodaran, Aswath: Supporting Material to "Corporate Finance: Theory and Practice," Wiley, 2nd ed., 2001, available at http://pages.stern.nyu.edu/ ~adamodar/New_Home_Page/CF2E.htm (Cf. section "3.

this rule; the Respondent's however, does not: from 2008 to 2010, depreciation exceeds capex, even though the two progressively approach and the opposite is true from 2011 onwards: capex are increasingly higher than depreciation.[618]

565. To sum up, the Arbitral Tribunal has opted for the Claimant's suggestion.

### c.    Working Capital

566. Both Parties' experts have adopted very different approaches to calculate working capital:

-    Abdala/Zadicoff determined what the reasonable ratios (measured in days) should be for the variables making up the working capital; then, they applied such ratios to the estimated revenue and cost figures, thus arriving at the final working capital figures;[619]

-    Hart has not used the reasonable ratio in his valuation exercise; instead, he calculated the average ratio of working capital to revenue for 2005 to 2007, which is 31%, and applied this 31% to the revenue estimated for each year, thus arriving at the working capital.[620]

567. The Arbitral Tribunal believes Abdala/Zadicoff's hypotheses are risky and historical data show that Tavsa's working capital was more conservative. Next is a comparison of the Claimant's proposal to historical data for the basic variables[621] in the working capital determination:[622]

-    Cash and equivalents: the average ratio of cash and cash equivalents to revenue (measured in days), based on all historical data, is 35 days;[623] however, the Claimant used 10 days as reference for its working capital calculation;[624]

---

Derivations and Discussion" of "Chapter 9: Estimating Earnings and Cashflows on Projects").
[618] Tavsa 2008 Joint Model, Capex & Depreciations, FCF.
[619] Tavsa 2008 Joint Model, Working Capital, Compass Lexecon.
[620] Tavsa 2008 Joint Model, Working Capital, Credibility.
[621] As per the traditional accounting denomination.
[622] Tavsa 2008 Joint Model, Working Capital.
[623] = [64.6 (1999) + 14.4 (2000) + 20.3 (2001) + 34.9 (2002) + 83.1 (2003) + 9.7 (2004) + 5.5 (2005)  + 44.5 (2006) + 39.6 (2007) / 9 years].
[624] Tavsa 2008 Joint Model. Working Capital.

- Accounts receivable: similarly, the average accounts receivable/revenue ratio is 95 days,[625] while the Claimant used 70 days;

- Inventories: here, the average inventories to cost of goods sold ratio is 140,[626] and the Claimant used 100 as reference;

- Prepaid expenses in other current assets: the average ratio of these expenses to the cost of goods sold is 4,[627] while the Claimant used 1;

- Accounts payable: the average accounts payable/total costs ratio is 109 days,[628] while the Claimant chose to use 70;

- Debts to staff: the average debts to staff/total costs ratio is 6.1 days,[629] while the Claimant used 5.

568. The Arbitral Tribunal believes a hypothetical buyer would have analyzed Tavsa's historical behavior and ruled out the Claimant's hypotheses in calculating the working capital on account of these being overly risky.

569. Therefore, the Arbitral Tribunal will choose the option proposed by expert Hart in the working capital calculation, which is consistent with historical data.

### d. Technical Assistance Contract

570. The Claimant suggests that, at the end of the technical assistance contract between Tavsa and Tamsa, the parties would not have renewed said contract because, after a period of 10 years, Tavsa would be in a position to be able to handle its own technical management.[630]

571. On the contrary, Hart believes this cost would continue to apply always, as someone would have to take over technical assistance and be paid for it.[631]

572. The Respondent's position seems to be more convincing and consistent with other assumptions in the model, such as the indefinite duration for Tavsa: in order to validate the assumption that Tavsa is a company of indefinite duration, the Arbitral Tribunal needs to be convinced that it will not become technically obsolete. Up to 2008, technical innovation was provided by Tamsa and, from that date onwards, either Tavsa would have to outsource it from a different company or it would have to devote its own resources to R+D work.

---

[625] = [213 (1999) + 69.4 (2000) + 63.8 (2001) + 65.9 (2002) + 131.2 (2003) + 105.8 (2004) + 80.1 (2005) + 60.7 (2006) + 64.1 (2007) / 9 years].

[626] = [223.2 (1999) + 124.9 (2000) + 155.5 (2001) + 216.2 (2002) + 136.2 (2003) + 100.7 (2004) + 90.5 (2005) + 104.9 (2006) + 112.1 (2007) / 9 years].

[627] = [0.8 (1999) + 25.9 (2000) + 1.7 (2001) + 3.7 (2002) + 0.2 (2003) + 0.8 (2004) + 0.8 (2005) + 0.1 (2006) + 0.8 (2007) / 9 years].

[628] = [193.4 (1999) + 175.7 (2000) + 76.6 (2001) + 117.3 (2002) + 174.5 (2003) + 56.6 (2004) + 35.7 (2005) + 75 (2006) + 77 (2007) / 9 years].

[629] = [6.2 (1999) + 8.4 (2000) + 6 (2001) + 9.4 (2002) + 8.1 (2003) + 5.4 (2004) + 4.8 (2005) + 3.3 (2006) + 3.3 (2007) / 9 years].

[630] Abdala/Zadicoff II, para. 50.

[631] Hart I, para. 194.

573. What the Claimant suggests, however, is that Tavsa would be technically competitive without assuming any cost on account of technological innovation, which is an assumption the Arbitral Tribunal cannot validate.

574. Therefore, the Arbitral Tribunal accepts the Respondent's assumption that, from 2009 onwards, Tavsa would devote to technical assistance a sum equivalent to the one it used to pay Tamsa under the contract: 3% of revenue.

<u>Subsidiary Claim</u>

575. As a subsidiary position for the event the Arbitral Tribunal should include a technical assistance expense, experts Abdala/Zadicoff have raised a separate claim in Tamsa's name.

576. The experts' argument seems to be as follows: if the assumption that Tavsa continued to pay for technical assistance is accepted, then its cash flows would be reduced; on the other hand, Tamsa would cease to receive income from the technical assistance contract. The conclusion would then be that Tamsa must be entitled to be paid compensation for such lost income.

577. The argument is a *non sequitur*: the exercise here consists in assessing Tavsa's value and, in the course of that exercise, the Arbitral Tribunal will validate realistic hypotheses – the fate of other companies, such as Tamsa, has no bearing on this exercise. Moreover, the Arbitral Tribunal is bound to rule based on the parties' cases and claims only, and in this case the Claimants' *petitum* refers to compensation for their investments in Tavsa and Comsigua,[632] but no mention is made at all to an investment in or of Tamsa.

**D.   WACC**

578. There are three WACC parameters the Arbitral Tribunal must rule on:

**a.   Risk-Free Rate**

579. The proposed alternatives are: 4.29%, in the opinion of the Claimant' experts, and 4.5%, in the opinion of the Respondent's expert. The difference is due mostly to the bonds' maturity period: 10-year bonds, as proposed by the Claimant, or 20-year bonds, as proposed by the Respondent.

580. The Arbitral Tribunal will use a 10-year maturity period, as this is the period that is closer to the valuation horizon, *i.e.* nine years (2008 – 2017) and, therefore, the one that is more representative.

---

[632] CI, para. 235 (c); CIV, para. 321(c); CV, para. 319 (c).

### b.    Market Premium

581.   The choice here is between 4.79%, as per the Claimant's experts, and 6.2%, as per the Respondent's expert, depending on whether a geometric average or an arithmetic average is used, respectively.

582.   The use of a geometric or an arithmetic average is still the subject of open debate in the valuation literature, as acknowledged by the experts, with pros and cons for one or the other average.

583.   The Arbitral Tribunal is unable to solve this issue and rule on a preferred choice on absolute terms. However, in this case, it has to choose one of the two averages, and must then go for the arithmetic average, due to reasons of simple internal consistency: because the market premium is the difference between the market return and the risk-free rate, then consistency requires that the calculation method be in line with the calculation of the risk-free rate.

584.   The Arbitral Tribunal has already decided that the appropriate risk-free rate is the one calculated by the Claimant and, in accordance with exhibit CLEX 69, produced by experts Abdala/Zadicoff, they have used a simple arithmetic average both to derive the monthly average risk free rate and to derive the annual average.

585.   However, the same experts suggest applying a geometric average to determine the market premium, and this course of action is inconsistent and should be ruled out.

586.   The market premium will then be calculated as an arithmetic average, as suggested by expert Hart.

### c.    Beta

587.   The difference is between the 1.86 proposed by Abdala/Zadicoff and the 2.2 suggested by Hart, and is the result of the different adjustments applied to the beta coefficient by each expert:

-      Abdala/Zadicoff apply the reversion-to-one adjustment, which is based on the empirical verification that every company's beta moves towards the average beta, which is one, over time; the experts rely on the opinion of Prof. Damodaran.[633]

-      Hart, for his part, finds that the premises to apply the reversion-to-one are not satisfied, and advocates for applying the Morningstar adjustment, which suggests that a company's beta will approach the average beta of its peer group.[634]

---

[633] CLEX-62.
[634] CRED-6, p. 15.

588. The Arbitral Tribunal is not convinced that the reversion-to-one adjustment is applicable here. According to Prof. Damodaran's opinion, relied upon by the Claimant, the premise for this adjustment is that the company's product mix and its client base usually diversify as the company grows.[635] However, as regards Tavsa, it is a manufacturer of seamless tubes, with a single client in the local market and with no growth forecasts. The premise to apply the adjustment does not seem to be satisfied.

589. As to the adjustment proposed by the Respondent, the Arbitral Tribunal takes note that it has not been the subject of criticism and, therefore, between the two proposed options, the Arbitral Tribunal will choose the adjustment suggested by the Respondent.

### d.    Country Risk Premium

590. Abdala/Zadicoff suggest a premium of 4.6%. The Respondent's expert has changed his position as to the country risk premium:

591. (i) In his first report, Hart accepted the country risk premium suggested by the Claimant: 4.6%.[636]

592. (ii) In his second report, the expert first brought up the *Tidewater* award. Hart explained that the risk premium could also reflect other risks in addition to those which have traditionally been included. He noted that the 4.6% rate only reflects the risk of the Venezuelan Government's default on its USD-denominated bonds, but not the additional risk of doing business in Venezuela as opposed to the U.S., which would be a much higher rate.[637] In support of this position, he relied on the *Tidewater* award as an example of an arbitral tribunal that had elected to include other additional risks.[638] But in his second report, Hart continued to advocate for a 4.6% premium.[639] Consequently, it looks like both Parties' experts were in agreement on this figure.

593. (iii) Everything changed at the Evidentiary Hearing. There, Hart's position takes a radical turn for the first time, and he openly suggests that the country risk premium be set at 14.75%,[640] which is the rate accepted as country risk by the tribunal in *Tidewater*.[641]

---

[635] CLEX-62, p. 200: "This may be explained by the fact that firms' product mix and client base become more diversified as they get larger."
[636] Hart I, p. 96.
[637] Hart II, para. 245.
[638] Hart II, para. 244.
[639] Hart II, para. 250: "the country risk premia […] is an input that is not disputed between the experts."
[640] T, p. 1018, and H 4, slide 26.
[641] "As a simple rule of thumb, when projects have infinite life, the capital maintenance expenditures should approach depreciation." Cf. Damodaran, Aswath: Supporting Material to "Corporate Finance: Theory and Practice," Wiley, 2nd ed., 2001, available at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/CF2E.htm (*Cf.* section "3. Derivations and Discussion" of "Chapter 9: Estimating Earnings and Cashflows on Projects").

594. (iv) <u>In the Joint Report,</u> expert Hart set forth in writing that the country risk premium could be any value between 4.6% and 14.75%, depending on how many additional risks the Arbitral Tribunal decided to factor in.[642]

595. The Arbitral Tribunal is not in agreement or disagreement on Hart's suggested increase of the country risk rate to have that value reflect the risk of doing business in Venezuela. The Arbitral Tribunal will merely have this award reflect that expert Hart has failed to identify the components and amount of such additional risk. Without this, the Arbitral Tribunal is unable to determine whether such additional risk is or is not already accounted for in the beta or the size premium.

596. Thus, the Arbitral Tribunal will use 4.6% as the country risk premium, as this is a figure both experts have accepted as reasonable.

**e.    Size Premium**

597. The Claimants' experts do not find it necessary to include a size premium, whereas the Respondent's expert does indeed suggest adding a 2.73% premium. The reason provided by expert Hart is that Tavsa is smaller than the average company in the sample used to calculate the beta.

598. The Claimants' experts do not categorically object to the use of size premiums, but do question the contention that Tavsa is a small company since, as compared to other companies operating in the same industry in Venezuela, it would not be considered so.

599. On this aspect, the Respondent is more convincing: the smaller the size, the greater the investment's liquidity risk. If the companies used in the sample to calculate the beta are, on average, larger or smaller than the company whose WACC is being calculated, it seems reasonable to apply a size premium.

* * *

600. <u>To sum up,</u> the Arbitral Tribunal has decided as follows:

- The risk free rate is to be calculated based on a 10-year bond, as suggested by the Claimant: 4.29%;

- The market risk premium is to be obtained through an arithmetic average, as suggested by the Respondent: 6.2%;

- The appropriate beta is the Morningstar-adjusted beta, as recommended by the Respondent: 2.2;

- The country risk premium is 4.6%, as accepted by both parties' experts; and, lastly,

- A size premium is to be applied, as suggested by the Respondent: 2.73%.

---

[642] Joint Report, para. 22.

601. Once the above parameters have been input into the WACC calculation formula,[643] the result is a rate of 21.7%.

\* \* \*

602. Next, the Arbitral Tribunal will list each of the decisions arrived at in the preceding paragraphs for the above-discussed variables:

- <u>Production</u>: defined at 50,748 tons of tubes per year, as suggested by Venezuela;

- <u>Labor Cost Adjustment</u>: the variable labor cost is reduced by 30% to account for the above-set production level;

- <u>Price</u>: projected using the 30/70 formula negotiated with PDVSA, with the international reference price estimated based on the Metal Bulletin Research prices, as advocated for by the Claimant;

- <u>Opex</u>: as calculated by the Claimant, based on the 2007 cost as increased per the expected inflation;

- <u>Technical Assistance Contract</u>: the cost associated with this contract is to be included, as suggested by the Respondent, as this service can be expected to continue to be needed;

- <u>Capex</u>: calculated as suggested by the Claimant, as this approach is consistent with the standard valuation practice;

- <u>Working Capital</u>: using the Respondent's figures, as the opposing assumptions are excessively risky;

- <u>WACC</u>: 21.7%, with the Arbitral Tribunal choosing some parameters as suggested by the Claimants and others as suggested by the Respondent.

603. The Arbitral Tribunal has incorporated these decisions into the spreadsheet prepared by both experts, thus obtaining for the cash flows from May 2008 to December 2017 a present value, as of April 30, 2008, of USD 132,342,506; added to the present value of the terminal value of USD 28,151,108, this results in a value for Tavsa of USD 160,493,614. After applying a 70% factor to reflect the Claimant's interest, the result is **USD 112,345,530**.

604. This is the market value of Tenaris' shareholding interest in Tavsa and the amount the State of Venezuela is to pay it as compensation for its expropriation.

---

[643] For convenience reasons, the Arbitral Tribunal has input them into the spreadsheet jointly prepared by both experts.

140

### 3.2    COMPARISON: OTHER APPROACHES

605.    In order to verify the value arrived at through the DCF method, each expert has suggested applying other additional approaches.

### A.    <u>Return on Investment</u>

606.    Both Parties' experts have brought attention to the rate of return on the investment, which is implied in the compensation due to Tavsa: Hart asserts that the rate of return is 485%,[644] while Abdala/Zadicoff reduce it to 32.6%.[645]

607.    The Claimant's experts' approach is very valid, as it is interesting to measure the relationship between what Tenaris invested and the value that is recognized to its interest; however, the experts' calculations may not be taken into consideration because they are based on the value estimated by Abdala/Zadicoff for Tavsa, which the Tribunal has reduced significantly. Therefore, the Arbitral Tribunal will perform its own calculation of the investment's internal rate of return ["**IRR**"].

608.    It is undisputed that Tenaris' investments in Tavsa amounted to USD 11.7 million in 1999 for the purchase of stock and a total of USD 30.2 million spent between 1999 and 2008 on capex and maintenance expenses.[646]

609.    Moreover, there were other companies in the Tenaris group that also received income from Tavsa, as commission fees. According to expert Hart, such commissions totaled 5% of Tavsa's annual revenue,[647] and equal some USD 32 million between 1999 and 2008. In Hart's view, such commission fees are to be accounted for as part of the return on the investment,[648] while Abdala/Zadicoff object to this, as they are not Tenaris' income from its investment in Tavsa.[649] Given the circumstances of this case and considering that the companies that received the commission fees were subsidiaries of Tenaris, the Arbitral Tribunal agrees to have such income accounted for as part of the return on the investment.

610.    The investment's IRR is calculated including:

-       The price paid by Tenaris in 1999 to acquire its interests in Tavsa;

-       The investments made (assumed to be evenly distributed over time between 1999 and 2008);

-       The commission fees (which the Tribunal also assumes evenly spread over time between 1999 and 2008); and

---

[644] Hart II, para. 24.
[645] H 3, slide 24.
[646] Hart II, para. 217.
[647] Hart II, para. 217.
[648] Hart II, para. 217.
[649] H 3, slide 24.

-    In 2008, a stream equal to Tenaris' stake in Tavsa, calculated via the DCF model (*i.e.*, USD 112.3 million):

|  | Stream in million USD |
|------|------|
| 1999 | -11.52[650] |
| 2000 | 0.18[651] |
| 2001 | 0.18 |
| 2002 | 0.18 |
| 2003 | 0.18 |
| 2004 | 0.18 |
| 2005 | 0.18 |
| 2006 | 0.18 |
| 2007 | 0.18 |
| 2008 | 112.48[652] |
| TIR | 29% |

611.    The IRR on an investment with these features stands at about 29%.[653] This rate is to be compared with the return on equity included in the calculation of Tavsa's WACC. The Arbitral Tribunal has used 25.26% (excluding the cost of debt),[654] which is reasonably close to the ratio of Tenaris' investment to the returns earned.

## B.    Market Multiples

612.    This approach was proposed by the Claimant. It is about identifying ratios that link the enterprise value to an accounting value (for instance, EBITDA); the next step is calculating the average of such ratios at comparable companies, stated as a multiple; that multiple is finally applied to the accounting value of the company whose value is being assessed.

### a.    The Experts' Positions

613.    Experts Abdala/Zadicoff identified three market ratios (EV/EBITDA, EV/Sales and EV/BVA), and then selected five companies as comparables. The experts calculated the ratios for each company and then obtained a median, which was, respectively, multiples of 8.1, 1.8 and 1.6 for each ratio. Applied to the value of EBITDA, Sales and BVA of Tavsa in fiscal year 2007, these result in a value of USD 226.6, 221.8 and 223.2 million, respectively;[655] or USD 223.8 million on average.

---

[650] -11.7 from the share purchase – 30.2/10 years of capex + 32/10 years of commission fees.
[651] - 30.2/10 years of capex + 32/10 years of commission fees.
[652] 112.3 million from the compensation for expropriation – 30.2/10 years of capex + 30.2/10 years of commission fees.
[653] Calculated through the automated function on the Excel spreadsheet.
[654] Tavsa 2008 Joint Model, WACC. The Claimant has estimated the return on equity at 17.79%, and the Respondent at 25.45%. Because the Arbitral Tribunal has accepted some of the Claimant's assumptions and some of the Respondent's, the final estimate is 25.26%.
[655] CLEX-3.

614. The Respondent is not opposed to the idea of using market multiples for comparison purposes, but notes that this needs to be done properly, and identifies two major flaws in the Claimant's calculations:

- The selected companies are not really comparable, as they are much larger than Tavsa, and cover markets very different from Tavsa's;

- The ratio calculations were based on a single year – 2007 – instead of using several years and finding the average; in addition, the selected year was an extraordinary year, based on results, and, in any event, the financial statements have not been normalized to ensure a comparison of homogenous magnitudes.

**b.    The Arbitral Tribunal's Decision**

615. These are the comparable companies selected by the Claimant's experts:[656]

| | Enterprise Value | Market Capitalization | Financial Debt | EBITDA | Sales | Book Value of Assets |
|---|---|---|---|---|---|---|
| *As at April 2008* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* |
| **Anhui Tianda Oil pipe Company Limited** | 296.66 | 187.40 | 109.26 | 31.31 | 207.18 | 187.30 |
| **Gandhi Special Tubes Limited** | 34.14 | 34.00 | 0.14 | 7.71 | 18.93 | 15.54 |
| **Sanyo Special Steel** | 1,094.72 | 767.01 | 327.72 | 187.52 | 1,478.76 | 1,298.66 |
| **S.C. T.M.K. - ARTROM S.A.** | 330.02 | 143.39 | 186.62 | 23.44 | 218.61 | 318.71 |
| **Tubos Reunidos S.A** | 1,588.57 | 1,223.98 | 364.59 | 195.05 | 901.09 | 1,111.83 |
| **Tenaris S.A.** | 35,531.78 | 31,814.57 | 3,717.21 | 3,459.36 | 10,242.90 | 15,617.07 |
| **Vallourec S.A** | 15,550.39 | 14,473.30 | 1,077.09 | 2,399.97 | 8,598.06 | 7,988.77 |

616. In contrast, Tavsa's figures are as follows: EBITDA: USD 31.3 million,[657] Sales: USD 141.5 million,[658] and BVA: USD 135.3 million.[659] And the value of Tavsa as arrived at through the DCF method stands at USD 160.5 million.[660]

617. Tavsa's value, as derived by the Tribunal through the DCF approach, fits the sample selected by the Claimant, as shown in the following charts, prepared by the Arbitral Tribunal based on information supplied by the Parties:[661]

---

[656] CLEX-3, Financial Data.
[657] Tavsa 2008 Joint Model, FCF.
[658] Tavsa 2008 Joint Model, FCF.
[659] Tavsa 2008 Joint Model, Historical Data – Tavsa.
[660] This is the full value of Tavsa, not just the Claimant' share.
[661] The information was taken from H 3, slides 18, 19, and 20, and the data on the Tavsa 2008 Joint Model. All data are for 2007.



618. This first figure measures the value of Tavsa's equity as obtained through the DCF method, expressed as a multiple of the book value of its assets. The multiple thus obtained is 1.2x.[662] Tavsa ranks between comparables Tubos Reunidos (1.4x) and Artrom S.A. (1x). In the eight-company sample – itself included – it ranks sixth.



619. This second chart measures the value of Tavsa's equity as arrived at through the DCF method, expressed as a multiple of its EBITDA. The resulting multiple is 5.1x.[663] Tavsa ranks between comparables Sanyo Special Steel (5.8x) and Gandhi Special Tubes (4.4x). In the eight-company sample, it takes seventh place.

---

[662] 160.5/135.3
[663] 160.5/31.3

144



620. This third chart shows the value of Tavsa's equity as arrived at through the DCF method, expressed as a [multiple] of its sales revenue. This yields a multiple of 1.1x.[664] This multiple places Tavsa between comparables Anhui Tianda (1.4x) and Sanyo Special Steel (0.7x). In the eight-company sample, it takes seventh place once again.

* * *

621. <u>To conclude,</u> Tavsa's value, as calculated by the Tribunal, ranks closer to the end as compared to the reference companies, which shows that it is relatively low but still within the limits set by these companies.

622. The market multiples methodology thus confirms the reasonableness of Tavsa's value as calculated through the DCF approach.

### C.   Comparable Transactions

623. The Respondent has identified as comparable transactions the construction of a plant in Mexico (**a.**) and the purchase of a plant in Indonesia (**b.**).

#### a.   Construction of a Plant in Mexico

624. In the first case, this is a construction project from 2008 that cost USD 850 million, with a capacity of 450,000 tons per year. Based on his belief that this is 14% of Tavsa's size, expert Hart estimates that building Tavsa anew would require an outlay of USD 122.8 million, and 70% of that figure is USD 85.9 million.[665]

625. The Claimant's experts have completed the information on this project, explaining that it was completed in May 2011 and the investment reached USD 1 billion, and, therefore, even accepting the relevance of the costs approach, the replacement value for a 70% interest in Tavsa would be USD 124.4 million.[666]

---

[664] 160.5/141.5.
[665] Hart II, para. 195.
[666] T., p. 868.

626. This replacement cost is a mere 10%[667] below Tavsa's DCF value, which corroborates the reasonableness of the figure arrived at through the latter methodology.

### b. Purchase of a Plant in Indonesia

627. In the second case, in April 2009 Tenaris purchased a majority stake in an Indonesian company with a production capacity of 120,000 tons per year, for USD 72.5 million. Expert Hart believes the implied price of a company with Tavsa's capacity would be USD 50.7 million.[668]

628. The little information that has been supplied does not make it easy to ascertain how comparable to Tavsa the Indonesian company really is.[669] And the Arbitral Tribunal does not know either whether Tenaris undertook to make additional investments in the Indonesian company, in addition to the purchase price.

* * *

629. In sum, the Arbitral Tribunal confirms that the value of Tenaris' shares in Tavsa totals USD 112,345,530.

---

[667] $(112.3 - 124.4)/124.4 = 9.73\%$.
[668] Hart II, para. 196.
[669] T., p. 868.

## VII.3.                    COMSIGUA'S VALUE

630. Before determining the value of Comsigua (**3.**), the Arbitral Tribunal will first set forth the position of the Claimant (**1.**) and, then, the position of the Respondent (**2.**).

**1.    THE CLAIMANT'S VALUE ASSESSMENT**

631. The Claimant's experts have calculated Comsigua's value based on the discounted cash flows method (**1.**); but also using market multiples (**2.**). Lastly, they have provided their opinion on Comsigua's value as implied by other transactions (**3.**).

**1.1  DISCOUNTED CASH FLOWS**

632. As already discussed in connection with Tavsa, this valuation approach consists in estimating the future revenue stream (**A.**) and deducting outgoing cash flows (**B.**). These net cash flows are generated in perpetuity at a growth rate, which translates into a terminal value calculated as of 2017 (**C.**). The cash flows are discounted at the appropriate discount rate to the valuation date, which is April 30, 2008 (**D.**).

**A.   Revenue**

633. Tavsa's revenue is determined by:[670] the expected sales of HBI (hot briquetted iron) (**a.**) multiplied by the projected price (**b.**).

**a.    Iron Production**

634. Comsigua's Hot Briquetted Iron (HBI) production was entirely dependent upon the availability of iron ore pellets in the market, with CVG FMO and Sidor being its only suppliers:[671]

- CVG FMO: experts Abdala/Zadicoff estimate that its production would have remained at its 2007 levels, to begin recovering in 2009 and then reach its historical 3.08 million tons peak in 2015;[672]

- Sidor: the experts have estimated production based on the five-year business plan prepared by Sidor itself in April 2008,[673] deducting Sidor's internal consumption of pellets.[674]

635. The experts start from the assumption that the entire production of CVG FMO and Sidor would be distributed on a *pro rata* basis (based on capacity) among the four HBI producers,[675] and that all of them would demand the amount of iron

---

[670] Abdala/Zadicoff I, para. 147.
[671] Abdala/Zadicoff I, para. 149.
[672] Abdala/Zadicoff I, para. 150.
[673] CLEX-37.
[674] Abdala/Zadicoff I, para. 151.
[675] Abdala/Zadicoff I, para. 152. HBI: hot briquetted iron.

ore pellets required to reach maximum production capacity.[676]

636. The experts' forecast is that Comsigua's production for 2008 would have been 400,000 tons, growing at an annual average rate of 12% for the following eight years, reaching a maximum production level of 870,000 tons in 2015, which would be sustainable over time.[677] This forecast assumes that Comsigua would be producing at maximum capacity (one million tons per year), but would not be investing to increase its production capacity.[678]

### b. Projected Price

637. The experts used the HBI price projections published for Venezuela by Metal Bulletin Research as of the valuation date.[679]

638. The experts' response to the criticism that they should have used historical HBI prices is that the valuation of companies is a looking-forward exercise, and that using projected future prices is a basic, standard principle in valuation practice.[680]

### B. **Expenditures**

639. Expenditures consist of operating expenses (opex) (**a.**), capital expenditures (capex) (**b.**) and others (**c.**).

### a. Opex

640. Operating expenses consist of two categories:

- <u>Costs of Goods Sold</u>: the materials needed to produce HBI and other associated costs like, primarily, energy expenses.[681] The future costs estimation follows the following pattern: the experts take the cost on the day preceding the valuation date and adjust that cost based on the expected evolution of the international price of pellets, as well as the Venezuelan PPI.[682]

---

[676] Abdala/Zadicoff I, para. 153.
[677] Abdala/Zadicoff I, para. 155.
[678] Abdala/Zadicoff I, para. 156.
[679] Abdala/Zadicoff I, para. 147.
[680] Abdala/Zadicoff II, para. 785.
[681] Abdala/Zadicoff I, para. 159.
[682] Abdala/Zadicoff I, para. 160.

- <u>Selling, General and Administrative Expenses</u>: these are variable (depending on production[683]), semi-fixed, and fixed costs, and include labor costs.[684] They are expected to evolve in line with the Venezuelan CPI.[685]

**b.    Capex**

641.   The experts base the capex on the historical average (2004–2007) capital investments, which are, primarily, maintenance expenses, and adjust these looking forward based on the U.S. PPI.[686]

**c.    Others**

642.   As regards taxes, the assumptions are identical to those used for Tavsa:[687] the science and technology tax (0.5% of gross income), anti-drug tax (1% of EBIT minus interest) and corporate income tax (34% net of the anti-drug tax).[688]

643.   As to changes in working capital, experts Abdala/Zadicoff based their calculations on the observed behavior for 2005– 2007, such that accounts receivable were estimated at 70 days of revenue, inventory at 65 days of costs of goods sold, and accounts payable at 100 days of total yearly costs.[689] Applying these estimates, they arrive at a working capital equal to 10 days of yearly revenue.[690]

**C.    <u>Terminal Value</u>**

644.   Terminal value is estimated as the value of the 2017 stream growing at a rate of 2.4% in perpetuity. The 2.4% growth rate is consistent with the U.S. inflation expectations.[691] Terminal value is above USD 627 million[692] –once discounted, terminal value will be almost 40%[693] of the total enterprise value.

**D.    <u>Discount</u>**

645.   Many of the component elements of the WACC (as of April 30, 2008) are the same as Tavsa's. Hence, the risk-free rate (4.29%), the market risk premium (4.79%), the country risk premium (4.6%) and the cost of debt (10.4% before taxes and 6.9% after taxes).

---

[683] Abdala/Zadicoff I, para. 162.
[684] Abdala/Zadicoff I, para. 161.
[685] Abdala/Zadicoff I, para. 162.
[686] Abdala/Zadicoff I, para. 164.
[687] Abdala/Zadicoff I, para. 165.
[688] Abdala/Zadicoff I, para. 140.
[689] Abdala/Zadicoff I, para. 166.
[690] Abdala/Zadicoff I, para. 143.
[691] Abdala/Zadicoff I, para. 167.
[692] CLEX-4, FCF, Terminal value leaving the discount factor out.
[693] See para. 648 *infra*. USD 161.2 million / 402.5 million = 40%.

646. The differences concern:

- The beta calculation, due to the use of a different reference index, which, for Comsigua, is code SIC 3312, covering U.S. steel works, blast furnaces and rolling mills;[694] the beta arrived at is 1.91.[695]

- The optimal capital structure, which is based on that of companies listed under SIC 3312 – which is a debt-to-equity ratio of 22.8%;[696] as of the valuation date, Comsigua had no outstanding financial liabilities,[697] but this would not affect the optimal capital structure used to calculate the WACC: in the experts' opinion, what is relevant is that the fair market value approach assumes that the buyer would have valued the company on the assumption that management would use an efficient capital structure.[698]

647. In sum, Comsigua's resulting WACC is 15.96%:[699]

| WACC as of Apr-08 | Comsigua |
| --- | --- |
| Cost of Equity | |
| US Risk Free | 4.29% |
| Market Risk Premium | 4.79% |
| VZ Beta | 1.91 |
| Levered Raw Beta | 2.33 |
| Beta Levered (Adjusted) | 1.89 |
| D/E US | 0.23 |
| US Tax Rate | 40% |
| Unlevered Beta | 1.66 |
| Optimal D/E | 22.8% |
| VZ Tax Rate | 34% |
| Country Risk Premium | 460 |
| Cost of Equity | 18.0% |
| Cost of Debt | |
| Pre Tax CoD (RF + CRP + Industry Premium) | 10.4% |
| Industry Premium | 1.5% |
| VZ Tax Rate | 34% |
| After Tax Cost of Debt | 6.9% |
| WACC | 15.96% |
| Debt to Firm Value | 19% |
| Equity to Firm Value | 81% |

\* \* \*

---

[694] Abdala/Zadicoff I, para. 180.
[695] Abdala/Zadicoff I, para. 183.
[696] Abdala/Zadicoff I, para. 190.
[697] Abdala/Zadicoff I, para. 168.
[698] Abdala/Zadicoff II, para. 106.
[699] Abdala/Zadicoff I, para. 191.

150

648. After discounting the annual cash flows between May 2008 and December 2017 to the valuation date, the experts arrive at a value of USD 241.3 million, and to be added to this is the discounted terminal value, which is USD 161.2 million; in total, USD 402.5 million.[700] After applying Talta's 7.58% interest, the value of its share in Comsigua is USD 30.5 million.[701]

## 1.2  MARKET MULTIPLES APPROACH

649. This approach consists in identifying companies that are comparable to Comsigua and deriving an average of the price/book value and EV/BVA multiples as of April 30, 2008.[702] The experts explain that, even though another two ratios were used for Tavsa, which were related to EBITDA and sales, they ruled these out for Comsigua. Due to exogenous factors not attributable to them, such as the shortage of pellets in the domestic market, these ratios did not reflect Comsigua's true production capacity.[703]

650. Experts Abdala/Zadicoff resorted Midrex, which is the supplier of the technology used in the process of iron oxide conversion into pellets (the stage before HBI production), as Midrex publishes information on HBI plants worldwide.[704] Having determined which companies owned the plants, the experts ruled out any companies that were not publicly listed and those whose main business was not the production and sale of HBI.[705] The sample came down to five companies, from which the experts used data for the twelve months up to March 31, 2008, or, where this was not possible, the information for the fiscal year ended December 31, 2007.[706]

| | Price to Book Value | Enterprise Value to Book Value of Assets |
|---|---|---|
| Multiples as of April 2008 | | |
| Bihar Sponge Iron Ltd | 1.9x | 1.3x |
| Monnet Ispat & Energy Ltd | 2.3x | 1.3x |
| Tata Sponge Iron, Ltd. | 1.8x | 1.1x |
| Lloyds Metals & Energy Limited | 4.4x | 2.0x |
| Orissa Sponge Iron & Steel | 3.0x | 1.6x |
| Median | 2.3x | 1.3x |
| Average | 2.7x | 1.4x |

651. Next, the experts calculated the median for these companies' multiples, and multiplied it by Comsigua's book value of assets and book value of equity. However, the values that were used are not the ones disclosed on Comsigua's financial statements, but other values that were calculated by the experts. The reason underlying the decision to deviate from the accounting values is that the experts do not trust the accounting methodology used by Comsigua.

---

[700] Abdala/Zadicoff I, Table IV, p. 31.
[701] Abdala/Zadicoff I, Table IV, p. 31.
[702] Abdala/Zadicoff I, para. 65.
[703] Abdala/Zadicoff I, para. 49.
[704] Abdala/Zadicoff I, para. 203.
[705] Abdala/Zadicoff I, paras. 204, 205.
[706] Abdala/Zadicoff I, para. 205.

The experts explain that, up to 2002, indexing was based on the Venezuelan CPI (the so called *"método del nivel general de precios"*). However, starting in 2003, Comsigua shifted to the *"método integral mixto"* method, whereby non-monetary holdings were valued by independent experts. In 2003, and once again in 2006, Comsigua restated the value of its non-monetary assets, thereby increasing the book value of its assets, as reflected in the "unrealized profits" item – as of December 31, 2007, this item represented almost one half of the company's equity.[707] The experts decided to perform their own calculation of the value of non-monetary assets for the period 2003 – 2008, using the general price level method:[708] based on data from the 2002 financial statements, the experts updated each asset using Venezuela's official CPI, and deducted depreciation.[709]

652. The following tables summarize the above exercise:

| Valuation as of April 30, 2008 | | |
|---|---|---|
| **Price to Book Value of Equity** | | |
| Comsigua's BV of Equity | [a] | 424.2 |
| Adjustment to Comsigua's BV of Equity | [b] | 252.2 |
| Comsigua's adjusted BV of Equity | [c]=[a]-[b] | 172.0 |
| P/BV Ratio | [d] | 2.3x |
| Comsigua's Implied Value of Equity | [e] = [c] × [d] | 389.8 |
| **Market Value of Equity to Claimants** | [f] = [d] × 7.58% | 29.5 |

| Valuation as of April 30, 2008 | | |
|---|---|---|
| **EV to Book Value of Assets** | | |
| Comsigua's BV of Assets | [a] | 506.1 |
| Adjustment to Comsigua's BV of Assets | [b] | 252.2 |
| Comsigua's adjusted BV of Assets | [c]=[a]-[b] | 253.9 |
| EV/Book Value of Assets Ratio | [d] | 1.3x |
| Comsigua's Enterprise Value | [e] = [c] × [d] | 323.9 |
| *less* Financial Debt | [f] | - |
| Comsigua's Implied Value of Equity | [g] = [e] - [f] | 323.9 |
| **Market Value of Equity to Claimants** | [h] = [g] × 7.58% | 24.6 |

653. The value of Comsigua totals USD 389.8 million by applying the price/book value multiple, and USD 323.9 million by applying the EV/BVA multiple; on average, USD 356.9 million.[710] After applying 7.58% to account for Talta's stake, this results in a value of USD 29.5 and 24.6 million for its investment.

---

[707] Abdala/Zadicoff I, para. 206.
[708] Abdala/Zadicoff I, para. 207.
[709] Abdala/Zadicoff I, para. 207.
[710] Abdala/Zadicoff I, para. 71.

### 1.3 OTHER RELEVANT TRANSACTIONS

654. There are three transactions which are of interest and could be used as a reference to determine Comsigua's value.

### A. Repurchase of Shares

655. In May 2007, Comsigua and IFC (until then, a shareholder of Comsigua) signed a share repurchase agreement. The implicit value of a 7.58% shareholding interest would be USD 16.6 million.[711]

656. This value is lower than the value arrived at by experts Abdala/Zadicoff through the DCF approach; however, the experts attribute this difference to the improvement in market conditions between the date of the share repurchase (May 2007) and the valuation date (April 2008).[712] In fact, companies saw an appreciation in value across the industry.[713]

657. To verify the above assertions, the Claimant's experts engaged in the following exercise: they performed a new DCF valuation of Comsigua as of May 2007, but based on the price and cost estimates available on that date,[714] and the result they arrived at is USD 18.6 million; this figure is reasonably close to the USD 16.6 million value implicit in the share repurchase transaction.[715]

### B. Comsigua's Management's Recommendation

658. Experts Abdala/Zadicoff have not overlooked the agreement reached between the State of Venezuela and the Japanese Shareholders who jointly held a 73.37% stake in Comsigua. The State paid USD 209.6 million for these shares in 2011.

659. Following the Japanese Shareholders' sale, the only private capital remaining at Comsigua was the Claimant's. Comsigua's President had been negotiating with Talta to purchase the latter's shares on terms equivalent to those underlying the transaction with the Japanese Shareholders:

> USD 24,058,737, with an initial payment of slightly over USD 8 million, and 10 half-yearly installments of USD 1,600,174 each, plus interest at 3% p.m., even though Talta was required to provide a bond of 10% of the total price to secure payment of the outstanding liabilities.

---

[711] Abdala/Zadicoff II, para. 64.
[712] Abdala/Zadicoff II, para. 67.
[713] Abdala/Zadicoff II, para. 69.
[714] HRC prices at USD 305 per ton, growing at the 2% inflation rate; iron ore prices evolving in line with HRC; and WACC and macroeconomic expectations as of May 2007.
[715] Abdala/Zadicoff II, para. 67.

660. However, in order to be able to formalize the offer, Comsigua needed to secure approval from higher authorities and it is for this reason that, on April 17, 2012, Comsigua's President sent a letter to the President of CVG asking for authorization to submit the proposal to the Minister of the People's Power for Industry.[716]

661. It is the view of experts Abdala/Zadicoff that this offer, which is framed on terms similar to those of the transaction with the Japanese Shareholders, has the same flaws as the latter does.[717] The only aspect of note here is that Venezuela was proposing compensation on a pro-rata basis, at the same price per share as offered to each Japanese Shareholder; *i.e.* Venezuela failed to distinguish between minority and majority shareholders and, therefore, it would be wrong to apply a discount to the offered price, as this is a minority interest.[718]

### C.    Expropriation of Venprecar and Orinoco Iron

662. According to the financial statements of International Briquettes Holding, the sole shareholder of Venezolana de Prerreducidos Caroní, C.A. ["**Venprecar**"] and of Orinoco Iron S.C.S. ["**Orinoco Iron**"], the value of these two competitors of Comsigua in June 2009 (before their expropriation) was USD 1,200 million, or USD 382 per ton of production capacity per year.[719]

663. Comsigua's historical capacity was close to 1.2 million tons per year; in their discounted cash flows valuation, experts Abdala/Zadicoff assumed a production capacity of 1 million. Comsigua's value as assessed by the experts through the discounted cash flows approach is USD 402 per ton of capacity, or USD 335 considering the company's historical capacity – which figures are close to the implicit value of the company as per the assessed value of Venprecar and Orinoco Iron.[720]

### 2.    THE RESPONDENT'S VALUE ASSESSMENT

664. Expert Hart does not object to the use of the DCF (**1.**) or market ratios (**2.**) as methods to assess Comsigua's value; he does, however, bring into question certain assumptions or parameters used by the opposing experts. Even so, he still prefers[721] other methods to calculate the value (**3.**); specifically, the expert analyzes the transaction with the Japanese Shareholders and the purchase price recommended by Comsigua's management, but has also found other indications of Comsigua's value.

### 2.1    DISCOUNTED CASH FLOWS

665. There are three parameters Hart disagrees on:

---

[716] CRED-59.
[717] Abdala/Zadicoff II, paras. 73, 76.
[718] Abdala/Zadicoff II, para. 74.
[719] Abdala/Zadicoff II, para. 77.
[720] Abdala/Zadicoff II, para. 77.
[721] Hart II, para. 68.

## A. **Price**

666. The expert criticizes the fact that Abdala/Zadicoff's price estimations are based solely on the Metal Bulletin Research forecasts and, more specifically, that they failed to take into consideration the historical evolution of HBI prices.[722]

667. Hart takes issue with the fact that his colleagues failed to perform a historical analysis of the HBI prices and also failed to provide evidence of the price expectations used by Comsigua's management.[723] This is particularly relevant in highly volatile periods or bubble periods,[724] as was the case here: in 2008, which is the starting point for the value assessment, future price projections showed an upward trend, as HBI hit a historical peak in 2008. Using a very high price as the starting point has caused the price estimations to be very high – even higher than the historical average, and higher still than the actual prices from 2008 onwards.[725]

668. In spite of this criticism, the expert has not provided the Arbitral Tribunal with his best price estimates as of April 30, 2008, which is the valuation date.

## B. **Discount Rate**

669. As already discussed in connection with Tavsa, Hart raises the same reservations in connection with the calculation of Comsigua's discount rate:

- The risk-free rate will be 4.5%;[726]

- The equity risk premium is set at 6.2%;[727]

- The size premium is 2.73%;[728]

- The beta is to be adjusted by the Morningstar methodology, which takes into consideration the beta coefficients and capital structure of SIC 3312 companies.[729]

670. This leads to a beta of:[730]

| | |
|---|---|
| Leveraged beta | 2.33 |
| Adjusted leveraged beta | 2.2 |
| U.S. Debt/Equity | 0.228 |

---

[722] Hart I, para. 123.
[723] Hart I, para. 126.
[724] Hart I, para. 127.
[725] Hart II, para. 104.
[726] Hart I, para. 249.
[727] Hart I, para. 255.
[728] Hart I, para. 264.
[729] Hart I, para. 259.
[730] Hart I, para. 259.

155

| U.S. tax rate | 40% |
|---|---|
| **Beta** | **1.94** |

671. The expert raises one additional important criticism: he rejects the proposed capital structure consisting of 81% equity and 19% debt, for two reasons:

- As a minority shareholder, it is not reasonable to assume that the Claimant could have altered the structure existing at the time, which was 100% equity;[731]

- The opposing experts' proposal is not acceptable either, considering that Abdala/Zadicoff claim that there is no outstanding financial debt.[732]

672. According to Hart, the capital structure should be 100% equity, and, therefore, the discount rate should be calculated as follows:[733]

| | | |
|---|---|---|
| Cost of equity = **23.83%** | Risk-free rate | 4.5% |
| | Market premium | 6.2% |
| | Beta | 1.94 |
| | Country risk premium | 4.6% |
| | Size premium | 2.73% |

## 2.2 MARKET MULTIPLES APPROACH

673. According to theory, when there are comparable companies, the value of these companies – stated as multiples of certain ratios – can be used to assess the value of the company in question.[734] The Claimants' experts, Abdala/Zadicoff, have applied this approach, using a five-company sample. Expert Hart does not agree that all five companies selected by the opposing experts are truly comparable:[735]

- The five companies operate in India, a market with business risks different from those in Venezuela;

- The selected companies produce sponge iron, while Comsigua produces HBI, which is the compressed variant of sponge iron, with higher production and capital costs;

- The reference companies use rotary kiln technology, while Comsigua has natural gas furnaces using Midrex technology;

---

[731] Hart I, para. 128.
[732] Hart I, para. 129.
[733] Hart I, Annex 5.
[734] Hart I, para. 134.
[735] Hart I, paras. 140, 142.

- The selected companies use local iron ore and coal, controlled by them for the most part, whereas Comsigua obtains its raw materials under supply agreements with other Venezuelan companies.

## 2.3 OTHER VALUE INDICATIONS

674. Hart identifies three alternative indicators of Comsigua's value and provides his opinion on a fourth alternative suggested by Abdala/Zadicoff.

### A. Comsigua's Management's Recommendation

675. More than three years after the issue of the Nationalization Decree, on May 20, 2011, the State signed a share purchase agreement with the Japanese Shareholders, who held 73.37% of the company in total. The price paid for those shares was USD 232.9 million:[736]

> The USD 232.9 million price was to be paid as follows: an initial payment of USD 78 million upon execution, with 10 subsequent installments of USD 15 million each every six months, plus interest at 3%; in turn, the sellers were to contribute 10% of the price as a bond due to potential outstanding liabilities.[737]

676. On April 17, 2012, Comsigua's President sent a letter to the President of CVG[738] recommending the purchase of Talta's shares in Comsigua on terms equivalent to those agreed upon with the Japanese Shareholders:[739]

> The price was USD 24 million, with an initial payment of USD 8 million and ten successive installments of USD 1.6 million plus interest at 3%; also, Talta was required to set up a bond for 10% of the price to compensate for potential liabilities of Comsigua.

677. The Claimants' experts find this transaction not to be comparable, as it does not reflect the market value. In any event, they have calculated the implicit value of Talta's shares: in their first report, they estimated a value of USD 17.1 million (considering only the transaction with the Japanese Shareholders);[740] and in their second report, they raised that figure to USD 24.1 million (considering Talta's offer).[741]

678. Hart disagrees: he does find the transaction to be comparable, but does not agree on the price estimate. In his opinion, the appropriate thing to do would be discount the installments at 11.44%, which is the yield on the 4-year Venezuelan State bonds[742] (four years being the maturity period that best approximates the five-year payment stream), and adjust the value to reflect the contribution towards liabilities and the discount for Talta's minority position. He thus arrives at a value of USD 14.8 million.[743]

---

[736] Hart I, para. 120.
[737] Hart I, para. 108.
[738] CRED-59.
[739] Hart I, para. 113.
[740] Abdala/Zadicoff I, para. 72.
[741] Abdala/Zadicoff II, para. 73.
[742] Note that, later on, at the Hearing, the expert will refer to a seven-year bond (T., p. 1030:20).
[743] Hart I, para. 110.

### B.    Share Repurchase

679.    In May 2007, Comsigua and IFC (one of Comsigua's private investors) signed a share purchase agreement whereby the former would repurchase the latter's stake in it. The price was USD 19 million for 4.75 million shares, or a price of USD 4 per share. Applying this price to the Claimant's 4,140,055 shares, the resulting figure is USD 16.6 million.[744]

680.    Abdala/Zadicoff argue that the difference between the value shown by this share repurchase and the value arrived at through the DCF approach is due to the increase in HBI prices. But Hart is reluctant to accept this explanation without having an exhaustive analysis showing that Comsigua's costs did not also increase in line with the prices.[745]

681.    Hart further points out that Abdala/Zadicoff rely on the price increases of five reference companies. But four of these companies are the ones already used under the market ratios method and, as already discussed, Hart has reservations regarding their comparable status.[746]

### C.    Expropriation of Venprecar and Orinoco Iron

682.    Hart does not believe that the expropriation of Venprecar and Orinoco Iron can serve as an indicator of the compensation due to Comsigua.[747]

683.    Hart argues that the opposing experts have based their calculations of the value of the companies on their capacity, but that equating capacity to value is oversimplifying. First of all, because these calculations do not account for the disparity in the capacities of the two companies (Venprecar 820,000 tons, as compared to the 2.2 million tons of Orinoco Iron); second, because there are other estimation parameters as production and profitability, which are preferable to capacity.[748]

---

[744] Hart I, para. 104.
[745] Hart II, para. 76.
[746] Hart II, para. 79.
[747] Hart II, para. 91.
[748] Hart II, para. 91.

### 3. THE ARBITRAL TRIBUNAL'S DECISION

684. For Comsigua's valuation, the Arbitral Tribunal must preliminary decide on the applicable valuation method, as the experts disagree on which method is the most adequate one:

- Talta advocates for a DCF methodology, whereas

- The Respondent prefers extrapolating a value from other transactions.

685. The Arbitral Tribunal sees no reason to deviate from the traditional DCF method (**1.**), which has become a standard in the valuation of companies: in this case, the company has a past history and future cash flows were predictable and can be estimated in a reasonably accurate manner.

686. That said, there is no reason keeping the Arbitral Tribunal from comparing the value thus arrived at to the result obtained through other methods (**2.**).

### 3.1 DISCOUNTED CASH FLOWS

687. The Claimant's experts have assessed Comsigua's value by discounting its future cash flows to valuation date, which is April 30, 2008. Their exercise is similar to the one discussed in connection with Tavsa. The value they arrive at is USD 30.5 million.

688. The Respondent has maintained that the correct valuation date is May 20, 2009. However, in contrast with its position regarding Tavsa's valuation, it has not subsidiarily provided an alternative valuation of Comsigua.

689. In fact, the only parameter affecting Comsigua's value as of April 30, 2008 for which expert Hart has supplied an alternative figure is the discount rate. Next, the Arbitral Tribunal will make a decision on the adequate rate, taking Hart's criticism into consideration.

#### A. Discount Rate

690. The Claimant's experts have discounted the cash flows at Comsigua's WACC, which, in their opinion, is 15.96%. The Respondent's expert has taken issue with the use of the WACC as a discount rate as, in his opinion, using the return on equity is more appropriate.

691. The Arbitral Tribunal will then decide which of these two is the more appropriate rate (**a.**) and it will then decide what the value of that rate is (**b.**).

#### a. WACC or Return on Equity

692. The Claimant's experts have calculated Comsigua's WACC to determine the discount rate. That WACC is the weighted addition of the cost of debt and the return on equity. The Claimant weights these two costs following an optimal capital structure (19/81 debt/equity).[749]

---

[749] Abdala/Zadicoff I, p. 92.

693. The reason why the Respondent's expert does not think it best to use the WACC as a discount rate is that Comsigua has no financial debt outstanding[750] and, accordingly, he suggests leaving the cost of debt out and considering only the return on equity.

694. Abdala/Zadicoff's counterargument is that the actual capital structure is irrelevant in determining the market value, as the only decisive factor is the structure a hypothetical buyer would have applied to assess a value estimate, and that buyer would have always applied an optimal structure.[751]

695. The Arbitral Tribunal agrees with the Claimant's experts: the goal here is to asses Comsigua's value by applying valuation standards, which include the hypothesis that WACC is calculated based on an optimal capital structure. That Comsigua has no debt outstanding and is financed 100% with equity capital does not change this hypothesis.

696. The same conclusion follows from mere internal consistency considerations: in valuing Tavsa, which also had no financial debt, the Respondent agreed to have its WACC include the company's cost of debt. The Respondent has argued that Tavsa's case is distinguishable, as Tenaris held a majority interest and, therefore, it could have imposed a change in the capital structure. This argument is unpersuasive: each company should be applied its own WACC, irrespective of whether the shareholder holds a minority or a controlling interest in it.

**b.    Rate**

697. In line with the preceding decision, the Arbitral Tribunal must now determine what Comsigua's WACC is.

698. This WACC is derived from the following parameters:

- Risk-free rate;

- Market premium;

- Beta;

- Country risk premium; and, if applicable,

- Size premium;

---

[750] Note that Tavsa holds no financial debt either; Hart does not object to using the WACC for Tavsa as, in his view, because Tenaris had a control position in Tavsa, it could impose the capital structure it found most appropriate, as just another strategic decision – which would not be possible at Comsigua, where Talta holds a minority interest.
[751] Abdala/Zadicoff II, para. 106.

- Cost of debt;

- Optimal capital structure.

699. The Parties' experts are in disagreement as to the amount of each of the above parameters, and their points of disagreement are identical to those that were discussed for Tavsa's valuation. Consequently, the decisions made in that connection[752] are fully applicable here:

- Risk-free rate: the Tribunal has elected the 10-year bonds, as suggested by the Claimant, at a rate of 4.29%;[753]

- Market premium: the Tribunal has opted to use the arithmetic average, as suggested by the Respondent, which results in 6.2%;[754]

- Beta: the Tribunal has preferred the Morningstar-adjusted beta, as suggested by the Respondent, which is 1.94;[755]

- Country risk premium: the Tribunal has used a premium of 4.6%, which is the rate accepted by both experts;

- Size premium: the Tribunal has accepted the application of this 2.73% premium, as suggested by the Respondent.[756]

700. The above parameters are the inputs in the return on equity formula:

$$K_e = r_f + \beta\,(r_m - r_f) + p_c + p_s$$

Where $r_f$ is the risk-free rate, $\beta$ is the beta coefficient, y $r_m - r_f$ is the market risk premium, $p_c$ is the country risk premium, and $p_s$ is the size premium.

This results in a return on equity of:
4.29% + 1.94 x 6.2% + 4.6% + 2.73%; *i.e.*, 23.65%.

701. As to the net cost of debt, it stands at 6.9%.[757]

702. The optimal capital structure is 19/81 debt/equity.[758] And this leads to a WACC of 20.47%.[759]

---

[752] See para. 600 *supra*.
[753] Abdala/Zadicoff I, para. 176.
[754] Hart I, Annex 5.
[755] Hart I, Annex 5.
[756] Hart I, Annex 5.
[757] Abdala/Zadicoff I, p. 92.
[758] Abdala/Zadicoff I, p. 92.
[759] 23.65% * 0.81 + 6.9% + 0.19.

### B.     Comsigua's Value

703. The Arbitral Tribunal has used the Comsigua cash flows spreadsheet submitted as Exhibit CLEX-4 as basis, and substituted the discount rate proposed in that spreadsheet with a rate of 20.47%, as per the above decision.

704. This leads to a present value of the cash flows generated between 2008 and 2017 of USD 208.7 million, and a terminal value of USD 85.3 million; in total, a value of USD 294 million for Comsigua as of April 30, 2008. Applying 7.58% to this value to account for the Claimant's shareholding, we arrive at **USD 22.3 million**.

### 3.2    OTHER APPROACHES

705. The Arbitral Tribunal has decided to assess Comsigua's value by applying the DCF methodology. This, however, does not exclude the need to use other approaches to compare the value thus arrived at. The Tribunal will analyze these next.

### A.     Market Multiples

706. This approach was proposed by the Claimant.

707. Its experts selected the following comparable companies:[760]

| | Enterprise Value | Market Capitalization | Book Value of Equity | Book Value of Assets |
|---|---|---|---|---|
| *As of April 2008* | *US$ Million* | *US$ Million* | *US$ Million* | *US$ Million* |
| **Bihar Sponge Iron Ltd** | 95.30 | 65.15 | 33.65 | 74.81 |
| **Monnet Ispat & Energy Ltd** | 803.25 | 622.76 | 274.76 | 629.51 |
| **Tata Sponge Iron, Ltd.** | 125.82 | 109.31 | 60.88 | 118.45 |
| **Lloyds Metals & Energy Limited** | 239.32 | 191.47 | 43.96 | 121.23 |
| **Orissa Sponge Iron & Steel** | 181.44 | 118.50 | 39.73 | 110.03 |

708. As per their own calculations, as of April 30, 2008, the adjusted book value of Comsigua's equity was USD 172 million[761] and the adjusted book value of its assets was USD 253.9 million.[762]

709. The following charts, prepared by the Arbitral Tribunal based on the data supplied by the Claimants, compare the EV/BVA and Price/BVE ratios (provided by the Claimant) to Comsigua's ratio, calculated by dividing the DCF value (USD 294 million) by the adjusted book value of equity (USD 172 million) and the adjusted book value of assets (USD 253.9 million):

---

[760] CLEX-5, Financial Data.
[761] Abdala/Zadicoff I, p. 37.
[762] Abdala/Zadicoff I, p. 38.



710. The first chart shows the value of Comsigua's equity, as arrived at through the DCF, stated as a multiple of the book value of its assets. The multiple is 1.1x.[763] Comsigua ranks last, as it has the lowest multiple among the five comparables.



711. The second chart features the value of Comsigua's equity, as arrived at through the DCF approach, stated as a multiple of the book value of its equity. The multiple is 1.7x.[764] Again, Comsigua ranks last relative to its comparable companies.

\* \* \*

712. <u>To conclude</u>, the charts show that Comsigua ranks at the bottom, even though not far from the reference companies. The Arbitral Tribunal would have expected its value to place it on a more central position, as would have been the case with a multiplier of 1.25x for the BVA and 2x for the BVE.

---

[763] 294/253.9.
[764] 294/172.

163

713. Applying a BVA multiplier of 1.25x and a BVE multiplier of 2x, the value of Talta's interest in Comsigua is USD 24.06 million[765] and USD 26.08 million.[766]

## B.  **Comparable Transactions**

714. The Parties have referred to three potentially-comparable transactions: the purchase of IFC's shares, the valuation of Venprecar and Orinoco Iron, and, lastly, the one the Parties have paid the most attention to: the compensation paid to the Japanese Shareholders.

### a.  **The Purchase of IFC's Shares**

715. Hart, the Respondent's expert, has addressed the May 2007 transaction whereby Comsigua repurchased a shareholder's (IFC) 4.75 million shares for a price of USD 19 million. Applying the same price, the value of the Claimant's 7.58% shareholding would be USD 16.6 million.

716. The Claimant's experts have pointed out that the market circumstances in May 2007 and April 2008 are not comparable: because the price of HBI (Comsigua's product) increased by 40% that year,[767] companies in this sector experienced a marked appreciation in their value, which the experts have estimated at 74% to 140%.[768]

717. The Arbitral Tribunal accepts the Claimant's experts' criticism, and it is its view that Comsigua's implicit value as per the May 2007 IFC transaction cannot per se be used as indicative of the company's value in April 2008, without applying the necessary adjustments:

- By the mere lapse of time: if the May 2007 value is capitalized at the discount rate used in the DCF exercise, the value goes from USD 16.6 million to 20 million.[769]

- By the increased price of HBI: using the comparable company that showed the least appreciation as per the experts' calculation (74%) as reference, and applying that figure to the May 2007 value, the value as of April 2008 is USD 28.88 million.[770]

---

[765] USD 253.9 million x 1.25 * 7.58%. For its calculations, the Arbitral Tribunal has used the full figures in the data provided by the experts, even though the Award only shows rounded-up amounts.
[766] USD 172 million x 2 * 7.58%. For its calculations, the Arbitral Tribunal has used the full figures in the data provided by the experts, even though the Award only shows rounded-up amounts.
[767] Abdala/Zadicoff II, para. 65.
[768] Abdala/Zadicoff II, para. 69.
[769] 16.6 * (1+20-47%).
[770] 16.6 * (1+74%).

718.  The Arbitral Tribunal considers the IFC transaction to be an indicator of the value of the Claimant's investment in Comsigua as of April 30, 2008 between USD 20 million and 29 million.

### b.  The Value of Venprecar and Orinoco Iron

719.  Experts Abdala/Zadicoff referred to the valuation of Venprecar and Orinoco Iron which, as per their parent's financial statements, was USD 1.2 billion in June 2009. To find a point of comparison, the Claimant decides to translate that value into a price per ton produced. Applying this price per ton produced to Comsigua's production, the value of Tavsa's interest in Comsigua would be USD 29 million.[771]

720.  The Respondent finds the notion of stating the value in terms of capacity overly simplistic, particularly considering the differences between each company's plants' capacity.

721.  The Arbitral Tribunal agrees that tying value to production capacity is a simplification and, therefore, it will give prevalence to other comparable transactions in setting Comsigua's value.

### c.  The Purchase of the Japanese Shareholders' Shares

722.  In May 2011, CVG purchased the shares of a group of Japanese Shareholders, who held 73.37% of Comsigua's shares, in the aggregate, for USD 232.9 million.[772] The same economic terms of the transaction with the Japanese Shareholders are the terms underlying the recommendation made by CVG's management on April 17, 2012 for the purchase of Talta's shares for USD 24 million, with an initial payment of USD 8 million and the remaining USD 16 million payable in ten half-yearly installments, at 3% interest, and the furnishing of a bond by Talta.

723.  In expert Hart's view, this transaction[773] is a good indication of Comsigua's value, which would be USD 14.76 million in April 2012:[774]

  -  USD 21.15 million for the offered price, with each installment discounted at the yield on Venezuelan bonds (11.44%), plus 3% interest;
  -  Minus USD 2.4 million to account for the fact that Talta was required to set up a bond for 10% of the offered price in order to cover potential liabilities of Comsigua;

---

[771] H 3, slide 28.
[772] Hart I, para. 105.
[773] Because the terms were identical, both Parties' experts have considered only one transaction.
[774] Hart I, Annex 4.

-    Minus 21.26% as a minority interest discount.

724.  Experts Abdala/Zadicoff refuse to recognize any reliability at all to this approach as, in their view, it is a forced sale to the State that cannot be indicative of the fair market value, which is the value we are trying to determine. Moreover, they bring the Respondent's calculations into question.[775]

The Arbitral Tribunal's Position

725.  The Tribunal will first determine what the correct value of the compensation proposed by the State is.

726.  The starting point must be the calculation performed by expert Hart, who is the expert who has performed a more in-depth analysis of this purchase as indicative of Comsigua's value:[776]



727.  The Arbitral Tribunal will now analyze the criticisms raised by Abdala/Zadicoff:

(i)    Offered Price

728.  The Claimant notes that the price considered by Hart is USD 10 million lower than the price offered.

729.  The Arbitral Tribunal believes the criticism might stem from the fact that the final price discounted and adjusted by Hart is USD 14,759,605, when the nominal offer was for USD 24,058,737.

730.  The criticism is not acceptable. The exercise consists, precisely, in finding out what the price the State was willing to pay for Talta's shares in Comsigua in a single payment back in April 2012 was. And, in any event, to clear any doubts, the figure in the last column, which is the undiscounted principal sum, is USD 24,058,737.

---

[775] Abdala/Zadicoff II, para. 74.
[776] Hart I, Annex 4.

(ii)  Interest

731. Abdala/Zadicoff complain that expert Hart did not include interest, even though the offer provided for the accrual of interest.

732. Indeed, the offer provided as follows:[777]

> "Ten (10) half-yearly, consecutive installments, represented by 10 promissory notes for the sum of USD 1,600,174.00 each. In addition to each installment, there shall be added the interest accrued on each promissory note at the time of effective payment, accrued at a rate of 3% p.a."

733. The Arbitral Tribunal fails to fully comprehend Abdala/Zadicoff's criticism, as expert Hart has clearly included the accrued interest in his calculations. And he calculated interest as follows:

- He used, as principal, the outstanding amount of the full agreed-upon price;

- He applied a simple interest calculation method;

- The accrual period is always six months.

734. This method is correct.

(iii)  Discount

735. The next step is to discount each interest payment and the payment of the USD 1,600,174 installment to the initial date.

736. Expert Hart used a rate of 11.44%, which is the equivalent of the yield of the 7-year Venezuelan bonds.[778] The Claimant questions the suggestion that the discount rate needs to be adjusted to reflect a collection risk from Venezuela.[779]

737. The Arbitral Tribunal does not agree with either Party:

- It disagrees with the Claimant, because payments by the State must be discounted at a rate that represents the risk of the transaction, *i.e.* the rate applied to State bonds with a similar maturity period, which, in this case, is five years.

- But it does not agree with the Respondent that its suggested 11.44% reflects the sovereign debt yield on a five-year investment. To begin with, expert Hart claims to have used the yield on seven-year bonds,[780] even though the transaction had a period of five years (up to 2017); moreover, there were sovereign debt bonds in the market –TICC042017 (6.25% coupon) and PDVSA 2017 – October 2010 (5.25% coupon) and PDVSA 2017N – October 2011 (8.5% coupon) – which matured, precisely, in 2017

---

[777] CRED-59, p. 4
[778] T., p. 1030:20.
[779] T., p. 872:18–21.
[780] T., p. 1030; even though in Hart I, para. 110, he refers to a four-year bond.

167

and which, therefore, seem to be more adequate to calculate the discount rate. Lastly, the Arbitral Tribunal has doubts as to whether the suggested 11.44% has been correctly calculated.[781]

738. The Arbitral Tribunal believes that a discount rate of 6.25% adequately reflects the risk of a sale of shares in 2012, where the price of the securities would be paid over a period of five years.

739. The amount of the installment payments and the interest, discounted to the initial date at 6.25%, is USD 14,768,469.[782]

740. To be added to this sum is still the agreed-upon initial payment of USD 8,056,993. In total, USD 22,825,462. This was the price offered by the State, for a single payment (rather than installments).

(iv)  Bond

741. Expert Hart deducts, off the discounted price, 10% of the offered price, to account for the bond to be furnished by Talta.

742. The Claimant does not deny that the bond was a requirement of the offer; its argument is that the Japanese Shareholders got full compensation, without a deduction on account of the bond,[783] and that Talta should be applied the same terms. It further notes that, at the time when the offer was made, it was uncertain that the bond would have to be enforced due to any liabilities materializing.[784]

743. The Arbitral Tribunal takes note of the fact that the offer provides as follows:[785]

> "TALTA – Trading e Marketing, Lda. is to furnish CVG with a Bond in a sum equal to 10% of the full price amount (USD 2,405,873.74), to guarantee the effective payment of all liabilities that arise or may arise on a date after the execution of the Share Assignment Agreement, in connection with its management."

744. The offer also mentions that the purchase of Talta's shares is done:[786]

> "[…] on the same conditions on which the Japanese companies' shares were negotiated."

---

[781] Hart I, para. 110 refers to CRED-32, which seems to be a printout of a webpage (which the expert claims is investing.com, even though this is not shown in the printout) showing the yields of Venezuelan bonds with two, four (11.435% yield), six, 15 and 20 year maturity periods; however, it does not show the date on which those yields were calculated. The Arbitral Tribunal visited investing.com (the same source used by the expert) and checked the yields of Venezuelan bonds a year ago (as the page does not provide data further back in time), and the figure shown for five-year bonds is exactly 11.435%; which raises the suspicion that expert Hart, who prepared his report in October 2014, used the yield on 2014 bonds, not 2012 bonds.
[782] The Arbitral Tribunal has discounted each payment calculated by expert Hart via the formula $(1+6\%)$ ^- $n$, where $n$ is the time elapsed from May 15, 2012 to the date of payment.
[783] T., pp. 1208, 1209.
[784] T., p. 1209.
[785] CRED-59, p. 5.
[786] CRED-59, p. 4.

745. The Arbitral Tribunal has analyzed the language of the offer and the Parties' arguments and, once again, partially agrees with each Party:

- The Claimant is right to reject a price deduction for 100% of the amount of the bond: the offer did not provide for a price reduction, but for a bond, which might or might not be enforced, based on the materialization of hidden liabilities; however, the fact that the Japanese Shareholders did or did not have their bond enforced is irrelevant as those are subsequent events that were unknown at the time.

- The Respondent is right that the provision of a bond has the effect of reducing the value of the offer, as there is a risk that the bond will, in fact, be enforced – what needs to be determined is how probable it was that hidden liabilities would materialize over the four years of the bond's effective period. At the Hearing, the Arbitral Tribunal raised this issue to expert Hart, suggesting the application of a 50% reduction factor;[787] the expert replied that it is very difficult to make this sort of assessment, but did not rule out the suggested percentage as being absurd. This will then be the percentage the Tribunal will apply.

746. Thus, the Arbitral Tribunal has estimated that, if the amount covered by the bond was USD 2,405,874, its effect on the price will then be a reduction by one half of its value (USD 1,202,937). The offered price is then assessed at USD 21,622,525.[788]

(v)   Minority Share Discount

747. The next adjustment applied by Hart is a price reduction to reflect the fact that Comsigua is a minority shareholder. Talta objects, basically arguing that compensation should be paid to all shareholders alike, irrespective of whether they are majority or minority shareholders and, in fact, so was done with the Japanese Shareholders (who, individually, were minority shareholders).

748. The Arbitral Tribunal agrees with Talta. The State's offer did not mention any discount and, therefore, there is no reason to believe that there was one implied: the offer was what it was. Moreover, the Claimant is completely right to point out that the Japanese Shareholders were paid a single price, without discriminating between those who were selling a larger or a smaller shareholding, as all of them were individually minority shareholders, just like Comsigua.

749. It is thus incorrect to apply any additional adjustment to the price. The value of Talta's interest in Comsigua, as implicit in the Government's purchase offer, is USD 21,622,525 USD.

*  *  *

---

[787] T., pp. 1210–1212.
[788] USD 22,825,462 – 1,202,937.

750.  The Arbitral Tribunal has before it different calculations which are, more or less reliably, indicative of Comsigua's value:

-  Market multiples: between USD 24.06 million and 26.07 million, or USD 25.065 million on average;

-  Purchase of IFC's shares: between USD 20 million and 29 million, or USD 24.5 million on average;

-  Value of Venprecar Orinoco Iron: USD 29 million;

-  Compensation paid to the Japanese Shareholders: USD 21.62 million.

751.  The above approaches show that the value arrived at through the discounted cash flows method (USD 22.3 million) is on the low end and, therefore, needs to be increased.

752.  In order to determine the amount of that increase, the Arbitral Tribunal has decided to set an order of priority for the above discussed indicators:

-  (i) topmost is the compensation paid to the Japanese Shareholders, which represents the value the State attributed to their shareholdings. However, the Arbitral Tribunal also accepts the criticism that this is not indicative of a fair market value, but the price of a forced sale and, therefore, it will treat this price as an indication of the minimum value of Talta's share in Comsigua, assigning it a weight of 0.3;

-  (ii) next is the purchase of IFC's shares, as it is indicative of the value of Comsigua at a time prior to the expropriation, but under market circumstances that were less favorable than those at the time of the expropriation; therefore, the Tribunal will assign it a weight of 0.26;

-  (iii) the reliability of market multiples is more limited, as there is no evidence that the experts have normalized the data, and their weight is thus 0.24; and

-  (iv) lastly, the value of Venprecar and Orinoco Iron, because the Arbitral Tribunal believes that expressing value in terms of production capacity is an exercise of questionable reliability, and therefore assigns it a weight of 0.2.

753.  Using the above order of priority, the Arbitral Tribunal has applied the weight factors to the relevant value:

-  Compensation paid to the Japanese Shareholders: 0.3 x USD 21.62 million;

-  Purchase of IFC's shares: 0.26 x USD 24.5 million;

-  Market multiples: 0.24 x USD 25.065 million;

-  Value of Venprecar and Orinoco Iron: 0.2 x USD 29 million.

754. The result of the above weighting exercise is that the value of Talta's share in Comsigua is **USD 24,672,357**.

\* \* \*

755. The Arbitral Tribunal notes that the market value of the Claimants' shareholding in Comsigua (USD 24,672,357) is higher than the USD 24.1 million offered by the Republic. Therefore, as pointed out by the Claimants, there is no need for the Arbitral Tribunal to rule on the subsidiary claims based on the unfair and inequitable treatment, discriminatory treatment, and breach of the most-favored nation clause allegations.[789]

---

[789] CV, para. 321.

# VIII.    INTEREST

756. The Claimants have requested an interest award.

757. Interest accrual is an issue addressed in the BITs:

- The Portuguese **BIT** provides that "compensation will accrue interest at the exchange rate applicable at the date in which the transaction becomes effective, in the territory where the investment is located".[790]

- Pursuant to the Luxembourg **BIT**, "interest [on compensation] shall be paid at the normal commercial rate from the date of its determination to the date of payment".[791]

758. The Parties disagree on the applicable interest rate.

## 1.    THE CLAIMANTS

759. The Claimants argue that, whatever the applicable interest rate is, it must guarantee full compensation; in other words, the Claimants are to be placed in a position equal to the position they would be in had the wrong not taken place.[792]

760. It is the Claimants' view that the rate that provides full compensation is the one reflecting the cost of opportunity lost by not having had the funds due them available, *i.e.* the WACC,[793] not a risk-free rate:

- The BITs do not mention a risk-free rate;[794]

- The Claimants have *de facto* lent money to Venezuela and, therefore, there is no reason to apply a risk-free rate to that loan, as the cost of Venezuela's debt has been much higher (9.8% in April 2008);[795]

- Arbitral awards have repeatedly held that a risk-free rate does not apply; rather, the applicable rate is one that compensates for the loss of investment opportunities during the time over which the compensation was due but not paid;[796]

- Hart himself applied a rate of 11.44% to discount the installment payments in the transaction with the Japanese Shareholders.[797]

761. The Claimants have also requested that interest be compounded,[798] as compound

---

[790] Portuguese BIT, Article IV.1(c).
[791] Luxembourg BIT, Article 4.2.
[792] CV, para. 297.
[793] CV, para. 297.
[794] CV, para. 300.
[795] CV, para. 301.
[796] CV, paras. 298, 299.
[797] CV, para. 302.
[798] CV, para. 303.

interest is the computation method that best provides full reparation for the loss, as has been acknowledged in previous awards.[799] The BITs' mention of a "normal commercial rate" means that they are referring to compound interest.[800] Compounding should be annual, since the cost of equity is measured using the expected annual returns as basis.[801]

## 2. THE RESPONDENT

762. The quantum expert hired by Venezuela objects to the Claimants' proposals.

763. Hart notes that he agrees that the Claimants be paid interest if the Award orders compensation, but granting interest at the WACC is entirely inappropriate.[802]

764. Hart analyzed the provisions of the BITs on the subject of interest and found that the "normal commercial" rate means the late interest rate applicable on trade transactions.[803] The expert advocates for the use of the interest rate used in Comsigua's shareholder agreements (six-month LIBOR + 2% p.a.) as the reference rate.[804]

765. However, the expert is also for applying a different alternative interest rate, as it is the one most frequently used in ICSID awards: the yield on 10-year U.S. Treasury Bonds.[805]

766. Faced with the opposing experts' suggestion to apply the WACC as the interest rate, the expert is surprised and claims to know of no awards granting interest at such rate;[806] the expert argues that, in *Saur,* the arbitral tribunal did not use the WACC as the interest rate but applied the rate the parties had agreed upon as the guaranteed rate of return.[807]

---

[799] CV, paras. 304, 305.
[800] CV, para. 306.
[801] CV, para. 308.
[802] Hart II, para. 199.
[803] Hart II, para. 202.
[804] Hart II, para. 203.
[805] Hart II, para. 204.
[806] Hart II, para. 181.
[807] Hart II, para. 207.

767. As to whether interest is to be compounded, Venezuela argues that neither the BITs[808] nor well-established practice provide for this possibility,[809] and further claims that simple interest does provide full reparation.[810]

### 3. THE ARBITRAL TRIBUNAL'S DECISION

768. The BITs contain a generic agreement as to the applicable interest rate. Such rate must be:

- A normal commercial rate,

- And, as specified in the Portuguese BIT, it must be the rate applicable in Venezuela.

769. However, within that framework, the Arbitral Tribunal has discretion to determine the interest rate. In this case, the experts' proposals range between:

- The WACC for the compensation due for Tavsa's expropriation and the cost of equity for Comsigua's case;

- LIBOR for six-month USD deposits + 2%;

- The yield on 10-year U.S. Treasury Bonds.

770. The Tribunal is not of the opinion that WACC and the yield on U.S. Treasury Bonds are "normal commercial rates" "applicable in Venezuela," as required by the BITs and, therefore, it rejects their application. However, the Tribunal believes that LIBOR plus a margin would indeed satisfy these requirements:

- It is a normal commercial rate: LIBOR is the interest rate applied in the London interbank market, and is set on a daily basis by the British Bankers' Association for interbank deposits with different maturity periods, denominated in various currencies; it is universally accepted as the reference rate to set interest rates on loans, deposits and other financial instruments and, in financial practice, bank loans to customers accrue interest at the interbank LIBOR plus a margin.

- It is a rate applicable in Venezuela: economic players in Venezuela frequently use LIBOR, as shown by the fact that clause 9 of Addendum No. 5 to Comsigua's Shareholders' Agreement[811] uses LIBOR for the interest accrued on the sums owed by the shareholders to Comsigua or vice versa.

771. Accordingly, the Arbitral Tribunal decides that the late interest to be paid by Venezuela accrue based on the LIBOR rate for dollar-denominated one-year deposits, with the rate adjusted to reflect market changes, yearly in arrears.

---

[808] RV, para. 268.
[809] RV, para. 270.
[810] RV, para. 269.
[811] CLEX-19.

174

772. Still to be defined is the appropriate margin above LIBOR. Expert Hart proposes 2%. The Arbitral Tribunal finds that this figure, which may very well have been appropriate under different economic circumstances, is not so in the light of current circumstances, where interest rates are typically extremely low (even negative). Therefore, the Tribunal considers a 4% margin to adequately compensate the investor for the unavailability of the funds and the financial risks faced.

773. Lastly, the Tribunal must determine whether interest is to be compounded after a given period. The BITs are silent on the matter. It is the Tribunal's view that in a LIBOR-based interest calculation, compounding is financially essential to compensate the investor. Indeed: the goal of interest is to compensate for the outside financial cost the Claimant would hypothetically have incurred to cover the deficit caused by the delayed compensation payment. Had the Claimant borrowed on normal market conditions at LIBOR for one year, it would have had to pay interest annually from the *dies a quo;* otherwise, such interest would have been added to the principal, thereafter accruing interest in turn. Therefore, in order to fully compensate the Claimant, the award must allow the annual compounding of interest.

774. Finally, the Tribunal has verified that the Claimants have simultaneously asked for compensatory and late interest.[812]

775. To conclude, the Arbitral Tribunal's decision is as follows:

- Interest accruing on a principal of USD 112,345,530 ["**Tavsa Interest**"] and USD 24,672,357 ["**Comsigua Interest**"];

- Tavsa Interest and Comsigua Interest will accrue at a rate equal to LIBOR for one-year USD deposits + 4% p.a.;

- Tavsa Interest and Comsigua Interest will accrue from April 30, 2008 to the date of actual payment, with the interest rate redefined yearly as from such date;

- Accrued Tavsa Interest and Comsigua Interest will be compounded annually, at the same time as the new interest rate is set for the upcoming period;

- Tavsa Interest will be paid to Tenaris, and Comsigua Interest will be paid to Talta, in line with the Arbitral Tribunal's decision in paragraph 402 *supra.*

---

[812] CI, para. 231.

175

# IX.  TAXES

776. The Parties debate whether the Award should include an express declaration that the Claimants are to be indemnified in respect of taxes the Venezuelan Republic or other States might apply to the awarded payments. The Tribunal will explain the Parties' positions (**1.**) and make a decision (**2.**) to, then, move on to a specific issue: the potential impact of Article 5 of the Luxembourg BIT (**3.**).

## 1.  THE PARTIES' POSITIONS

777. The Claimants argue that Abdala/Zadicoff's value assessments were made net of Venezuelan taxes. Consequently, any tax Venezuela might claim on the compensation would amount to double taxation.[813] Therefore, to secure full reparation, the Claimants have requested that the Tribunal declare that:

   - The Award is made net of Venezuelan taxes;[814] and

   - Venezuela may not claim taxes of any kind on the Award.[815]

778. They are also seeking to have Venezuela indemnify them in respect of any tax liability that might arise in Luxembourg, Portugal or any other jurisdiction. The underlying rationale for this claim is that such liabilities would also be a result of the wrong committed by Venezuela: had Venezuela not breached the BITs, no compensation would have been paid, and there would thus be no taxable income on that account.[816]

779. Expert Hart, appointed by the Bolivarian Republic, notes that the Claimants have failed to specify what the tax risk they claim to be facing is, and, therefore, contends this claim is speculation and advocates for its dismissal.[817]

780. Venezuela adds that the language of the BITs restricts the Tribunal's role to determining whether or not there was a breach of the obligations therein established and, as the case may be, setting the amount of compensation due; however, the BITs do not vest the Tribunal with the additional power to issue a purely declaratory opinion, let alone concerning an issue as important to sovereignty as the matter of taxation powers.[818]

781. As to the claim for indemnity from tax liabilities arising abroad, Venezuela finds this constitutes an unjustified benefit. The Claimants have failed to explain what these taxes are, how they would be damaging to them, or the causal link between the taxes and the wrongful acts.[819]

---

[813] CV, para. 309.
[814] CV, para. 309.
[815] CV, para. 309.
[816] CV, para. 319(g).
[817] Hart II, para. 208.
[818] RV, para. 273.
[819] RV, para. 274.

2. **THE ARBITRAL TRIBUNAL'S DECISION**

782. The Claimants have asserted two very distinct requests:

- As to the taxes that might apply in Venezuela (**A.**), they ask that the Arbitral Tribunal order Venezuela not to claim taxes on the Award or, in the alternative, that it declare that the Award is rendered net of Venezuelan taxes; and

- As to the taxes that might apply in other jurisdictions (**B.**), they ask that the Arbitral Tribunal order Venezuela to indemnify the Claimants with respect to any such taxes.

A. **The Claim for Venezuelan Taxes**

783. The Claimants' first request is that the Arbitral Tribunal order the Venezuelan State to refrain from taxing any awarded compensation. This request must fail.

784. The Claimants have not explained the legal basis upon which this Arbitral Tribunal would be able to rule as requested. Obviously enough, the BITs and the Washington Convention offer no such basis, as these sources of law only authorize the Arbitral Tribunal to rule on whether Venezuela has breached its obligations under the BITs and, if so, set the appropriate compensation to provide reparation for the damage thus caused; however, they do not allow it to order a sovereign State like the Bolivarian Republic of Venezuela to refrain from applying taxes as it sees fit on any tax event.

785. The issue raised by the Claimants' in their second request is an entirely different matter: that the Arbitral Tribunal declare that the amount of the award is set net of taxes.

786. The starting point is as follows: the Claimants are a Luxembourg company and a Portuguese company and, therefore, their domicile for tax purposes is outside of Venezuela. The Claimants are looking for a guarantee that, whatever the amount they are awarded, such amount will not be reduced by potential taxes applied in Venezuela, but will remain equal to what is ordered in this Award.

787. The BITs require this of the State:

"[…] the payment of immediate, adequate and effective compensation […]."[820]

"The compensation […] shall be paid without undue delay and shall be freely transferrable."[821]

788. The Arbitral Tribunal is of the opinion that the BITs support the Claimants' request: in this case, adequate compensation amounts to USD 137,017,887[822] plus interest accrued until effective payment. The USD 137,017,887 plus interest are to be paid effectively and be freely transferrable. This means that such

---

[820] Portuguese BIT, Article IV(c), and Luxembourg BIT, Article 4(c).
[821] Portuguese BIT, Article V.1(c) (in virtually identical terms) and Luxembourg BIT, Article 4.2.
[822] USD 112,345,530 for Tavsa's expropriation, and USD 24,672,357 for Comsigua's expropriation.

amounts are the ones that are really to become an asset of the Claimants, who are legal entities with no tax domicile in Venezuela.

789. If compensation could be subjected to Venezuelan taxes and Venezuela tried to apply an offset between the compensation and the tax, the compensation effectively paid would be lower than set in this Award, and the Bolivarian Republic would thereby be defaulting on its obligations under the BITs. The succession of causal links is satisfied: the monetary reduction suffered by the Claimants would be attributable to actions of Venezuela exclusively, as Venezuela would be the beneficiary of the tax whose application is reducing the compensation amount.

790. Otherwise, *reductio ad absurdum*, Venezuela could tax any compensation due under an international award at 99%, thus reducing effective payment to 1% of the amount of the award. The Award would be thus left without any content.

791. In sum, if Venezuela were to subject the compensation to a tax which, once paid, would cause the Claimant's incoming money stream to be decreased, Venezuela would then be under an obligation to raise the amount of compensation, such that the net sum after tax payment (or an offset) would reach USD 137,017,887 plus accrued interest and costs.

792. To conclude, the Arbitral Tribunal will allow the Claimants' claim: the compensation ordered in the Award will be net of Venezuelan taxes.

### B.    The Claim for Taxes in the Country of Residence

793. The Claimants go one step further and ask that Venezuela indemnify them from any tax liabilities that might accrue in Portugal and Luxembourg (the Claimants' tax domiciles) or in any other jurisdiction as a result of being paid the awarded compensation.

794. On this point, the Arbitral Tribunal concurs with the Respondent: Venezuela should not be made liable for taxes applied outside of its territory, as the causal link is broken when Venezuela satisfies the award and pays compensation to the Claimants. From then on, any taxation affecting the Claimants' assets will be attributable to the taxing State, not Venezuela. Venezuela cannot take responsibility for the sovereign decisions of another jurisdiction, which are beyond its control.

Additional Argument

795. Lastly, the Claimants have argued that the DCF model that was used as basis to calculate the compensation due already made provision for taxes. Consequently, the Claimants suggest, the compensation had already been reduced to reflect the tax impact and, if the Arbitral Tribunal were not to keep the Claimants indemnified from a tax perspective, it would be allowing double taxation.

796. This argument is a *non sequitur*:[823] the DCF methodology is an approach to assess the value of a company consisting in estimating the net cash flows the company will be generating in the future. However, the tax on the income of the target company is one thing, and the tax that will apply to a company's owner upon the company's sale or expropriation is an entirely different matter: corporate income tax and tax on the owner's profits upon a sale or expropriation are radically different concepts.

3. **ARTICLE 5 OF THE LUXEMBOURG BIT**

797. Article 5 of the Luxembourg BIT, entitled *"Transferencias"* [Transfers] includes the following provision:

> "1. Each Contracting Party shall grant investors of the other Contracting Party the free transfer, to or from its territory, of all payments related to an investment and, in particular: [...]
>
> (c) compensation paid under Article 4. [...]
>
> 3. Each Contracting Party shall issue the necessary authorizations to ensure that such transfers are completed without undue delay and without charges other than the usual taxes and expenses."

798. The French version of Article 5.3 reads:

> "*Chacune des Parties contractantes, délivrera les autorisations nécessaires pour assurer sans délai injustifié l'exécution des transfers, et ce, sans d'autres charges que les taxes et frais usuels.*"

799. The Arbitral Tribunal asked the Parties[824] to comment on the potential impact of Article 5 of the Luxembourg BIT on their positions on the subject of tax indemnity.

A. **The Claimants' Position**

800. It is the Claimants' view that Article 5 of the Luxembourg BIT does not relate to taxes applied on the compensation due for expropriation, as it only refers to the

---

[823] *ConocoPhillips*, Exhibit CLA 78: in a very unpersuasive manner, this award argued that there was a link between the taxes factored into the cash flows model and the debtor's obligation to cover the creditor's tax liabilities. An agreement whereby seller and buyer set the price for the purchase of a company via a discounted cash flows calculation including the tax effect (both positive and negative) the company will experience in the future does not mean that the buyer has to pay the seller, in addition to the purchase price, the corporate tax that will apply to the seller for the profits earned upon the sale of the company.
[824] Letter of August 5, 2016.

usual taxes and expenses that apply on the issue of the authorizations required in order to make transfer of the payment possible.[825] The French version of the BIT, which includes the words "*et ce*," more clearly denotes that the fiscal assessment in question relates to the authorizations.[826] Moreover, paragraph 1 of that Article ensures the free transfer of compensation; if such compensation were taxed, it would no longer be a free transfer.[827]

801. Moreover, the relevant legislation on the subject of taxation of the compensation due for expropriation is the Nationalization Decree, No. 6058, itself, Article 10 of which clearly enshrines the tax-exempt status of such compensation:[828]

> "Any acts, transactions and agreements done or executed for the purpose of the transformation to a State-Owned Company referred to in this Decree, as well as any assignments, transfers of assets, and any other transaction that entails an enrichment or the disposal, conveyance or sale of assets intended to become assets of such companies shall be exempt from the payment of any taxes, fees, special contributions or any other fiscal obligation."

802. According to the Claimants, the above conclusion is reinforced by the fact that the compensation paid to the Japanese Shareholders was free of taxes, pursuant to said Article 10:[829]

[830]

> "Pursuant to the [Nationalization] Decree […] any transactions hereunder are free of any and all taxes and, therefore, any moneys to be paid by [Venezuela] shall be so payable without deducting any amount whatsoever on account of taxes. […] In the event that any of the Sellers is required to pay taxes to the Republic or to any division and organization of the State of Venezuela, [Venezuela] shall indemnify the Seller for such payment and any other payment."

## B.   The Respondent's Position

803. The Respondent's reading of Article 5 of the Luxembourg BIT is different. In its view, this Article allows the State to levy the usual taxes and fees on the compensation due for expropriatory measures.[831]

804. It further notes that the Claimants have no standing to rely on the Nationalization Decree to seek tax indemnity as the Nationalization Decree only applies to lawful expropriations and, in the case at hand, the Claimants contend they suffered an unlawful expropriation. The applicable legal instrument is then the Luxembourg BIT, which draws no distinction between lawful and unlawful expropriations.[832]

---

[825] CVI, para. 11.
[826] CVII, para. 6.
[827] CVII, para. 8.
[828] CVI, para. 9.
[829] CVI, para. 10.
[830] Exhibit C-72.
[831] RVI, para. 6.
[832] RVI, para. 17.

805. As to whether the French version of the BIT sheds some light on its correct interpretation, the Respondent doubts it. According to the Bolivarian Republic, the expression "*et ce*" may refer to both the authorizations and the transfers.[833]

806. The Respondent also denies that its obligation under the BIT to allow "free transfer" entails unrestricted freedom.[834]

## C. The Arbitral Tribunal's Decision

807. Article 5.3 of the Luxembourg BIT allows the application of certain "usual taxes and expenses:"

> "*Each Party to the Contract shall issue the necessary authorizations to ensure that the transfers will be made without undue delay and without other charges other than habitual taxes and expenditures.*"

808. The Parties' positions conflict as regards the correct interpretation of Article 5.3 of the Luxembourg BIT, and whether this provision might undermine the conclusion on tax indemnity reached by the Arbitral Tribunal in the preceding section:

- It is the Claimants' view that the expression "*sin otros cargos que no sean los impuestos y gastos usuales*" refers to the fiscal assessments related to the issue of authorizations;

- The Respondent contends these are assessments concerning the transfers.

809. The Arbitral Tribunal finds the Claimants' position to be more persuasive, for the following reasons.

810. The Arbitral Tribunal will first determine what the correct text of Article 5.3 is (**a.**) and will then interpret it in the light of the relevant criteria (**b.**)

## a. The Correct Version of Article 5.3

811. Tenaris has brought to the Arbitral Tribunal's attention the semantic discrepancies between the French and Spanish versions of the BIT. Correctly translated from its French version, Article 5.3 reads as follows:[835]

> "Each Contracting Party shall issue the necessary authorizations to ensure that such transfers are completed without undue delay, **and this** without any charges other than the usual **fees** and expenses."

812. There are thus significant differences between the correct translation from

---

[833] RVII, para. 4.

[834] RVII, para. 5.

[835] Free translation of the original by the Arbitral Tribunal: "*Chacune des Parties contractantes, délivrera les autorisations nécessaires pour assurer sans délai injustifié l'exécution des transfers, et ce, sans d'autres charges que les taxes et frais usuels.*" Bold and underlined emphasis is the Arbitral Tribunal's.

181

Case 1:28-cv-03378-DLC   Document 4   Filed 08/17/16   Page 407 of 709   Page ID #: 443

French into Spanish and the Spanish version of the BIT:

- The first one is a clear translation error: the Spanish version leaves out two words ("*et ce*") which do appear in the French version;

- The second one is terminological in nature: the correct translation of the French word "*taxes*" is the specific concept of "*tasas*" [fees], not the generic "*impuestos*" [taxes], as both "*taxes*" and "*tasas*" refer to charges applied by a State for the provision of a public service.[836]

813. Which version should prevail?

814. The BIT itself provides the answer: pursuant to its final provision, even though the Spanish, French and Dutch versions are equally authentic, in the event of discrepancies consideration is to be had to the fact that the negotiations took place in French. Therefore, since there are indeed discrepancies between the Spanish and French versions of Article 5.3, the Arbitral Tribunal will take into consideration the fact that the contracting States negotiated these provisions in French and it is based on this version that they projected their consent.

815. Article 5.3 is not an isolated instance of inconsistencies between the French and the Spanish versions:

- Article 1.1(b) substitutes "*and*" with "*or*";[837]

- There are words left out of Articles 5.1(b) and 10.3;[838]

- Article 9.2 changes tenses from present to future;[839]

- Article 10.1 adds words.[840]

816. Without question, the Contracting Parties were aware of the potential differences between the French-negotiated original and the two versions translated into Spanish and Dutch, and it is for this reason that they included a closing provision giving prevalence to the original language in which the negotiations were carried

---

[836] 'Taxe' is defined in the Larousse dictionary as "a fiscal assessment intended to increase the treasury of the State, a local collective or a public administrative entity as consideration for a service provided to private parties." Likewise, 'tasa' is defined in the *Diccionario de la Real Academia de la Lengua* dictionary as follows: "*A charge applied on the enjoyment of certain services or the performance of certain activities.*"

[837] "*[...], ainsi que toute personne moral effectivement contrôlée par un investisseur compris dans le paragraphe 1, a) __et__ b).*" "*[...], así como toda persona jurídica controlada efectivamente por un inversor comprendido en el párrafo 1.a) __o__ b) [...].*"

[838] "*des sommes destinées au règlement d'obligations contractuelles, y compris les sommes nécessaires au remboursement d'emprunts, __les redevances__ et autres paiements découlant de licences, franchises, __concessions__ et autres droits similaires, ....*" "*las sumas destinadas al pago de obligaciones contractuales inclusive las sumas necesarias para el pago de préstamos, __de regalías__, de todos los pagos referentes a licencias, franquicias, __concesiones__ y otros derechos similares.*"

"*Si le Vice-Président de la Cour __est ressortissant__ de l'une ou l'autre Partie contractante ....*" "*Si el Vicepresidente de la Corte Internacional de cualquiera de las Partes Contratantes.*"

[839] "*[...]le différend __est soumis__ [...]*"; "*Á cette fin, chacune des Parties contractantes __donne__ son consentement [...].*" "*[...] la controversia __se someterá__ [...]*"; "*A este fin cada una de las Partes Contratantes __otorgará__ su consentimiento[...].*"

[840] "*Tout différend relatif à l'interprétation [...].*" "*Cualquier controversia __entre las Partes Contratantes__ relativa a la interpretación [...].*"

182

out.

### b. Interpretation of Article 5.3

817. Having established what the relevant language of Article 5.3 is, the Arbitral Tribunal must now interpret whether the levy thereby authorized affects the issue of authorizations or the transfer of the compensation payment.

818. The rules of interpretation of any treaty are enshrined in Article 31 of the VCLT: ordinary meaning, (**i.**), context, and object and purpose (**ii.**)

### (i) Ordinary Meaning

819. Article 5.3 allows the application of fees (and other expenses). The goal here is to determine whether, from the standpoint of the provision's ordinary meaning, the correct reading is that such fees apply to the issue of authorizations (as advocated for by the Claimants) or what they actually apply to is capital transfers (according to the Respondent).

820. The Tribunal leans toward the interpretation proposed by the Claimants: each Contracting Party is to issue the necessary authorizations to ensure that transfers take place without undue delay and without any other charges other than the usual taxes and expenses.

821. In its French version, Article 5.3 reads as follows:

> "*Chacune des Parties contractantes, délivrera les authorisations nécessaires pour assurer sans délai injustifié l'exécution des transfers, et ce, sans d'autres charges que les taxes et frais usuels.*"

822. By means of Article 5.3, each Contracting Party assumes an obligation: it will issue the authorizations required to ensure that transfers are made without undue delay. Then the BIT includes the expression *"y esto, sin otros cargos [...]"* ("*et ce, sans d'autres charges*"). A textual reading of those words supports the Claimants' interpretation: *"Esto"* ("*ce*") [this] can only refer to the obligation undertaken by the State in Article 5.3, *i.e.* the issue of the authorization, not the transfers themselves.

823. This textual interpretation is reinforced by the use of the notion of *"tasas"* ("*taxes*") [fees]. There are different kinds of fiscal burdens, and fees are one of them.[841] A fee is a levy paid by a party as consideration for a service provided by the Administration. This is the usual meaning of the term *'tasa.'* There is only one taxable event the *tasas* mentioned in Article 5.3 can apply to: the issue, by the Authorities, of the administrative authorizations required to allow the transfer of an investment or the returns on an investment abroad. The issue of an authorization is indeed a public service, whereas the existence of a transfer cannot be the subject of a fee, as a transfer is not in itself a service provided by the Administration.

---

[841] Venezuelan Law distinguishes between fees and other fiscal burdens, such as taxes. *Cf.* Articles 31 and 136 of the 1961 Venezuelan Constitution and Article 13 of the 1994 Venezuelan Organic Tax Code, as they were in force when the BITs were negotiated.

(ii)   Context, Object and Purpose

824.  The object and purpose of the BIT is to attract investments by creating favorable economic conditions.[842]

825.  Such favorable economic conditions include the States' obligations to pay adequate and effective compensation in the event of expropriation (Article 4.1(d) and to allow the free transfer of such compensation (Articles 4.2 and 5.1(e)) – all in accordance with Article 5.3.

826.  Between a scenario where the State is allowed to levy fiscal amounts on the transfer of compensation and another where the State is only allowed to levy assessments on the issue of the authorization required to make the transfer, the Tribunal will choose the latter scenario, as it is the one that best fits the purpose of the BIT and its context.

**c.   Additional Argument**

827.  The Claimants have pointed out that Article 10 of the Nationalization Decree provided that the compensation for expropriation would be exempt of the payment of taxes, fees, special contributions or any other fiscal obligation.[843] And the compensation to the Japanese Shareholders[844] expressly acknowledged the fact that, pursuant to the Nationalization Decree, such transaction was free of any and all taxes; therefore, were Venezuela to apply an assessment on the compensation, the Bolivarian Republic should gross the amount due up to a net amount which, after deducting such taxes, would be equal to the agreed upon compensation.[845] This would reinforce the conclusion that the correct interpretation of Article 5.3 of the Luxembourg BIT prevents the application of taxes on the compensation.

828.  The Respondent refuses to recognize any relevance to the tax-related provisions of the Nationalization Decree, as they only apply to voluntary settlements between the State and an investor, as was the case with the compensation paid to the Japanese Shareholders.[846]

829.  The Arbitral Tribunal disagrees with the Respondent: the tax indemnity that is expressly recognized in the Nationalization Decree and was granted to the Japanese Shareholders is relevant, because it evidences State behavior that is consistent with the manner in which the Arbitral Tribunal has interpreted Article 5.3 of the BIT in this Award.

---

[842] First desiring clause.
[843] Article 10: "Any acts, transactions and agreements done or executed for the purpose of the transformation to a State-Owned Company referred to in this Decree, as well as any assignments, transfers of assets, and any other transaction that entails an enrichment or the disposal, conveyance or sale of assets intended to become assets of such companies shall be exempt from the payment of any taxes, fees, special contributions or any other fiscal obligation."
[844] Exhibit C-72.
[845] Clause 10.1.
[846] RVII, para. 19.

# X. COSTS

830. Arbitration Rule 47(1)(j) provides that

> "the award shall be in writing and shall contain […] any decision of the Tribunal regarding the cost of the proceeding."

831. The Tribunal requested that the Parties submit a breakdown of the sums they are seeking as costs.[847] The following sections recount the Parties' claims regarding the costs of the proceedings in connection with the Centre and the arbitrators' fees ["**Costs of the Proceeding**"] and the fees and expenses of their attorneys, witnesses, experts and other representatives ["**Defense Expenses**"]. The Tribunal notes that neither Party has challenged the cost items claimed by the opposing Party or the accuracy of the amounts sought.

## 1. THE CLAIMANTS' POSITION

832. The Claimants are seeking the following amounts:

- Costs of the Proceeding: USD 1,050,000;[848]

- Defense Expenses: USD 5,721,236,[849] EUR 256,892, COP 487,000, ARP 58,882 and MXN 76,852.

833. The sum of the above figures totals USD 6,771,236, EUR 256,892, COP 487,000, ARP 58,882 and MXN 76,852.

834. The Claimants have requested that the Tribunal order Venezuela to pay all of the above sums.

## 2. THE RESPONDENT'S POSITION

835. The Respondent, who has not contributed to the Costs of the Proceeding, is only seeking Defense Expenses in the sum of USD 7,974,674.[850]

836. The Respondent trusts that the Tribunal will find that it lacks jurisdiction and argues that, in any event, Venezuela has not failed to fulfill its obligations under the BITs.[851] It therefore requests that the Claimants be ordered to pay all of the costs of this arbitration.[852]

## 3. THE ARBITRAL TRIBUNAL'S DECISION

837. Article 61(2) of the ICSID Convention provides as follows:

---

[847] T., p. 1716:1–21.
[848] CVI, p. 6; Letter from the Claimants, October 7, 2016.
[849] CVI, pp.6-8.
[850] RVI, p. 6.
[851] RIV, para. 458.
[852] RIV, para. 458.

"the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid."

## A. Cost Awarding Criteria

838. Neither the ICSID Convention nor the Arbitration Rules offer any sort of guidance for the allocation of costs and, therefore, the Tribunal has discretion to rule on their allocation.

839. The Claimants have asked that the Arbitral Tribunal apply the costs-follow-the-event standard,[853] while the Respondent suggests the procedural recklessness standard, which, in its opinion, applies to the Claimants, who therefore should be made to bear the costs of this arbitration.[854] The Arbitral Tribunal will analyze each standard separately, starting with the recklessness standard.

The Claimants' Alleged Recklessness

840. The Respondent maintains that, throughout the arbitration, the Claimants engaged in bad faith behavior that caused delays and unnecessary complications, and mentions the following as examples:[855]

-   Objecting to the bifurcation of the proceedings.

-   Filing 16 exhibits with its counter-memorial, which should have been filed earlier, instead of one month before the Hearing on jurisdiction; the work required to analyze this new evidence made it necessary to cancel the Hearing.

-   Making incomplete submissions of the evidence requested by the Respondent's expert.

-   Refusing to examine the Respondent's expert after his presentation, so that they would have all night to better prepare for his examination the next day.

-   Requesting the incorporation of new documents a few days prior to the Evidentiary Hearing, thus forcing the Republic to use up time that had been set aside to prepare for the Hearing to respond to this untimely evidence.

841. According to repeated decisions, in order for a tribunal to be able to rule that a party committed procedural recklessness, it is necessary that the opposing party establish:

---

[853] CV, para. 314.
[854] RV, para. 276.
[855] RV, para. 276.

- Frivolous, irrational, or unlawful behavior,[856] or

- Obstructionist behavior that causes an unnecessary extension of the proceedings.[857]

842. None of the Claimant's behaviors pointed out by the Bolivarian Republic warrants being labeled as reckless.

<u>The Costs-Follow-The-Event Criterion</u>

843. The Claimants have asked the Tribunal to apply the costs-follow-the-event criterion, ordering the losing party to pay the expenses incurred by the prevailing party. The Arbitral Tribunal agrees on applying this principle, as it is commonly used in arbitration practice.[858]

844. In this case, the Claimants are the prevailing parties as they have had the jurisdictional objections rejected and their main expropriation claim accepted by the Arbitral Tribunal. However, the Respondent has also prevailed to a certain extent, as it has managed to persuade the Arbitral Tribunal that the amount of compensation due was lower than sought.

**B.  Application of the Costs-Follow-The-Event Rule**

845. The Arbitral Tribunal will apply the rule that costs follow the event to the two major cost categories: on the one hand, the Costs of the Proceeding and, on the other Defense Expenses.

**a.  Costs of the Proceeding**

846. The first expense category the Claimants seek to be reimbursed for is USD 1,050,000 as Costs of the Proceeding, for the advances paid to ICSID. The Arbitral Tribunal finds that these Costs of the Proceeding are to be borne by the Respondent in full, for the following reasons:

- Pursuant to Regulation 14(3)(d) of the Administrative and Financial Regulations of the Centre, the Costs of the Proceeding are to be borne by the parties by half; however, in this case, the Respondent chose not to pay its half, such that the Claimants were forced to cover Venezuela's portion.

- The Arbitral Tribunal has rejected the Respondent's jurisdictional objections and granted the Claimants' main *petitum*.

847. In the absence of an allegation or evidence, it is the Arbitral Tribunal's understanding that the Claimants covered the Costs of the Proceeding in equal portions and, therefore, Venezuela is to reimburse:

- Tenaris: for USD 525,000; and

---

[856] *Ömer Dede,* para. 6; *MCI Power*, para. 372; *AES*, para. 15.3.3; *EDF*, para. 322.
[857] *Liberian Eastern Timber; Olguín*.
[858] *EDF*, para. 327; *Plama*, para. 316, *Phoenix*, para. 151, *OI European*, para. 964.

- Talta: for USD 525,000.

**b.    Defense Expenses**

848.    The Claimants seek close to USD 6 million[859] in Defense Expenses, which cover various different costs. It is the Arbitral Tribunal's view that, of such Defense Expenses, the Claimants can only seek from the Respondent those which are essential to reasonably defend their claim ["**Reasonable Defense Expenses**"].

849.    Considering the complexity of the case at hand, the quantum of the claims and the work performed by counsel and experts, the Arbitral Tribunal finds that Reasonable Defense Expenses total USD 2.8 million.

850.    Of such USD 2.8 million, Venezuela will bear the portion arrived at by applying the rule that costs follow the event. In order to assess the sum due, the Arbitral Tribunal will proceed as follows:

-    <u>First</u>, it will determine what the major issues to be ruled upon have been;

-    <u>Second</u>, because the Claimants have failed to break down their legal Defense Expenses, the Arbitral Tribunal will attribute a weight to each issue; moreover, it will determine the proportion in which these are to be allocated among the two Claimants, who made their costs request jointly, without specifying the allocation percentage;

-    <u>Third</u>, it will determine a success percentage for the Claimants' claims concerning each matter, and will apply that percentage to the relevant Reasonable Defense Expenses.

851.    In this arbitration, the Arbitral Tribunal has had to make three major decisions: whether it had jurisdiction, whether Venezuela had engaged in wrongful conduct that engaged its responsibility, and the compensation due to the Claimants by Venezuela on account of such wrongful conduct.

852.    Weighing the complexity of each such issue and the attention given it by the attorneys and itself, the Arbitral Tribunal has concluded that:

-    Jurisdictional issues have a weight of 20%;

-    Responsibility issues have a weight of 30%; and

---

[859] As well as much lower additional amounts in other currencies.

- Quantum issues have a weight of 50%.

853. Accordingly, Reasonable Defense Expenses are divided as follows:

- Jurisdiction: 20% of USD 2,800,000, *i.e.* USD 560,000; because the jurisdictional objections were asserted as against both Claimants, the Arbitral Tribunal finds that the cost is to be allocated to Tenaris and Talta in equal portions.

- Responsibility: 30% of USD 2,800,000, *i.e.* USD 840,000; again, because the Respondent denied having unlawfully expropriated the two companies, the Tribunal rules that this cost is to be allocated to Tenaris and Talta on a 50% basis.

- Damages quantum: 50% of USD 2,800,000, *i.e.* USD 1,400,000. The Arbitral Tribunal finds that the Reasonable Defense Expenses covering the assessment of the compensation amount due for the expropriation of Tavsa and Comsigua are to be allocated, based on complexity considerations, 75% to Tavsa and 25% to Comsigua, *i.e.* USD 1,050,000 to Tavsa (Tenaris) and USD 350,000 to Comsigua (Talta).

854. The next step is to determine the degree to which the Claimants have succeeded as regards each such issue:

- Jurisdiction: because the Arbitral Tribunal has rejected all jurisdictional objections raised by the Respondent, the Claimant's success percentage here is 100%;

- Merits: the Claimants' main cause of action was the expropriation by Venezuela, and the Arbitral Tribunal has agreed with them and, therefore, their success percentage is, yet again, 100%;

- Quantum: the Claimants were seeking USD 213.2 million for Tavsa's expropriation, and USD 30.5 million for Comsigua's expropriation; here, the Tribunal has respectively granted the sums of USD 112.3 million and USD 24.67 million. In other words, Tenaris' claim concerning Tavsa has been 53% successful, and Talta's claim in connection with Comsigua has been 81% successful.

855. The Arbitral Tribunal will apply the above success percentages to the Reasonable Defense Expenses for each legal issue:

- Jurisdiction: 100% of USD 560,000, *i.e.* USD 560,000, due to Tenaris and Talta in equal portions (USD 280,000);

- Responsibility: 100% of USD 840,000, *i.e.* USD 840,000, due to Tenaris and Talta in equal portions (USD 420,000), and

- Quantum: 53% of USD 1.05 million for Tavsa, and 81% of USD 350,000 for Comsigua, *i.e.* USD 556,500 for Tavsa (Tenaris) and USD 283,500 for

189

Comsigua (Talta).

856. <u>To conclude</u>, the above means that Venezuela will be required to reimburse to:

- Tenaris: USD 1,256.500 on account of Reasonable Defense Expenses, determined based on the success of its claims for Talta's expropriation;

- Talta: USD 983,500 on account of Reasonable Defense Expenses, determined based on the success of its claims for Comsigua's expropriation.

# XI. **SUMMARY**

857. In this Award, the Tribunal addresses three major issues:

- Whether it has jurisdiction (**1.**)

- Whether the Bolivarian Republic expropriated Tenaris' and Talta's investment in Venezuela, in violation of Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT (**2.**)

- What the sum due on account of compensation for that expropriation is (**3.**).

858. The Arbitral Tribunal also rules on lesser issues (**4.**), like the interest, Claimants' tax indemnity, and costs claims.

## 1. JURISDICTION

859. Venezuela raised three jurisdictional objections, all of which have failed.

### A. **Lack of Consent**

860. In investment arbitration proceedings arising from a BIT, consent to arbitration is perfected successively: the State's offer is formalized first, and it is then accepted by the investor.

861. Venezuela contends that the Claimants did not timely accept the Republic's arbitration offer.

862. The timing of acceptance is relevant, as the Bolivarian Republic has denounced the Convention.[860]

863. (i) The Respondent raised two objections to Tenaris' consent to submit disputes arising in connection with Tavsa to arbitration, which the Tribunal has dismissed:

- Following the Tavsa Notice and before Venezuela submitted its Denunciation, Tenaris tried for more than six months to settle the Tavsa-related dispute;[861]

- The terms of Venezuela's arbitration offer were perfectly consistent with those of Tenaris' acceptance;[862] even if the inclusion of a reservation of rights by Tenaris were viewed as having entailed an alteration to the terms of the offer, it would not be a material change[863] and, in any event, it would be irrelevant, as Tenaris never actually enforced that reservation.[864]

---

[860] See para. 62 *supra*.
[861] See para. 81 *supra*.
[862] See para. 86 *supra*.
[863] See para. 90 *supra*.
[864] See para. 89 *supra*.

864. (ii) The Arbitral Tribunal concludes that <u>Talta</u> had validly accepted Venezuela's offer to submit any disputes related to <u>Comsigua</u> to arbitration: the six-month negotiation period started, as per the Portuguese BIT, with the first negotiation consultation – June 28, 2010[865] – and thus expired before Talta sent the Comsigua Notice on December 2, 2011, accepting Venezuela's arbitration offer; this Notice also predates the Denunciation.[866]

865. (iii) The case of <u>Tenaris</u> as an indirect investor in <u>Comsigua</u> is more complicated as, pursuant to the Luxembourg BIT, the six-month negotiation period starts as from the Comsigua Notice (December 2, 2011), such that, by the time it expired, Venezuela had already denounced the Convention.

866. Venezuela argues as follows:

- Tenaris' acceptance of the offer to arbitrate, stated in the Comsigua Notice, does not perfect consent to arbitration as the six months of prior negotiations– a jurisdictional requirement, not a procedural one – had not yet expired;[867]

- The acceptance stated in the Request of Arbitration does not perfect consent either because, even though it was filed after the mandatory negotiation period, this took place after the Denunciation.[868]

867. Tenaris disagrees: the prior negotiations requirement is said to be procedural in nature and would only determine the time at which the request for arbitration can actually be filed, but would not affect consent to arbitration, which could be stated (and perfected) prior to the expiration of the negotiation period.[869]

868. The Arbitral Tribunal finds that the Luxembourg BIT allowed Tenaris to choose a forum for dispute resolution and thus accept the State's arbitration offer as early as the Comsigua Notice.[870]

---

[865] See para. 95 *supra*.
[866] See para. 96 *supra*.
[867] See para. 112 *supra*.
[868] See para. 114 *supra*.
[869] See para. 119 *supra*.
[870] See para. 122 *supra*.

### B.  Lack of an Effective Seat

869.  The second jurisdictional objection focuses on the lack of an Effective Seat in Luxembourg and Portugal. According to Venezuela, the BITs require that the investors have their Effective Seat (not just a Statutory Seat) in Luxembourg and Portugal;[871] neither Tenaris nor Talta satisfy this requirement,[872] as their Effective Seat is said to be in Argentina.[873]

870.  On the other hand, the Claimants contend that their Effective Seats are the same as their Statutory Seats and, in any event, are located in Luxembourg and Portugal.[874]

871.  In theory, the Tribunal agrees with the Bolivarian Republic: the BITs do require that the Effective Seat (not just the Statutory Seat) of the companies be located in Luxembourg or Portugal.[875]

872.  Having defined what the relevant factors to determine the Effective Seat are[876] and having assessed the evidence produced by the parties, the Arbitral Tribunal finds that it has not been established that Tenaris' and Talta's Effective Seats are located in Argentina; instead, the evidence points to their Effective Seats being respectively located in Luxembourg and Portugal and, therefore, the Arbitral Tribunal has rejected the Bolivarian Republic's objection to its *ratione personae* jurisdiction.[877]

### C.  Notification Defects

873.  The third and final objection to jurisdiction focuses on certain flaws in the Tavsa Notice: allegedly, it did not make reference to a dispute concerning unfair and inequitable treatment, and Tenaris is now asserting such a claim.[878] Because Tenaris' claim for unfair and inequitable treatment is framed as a subsidiary petition relative to its main claim, which is an expropriation claim, and the Arbitral Tribunal will allow its main claim, there is no need to analyze this final objection to jurisdiction.[879]

### 2.  EXPROPRIATION

874.  The Arbitral Tribunal concludes that, in carrying out the orders in its Nationalization Decree and Implementing Decree, Venezuela forcefully acquired the assets of Tavsa and Comsigua and took over their business activity. Such forced acquisition materialized:

---

[871] See para. 152 *supra.*
[872] See para. 153 *supra.*
[873] See para. 153 *supra.*
[874] See para. 153 *supra.*
[875] See para. 189 *supra.*
[876] See para. 230 *supra.*
[877] See para. 230 *supra.*
[878] See para. 232 *supra.*
[879] See para. 234 *supra.*

- For Tavsa, through the transfer record of November 16, 2009;[880]

- For Comsigua, on June 17, 2011, through the administrative appointment of the company's new President and the power handover that was formalized at the Takeover Meeting.[881]

875. Because both Tenaris and Talta still hold title to their shares in Tavsa and Comsigua, the Arbitral Tribunal has defined this expropriation as an indirect expropriation: both investors keep title to their shares in shell companies whose assets and business activity are under the control of the State of Venezuela.[882]

876. The Arbitral Tribunal has verified that Venezuela has not yet paid any compensation at all to the investors, in spite of the fact that more than seven years have elapsed since the issue of the Nationalization Decree and the Implementing Decree. This delay does not constitute "immediate payment" as required by Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT.[883]

877. Venezuela tries to justify the delay, but the Tribunal does not agree on its argument: no judgment has been rendered ordering payment of the fair price because the State, who is the party required to institute the judicial expropriation proceedings in its capacity as the expropriating entity, has not done so;[884] the Arbitral Tribunal also fails to see any obstructing behavior on the part of the Claimants that could be the reason for a delay in the payment of compensation.[885]

## 3. COMPENSATION DUE

878. The BITs require that the amount of compensation for expropriation be equal to the fair value of the investments on the date before that on which the measure was taken.[886]

879. Therefore, prior to determining the value of Tenaris' and Talta's investment in Tavsa and Comsigua, the Arbitral Tribunal had to determine what the valuation date would be. It is the Arbitral Tribunal's view that the expropriations took place by virtue of the Nationalization Decree, as supplemented by the Implementing Decree.[887] Therefore, the date of the expropriatory measure is April 30, 2008, and the day before that is April 29, 2008.[888] To allow for easier calculations, the experts have used April 30, 2008 as the reference date, and the Arbitral Tribunal accepts this simplification.[889]

---

[880] See para. 271 *supra*.
[881] See para. 273 *supra*.
[882] See para. 337 *supra*.
[883] See para. 357 *supra*.
[884] See para. 358 *supra*.
[885] See paras. 372, 377 *supra*.
[886] See para. 393 *supra*.
[887] See paras. 405, 411 *supra*.
[888] See para. 409 *supra*.
[889] See para. 410 *supra*.

## A. Tavsa's Value Assessment

880. The decision on Tavsa's value assessment has been made as follows:

881. (i) The Arbitral Tribunal first applies a DCF methodology to value Tavsa.[890] The discount rate used in this exercise is the company's WACC, set at 21.7%.[891] The value thus arrived at for Tenaris' 70% stake in Tavsa is **USD 112,345,530**.[892]

882. (ii) Second, the Tribunal has compared that value by applying other methodologies: the return on investment approach, which results in a rate similar to the return on equity used in the WACC calculation;[893] the market multiples approach, as per which Tavsa's value is within the range set by the reference companies;[894] and, lastly, the comparable transactions approach, which also confirms the assessed value.[895]

## B. Comsigua's Value Assessment

883. The Tribunal has assessed Comsigua's value also by applying a DCF methodology. The Tribunal has applied a WACC of 20.47%,[896] and estimated that Talta's 7.58% share in Comsigua is worth USD 22.3 million.[897]

884. Next, the Arbitral Tribunal compares this value by applying other methodologies: the market multiples approach yields a higher value,[898] as does the comparable transactions approach;[899] the Tribunal also considers the offer Venezuela had made to Talta;[900] and finds that the DCF value is low as compared to the values from the other approaches; to arrive at the correct value, it weighs the various assessments[901] and sets a value of **USD 24,672,357.**

\* \* \*

885. Lastly, given that there is no specific request by the Claimants, the Arbitral Tribunal rules that the compensation due for expropriation should be paid to the direct investor in each expropriated company: Tenaris is to be paid compensation for Tavsa, and Talta is to be paid compensation for Comsigua.[902]

---

[890] See para. 518 *supra*.
[891] See para. 601 *supra*.
[892] See para. 603 *supra*.
[893] See para. 612 *supra*.
[894] See para. 623 *supra*.
[895] See para. 703 *supra*.
[896] See para. 704 *supra*.
[897] See para. 704 *supra*.
[898] See para. 706 *supra*.
[899] See para. 714 *supra*.
[900] See paras. 725 *et seq. supra*.
[901] See para. 755 *supra*.
[902] See para. 775 *supra*.

## 4.  OTHER DECISIONS

886.  The Arbitral Tribunal has made three additional decisions.

887.  (i) The first one concerns interest. The Tribunal has been called upon to determine, in accordance with the BITs, the "normal commercial" rate "applicable in Venezuela."[903] The Tribunal's ruling is that the rate that best fits this description is LIBOR for one-year USD deposits plus 4% p.a.[904] Accrued interest is to be compounded every year in arrears. The accrual period started on April 30, 2008 and will end upon actual payment.

888.  (ii) The second one concerns taxation. The Claimants requested that the Arbitral Tribunal order Venezuela not to claim taxes on the award and, subsidiarily, that the Award be rendered net of Venezuelan taxes; they also asked that Venezuela indemnify the Claimants for any tax levied on the sums of the Award outside of Venezuela.[905]

889.  The Arbitral Tribunal rejects all such requests,[906] except for the subsidiary one: the monetary award will be net of Venezuelan taxes, such that, should Venezuela levy taxes on the amount of the Award, it will gross up the compensation paid in order that the amount paid to the Claimants, net of Venezuelan taxes, is the amount set forth in the Award.[907]

890.  (iii) Lastly, the Arbitral Tribunal applies the rule that costs follow the event[908] to the two major expense categories comprising the costs:

- Costs of the Proceeding: the Arbitral Tribunal rules that Venezuela will fully bear these Costs;[909] therefore, Venezuela will reimburse each Claimant for USD 525,000.[910]

- Reasonable Defense Expenses: the Arbitral Tribunal takes consideration of the complexity of each issue debated here and the Claimants' degree of success;[911] it finds that Venezuela is to reimburse Tenaris for USD 1,256,500 and Talta for USD 983,500[912] on this account.

---

[903] See para. 757 *supra*.
[904] See para. 771 *supra*.
[905] See para. 777 *supra*.
[906] See para. 842 *supra*.
[907] See para. 843 *supra*.
[908] See para. 845 *supra*.
[909] See para. 846 *supra*.
[910] See para. 847 *supra*.
[911] See para. 849 *supra*.
[912] See para. 856 *supra*.

891. The Claimants have made other subsidiary requests in the event that the Tribunal chose not to use April 30, 2008 as the valuation date or that the compensation awarded for Comsigua fell short of a certain threshold amount. Because the Tribunal has accepted that date and awarded compensation above the threshold amount, these subsidiary claims do not apply.[913]

---

[913] CV, paras. 320, 321.

# XII. DECISION

892. For the reasons stated above, the Arbitral Tribunal has unanimously reached the following decisions:

   1.   To declare that it has jurisdiction to determine the Claimants' claims.

   2.   To declare that the Bolivarian Republic of Venezuela breached Article 4 of the Luxembourg BIT and Article IV of the Portuguese BIT.

   3.   To order the Bolivarian Republic of Venezuela to pay Tenaris the sum of USD 112,345,530 as compensation for its investment in Tavsa, and to pay Talta the sum of USD 24,672,357 as compensation for its investment in Comsigua.

   4.   To order the Bolivarian Republic of Venezuela to pay Tenaris interest on the sum of USD 112,345,530, accruing from April 30, 2008 up to the date of actual payment at a rate equal to the LIBOR for one-year USD deposits plus 4% p.a., with the interest rate redefined every year from April 30, 2008 onwards, and interest compounded on a year-in-arrears basis.

   5.   To order the Bolivarian Republic of Venezuela to pay Talta interest on the sum of USD 24,672,357, accruing from April 30, 2008 up to the date of actual payment at a rate equal to the LIBOR for one-year USD deposits plus 4% p.a., with the interest rate redefined every year from April 30, 2008 onwards, and interest compounded on a year-in-arrears basis.

   6.   To order the Bolivarian Republic of Venezuela to reimburse Tenaris for the sums of USD 525,000 and USD 1,256,500 for the Costs of the Proceedings and Reasonable Defense Expenses, respectively, and Talta for USD 525,000 and USD 983,500 on account of those same cost items.

   7.   To declare that the monetary awards hereby ordered are stated net of taxes applied by the Bolivarian Republic of Venezuela and to order the Bolivarian Republic of Venezuela to indemnify the Claimants with respect to any tax that may apply to such awards.

   8.   To declare that the Claimants' subsidiary claims have been dismissed, as their main claims have been allowed and granted.

   9.   To dismiss any other claims.

[Signature]                                    [Signature]

Brigitte Stern, Arbitrator                     Enrique Gómez Pinzón, Arbitrator
Date: [handwritten]: *November 30,*            Date: [handwritten]: *November 24,*
*2016*                                         *2016*

[signature]

Juan Fernández-Armesto, President
Date: [handwritten]: *December 5, 2016*

# EXHIBIT 5

# EXHIBIT C

*Tenaris S.A. et al. v. Bolivarian Republic of Venezuela*, 1:18-cv-01371-CRC

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE (202) 458 1534 | FACSIMILE (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

8 August 2018

By courier
(*advance copy by email*)

Tenaris S.A. y Talta – Trading e Marketing
Sociedade Unipessoal Lda.
c/o Mr. Nigel Blackaby
Ms. Caroline Richard
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW, 10th floor
Washington, DC 20005
United States of America
  *and*
c/o Mr. Elliot Friedman
Mr. Ben Love
Ms. Paige von Mehren
Ms. Jessica Moscoso
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue, 31st floor
New York, NY 10022
United States of America

Bolivarian Republic of Venezuela
c/o Dr. Reinaldo Enrique Muñoz Pedroza
Dr. Henry Rodríguez Facchinetti
Procuraduría General de la República
Av. Los Ilustres, c/c calle Francisco
Lazo Martí
Urb. Santa Mónica
Caracas
Venezuela
  *and*
c/o Mr. Ignacio Torterola
Mr. Diego Gosis
Mr. Quinn Smith
Ms. Verónica Lavista
Mr. Guillermo Moro
GST LLP
1875 I Street NW, 5th floor
Washington, DC 20006
United States of America

Re:  **Tenaris S.A. y Talta – Trading e Marketing Sociedade Unipessoal Lda. v.**
**Bolivarian Republic of Venezuela**
(ICSID Case No. ARB/11/26) - Annulment

Dear Mesdames and Sirs,

Please find enclosed certified copies of the English and Spanish versions of the *ad hoc* Committee's Decision on the Application for Annulment of the Bolivarian Republic of Venezuela dated 8 August 2018 (the "Decision").

Pursuant to Arbitration Rules 48 and 53, I have authenticated the original texts of the Decision and deposited them in the archives of the Centre. In accordance with these same rules, the Decision is deemed to have been rendered on the date of dispatch, which is indicated on the original texts of the Decision and on all copies.

In accordance with Section 21.1 of Procedural Order No. 1, the Centre shall not publish any procedural order or decision related to this proceeding without the parties' consent. I would be grateful if the parties could inform us whether they consent to the publication of the Decision on the ICSID website.

I take this opportunity to inquire whether the parties would also consent to the publication of the following order and decision issued by the *ad hoc* Committee in this case:

1. Procedural Order No. 1, dated 16 February 2017; and

2. Decision on the Request to Maintain the Stay of Enforcement of the Award, dated 24 March 2017.

Copies of the listed documents are attached for your reference.

Yours sincerely,

Martina Polasek
Acting Secretary-General

Enclosures

cc (with enclosures):
Members of the *ad hoc* Committee

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
WASHINGTON, D.C.

In the annulment proceeding between

## TENARIS S.A. AND TALTA - TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA

(Respondents)

and

## BOLIVARIAN REPUBLIC OF VENEZUELA

(Applicant)

## ICSID Case No. ARB/11/26

---

## DECISION ON THE APPLICATION FOR ANNULMENT OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

---

### Members of the *ad hoc* Committee

Dr. Andrés Rigo Sureda, President
Professor Fernando Cantuarias Salaverry
Professor Diego P. Fernández Arroyo

### Secretary of the *ad hoc* Committee

Mrs. Ana Constanza Conover Blancas

*Date of dispatch to the Parties*: 8 August 2018

# REPRESENTATION OF THE PARTIES

*Representing the Bolivarian*
*Republic of Venezuela*:


Dr. Reinaldo Enrique Muñoz Pedroza
Dr. Henry Rodríguez Facchinetti
Procuraduría General de la República
Av. Los Ilustres, c/c calle Francisco
Lazo Martí
Urb. Santa Mónica
Caracas
Venezuela

  and

Mr. Ignacio Torterola
Mr. Diego Gosis
Mr. Quinn Smith
Ms. Verónica Lavista
Mr. Guillermo Moro
GST LLP
1875 I Street NW, 5th Floor
Washington, D.C. 20006
United States of America

*Representing Tenaris S.A. and*
*Talta - Trading E Marketing Sociedade*
*Unipessoal Lda*:


Mr. Nigel Blackaby
Ms. Caroline Richard
Freshfields Bruckhaus Deringer US LLP
700 13th Street NW, 10th Floor
Washington, D.C. 20005
United States of America

  and

Mr. Elliot Friedman
Mr. Ben Love
Ms. Paige von Mehren
Ms. Jessica Moscoso
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue, 31st Floor
New York, NY 10022
United States of America

# TABLE OF CONTENTS

I.     **INTRODUCTION AND PARTIES** ........................................................... 1

II.    **PROCEDURAL HISTORY** ...................................................................... 1

    A.    Application, Registration, Provisional Stay of Enforcement and Constitution of the Committee ............................................................................................... 1

    B.    First Session and Procedural Order No. 1 ............................................ 2

    C.    Procedure Concerning the Stay of Enforcement of the Award ........................... 2

    D.    Procedure Concerning the Application for Annulment ..................................... 3

    E.    Reconstitution of the Committee and Hearing on Annulment ........................... 3

    F.    Post-Hearing Phase ............................................................................. 5

III.    **THE AWARD AND THE DECISION ON RECTIFICATION** ........................ 5

    A.    The Original Arbitration Proceeding .................................................... 5

    B.    The Award ......................................................................................... 6

    C.    The Decision on Rectification ............................................................. 6

IV.    **THE PARTIES' ARGUMENTS** ............................................................... 7

    A.    The Applicant's Arguments ................................................................. 7

        1.    Applicable Standard .............................................................. 7

            i.    Manifest Excess of Powers ........................................ 8

            ii.    Failure to State the Reasons on which the Award is Based ............... 9

            iii.    Serious Departure from a Fundamental Rule of Procedure ............... 10

        2.    Grounds Related to the Decision on Jurisdiction ...................... 10

            i.    Manifest Excess of Powers ........................................ 10

            ii.    Failure to State the Reasons on which the Award is Based ............... 12

            iii.    Serious Departure from a Fundamental Rule of Procedure ............... 12

        3.    Grounds Related to the Decision on Expropriation .................. 14

            i.    Manifest Excess of Powers ........................................ 14

            ii.    Failure to State the Reasons on which the Award is Based ............... 15

        4.    Grounds Related to the Damage Assessment Methodology ................. 17

            i.    Manifest Excess of Powers ........................................ 17

            ii.    Failure to State the Reasons on which the Award is Based ............... 17

            iii.    Serious Departure from a Fundamental Rule of Procedure ............... 19

        5.    Grounds Related to the Costs Award Regarding the Request for Rectification ...... 21

|  |  | i. | Failure to State the Reasons on which the Decision on Rectification is Based | 21 |
|  |  | ii. | Serious Departure from a Fundamental Rule of Procedure | 22 |
| B. | The Respondents on Annulment's Arguments |  |  | 23 |
|  | 1. | Applicable Standard |  | 23 |
|  |  | i. | Manifest Excess of Powers | 23 |
|  |  | ii. | Failure to State the Reasons on which the Award is Based | 25 |
|  |  | iii. | Serious Departure from a Fundamental Rule of Procedure | 26 |
|  | 2. | Grounds Related to the Decision on Jurisdiction |  | 26 |
|  |  | i. | Manifest Excess of Powers | 26 |
|  |  | ii. | Failure to State the Reasons on which the Award is Based | 27 |
|  |  | iii. | Serious Departure from a Fundamental Rule of Procedure | 29 |
|  | 3. | Grounds Related to the Decision on Expropriation |  | 29 |
|  |  | i. | Manifest Excess of Powers | 29 |
|  |  | ii. | Failure to State the Reasons on which the Award is Based | 30 |
|  | 4. | Grounds Related to the Damage Assessment Methodology |  | 33 |
|  |  | i. | Manifest Excess of Powers | 33 |
|  |  | ii. | Failure to State the Reasons on which the Award is Based | 34 |
|  |  | iii. | Serious Departure from a Fundamental Rule of Procedure | 36 |
|  | 5. | Grounds Related to the Costs Award Regarding the Request for Rectification | | 37 |
|  |  | i. | Failure to State the Reasons on which the Decision on Rectification is Based | 37 |
|  |  | ii. | Serious Departure from a Fundamental Rule of Procedure | 38 |
| **V.** | **THE PARTIES' REQUESTS FOR RELIEF** |  |  | **39** |
| A. | The Applicant's Request for Relief |  |  | 39 |
| B. | Respondents on Annulment's Request for Relief |  |  | 39 |
| **VI.** | **THE COMMITTEE'S ANALYSIS** |  |  | **39** |
| A. | Applicable Standard |  |  | 39 |
|  | 1. | Manifest Excess of Powers |  | 41 |
|  | 2. | Failure to State the Reasons on which the Award is Based |  | 41 |
|  | 3. | Serious Departure from a Fundamental Rule of Procedure |  | 43 |
| B. | Grounds Related to the Decision on Jurisdiction |  |  | 44 |
|  | 1. | Manifest Excess of Powers |  | 44 |
|  | 2. | Failure to State the Reasons on which the Award is Based |  | 48 |
|  | 3. | Serious Departure from a Fundamental Rule of Procedure |  | 50 |

C.    Grounds Related to the Decision on Expropriation ........................................................... 52

    1.    Manifest Excess of Powers ................................................................... 52

    2.    Failure to State the Reasons on which the Award is Based .................. 52

D.    Grounds Related to the Damage Assessment Methodology ........................................ 54

    1.    Manifest Excess of Powers ................................................................... 54

    2.    Failure to State the Reasons on which the Award is Based .................. 55

        i.    Failure to Explain the Tribunal's Approach or Methodology ........... 55

        ii.    The Tribunal Failed to Explain why it Missed Key Steps in Calculating Damages ..................................... 56

        iii.    The Contradictions in the Tribunal's Analysis ................................ 57

    3.    Serious Departure from a Fundamental Rule of Procedure .................. 60

        i.    Burden of Proof and Due Process ..................................................... 60

        ii.    Violation of the Parties' Right to be Heard ...................................... 60

        iii.    Violation of the Parties' Right to Equal Treatment .......................... 63

E.    Grounds Related to the Costs Award Regarding the Request for Rectification ............... 64

VII.    **DECISION ON COSTS** ........................................................................................ **66**

A.    Statement of Costs of the Applicant ............................................................................. 66

B.    Statement of Costs of the Respondents on Annulment ................................................ 67

C.    Costs of the Proceeding ............................................................................................... 67

D.    Decision of the Committee ........................................................................................... 68

VIII.    **DECISION** ............................................................................................................ **68**

# LIST OF DEFINED TERMS

_____

| | |
|---|---|
| Applicant or Venezuela | Bolivarian Republic of Venezuela. |
| Application for Annulment | Application for Annulment of the Bolivarian Republic of Venezuela, filed on 21 September 2016. |
| Arbitration Rules | Rules of Procedure for Arbitration Proceedings of the International Centre for Settlement of Investment Disputes in force as of 10 April 2006. |
| Award | Award dated 29 January 2016, rendered in the arbitration proceeding captioned *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26. |
| Background Paper | Updated Background Paper on Annulment for the Administrative Council of ICSID dated 5 May 2016. |
| Committee or *ad hoc* Committee | *Ad hoc* committee in the annulment proceeding captioned *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26. |
| Counter-Memorial | Respondents' Counter-Memorial on Annulment, filed on 3 July 2017. |
| DCF | Discounted Cash Flow. |
| Decision on Rectification | Decision on Rectification of the Award dated 24 June 2016, issued in the arbitration proceeding captioned *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26. |
| Hearing on Annulment or Hearing | Hearing on annulment held on 22 and 23 March 2018 in Washington, D.C. |
| ICSID Convention or Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States. |
| ICSID or Centre | International Centre for Settlement of Investment Disputes. |
| Luxembourg Treaty | Agreement between the Belgium-Luxembourg Economic Union and the Government of the Republic of Venezuela for the Reciprocal Promotion and Protection of Investments, signed on 17 March 1988, and in force as of 28 April 2004. |

| | |
|---|---|
| Matesi | Materiales Siderúrgicos S.A. |
| Memorial | Memorial on Annulment of the Award of the Bolivarian Republic of Venezuela, filed on 19 April 2017. |
| Parties | Tenaris S.A., Talta - Trading e Marketing Sociedade Unipessoal Lda., and the Bolivarian Republic of Venezuela. |
| Portuguese Treaty | Agreement between the Government of the Portuguese Republic and the Government of the Republic of Venezuela for the Reciprocal Promotion and Protection of Investments, signed on 17 June 1994, and in force as of 11 May 1995. |
| Rejoinder | Respondents' Rejoinder on Annulment, filed on 2 October 2017. |
| Reply | Reply on Annulment of the Award of the Bolivarian Republic of Venezuela, filed on 17 August 2017. |
| Respondents on Annulment or Respondents | Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. |
| Talta | Talta - Trading e Marketing Sociedade Unipessoal Lda. |
| Tenaris | Tenaris S.A. |
| Tr. Day # [page:line] | Transcript of the hearing on annulment held on 22 and 23 March 2018, followed by date, page and line number. |
| Treaties | Luxembourg Treaty and Portuguese Treaty. |
| Tribunal | Arbitral tribunal composed of Messrs. John Beechey (President), Judd L. Kessler and Toby T. Landau, constituted on 26 April 2012 in the arbitration proceeding captioned *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26. |
| USD | United States Dollars. |
| Vienna Convention | Vienna Convention on the Law of Treaties, UN Doc. A/Conf.39/27 (1969). |

# I. INTRODUCTION AND PARTIES

1. This decision is issued within the framework of the annulment proceeding of the award rendered on 29 January 2016 —including the Decision on Rectification of the Award issued on 24 June 2016 (together, the "**Award**"), under ICSID Case No. ARB/11/26.

2. The applicant in this annulment proceeding, respondent in the original arbitration proceeding, is the Bolivarian Republic of Venezuela ("**Venezuela**" or the "**Applicant**"). Respondents on annulment, claimants in the original arbitration proceeding, are Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. ("**Tenaris**" and "**Talta**", or the "**Respondents**").

3. The Applicant and the Respondents are hereinafter collectively referred to as the "**Parties**", and individually referred to as a "**Party**". The Parties' legal representatives and their respective addresses are listed above on page (i).

# II. PROCEDURAL HISTORY

## A. APPLICATION, REGISTRATION, PROVISIONAL STAY OF ENFORCEMENT AND CONSTITUTION OF THE COMMITTEE

4. On 21 September 2016, Venezuela filed with the Secretary-General of the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") an application for annulment of the Award (the "**Application for Annulment**"), in accordance with Article 52 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**") and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"). The Application for Annulment was filed within the term established in Article 52(2) of the ICSID Convention.

5. Venezuela bases its Application for Annulment on the following grounds set forth in the ICSID Convention: *(a)* manifest excess of powers (Article 52(1)(b)); *(b)* serious departure from fundamental rules of procedure (Article 52(1)(d)); and *(c)* failure to state reasons (Article 52(1)(e)).

6. The Application for Annulment contained a request for a stay of enforcement of the Award under Article 52(5) of the ICSID Convention and Arbitration Rule 54.

7. On 29 September 2016, the Acting Secretary-General registered the Application for Annulment and informed the Parties of the provisional stay of enforcement of the Award in accordance with Arbitration Rule 54(2).

8. On 27 December 2016, the Acting Secretary-General notified the Parties of the constitution of the *ad hoc* Committee (the "**Committee**"), in accordance with Arbitration Rule 52(2). The Committee was composed of Dr. Andrés Rigo Sureda (President), a Spanish national; Professor Piero Bernardini, an Italian national; and Professor Diego P. Fernández Arroyo, an Argentine and Spanish national.

9. On the same date, the Parties were informed that the annulment proceeding was deemed to have begun, pursuant to Arbitration Rules 6 and 53. Likewise, the Parties were notified that Mrs. Ana Constanza Conover Blancas, ICSID Legal Counsel, would serve as Secretary of the Committee.

## B.  FIRST SESSION AND PROCEDURAL ORDER NO. 1

10. On 3 February 2017, the Committee held a first session with the Parties by telephone conference.

11. On 16 February 2017, the Committee issued Procedural Order No. 1 fixing the procedural calendar and the rules of procedure applicable to the annulment proceeding.

## C.  PROCEDURE CONCERNING THE STAY OF ENFORCEMENT OF THE AWARD

12. By communications dated 9 and 10 January 2017, the Parties informed the Committee of their agreement to file three rounds of simultaneous written submissions on the issue of stay of enforcement of the Award. Moreover, the Parties informed the Committee that they had agreed to hold a hearing on the stay of enforcement of the Award in March 2017.

13. By letter dated 12 January 2017, the Committee took note of the schedule of simultaneous written submissions agreed upon by the Parties and extended the provisional stay of enforcement of the Award until the Committee ruled on this issue.

14. In accordance with the procedural calendar agreed by the Parties, Venezuela filed its respective submissions in support of the continuance of the provisional stay of enforcement of the Award on 27 January, 17 February, and 28 February 2017. On the same dates, the Respondents filed their respective submissions in opposition to the continuance of the provisional stay of enforcement of the Award.

15. On 15 February 2017, the Parties and the Committee held a pre-hearing organizational meeting, via telephone conference, in order to resolve any outstanding procedural, administrative or logistical matters concerning the hearing on stay.

16. On 1 March 2017, the hearing on stay was cancelled on account of the lack of payment of the first advance requested to Venezuela by letter dated 8 December 2016.

17. On 10 March 2017, the Committee informed the Parties that it would issue its decision on the stay of enforcement of the Award given its priority pursuant to Arbitration Rule 54(1), no hearing being held on the issue. No comments were received from the Parties in this regard.

18. On 24 March 2017, the Committee issued its Decision on the Request to Maintain the Stay of Enforcement of the Award. In said decision, the Committee dismissed Venezuela's request to maintain the stay of enforcement of the Award and lifted the provisional stay of enforcement of the Award.

**D.  PROCEDURE CONCERNING THE APPLICATION FOR ANNULMENT**

19. In accordance with the procedural calendar agreed-upon for written submissions in Procedural Order No. 1:

   a)  on 19 April 2017, Venezuela filed its Memorial on Annulment of the Award ("**Memorial**");

   b)  on 3 July 2017, the Respondents filed their Counter-Memorial on Annulment ("**Counter-Memorial**");

   c)  on 17 August 2017, Venezuela filed its Reply on Annulment of the Award ("**Reply**"); and

   d)  on 2 October 2017, the Respondents filed their Rejoinder on Annulment ("**Rejoinder**").

20. On 6 October 2017, after the resignation of Professor Piero Bernardini, the Secretary-General notified the Parties of a vacancy on the Committee and that the proceeding was suspended pursuant to Arbitration Rules 10(2) and 53.

**E.  RECONSTITUTION OF THE COMMITTEE AND HEARING ON ANNULMENT**

21. On 10 November 2017, the Centre notified the Parties that the Committee had been reconstituted following the acceptance of Professor Fernando Cantuarias Salaverry, a

Peruvian national, of his appointment as member of the Committee. In accordance with Arbitration Rules 12 and 53 of the, the proceeding was resumed as of such date.

22. On 20 March 2018, Messrs. Paul S. Richler and Kenneth J. Figueroa of the firm Foley Hoag LLP (Washington D.C. office) informed the Committee that, as of such date, Foley Hoag LLP would no longer represent Venezuela in the annulment proceeding.

23. On 22 and 23 March 2018, the Committee held an oral hearing with the Parties on the Application for Annulment at the World Bank facilities in Washington, D.C., the seat of ICSID (the "**Hearing on Annulment**" or "**Hearing**"). The following persons were present at the Hearing:

Members of the Committee:

Dr. Andrés Rigo Sureda, President
Professor Fernando Cantuarias Salaverry
Professor Diego P. Fernández Arroyo

ICSID Secretariat:

Mrs. Ana Constanza Conover Blancas

For the Applicant:

Mr. Ignacio Torterola, GST LLP
Mr. Diego Gosis, GST LLP
Mr. Quinn Smith, GST LLP P
Ms. Mariana Lozza, GST LLP
Mr. Alejandro Vulejser, GST LLP
Mr. Joaquín Coronel, GST LLP

For the Respondents:

Mr. Nigel Blackaby, Freshfields Bruckhaus Deringer
Mr. Elliot Friedman, Freshfields Bruckhaus Deringer
Mr. Ben Love, Freshfields Bruckhaus Deringer
Ms. Jessica Moscoso, Freshfields Bruckhaus Deringer
Ms. Paige von Mehren, Freshfields Bruckhaus Deringer
Mr. Bas Munnik, Freshfields Bruckhaus Deringer

Interpreters:

Ms. Silvia Colla
Mr. Charles Roberts
Mr. Claudio Debenedetti

Court reporters:

Mr. David Kasdan, Worldwide Reporting, LLP
Mr. Dante Rinaldi, D-R Esteno
Mr. Dionisio Rinaldi, D-R Esteno

## F.   POST-HEARING PHASE

24.   On 2 and 4 May 2018, the Parties submitted their respective statements of costs.

25.   The proceeding was closed on 4 June 2018.

## III.   THE AWARD AND THE DECISION ON RECTIFICATION

## A.   THE ORIGINAL ARBITRATION PROCEEDING

26.   The arbitration proceeding to which the Application for Annulment refers was instituted before the Centre on the basis of the ICSID Convention, the Agreement between the Belgium-Luxembourg Economic Union and the Government of the Republic of Venezuela for the Reciprocal Promotion and Protection of Investments, signed on 17 March 1988, and in force as of 28 April 2004 (the "**Luxembourg Treaty**"), and the Agreement between the Government of the Portuguese Republic and the Government of the Republic of Venezuela for the Reciprocal Promotion and Protection of Investments, signed on 17 June 1994, and in force as of 11 May 1995 (the "**Portuguese Treaty**" and, together with the Luxembourg Treaty, the "**Treaties**").

27.   The dispute in the original proceeding arose within the framework of Tenaris' and Talta's investment in Matesi Materiales Siderúrgicos S.A. ("**Matesi**"), a Venezuelan company engaged in the production of hot briquetted iron, a component used in the production of steel. In the context of the arbitration, Tenaris and Talta argued that their use and enjoyment of

their investment had been lost as a result of the indirect expropriation of, and pre-nationalisation interference with, their investments in Matesi.[1]

## B. THE AWARD

28. The Award was rendered on 29 January 2016 by an arbitral tribunal presided over by Mr. John Beechey (a national of the United Kingdom) and also composed of Messrs. Judd L. Kessler (a national of the United States of America) and Toby T. Landau QC (a national of the United Kingdom) (the "**Tribunal**").

29. In the Award, the Tribunal declared that it had jurisdiction to hear and determine all of Tenaris' and Talta's claims, save in respect of certain off-take agreement, which the Tribunal concluded that was not an investment.[2] As to the merits, the Tribunal found that Venezuela expropriated Tenaris' and Talta's investment in Venezuela failing to observe the requirements laid down in the Treaties.[3] The Tribunal determined that Tenaris and Talta were entitled to compensation for such expropriation and ordered Venezuela to pay USD 87,300,000.00 (eighty-seven million, three hundred thousand US Dollars), plus interest, for its breaches of the Treaties.[4]

## C. THE DECISION ON RECTIFICATION

30. On 14 March 2016, Venezuela filed with the Tribunal a request for rectification of the Award, seeking a correction of the Tribunal's calculation of the amount of damages awarded to Tenaris and Talta, "such that the Award would be: '…*rectified in order to avoid inappropriate double compensation*'".[5]

31. On 24 June 2016, the Tribunal issued its Decision on Rectification, denying Venezuela's request for rectification. In addition, the Tribunal required Venezuela to pay Tenaris and Talta their costs incurred in connection with the request for rectification.[6]

---

[1] *See* Award, paras. 5-6.
[2] *Id.*, paras. 293, 313, 625(1) and 625(2).
[3] *Id.*, paras. 494 to 497, and 625(5).
[4] *Id.*, paras. 570 and 625.
[5] Decision on Rectification, para. 2. Italics in the original.
[6] *Id.*, para. 114.

32.    In the present proceeding, Venezuela seeks annulment of the Award, including the Decision on Rectification of the Award.[7]

## IV.  THE PARTIES' ARGUMENTS

### A.    THE APPLICANT'S ARGUMENTS

33.    The Applicant considers that the Tribunal's decisions on jurisdiction and expropriation, as well as the damage assessment methodology used by the Tribunal, and the award of costs in the Decision on Rectification, are subject to annulment pursuant to the grounds set forth in Article 52(1)(b), (d) and (e) of the ICSID Convention (manifest excess of powers, serious departure from fundamental[8] rules of procedure, and failure to state reasons, respectively).

34.    The following is a brief summary of the Applicant's arguments in connection with the applicable standard and the reasons to annul the Award, with respect to each of the grounds for annulment relied upon.

#### 1.    APPLICABLE STANDARD

35.    The Applicant does not dispute, as a matter of principle, that the annulment regime set forth in the ICSID Convention is extraordinary in nature. Moreover, the Applicant agrees with the Respondents that annulment is not a remedy against an incorrect decision, but against the defects provided for in Article 52 of the Convention.[9] The Applicant notes that the grounds for annulment set forth in the Convention should be neutrally examined; that is, adopting a position that is neither expansive nor restrictive in general of the annulment regime.[10]

36.    In addition, contrary to the Respondents' arguments, the Applicant submits that, in case of finding that an award has annullable defects, annulment committees must necessarily order that it be annulled, without exercising any discretion. Furthermore, it indicates that

---

[7] Application for Annulment, para. 1.

[8] The Spanish version of the Convention (Article 52(1)(d)) does not include the description of the rule as "fundamental" contained in the English and French versions. On the other hand, Arbitration Rule 50(1)(c)(iii) requires that the rule departed from be fundamental. This has not been a matter of discussion between the Parties, who, like the Committee, understand in their arguments that the rule must be fundamental. The further note of the Committee in footnote 8 of the Spanish version of this Decision on the differences between Article 52 (1)(d) and Rule 50(1)(c)(iii) is unnecessary here because the English versions of both texts are consistent.

[9] *See* Reply, paras. 18, 25.

[10] *See id.*, paras. 26-27.

annulment committees may consider and analyse the arbitration's underlying arguments so as to determine whether an award should be annulled or not.[11]

### i. **Manifest Excess of Powers**

37. Pursuant to Article 52(1)(b) of the ICSID Convention, an award may be annulled in the event that the Tribunal has manifestly exceeded its powers. The Applicant considers that, in order to verify that this ground is present, a "two-step" approach should be adopted, whereby the Committee must annul the award if satisfied that *i)* there was an excess of powers, and, if so, that *ii)* such excess was manifest.[12]

38. Contrary to the Respondents' position, the Applicant highlights that the term "manifest" does not entail a restrictive interpretation. The manifest excess does not require the defect in the award to arise *prima facie,* and the need for a certain degree of analysis and study (including the revision of the evidentiary record of the arbitration) does not deprive the excess of its "manifest" nature.[13] Furthermore, the Applicant admits that, to be manifest, the excess of powers must be serious to some extent.[14]

39. The Applicant points out that a tribunal exceeds its powers "insofar as it has made a decision outside its jurisdiction or has failed to exercise its jurisdiction in full." [Committee's translation][15] This includes a tribunal assuming powers it has not been granted or exceeding the arbitration agreement, or failure to meet the jurisdictional requirements agreed by the States party to the applicable treaty.[16]

40. Moreover, the Applicant contends that a tribunal may incur an excess of powers if it ignores the proper law, or if the award is based on a law other than the proper law. Consequently, the Committee should analyse whether the tribunal identified the proper law correctly and whether it actually applied it.[17]

---

[11] Reply, paras. 21, 28-30.
[12] Memorial, para. 23; Reply, para. 34.
[13] Memorial, para. 24; Reply, paras. 38-39, 42.
[14] Reply, para. 46.
[15] Memorial, para. 26. *See also* Reply, paras. 48 and 129.
[16] Memorial, para. 27.
[17] Memorial, paras. 29, 31; Reply, paras. 55, 129, 162 and 202.

41. In conclusion, the Applicant considers that the Award should be annulled in full in accordance with Article 52(1)(b) of the ICSID Convention if the Tribunal ignored the proper law or the award was based on a law other than the proper law.

###    ii.    Failure to State the Reasons on which the Award is Based

42. Article 52(1)(e) of the ICSID Convention sets forth as grounds for annulment the failure to state the reasons on which the award is based. The Applicant observes that such provision is subject to no condition whatsoever (*e.g.*, to that failure being "manifest" or "serious").[18] In addition, the Applicant notes that the requirement of stating the reasons leading to the tribunal's decision aims at the intelligibility of awards and is one of its essential validity requirements.[19]

43. The Applicant submits that the purpose of this ground is to ensure that the parties to an arbitration under the ICSID Convention can understand tribunals' decisions and the reasons why such decisions were adopted.[20] Pursuant to this ground, the Committee should evaluate whether the reasons furnished by the Tribunal are inadequate in the sense that they hinder the understanding of its reasoning at the time of making decisions.[21]

44. Furthermore, the Applicant asserts that stating contradictory, inadequate or insufficient reasons also entails a failure to state reasons. Venezuela defines contradictory reasons as those in contrast to each other and, thus, cancelling each other out, and inadequate or insufficient reasons as those not logically leading to the conclusion reached.[22]

45. In conclusion, the Applicant considers that the Award should be annulled in accordance with Article 52(1)(e) of the ICSID Convention in the event of a failure to state reasons therein, whether a complete lack of reasons, or the statement of contradictory, insufficient and/or inadequate reasons.

---

[18] Reply, para. 70.
[19] Memorial, paras. 36-37; Reply, para. 69.
[20] Memorial, para. 38; Reply, para. 69.
[21] Reply, paras. 82-83.
[22] Memorial, paras. 40-41; Reply, para. 93.

### iii.   Serious Departure from a Fundamental Rule of Procedure

46.   Pursuant to Article 52(1)(d) of the ICSID Convention, an award may be annulled in the event of a serious departure from a fundamental rule of procedure. The Applicant points out that the term "fundamental rule of procedure" should be broadly understood. According to the Applicant, this arises from the *travaux prèparatoires* of the ICSID Convention and has been endorsed by different annulment committees.[23]

47.   Moreover, the Applicant contends that the "serious" nature of the departure should be determined on a case-by-case basis. Accordingly, and contrary to the Respondents' position, determining seriousness does not mean that the applicant must prove that the result would have been different had such rule not been departed from, but that the departure from the rule could have made an impact on the award.[24]

48.   In conclusion, the Applicant considers that the Award should be annulled in accordance with Article 52(1)(d) of the ICSID Convention if there were departures from fundamental rules of procedure and such departures were serious.

## 2.   GROUNDS RELATED TO THE DECISION ON JURISDICTION

### i.   Manifest Excess of Powers

49.   The Applicant considers that the Tribunal manifestly exceeded its powers by establishing that it had jurisdiction to settle this dispute where it did not, and, also, by failing to apply the proper law. In both cases, the Applicant refers to the Tribunal's analysis of the terms "*seat*" and "*siège social*" contained in the Treaties in order to determine whether Tenaris and Talta qualify as investors.

50.   In both Treaties, the definition of "investor" includes companies constituted and having their "*seat*" (or "*siège social*") in the territory of one of the Contracting States.[25] The Tribunal found that, to determine the nationality of the investor, two elements had to be proved: the requirement of having been constituted (*i.e.*, having a statutory seat) and the requirement of

---

[23] Memorial, para. 33.
[24] Memorial, para. 34, and Reply, para. 62; *see also* Reply, paras. 63 to 66.
[25] Memorial, paras. 58-59 (citing the Luxembourg Treaty, Article 1(b) (C-1); and the Portuguese Treaty, Article 1(b) (C-3)).

having a *seat* or *siège social* in the territory of a Contracting State (which the Tribunal deemed equal to a place of actual or effective management).[26]

51. The Applicant argues that the evidentiary record could, at most, satisfy the requirement of statutory seat. However, it considers that in no way was it shown that Tenaris and Talta had their place of actual or effective management in Luxembourg and Portugal, respectively.[27] By not having proved a requirement deemed essential by the Tribunal itself to regard the Respondents as "investors" under the Treaties, the Tribunal assumed jurisdiction to entertain the dispute when it had none, which is why it manifestly exceeded its powers.[28]

52. Venezuela clarifies that, contrary to the Respondents' statements, it is not requesting that evidence be re-examined. On the contrary, it contends that the elements that the Tribunal itself claimed that it had to demonstrate were not demonstrated, and that the requirements of constitution and seat not having been met, the Tribunal lacked jurisdiction.[29] In addition, it considers that these excesses of powers by the Tribunal are manifest, as they may be readily perceived by any reasonably informed third party, no investigation being necessary.[30]

53. Furthermore, the Applicant considers that the Tribunal failed to apply the proper law. In this regard, it refers to the Tribunal's indication in the Award that, even though the interpretation of the terms "*seat*" and "*siège social*" was a matter of international law, it would consider the municipal law of Luxembourg and Portugal by way of background to its interpretation. Venezuela points out that such *renvoi* to municipal law does not stem from the Treaties' dispute resolution clauses, and that, since the text of the Treaties allowed for no such distinction, the Tribunal had no basis to make it.[31]

54. In conclusion, the Applicant states that the Tribunal departed from the proper law and its own prior findings by asserting jurisdiction to settle this dispute where it lacked such prerogative, which entailed a manifest excess of powers, in the terms of Article 52(1)(b) of the ICSID Convention.

---

[26] *See*, for example, *id.*, paras. 44, 62 (referring to para. 153 of the Award), 63 and 103; Reply, paras. 102-103, 106-107 and 132.
[27] Reply, paras. 136, 150-152, 157; Memorial, paras. 95-101.
[28] *See*, for example, Memorial, para. 44.
[29] Reply, para. 159.
[30] *Id.*, para. 160.
[31] *Id.*, paras. 162-165.

### ii.  Failure to State the Reasons on which the Award is Based

55. The Applicant considers that the Tribunal failed to state reasons by determining that it had jurisdiction to decide this dispute.

56. Venezuela indicates that the Tribunal started from the premise that, for the terms "*seat*" and "*siège social*" contained in the Treaties to have *effet utile*, they had to mean something other than statutory seat and, thus, it concluded that both terms meant that Tenaris and Talta were to have their effective management in the territory of a contracting party. Nevertheless, Venezuela contends that the Tribunal limited its analysis of these terms to considerations regarding the statutory seat, the Respondents' place of effective management not having been proved.[32]

57. Hence, by building on premises that do not support the conclusion reached, the Tribunal failed to state reasons in the terms of Article 52(1)(e) of the ICSID Convention, given the contradictory nature of the reasons stated thereby.[33]

58. The Applicant also submits that the Award contains other contradictions regarding jurisdiction that make it annullable pursuant to Article 52(1)(e) of the ICSID Convention. Among other examples, Venezuela states that the Tribunal relied upon Tenaris' articles of association as applicable but it did not reach the conclusion to which those rules should lead but their opposite, and that the Tribunal used a witness statement to substantiate some conclusions but ignored it in other respects.[34]

59. Furthermore, Venezuela considers that the Tribunal failed to state the reasons why it had made certain decisions regarding the evidence produced, arbitrarily deciding its admission.[35]

### iii.  Serious Departure from a Fundamental Rule of Procedure

60. The Applicant states that the Tribunal incurred in a serious departure from fundamental rules of procedure by determining that it had jurisdiction to decide the dispute between the Parties, in two respects. First, by making an arbitrary assessment of the evidence produced and not produced on record (in violation of Venezuela's right of defence and the principle of equality

---

[32] Memorial, paras. 60-62; Reply, paras. 168, 172.
[33] Memorial, para. 71; Reply, paras. 171, 173.
[34] Memorial, paras. 76, 86. *See also id.*, paras. 76, 82 and 92.
[35] *Id.*, paras. 44-45.

of arms between the parties). Second, by unduly shifting the burden of proof to Venezuela (in violation of the principle of equality of arms and due process).

61. First, Venezuela contends that the Tribunal deemed as proven facts that were not substantiated and admitted as conclusive elements lacking evidentiary value pursuant to the proper law.[36]

62. Venezuela refers to the Tribunal's determination that the notion of *seat* and *siège social* meant the place where Tenaris and Talta exercised their daily acts of management (including the place where the board of directors met among the elements indicative of the existence of an effective seat), and objects that the Tribunal had later departed from this determination by founding its conclusions on elements that merely showed Tenaris' and Talta's registrations in their statutory seats.[37]

63. The Applicant mentions other examples in the Award where it considers that the Tribunal reached certain conclusions by means of factual speculations and assumptions in favor of Tenaris and Talta.[38]

64. Therefore, the Applicant concludes that, by making an "ostensibly arbitrary" assessment of the evidence produced and not produced on record, the Tribunal undermined Venezuela's exercise of its right of defence, and the equality of arms between the Parties.[39]

65. Second, the Applicant contends that the Tribunal shifted the burden of proof to Venezuela, where it fell upon the Respondents, by stating that Venezuela was "unable to identify and demonstrate any other corporate seat for Tenaris, outside of Luxembourg".[40] As a result, the Tribunal ignored its essential duty to verify the objective requirements necessary to exercise its jurisdiction. According to the Applicant, if the claimant fails to satisfy the jurisdictional burden of proof, the Tribunal must necessarily declare that it lacks jurisdiction.[41]

66. In the Applicant's opinion, this shift of the burden of proof violates fundamental rules of evidence, such as equality of arms between the parties and due process. Therefore, it constitutes a serious departure from fundamental rules of procedure in the terms of Article 52(1)(d) of the ICSID Convention.[42]

---

[36] *Id.*, para. 45.
[37] *Id.*, paras. 95-104.
[38] *See id.*, paras. 78-81, 90-91; Reply, paras. 123-124.
[39] Memorial, para. 71.
[40] *Id.*, para. 84, and Reply, para. 117 (internal quotations omitted, citing para. 216 of the Award).
[41] Memorial, paras. 84-85; Reply, para. 116.
[42] Memorial, para. 85; Reply, paras. 109, 120-121 and 125.

### 3. GROUNDS RELATED TO THE DECISION ON EXPROPRIATION

#### i. **Manifest Excess of Powers**

67.   Venezuela contends that the Tribunal manifestly exceeded its powers with regard to its decision on expropriation, in two respects. First, by finding that there was an illegal expropriation under domestic law, while failing to apply the relevant Treaty provisions. Second, by simply mentioning in the Award that the requirement of payment of compensation was breached after analysing certain provisions of Venezuelan law, offering no explanation whatsoever based on applicable Treaty provisions.[43]

68.   First, Venezuela submits that the Tribunal failed to explain the reasons why the alleged breach of domestic law requirements constitutes an unlawful expropriation in view of each of the requirements listed in the Treaties. In the absence of such an analysis, the Applicant concludes that the Tribunal did not decide on the basis of the proper law which was the Treaties themselves.[44]

69.   Second, the Applicant considers that the Tribunal limited itself to analyse the facts only in the light of certain provisions of Venezuelan law relevant to the payment of compensation, without explaining the reasons why the failure to pay compensation entailed a violation of Treaty provisions.[45] The Applicant notes that it is not enough for the Tribunal to have mentioned in the Award that Venezuela violated the Treaties by conducting an expropriation in disregard of provisions on payment of compensation; the Tribunal should have at least tried to apply the proper law, in this case, under a factual and legal analysis of the compensation requirement in accordance with applicable Treaty provisions.[46]

70.   In the Applicant's opinion, the foregoing entails a failure to apply the law chosen by the Contracting States in Article 8(3) of the Portuguese Treaty and Article 9(5) of the Luxembourg Treaty for dispute resolution purposes, as well as a manifest excess of powers by the Tribunal, in the terms of Article 52(1)(b) of the ICSID Convention.[47]

---

[43] Memorial, paras. 46-49, 137-141; Reply, para. 205.
[44] Memorial, paras. 46, 138-139.
[45] *Id.*, paras. 47-48; Reply, para. 211.
[46] Memorial, paras. 48, 140.
[47] *Id.*, paras. 136-139, 141-142; Reply, paras. 212-214.

ii.    **Failure to State the Reasons on which the Award is Based**

71.    Venezuela submits that the Tribunal failed to state the reasons for its ruling on expropriation, in two respects.

(a)    **Failure to State Reasons where Finding that Venezuela Violated Article 4(a) of the Portuguese Treaty and Article 4(1)(b) of the Luxembourg Treaty**

72.    The Applicant states that the Tribunal failed to state reasons, since it limited itself to transcribing the expropriation provisions of the Treaties in the Award and analysing the facts in the light of Venezuelan law, having conducted no analysis whatsoever under applicable international law, even though Venezuela raised arguments on expropriation based on international law and customary international law during the written phase.[48]

73.    Moreover, the Applicant contends that the Tribunal failed to explain the reasons why Venezuela's proposition whereby any violation of a municipal law provision does not entail an international wrongful act is erroneous or invalid. Such lack of explanation constitutes a defect leading to annulment of the Award.[49]

74.    In addition, the Applicant criticises the Tribunal's lack of explanation to conclude that non-compliance with the phrases "in accordance with the legislation in force" (included in the Portuguese Treaty) and "in accordance with legal procedures" (included in the Luxembourg Treaty), as references to municipal law, entailed a violation of the Treaty or international law.[50] Likewise, the Applicant objects to the Respondents' argument that the Treaties made a *renvoi* to Venezuelan law, since, even assuming that it was correct, such an argument was not raised by the Tribunal, and the Committee has no power to create reasons where there were none in the Award.[51]

75.    Likewise, the Applicant criticises the Tribunal for failing to explain the bases for comparing certain aspects of the *Generation Ukraine* decision with the facts of the present case.[52] In addition, Venezuela criticises the Tribunal's partial citation of *ADC v. Hungary* in

---

[48] Memorial, paras. 46, 114-116; Reply, para. 184.
[49] Memorial, para. 119. *See also* Reply, para. 186.
[50] Memorial, para. 124; Reply, para. 186.
[51] Reply, para. 186.
[52] *Id.*, para. 191 (referring to *Generation Ukraine Inc. v. Ukraine*, ICSID Case No. ARB/00/9, Award dated 16 September 2003 ("***Generation Ukraine***")).

paragraph 496 of the Award, and contends that it failed to state reasons by failing to explain the similarities between that case and the case at issue.[53]

76. The Applicant concludes that the Tribunal failed to state reasons when determining that Venezuela violated Article 4(a) of the Portuguese Treaty and Article 4(1)(b) of the Luxembourg Treaty, as a consequence of which the Award should be annulled.

### (b) Failure to State Reasons where Finding that Venezuela Violated Article 4(c) of the Portuguese Treaty and Article 4(1)(d) of the Luxembourg Treaty

77. The Applicant makes reference to the Tribunal's determination that "the simple failure on the part of Venezuela to pay compensation is sufficient to render the expropriation unlawful as a matter of Venezuelan law".[54] According to the Applicant, the Tribunal's finding that Venezuela violated both Treaties by conducting an expropriation without provisions for payment of compensation lacks reasons from the perspective of both international law and Venezuelan law.[55]

78. On the one hand, the Applicant submits that the Tribunal analysed the facts only in the light of certain provisions of Venezuelan law, despite Venezuela's argument in the arbitration that failure to pay compensation does not render an expropriation illegal *per se*. Given this lack of analysis under international law, the Tribunal failed to state the reasons why the failure to pay compensation entailed a violation of the expropriation provisions of the Treaties.[56]

79. On the other hand, Venezuela argues that, even under Venezuelan law, the Tribunal failed to analyse whether Tenaris and Talta would have been able to receive compensation had they resorted to the domestic procedural remedies available.[57]

80. Therefore, on the basis of Article 52(1)(e) of the ICSID Convention, Venezuela requests that the Award be annulled regarding the Tribunal's determination that there was a violation of the expropriation clauses of the Treaties.

---

[53] Memorial, para. 124; Reply, paras. 192, 194 (referring to *ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award dated 2 October 2006 ("**ADC v. Hungary**")).
[54] Memorial, para. 47 (internal quotations omitted, citing para. 481 of the Award).
[55] *Id.*, paras. 126-129.
[56] *Id.*, paras. 47-48, 113-115, 127; Reply, para. 198.
[57] Memorial, para. 129.

### 4.   GROUNDS RELATED TO THE DAMAGE ASSESSMENT METHODOLOGY

#### i.   Manifest Excess of Powers

81.   The Applicant contends that the Tribunal manifestly exceeded its powers with regard to the damage assessment methodology, in two respects. First, by using a methodology for which the Parties never advocated. Second, by awarding a double counting of damages.[58]

82.   First, Venezuela argues that the Award should be annulled as the Tribunal adopted a new methodology in order to calculate the fair market value of Tenaris' and Talta's interest in Matesi, which was neither advocated for nor analysed by the Parties.[59]

83.   In support of its argument, the Applicant cites the decision of the annulment committee in *Wena Hotels* which highlights, as a classic example of manifest excess of powers, the situation in which a tribunal chooses 'a third line' between two possible boundary lines submitted by the parties. In this case, the Applicant contends that the Tribunal's choice of a third methodology never argued by the Parties constitutes a manifest excess of powers, and, thus, the Award should be annulled.[60]

84.   Second, the Applicant considers that the damage assessment methodology adopted by the Tribunal resulted in a double counting of damages of USD 25.75 million. That is tantamount to an unjust enrichment in favor of Tenaris and Talta, as well as a manifest excess of powers by the Tribunal.[61]

85.   Therefore, by using a damage methodology other than that proposed by the Parties and double counting damages, the Tribunal manifestly exceeded its powers, in the terms of Article 52(1)(b) of the ICSID Convention.[62]

#### ii.   Failure to State the Reasons on which the Award is Based

86.   The Applicant submits that the Tribunal failed to state reasons in its analysis by using a damage assessment methodology, other than that proposed by the Parties, on three main

---

[58] *Id.*, paras. 50-52, 167-169.
[59] *Id.*, paras. 50 and 143; Reply, paras. 233, 245.
[60] Memorial, paras. 167-168 (referring to *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on Annulment dated 5 February 2002 (RLA-169) ("***Wena Hotels***")); Reply, para. 233.
[61] Memorial, paras. 52, 154 and 169.
[62] *Id.*, paras. 52 and 169.

accounts: *(a)* the Tribunal failed to identify precisely the valuation approach or the methodology used in its damage assessment; *(b)* the tribunal ignored key steps in the calculation of damages without providing an explanation or analysis; and *(c)* the damage analysis conducted by the Tribunal contains contradictions.[63]

87.  First, the Applicant asserts that the Tribunal simply made reference in the Award to Matesi's asset acquisition transaction. However, it failed to explain in detail both, the approach and the damage methodology used. Consequently, it is not possible to determine whether the Tribunal compensated the Respondents' initial investment or Matesi's business value on the basis of an asset transaction. In other words, the Tribunal's failure to define the methodology adopted in order to assess damages makes it impossible to know or infer the premises on which such assessment was made.[64] In the absence of an explanation by the Tribunal of the elements of its methodology, Venezuela submits that it is not possible to understand the conclusions at which the Tribunal arrives or determine whether or not they are within the competence of the Tribunal.[65]

88.  Second, the Applicant contends that the Tribunal failed to explain the reasons why it ignored key steps in the calculation of damages, which led to a double counting of damages. In Venezuela's opinion, such omissions included the following: failing to explain the reasons why it did not consider Matesi's debt as of the valuation date and the reasons why the total amount of certain long-term loan ("**Talta Loan**") was to be recognized as further damages.[66]

89.  Lastly, the Applicant argues that there are contradictions in the damage analysis conducted by the Tribunal, as it rejects the damage methodologies proposed by the Parties, while expressing uncertainties not dispelled in the Award as to the very damage methodology it decided to adopt.[67] The Applicant refers to paragraph 567 of the Award in which the Tribunal admitted having accepted with some reluctance the value of the Respondents' initial investment at Matesi's fair market value. Among other criticisms, the Applicant indicates that the Tribunal failed to state the reasons why such reluctance was to be tolerated, or that would help to understand why the Tribunal adopted a mechanism that the Tribunal itself deemed unfair and unreliable.[68]

---

[63] *Id.*, paras. 53 and 170-177; Reply, paras. 246 to 257.
[64] Memorial, paras. 53, 144-149, 171; Reply, para. 246.
[65] Reply, para. 247.
[66] Memorial, paras. 53 and 172-174. *See also*, for example, Reply, paras. 248-250.
[67] Memorial, paras. 53, 175-177; Reply, paras. 252, 254.
[68] Memorial, para. 175.

90.     Therefore, the Applicant concludes that the rejection of the methodologies proposed by the Parties on account of their uncertainties and the choice of a methodology that was not reliable according to the Tribunal itself, entail a fundamental contradiction, and, thus, a failure to state reasons pursuant to Article 52(1)(e) of the ICSID Convention.[69]

### iii.     Serious Departure from a Fundamental Rule of Procedure

91.     The Applicant contends that the Tribunal incurred a serious departure from several rules of procedure by choosing a methodology that was neither advocated for nor analysed by the Parties.

92.     In particular, the Applicant states that the Tribunal violated *(a)* Venezuela's right of due process, as well as fundamental principles of burden of proof, by proceeding to assess damages after completely rejecting the methodologies proposed by Tenaris and Talta in order to prove their damages; *(b)* the Parties' right to be heard, by using a damage assessment methodology other than that presented and discussed by the Parties, affording them no opportunity to make observations; and *(c)* the principle of equal treatment of the Parties, by incurring a double counting of damages leading to unjust enrichment in favor of the Respondents.[70]

93.     First, the Applicant submits that the Tribunal violated fundamental principles of burden of proof with respect to the damages alleged. Venezuela indicates that the Tribunal completely rejected the Respondents' submission on damages by considering that the Discounted Cash Flow ("**DCF**") methodology proposed suffered from various uncertainties. Moreover, the Tribunal completely rejected the supplementary valuation submitted by Tenaris and Talta in accordance with the "market multiples" methodology.[71]

94.     Since these methodologies rejected by the Tribunal were the only ones presented by Tenaris and Talta to prove their damages, in Venezuela's opinion, the Tribunal decided that Tenaris and Talta failed to discharge their burden of proof. Consequently, the Tribunal should have dismissed their claim for damages entirely. Nevertheless, the Tribunal proceeded to adopt a new methodology that was never discussed by the Parties and ordered that damages

---

[69] *Id.*, paras. 176-178; Reply, paras. 251, 257.
[70] Memorial, paras. 51, 155 and 166; Reply, para. 217.
[71] Memorial, para. 157 (referring to paras. 526-527 and 532 of the Award).

be paid.[72] Thus, the Tribunal violated Venezuela's right of due process and incurred a serious departure from a fundamental rule of procedure.[73]

95. Second, the Applicant submits that the fact that it was not possible to discuss the new damage assessment methodology adopted by the Tribunal violated the Parties' right to be heard.[74] In this regard, Venezuela contends that the right to be heard is a fundamental rule of procedure, and affirms that arbitral tribunals and national courts have recognized that adopting a damage methodology other than that presented and discussed by the parties, without the parties having the opportunity to make observations (as was the case here), constitutes a serious violation of a rule of procedure.[75]

96. In the Applicant's view, it is not enough for a methodology to be generally acknowledged or based on objective data submitted by the parties. In any case, a tribunal should give the parties an opportunity to make observations. In addition, the Applicant asserts that the opportunity to express views and argue about the damage methodology to be adopted by the tribunal is of paramount importance, since using a methodology other than that presented by the parties is a substantial defect that changes the outcome of the case.[76]

97. Accordingly, and contrary to the Respondents' argument whereby the outcome of the case was allegedly not affected, the Applicant states that the damage amount determined by the Tribunal may not be claimed to reflect the position of an expert of Venezuela –and that any comparison between the alternative valuation made by such expert and the Tribunal's calculation is inadequate.[77]

98. Lastly, the Applicant submits that the Tribunal violated the equality of the Parties by favoring the unjust enrichment of Tenaris and Talta. Venezuela contends that the Tribunal, by assessing damages in accordance with its new methodology, double counted damages in the amount of USD 25.75 million, the outstanding balance of the Talta Loan, which was not an additional investment and would have already been recovered under the valuation methodology adopted by the Tribunal. The Applicant argues that this is tantamount to unjust

---

[72] *Id.*, paras. 157-158; Reply, para. 227.
[73] Memorial, paras. 156, 159; Reply, paras. 227-228.
[74] Memorial, para. 163.
[75] *Id.*, para. 160; Reply, para. 218.
[76] Memorial, paras. 161-162.
[77] Reply, paras. 224-226.

enrichment in favor of the Respondents, and that, by awarding such amount, the Tribunal violated basic principles of due process, such as equal treatment of the parties.[78]

5. **GROUNDS RELATED TO THE COSTS AWARD REGARDING THE REQUEST FOR RECTIFICATION**

i. <u>**Failure to State the Reasons on which the Decision on Rectification is Based**</u>

99. The Applicant contends that the Tribunal failed to state the reasons to order Venezuela to pay the costs incurred by the Respondents in the course of the rectification proceeding.[79]

100. According to Venezuela, such decision is inconsistent with the Tribunal's indication in the Award that the award of costs against one of the parties is subject to a high threshold, which requires the presence of special circumstances.[80] Furthermore, the Applicant states that "the Tribunal's finding whereby, in its opinion, Venezuela's request failed to comply with the interpretation of the terms of Article 49(2) of the Convention says nothing about the reasons for awarding costs" [Committee's translation].[81] The Applicant highlights that the Tribunal identified none of the special circumstances that would warrant sanctioning Venezuela in costs, such as an abusive procedural conduct.[82]

101. Furthermore, Venezuela criticises the explanations offered by the Respondents of the possible reasoning employed by the Tribunal to have awarded costs differently in the Award and in the Decision on Rectification. The Applicant points out that the reasons argued by the Respondents are not included in the Award, and the Committee may not create reasons where the Tribunal itself failed to provide them.[83] Moreover, it objects to the Respondents' reference to the Tribunal's indication that there were plenty of authorities to award costs in favor of the successful party since it is an incomplete citation, made out of context in an *obiter* paragraph.[84]

---

[78] Memorial, paras. 164-165; Reply, paras. 231-232.
[79] Memorial, paras. 54 and 179.
[80] *Id.*, para. 185 (referring to para. 618 of the Award); Reply, para. 259.
[81] Reply, para. 263.
[82] Memorial, para. 186; Reply, para. 263.
[83] Reply, para. 263.
[84] *Id.*, para. 260.

102. The Applicant concludes that the Tribunal's failure to state the reasons to justify that Venezuela had to bear the costs incurred by Tenaris and Talta for exercising a right set forth in the ICSID Convention, and by ignoring the reasons why the Tribunal adopted a decision contrary to criteria it had previously applied, are grounds for annulment pursuant to Article 52(1)(e) of the ICSID Convention.[85]

## ii.    Serious Departure from a Fundamental Rule of Procedure

103. The Applicant contends that the Tribunal incurred a serious departure from a fundamental rule of procedure, since it violated the principle of equal treatment of the parties by ordering Venezuela to pay the costs incurred by Tenaris and Talta in the course of the rectification proceeding.[86]

104. The Applicant notes that, in its Decision on Rectification, the Tribunal expressly acknowledged Venezuela's decision to request the rectification of the Award as a right and an integral element of the ICSID investment arbitration system.[87] However, the Tribunal ordered Venezuela to pay all the costs of the rectification proceeding, including the attorneys' fees of the Respondents.

105. The Applicant cites several decisions in support of the claim whereby a large number of arbitral tribunals have distributed the costs of the proceeding equally between the disputing parties.[88] Venezuela points out that the criteria for equal distribution of costs include that the parties' arguments have been raised in good faith and have not been frivolous, and that the parties' conduct has been justified. In addition, Venezuela stresses that the Tribunal itself indicated in the Award that it is standard practice for each party to bear its own costs, and that departing from such rule required an egregious, illegal or frivolous conduct.[89]

106. Accordingly, the Applicant states that, even though the Tribunal dismissed the Request for Rectification, no part of the decision pointed to the existence of special circumstances that warranted sanctioning Venezuela. Therefore, this unjustified award of costs constitutes a serious violation of procedure.[90]

---

[85] Memorial, paras. 179 and 187; Reply, para. 264.
[86] Memorial, paras. 54, 180-184; Reply, paras. 265-268.
[87] Memorial, para. 54, footnote 75 (referring to para. 73 of the Decision on Rectification).
[88] *Id.*, para. 181 and footnote 235.
[89] *Id.*, para. 182.
[90] *Id.*, para. 183; Reply, paras. 266-267.

### B. THE RESPONDENTS ON ANNULMENT'S ARGUMENTS

107. The Respondents submit that Venezuela has not met the high standard that warrants the annulment of the Award; on the contrary, they consider that Venezuela's claims are based on disagreements with the Tribunal's findings. The Respondents assert that Venezuela seeks a substantive review of the Award as if it were an appeal, which is impermissible under the ICSID Convention.[91]

108. In particular, Tenaris and Talta claim that the Tribunal did not manifestly exceed its powers, and that there was no serious departure from a fundamental rule of procedure or failure to state the reasons on which the Award is based. The applicable standards and the arguments concerning each of these grounds are discussed *infra*.

### 1. APPLICABLE STANDARD

109. By way of introduction, the Respondents note that annulment is an extraordinary remedy in the ICSID system, not a mechanism for appeal.[92] The role of an *ad hoc* committee in deciding an application for annulment is accordingly limited. Said mandate is restricted to determining whether any of the grounds enumerated in Article 52(1) of the Convention has been established, which permit no form of substantive review of the merits of a tribunal's award. Thus, even when a tribunal has committed evident errors of fact or law, annulment is not a remedy against an incorrect decision.[93]

110. Moreover, the Respondents object to Venezuela's suggestion that all annullable errors justify annulment. The Respondents argue that Article 52(3) of the ICSID Convention empowers an *ad hoc* committee to annul the award if a ground under Article 52(1) is established,[94] though such article does not require a committee to do so.

### i. <u>Manifest Excess of Powers</u>

111. As regards the applicable standard for annulment under Article 52(1)(b) of the ICSID Convention, the Respondents aver that *(a)* an excess of powers must be manifest;

---

[91] *See*, for example, Counter-Memorial, paras. 1, 3-4, and 42-43; Rejoinder, paras. 4, 7-8.
[92] Counter-Memorial, para. 39; Rejoinder, paras. 5, 12.
[93] Counter-Memorial, para. 40; Rejoinder, para. 8.
[94] Counter-Memorial, para. 41 and footnote 79; Rejoinder, para. 10.

*(b)* Article 52(1)(b) does not permit a *de novo* assessment of the Tribunal's jurisdiction; and
*(c)* the erroneous application of the law is not an excess of powers.

112. First, the Respondents point to the fact that Article 52(1)(b) of the Convention permits annulment only where a tribunal has exceeded its powers and where that excess is manifest.[95] The term "manifest" means that the excess has to be "obvious, self-evident, clear, flagrant and substantially serious", and that it can be discerned without great effort or extensive analysis.[96] Also, they consider that whenever the underlying issue is subject to more than one reasonable interpretation or is otherwise open to debate, there can by definition be no excess of power.[97]

113. The Respondents further allege that any excess of powers must also be evident from reading the award, without having to review the evidence before the tribunal. In this regard, under the ICSID Arbitration Rule 34, only the Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value.[98]

114. Second, the Respondents state that Article 52(1)(b) does not permit a *de novo* assessment of the Tribunal's jurisdiction. The Respondents object to Venezuela's argument that any excess of powers as to jurisdiction constitutes a manifest excess of powers. Instead, they argue that the Convention does not distinguish between allegations of excesses of power that relate to jurisdiction, and those that relate to the merits (neither of which allows a *de novo* review).[99]

115. Third, the Respondents claim that the erroneous application of the law is not an excess of powers. The Respondents state, *inter alia*, that only a failure to apply the law *in toto* may amount to a manifest excess of powers for failure to apply the applicable law.[100] Moreover, a tribunal's decision not to address a particular provision that it considers irrelevant does not constitute a failure to apply the applicable law.[101]

---

[95] Counter-Memorial, para. 46.
[96] *Id.*, para. 47 (internal quotation marks omitted, citing *Impregilo SpA v. Argentine Republic,* ICSID Case No. ARB/07/17, Decision of the *Ad Hoc* Committee on the Application for Annulment dated 24 January 2014 (RLA-224), para. 128); Rejoinder, para. 13.
[97] Counter-Memorial, para. 48; Rejoinder, para. 13.
[98] Counter-Memorial, para. 49. *See also* Rejoinder, para. 24.
[99] Counter-Memorial, paras. 52 and 54; Rejoinder, paras. 13, 17 and 24.
[100] Counter-Memorial, para. 57; Rejoinder, para. 13.
[101] Counter-Memorial, para. 58.

116. In sum, the Respondents state that an excess of powers must be manifest in the award at first sight; evidentiary inquiries and a *de novo* review of the award are beyond the scope of an annulment committee's mandate; and an error of law is insufficient to annul an award.

## ii.     **Failure to State the Reasons on which the Award is Based**

117. The Respondents indicate that, in very limited circumstances, a violation of the duty to state reasons may warrant annulment under Article 52(1)(e) of the ICSID Convention.[102] Said provision does not authorize committees to review the quality or persuasiveness of a tribunal's reasoning. Therefore, an *ad hoc* committee may not annul an award because it disagrees with the reasons provided by a tribunal.[103]

118. The Respondents refer to different decisions from annulment committees in support of the fact that there is no basis for annulment so long as it is possible to follow a tribunal's reasoning through to its conclusion, even if the award contains an error of law or fact. In other words, reasons need not be correct, or even convincing; the key issue is whether there are reasons and these are understandable.[104]

119. To justify annulment of an award, a failure to state reasons must relate to a point that is essential to a tribunal's decision.[105] Contrary to Venezuela's assertion, a tribunal need not address each and every argument raised under every claim put before it, nor is it required to address those arguments that are not relevant to its final decision.[106] Further, the Respondents submit that the committees must consider whether the tribunal's reasons are implicit in the considerations and conclusions of the award.[107]

120. The Respondents claim that contradictory reasons may constitute a failure to state reasons, but only when they prevent the reader from understanding the tribunal's motives.[108] Likewise, the Respondents assert that annulment committees have also stressed the importance of distinguishing genuine contradictions in a tribunal's reasoning from a tribunal's appropriate weighing of conflicting considerations.[109]

---

[102] *Id.*, para. 86; Rejoinder, para. 50.
[103] Counter-Memorial, para. 87.
[104] *Id.*, paras. 89-90; Rejoinder, para. 54.
[105] Counter-Memorial, para. 92.
[106] *Id.*, para. 93.
[107] *Id.*, para. 91.
[108] *See id.*, para. 94.
[109] *Id.*, para. 95.

### iii.  <u>Serious Departure from a Fundamental Rule of Procedure</u>

121.  The Respondents state that the ground for annulment under Article 52(1)(d) is intended to ensure that minimum standards are observed in arbitral proceedings. Similarly, they indicate that the Applicant bears the burden of proving both that the Tribunal committed a serious departure from a rule of procedure, and that the rule was fundamental.[110]

122.  To be fundamental, the Respondents point out, the rule violated must relate to an element of due process, such as the equal treatment of parties, the right to be heard, or the right to an independent and impartial tribunal.

123.  Likewise, to satisfy the ground for annulment under Article 52(1)(d), it must be established that there was a "serious" departure from a fundamental rule of procedure. The procedural irregularity must have been serious to the effect that it must have caused the Tribunal to reach a result substantially different from what it would have achieved had the rule been observed.[111]

## 2.  GROUNDS RELATED TO THE DECISION ON JURISDICTION

### i.  <u>Manifest Excess of Powers</u>

124.  The Respondents state that the Tribunal did not manifestly exceed its powers when upholding jurisdiction over the dispute.

125.  As a preliminary consideration, the Respondents criticize Venezuela's alleged failure to assess the governing legal standard that an excess of powers should be "manifest", as well as its request to the Committee to undertake a *de novo* review of the Tribunal's jurisdictional findings.[112] The Respondents recall that the assessment of evidence is beyond the scope of review of an *ad hoc* committee, and that even if the Tribunal had made a mistake in its assessment of the evidence (which they claim is not the case), that too would not be a basis for annulment.[113]

---

[110] *Id.*, para. 154.
[111] *Id.*, para. 155. *See also* Rejoinder, para. 92.
[112] Counter-Memorial, paras. 50 and 61; Rejoinder, paras. 23-24.
[113] Counter-Memorial, paras. 50 and 61; Rejoinder, para. 22.

126. The Respondents submit that Venezuela's arguments on an alleged excess of powers simply criticize the Tribunal's reasoning and the evidence on which it relied, as if a *de novo* review of the facts was allowed, but provides no explanation of why Venezuela's failure to persuade the Tribunal on these points amounts to an excess of powers. In addition, the Respondents submit that Venezuela's treatment of the evidence is incomplete and inaccurate.[114]

127. In any event, the Respondents recall that the correctness of the Tribunal's legal and factual findings leading to its decision that it had jurisdiction *ratione personae* is not a ground for annulment.[115]

128. Similarly, Venezuela's arguments that the Tribunal adopted certain domestic law elements as necessary for establishing the location of the corporate seat of Tenaris and Talta (such as the place where directors' meetings would be held) are deemed irrelevant by the Respondents. The Respondents note that, although the Tribunal considered them relevant by way of background, the Tribunal confirmed that the interpretation of the terms "*siège social*" and "*sede*" remained a matter of international law alone.[116]

### ii.    Failure to State the Reasons on which the Award is Based

129. The Respondents assert that the Tribunal stated reasons for its decision on jurisdiction, and criticize Venezuela's allegation in this regard as based on a mischaracterization of the legal standard applied by the Tribunal.

130. The Respondents summarize the Tribunal's reasoning on jurisdiction and conclude that the reasons provided by the Tribunal for its decision are clear, straightforward, and may be followed from point A to point B.[117]

131. For example, after reviewing the Parties' positions on the meaning of the terms "*siège social*" and "*sede*", the Tribunal concluded that these meant something more than the purely formal matter of the address of a registered office or statutory seat. That led the Tribunal to assign to both terms a meaning of effective management or some sort of actual or genuine corporate activity.[118]

---

[114] Rejoinder, para. 29.
[115] Counter-Memorial, paras. 63 and 64.
[116] Rejoinder, para. 27.
[117] Counter-Memorial, paras. 97-107; Rejoinder, para. 59.
[118] Counter-Memorial, para. 98 (referring to paras. 150 and 154 of the Award).

132. Then, the Tribunal explained that, although the interpretation of these terms was a matter of international law alone, as the Treaties did not include an express *renvoi* to domestic law for neither of these terms, it was at least appropriate to consider the domestic law of Luxembourg and Portugal as background to their interpretation.[119] Among other arguments in support of its conclusions on jurisdiction, the Tribunal made certain observations about Tenaris' and Talta's corporate structure.[120]

133. The Respondents allege that Venezuela's argument amounts to an impermissible criticism of the evidentiary findings of the Tribunal. In their view, Venezuela is not actually claiming that the Tribunal has failed to state reasons, or that its reasons are contradictory, but rather that the Tribunal adopted the wrong reasons or findings based on the evidence before it. That is no basis for annulment.[121]

134. Similarly, the Respondents criticize two fundamental aspects of Venezuela's argument that the Tribunal failed to state reasons because no board meeting minutes were produced (and that, therefore, Tenaris and Talta could not have shown effective management in Luxembourg and Portugal).

135. First, this argument is based on the Tribunal's allegedly erroneous weighing of the evidence, which is no basis for annulment.[122] Second, the Respondents criticize that Venezuela focuses on only one of many factors underlying the Tribunal's conclusions, as the Tribunal never suggested that the location of a board meeting was unequivocal evidence of "effective management" or that the inability to prove the location of board meetings would result in a failure to prove Tenaris' "*siège social*".[123]

136. Similarly, the Respondents submit that the Tribunal consistently and clearly communicated the reasons for its jurisdictional decision as regards Talta, based on many factors that allow proceeding from point A to point B, and that in no event give rise to annullable error.[124]

---

[119] *Id.*, para. 99 (referring to para. 169 of the Award).
[120] *Id.*, paras. 102-106.
[121] Counter-Memorial, paras. 96 and 114; Rejoinder, para. 64.
[122] Counter-Memorial, paras. 109-110; Rejoinder, para. 62.
[123] Counter-Memorial, paras. 111-112.
[124] *Id.*, para. 113.

### iii.   Serious Departure from a Fundamental Rule of Procedure

137. The Respondents allege that the Applicant has not established how, in its jurisdictional decision, the Tribunal seriously departed from a fundamental rule of procedure. In their view, Venezuela does not identify precisely how its right of defence and the principle of equality of arms were undermined.[125]

138. The Respondents state that Venezuela attempts to reargue the merits of the dispute. For instance, Venezuela's argument that the Tribunal's assessment of the evidence produced and not produced in the record was patently arbitrary, is nothing more than a disagreement with the evaluation and weighing of the evidence. However, that does not establish the departure from a fundamental rule of procedure.[126]

139. As to the allegation that the Tribunal seriously departed from a fundamental rule of procedure because it shifted the burden of proof (allegedly requiring Venezuela to disprove the existence of the Tribunal's jurisdiction), the Respondents point out that upon reading the Award it follows that the Tribunal placed the burden of proof on Tenaris and Talta, and found that they satisfied that burden. In addition, the Respondents highlight the difference between the burden of the proof and the standard of proof that a party must satisfy.[127]

### 3.   GROUNDS RELATED TO THE DECISION ON EXPROPRIATION

### i.   Manifest Excess of Powers

140. The Respondents argue that the Tribunal did not exceed its powers —by allegedly failing to apply the proper law— when determining that Venezuela expropriated the investment of Tenaris and Talta in violation of the Treaties. In the Respondents' view, Venezuela's arguments are based on a mischaracterization of the Tribunal's decision.[128]

141. The Respondents assert that the Tribunal's decision that the expropriation of the investment of Tenaris and Talta was "unlawful as a matter of Venezuelan law" was based on the text of the Treaties, which established a *renvoi* to domestic law.[129] In other words, the Tribunal

---

[125] *Id.*, para. 158.
[126] Counter-Memorial, paras. 158-159.
[127] Rejoinder, paras. 93-95. *See also id.*, paras. 98-99.
[128] Counter-Memorial, paras. 67-68; Rejoinder, para. 36.
[129] Counter-Memorial, para. 68 (internal quotation marks omitted, citing para. 481 of the Award); Rejoinder, para. 39.

carried out a detailed analysis of the facts and the applicable Venezuelan law, and found that, when expropriating the Respondents' investment in violation of its own law, Venezuela breached its international law obligations as regards expropriation.[130]

142.   Hence, the Respondents consider that Venezuela's argument that the Tribunal based its decision on an analysis exclusively conducted under Venezuelan law is untenable, since that was what the Treaties themselves required. In any case, the Tribunal decided in accordance with the principles of international law, which principles directed the Tribunal to apply the *lex specialis* requirements in the Treaties over general rules of customary international law.[131]

143.   Moreover, the Respondents consider that Venezuela's argument that the Tribunal did not analyse the failure to pay compensation as an independent basis for the expropriation's unlawfulness under the Treaties, is merely a critique of the adequacy of the Tribunal's reasoning.[132]

144.   The Respondents point out that the legality requirements under the Treaties were cumulative and, once the Tribunal found that Venezuela failed to meet the requirements under Articles 4(a) and 4(c) of the Portuguese Treaty, and 4(1)(b) and 4(1)(d) of the Luxembourg Treaty, it needed not to analyse further the requirements related to expropriation under the Treaties.[133]

145.    As a consequence, the Respondents assert that the Tribunal's findings that Venezuela's expropriation was unlawful under the Treaties on account of failure to comply with its own law and to pay compensation are based on the proper law.[134]

### ii.    Failure to State the Reasons on which the Award is Based

146.   The Respondents assert that the Tribunal stated the reasons to conclude that *(a)* Venezuela failed to follow applicable legal procedures when expropriating the Respondents' investment; and *(b)* it also breached the Treaties by failing to pay compensation for the expropriation.

---

[130] Counter-Memorial, paras. 68-69.
[131] Rejoinder, para. 39.
[132] *Id.*, para. 41.
[133] *Id.*, para. 37.
[134] Counter-Memorial, para. 72.

(a) **The Tribunal Stated Reasons for Concluding that Venezuela Violated Article 4(a) of the Portuguese Treaty and Article 4(1)(b) of the Luxembourg Treaty**

147. The Respondents state that the Tribunal provided detailed reasons how Venezuela, by failing to follow its own legal procedures and legislation, breached the international law requirements for lawful expropriation in accordance with the Treaties.[135] They point out that the Tribunal devoted a section of the Award entitled "Failure to comply with the Treaties" and provide a summary of the reasons stated by the Tribunal therein.[136] Respondents indicate that such reasons are numerous, and are supported by findings of fact.[137]

148. Additionally, the Respondents object to the arguments raised by Venezuela in relation to the Tribunal's finding on the unlawfulness of the expropriation. They criticize, *inter alia*, Venezuela's allegation that the Tribunal merely analysed considerations related to Venezuelan law, and explain that the Treaties so provided in their *renvoi* clauses.[138]

149. In the Respondents' view, once a Treaty establishes a *renvoi* to domestic law, compliance with that domestic law is, by definition, internationalized. Similarly, the Respondents allege that the Tribunal clearly stated that the Treaties contained a *renvoi* to Venezuelan law in paragraphs 494 and 495 of the Award.[139]

150. The Respondents further object to Venezuela's argument that the Tribunal did not reference all of its arguments about compliance with international law. The Respondents state that the Tribunal was not required to address each and every argument presented by the Parties. Since the conditions for the legality of an expropriation were cumulative, failure to fulfil any of those conditions would suffice.[140]

151. Tenaris and Talta also dispute Venezuela's argument that, in order to complain of a breach of international law, the Respondents should have resorted to Venezuelan legal procedures. The Respondents indicate that the Tribunal itself rejected this argument in the Award and clearly motivated its decision.[141]

---

[135] *Id.*, para. 116.
[136] *Id.*, para. 117 (referring to paras. 481-492 of the Award).
[137] *Id.*, para. 118; Rejoinder, para. 65.
[138] Counter-Memorial, para. 119; Rejoinder, para. 65.
[139] Rejoinder, paras. 67, 69.
[140] Counter-Memorial, para. 121.
[141] *Id.*, paras. 122 and 125 (referring to paras. 489-492 of the Award); Rejoinder, para. 70.

152. Finally, as regards Venezuela's complaint about the Tribunal's partial quote of *ADC v. Hungary*, alleging that it failed to state reasons by not explaining the similarities between such case and the instant case, the Respondents submit that tribunals are not required to explain the differences and similarities between every case cited and the proceeding at issue. In any event, the Tribunal's reasoning in relation to such partial quote may be found in the preceding paragraphs of the Award.[142]

153. In sum, the Respondents claim that Venezuela's arguments about the Tribunal's findings on noncompliance with legal procedures applicable to expropriation amount to arguments about whether the Tribunal's reasons are correct, and they are no basis for annulment.[143]

### (b) The Tribunal Stated Reasons for Concluding that Venezuela Violated Article 4(c) of the Portuguese Treaty and Article 4(1)(d) of the Luxembourg Treaty

154. According to the Respondents, the Tribunal stated reasons for its finding that Venezuela, by failing to pay compensation for the expropriation of the investment of Tenaris and Talta, also failed to meet the requirements for a lawful expropriation under the Treaties.

155. In the Respondents' view, the Tribunal made its Venezuelan law findings in the course of its inquiry into whether Venezuela complied with the requirements to observe Venezuelan law under Article 4(a) of the Portuguese Treaty and Article 4(1)(b) of the Luxembourg Treaty, but not as a necessary premise for its conclusion that the same failure to pay compensation also breached Article 4(1)(d) of the Luxembourg Treaty and Article 4(c) of the Portuguese Treaty.[144]

156. The Respondents also consider that Venezuela's allegation that the Tribunal did not consider its arguments that the failure to pay compensation does not render an expropriation *per se* unlawful under international law is unacceptable. In this regard, they state that the Tribunal's decision was governed by the Treaties as *lex specialis*, rather than general international law.[145]

---

[142] Counter-Memorial, para. 126; Rejoinder, para. 71.
[143] Counter-Memorial, para. 127.
[144] *Id.*, para. 129.
[145] *Id.*, para. 130; Rejoinder, para. 76.

157. Furthermore, the Respondents also object to Venezuela's arguments that the Tribunal should have determined whether Tenaris and Talta could have resorted to local procedural remedies, or that the provision of adequate procedures to obtain compensation was enough in order to fulfil the requirement to pay compensation. In this regard, the Respondents highlight the Tribunal's finding that the mere availability of additional domestic law remedies did not excuse Venezuela's failure to pay compensation.[146]

158. In sum, the Respondents claim that the reasons set out by the Tribunal on why the failure to pay compensation renders the expropriation unlawful are clear and straightforward to follow.[147]

### 4. GROUNDS RELATED TO THE DAMAGE ASSESSMENT METHODOLOGY

### i. <u>Manifest Excess of Powers</u>

159. The Respondents assert that the Tribunal did not manifestly exceed its powers in the assessment of damages.

160. As a preliminary remark, the Respondents state that Venezuela does not dispute that the Tribunal had the power to award and calculate damages, and submit that, in the exercise of that function, tribunals have a broad margin of appreciation.[148] In the Respondents' view, Venezuela's real complaint is not that the Tribunal exceeded its powers, but that the Tribunal committed errors when determining damages, which is no basis for annulment.[149]

161. The Respondents argue that there cannot be an excess of powers, manifest or otherwise, when the Tribunal acts within the scope of its jurisdiction and the applicable legal framework.[150] In this regard, the Respondents assert that the key issue is not whether the Tribunal adopted a position that was or was not advanced by either Party, but whether it assessed damages within the applicable legal framework. The Respondents claim that Venezuela cannot deny that the Tribunal applied the legal framework agreed between the Parties when awarding damages (that is, the international law that required the Tribunal to

---

[146] Counter-Memorial, paras. 131-132.
[147] *Id.*, para. 132.
[148] *Id.*, para. 73.
[149] *Id.*, para. 75.
[150] Rejoinder, para. 43.

assess the fair market value of the expropriated investment), even though the Tribunal ultimately applied that legal framework according to its own appreciation of the evidence.[151]

162. The Respondents state that the Tribunal established a legal test based on a standard of compensation endorsed by the Parties, which was the fair market value. Once such legal test was established, the Tribunal exercised its discretion in the review of the evidence submitted by the Parties to determine what that fair market value was.[152] According to the Respondents, international tribunals frequently reach damages assessments that differ from those advanced by the parties based on the evidence on the record. In any case, the Respondents highlight that the Tribunal assessed damages within the legal framework advanced by the Parties.[153]

163. The Respondents further state that for an excess of powers to be annullable, it must have a material impact on the outcome of the Award.[154] Insofar as the valuation adopted by the Tribunal was nearly identical to the figure put forward by an expert for Venezuela, any impact resulting from the adoption of that methodology would be either immaterial or in Venezuela's favour.[155]

164. On the other hand, the Respondents criticize Venezuela's argument that the Tribunal exceeded its powers by allegedly awarding duplicative damages. The Respondents submit that, with that allegation, Venezuela asks the Committee to review the Tribunal's findings of fact, which is beyond the role of an annulment committee and amounts to an impermissible attempt to appeal. In any event, the Respondents point out that there was no double counting of damages.[156]

### ii.   Failure to State the Reasons on which the Award is Based

165. The Respondents state that the Tribunal *(a)* explained its damages methodology; *(b)* did not omit any key steps in assessing damages; and *(c)* did not contradict itself when it determined damages.

166. First, the Respondents allege that the Tribunal explained in detail the damages methodology it used. After summarizing such explanations, the Respondents conclude that the Tribunal's

---

[151] *Id.*, paras. 44-45.
[152] Counter-Memorial, paras. 77-78.
[153] *Id.*, paras. 79-82; Rejoinder, para. 47.
[154] *See, e.g.*, Rejoinder, para. 15.
[155] Counter-Memorial, para. 83. *See also* Rejoinder, para. 49.
[156] Counter-Memorial, para. 84.

reasons for determining the value of the 2004 acquisition of Matesi's assets, relevant to an assessment of Matesi's fair market value, can be followed without difficulty.[157]

167. In addition, contrary to Venezuela's argument, the Tribunal was not required to state whether the methodology was an appraisal based on a 2004 transaction or a valuation based on the initial investment's cost, in order to satisfy the requirement to state reasons. In any event, throughout its analysis, the Tribunal mentioned that it assessed Matesi's fair market value based on an actual transaction relating to Matesi, which it considered as a proxy for fair market value of Respondents' interest in Matesi.[158]

168. Second, Respondents object to Venezuela's argument that the Tribunal failed to consider Matesi's debt as of the valuation date. The Respondents contend that the Tribunal clearly described its methodology for valuing Tenaris' and Talta's losses, and addressed Venezuela's double counting arguments in its Award, and again in the Decision on Rectification.[159] The Respondents allege that Venezuela's argument amounts to an impermissible allegation that the Tribunal incorrectly assessed fair market value, not a ground for annulment.[160]

169. The Respondents also criticize Venezuela's argument that the Tribunal failed to explain why the total amount of the Talta Loan should be recognized as additional damages (which Venezuela believes led to double counting of damages). The Respondents state that the Tribunal decided in the Award that said loan constituted an investment in its own right, as well as an additional investment of Talta that had been expropriated and for which Talta should be compensated. Therefore, the Respondents submit that the Tribunal's reasons for granting additional compensation are straightforward and that Venezuela's disagreement with the Tribunal's findings of fact in that regard does not amount to a failure to state reasons.[161]

170. Finally, the Respondents assert that Venezuela mischaracterizes the Tribunal's decision on damages by arguing that the Tribunal adopted a transaction-based methodology that suffered from uncertainties and, at the same time, rejected the damages methodologies discussed by the Parties due to their uncertainties. The Respondents point to the reasons provided by the

---

[157] *Id.*, paras. 133-134.
[158] *Id.*, para. 135.
[159] *Id.*, para. 137 (referring to paras. 566-570 of the Award, and paras. 101-105 of the Decision on Rectification). *See also* Rejoinder, para. 81.
[160] Counter-Memorial, para. 138.
[161] *Id.*, paras. 140-143.

Tribunal in paragraphs 525 to 532 of the Award in support of its decision to reject the DCF and market multiples method.[162]

171. In any case, the Respondents highlight the Tribunal's remark that, to the extent that certain factors rendered its valuation inaccurate, they would do so in favor of Venezuela. Moreover, the Respondents state that the Tribunal considered that its methodology established damages with reasonable certainty, while the methodologies advanced by the Parties did not.[163]

172. In sum, the Respondents submit that there was no contradiction and the Tribunal's reasoning on damages can be easily followed.[164]

### iii.   Serious Departure from a Fundamental Rule of Procedure

173. The Respondents state that the Tribunal's decision on damages in the Award did not violate any fundamental principle relating to the allocation of the burden of proof, the right to be heard, or the right to equal treatment.[165]

174. As regards the burden of proof, the Respondents indicate that the two key pieces of evidence on which the Tribunal based its valuation of Matesi were on the record and undisputed by Venezuela: the definition of fair market value applied by the Tribunal, and the value of the transaction on which the Tribunal based its valuation.[166]

175. The Respondents allege that Tenaris and Talta had to prove they had suffered a loss and submitted evidence that the Tribunal deemed sufficient to establish what the value of its investment would have been but-for Venezuela's measures. The Tribunal found that the Respondents adduced such evidence (in the form of the sale price for Matesi in 2004) and therefore the Respondents carried their burden of proof.[167]

176. Furthermore, the Respondents allege that the Tribunal did not violate the right to be heard or the right to equal treatment. The Respondents state that the power of a tribunal to reach a decision that differs from the positions taken by the parties is well-recognized. The exercise

---

[162] *Id.*, paras. 144-146 and footnotes 283 and 284.
[163] Rejoinder, para. 84.
[164] Counter-Memorial, para. 149.
[165] *Id.*, paras. 160-174.
[166] *Id.*, para. 162.
[167] Rejoinder, para. 114.

of that power cannot, without additional factors, constitute a departure from the right to be heard.[168]

177. In this regard, the Respondents refer to the decision on annulment in the case *Klöckner* and state that the committee considered that the tribunal had the discretion to adopt a position that was different from that advanced by the parties. The operative question, according to the committee, was whether the tribunal, in adopting its own position, went outside the legal framework established by the parties.[169]

178. In this case, the Respondents maintain that the Parties had a full, fair and equal opportunity to make submissions on the valuation of Matesi. Hence, it was within the discretion of the Tribunal to adopt the Parties' positions on that issue or a third position based on the evidence before it. According to the Respondents, the Tribunal acted within the legal framework agreed upon by the Parties (by basing the damages on an assessment of the fair market value in light of the evidence on the record) and did not deny the Parties the right to be heard on how that framework should be applied.[170]

179. Moreover, the Respondents stress that the Tribunal's decision to calculate the amount of damages using an alternative methodology, rather than the methodology adopted by the Parties, did not affect Venezuela because the figure produced was no higher than that endorsed by an expert for Venezuela.[171]

### 5. GROUNDS RELATED TO THE COSTS AWARD REGARDING THE REQUEST FOR RECTIFICATION

#### i. <u>Failure to State the Reasons on which the Decision on Rectification is Based</u>

180. Tenaris and Talta object to Venezuela's argument that the Tribunal's award of costs in the Decision on Rectification contradicts its decision on costs in the Award. In this regard, the Respondents state that although the Tribunal declined to award costs in the Award because some of Tenaris' and Talta's claims did not succeed, the Tribunal took a different approach

---

[168] Counter-Memorial, paras. 163-174.
[169] *Id.*, para. 167 (referring to *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2, Decision on Annulment dated 3 May 1985 (RLA-164), para. 91); Rejoinder, para. 106.
[170] Counter-Memorial, para. 169; Rejoinder, para. 107.
[171] Counter-Memorial, para. 174; Rejoinder, paras. 110, 115-117.

in the rectification phase, where all of Venezuela's requests failed. Therefore, the Tribunal's differing approach to two distinct situations presents no contradiction.[172]

181. In addition, the Respondents cite the Tribunal's conclusion in the Decision on Rectification that, since the request was not filed in conformity with the intent and the plain meaning of the terms of Article 49(2) of the ICSID Convention, the Tribunal deemed it appropriate that Venezuela paid Tenaris' and Talta's costs related to the rectification proceeding. The Respondents argue that Venezuela's disagreements with the appropriateness of the Tribunal's reasoning do not amount to a failure by the Tribunal to state reasons.[173]

### ii. Serious Departure from a Fundamental Rule of Procedure

182. The Respondents contend that the Tribunal did not depart from any fundamental rule of procedure when awarding costs to Tenaris and Talta in the rectification proceeding.

183. The Respondents object to the Applicant's argument that the Tribunal violated the parties' right to equal treatment by requiring Venezuela to pay the costs related to the rectification proceeding. The Respondents state that the Tribunal acted in conformity with the procedural power under Arbitration Rule 28, which grants discretion to the Tribunal to allocate costs to one of the Parties. Likewise, the Respondents argue that there is no procedural right to equal treatment as regards costs allocation.[174]

184. Moreover, the Respondents consider false Venezuela's premise that the allocation of costs to a party requires a frivolous or abusive conduct by such party (although the Tribunal did find in its decision that the rectification request "was not filed in conformity with the intent and plain meaning" of Article 49(2) of the ICSID Convention).[175]

185. The Respondents claim that the Tribunal itself expressly acknowledged that there were many authorities in support of the prevailing party receiving its costs and expenses from the opposing party.

186. In sum, the Respondents state that Venezuela's argument is not about departure from a fundamental rule of procedure, but rather a disguised attempt to appeal the costs award.[176]

---

[172] Counter-Memorial, paras. 150-152; Rejoinder, para. 89.
[173] Counter-Memorial, para. 152.
[174] *Id.*, paras. 175-176. *See also* Rejoinder, paras. 118-119.
[175] Counter-Memorial, para. 177 (internal quotation marks omitted, citing para. 113 of the Decision on Rectification).
[176] *Id. See also* Rejoinder, para. 118.

## V.   THE PARTIES' REQUESTS FOR RELIEF

### A.   THE APPLICANT'S REQUEST FOR RELIEF

187.  In its Reply, Venezuela requests as follows:

> "The Republic respectfully requests that the *ad hoc* Committee
> annul the Award in whole and/or in part as the case may be on the
> grounds set forth in Article 52(1)(b), 52(1)(d) and 52(1)(e) of the
> ICSID Convention.
>
> The Republic respectfully requests that Tenaris and Talta be ordered
> to bear the costs and expenses incurred by Venezuela in the course
> of this proceeding." [Committee's translation][177]

### B.   RESPONDENTS ON ANNULMENT'S REQUEST FOR RELIEF

188.  In their Rejoinder, Tenaris and Talta request as follows:

> "The [Respondents] accordingly request that the *ad hoc* Committee:
>
> (a)    REJECT Venezuela's request for annulment in its entirety; and
>
> (b)    ORDER that Venezuela bear all costs and expenses incurred by
>        the [Respondents] in connection with the present annulment
>        proceedings, including the fees of the Centre, the costs and fees
>        of the ad hoc Committee, and the [Respondents]' legal fees
>        and expenses."[178]

## VI.   THE COMMITTEE'S ANALYSIS

### A.   APPLICABLE STANDARD

189.  The ICSID annulment regime is governed by Article 52 of the Convention, and, insofar as it
is necessary to interpret it and bearing in mind that the Convention is a treaty, the Committee

---

[177] Reply, paras. 277-278.
[178] Rejoinder, para. 123.

will abide by the provisions of the Vienna Convention on the Law of Treaties ("**Vienna Convention**") which is widely regarded as a compilation of customary international law.

190. The Committee also deems relevant the principles informing the annulment proceeding asserted by annulment committees and summarized by the Secretariat:

> "(1) the grounds listed in Article 52(1) are the only grounds on which an award may be annulled; (2) annulment is an exceptional and narrowly circumscribed remedy and the role of an *ad hoc* Committee is limited; (3) *ad hoc* Committees are not courts of appeal, annulment is not a remedy against an incorrect decision, and an *ad hoc* Committee cannot substitute the Tribunal's determination on the merits for its own; (4) *ad hoc* Committees should exercise their discretion not to defeat the object and purpose of the remedy or erode the binding force and finality of awards; (5) Article 52 should be interpreted in accordance with its object and purpose, neither narrowly nor broadly; and (6) an *ad hoc* Committee's authority to annul is circumscribed by the Article 52 grounds specified in the application for annulment, but an *ad hoc* Committee has discretion with respect to the extent of an annulment, *i.e.*, either partial or full."[179]

191. The Committee notes that both Parties admit that the annulment proceeding is an extraordinary proceeding limited to the grounds set forth in Article 52. However, the Parties disagree on how to interpret and apply the grounds for annulment invoked by the Applicant. In particular, while the Applicant states that Article 52 should be interpreted neither expansively nor restrictively, the Respondents insist that the interpretation should be consistent with the objects, purpose and terms of Article 52, which were expressly devised to limit the scope of review. On the other hand, the Parties disagree on whether annulment committees have a duty to annul the award where one of the grounds of Article 52 is identified (Applicant) or whether they have discretion to do so (Respondents). The Committee will analyse the grounds below but notes that the disagreement on whether the Committee has discretion to annul the Award in case it upholds one of the grounds is an issue to be addressed only if necessary.

---

[179] Updated Background Paper on Annulment for the Administrative Council of ICSID dated 5 May 2016 ("**Background Paper**"), para. 74.

1. **MANIFEST EXCESS OF POWERS**

192. First, Venezuela bases its Application on the manifest excess of powers by the Tribunal. The Parties disagree on the scope of the adjective "manifest" qualifying "excess." The ordinary meaning of this adjective is "exposed, patent, clear".[180] Applied to "excess," the adjective "manifest" indicates that it must be patent and clear. This is the meaning on which most annulment committees agree as summarized by the Background Paper: "The 'manifest' nature of the excess of powers has been interpreted by *most ad hoc* Committees to mean an excess that is obvious, clear or self-evident, and which is discernable without the need for an elaborate analysis of the award."[181] It should be noted that, in some cases, committees have understood the meaning of "manifest" to require that the excess be "serious or material to the outcome of the case."[182] The seriousness of the excess is explained by the exceptional nature of annulment, a measure which should not be resorted to unless the excess had serious consequences for one of the parties.[183]

193. The Applicant has based its allegations on the interpretation of "manifest" by the annulment committee in the *Occidental* case. In said case, the committee agreed with the parties that "manifest excess" means "perceived without difficulty." Nevertheless, in the following paragraph, in reliance on *Pey Casado*, it added that "[t]he above said, 'manifest' does not prevent that in some cases an extensive argumentation and analysis may be required to prove that the misuse of powers has in fact occurred."[184] In the Committee's opinion, an issue requiring such extensive arguments and analysis could rarely be perceived without difficulty. The Committee will adopt the ordinary meaning of "manifest excess," that is, a clear and patent excess under the rules of interpretation of treaties of the Vienna Convention.

2. **FAILURE TO STATE THE REASONS ON WHICH THE AWARD IS BASED**

194. Second, the Applicant invokes as grounds for annulment the failure to state reasons. The Parties disagree on *(a)* the implications of the failure to state reasons in Article 52(1)(e) not

---

[180] Diccionario de la lengua española de la Real Academia Española, first entry of the adjective "manifiesto, ta". http://dle.rae.es/?id=OdqKbQC.

[181] Background Paper, para. 83 (emphasis added by the Committee, internal quotations omitted). The Committee refers to the cases cited therein.

[182] *Id.*, para. 83.

[183] *Libananco Holdings Co. Limited v. Republic of Turkey*, ICSID Case No. ARB/06/8, Decision on Annulment dated 22 March 2013, para. 102.

[184] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment dated 2 November 2015 (RLA-238) ("***Occidental***"), para. 59.

being qualified by a restrictive adjective, such as manifest or serious; *(b)* whether the award should deal with every question submitted by the Parties to the Tribunal, including the reasons for reasons; and *(c)* whether contradictory reasons call for annulment of the award even though the Tribunal's reasoning can be followed.

195. The Committee considers that the lack of adjectives qualifying the grounds of failure to state reasons does not imply that the text of Article 52(1)(e) should be broadly interpreted. Like the rest of the Convention, it should be neither broadly nor narrowly interpreted. The grounds qualified by "manifest," "serious" or "fundamental" are limited in their interpretation by the ordinary meaning of these adjectives only.

196. The issue of whether a tribunal should deal with every question submitted by the parties is based on Article 48(3) of the Convention. Undoubtedly, the tribunal should do so, and, should it fail to fulfil this duty, the parties may request that it deal with any undecided question, but this is not an issue to be determined by an annulment committee. As stated in the Background Paper:

> "While a Tribunal must deal with every question submitted to it, the drafting history indicates that a failure to do so should not result in annulment. Instead, the ICSID Convention provides another remedy where a Tribunal fails to address a question: the dissatisfied party may request that the same Tribunal issue a supplementary decision concerning the question not addressed."[185]

197. As to the effect of contradictory reasons, what really matters is, on the one hand, whether the contradiction is such as to prevent the tribunal's reasoning from being understood, and, on the other hand, whether the issue subject to this reasoning is material to the tribunal's decision. If the tribunal's reasoning can be followed, then reasons may not be genuinely deemed contradictory.[186]

---

[185] Background Paper, para. 103 (internal quotations omitted).

[186] "[A]nnulment under Article 52(1)(e) should only occur in a clear case. This entails two conditions: first, the failure to state reasons must leave the decision on a particular point essentially lacking in any expressed rationale; and second, that point must itself be necessary to the tribunal's decision. It is frequently said that contradictory reasons cancel each other out, and indeed, if reasons are genuinely contradictory so they might. However, tribunals must often struggle to balance conflicting considerations, and an *ad hoc* committee should be careful not to discern contradiction when what is actually expressed in a tribunal's reasons could more truly be said to be but a reflection of such conflicting considerations." *Compañia de Aguas del Aconquija S.A. and Vivendi Universal S.A. (formerly Compagnie générale des eaux) v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment dated 3 July 2002, para. 65.

### 3. SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

198. Third, the Applicant claims a serious departure from a fundamental rule of procedure. That is to say, the departure must be serious, and the rule has to qualify as fundamental. It is not enough for the tribunal to have departed from a rule of procedure, or for the departure to have occurred if it is not serious. Both the serious circumstances of the departure and the fundamental nature of the rule must exist.

199. The Parties disagree on whether the Applicant must show that such departure was material to the outcome of the case or whether it is enough to prove that the departure had the potential to produce an effect on the award. The Committee points out that annulment committee decisions are not uniform on this matter. The Background Paper indicates that, in some cases, annulment committees have required that the departure needs to have an impact on the outcome of the award to be serious.[187] On the other hand, Professor Schreuer, in his analysis of the meaning of "serious" in the practice of annulment committees, concludes: "[i]n order to be serious the departure must be more than minimal. It must be substantial. In addition, the cases confirm that this departure must potentially have caused the tribunal to render an award 'substantially different from what it would have awarded had the rule been observed.'"[188]

200. The Committee agrees that it is enough to prove that the serious departure could potentially have a material impact on the outcome of the award. As pointed out by the *Tulip* committee cited by the Applicant in support of its position:

> "To require an applicant to prove that the award would actually have been different, had the rule of procedure been observed, may impose an unrealistically high burden of proof. Where a complex decision depends on a number of factors, it is almost impossible to prove with certainty whether the change of one parameter would have altered the outcome."[189]

---

[187] Background Paper, para. 100.
[188] Christoph H. Schreuer *et al.*, *The ICSID Convention: A Commentary*, 2nd edition (Cambridge University Press, 2009), p. 982 in para. 287.
[189] *Tulip Real Estate and Development Netherlands BV v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment dated 30 December 2015 (CLA-126) ("***Tulip***"), para. 78. Cited in the Reply, para. 66.

201. In any event and to conclude these considerations on the applicable standard, the determination of whether a fundamental rule of procedure has been breached is factual in nature and involves an examination of the conduct of the proceeding before the tribunal.[190] Thus, the seriousness of the departure should be assessed on a case-by-case basis.

202. The Committee will bear these considerations in mind when analysing the Parties' allegations.

## B.   GROUNDS RELATED TO THE DECISION ON JURISDICTION

203. The Applicant alleges that, by determining that it had jurisdiction over the dispute, the Tribunal manifestly exceeded its powers, seriously departed from a fundamental rule of procedure and failed to state the reasons for its decision.

### 1.   MANIFEST EXCESS OF POWERS

204. The Applicant's allegation of manifest excess of powers by the Tribunal is founded on the Tribunal's failure to apply to the facts of the case the criteria it had adopted itself on the basis of the applicable Treaties in order to determine whether the corporate seat of Tenaris was in Luxembourg or the corporate seat of Talta was in Portugal. Venezuela agrees with the Tribunal's findings on the interpretation of the definition of "investor" in both Treaties but disagrees as regards its application by the Tribunal to the case-specific facts.

205. In its arguments, Venezuela reviews the Tribunal's reasoning in its examination of evidence point by point, but neither questions the limitations of this Committee to re-evaluate the evidence submitted nor considers how an excess of powers can be manifest if the Committee is required to weigh evidence again.

206. Venezuela invites the Committee to conduct "a thorough analysis of the jurisdiction erroneously assumed by the Tribunal, from the outset." [Committee's translation][191] In the Applicant's view, "in light of the evidence on the arbitration record, the application of the legal criteria established by the Tribunal itself could only have led it to conclude that it did not have jurisdiction to hear the dispute.".[192] [Committee's translation]

---

[190] Background Paper, para. 100.
[191] Memorial, para. 28.
[192] Reply, para. 158.

207. The Committee notes that, pursuant to the Arbitration Rules and consistently with the purpose of Article 52 of the Convention, it is for the Tribunal, not the Committee, to weigh the evidence adduced.[193] Annulment committees agree on this point. It would not be proper for this Committee to re-evaluate the evidence, nor is it in a position to do so without addressing the merits.[194] In *Rumeli v. Kazakhstan*, the annulment committee held that "an *ad hoc* committee is not a court of appeal and cannot therefore enter, within the bounds of its limited mission, into an analysis of the probative value of the evidence produced by the parties."[195]

208. The Applicant contends that it is not requesting that evidence be reconsidered, but, "on the contrary, that the elements that the Tribunal itself claimed that it had to demonstrate, were not demonstrated, and that the requirements of both 'place of constitution' and 'seat' not having been met by both Tenaris and Talta, they are not 'nationals' of Luxembourg and Portugal, respectively, the Tribunal thus lacking jurisdiction." [Committee's translation][196] Notwithstanding the Applicant's arguments, for the Committee to be able to decide whether these requirements have been proved, it would have to weigh the substance of the evidence submitted and reach its own conclusion.

209. Venezuela has clarified that the excesses of powers by the Tribunal "are manifest as any reasonably informed third party reading the Award, no inquest being necessary, may readily understand that the Tribunal established that it had to necessarily demonstrate certain parameters in order to determine that both a place of constitution and a seat existed (in accordance with the requirements laid down by both Treaties), but deemed as proven facts of which it had no evidence whatsoever, and, consequently, determined that it had jurisdiction when it did not." [Committee's translation][197] It is enough to dwell on the extensive allegations on this issue to realise that a simple reading of the Award by the Committee or a third party may not arrive at the definite conclusions reached by the Applicant. The fact that the Tribunal "has no evidence whatsoever" itself calls for considerable knowledge of the evidence which is or not on record.

---

[193] Arbitration Rule 34(1).
[194] *Duke Energy International Peru Investments No. 1 Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision on Annulment dated 1 March 2011 (CLA-121), para. 214.
[195] *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision on Annulment dated 25 March 2010 (CLA-120) ("**Rumeli v. Kazakhstan**"), para. 96.
[196] Reply, para. 159.
[197] *Id.*, para. 160.

210. In the Reply, the Applicant contends that, "pursuant to Article 52(1)(b) of the ICSID Convention, the ground of manifest excess of powers is established insofar as a tribunal has made a decision outside its jurisdiction or has failed to exercise its jurisdiction in full." [Committee's translation][198] The Respondents interpret this assertion to the effect that Venezuela alleges that a jurisdictional error would in itself entail an excess of powers that warrants annulment of the Award.

211. Although it is not obvious that the text cited from the Reply has the meaning assigned by the Respondents, the Committee, for the avoidance of doubt, clarifies that Article 52 does not distinguish between the effect of jurisdictional errors and errors concerning the merits of the dispute. Such a distinction is alien to the text of Article 52 as several annulment committees have stated.[199] That is to say, in the event of an excess of powers in the decision on jurisdiction, that excess must be as manifest as in the case of the merits. The Committee may not disregard a term included in an article of the ICSID Convention, depending on the subject of analysis.

212. In consideration of the foregoing and reaffirming that it is for the Tribunal to weigh evidence and be the judge of its own competence, the Committee finds that in this respect the Tribunal did not manifestly exceed its powers in its decision on jurisdiction.

213. Venezuela also alleges that, in its decision on jurisdiction, the Tribunal manifestly exceeded its powers by failing to apply the proper law. According to Venezuela, the dispute resolution clauses of both Treaties fail to show "the distinction made by the Tribunal between a *renvoi* to municipal law for the purpose of nationality requirements of place of constitution *vis-à-vis* seat." [Committee's translation][200] Venezuela contends that this distinction is inadmissible and argues that the requirements of *seat* and *siège social* identified by the Tribunal are those imposed by municipal law, not by international law as found by the Tribunal in the Award.

214. In other words, the issue to be determined by the Committee is whether the Tribunal applied international law where the national law of Portugal or Luxembourg was the proper law. First, the Committee notes that the Applicant does not object to the notions of *seat* and *siège social* identified by the Tribunal as it does in the first part of these considerations on

---

[198] *Id.*, para. 129.
[199] *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment dated 21 March 2007 (RLA-177), para. 54; *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision on Annulment dated 5 June 2007 (RLA-179), paras. 118-119.
[200] Reply, para. 163.

the jurisdiction of the Tribunal. In that phase, the Applicant alleges that the Tribunal failed to weigh the evidence adduced in view of the requirements for the notions of *seat* and *siège social* to exist.

215. The Tribunal determined that, on the basis of the Treaties, the terms *seat* and *siège social* were to be construed under international law, since the Treaties make no *renvoi* to national laws regarding this issue as opposed to the terms "citizen", company "constituted", "nationals", companies that "are constituted and operating" where there is a *renvoi* to national laws. In the case of *seat* and *siège social*, the Tribunal merely considered national laws as "background" and supplementary material to the interpretation of these terms,[201] and insisted that "the interpretation of the terms '*siège social*' and '*sede*' remains a matter of international law alone (there being no express *renvoi* to municipal law for either term) […]."[202] The Tribunal considered national laws in connection with Article 32 of the Vienna Convention "in order to confirm the interpretation at which it has arrived pursuant to Article 31," maintaining that, on such basis, "it may have regard to municipal law (*e.g.*, in order to ensure that the interpretation under Article 31 is not impossible, or unworkable as a practical matter)."[203] Having regarded the "extensive evidence and submissions on Luxembourg, Portuguese and Venezuelan law" as supplementary material, the Tribunal arrived "at the firm conclusion that there is nothing as a matter of Luxembourg, Portuguese or Venezuelan law that causes it to re-consider the interpretation of '*siège social*' and '*sede*' to which the application of Article 31 of the Vienna Convention gives rise."[204]

216. In response to Venezuela's allegation that the definitions of "corporate investor" in the Treaties were to be construed pursuant to Article 25 of the ICSID Convention, the Tribunal reaffirmed that "the interpretation of the terms '*siège social*' and '*sede*' remains a matter of international law alone (there being no express *renvoi* to municipal law for either term)[…]."[205] According to Venezuela, there is nothing that "puts domestic law in tension with international law, so that the latter has to prevail over the former." [Committee's translation][206] In the Committee's opinion, it is not a question of one law being in tension with respect to another in order to determine the proper law. The Tribunal applied national

---

[201] Award, para. 169.
[202] *Id.*
[203] *Id.*, para. 170.
[204] *Id.*, para. 171.
[205] *Id.*, para. 169.
[206] Reply, para. 164.

law in its interpretation only as a supplementary element under Article 32 of the Vienna Convention. The Committee finds that the Tribunal did not exceed its powers by applying international law to the interpretation of the terms *seat* and *siège social* in the Treaties.[207]

### 2. FAILURE TO STATE THE REASONS ON WHICH THE AWARD IS BASED

217. According to Venezuela, "it is not possible to understand how the Tribunal, having identified the premises correctly, reached conclusions… which are plainly contradictory therewith." [Committee's translation][208] Second, the Applicant also asserts that the Respondents' argument whereby "the Tribunal had considered the location of board meetings as just one of a number of factors in determining the seat of effective management in Luxembourg"[209] is groundless [Committee's translation].

218. In the Committee's view, both issues are related, and the answer to the first depends on whether the board meetings were actually identified as one factor among others in order to determine the place of effective management.

219. The Tribunal analysed *seat* and *siège social* as defined in the Treaties and concluded the analysis of the text by stating: "if '*siège social*' and '*sede*' are to have any meaning, and not be entirely superfluous, each must connote something different to, or over and above, the purely formal matter of the address of a registered office or statutory seat. And this leads one to apply the other well-accepted meaning of both terms, namely 'effective management', or some sort of actual or genuine corporate activity."[210] The Tribunal continued analysing the text of the Treaties in view of their objects and purposes: "Nothing in the evident objects and purposes of either Treaty suggests that a purely formal test of 'registered office' or 'statutory office' is required. And nothing suggests that a requirement of a genuine link would somehow undermine any object or purpose. On the contrary, if anything, requiring some

---

[207] The Committee is aware that, in the *CFHL* case discussed by the Parties at the Hearing, the tribunal considered that "it would not be consistent to use a completely different principle to define 'siège social' when it is not put into question that both conditions are cumulative. The character of Investor is a single capacity and cannot depend on two different sources." Tr. Day 2, 246:11-16 (citing *Capital Financial Holdings Luxembourg S.A. v. Republic of Cameroon*, ICSID Case No. ARB/15/18, Award dated 22 June 2017 (RLA-266) ("**CFHL**"), para. 210). The tribunal's finding in such case does not imply that the Tribunal's interpretation in the Award was erroneous; it merely shows that the text of the Treaty may be read differently. The tribunal itself noted that the definition of company in Article 1(2) of the Cameroon treaty was ambiguous (award, para. 205). It is not the function of the Committee to choose which of the interpretations could be more convincing.

[208] Reply, para. 171.

[209] *Id.*, para. 174.

[210] Award, para. 150.

genuine link with one Contracting State would appear to be consistent with the bilateral / reciprocal nature of each Treaty."[211]

220. Then, the Tribunal indicates that, "[h]aving arrived at a meaning for both terms in the context in which they appear here, there is then a question as to the precise test that each imports."[212] To that effect, the Tribunal considers it critical "to take into account the actual nature of each company, and its actual activities."[213] Given the Respondents' nature of holding companies, "the Tribunal considers that the test of actual or effective management must be a flexible one, which takes into account the precise nature of the company in question and its actual activities."[214] The Tribunal distinguishes between the existence of Tenaris as a holding company and the existence and operation of its subsidiaries located outside Luxembourg. The Tribunal finds: "Accordingly, the Tribunal considers Venezuela's focus upon the extent of activity of, and net sales generated by, Tenaris' subsidiaries outside Luxembourg, and the number of subsidiaries Tenaris has in countries other than Luxembourg, is misconceived. It is Tenaris' own operation within Luxembourg that must be examined for the purposes of the Luxembourg Treaty."[215]

221. Next, the Tribunal refers to the organization and structure of Tenaris in accordance with the Luxembourg Registry of Commerce and Corporations and its articles of association and highlights a number of "key points"[216] with respect to the actual management of Tenaris and its business in Luxembourg. Among others, the Tribunal mentions the fact that annual general meetings of shareholders and board of directors' meetings are held in Luxembourg, that its books and records are kept in Luxembourg, and that its auditors are Luxembourgish. As to other criteria raised by Venezuela by reference to Luxembourg law, the Tribunal agrees with the Respondents that they are irrelevant or inaccurate, as "the test to be applied in each Treaty here is ultimately one of international law, not Luxembourg law."[217] Nonetheless, "for completeness,"[218] the Tribunal explains the reasons why the criteria raised by the Applicant are dismissed.

---

[211] *Id.*, para. 153.
[212] *Id.*, para. 197.
[213] *Id.*, para. 198.
[214] *Id.*, para. 200.
[215] *Id.*, para. 204 (internal footnotes omitted).
[216] *Id.*, para. 207.
[217] *Id.*, para. 217.
[218] *Id.*

222.   The Tribunal conducts the same exercise with regard to Talta and finds as to both companies that, in view of the nature of each company and the Treaty provisions, both companies have shown that their respective seats are in Luxembourg and Portugal.

223.   The Committee has thoroughly reviewed the Tribunal's reasoning. In the Committee's opinion, the Tribunal's considerations can be followed without difficulty and have a logical sequence. They are determined by the application of international law to the terms *seat* and *siège social*, as well as the Respondents' nature of holding companies.[219] It is noteworthy that the evidence analysed by the Tribunal goes beyond board meetings, and, thus, the Applicant's emphasis on such lack of evidence should be placed in the broader context analysed by the Tribunal. Therefore, the Committee determines that the Tribunal did not fail to state reasons.

### 3.   SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

224.   The Applicant's allegations are grounded on the premise that the Tribunal weighed evidence arbitrarily on the basis of mere presumptions and shifted the burden of proof to the respondent in the arbitral proceeding. On the first point, the Applicant specifies that "it does not question the Tribunal's findings with respect to a specific evidentiary element, but rather that the Tribunal presumed facts that Tenaris and Talta were to prove in order for it to assert its jurisdiction but they did not demonstrate them." [Committee's translation][220] According to the Applicant, the Tribunal thus violated its right of defence and the equality of arms between the Parties.

225.   The shortage of evidence about which the Applicant complains is difficult to perceive without the Committee evaluating the sufficiency of what was proved and, ultimately, the value attached by the Tribunal to the evidence submitted, which is beyond the scope of competence of the Committee. The Committee refers to its considerations on failure to state reasons in the foregoing section.

---

[219] The Committee notes that the tribunal in the *CFHL* case, which was discussed by the Parties at the Hearing (*see supra* note 207), agrees with the Tribunal on taking into consideration the nature of holding companies as well as on conducting a flexible analysis of the criteria in order to determine the place of actual management. Award, paras. 242-243.

[220] Reply, para. 125.

226. As to the second point, the Applicant refers to the jurisprudence of the International Court of Justice and arbitral tribunals to demonstrate the effectiveness of the principle whereby it is for the party alleging a fact to show its existence. The Parties do not disagree on this point. As stated by Tenaris and Talta: "It is undisputed that the Claimants had the burden of proving facts necessary for the Tribunal to assert jurisdiction, just as any party bears the burden of proving the facts it asserts."[221]

227. Venezuela's allegation is based on that, "in the instant case, the Tribunal shifted the burden of proof when contending that 'the Respondent has been singularly unable to identify and demonstrate any other corporate seat for Tenaris, outside of Luxembourg'. It was not for the Republic to prove that Tenaris had other corporate seats, but for Tenaris to show that its corporate seat was indeed in Luxembourg." [Committee's translation but for the Award quotation][222]

228. The Committee observes that Venezuela's allegation is based on paragraph 216 of the Award whereby "the Tribunal notes that the Respondent has been singularly unable to identify and demonstrate any other corporate seat for Tenaris, outside of Luxembourg. It was not until its Rejoinder that it posited Argentina, but in the Tribunal's view this has no foundation. In particular, the Respondent has been unable to point to any consistent acts of management of Tenaris itself (as distinct from its subsidiaries) taking place elsewhere."[223] This paragraph follows considerations by the Tribunal based on the evidence on record that lead the Tribunal to conclude that "the 'effective' centre for such activity was Luxembourg."[224] The Tribunal lists the pieces of evidence and only later refers to the shortcomings in Venezuela's allegations. As it clearly follows from the text of the Award, Venezuela had raised its arguments against the Respondents' claims and these deserved a response from the Tribunal. In its context, the paragraph cited does not entail a demand by the Tribunal for Venezuela to submit evidence, but rather the other side of each party proving the facts that it alleges. The Tribunal addressed the criteria asserted by Venezuela, rejected them because they were based on Luxembourg law and considered them irrelevant or inaccurate, but still explained each one of them. The Committee finds that the Tribunal neither shifted the burden of proof nor breached any fundamental rule of procedure.

---

[221] Rejoinder, para. 95 (internal footnotes omitted).
[222] Reply, para. 117.
[223] Award, para. 216.
[224] *Id.*, para. 205.

## C. GROUNDS RELATED TO THE DECISION ON EXPROPRIATION

### 1. MANIFEST EXCESS OF POWERS

229. Venezuela bases this ground on the fact that the Tribunal failed to apply the proper law to the dispute, analysed expropriation only from the standpoint of Venezuelan law, and applied neither international law nor the Treaty provisions for dispute resolution.

230. This ground is related to the failure to state reasons to be addressed by the Committee *infra*. The Committee highlights, in particular, that the proper law applicable to expropriation under the Treaties is Venezuelan law, and there is no dispute that this was the law applied by the Tribunal. As stated *infra*, the Tribunal limited itself to follow the Treaty provisions on the application of Venezuelan law in order to determine whether the expropriation was lawful.

### 2. FAILURE TO STATE THE REASONS ON WHICH THE AWARD IS BASED

231. The Applicant alleges that the Tribunal failed to state reasons as it did not explain how the breach of requirements under Venezuelan law amounts to a breach of the Treaties, and "why it considers that the phrase '*in accordance with the legislation in force*' is an 'explicit' reference to a version of Venezuelan law under which court remedies that the Claimants could have availed themselves of would not be considered." [Committee's translation][225] The Applicant further alleges the lack of explanation in the comparisons made by the Tribunal with the cases *Generation Ukraine* and *ADC v. Hungary*. According to Venezuela, "paragraphs 490 to 492 of the Award are a typical case where it is not possible to understand how the Tribunal proceeded from Point A to Point B and eventually to the conclusion that, for those reasons, there was an expropriation in violation of the Treaties."[226] [Committee's translation]

232. The Committee has reviewed the Tribunal's considerations on the expropriation and, in particular, the paragraphs highlighted by Venezuela in its allegations. The Tribunal's considerations must be analysed based on the text of the Treaties. The Treaties require that expropriation be carried out under "legal procedures" and "in accordance with the legislation in force", respectively. The Tribunal carefully analysed the requirements for an

---

[225] Memorial, para. 122. Italics in the original.
[226] *Id.*, para. 121.

expropriation to comply with Venezuelan law, including payment of fair compensation.[227] The Committee does not find it difficult to follow the reasoning of the Tribunal, no additional reasons being necessary to explain the passage from Venezuelan to international law. An instrument of international law may require compliance with certain requirements under domestic law, as in the present case. In the event that such requirements are not met, the breach of domestic law translates into a breach of international law. The Committee is aware of the fact that not every breach of domestic law is a breach of international law, but in this case it is the Treaties that provide that a breach of domestic law results in a breach of international law.

233. In paragraph 494 of the Award "[t]he Tribunal further concludes that the failure of Venezuela to observe the requirements of its own nationalisation legislation is sufficient to constitute a breach of Article 4(a) of the Portuguese Treaty, which has an explicit *renvoi* to Venezuelan domestic law through the language: '*in accordance with the legislation in force.*'"[228] In the next paragraph, the Tribunal expresses that it is satisfied that "Venezuela has breached the requirement of Article 4(1)(b) of the Luxembourg Treaty to the extent that its conduct was not: '*in accordance with legal procedures.*'"[229]

234. These conclusions follow the enumeration of violations of Venezuelan law. The Tribunal links the violation of Venezuelan law to the provisions of the Treaties. The latter were applied by the Tribunal in reference to Venezuelan domestic law. The Committee does not find any lacuna in the Tribunal's reasoning to connect the Treaties to the Tribunal's findings in this regard.

235. As previously indicated, the Applicant argues that the Tribunal failed to explain why, in referring to Venezuelan law, it only applies certain provisions and does not include the judicial remedies to which the Respondents could have resorted. As stated in the Award, "Venezuela urges the Tribunal to have in mind […] that an investor cannot assume that a lack of diligence in pursuing local remedies will have no bearing upon the success of any eventual treaty claim that it might seek to bring."[230] The Tribunal considered this argument and pointed out that "Venezuela had put in place a 'tailor made' process, which Venezuela

---

[227] Award, paras. 481 *et seq.*
[228] Award, para. 494. Italics in the original.
[229] *Id.*, para. 495. Italics in the original.
[230] *Id.*, para. 490.

itself then chose not to follow,"[231] adding that Venezuela could not expect that "the obligation to observe those requirements [lay] solely on the investor's shoulders."[232]

236. The Applicant has critically referred to the use of precedents by the Tribunal, either because it refers to only a few or does not explain in which way they differ from or are similar to the present case. The Committee notes that nothing in the ICSID Convention requires tribunals to rely on precedents for their decisions or to refer to them. However, it is apparent that tribunals (and annulment committees) cite frequently previous decisions and case-law trends on certain matters may be observed. The persuasive value of certain precedents has often been confirmed by ICSID arbitral tribunals. Notwithstanding the above, it seems clear to the Committee that the use (or lack of use) of precedents may not be a ground for annulment, as apparently claimed by the Applicant when stating that: "The Tribunal merely notes, in a single paragraph, that the present case is similar to *ADC v. Hungary* without providing any reason for such a conclusion, again incurring in failure to state reasons."[233] [Committee's translation] The Applicant further alleges that the Tribunal compares this case to certain aspects of *Generation Ukraine*, but fails to explain the reasons for such comparison. The Committee will not discuss how the Tribunal took into account the relevance or the persuasive value of those cases. The Committee will merely note the limited scope of the precedents used by the Tribunal in the underlying arbitration in order to establish a ground for annulment.

237. In conclusion, the Committee dismisses the Applicant's allegations concerning a failure to state reasons on the decision on expropriation.

## D.  GROUNDS RELATED TO THE DAMAGE ASSESSMENT METHODOLOGY

### 1.  MANIFEST EXCESS OF POWERS

238. The Committee considers and dismisses in section VI(D)(3) *infra* that the use by the Tribunal of a methodology not advocated by the Parties constitutes —in the circumstances of this case— a violation of a fundamental rule of procedure. The same considerations apply herein. The Applicant relies on a case to which refers the annulment committee in *Wena Hotels* and on another case of the French Court of Cassation. In the latter, the Court decided that

---

[231] *Id.*, para. 492.
[232] *Id.*
[233] Memorial, para. 124.

arbitrators might only rule on what they had been authorized to. A basic maxim which could be hardly questioned.

239. As regards *Wena Hotels*, the reference is to a citation of a case about boundary lines in the decision on annulment. The committee cites it to explain the concept of manifest excess of powers in general terms. Clearly, when a tribunal sets boundaries without consulting the parties is exceeding its powers; it is a good example that illustrates the concept of excess. However, in the underlying arbitration, the purpose was not to set boundaries but merely to assess damages. Neither of those two cases cited by the Applicant is of assistance to the Committee.

240. Although there was some agreement between the Parties on the DCF method, the Tribunal pointed out that, as it was used by the Parties' experts, it yielded extreme results that the Tribunal found barely useful according to its own considerations. Like other tribunals cited by the Committee have done, the Tribunal searched for elements in the allegations and evidence presented by the Parties that helped it render a decision. As concluded by the Committee, the Tribunal acted within its discretion in assessing damages and did not manifestly exceed its powers.

241. The Applicant further adduces the alleged double counting of damages as evidence of manifest excess of powers. According to the Applicant, the Tribunal's mandate did not include "granting unjust enrichment in favor of Claimants."[234] [Committee's translation] The Committee shall treat this allegation together with the ground of failure to state reasons to which it is closely related.

## 2. FAILURE TO STATE THE REASONS ON WHICH THE AWARD IS BASED

### i. Failure to Explain the Tribunal's Approach or Methodology

242. According to Venezuela, the Tribunal does not precisely define the valuation approach it uses. Under the Treaties, the Tribunal should calculate the Fair Market Value. The Committee notes that the Tribunal, after discarding the DCF and market multiples valuation methods, cites Kantor and considers that "[t]he best evidence of a company's value, or course [*sic*], may be the actual price received in an arm's-length transaction for the sale of an interest in that very business."[235] Then, it lists the conditions that the agreed price must meet in order

---

[234] *Id.*, para. 169.
[235] Award, para. 555.

to express the Fair Market Value. The Tribunal concludes its analysis of the sale of Matesi in these terms:

> "Having considered all of the evidence before it, the Tribunal is satisfied that the resulting transaction was freely entered into by the buyers and seller, at arm's length, in a reasonably open market, with both the seller and the buyers having reasonable knowledge of the relevant facts and other market circumstances. The Tribunal is, thus, satisfied that the agreed price of US$ 60.2 million for Talta's 50.2% interest in Matesi is an appropriate reflection of the Fair Market Value of Talta's interest in the Matesi plant."[236]

243. In view of the Tribunal's reasoning, it is evident that the Tribunal adopts the arm's-length sale approach. The Committee does not deem that it was necessary for the Tribunal to explain beyond the statements in this paragraph to know which approach it used.

### ii.   The Tribunal Failed to Explain why it Missed Key Steps in Calculating Damages

244. The Applicant refers to two steps, both relating to Matesi's debt. According to the Applicant, the Tribunal did not take into account the company's debt and included the Talta Loan in the calculation of damages. The Committee considers them together.

245. The Tribunal had decided that the Talta Loan was an investment, separate from the acquisition of the company, and had been expropriated. The Tribunal explained:

> "Turning briefly to the issue of the Talta Loan, the Tribunal has given careful consideration to the arguments of Respondent to the effect that this loan was non-performing, or was never intended to be repaid, or that the US$ 27.1 million remaining as unpaid on Matesi's books should not be considered an investment – or, if it is, it should be excluded from the calculation of compensation, because it amounts to double counting.
>
> As set out earlier, the Tribunal has concluded that, pursuant to the Investment Agreement, Talta had committed to advance an

---

[236] *Id.*, para. 566.

additional US$ 60 million partially to finance the purchase of the Posven assets and to contribute to the costs of refurbishment. It is thus satisfied that the outstanding balance of the Talta Loan – whether it is considered still to be a loan or, instead, a contribution to the equity of Matesi – represents a legitimate investment by Talta for which Talta must be compensated."[237]

246. The Tribunal lists the Applicant's arguments and, in the Committee's view, its reasoning can be followed. According to the Tribunal, the Talta Loan represented an additional investment to purchase the Posven assets and to contribute to the costs of refurbishment of Matesi. The issue was again discussed as part of the Request for Rectification. The Tribunal merely referred to its statements in the Award and concluded: "The double-counting issue was thus addressed and rejected in the Tribunal's Award."[238]

247. In light of the foregoing, the Committee finds that the Tribunal did not miss any key steps in the calculation of damages, as claimed by the Applicant, and that nothing in the Tribunal's decision leads the Committee to conclude that such decision entailed an unjust enrichment of the Respondents since the Tribunal considered the Talta Loan to be an additional investment.

### iii. The Contradictions in the Tribunal's Analysis

248. The Applicant alleges that contradictions arise from dismissing the DCF and market multiples approaches on account of their uncertainties or lack of reasonable certainty and, nevertheless, relying on a valuation approach which suffered from the same sort of uncertainties.

249. The Committee notes that the Tribunal analysed in detail these uncertainties:

"Given the normal need for adjustments during the start-up period, the ups and downs of pellet production and delivery, and the brevity of operation of the plant under its owners, serious questions are presented in using the available data from this short, initial period to construct a DCF model. Similarly, the prospects for future supplies of pellets and iron seem even more problematic. In addition, the

---

[237] *Id.*, paras. 568-569.
[238] Decision on Rectification para. 105.

sharp decline in CVG FMO pellet production adds another obstacle to the reliable projection of Matesi's future free cash flow – and therefore also for the application of the DCF approach.

Finally, these uncertainties are compounded by other government interventions in the market place, as well as unstable inventories and shortages of a wide range of products in the Venezuelan market. It is not appropriate for this Tribunal to express itself, either positively or negatively, on the policies of the government of Venezuela. It observes, simply that general economic conditions in Venezuela as well as the business situation at Matesi did not, at the time of expropriation – or later – give rise to the likelihood that Matesi's free cash flows could be projected with reasonable certainty."[239]

250.  Likewise, it pointed to the uncertainties of the market multiples approach:

"As the Tribunal has indicated above, in the context of the DCF method, the uncertainties presented in the Venezuelan market at the time of the expropriation presented complex circumstances which render comparisons of the value of Matesi with even ostensibly similar companies in other countries very difficult indeed. The Tribunal is not persuaded that the five companies selected by Claimants' experts as most comparable to Matesi (all of which operate in India and which make somewhat different products with different technologies) provide reliable guidance to the Tribunal on the basis of which it might proceed to achieve a satisfactory finding of value in this case."[240]

251.  Venezuela's allegation concerns the Tribunal's observations after concluding that: "[it was] satisfied that the resulting transaction was freely entered into by the buyers and seller, at arm's length, in a reasonably open market, with both the seller and the buyers having reasonable knowledge of the relevant facts and other market circumstances."[241]

---

[239] Award, paras. 526-527.
[240] Id., para. 532.
[241] Id., para. 566.

252. The Tribunal explains that "a sale closer to the date of expropriation would likely be more fair and more reliable."[242] This would evidently be the case, but this consideration does not mean that the Tribunal considered it as reliable or less reliable than the DCF or the market multiples approach. The Tribunal further explains that the nationalization of the steel industry has contributed to "an environment in which the traditional approaches to establishing fair market value confront serious difficulties." Clearly, this consideration is general and affects all methodologies that seek to calculate the fair market value, including those used by the Parties.

253. The Applicant submits that the Tribunal's reluctance to accept Matesi's sale price is unexplained, as well as why the Tribunal considered it unfair and unreliable. First, the Tribunal uses less categorical terms and says that the date of expropriation would "*likely* be more fair and more reliable."[243] The Tribunal's reluctance is explained by the preceding considerations. The Tribunal had previously explained that using Matesi's sale as a valuation basis does away the uncertainties inherent to future cash flows and of finding comparable companies. The fact that the Tribunal, in its careful reasoning, stated the difficulties following the nationalization of the industry or the time elapsed since the sale of Matesi, does not mean that the uncertainties why the Tribunal rejected the other valuation methods are less valid.

254. The Applicant has referred to the annulment of the award in *Teco v. Guatemala* in support of its allegation of contradictory reasons of the Tribunal. According to the Applicant, this award was annulled because "the reasons to decide on the historical damages claim were not clear, mainly because the expert reports on that matter had not been reviewed, which made it difficult to follow the tribunal's reasoning on such claims."[244] [Committee's translation]

255. The Tribunal reviewed the expert reports but dismissed them for the aforementioned reasons. The Tribunal evaluated degrees of certainty and determined the price that, in its opinion, was more certain. In the Committee's view, the Tribunal indisputably explained that the actual price paid in a sale, even if it dates back a few years, is more certain than a price calculated on the basis of uncertain future cash flows or doubtfully comparable companies *per se* or on account of the markets they operate in.

---

[242] *Id*., para. 567.
[243] Italics added by the Committee.
[244] Memorial, para. 177 (referring to *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment dated 5 April 2016 (RLA-244) ("***Teco v. Guatemala***"), para. 138).

3. **SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE**

i. **Burden of Proof and Due Process**

256. The Applicant alleges that, in rejecting the methodologies advanced by the Respondents, the Tribunal decided that the latter failed to satisfy their burden of proof. Notwithstanding that decision, "instead of dismissing Claimants' damages claim in view of the apparent failure to satisfy their procedural burden, the Tribunal adopted a new methodology never discussed by the parties and ordered payment of damages, replacing the claimants' intended role."[245] [Committee's translation]

257. A distinction should be drawn between the evidence of the damage caused and the assessment of its amount. The expropriation of Matesi is undisputed. The purpose of the arbitration was to determine whether the expropriation had been unlawful and the relevant quantum, if any. After addressing the first issue, the Tribunal stated: "In light of the evidence before it, the Tribunal is in no doubt that Venezuela failed to implement the procedures that it had put in place to effect the nationalisation of SIDOR and its subsidiaries and, specifically, Matesi."[246] The Tribunal based its decision on Venezuela's liability on the evidence produced in the context of the proceedings. The next step is to determine the quantum of the damage established. In the Committee's view, the Tribunal did not "replace the claimants' intended role", in terms of burden of proof. Upon determining the quantum, the facts are established. The issue raised by Venezuela is the Tribunal's discretion to calculate damages, which is addressed *infra*.

ii. **Violation of the Parties' Right to be Heard**

258. The Applicant claims that "the opportunity to discuss and argue about the damages methodology to be adopted by the Tribunal is essential because, as acknowledged by several *ad hoc* committees, the use of a methodology different from that advanced by the parties is a substantial defect that changes the outcome of the case."[247] [Committee's translation] In turn, the Respondents argue that "it was within the discretion of the tribunal to adopt the Parties' positions on that issue or a third position based on the evidence before it, even if it

---

[245] *Id.*, para. 159.
[246] Award, para. 493.
[247] Memorial, para. 162.

did not choose to solicit additional submissions on the position eventually adopted."[248] According to the Respondents, "[a] tribunal is not required to submit its chosen methodology to the parties for advance comment. All that a Tribunal is required to do is to render a damages award that fits within the applicable legal framework […]"[249]

259. In the Award, the Tribunal notes that the experts agree on the definition of fair market value. Also, there is some consensus —at least superficially— among the experts as regards the appropriate methodology (DCF). However, whereas Venezuela's experts concluded that Talta's interest in Matesi was nil, Tenaris' and Talta's experts calculated such interest —and therefore the damage payable by Venezuela— at USD 239 million. In view of this discrepancy and the market circumstances in Venezuela, the Tribunal stated that it had "carefully considered both the DCF and 'market multiples' approaches, as put forth and then critiqued by the Parties' respective experts and counsel."[250] Then, the Tribunal made the following considerations about the valuation approaches:

> "The Tribunal recognises that parties in investment cases may be prone to adopt dramatically contrasting approaches to the presentation of quantum issues in order to maximise a position – or to minimise that of the opposing party. Such a conflict can result in little or no engagement between the methodological arguments and valuation theories advanced by the opposing parties. In consequence, tribunals have based their findings upon other evidence and argument in the record introduced by each party in an attempt to arrive at a quantum determination in which they consider that they can have the requisite degree of confidence. In so doing tribunals have, per force, sometimes made use of valuation procedures, which are generally acknowledged to be sound, but which differ from the principal valuation theories advanced by the parties. That is the position in this case in that, for the reasons set out below, the Tribunal has concluded that in the circumstances of

---

[248] Counter Memorial, para. 169.
[249] Rejoinder, para. 106.
[250] Award, para. 523.

this case, there are major flaws in the principal approaches adopted by both Claimants and by Venezuela."[251]

260. Several tribunals in other cases have made similar considerations when they believed that the approaches used by the parties were unconvincing, and have performed their own valuation without turning to the parties. In *Gemplus v. Mexico*: "The Tribunal does not consider the DCF method to be an appropriate methodology to apply on the facts of the present case; and it rejects the Claimants' case on the use of the DCF method […]."[252] Similarly, the Tribunal rejects any method other than the DCF method advanced by the respondent and concludes: "Having rejected the Parties' respective primary cases, as to their respective DCF and Non-DCF methods, *it is necessary for the Tribunal to steer an appropriate middle course, between Scylla and Charybdis* […]"[253]

261. The same line of reasoning was adopted by the tribunal in *Khan v. Mongolia*:

> "The Tribunal has been presented with three principal methodologies by the Parties: DCF, market comparables and market capitalisation. The Tribunal examines each of the methodologies below, but has ultimately come to the conclusion that – while all of them are valid and widely-used methods for valuing mines – none of these methodologies are wholly satisfactory in the present case. This conclusion is not a reflection on the expert witnesses, all of whom the Tribunal found to be helpful and professional. Ultimately, however, the Tribunal considers that the true value of Khan's investment is better reflected by the offers made for the mine or for Khan Canada's shares in and around the relevant period than by the more traditional methodologies advanced by the Parties."[254]

262. In *National Grid*, the Tribunal appointed its own expert after consulting with the parties, which were given the opportunity to raise their objections on said expert's recommendations. Nevertheless, the Tribunal in *National Grid* held as follows:

---

[251] *Id.*, para. 523 (internal footnote omitted).

[252] *Gemplus, S.A., SLP, S.A., Gemplus Industrial, S.A. de C.V., and Talsud S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 and ARB(AF)/04/4, Award dated 16 June 2010 (RLA-195) ("***Gemplus v. Mexico***"), paras. 13-72 and 13-73.

[253] *Id*., para. 13-75. Italics added by the Committee.

[254] *Khan Resources and others v. Mongolia*, UNCITRAL, Award dated 2 March 2015 (CLA-125) ("***Khan v. Mongolia***"), para. 390.

> "As indicated earlier, the Tribunal, in reaching these conclusions, has carefully studied the reports and declarations of each of the experts as well as the presentations of legal counsel. In lieu of relying directly or solely on the opinion or valuation of any of the experts, we have made use of their opinions and compared them to available market information. In so doing, the Tribunal has attempted to carefully evaluate the reasonableness of its conclusions."[255]

263. The committee in *Adem Dogan* affirmed that "the Tribunal was not bound, either by the terms of the BIT or any agreement between the Parties, to apply a specific method of valuation."[256]

264. The Committee clarifies that, in its opinion, the *Pey Casado* case does not support the Applicant's thesis. Contrary to its allegations, *Pey Casado* did not concern the implementation of a different methodology to calculate damages by the Tribunal, but rather the Tribunal awarded damages for denial of justice and discrimination where the claimant had alleged damages solely for expropriation.[257]

265. In view of the Tribunal's careful review of the valuation methods, its arguments about the appropriateness or inappropriateness of each such method, the use of the elements on the record and upon which the Tribunal relied to calculate damages, and taking into account a tribunal's discretion on this matter, the Committee concludes that the Tribunal did not violate the Parties' right to be heard.

### iii. <u>Violation of the Parties' Right to Equal Treatment</u>

266. The Applicant alleges that the fact that the Tribunal has added the amount of the Talta Loan to the valuation of Matesi is "inexplicable, unacceptable and illogical" [Committee's translation]. According to the Applicant, the amount of such loan constitutes unjust enrichment in favor of the Respondents. The allegation is succinct and is based on the fact

---

[255] *National Grid v. Argentine Republic*, UNCITRAL, Award dated 3 November 2008 (CLA-76) ("***National Grid***"), para. 289.

[256] *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9 Decision on Annulment dated 15 January 2016 (RLA-262) ("***Adem Dogan***"), para. 219.

[257] *Victor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment dated 18 December 2012 (RLA-216) ("***Pey Casado***"), in particular, paras. 261-271.

that, as stated by Venezuela, the Tribunal compensated the Respondents twice. This issue was discussed both during the proceedings and in the request for rectification. Whether the amount of the Talta Loan constitutes unjust enrichment depends on the reasons provided by the Tribunal to include it as compensation. The failure to state reasons for damages has been claimed separately, and the Committee has already addressed the alleged unjust enrichment as part thereof.[258]

## E. GROUNDS RELATED TO THE COSTS AWARD REGARDING THE REQUEST FOR RECTIFICATION

267. Venezuela alleges that the Tribunal's decision to order Venezuela to pay the costs of the other party's defence related to the Request for Rectification involved two grounds for annulment: the Tribunal seriously departed from a fundamental rule of procedure and failed to state the reasons for such decision on costs. The Committee has inverted the order that these grounds have been alleged, as the Committee must first determine if the Tribunal's decision is well-founded to determine if there existed a serious departure from a fundamental rule.

268. Before addressing these grounds, the Committee shall refer to the applicable rules and practice of arbitral tribunals that the Parties have amply presented.

269. First, Article 61(2) of the ICSID Convention provides that "[…] the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award." The Convention leaves it up to the Tribunal to determine costs and their allocation between the parties.

270. The underlying principles of the preparatory works of the ICSID Convention and the practice of ICSID tribunals, as well as other arbitration systems, have been summarized by Professor Schreuer and partially cited by the Applicant. These include: If a party has completely prevailed, the other may have to bear the arbitration costs and all or part of the prevailing party's expenses; lack of cooperation with the tribunal by either party, violation of ICSID's exclusive jurisdiction, etc. shall be reflected on the decision on costs; and if one party is held liable for a part of the proceedings, it should bear the relevant expenses. Moreover, "[i]n the

---

[258] *See* paras. 245-247 *supra*.

absence of reasons to decide otherwise, each party should bear half of the costs of the arbitration including the charges for the Centre's services and the fees and expenses of the arbitrators and should pay for its own expenses in preparing and presenting its case".[259] This last principle is the only principle quoted by the Applicant in its allegations.

271. The Tribunal decided that "the Request in this case was not filed in conformity with the intent and the plain meaning of the terms of Article 49(2) of the ICSID Convention. Accordingly, the Tribunal finds it appropriate that Venezuela should bear Claimants' costs incurred in connection with the rectification proceeding, namely US$73,457.40."[260] This decision follows after considerations in which the Tribunal finds that the Request for Rectification is not intended to cure an error which does not affect the substance of the findings made in the Award as contended by the Applicant.[261] In these considerations, the Tribunal notes that it had already ruled upon the double counting issue. According to the Tribunal's reasoning, Venezuela questions the methodology and resulting calculations and invites the Tribunal "to undertake a comprehensive re-evaluation of Claimants' stake in Matesi, premised on steps, which it says are relevant to the DCF methodology, which the Tribunal had expressly rejected. Moreover, it is suggested that the Tribunal might entertain further expert evidence or even another hearing before it rules on the Request. None of these proposals is consistent with the steps necessary to correct a straightforward clerical, arithmetical or similar error in the Award."[262]

272. Thus, the Tribunal amply explained to what extent the request departed from the concept of rectification and, in exercise of its discretion, did not need to say anything else in support of its decision on costs.

273. The Applicant describes the decision on costs as contradictory with the Tribunal's acknowledgement that making use of rectification proceedings is a right and an integral part of the ICSID arbitration system. The Committee observes that the fact that it is a right does not necessarily mean that its exercise is gratuitous for the exercising party if the Tribunal finds it groundless. The Tribunal, as acknowledged by the Applicant, must take into account the interests of both parties in order to treat them equally.

---

[259] Schreuer, *The ICSID Convention*, *supra* note 188, p. 1236.
[260] Decision on Rectification, para. 113.
[261] *Id.*, paras. 108-110.
[262] *Id.*, para. 110.

274. In view of the reasons stated by the Tribunal, the Committee has no difficulty in concluding that the Tribunal's decision on costs in the rectification proceeding did not entail a serious departure from a fundamental rule of procedure and was reasoned.

## VII. DECISION ON COSTS

### A. STATEMENT OF COSTS OF THE APPLICANT

275. The Applicant submits that, in principle, each party should bear its own costs incurred in relation to the annulment proceeding, unless there is procedural abuse or substantial grounds for departing from the usual rule.[263] In this case, Venezuela requests that Tenaris and Talta be ordered to pay the Applicant's costs and expenses related to the annulment proceedings,[264] as follows:

| | | |
|---|---|---|
| a. | Legal fees (Foley Hoag LLP): | USD 475,984.50 |
| b. | Legal fees (GST LLP): | USD 687,627 |
| c. | Hearing expenses: | USD 16,175.15 |
| d. | Other expenses: | USD 18,310.58 |
| e. | Costs of the proceedings (ICSID costs, and fees and expenses of the Committee): | USD 400,000 |
| f. | Registration Fee of the Request for Annulment: | USD 25,000 |
| | **TOTAL:** | **USD 1,623,097.23** |

---

[263] Reply, paras. 269-276.
[264] *Id.*, para. 278.

## B.   STATEMENT OF COSTS OF THE RESPONDENTS ON ANNULMENT

276.   The Respondents submit that the Applicant should bear, in whole, the Respondents' costs and expenses incurred in relation to the annulment proceeding, including ICSID costs, the fees and expenses of the *ad hoc* Committee, and the Respondents' legal fees and expenses,[265] as follows:

|   |   |   |
|---|---|---|
| a. | Legal fees: | USD 1,285,523.70 |
| b. | Translations: | USD 15,088.00 |
| c. | Travel expenses: | USD 6,433.57 |
| d. | Copying: | USD 11,336.22 |
| e. | Courier: | USD 1,615.82 |
| f. | Online research: | USD 73.64 |
| g. | Hearing equipment: | USD 573.29 |
|   | **TOTAL**: | **USD 1,320,644.24** |

## C.   COSTS OF THE PROCEEDING

277.   The costs of the annulment proceeding, including the Committee's fees and expenses, ICSID's administrative fees and direct expenses, are as follows:

| | |
|---|---|
| Committee Members' fees and expenses | USD 221,269.22 |
| ICSID's administrative fees | USD 74,000.00 |
| Direct expenses[266] | USD 61,308.91 |
| **Total**: | **USD 356,578.13** |

---

[265] Rejoinder, paras. 120-122, 123(b).
[266] This amount includes meeting-related expenses, court reporting and translation services, and charges relating to the dispatch of this Decision on Annulment (courier, printing and copying).

278. The costs listed *supra* were advanced by the Applicant, in accordance with Regulation 14(3)(e) of ICSID Administrative and Financial Regulations.

## D.   DECISION OF THE COMMITTEE

279. Article 61(2) of the ICSID Convention —applicable to this proceeding by virtue of Article 52(4) of the ICSID Convention— provides the following:

> "In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid."

280. This provision, together with Arbitration Rule 47(1)(j) (applicable to this proceeding under Arbitration Rule 53), grants discretion to the Committee to determine the allocation of costs it deems appropriate in the present proceeding.

281. The Committee has decided to reject the Request for Annulment in whole and, accordingly, the Applicant shall bear all fees and expenses of the Committee Members, and the charges for the use of the facilities of the ICSID. On the other hand, while the alleged grounds for annulment have been rejected by the Committee, the underlying fundamental questions posed by them justify that each Party shall bear all expenses incurred in connection with its own defence.

## VIII. DECISION

282. For the reasons stated *supra*, the Committee decides:

> (1) To fully dismiss the Request for Annulment.
>
> (2) That the Applicant shall bear the costs of the proceeding, including the fees and expenses of the members of the Committee.
>
> (3) That each Party shall bear the expenses incurred in connection with its own defence.

Professor Fernando Cantuarias Salaverry

Member of the *ad hoc* Committee

Date: 8 August 2018

Professor Diego P. Fernández Arroyo

Member of the *ad hoc* Committee

Date: 8 August 2018

Dr. Andrés Rigo Sureda

President of the *ad hoc* Committee

Date: **8 August 2018**

# **EXHIBIT 6**

# Exhibit A

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES
WASHINGTON, D.C.


In the annulment proceeding between

## BOLIVARIAN REPUBLIC OF VENEZUELA

(Applicant)


and


## TENARIS S.A. & TALTA – TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA.

(Respondents)


## ICSID Case No. ARB/12/23

---

## DECISION ON ANNULMENT

---


### Members of the *ad hoc* Committee
Prof. Dr. Rolf Knieper, President of the *ad hoc* Committee
Mr. José Antonio Moreno Rodríguez, Member of the *ad hoc* Committee
Mr. N. Fernando Piérola Castro, Member of the *ad hoc* Committee


### Secretary of the *ad hoc* Committee
Mr. Marco Tulio Montañés-Rumayor


*Date of Dispatch to the Parties:* 28 December 2018

## REPRESENTATION OF THE PARTIES

*Representing the Applicant*
**Dr. Reinaldo Enrique Muñoz Pedroza**
Procurador General
Procuraduría General de la República
Av. Los Ilustres,
cruce con calle Francisco Lazo Martí
Urb. Santa Mónica
Caracas, Venezuela

**Mr. Diego B. Gosis**
**Mr. Quinn Smith**
GST LLP
1111 Brickell Avenue, Suite 2715
Miami, FL 33131
United States of America

**Mr. Ignacio Torterola**
GST LLP
1875 I Street, N.W., 5th Floor
Washington, DC 20006
United States of America

*Representing the Respondents*
**Mr. Nigel Blackaby**
**Ms. Caroline Richard**
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
United States of America

**Mr. Elliot Friedman**
**Mr. Ben Love**
Freshfields Bruckhaus Deringer US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022
United States of America

## Table of Contents

I.      INTRODUCTION .................................................................................................... 1

II.     PROCEDURAL HISTORY ..................................................................................... 1

     A.     Registration and Provisional Stay of Enforcement of the Award ........................ 1

     B.     Constitution of the Committee ........................................................................... 2

     C.     First Session and Procedural Order No. 1 .......................................................... 2

     D.     Procedure regarding the Stay of Enforcement of the Award .............................. 3

     E.     Reconstitution of the Committee ....................................................................... 6

     F.     Written Submissions regarding the Application for Annulment ......................... 6

     G.     Hearing on Annulment ....................................................................................... 7

     H.     Post-Hearing Phase ........................................................................................... 8

III.    THE PARTIES' REQUESTS FOR RELIEF ......................................................... 9

     A.     The Applicant's Request for Relief ................................................................... 9

     B.     The Respondents' Request for Relief ................................................................ 9

IV.    THE PARTIES' POSITIONS AND THE ANALYSIS OF THE COMMITTEE ......... 9

     A.     The Relevant Standards ..................................................................................... 9

         (1)     Manifest Excess of Powers (Article 52(1)(b)) ........................................ 11

     a.     Summary of the Parties' Positions ................................................................... 11

     b.     The Committee's Analysis ............................................................................... 16

         (2)     Serious Departure from a Fundamental Rule of Procedure (Article 52(1)(d)) ........ 19

     a.     Summary of the Parties' Positions ................................................................... 19

     b.     The Committee's Analysis ............................................................................... 22

         (3)     Failure to State Reasons (Article 52(1)(e)) ............................................. 26

     a.     Summary of the Parties' Positions ................................................................... 26

     b.     The Committee's Analysis ............................................................................... 29

     B.     The Application of the Standards to the Facts .................................................. 31

         (1)     Manifest Excess of Powers ...................................................................... 32

     a.     The Issue of Jurisdiction Ratione Personae ...................................................... 32

b.      The Issue of Jurisdiction Ratione Temporis ............................................. 44

c.      The Issue of Expropriation................................................................. 50

        (2)      Serious Departure from a Fundamental Rule of Procedure ..................... 57

a.      The Issue of Burden of Proof and Evidence .................................... 57

b.      The Issue of the Valuation Date of Damages .................................. 65

c.      The Issue of an Increase of Compensation Awarded to COMSIGUA ............. 66

d.      The Issue of Tax Indemnity ...................................................... 69

e.      The Issue of the Tribunal's Decision on Costs ................................ 73

        (3)      Failure to State Reasons ............................................... 75

a.      The Issue of the Claimants' Seats ............................................. 75

b.      The Issue of the Consent to Arbitrate .......................................... 80

c.      The Issue of Expropriation...................................................... 87

d.      The Issue of the Valuation Date for the Determination of Damages............... 90

e.      The Issue of Price Projections in the Determination of Quantum ................ 97

f.      The Issue of COMSIGUA's Compensation ................................... 101

g.      The Issue of the Tax Indemnity ................................................ 108

h.      The Issue of the Apportionment of Costs ...................................... 113

V.    DECISION ON COSTS............................................................... 117

      A.     The Applicant's Statement of Costs ......................................... 117

      B.     The Respondents' Statement of Costs ........................................ 118

      C.     The Costs of the Proceeding ................................................ 119

      D.     The Committee's Analysis and Decision...................................... 120

VI.   DECISION .......................................................................... 121

# FREQUENTLY USED ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| Application for Annulment | Venezuela's application for annulment of the Award, dated 11 April 2017 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| Award | Award rendered by the Arbitral Tribunal, dated 12 December 2016 |
| Background Paper | ICSID Secretariat, Updated Background Paper on Annulment for the Administrative Council of ICSID, dated 5 May 2016 |
| Claimants | Claimants in the original proceeding: Tenaris S.A. & Talta – Trading E Marketing Sociedade Unipessoal LDA |
| Committee | *Ad hoc* Committee |
| Counter-Memorial | Tenaris's Counter-Memorial on Annulment, dated 20 March 2018 |
| Decision on Stay | Committee's Decision on Venezuela's Stay Request, dated 23 February 2018 |
| Hearing | Hearing on Annulment held from 27 to 28 August 2018. |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States |
| ICSID or Centre | International Centre for Settlement of Investment Disputes |
| ICJ | International Court of Justice |
| Luxembourg BIT or Luxembourg Treaty | Agreement between the Belgium-Luxembourg Economic Union and the Government of the Republic of Venezuela for the Reciprocal Promotion and Protection of Investments, signed on 17 March 1988, and in force as of 28 April 2004 |
| Memorial | Venezuela's Memorial on Annulment, dated 23 January 2018. |
| Portugal BIT or Portugal Treaty | Agreement between the Government of the Portuguese Republic and the Government of the Republic of Venezuela for the Reciprocal Promotion and Protection of Investments, signed on 17 June 1994, and in force as of 11 May 1995 |
| Rejoinder | Tenaris's Rejoinder on Annulment, dated 29 May 2018 |

| Reply | Venezuela's Reply on Annulment, dated 17 April 2018 |
|---|---|
| Stay Hearing | Hearing on the Stay of Enforcement of the Award held on 1 February 2018 |
| Stay Request | Venezuela's request for a continued stay of enforcement of the Award contained in its Application for Annulment, dated 11 April 2017 |
| *Tenaris I v. Venezuela* Decision | The Decision on the Application for Annulment issued in *Tenaris SA and Talta - Trading E Marketing Sociedade Unipessoal Lda v Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/26), dated 8 August 2018 |
| Tenaris/Respondents | Tenaris S.A. & Talta – Trading E Marketing Sociedade Unipessoal LDA |
| Tenaris' Costs | Tenaris' Statement of Costs, dated 9 October 2018 |
| Tenaris' PHB | Tenaris' Post-Hearing Brief, dated 25 September 2018 |
| Treaties | Collectively the Portugal and the Luxembourg treaties |
| Stay Tr. p. # | Transcript of the Hearing on the Stay of Enforcement of the Award of 1 February 2018 |
| Tr. p. # | Transcript of the Hearing on Annulment held from 27 to 28 August 2018 |
| VCLT | Vienna Convention on the Law of Treaties. |
| Venezuela/Applicant | Bolivarian Republic of Venezuela |
| Venezuela Costs | Venezuela's Statement of Costs, dated 9 October 2018 |
| Venezuela's PHB | Venezuela's Post-Hearing Brief, dated 25 September 2018 |

## I.  INTRODUCTION

1.  This decision concerns the application for annulment ("**Application for Annulment**") submitted by the Bolivarian Republic of Venezuela (the "**Applicant**" or "**Venezuela**") of the award rendered on 12 December 2016 (the "**Award**") in ICSID Case No. ARB/12/23, initiated by Tenaris SA and Talta - Trading e Marketing Sociedade Unipessoal LDA (the "**Respondents**" in the annulment or "**Tenaris**").

2.  The Applicant and the Respondents are hereinafter collectively referred to as the "**Parties**", and individually referred to as a "**Party**." The Parties' legal representatives are listed above on page (ii).

## II.  PROCEDURAL HISTORY

### A.  Registration and Provisional Stay of Enforcement of the Award

3.  On 11 April 2017, the Secretary-General of the International Centre for Settlement of Investment Disputes ("**ICSID**" or "**Centre**") received an Application for Annulment from Venezuela.

4.  The Application for Annulment was filed pursuant to Article 52 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**" or "**Convention**") and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**Arbitration Rules**"). In its Application for Annulment, Venezuela requested that enforcement of the Award be stayed provisionally pursuant to Article 52(5) of the ICSID Convention.[1]

5.  On 18 April 2017, the Secretary-General registered the Application for Annulment. She also informed the Parties that, pursuant to Article 52(3) of the ICSID Convention, the Chairman of the Administrative Council of ICSID would proceed with the appointment of an *ad hoc* Committee. Finally, the Secretary-General confirmed the provisional stay of enforcement of the Award pursuant to Arbitration Rule 54(2).

---

[1] Application for Annulment, ¶ 63.

### B. Constitution of the Committee

6.  On 17 October 2017, the Secretary-General notified the Parties that the three members of the *ad hoc* Committee (the "**Committee**") had accepted their appointments. Accordingly, the Committee was deemed to have been constituted and the annulment proceeding to have begun as of that date pursuant to Arbitration Rules 6 and 53.

7.  The Committee was composed of Prof. Dr. Rolf Knieper, a national of Germany, President of the Committee; Ms. Dyalá Jiménez Figueres, a national of Costa Rica; and Mr. José Antonio Moreno Rodríguez, a national of Paraguay. Mr. Marco Tulio Montañés-Rumayor, ICSID Legal Counsel, was designated to serve as Secretary of the Committee.

### C. First Session and Procedural Order No. 1

8.  On 5 December 2017, the Committee held the First Session by telephone conference. An audio recording of the session was distributed to the Members of the Committee as well as to the Parties. Participating in the session were:

    Members of the Committee:
    Prof. Dr. Rolf Knieper, President of the Committee
    Ms. Dyalá Jiménez Figueres, Member of the Committee
    Mr. José Antonio Moreno Rodríguez, Member of the Committee

    ICSID Secretariat:
    Mr. Marco Tulio Montañés-Rumayor, Secretary of the Committee

    Attending on behalf of Venezuela:
    Mr. Henry Rodríguez Facchinetti, Attorney-General's Office
    Mr. Diego Gosis, GST LLP
    Mr. Guillermo Moro, GST LLP
    Mr. Kenneth Figueroa, Foley Hoag LLP
    Ms. Analía González, Foley Hoag LLP

    Attending on behalf of Tenaris:
    Mr. Elliot Friedman, Freshfields Bruckhaus Deringer US LLP
    Mr. Ben Love, Freshfields Bruckhaus Deringer US LLP

9.      During the First Session, the Committee and the Parties considered (i) the draft agenda and the draft procedural order circulated by the Secretary of the Committee on 3 November 2017 and (ii) the Parties' agreements and positions on the draft agenda and the draft procedural order submitted on 28 November 2017.

10.     Among other items on the agenda, the Parties confirmed the proper constitution of the Committee and a timetable for the proceeding, with the exception of hearing dates for the Stay Request and the Application for Annulment.

11.     On 6 December 2017, the Committee issued Procedural Order No. 1 governing the procedural matters of the annulment proceeding, including the further schedule of written and oral pleadings.

### D. Procedure regarding the Stay of Enforcement of the Award

12.     In its Application for Annulment, Venezuela requested that the stay of enforcement of the Award be maintained until the Committee rendered a decision on the Application for Annulment ("**Stay Request**").[2]

13.     On 19 October 2017, Tenaris opposed Venezuela's Stay Request, asking that (i) Venezuela post financial security as a condition to continuing the stay or, alternatively, that (ii) the stay be lifted ("**Tenaris' First Submission**"). Tenaris' First Submission was accompanied by Exhibits A/C-1 to A/C-30, and Legal Authorities A/CLA-1 to A/CLA-37.

14.     By letter dated 20 October 2017, the Committee informed the Parties that, as contemplated by Arbitration Rule 54(2), "it ha[d] decided to extend the provisional stay of enforcement of the [A]ward until it rule[d] on such request after receiving the parties' submissions to that effect."[3]

15.     On the same letter of 20 October 2017, the Committee fixed a timetable for the exchange of written and oral submissions on the Stay Request.

---

[2] *Id.*, ¶ 64.
[3] Letter from the Committee to the Parties dated 20 October 2017.

16.     On 8 November 2017, Venezuela filed its reply to Tenaris' First Submission ("**Venezuela's First Submission**") in Spanish. Venezuela's First Submission was accompanied by Exhibits A/R-1 to A/R-13, and Legal Authorities A/RLA-1 to A/RLA-26.

17.     On 27 November 2017, Tenaris filed a reply to Venezuela's First Submission of 8 November 2017 ("**Tenaris' Second Submission**") in English.  Tenaris' Second Submission was accompanied by Exhibits A/C-31 to A/C-47, and Legal Authorities A/CLA-38 to A/CLA-44.

18.     On 14 December 2017, Venezuela filed its reply to Tenaris' Second Submission ("**Venezuela's Second Submission**") in Spanish. Venezuela's Second Submission was accompanied by Exhibits A/R-14 to A/R-19, and Legal Authorities A/RLA-27 to A/RLA-32.

19.     A hearing on the Stay Request ("**Stay Hearing**") was held on 1 February 2018 at the seat of the Centre in Washington, D.C.  The following were present at the Stay Hearing:

| COMMITTEE | |
|---|---|
| Prof. Dr. Rolf Knieper | President |
| Ms. Dyalá Jiménez Figueres | Member |
| Mr. José Antonio Moreno Rodríguez | Member |
| **ICSID SECRETARIAT** | |
| Mr. Marco Tulio Montañés-Rumayor | Secretary of the Committee |
| **APPLICANT (Venezuela)** | |
| *Counsel:* | *Affiliation* |
| Mr. Ignacio Torterola | GST LLP |
| Mr. Diego Gosis | GST LLP |
| Ms. Marianna Lozza | GST LLP |
| Mr. Guillermo Moro | GST LLP |
| Mr. Gary Shaw | GST LLP |

| RESPONDENTS (Tenaris and Talta) | |
| --- | --- |
| *Counsel:* | *Affiliation* |
| Mr. Nigel Blackaby | Freshfields Bruckhaus Deringer |
| Mr. Elliot Friedman | Freshfields Bruckhaus Deringer |
| Mr. Ben Love | Freshfields Bruckhaus Deringer |
| Ms. Paige von Mehren | Freshfields Bruckhaus Deringer |
| Ms. Jessica Moscoso | Freshfields Bruckhaus Deringer |
| Ms. Yesica Crespo | Freshfields Bruckhaus Deringer |
| **COURT REPORTERS** | |
| Ms. Dawn K. Larson | Worldwide Reporting, LLP |
| Ms. Elizabeth Cicoria | DR Esteno |
| Mr. Rodolfo Rinaldi | DR Esteno |
| **INTERPRETERS** | |
| Ms. Silvia Colla | English-Spanish interpreter |
| Mr. Daniel Giglio | English-Spanish interpreter |
| Mr. Claudio Debenedetti | English-Spanish interpreter |

20.     During the Stay Hearing, and as agreed by the Parties, the Committee admitted onto the record two new exhibits:[4] (i) *Tidewater v. Bolivarian Republic of Venezuela*, No 15-cv-01960 (ALC), Petitioner's Response to Respondent's Renewed Motion to Vacate the Judgement (S.D.N.Y. Nov. 28, 2017), A/C-48; and (ii) *Tidewater v. Bolivarian Republic of Venezuela*, No 15-cv-01960 (ALC), Order (S.D.N.Y. Jan. 22, 2018), A/C-49.

21.     On 20 February 2018, Venezuela informed ICSID to send all future case correspondence exclusively to the Procuraduría and to counsel from GST LLP.

---

[4] Stay Tr., p. 150:9-18.

22. On 23 February 2018, the Committee issued a decision on Venezuela's Stay Request ("**Decision on Stay**"). In it, the Committee decided to:

> "Lift the stay of enforcement of the Award;
>
> Reserve its decision on the allocation of costs until the final decision on annulment…;"[5]

### E. Reconstitution of the Committee

23. On 25 April 2018, following the resignation of Committee member Ms. Dyalá Jiménez Figueres, the Secretary-General notified the Parties of the vacancy on the Committee and of the suspension of the proceeding pursuant to ICSID Arbitration Rules 53 and 10(2).

24. On 7 May 2018, the Centre notified the Parties that the Committee had been reconstituted following the acceptance of Mr. N. Fernando Piérola Castro, a Peruvian and Swiss national, of his appointment as a member of the Committee.

25. The proceeding was resumed on the above date pursuant to ICSID Arbitration Rules 12 and 53.

### F. Written Submissions regarding the Application for Annulment

26. On 23 January 2018, Venezuela filed a memorial on annulment accompanied by Exhibits A/R-20 to A/R-57, and Legal Authorities A/RLA-33 to A/RLA-103 ("**Memorial**").

27. On 20 March 2018, Tenaris filed a counter-memorial on annulment accompanied by Exhibits A/C-48 to A/C-59, and Legal Authorities A/CLA-45 to A/CLA-66 ("**Counter-Memorial**").

---

[5] Decision on Stay, ¶ 159.

28. On 17 April 2018, Venezuela filed a reply on annulment accompanied by Exhibits A/R-58 to A/R-59, and Legal Authorities A/RLA-104 to A/RLA-109 ("**Reply**").

29. On 29 May 2018, Tenaris filed a rejoinder on annulment accompanied by Exhibits A/C-60 to A/C-65, and Legal Authorities A/CLA-67 to A/CLA-85 ("**Rejoinder**").

30. On 20 August 2018, and further to their agreement, the Parties requested the Committee's leave to introduce into the record the decision on the application for annulment of the Bolivarian Republic of Venezuela issued in *Tenaris SA and Talta - Trading E Marketing Sociedade Unipessoal Lda v Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/26) dated 8 August 2018 ("***Tenaris I v. Venezuela Decision***").

31. On 22 August 2018, the Committee granted the Parties leave to introduce into the record the *Tenaris I v. Venezuela* Decision.

32. On August 27, 2018, the Parties introduced the *Tenaris I v. Venezuela* Decision as A/CLA-86.

### G. Hearing on Annulment

33. On 27 to 28 August 2018, a hearing on annulment ("**Hearing**") was held at the seat of the Centre in Washington, D.C. The following persons were present at the Hearing:

| COMMITTEE | |
|---|---|
| Prof. Dr. Rolf Knieper | President |
| Mr. José Antonio Moreno Rodríguez | Member |
| Mr. N. Fernando Piérola Castro | Member |
| **ICSID SECRETARIAT** | |
| Mr. Marco Tulio Montañés-Rumayor | Secretary of the Committee |

| APPLICANT (Venezuela) | |
|---|---|
| *Counsel:* | **Affiliation** |
| Mr. Ignacio Torterola | GST LLP |
| Mr. Diego B. Gosis | GST LLP |
| Mr. Quinn Smith | GST LLP |
| Ms. Katherine Sanoja | GST LLP |
| Ms. Adrianne Silva | GST LLP |
| *Parties:* | |
| Dr. Reinaldo Muñoz Pedroza | Procuraduría General de la República |
| Sr. Henry Rodríguez Facchinetti | Gerente General de Litigio, Procuraduría General de la República |
| **RESPONDENTS (Tenaris and Talta)** | |
| *Counsel:* | **Affiliation** |
| Mr. Nigel Blackaby | Freshfields Bruckhaus Deringer US LLP |
| Ms. Caroline Richard | Freshfields Bruckhaus Deringer US LLP |
| Ms. Jessica Moscoso | Freshfields Bruckhaus Deringer US LLP |
| Ms. Paige von Mehren | Freshfields Bruckhaus Deringer US LLP |
| Mr. Pieter-Bas Munnik | Freshfields Bruckhaus Deringer US LLP |
| Mr. Reynaldo Pastor | Freshfields Bruckhaus Deringer US LLP |
| Mr. Jowkuell Arias-Tapia | Freshfields Bruckhaus Deringer US LLP |
| Ms. Sandra Diaz | Freshfields Bruckhaus Deringer US LLP |

### H. Post-Hearing Phase

34.    On 11 September 2018, the Parties jointly submitted the agreed-upon revisions to the Hearing transcripts.

35.    On 25 September 2018, the Parties filed their post-hearing briefs ("**PHBs**").

36.    On 9 October 2018, the Parties submitted their statements of costs.

37.    On 17 October 2018, the Committee declared the proceeding closed.

## III.    THE PARTIES' REQUESTS FOR RELIEF

### A.  The Applicant's Request for Relief

38.    In its Memorial, as well as in its Reply and PHB, Venezuela requests that:

> "(a) The Award rendered in this case be annulled pursuant to Article 52 and Arbitration 50 of the ICSID Convention;
>
> (b) Tenaris and Talta be ordered to pay all costs and legal expenses arising out of these proceedings."[6]

### B.  The Respondents' Request for Relief

39.    In its Counter-Memorial, Rejoinder and PHB, Tenaris requests that the Committee:

> "(a) Reject Venezuela's request for annulment in its entirety; and
>
> (b) Order that Venezuela bear all costs and expenses incurred by the Claimants in connection with the present annulment proceedings, including the fees of the Centre, the costs and fees of the ad hoc Committee, and the Claimants' legal fees and expenses."[7]

## IV.    THE PARTIES' POSITIONS AND THE COMMITTEE'S ANALYSIS

40.    In this Section, the Committee will first determine the relevant standards governing an annulment proceeding (A), and then apply those standards to the facts of this proceeding (B).

### A.   The Relevant Standards

41.    The grounds upon which an application for annulment may be based are enumerated in Convention Article 52(1). In the present case, the Applicant invokes three of these grounds, namely:

> (1) that the Tribunal has manifestly exceeded its powers (Art. 52(1)(b));

---

[6] Memorial, ¶ 291; Reply, ¶ 274; PHB, p. 15.
[7] Counter-Memorial, ¶ 195; Rejoinder, ¶ 184; Tenaris' PHB, ¶ 35.

(2) that there has been a serious departure from a fundamental rule of procedure (Art. 52(1)(d)); and

(3) that the Award has failed to state the reasons on which it is based (Art. 52(1)(e)).

42.    The Committee has to interpret these terms "in good faith in accordance with the ordinary meaning to be given to the terms … in their context and in the light of its objective and purpose," as provided for in Article 31 of the Vienna Convention on the Law of Treaties ("**VCLT**") of 1969.

43.    As stated in the ICSID Secretariat's Background Paper on Annulment ("**Background Paper**"), the Convention's drafting history demonstrates that "assuring the finality of ICSID arbitration awards was a fundamental goal for the ICSID system."[8] Therefore, the "limited and exceptional nature" of annulment has to be taken into account as well as its "narrowly circumscribed"[9] criteria. Its objective is "to reconcile finality of the award with the need to prevent flagrant cases of excess of jurisdiction and injustice."[10] An annulment committee should not qualify a tribunal's reasoning as superficial, substandard, deficient, wrong or otherwise faulty. All this would reassess the reasoning of the tribunal which is only appropriate for an appeal. This does not imply that the narrowly circumscribed criteria have to be interpreted restrictively. This Committee agrees with the annulment committee in *Mitchell v. Congo*, which stated that the grounds for annulment "must be examined in a neutral and reasonable manner, that is, neither narrowly nor extensively."[11]

44.    ICSID Convention Article 53 provides that an award is not "subject to any appeal." The Parties agree that "annulment is not a remedy against a merely incorrect decision; annulment is not an appeal."[12] Therefore, the Committee has no competence to

---

[8] ICSID Secretariat, Updated Background Paper on Annulment for the Administrative Council of ICSID, 5 May 2016, ¶¶ 71, 73 and 74 ("Background Paper").
[9] Background Paper, ¶ 74.
[10] Background Paper, ¶ 7.
[11] *Patrick Mitchell v. Democratic Republic of Congo,* ICSID Case No. ARB/99/7, Decision on Annulment (1 November 2006), ¶ 19.
[12] Reply, ¶ 6; Counter-Memorial, ¶ 1.

substitute its own judgments on the jurisdiction of the Tribunal or on the merits for the judgments of the Tribunal.

45.     With these objectives in mind, the Committee will summarize the Parties' submissions for each of the three annulment grounds invoked by Venezuela. These summaries are not meant to be recitals but orientations without intending completeness.

### (1) Manifest Excess of Powers (Article 52(1)(b))

#### a.  *Summary of the Parties' Positions*

46.     It is generally accepted and undisputed between the Parties that both the usurpation of competence by a tribunal as well as its failure to apply the proper law to the merits of the case represent core manifestations of excess of power. Both Parties have adduced a good number of decisions confirming these principles. It is further uncontroversial, and simply a reflection of the ICSID Convention, that in both instances described above, the excess of powers must be "manifest."

47.     Rather, the dispute between the Parties concerns the Committee's competence to re-examine the Tribunal's reasoning and determination and qualify them with respect to their conformity to its mandate as established and circumscribed by the Parties' consent.

48.     The Applicant is of the view that the Committee has the "power to conduct the necessary analysis of the jurisdiction that the Tribunal assumed when it did not have the power to do so,"[13] and to "verify the excess of powers by analyzing the facts of the case together with the sources of jurisdiction invoked"[14], including "the duty to make an interpretation of those sources."[15] The Applicant summarizes this point as follows:

---

[13] Reply, ¶ 17.
[14] Memorial, ¶ 37. See also *Azurix Corp v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic (1 September 2009) (hereinafter *Azurix v. Argentina*), ¶ 82 (A/RLA-49).
[15] Memorial, ¶¶ 37 and 18.

> "If the Committee were to choose not to conduct a complete analysis of the jurisdiction mistakenly assumed by the Tribunal from the very beginning, it would simply be impossible to prove the existence of the ground invoked and, therefore, Article 52(1)(b) would be demoted to an unenforceable right, which would contradict the rules governing the interpretation of the ICSID Convention."[16]

49.     Venezuela relies in particular on the *ad hoc* committee's decision in *Occidental v. Ecuador*, which found:

> "Jurisdictional excess of powers requires a finding that the tribunal has misconstrued the applicable law (e.g. the law regulating ownership of a protected investment) or has wrongly established the relevant facts (e.g. whether an investor actually controls an investment). Article 52(1)(b) of the Convention requires that the excess of jurisdiction resulting from such misconstruction or from such wrongful determination be "manifest"; if that requirement is fulfilled, the tribunal's award deserves annulment."[17]

50.     The Respondents refute this argument. They contend that Venezuela's position, as well as the holding by the *Occidental v. Ecuador* committee, would lead to a "*de novo* review of the Tribunal's jurisdictional findings,"[18] to which the Committee is not entitled as it would go "beyond the scope of annulment review."[19] They argue "that where an issue can reasonably be resolved one way or another, and a tribunal adopts one of those reasonable alternatives, there can be no manifest excess of powers."[20]

51.     The Respondents rely in particular on the *ad hoc* committee's decision in *Azurix v. Argentina*, which found:

> "If … reasonable minds might differ as to whether or not the tribunal has jurisdiction, that issue falls to be resolved definitively by the tribunal in exercise of its power under Article 41 before the award is given, rather than by an ad hoc committee under Article 52(1)(b) after the award has been given.
>
> In these circumstances, even if it is subsequently seen to be arguable whether or not the tribunal's decision under Article 41 was correct, it cannot

---

[16] Memorial, ¶ 38.

[17] *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision of the *ad hoc* Committee on the Application for Annulment (2 November 2015) (hereinafter *Occidental v. Ecuador*), ¶ 50 (A/RLA-42).

[18] Counter-Memorial, ¶ 82.

[19] Rejoinder, ¶ 61.

[20] Rejoinder, ¶ 69.

be said that the tribunal manifestly lacked jurisdiction, and there is no basis for an ad hoc committee in purported exercise of its power under Article 52(1)(b) to substitute its own decision for that of the tribunal. As the tribunal's decision under Article 41 must be treated as conclusive, in such a case there is also no occasion for an ad hoc committee to express its own view on whether or not the tribunal had jurisdiction."[21]

52.   The Applicant also raises a related issue on jurisdiction and contends that in theory a tribunal will exceed its powers if it does not exercise its competence.[22] The Committee will not venture into this issue as neither Party asserts such conduct by the present Tribunal. The issue is purely academic under the circumstances of the case.

53.   To allow the award to be annulled, Convention Article 52(1)(b) provides that the tribunal must have "manifestly" exceeded its powers when ascertaining its competence. The Applicant agrees with Respondents on the fact that "manifest" means "obvious" or "self-evident."[23] However, the Parties differ greatly on the interpretation of these generic terms.

54.   The Applicant contends that *ad hoc* committees have the power and the duty to review thoroughly the tribunal's reasoning leading to the acceptance of its competence. It quotes – along with other decisions – *Caratube v. Kazakhstan*. In that case the committee held that:

> "the power of any arbitral tribunal derives from the authority vested upon it through the consent of the parties; if arbitrators address disputes not included in the powers granted, or decide issues not subject to their jurisdiction or not capable of being solved by arbitration, their decision cannot stand and must be set aside."[24]

55.   According to the Applicant, the Committee has to examine itself, with the "necessary degree of argumentation and analysis,"[25] whether the Tribunal was competent to

---

[21] *Azurix Corp v. Argentine Republic*, ¶¶ 68-69.
[22] Memorial, ¶ 30.
[23] Memorial, ¶ 27; Counter-Memorial, ¶ 76.
[24] *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision of the *ad hoc* Committee on the Application for Annulment (21 February 2014) (hereinafter *Caratube v. Kazakhstan*), ¶ 74 (A/RLA-41); similarly *Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision of the *ad hoc* Committee on the Application for Annulment (12 February 2015), ¶ 76 (A/RLA-50).
[25] Reply, ¶ 15.

decide the dispute. If not, the Committee has to annul the award which the Tribunal had rendered appropriating a competence that it did not have.[26] The Applicant further argues that "manifest" does not necessarily imply substantial seriousness and does not exclude that "an extensive argumentation and analysis may be required to prove that the misuse of powers has in fact occurred," as stated by the *ad hoc* committee in *Occidental v. Ecuador*.[27] In fact, according to the Applicant, "the manifest excess does not need to be prima facie apparent."[28]

56.     The Respondents refute the Applicant's argumentation. They contend that such argumentation would lead away from the concept of annulment as being an extraordinary remedy introduced "to safeguard the procedural integrity of arbitral proceedings,"[29] and instead install "a full-blown appellate mechanism."[30] In their view, "[t]he 'manifest' requirement was included in the ICSID Convention to safeguard the finality of awards, and is an intentional limit on the review function exercised by an annulment committee."[31]

57.     They note that the "excess of powers cannot be 'manifest' if the alleged excess is discernible only through elaborate interpretation of a tribunal's reasoning (such an exercise would, moreover, cross the line from annulment into appeal)."[32] Instead, the Respondents sustain that an excess of powers is only 'manifest' if it can be discerned without great effort or extensive analysis.[33]

58.     They also state that for systemic reasons, *ad hoc* committees are not authorized to review the quality of the tribunal's interpretation of the law nor its assessment of evidence and "whenever the underlying issue is subject to more than one reasonable

---

[26] *Ibid*.
[27] *Occidental v. Ecuador*, ¶ 59; See also: *Caratube v. Kazakhstan*, ¶¶ 77-78.
[28] Memorial, ¶ 26.
[29] Counter-Memorial, ¶ 31.
[30] Counter-Memorial, ¶¶ 31 and 76.
[31] Counter-Memorial, ¶ 75.
[32] Counter-Memorial, ¶ 77.
[33] Counter-Memorial, ¶ 76.

interpretation or is otherwise open to debate, there can by definition be no excess of powers, and a tribunal's decision is final and its award must be upheld."[34]

59. The Respondents rely on *Impregilo v. Argentina* when they note that the excess of powers must be "substantially serious"[35] to warrant annulment of the award. They assert that even if a committee might decide not to take the gravity of the tribunal's error into consideration, it has "to conclude that an annullable error actually had (or could have had, according to Venezuela) a material impact on the outcome of a case."[36]

60. The failure to apply the proper law represents the alternative limb for a possible manifest excess of powers. Again, the Parties do not disagree in principle but only in the determination of the borderline.

61. The Applicant submits that "the parties agree, as they must, that annulment committees have the power to annul an award when a tribunal did not apply the proper law and that a mere misapplication of the law does not warrant an annulment of the award."[37]

62. However, it notes that a misconstruction of the applicable law, an "error of law that is effectively equivalent to a failure to apply the applicable law,"[38] or the wrong establishment of facts, constitute a manifest excess of powers. The Applicant refers to this effect – among others – to *Occidental v. Ecuador* and *TECO v. Guatemala.*[39] Furthermore, it considers that a committee should not limit its analysis to whether the tribunal formally listed certain applicable rules, but instead, whether the tribunal,

---

[34] Counter-Memorial, ¶¶ 79 and 80; Rejoinder, ¶ 68. The Respondents rely on *Daimler Financial Services AG v. Republic of Argentina*, ICSID Case No. ARB/05/1, Decision on Annulment (7 January 2015) (hereinafter *Daimler v. Argentina*), ¶ 187 (A/RLA-39), and *Impregilo SpA v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *Ad Hoc* Committee on the Application for Annulment (24 January 2014) (hereinafter *Impregilo v. Argentina*), ¶¶ 137-141 (A/RLA-44).
[35] Counter-Memorial, ¶ 76.
[36] Rejoinder, ¶ 63.
[37] Reply, ¶ 18.
[38] Memorial, ¶ 44.
[39] Reply, ¶¶18 and 20; Memorial, ¶¶ 39-46; *Occidental v. Ecuador*, ¶¶ 50 and 51; *TECO Guatemala Holdings LLC v. Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment (5 April 2016) (hereinafter *TECO v. Guatemala*), ¶311 (A/RLA-67).

under the specific circumstances of the case in question, has in fact effectively applied them.

63. The Respondents disagree with the Applicant. They submit that an "erroneous application of the law is not a manifest excess of powers."[40] Neither is it an alleged partial non-application of the law: "a tribunal's decision not to address or apply a particular provision that it considers irrelevant does not constitute a failure to apply the applicable law."[41]

### b. The Committee's Analysis

64. The Committee emphasizes that it is not a court of appeal and that it does not have the authority to substitute its judgment on jurisdictional requirements, the interpretation of law, and/or the assessment of facts, for that of the Tribunal.

65. It agrees with the Parties that a tribunal may exceed its powers when it exercises jurisdiction that it does not have, and when it fails to apply the proper law.

66. "Consent of the parties is the cornerstone of the jurisdiction of the Centre"[42] and thus, of the competence of an ICSID tribunal. Consent establishes and limits both the jurisdiction of the Centre and the competence of tribunals. Tribunals have to assess the applicability of the ICSID Convention to the dispute between the parties at hand, and, once so ascertained, they have to apply it as well as the Arbitration Rules.

67. Consent extends to the applicable law. As Prof. Schreuer has stated, "the provisions on applicable law are essential elements of the parties' agreement to arbitrate and constitute part of the parameters for the tribunal's activity."[43] A tribunal that fails to

---

[40] Counter-Memorial, ¶ 85; relying on *Impregilo v. Argentina*, ¶ 131.

[41] Counter-Memorial, ¶ 88, relying on *Continental Casualty Company v. The Argentine Republic*, ICSID Case No. ARB/03/9, Decision on the Application for Partial Annulment of Continental Casualty Company and the Application for Partial Annulment of the Argentine Republic (16 September 2011) (hereinafter *Continental v. Argentina*), ¶ 91 (A/RLA-51), and C. Schreuer, *The ICSID Convention, A Commentary* (2d edition 2009), Art. 52, ¶ 226 (hereinafter *Schreuer*).

[42] Report of the Executive Directors of the International Bank of Reconstruction and Development on the Convention of the Settlement of Investment Disputes between States and Nationals of Other States, ¶ 23.

[43] *Schreuer*, Art. 52, ¶ 192.

apply the applicable law transgresses the boundaries of its mandate as expressed in the parties' consent as much so as when it usurps jurisdiction.

68.   These alternative expressions of excess of power are not simply juxtaposed but are substantively interconnected. According to Convention Article 41, the tribunal is the judge of its own competence. It has to exercise its judgment in applying and interpreting Convention Article 25 and any other agreements between the disputing parties (i.e. the provisions of a BIT, contract, investment law, etc.). Thus, an excess of powers made effective through the usurpation of competence is the result of the non-application of the applicable law.

69.   In line with the *jurisprudence constante,* the Committee finds that the erroneous application of the applicable law must be distinguished from its non-application and does not lead to an excess of power. The Parties have no query in this respect and agree – as said – that "a mere misapplication of the law does not warrant an annulment of the award."[44]

70.   The Parties have engaged in a short exchange on the question of whether an erroneous application of the law may be so egregious that it equals to a non-application of it. The Applicant quotes *TECO v. Guatemala* where the *ad hoc* committee found that a manifest excess of powers may exist when the tribunal "committed an error so egregious that its interpretation can be deemed untenable."[45] The issue is without practical importance in the present case as "the Republic is not arguing that the Tribunal erroneously applied the proper law."[46] Rather, it asserts that the Tribunal did not "effectively apply" the proper law.[47]

71.   *Ad hoc* committees may only annul an award that was rendered by a tribunal in excess of powers when the excess was "manifest." This qualification must have a meaning and cannot be ignored.

---

[44] Reply, ¶ 18.
[45] *TECO v. Guatemala*, ¶ 311.
[46] Reply, ¶ 20.
[47] Memorial, ¶ 44.

72.     Different methods may be used to provide specific meaning to the term "manifest" beyond general notions. One consists in establishing a *prima facie* test on the evidence of the excess; another one is based on assessing the excess first and subsequently determining whether this excess is "manifest." The Committee believes that the method must not prevail over the substance. Ultimately, both methods must examine the facts and interpret the legal terms in accordance with VCLT Article 31.

73.     In the Committee's mind, the term "manifest" underlines the limited and exceptional character of an annulment as opposed to an appeal. The finality of an award must not be disturbed if the excess of power is not manifest. This objective must be taken into account when establishing the standard.

74.     Therefore, the Committee agrees with the Parties and a well-established jurisprudence that the term "manifest" means "obvious" and "self-evident." It further shares the *ad hoc* committee's view in *Soufraki v. UAE,* which held that:

> "a strict opposition of two different meanings of "manifest" – either "obvious" or "serious" – is an unnecessary debate. It seems to this Committee that a manifest excess of power implies that the excess of power should at once be textually obvious and substantively serious."[48]

75.     This does not imply that whenever a tribunal reached a decision on jurisdiction after an extensive argumentation and analysis, there can be no manifest excess of power just because it may take the committee an equally extensive argumentation and analysis to understand the tribunal.

76.     Two levels of reflection have to be distinguished. The first level concerns the ease with which the tribunal's analysis can be understood. Once understood, the second level concerns the ease with which the excess of powers can be detected. Only if the tribunal's extensive argumentation and analysis represent an 'obvious', 'clear', 'evident', 'serious', or in other words, a 'manifest' non-application of the proper law (and therefore a usurpation of jurisdiction), will it be justified to annul the award. A

---

[48] *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *Ad Hoc* Committee on the Application for Annulment of Mr. Soufraki (5 June 2007), ¶ 40 (A/RLA-46) (hereinafter *Soufraki v. UAE).*

tribunal's argumentation and analysis can be complex, extensive, deep and at the same time obviously, clearly and seriously outside the scope of application of the proper law.

77.  The Committee finds support for this position in the *ad hoc* committee's decision in *Pey Casado v. Chile,* introduced by the Applicant, which held that "an extensive argumentation and analysis do not exclude the possibility of concluding that there is a manifest excess of power, as long as it is sufficiently clear and serious."[49]

78.  The Committee distinguishes these two levels.

79.  It notes that even though a tribunal's argumentation and analysis may be extensive and complex, a committee may nevertheless find a manifest excess of power. However, to allow annulment, the tribunal's excess of power still needs to be clear and serious in such a manner that it is "manifest."

80.  The Committee does not share the point of view of the *ad hoc* committees in *Caratube v. Kazakhstan* and *Occidental v. Ecuador*, according to which a committee may require extensive argumentation and analysis to demonstrate that such excess of power has in fact occurred. In the Committee's view, such an interpretation may be regarded as neglecting the ordinary meaning of the term "manifest" in the light of the object and purpose of the Convention, and blurring the line between annulment and appeal. Furthermore, a committee should not need to resort to complex argumentation and analysis to find the existence of an excess of power by a tribunal, if such excess of power was sufficiently clear and obvious to fulfill the "manifest" requirement.

**(2) Serious Departure from a Fundamental Rule of Procedure (Article 52(1)(d))**

*a.  Summary of the Parties' Positions*

81.  The Parties agree that a tribunal departs from a fundamental rule of procedure when it disregards "the minimal standards of procedure to be respected in international law

---

[49] *Pey Casado v. Chile*, ¶ 70.

proceedings."[50] Venezuela relies (as well as Tenaris) on a series of uncontroversial decisions of *ad hoc* committees, such as *Wena v. Egypt* holding that:

> "[Article 52(1)(d)] refers to a set of minimal standards of procedure to be respected as a matter of international law. It is fundamental, as a matter of procedure, that each party is given the right to be heard before an independent and impartial tribunal. This includes the right to state its claim or its defense and to produce all arguments and evidence in support of it. This fundamental right has to be ensured on an equal level, in a way that allows each party to respond adequately to the arguments and evidence presented by the other."[51]

82.  Venezuela identifies the fundamental rules of procedure as including, "due process, the right of defense, the right of both parties to be heard and to submit their claim, the right of each party to properly respond to the arguments and evidence presented by the other party, equal treatment between the parties, the treatment of evidence and the burden of proof."[52] Venezuela states that "the principle ***onus probandi actori incumbit*** constitutes a fundamental rule of procedure,"[53] as well as "a fundamental principle of law, an essential component of the due process rights of a party."[54] It quotes *Caratube v. Kazakhstan* and *Klöckner v. Cameroon* to this effect. In both cases, the *ad hoc* committees held that "a reversal of the burden of proof could well lead to a violation of a fundamental rule of procedure. It all depends on the importance, for the decision of the Tribunal, of the subject regarding which the burden has been reversed."[55]

83.  The Respondents agree to the list mentioned in paragraph 82 above except for the criteria of "treatment of evidence and the burden of proof." They contend that neither the treatment of evidence nor the burden of proof is a fundamental rule of procedure. They assert that "none of the cases and authorities cited by Venezuela support the proposition that the burden of proof is a fundamental rule of procedure. […] Indeed,

---

[50] Memorial, ¶ 49; Rejoinder, ¶¶ 12 and 13.
[51] *Wena Hotels Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment of the Arbitral Award dated 8 December 2000 (5 February 2002) (hereinafter *Wena Hotels v. Egypt*), ¶¶ 56 and 57 (A/RLA-64).
[52] Reply, ¶ 22.
[53] Venezuela's PHB, p. 2 (emphasis in the original).
[54] Venezuela's PHB, p. 3.
[55] *Caratube v. Kazakhstan*, ¶ 97, quoting *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2, Decision on Annulment (3 May 1985) (hereinafter *Klöckner v. Cameroon*) (A/CLA-53).

no *ad hoc* committee has ever annulled an award based on an alleged misallocation of the burden of proof."[56] They argue that debates about evidence are regularly focused on its weight and probity, and are therefore more of a substantive rather than a procedural nature.[57] Since Arbitration Rule 34(1) bestows a high degree of discretion on the tribunal to judge the probative value of evidence, and since international law does not provide for formal evidentiary rules, it is impossible – or at the very least highly unlikely – that the evidentiary standards applied in ICSID arbitration could ever be classified as "fundamental" rules for purposes of Article 52(1)(d)."[58] The Respondents rely on *Continental Casualty v. Argentina* where the *ad hoc* committee found:

> "that the ICSID Convention and the Arbitration Rules contain no provisions with respect to the burden of proof or standard of proof. Accordingly, there cannot be any requirement that a tribunal expressly apply a particular burden of proof or standard of proof in determining the dispute before it. Indeed, the tribunal is not obliged expressly to articulate any specific burden of proof or standard of proof and to analyse the evidence in those terms, as opposed simply to making findings of fact on the basis of the evidence before it."[59]

84.  With respect to the cumulative requirement of Article 52(1)(d), according to which the departure from a fundamental rule must be "serious", the Applicant asserts that the Committee has to ascertain the existence of the requirement under the specific circumstances of the case and not "aprioristically or automatically."[60] It further contends that it does not have to prove that the departure from the fundamental rule was result-determinative or that it would have won the case if the departure had not taken place. Rather, it has to demonstrate that "the departure had the potential to have an effect on the award."[61] The Applicant relies on a series of decisions by *ad hoc* committees, such as *Pey Casado v. Chile,* stating that:

> "The applicant is not required to show that the result would have been different, that it would have won the case, if the rule had been respected.

---

[56] Tenaris PHB, ¶ 24.
[57] Rejoinder, ¶¶ 14 and 15; Tr. D1, p. 189.
[58] Rejoinder, ¶ 16.
[59] *Continental v. Argentina*, ¶ 135.
[60] Memorial, ¶ 50.
[61] Memorial, ¶¶ 50, 55; Reply, ¶ 23.

> The committee notes in fact that, in Wena, the committee stated that the applicant must demonstrate "the impact that the issue may have had on the award." The Committee agrees that this is precisely how the seriousness of the departure must be analyzed."[62]

85.     The Respondents contend that "the departure from that fundamental procedural rule must have been so serious as to deprive Venezuela of the intended benefit of that rule; and the claimed violation must have affected the outcome of the arbitration (or, according to Venezuela, at least had the potential to affect the outcome of the arbitration)."[63]

86.     For both criteria, the Respondents rely on decisions of *ad hoc* committees. For instance, in *MINE v. Guinea,* the committee ruled that "the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was intended to provide."[64] Also, in *Azurix v. Argentina,* the committee held that "the violation of such a rule must have caused the Tribunal to reach a result substantially different from what it would have awarded had such a rule been observed."[65]

### b.  *The Committee's Analysis*

87.     In line with the Parties, the Committee subscribes to the definitional criteria set out in *Wena v. Egypt*. If minimal standards of procedure are not respected, committees have the authority to annul the award.

88.     The Parties disagree on whether "the treatment of evidence and the burden of proof" are fundamental rules of procedure. The Committee reiterates that the right of each party to produce evidence in support of its case and the right to have an adequate opportunity to respond to the evidence produced by the other party form part of such fundamental rules. However, both do not concern the submission of evidence as such, but are rather expressions of the rights to be heard and to be treated equally and

---

[62] *Pey Casado v. Chile*, ¶ 78.
[63] Counter-Memorial, ¶ 41.
[64] *Maritime International Nominees Establishment v. The Government of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award (22 December 1989) (hereinafter *Maritime v. Guinea*), ¶ 5.05; identical in *Wena Hotels v. Egypt*, ¶ 58.
[65] *Azurix v. Argentina*, ¶ 234.

impartially. In that sense, the *ad hoc* committee in *Tenaris I* distinguishes correctly both issues and "finds that the Tribunal neither shifted the burden of proof **nor** breached any fundamental rule of procedure."[66]

89.     To the extent that the Applicant invokes an additional element affecting the evidence, namely its "treatment,"[67] the Committee does not see a possible fundamental rule of procedure that may be violated by the Tribunal's treatment of evidence. Arbitration Rule 34 grants wide discretion to tribunals to order the production of evidence and to judge its admissibility and probative value. The Parties have not adduced any further substantive procedural rules of evidence that might be relevant to the present case, and the Committee is unaware of any.

90.     In addition, the Committee recalls that the different grounds for annulment in Convention Article 52(1) pursue different rationales and must not be amalgamated. An alleged non-application of the proper law and rules may represent a manifest excess of powers and must be examined under the heading of Article 52(1)(b). Its rationale is the respect of the parties' consent, which limits the mandate of the tribunal. Only if this non-application seriously departs from fundamental rules of procedure can Article 52(1)(d) be invoked. Its rationale is the preservation of the integrity and propriety of the procedure and not the application of the proper law.

91.     Chapter IV of the Arbitration Rules contains the evidentiary rules of ICSID proceedings. It confirms the standards of impartiality, equality of the parties and due process. In addition, it confers discretion on tribunals to determine how to conduct proceedings diligently and in the respect of procedural economy. While the standards are part of the fundamental rules of procedure, the technical provisions on the written and oral procedures, the production of documents, and the examination of witnesses and experts, are not. They do not touch upon the fundamental requirement of

---

[66] *Tenaris S.A. and Talta v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26, Decision on the Application for Annulment of the Bolivarian Republic of Venezuela (8 August 2018), ¶ 228 (emphasis added by Committee) (hereinafter *Tenaris I v. Venezuela* Decision) (A/CLA-86)
[67] Reply, ¶ 22.

procedural justice and fairness. Their non-application may imply an excess of power but not a departure from a fundamental procedural rule.

92.    As to the burden of proof, the Committee has no doubt that the principle of "*actori incumbit probatio*" represents a generally accepted rule. It is applied in many national jurisdictions, either codified or as a matter of court practice, and also in international law. The Applicant quotes a recent judgment of the International Court of Justice ("ICJ") where it recalls that "it is for the party alleging a fact to demonstrate its existence."[68] It further relies on abundant tribunal practice confirming that claimants bear the burden of proof for their claims, including and especially when jurisdictional matters, such as the nationality of a party, are at stake. These matters must be proven and not only assumed.[69] The Applicant relies on Prof. Bin Cheng's commentary affirming that "there exists a general principle of law placing the burden of proof upon the claimant and that this principle is applicable to international judicial proceedings."[70]

93.    That said, the Committee is unable to identify the principle as an unshakeable and invariable minimum standard of procedure, as compared, for instance, to the right to be heard and rebut evidence, due process, neutrality and impartiality of tribunals and the equality of parties. In the words of the ICJ with respect to the burden of proof, "[t]his principle is not an absolute one."[71] The Committee agrees with the *Caratube* committee that "a reversal of the burden of proof could well lead to a violation of a fundamental rule of procedure", if for instance the tribunal did not treat the parties equally or did not grant an opportunity to be heard on the issue. However, these are consequences of other principles that have an impact in the treatment of the burden of proof but they are not principles themselves. The Applicant relies on a dissenting opinion in *Soufraki v. UAE*, where the arbitrator held, without further arguments or reference to court practice, that "an erroneous reversal of the burden of proof […] is

---

[68] International Court of Justice, *Application of the Convention on the Prevention and Punishment of the Crime of Genocide* (hereinafter *Croatia v. Serbia*), Judgment (3 February 2015), ¶ 172 (A/RLA-81).
[69] Memorial, ¶¶ 93-101.
[70] Venezuela's PHB, p. 2, quoting Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals. Cambridge, 1953-2006, pp. 326, 327 cited in *Soufraki v. UAE*.
[71] *Croatia v. Serbia*, ¶ 172.

24

a serious departure from the fundamental rule of procedure."[72] This statement in itself does not convince the Committee.

94. Firstly, the principle is less a rule of procedure than a rule to determine the requirements of substantive law. Although mostly relevant in court and arbitral proceedings, it does not necessarily guide the process before the court or tribunal and does not define the parties' fundamental rights and duties. Rather, it provides an instrument to judges and arbitrators that allows them to ascertain or reject a claim in situations of *non liquet*. It is thus understandable that in certain national and regional jurisdictions the principle is codified and/or considered as a substantive and not procedural law and rule.

95. Secondly, to the extent that the principle is considered a procedural rule, it cannot be considered a basic, invariable, and 'absolute' element of the corpus of due process and minimal standards of procedure. For a variety of circumstances and purposes of substantive law, such as consumer protection, product liability, tort claims, and others, jurisprudence and legislators have adapted and even reversed the principle when requirements of social justice and fairness seemed to require so.

96. Such changes and adjustments show that the burden of proof is not part of the minimal standards and the fundamental rules of procedure. It seems that the appropriate place to determine whether the principle or a law on the burden of proof has been applied or not comes therefore under the realm of excess of powers and not of a serious departure from a fundamental rule of procedure.

97. When qualifying the departure from a fundamental rule of procedure in Article 52(1)(d) as "serious," the Convention reconfirms the high value of finality of awards. It recalls the limited and exceptional character and purpose of annulment. As the Applicant notes, the term underlines the "stringent standard of annulment."[73] A departure without any effect on the proceeding and without depriving a party of the protection of procedural fairness, which is at the heart of procedural rules, cannot be

---

[72] *Soufraki v. UAE*, Separate Opinion and Statement of Dissent of Omar Nabulsi (27 May 2007), ¶ 49.
[73] Memorial, ¶ 68.

qualified as serious. Therefore, the Committee agrees with the decisions in *MINE*, *Wena,* and others, that emphasize that the departure must be "substantial" to be serious.

98.     Does this mean that applicants have to prove that the departure has caused the tribunal to render an award substantially different from what it would have awarded had such a rule been observed?

99.     The Committee finds that the asserting party must demonstrate that, indeed, the departure of a fundamental procedural rule caused the tribunal to reason in a way that decreased the level of procedural fairness and protection in its disfavor.

100.    However, an applicant must not and cannot be asked to prove in addition that such a substantively untenable result caused by a specific departure from the rules of procedure caused the tribunal to render a different award. The decision-making process in arbitral deliberations is a complex matter and influenced by a variety of considerations and compromise. It is not excluded, but by no means certain or even probable, that the debate on one specific procedural rule may alter the totality of the construct of determination resulting from complex deliberations.

### (3) Failure to State Reasons (Article 52(1)(e))

#### a. *Summary of the Parties' Positions*

101.    The Parties agree that Convention Article 52(1)(e) requires "the failure to state any reasons with respect to all or part of an award, a tribunal's reasoning which is genuinely contradictory, or a reasoning that is so lacking in coherence that a reader cannot follow it."[74] However, at a lower level of abstraction, they present a different reading.

102.    The Applicant contends generally that the duty of a tribunal to provide coherent and adequate reasoning is one of the essential requirements for the validity of an award, as clearly established by Convention Article 52(1)(e) in conjunction with

---

[74] Reply, ¶ 24; Counter-Memorial, ¶ 111.

Article 48(3).[75] Venezuela refers to Convention Article 48(3) since "it requires that the reasons be stated."[76] Relying on the annulment decision in *Tidewater v. Venezuela,* and the expert opinions of Professors Alvarez and Reisman, it points to:

> "the crucial importance of the duty to state the reasons for the decisions rendered in arbitrations involving the analysis of public decisions made by sovereign States, taking into account the fact that those interested in such decisions include not only the parties to the dispute, but also the people of the State concerned, which increases the duty of intelligibility and transparency of the decision."[77]

103. It further notes that the clear language of the Convention, which does not use terms such as 'manifest' or 'serious', does not allow a restrictive interpretation. At the same time, the wording 'failure to state reasons' must not be understood to mean a complete failure to state reasons. There is general agreement that the ground for annulment cannot be restricted to the "highly unlikely, if not virtually unimaginable" and unconceivable situation of a complete absence of reasons and must extend to situations of "lack, unintelligibility, inconsistency and frivolity of reasons", as well as "contradictory and/or insufficient reasons", whereby "contradictory reasons are those that are mutually inconsistent and thus cancel each other out."[78] Venezuela also sustains that inadequate and insufficient reasons amount to a failure to state reasons, whereby "inadequate or insufficient reasons are those that do not logically lead to the conclusion posited."[79]

---

[75] Memorial, ¶ 61; Venezuela quotes *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment (10 July 2014), ¶ 64.

[76] Reply, ¶ 28.

[77] Memorial, ¶ 65; *Tidewater Inc., Tidewater Investment SRL, Tidewater Caribe, C.A., et al. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment (27 December 2016), ¶¶ 163-165; Guillermo Aguilar Alvarez and Michael Reisman, *The Reasons Requirement in International Investment Arbitration*, 2008

[78] Memorial, ¶¶ 67-73; Reply, ¶ 24; Venezuela relies on and quotes – among others – *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment (10 July 2014), ¶ 202; *Ioan Micula, Viorel Micula, S.C. European Food S.A, S.C. Starmill S.R.L. and S.C. Multipack S.R.L. v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment (26 February 2016), ¶ 157; *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision of the *ad hoc* Committee on the Application for Annulment (21 February 2014), ¶¶ 102; *Maritime v. Guinea*, ¶ 5.09; *Pey Casado v. Chile*, ¶ 86; *Tidewater Inc., Tidewater Investment SRL, Tidewater Caribe, C.A., et al. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment (27 December 2016) (hereinafter *Tidewater v. Venezuela*), ¶ 195 (A/RLA-71); *TECO v. Guatemala*, ¶ 250.

[79] Memorial, ¶ 75.

104.   The Applicant insists that the lack of reasons may not be replaced by mere reference to elements, documents or decisions outside the award and must not be replaced by the committee's own reasoning, as clearly held in *Rumeli v. Kazakhstan*. In that case, the committee stated that "an ad hoc committee should not construct reasons in order to justify the decision of the tribunal."[80] In the same vein, it contends that *ad hoc* committees do not have the authority to "speculate about what the tribunal allegedly intended to express but did not state" but has to annul the award if the intentions are not explicit.[81] As found in *Klöckner v. Cameroon*, it "is not for the Committee to imagine what might or should have been the arbitrators' reasons."[82]

105.   The Respondents assert that Convention Article 52(1)(e) does not "authorize committees to review the quality or the persuasiveness of a tribunal's reasoning,"[83] and that they may not annul an award "because it disagrees with the reasons provided by a tribunal."[84] They rely on a broad range of decisions by *ad hoc* committees that have "consistently confirmed there is no basis for annulment so long as it is possible to follow a tribunal's reasoning through to its conclusion – even if the award contains an error of law or fact."[85] However, the "reasons need not be correct, or even convincing, for an award to survive annulment."[86]

106.   In order to avoid "hair-trigger annulment" in cases where the tribunal's argumentation is perfectly coherent, committees are bound to make an effort to also understand the implicit reasoning.[87]

107.   The Respondents refute the Applicant's assertion that the failure to state reasons should be interpreted broadly. They further contend that tribunals are not obliged to deal with every question and argument that have been put before them to avoid

---

[80] Memorial, ¶¶ 84-86; *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the *ad hoc* Committee (25 March 2010), ¶ 83.
[81] Reply, ¶¶ 28 and 29.
[82] *Klöckner v. Cameroon*, ¶ 151.
[83] Counter-Memorial, ¶ 110
[84] *Ibid.*
[85] Counter-Memorial, ¶ 112.
[86] Counter-Memorial, ¶ 113.
[87] Counter-Memorial, ¶ 114; Rejoinder, ¶ 112; Respondents rely among others on *Wena v. Egypt*, ¶ 81.

annulment. Instead, the Respondents sustain that the failure to state reasons must relate to a point that is "essential to a tribunal' decision."[88] The appropriate remedies for a challenge as to the substance of reasons as well as for the failure to address a particular question are embedded in Convention Article 49(2).[89]

108. Finally, the Respondents emphasize a distinction between genuinely contradictory reasons, which may give rise to annulment "if they do not enable the reader to understand the tribunal's motives,"[90] and the "tribunal's appropriate weighing of conflicting considerations."[91] In their view, tribunals must enjoy a certain amount of freedom on how to organize their reasoning. The scrutiny for hidden contradictions by *ad hoc* committees would necessarily transform the procedure into an illicit appellate mechanism.

### b. The Committee's Analysis

109. The Committee agrees with the Applicant's position that the statement of reasons is a primordial duty of arbitral tribunals in general, and investment arbitral tribunals, in particular. Indeed, the "legitimacy of the process depends on its intelligibility and transparency."[92]

110. At the same time, the Committee agrees with the Parties that only a total absence of reasons or a tribunal's reasoning which is genuinely contradictory, or a reasoning that is so lacking in coherence that a reader cannot follow it, warrants annulment. As repeatedly stated, the Committee is not a court of appeal. It is not authorized to qualify a tribunal's reasoning as superficial, substandard, deficient, wrong or otherwise faulty, and thus, substitute its judgment for that of the tribunal.

111. The Committee is mindful of the delicate task to determine properly the borderline between an appeal and an annulment in the context of Convention Article 52(1)(e).

---

[88] Counter-Memorial, ¶ 115.
[89] Conter-Memorial, ¶¶ 116 and 117; Tenaris' Rejoinder, ¶¶ 113-116; Respondents rely among others on *Wena v. Egypt*, ¶ 80, and on *Michael Reisman*, "The Breakdown of the Control Mechanism in ICSID Arbitration" (1989) 4 Duke Law Journal 740, p. 763.
[90] Rejoinder, ¶ 117.
[91] Counter-Memorial, ¶ 121.
[92] *Tidewater v. Venezuela,* Decision, ¶ 163.

As Prof. Schreuer stated, "an evaluation of the tribunal's reasoning is most likely to blend into an examination of the award's substantive correctness and hence to cross the border between annulment and appeal."[93]

112. It is true that, differently from Convention Article 52(1)(b) and (d), Article 52(1)(e) does not add qualifications such as "manifest" or "serious." That does not, however, imply that the interpretation has to be broad and extensive. Rather, the omission is intrinsic to the formulation of the ground: taken literally, a failure to state reasons (in the French version: 'défaut de motifs') means an absence of reasons. This is in itself so restrictive that no further adjective would add severity to it. At the same time, a total absence of reasons is so improbable that an appropriate interpretation, taking into consideration the mandate of VCLT Article 31, must extend the meaning of 'failure' to practically relevant insufficiencies such as total incoherence or genuine contradiction in order to give an *effet utile* to the term and to satisfy the purpose of the provision, i.e. the intelligibility of the award for the parties and the public.

113. This generally accepted interpretation is in itself a broad reading of the term 'failure', which has a narrow meaning, without further restrictive adjectives. This extensive reading must be exercised with prudence and measure. Efforts to move the exercise further by labelling reasons as 'frivolous' or 'inadequate' will inevitably cross the border to the scrutiny of the quality of the award and thereby to an appeal award.

114. Therefore, the Committee will proceed to assess the quality of the Tribunal's reasoning but will limit its examination to the question of whether the reasons are so incoherent and/or contradictory that they cannot be understood and followed. This threshold concerns the totality of the reasons in the Award, encompassing those presented for the Tribunal's competence and jurisdiction, for the merits of the claim, the quantum of compensation, and the allocation of the costs.

115. The Applicant requests the annulment of the Award for the failure to state reasons and bases its request on Convention Article 52(1)(e). It refers explicitly to Convention

---

[93] *Schreuer*, Art. 52, ¶ 344.

Article 48(3), which provides that the tribunal has to state the reasons upon which the award is based.[94] It has chosen not to seek a supplementary decision of the Award by the Tribunal in accordance with Convention Article 49(2).

116. Both remedies follow different rationales and objectives. Convention Article 49(2) "enables the tribunal to correct mistakes that may have occurred in the award's drafting in a non-bureaucratic and expeditious manner,"[95] while Article 52(1) is concerned with the integrity of the proceedings and "would safeguard against violation of the fundamental principles of law."[96]

117. The remedies do not exclude each other. Applicants are free to pursue one or the other as long as the specific requirements for each of them are met. Venezuela is not obliged to apply first to the initial tribunal in accordance with Convention Article 49(2) and request a decision on an alleged failure to state reasons. Therefore, Article 49(2) does not stand in the way of a request for annulment.

## B. The Application of the Standards to the Facts

118. The Applicant asserts 16 different violations or issues which in its view give rise to the annulment of the Award.

119. The Committee will address the alleged violations one by one. For reasons of transparency and readability, it has regrouped the different issues under the three separate grounds for annulment asserted by Venezuela. Although the three grounds are each based on different requirements, on several occasions the alleged violations are based on identical facts, leading inevitably to a certain degree of repetition.

120. The Committee has studied the written and oral submissions of both Parties carefully and considered them during its deliberations. The purpose of the following summaries of the Parties' positions is not to rehearse them exhaustively, but to present the salient features and in particular the points of divergence between the Parties.

---

[94] Reply, ¶ 28.
[95] *Schreuer*, Art. 49, ¶ 28.
[96] Background Paper, ¶ 71.

### (1) Manifest Excess of Powers

#### a. The Issue of Jurisdiction Ratione Personae

##### i.     Summary of the Parties' Positions

###### 1.  The Applicant

121.   As a preliminary matter, the Applicant asserts that the Committee has the power to conduct a "broad-scope analysis"[97] of the Tribunal's reasoning and that "a review of the evidence on the record and even the submission of new evidence are not contrary to the requirement that the excess of powers by the Tribunal be manifest."[98] To that effect, it relies on the decision of the *ad hoc* committee in *MHS v. Malaysia.* That committee found that the tribunal failed to apply the BIT and reassessed the tribunal's interpretation of the term "investment" of Convention Article 25 in a thorough legal analysis, including going back to the *travaux préparatoires* of the ICSID Convention. The committee came to the conclusion that the tribunal had omitted one of the criteria normally used to define "investment", i.e. the contribution to the local economy, and that it had "reached conclusions not consonant with the *travaux* in key respects."[99] The Applicant argues that the committee had rightly interpreted the applicable rules differently from the tribunal, and had in fact conducted "a proper *de novo* analysis."[100]

122.   In the same vein, the *ad hoc* committee in *Sempra v. Argentina* equally "made an interpretation of the applicable norms that differed greatly from that of the tribunal."[101] The committee concluded that the tribunal had failed to apply Article XI of the BIT. After a thorough legal analysis of both BIT Article XI and Article 25 of the ILC Draft, the committee concluded that both texts differed in substance and that BIT Article XI should have been applied. In the committee's words:

> "Thus, the Tribunal adopted Article 25 of the ILC Articles as the primary law to be applied, rather than Article XI of the BIT, and in so doing made a fundamental error in identifying and applying the applicable law. The

---

[97] Reply, ¶ 66.
[98] Reply, ¶ 65.
[99] *Malaysian Historical Salvors Sdn, Bhd v. Malaysia*, ICSID Case No. ARB/05/10, Decision of the *ad hoc* Committee on the Application for Annulment (16 April 2009), ¶ 62 (A/RLA-52).
[100] Reply, ¶ 71.
[101] Reply, ¶ 72.

> Committee is therefore driven to the conclusion that the Tribunal has failed
> to conduct its review on the basis that the applicable legal norm is to be
> found in Article XI of the BIT, and that this failure constitutes an excess of
> powers within the meaning of the ICSID Convention."[102]

123. The Applicant maintains that the *ad hoc* committee in *Enron v. Argentina* had also "made an enquiry into the underlying tribunal's analysis" to find that the tribunal had not applied the proper law but the results of an expert opinion. Not only had the committee criticized the tribunal's approach but had corrected the tribunal by stating how the tribunal should have reasoned. In fact, the committee had found:

> "The Tribunal's process of reasoning should have been as follows. First,
> the Tribunal should have found the relevant facts based on all of the
> evidence before it […]. Secondly, the Tribunal should have applied the
> legal elements of the Article 25(2)(b) to the facts as found […]. Thirdly, in
> the light of the first two steps, the Tribunal should have concluded whether
> or not Argentina had "contributed to the situation of necessity" within the
> meaning of Article 25(2)(b)."[103]

124. The Applicant concludes from these decisions that an in-depth analysis and *de novo* review of the Award are appropriate and necessary in order to determine that the Tribunal's own findings on the legal requirements for the definition of *siège social* or, respectively, the seat of the Respondents are not backed-up by the evidence.[104] It alleges that it "is manifest that the Tribunal failed to decide the case based on the evidentiary materials put before it by the Claimants."[105]

125. The Applicant recalls, relying on *ICS v. Argentina*, that "a State's consent to arbitration shall not be presumed in the face of ambiguity. Consent to the jurisdiction of a judicial or quasi-judicial body under international law is either proven or not." Since Venezuela did not consent to arbitrate with claimants that were not investors from Luxembourg and Portugal, respectively, and since Tenaris and Talta were not

---

[102] *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision of the *ad hoc* Committee on the Application for Annulment (29 June 2010) (hereinafter *Sempra v. Argentina*), ¶¶ 208 and 209 (A/RLA-36).
[103] *Enron Creditors Recovery Corp. Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision of the ad hoc Committee on the Application for Annulment (30 July 2003), ¶ 393 (A/RLA-60).
[104] Memorial, ¶¶ 128 ss.; Reply, ¶¶ 88 ss.
[105] Memorial, ¶143.

investors from either country, its consent is lacking and thereby the jurisdiction of the Tribunal.[106]

126. Finally, the Applicant states that the Tribunal had held that international law should apply to establish the proper meaning of *siège social*, including the rules on interpretation, and since that law does not provide for a definition of the 'effective seat', the Tribunal proposed to look into "rules generally accepted by different municipal legal system."[107] Instead of applying these rules, it had "invoked only a rebuttable presumption on the seat present in Portuguese law."[108] "By applying Portuguese law, as it did, the Tribunal manifestly exceeded its powers."[109] The "Tribunal said that it was applying principles of international law and ended up applying Portuguese and Luxembourg law."[110]

127. In developing its case, the Applicant does not contest that the Tribunal refers to and interprets Convention Article 25, Article 1.b) of the Luxembourg-Venezuela BIT and Article I.1.b) of the Portugal-Venezuela BIT. Likewise, it does not contest the result of such interpretation according to which the terms nationality/*siège social*/seat mean the effective seat and not a statutory seat.

128. Further, it agrees in principle with the Tribunal's analysis that according to the unanimous and undisputed expert opinions for both legal systems:

> "the factors conditioning a company's Effective Seat are three:
>
> - The place in which the shareholders' meetings and the board of directors' meetings are conducted; the place where they are held is relevant;
>
> - The place in which the management tasks take place, the place from which a company reaches out to customers, where it signs its main contracts and where financial activities are carried out;

---

[106] Venezuela's PHB, p. 10; Venezuela relies on *ICS Inspection and Control Services Ltd. v. Argentina*, PCA Case No. 2010-9, Award on Jurisdiction (10 February 2012), ¶ 280 (A/RLA-86).
[107] Award, ¶ 192.
[108] Memorial, ¶ 155.
[109] Venezuela's PHB, p. 8
[110] Tr. D2, p. 344.

- The place where the company's books are deposited and kept."[111]

129. The Applicant confirms that "[a]ll these elements had to be present for the Tribunal to affirm its jurisdiction. They are cumulative requirements."[112] However, it observes that according to the expert on Luxembourgian law "the minutes of the board of directors appear as the most relevant evidence to assess whether the decision-making nerve centre of Tenaris S.A. is located in Luxembourg." It criticizes the Tribunal for not having applied this hierarchy of criteria.[113]

130. During the Hearing, the Applicant presented the minutes of meetings of the board of directors to prove that they were authentic but "heavily redacted" and void of content.[114] It alleges that they were not only submitted untimely[115] but that they do not prove the effective seats to be located in Luxembourg and Portugal. The Applicant asserts that Tenaris' meetings were mostly held by telephone conference at times convenient for South American time zones, that members of the board dialed in from places that were incorrectly identified by the Tribunal and overwhelmingly from outside Luxembourg, that most of the minutes concern meetings held after the date of notice of arbitration and are of no value as to the establishment of the effective seat at that crucial moment.[116] The Applicant does not comment on the Tribunal's finding that "Talta's board of directors always met in Portugal."[117]

131. With respect to the Tribunal's holding that Luxembourgian law allows board meetings held by telematics means and that such law "establishes the presumption that the meetings held by telematics channels are deemed conducted in the statutory seat,"[118] the Applicant alleges that the central administration of a company and its

---

[111] Award, ¶ 193.
[112] Reply, ¶ 85; Memorial, ¶¶ 131 and 132.
[113] Memorial, ¶ 133, quoting the expert on Luxembourg law.
[114] Tr. D2, p. 28.
[115] This issue will be dealt with in the context of a departure from procedural rules.
[116] Memorial, ¶¶ 133 ss.; Reply, ¶¶ 88 ss.
[117] Award, ¶ 210.
[118] Award, ¶ 212.

statutory seat "are not necessarily the same" and that the "mere assumption" of coinciding is not backed by the minutes.[119]

132.   With respect to the other criteria that the Tribunal used to define the effective seat, i.e. the meetings of shareholders and the place where the companies are audited and the books are kept, the Applicant asserts that they are irrelevant. Both are "mere consequences of compliance with the legal requirements of the place of incorporation and, as such, they are irrelevant for purposes of determining the effective seat of a company": both Luxembourgian and Portuguese law require that accounts are audited, and books are kept, and shareholder meetings are conducted at the statutory seat.[120]

133.   As to the criteria for the *siège social* under Luxembourgian law and their application in a concrete situation, the Applicant relies on the recent award in *CFH v. Cameroon*,[121] which "is deferential to the Tenaris awards only in relation to the interpretation of the concept of seat."[122] That tribunal had to apply almost identical provisions of the Belgo-Luxembourg Economic Union (BLEU) BIT; it "sided with the Tribunal [sic] in the determination of the elements that would indicate where the effective seat of a company is located."[123] Despite an identical application and interpretation of the law, in direct reference to the present case, "that tribunal reached a very different conclusion," [124] based on the evidence.

134.   The *CFH v. Cameroon* tribunal found that:

Shareholder meetings took place in Luxembourg, although irregularly;

---

[119] Memorial, ¶ 145; Reply, ¶ 94.
[120] Reply, ¶¶ 95 and 101; The Applicant discusses further facts referring to the issue of the Claimants' nationality, such as the office space and the nature of the Portuguese company. It is not always evident to the Committee whether issues are addressed to document an excess of power or a failure to state reasons. For these particular items, however, the Applicant clearly states that they concern the failure to state reasons only (cf. Venezuela's Memorial, ¶¶ 147, 154; Venezuela's Reply, ¶ 97). They will be addressed in that section.
[121] *Capital Financial Holdings Luxembourg S.A. v. Republic of Cameroon*, ICSID Case No. ARB/15/18, Award (22 June 2017) (hereinafter *CFH v. Cameroon*) (A/RLA-107).
[122] Venezuela's PHB, p. 11.
[123] Reply, ¶ 103.
[124] *Ibid.*

Board meetings were deemed to be formally held in Luxembourg, "but many directors voted by circular letters";

The company kept records in Luxembourg, "albeit incomplete."[125]

135. Despite these findings, according to the Applicant similar to the present case, "the tribunal still concluded that it did not have *ratione personae* jurisdiction."[126]

## 2. The Respondents

136. The Respondents recall the "elementary principles" for both substantive and jurisdictional enquiries "that annulment committees are not fact finders, and that annulment committees are without the power to substitute their assessment of the facts for that of a tribunal."[127] They rely on the *ad hoc* committee in *Tulip v. Turkey*, which held that: "[a]d hoc committees cannot review an award's findings for errors of fact or law."[128]

137. They explain that the Tribunal had applied the Convention and the Treaties and found –following the reasoning of Venezuela and its expert – that they all required that the effective and not only the statutory seat was decisive to establish the nationality of the investors. The Tribunal then determined the cumulative criteria that constitutes such effective seat, again in agreement with Venezuela, with the exception of its opinion on the hierarchy of the criterion of the meetings of the board of directors, where the Tribunal had considered and rejected the expert's legal argument.[129] "In other words, Venezuela claims that the Tribunal identified the correct legal test but then reached the wrong result based on the evidence."[130]

138. The Respondents contend that in light of these uncontroversial findings on law, the Applicant is only able to argue that the Tribunal erred in the appreciation of the facts and that "an annulment committee has the power and duty to review the evidence in

---

[125] Reply, ¶¶ 104 and 106; *CFH v. Cameroon*, ¶ 315.
[126] Reply, ¶ 107.
[127] Rejoinder, ¶ 74.
[128] *Tulip Real Estate and Development Netherlands BV v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment (30 December 2015), ¶ 44 (A/RLA-68).
[129] Counter-Memorial, ¶¶ 90-93 and 129-131; Rejoinder, ¶ 81.
[130] Counter-Memorial, ¶ 94.

full to find that claimed error."[131] Yet, it is widely accepted that *ad hoc* committees do not have such power. The Committee is not authorized to reassess the evidence and scrutinize whether the Tribunal erred in its assessment. As stated in *Rumeli v. Kazakhstan*, "it would not be proper for an ad hoc committee to overturn a tribunal's treatment of the evidence to which it was referred."[132]

139.    Even the cases on which Venezuela relies to justify a committee's *de novo* analysis of the tribunal's findings (and which have been criticized as going too far into the direction of appeal), do not accept that committees might undertake a *de novo* analysis of the factual findings of a tribunal.[133]

140.    The Respondents rely on the *ad hoc* committee in *Dogan v. Turkmenistan* that found:

> "The Committee shall not review the probative value attributed by the Tribunal to the evidence on which it has relied to reach its Decision on Jurisdiction. This is a matter of appreciation and evaluation of evidence. It is repetitious to observe that it is beyond the mandate of this Committee to revisit the conclusions reached by the Tribunal in such matters, considering that it is not acting as an appellate body."[134]

141.    Finally, the Respondents submit that the Applicant has failed to address the "manifest" requirement, which obliges it to prove that the alleged error was – in the words of the *Impregilo v. Argentina* committee – "obvious, self-evident, clear, flagrant and substantially serious."[135] The Applicant has ignored that another tribunal, which was confronted with the same jurisdictional issue with respect to the same Claimants and Respondent, had correctly found that *Tenaris* and *Talta* had their effective seats in Luxembourg and Portugal, respectively.[136] The correctness of the

---

[131] Rejoinder, ¶ 73.
[132] *Rumeli Telekom AS and Telsim Mobil Telekomunikasyon Hizmetleri AS v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the *Ad Hoc* Committee (25 March 2010) (hereinafter Rumeli v. Kazakhstan), ¶ 96 (A/RLA-78).
[133] Rejoinder, ¶¶ 73-78.
[134] *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment (15 January 2016), ¶ 214 (A/RLA-105).
[135] *Impregilo v. Argentina*, ¶ 128.
[136] *Tenaris SA and Talta-Trading E Marketing Sociedade Unipessoal LDA v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/26, Award, (29 January 2016) (hereinafter *Tenaris I v. Venezuela* Award), ¶ 226 (A/CLA-45).

tribunal's decision has been confirmed by an *ad hoc* committee that rejected Venezuela's request for annulment in this regard.[137] The Respondents submit that:

> "the Tribunal's jurisdictional decision in Tenaris II cannot be an obvious and self-evident excess of powers given that another tribunal has reached the same conclusion. In that circumstance, any alleged jurisdictional error, by definition, cannot be manifest."[138]

142.   Instead, as the Respondents submit, the Applicant relies on a separate case – *CFH v. Cameroon* – involving a different claimant and respondent, and different facts. The tribunal in that case found that the claimant had abused its rights by "wakening" a dormant company for the sole purpose of availing itself of treaty protection and that the evidence was insufficient. The Respondents assert that:

> "it is in any event misplaced to compare the evidence submitted in CFH to the evidence supporting the Tribunal's assumption of jurisdiction in this case. Moreover, even if the facts of the two cases were exactly the same, the different results reached by the two tribunals would not give rise to annulment of one award or the other. At most, in such circumstances one of the tribunals could be accused of making a factual or legal error. But that is not a basis for annulment."[139]

### ii.    The Committee's Analysis and Determination

143.   The Committee does not have the authority to scrutinize the Award for errors of law and/or fact. The Committee will proceed to examine the Applicant's *ratione personae* issue within the limits of its mandate.

144.   The Committee finds that the Tribunal has identified the relevant provisions of the ICSID Convention and the applicable Treaties in paragraphs 165-174 of the Award to determine its jurisdiction *ratione personae*. The Tribunal's further research of rules of international law has led it to conclude that "[i]nternational law lacks a concept of "seat" […] of its own", and that it "was developed within the different systems of Municipal Law. […] Hence to give substance to the term, it is necessary to resort to

---

[137] *Tenaris I v. Venezuela* Decision, ¶¶ 204-216.
[138] Counter-Memorial, ¶ 95; Rejoinder, ¶¶ 86-87.
[139] Rejoinder, ¶ 85 (footnotes omitted).

the rules generally accepted by different municipal legal systems."[140] It has then turned to the interpretation of the Treaties in light of VCLT Article 31.[141]

145. By relying on literature, jurisprudence and expert opinions presented by both Parties, the Tribunal developed its analysis in paragraphs 175-189 of the Award as to the requirement of an effective seat to determine the nationality of the Respondents. It reached its conclusion in application of detailed "hermeneutic principles, and in the light of the rules of international law."[142] In paragraphs 191-194 of the Award, it identified the factors that determine such seat. The reasoning is exhaustive. It corresponds to the reasoning in *Tenaris I* and has been largely quoted with approval in *CFH v. Cameroon*, where the tribunal held that the legal argumentation in both *Tenaris I* and the Tribunal in the present case are similar and appropriate.[143]

146. When considering the development of the Tribunal's reasoning, the Committee does not find a regressive argumentation based exclusively on Portuguese and Luxembourgian law.

147. The Tribunal has identified a number of factors to determine the effective seat, in close consideration of the Parties' experts. The disagreement between the Tribunal and the Applicant's expert on the hierarchy to be given to the different factors is not more than that: a disagreement on the interpretation of legal terms and by no means a non-application of the law. It is not the Committee's role to take sides in such a debate on the interpretation of a legal norm.

148. Conversely to the circumstances in the annulments of *MHS v. Malaysia* and *Sempra v. Argentina*, which have been presented above and which have both found that those tribunals failed to apply crucial provisions of the respective BITs, no such situation exists in the present case.

---

[140] Award, ¶ 181.
[141] Award, ¶¶ 183-188.
[142] Award, ¶ 189.
[143] *CFH v. Cameroon*, ¶¶ 226 ss. for *Tenaris I* and ¶¶ 262 and 263 for *Tenaris II*.

149.   Given these circumstances, the Committee is not surprised to find that the Parties' argumentation does not differ widely as to the legal analysis of the Tribunal. Rather, the Applicant bases its case on the assertion that it "is manifest that the Tribunal failed to decide the case based on the evidentiary materials put before it by the Claimants."[144]

150.   Having found that both Treaties demand an effective seat to determine the nationality of the Respondents, and having identified the factors that condition a party's effective seat, the Tribunal applied these legal determinations to the facts provided by the Parties. In paragraphs 195-203 of the Award, it presented the Respondents' evidence that is meant to prove that they had their seats in Luxembourg and Portugal, respectively; in paragraphs 204-206 of the Award, it presented Venezuela's evidence that is meant to prove that the Respondents' seat was Argentina and not Luxembourg and Portugal; and in paragraphs 207-230 of the Award, the Tribunal assessed the evidence.

151.   In a preliminary remark, the Tribunal has indicated that after having studied the experts' opinions and the accompanying evidence "it tends to think that in Portuguese Law there actually exists a presumption that the Effective Seat coincides with the Statutory Seat."[145] Notwithstanding this remark, the Tribunal has "thoroughly analyzed and assessed the evidence."[146] Evidently, the Tribunal has not based its determination on a mere presumption.

152.   The Tribunal has found that:

-    The shareholders' meetings of both Tenaris and Talta were always held in Luxembourg and Portugal respectively;
-    Tenaris' board of directors met 8 times in person in Luxembourg, twice in Mexico, and once in Argentina, once in the USA and 22 times by telephone

---

[144] Memorial, ¶ 143.
[145] Award, ¶ 207.
[146] Award, ¶¶ 207 and 208.

conference, which is allowed by Luxembourgian Law and deemed held at the statutory seat;

- Talta's board of directors always met in Portugal;

- Offices, even if small, are operated in both Luxembourg and Portugal;

- The issue of the number of employees is irrelevant for the purpose of determining the effective seat;

- The lack of operations with third parties does not imply the absence of business activities as holding companies;

- Luxembourgian and Portuguese auditing companies audit both Tenaris and Talta, respectively, and books are kept and stored in Luxembourg and Portugal, respectively.

153.   The Tribunal has concluded that "there is no evidence that Tenaris and Talta's Effective seat are located in Argentina. On the contrary, the evidence points to the fact that Effective Seat is located in Luxembourg and Portugal, respectively."[147]

154.   The Committee finds that the assessment of the evidence and the conclusions are developed with care. It has neither the right nor the duty to scrutinize them with the aim to find errors and/or incorrect appreciations as long as they do not amount to a suppression or manipulation of the evidence leading to a usurpation of jurisdiction.

155.   The Applicant submits that the geographical location from which directors dialed into telephone conferences was often not revealed, that the Tribunal did not correctly identify the names of the participating directors, and that the time zone of the conferences was appropriate for Argentina and Mexico but not for Luxembourg.[148] The Applicant has presented the minutes of meetings to prove its assertion, confirming that the documents were authentic.

156.   These allegations try to prove that the Tribunal erred in its appreciation. The Committee is not authorized to reassess this evidence and substitute its appreciation

---

[147] Award, ¶ 230; the foregoing is a summary of ¶¶ 198 and 207-229 of the Award.
[148] Memorial, ¶¶ 135-143.

for that of the Tribunal, as long as it does not believe that the Tribunal mishandled the evidence in order to establish its competence to hear the merits. The Committee does not find any indication in this sense. The Committee agrees with the *ad hoc* committee in *Tenaris I* which held that "it is for the Tribunal, not for the Committee, to weigh the evidence adduced."[149] In the Tribunal's appreciation of the evidence, the Respondents were Portuguese and Luxembourgian investors, respectively. As said, the Committee is not authorized to reassess that evidence. Therefore, Venezuela's assertion that it did not consent to arbitrate disputes with investors from different countries has no merit.

157. Further, the Applicant asks the Committee to be alerted by the fact that in *CFH v. Cameroon,* the tribunal shared the legal analysis of the Tribunal in the present case but reached completely different conclusions in evaluating the evidence.

158. The Committee has studied the award in *CFH v. Cameroon* and finds that those facts are very different from the ones of the present case. In that case, the tribunal found that for four years no shareholder meeting had taken place, no director had been nominated, and the books had not been audited. The company had been "en sommeil" for all those years only to have woken up ("réveillé") for the purposes of the dispute.[150]

159. Therefore, the issue was not one of effective seat but of the effective existence of the claimant. The tribunal denied jurisdiction for this reason and for the abusive conduct of the claimant. The difference of appreciation by the two tribunals is based on the difference of the factual circumstances. It is not indicative of a mishandling of evidence by the Tribunal in the present case.

160. The Committee finds it more appropriate to refer to the *Tenaris I* award, where the tribunal assessed the evidence similarly to the Tribunal in the present case.[151] The parallel indicates, indeed, that the Tribunal has not manipulated or suppressed the

---

[149] *Tenaris I v. Venezuela* Decision, ¶ 207.
[150] *CFH v. Cameroon*, ¶¶ 363-365.
[151] *Tenaris I v. Venezuela* Award, ¶ 226, as upheld in an annulment proceeding: *Tenaris I v. Venezuela* Decision, ¶ 127.

evidence and that it has not unlawfully arrogated the competence to decide the merits of the case.

161. For all these reasons, the Committee determines that the Tribunal has not exceeded its powers in its decision regarding the *siège social* and will not have to examine the term "manifest." Therefore, it rejects the Applicant's request to annul the Award based on this ground.

### b. *The Issue of Jurisdiction Ratione Temporis*

#### i. *Summary of the Parties' Position*

##### 1. *The Applicant*

162. The Applicant contends that the Tribunal exceeded its powers "when it granted jurisdiction without the parties' consent under the terms of the Treaties. Since the Tribunal fabricated jurisdiction where there was none, it exceeded its powers in a manifest manner."[152]

163. Venezuela recalls the fundamental importance of consent as expressed in paragraph 23 of the Report of the Executive Directors of the World Bank on the ICSID Convention: "Consent of the parties is the cornerstone of the jurisdiction of the Centre", and reiterated in abundant jurisprudence and doctrine. The Applicant states that *ad hoc* committees have the power "to review a tribunal's findings for errors of facts or law" since "through the application mutatis mutandis of Article 41 by the Committee, the Committee has to decide whether jurisdiction existed under the ICSID Convention."[153]

164. Without explicitly referring to Convention Article 72, it bases its argument on the requirement that the consent to jurisdiction must be received before the notice of denunciation of the Convention. Venezuela denounced the Convention on 24 January 2012. Only an acceptance of Venezuela's offer by Tenaris and Talta to have disputes with investors heard and decided by an arbitral tribunal under the ICSID Convention

---

[152] Reply, ¶ 137; Memorial, ¶¶ 186 and 187.
[153] Tr. D1, pp. 67-72.

that preceded the date of notice of denunciation would have perfected the consent. However, that acceptance was only declared valid after such date.

165. The Applicant submits that the substance and the limits of its offer were clearly circumscribed in the Treaties, and that Article 9 of the Luxembourg BIT unequivocally provided that the offer was contingent on a previous notice of dispute initiating amicable settlement negotiations.

166. It submits that the Respondents' letters and notices, as well as negotiations between different parties preceding the date of denunciation, cannot be considered valid manifestations of acceptance.

167. As to Tenaris-TAVSA, it states that "Tenaris' Notice of Dispute regarding TAVSA was flawed because it failed to accept the Republic's offer of consent given in the Treaty with Luxembourg,"[154] thus constituting "an amendment to the Republic's consent offer."[155] The Applicant contends that the Luxembourg BIT conditions the offer to arbitrate to a six-month consultation period. An acceptance that rejects that condition cannot be considered valid and thus cannot perfect the consent to arbitrate.[156] It relies on its expert report, as well as on case law and on the analysis of international law and the ICSID system. It argues that the reservation of the right to start arbitration before a six-month settlement negotiation period "clearly contravenes the design of the dispute settlement offer contained in the Belgium-Luxembourg/Venezuela BIT"[157] and has to be qualified as "lack of a corresponding acceptance."[158]

168. As to Tenaris-COMSIGUA, it states that "Claimants [sic] consent was not validly given before the Republic's Denunciation since it departed significantly from the terms of the offer contained in the Treaty invoked."[159]

---

[154] Reply, ¶ 120.
[155] Reply, ¶¶ 120-122.
[156] Tr. D2, pp. 413-414.
[157] Memorial, ¶ 170.
[158] Memorial, ¶ 169.
[159] Memorial, ¶174.

169.    As to Talta-COMSIGUA, it states that – like with Tenaris-COMSIGUA – "it is not possible to conclude that negotiations under the Treaties started before the COMSIGUA Notification of December 2011."[160] As a general rule, as correctly analyzed by the Republic's expert before the Tribunal, the consent to (ICSID) arbitration cannot be expressed before the expiry of the six-month amicable settlement period.[161]

170.    The Applicant asserts that by not taking these circumstances into consideration and by thus "wrongly establishing the relevant facts, the Tribunal made a decision that is beyond the scope of its jurisdiction."[162]

## 2. The Respondents

171.    The Respondents refute the Applicant's argumentation and the assertion that the Tribunal has established the facts wrongly. They argue that:

> "[t]he following two facts are relevant for present purposes: the Claimants accepted Venezuela's offer to arbitrate, and thus perfected consent, by notices submitted to Venezuela between 2009 and 2011; and Venezuela denounced the ICSID Convention on 24 January 2012. Thus, an agreement to arbitrate between the Claimants and Venezuela existed before the denunciation."[163]

172.    The Respondents contend that these facts are established and not contested, and that "Venezuela only disputes the *legal consequences* flowing from those facts."[164] Such appraisal does not constitute an excess of power, as little so as the assessment of the facts by the Tribunal. The Committee has no authority to reassess the Tribunal's findings on facts. Finally, "Venezuela does not even try to establish that the Tribunal's jurisdictional decision, even if wrong (which it is not), constitutes an excess of powers that is *manifest*."[165]

### ii. The Committee's Analysis and Determination

---

[160] Memorial, ¶ 177.
[161] Reply, ¶ 123.
[162] Reply, ¶¶ 140 and 141; Venezuela relies on *Occidental v. Ecuador*, ¶ 50.
[163] Counter-Memorial, ¶ 97 (footnotes omitted).
[164] Rejoinder, ¶ 90.
[165] Reply, ¶¶ 90 and 91.

173. The Committee has carefully studied the Award. It has not detected a non-application of the applicable law nor a mishandling of the evidence that the Parties had presented when establishing its competence, and thereby the jurisdiction of the Centre.

174. The Tribunal started its analysis and determination by quoting Convention Article 72 according to which the consent must be given or rather perfected before the denunciation of the Convention since in investment arbitration "consent to arbitrate is expressed consecutively."[166]

175. It then identified, quoted and applied the relevant provisions in both the Luxembourg and the Portugal BITs. Given the difference in their texts, and the factual circumstances for each of the Claimants and their investments, the Tribunal structured its analysis by distinguishing the different scenarios.

176. As to Tenaris-TAVSA, the Tribunal presented Venezuela's position in paragraphs 66-71 and Tenaris' position in paragraphs 72-76 of the Award. In paragraphs 77-91 of the Award, it presented its analysis and determination.

177. The Tribunal listed a string of uncontested communications and negotiations between the Parties that took place between May 2009 and November 2011 in order to reach an amicable settlement. It also referred to a Notice of Dispute dated 20 November 2009 which reads in the relevant part:

> "The Luxembourg Treaty contains Venezuela's consent to solve any dispute through international arbitration, in particular before the International Centre for the [sic] Settlement of Investment Disputes (ICSID). Tenaris and Tavsa LLC hereby also give their consent to resort to arbitration in the unfortunate event the dispute could not be settled amicably."[167]

178. The Tribunal took this Notice to mean that Tenaris perfected the consent to arbitrate before ICSID. In the Committee's mind, the text of the Notice is unambiguous and the interpretation given by the Tribunal is understandable.

---

[166] Award, ¶¶ 59 and 63.
[167] Quote reproduced from the Award, ¶ 85 (underlined in the original).

179.  The Tribunal noted that Venezuela "seems to have abandoned the argument," in the Tenaris-TAVSA context, that "acceptance should have been submitted only after negotiating in good faith for six months."[168] It therefore focused the debate on this issue to the circumstances of Tenaris-COMSIGUA. The Committee is not in a position to verify the Tribunal's assumption.

180.  The Committee notes, however, that the Applicant did not raise this specific issue in the annulment proceeding. Rather, Venezuela contends that Tenaris' acceptance was flawed since it contained a reservation. The reservation was inconsistent with Venezuela's offer and could therefore not perfect the consent.[169]

181.  With respect to the latter query, the Tribunal quoted the reservation in the Award which states:

> "In this context, Tenaris and Tavsa LLC hereby reserve their right to file for arbitration upon expiration of the six-month term […] or even before insofar as the Government's behaviour shows the expiration of such term is a mere formality deprived of all usefulness."[170]

182.  The Tribunal found, firstly, that Tenaris had never made use of the reservation, and secondly, that it did not substantially modify the offer, "as by doing so Tenaris merely subscribed to a principle accepted in investment arbitration and reflected in the Luxembourg Treaty itself."[171]

183.  The Committee does not have to determine whether the Tribunal applied the Luxembourg Treaty erroneously, although it finds that the reservation is not substantively inconsistent with Venezuela's standing offer to accept arbitration: Article 9.1 provides that the parties shall endeavor as far as possible to settle the dispute amicably. Tenaris' declaration expresses the acceptance of the offer unequivocally and states that it will conduct proceedings as legally prescribed. In any

---

[168] Award, ¶ 78.
[169] Tr. D1, p.53
[170] Quote reproduced from Award, ¶ 87.
[171] Award, ¶¶ 89 and 90.

event and for this reason, the Tribunal's determination does not amount to a non-application of the applicable law.

184. As to Talta-COMSIGUA, the Tribunal found that negotiations started in June 2010 and a Notice of Dispute was sent on 2 December 2011, i.e. before the date of denunciation, when Talta-COMSIGUA expressed its consent to submit the dispute to ICSID arbitration. It held that the consent was validly expressed and that the six-month negotiation period had been completed since, according to Article VIII.2 of the Portugal Treaty, it had started to run "from the beginning of these consultations."[172]

185. The Tribunal decided to postpone its final ruling until it had also determined whether Tenaris, being a joint claimant in COMSIGUA, had equally given its consent.

186. The Tribunal determined that the situation for Tenaris-COMSIGUA was "more complex" given the difference in wording between the Luxembourg and Portuguese Treaties.[173]

187. The Tribunal displayed the Applicant's and its expert's positions in paragraphs 103 and 106-114, and the Respondents' and their expert's positions in paragraphs 104 and 115-121 of the Award.

188. It developed its analysis in paragraphs 122-151 of the Award in a delicate appreciation of the experts' opinions on the proper reading of Article 9 of the Luxembourg Treaty. In reference to VCLT Article 31 and by weighing the text of the Luxembourg Treaty, its context, purpose and object, as well as the overriding requirement of good faith, the Tribunal concluded that "Article 9 of Luxembourg Treaty (when correctly interpreted) allows the investor expressing its consent in advance and, at the same time, declaring its choice for ICSID arbitration."[174]

---

[172] Award, ¶¶ 95-97.
[173] Award, ¶ 100.
[174] Award, ¶ 143.

189. Therefore, the Tribunal held that Talta's and Tenaris' Notice of Dispute dated 2 December 2011, and hence before Venezuela's denunciation of the ICSID Convention, which had chosen the ICSID procedure, completed the consent.

190. In an addendum, the Tribunal analyzed a number of cases that had been submitted by Venezuela to evidence that the consent can only be completed after the negotiation period and found these cases inconclusive.[175]

191. The Committee cannot but state that the Tribunal applied the relevant treaty and came to reasonable conclusions for all constellations, i.e. for Tenaris-TAVSA, Talta-COMSIGUA and Tenaris-COMSIGUA.

192. Therefore, the Committee determines that the Tribunal has not exceeded its powers in its decision regarding the consent to arbitrate and will not have to examine the term "manifest." Accordingly, it rejects the Applicant's request to annul the Award based on this ground.

### c. The Issue of Expropriation

#### i. Summary of the Parties' Position

##### 1. The Applicant

193. The Applicant contends that the Tribunal "manifestly exceeded its power by failing to apply the applicable law, *i.e.* the Portugal BIT and customary rules of international law."[176]

194. It submits that the Tribunal initially confirmed that both the Luxembourg and the Portugal Treaties had to be applied and that it analyzed them both "when addressing many of the parties' arguments on expropriation" but that it failed to do so when considering the issue of compensation. Thereby, it overlooked Venezuela's argument that the Portugal BIT required only a suitable mechanism to ensure payment of

---

[175] Award, ¶¶ 145-151.
[176] Memorial, ¶ 188.

compensation, "and that lack of payment did not make a legal expropriation illegal."[177]

195. Venezuela had put the question before the Tribunal whether it had violated Article IV of the Portugal BIT. That question was not addressed, amounting to "a failure to apply the proper law in a manifest excess of powers."[178]

196. The Applicant admits that the Tribunal refers to the Portugal BIT when it presents both BITs in its section on "The Lack of Payment" and states that:

> "Prima facie the Arbitral Tribunal sits with Claimants: a delay of more than seven years in the payment of compensation does not constitute "immediate" payment, following the wording of art. IV of the Portugal Treaty."[179]

However, that was "merely a prima facie expression that had to be addressed and elaborated on by the Tribunal." By failing to make a "conclusive determination" to that effect, the Tribunal exceeded its power.[180]

197. Instead of applying the Portugal BIT to the events concerning TALTA, the Tribunal applied the Luxembourg BIT, which is not the applicable law with respect to an allegedly Portuguese Claimant, and "any use of the Luxembourg Treaty as to Talta is frivolous."[181]

198. The Applicant extends its complaint to the non-application of customary international law. It asserts:

> "The Republic's argument based on customary international law relied on the fact that the BITs are the ones that provide for the application of such rules as part of the applicable law. Therefore, applying customary international law amounts to applying the proper law, i.e. the BITs. Consequently, not applying customary international law means not applying the proper law."[182]

---

[177] Memorial, ¶¶ 192 to 198; Reply, ¶¶ 148 and 149.
[178] Tr. D1, pp. 85 and 86.
[179] Award, ¶ 357.
[180] Reply, ¶¶ 150 and 151; Tr. D2, pp. 421-424.
[181] Tr. D1, p. 94.
[182] Reply, ¶ 153; Memorial ¶ 194.

It insists that the Tribunal's manifest excess of power is particularly blatant since it did apply customary international law selectively, for instance in connection with quantum.[183]

199.     The Applicant relies on *Sempra v. Argentina*, where the *ad hoc* committee found that the tribunal had exceeded its powers by applying – through Article 25 of the Draft Articles on State Responsibility – customary international law, "rather than Article XI of the BIT."[184] It argues:

> "In the present case, the Tribunal did the opposite; i.e. it adopted the BIT (not the Venezuela-Portugal Treaty) as the primary law to be applied, and failed to apply the rules on customary international law on expropriation, which indeed is part of the applicable law pursuant to the terms of the BITs."[185]

### 2.    The Respondents

200.     The Respondents refute the Applicant's argumentation. They contend that the Tribunal did apply the Portugal BIT when finding that the non-payment for more than seven years did not constitute immediate payment, following the wording of its Article IV requirement. No extended analysis was needed and appropriate to come to this conclusion. The succinctness of the reasoning does not amount to a non-application of the norm but at best to a failure to state reasons.

201.     The expression "*prima facie*" in paragraph 357 of the Award might be a "rather strange coda" and the issue could "have been more felicitously expressed" but that does not hinder the identification of the clear conclusion by the Tribunal that Venezuela violated Article IV.1 of the Portugal BIT.[186]

202.     Further, the Tribunal elaborated on the Luxembourg BIT because of its "more permissive language." In any event, the Applicant's arguments do not relate to

---

[183] Reply, ¶ 153.
[184] *Sempra v. Argentina*, ¶ 207.
[185] Reply, ¶ 157.
[186] Tr. D1, pp. 251-252.

COMSIGUA, since the TAVSA investment was covered by the Luxembourg BIT, whose non-application is not alleged.[187]

203. With respect to the alleged non-application of customary international law, the Respondents rely on the *Vivendi I v. Argentina* committee, which found that:

> "[n]o doubt an ICSID tribunal is not required to address in its award every argument made by the parties, provided of course that the arguments which it actually does consider are themselves capable of leading to the conclusion reached by the tribunal and that all questions submitted to a tribunal are expressly or implicitly dealt with."[188]

They explain that the Tribunal had established under the Treaties that Tenaris and Talta had been unlawfully expropriated and that there was no need to go any further in its analysis. The Treaties were *leges speciales* that cannot be overridden by customary law. By not taking it into consideration, the Tribunal expressed implicitly that it gave primacy to the BITs. It did not have to reject the application of customary law explicitly. In any event and where appropriate, the Tribunal did apply customary international law.[189]

204. Finally, the Respondents assert that the non-application of the applicable law can only be considered an excess of power when it is not applied *in toto,* which is not the case here. Any other interpretation would amount to the unauthorized scrutiny of the correct application of the law.[190]

### ii. The Committee's Analysis and Determination

205. The Applicant alleges the non-application of two sets of legal norms: (i) the Portugal BIT and (ii) provisions of customary international law. The Committee will address both allegations separately.

206. With respect to the Portugal BIT, the Committee notes at the outset that the Applicant's allegation relates only to Talta-COMSIGUA's expropriation. The

---

[187] Counter-Memorial, ¶¶ 103-106; Rejoinder, ¶ 93.
[188] *Compañía de Aguas del Aconquija SA and Vivendi Universal v. Argentine Republic,* ICSID Case No. ARB/97/3, Decision on Annulment (3 July 2002) (hereinafter *Aguas v. Argentina*), ¶ 87 (A/RLA-45).
[189] Rejoinder, ¶¶ 104, 105, 108.
[190] Rejoinder, ¶ 107.

Applicant does not assert that the Tribunal did not apply the Luxembourg BIT, and the issues connected to Tenaris' investments in both TAVSA and COMSIGUA are covered by the Luxembourg Treaty. Having argued that the Tribunal "only referred to the Venezuela-Luxembourg Treaty,"[191] the Applicant states without any elaboration that "the Tribunal […] failed to apply both."[192] The Committee is unable to follow the Applicant's reasoning.

207. In addition, in the Committee's view, the Tribunal has done more than just presenting a "*prima facie* conclusion," as alleged by the Applicant.[193]

208. It has opened its analysis on the issue of expropriation by quoting both Treaties in their relevant parts. It concluded that "the Treaties" allow expropriations when they meet certain requirements one of which is that they are "accompanied by provisions that contemplate the payment of compensation […] and payment thereof shall be made without undue delay."[194] That is an interpretation of both BITs. It is not for this Committee to delve into its correctness.

209. The Tribunal has reiterated the text of both Treaties when discussing the lack of payment. It has concluded that the wording of Article IV of the Portugal BIT, which requires that the "immediate, adequate and effective" payment of compensation must be guaranteed (differently from the wording of Article 4 of the Luxembourg BIT), has been violated. From there it has drawn the further conclusion that "a delay of more than seven years in the payment of compensation does not constitute "immediate" payment, following the wording of art. IV of the Portugal Treaty."[195]

210. This is a reasoned conclusion in application of the Portugal BIT. The Applicant denies this fact by arguing that the Tribunal itself had stated that it is only *prima facie*, which should have been followed up by a more "conclusive determination."[196]

---

[191] Memorial, ¶¶ 189-198; Reply, ¶¶ 147-150.
[192] Reply, ¶ 151.
[193] Reply, ¶ 151.
[194] Award, ¶¶ 314-321.
[195] Award, ¶ 357.
[196] Reply, ¶ 151.

211.  The Committee does not have to entertain an analysis of the term "*prima facie,*" nor whether the structure of paragraph 357 of the Award is linguistically appropriate. However, it notes that "*prima facie*" precedes the Tribunal's statement that it sides with the Respondents. It refers to paragraph 356 of the Award where the Respondents assert that Venezuela has breached Articles 4 and IV of both Treaties by not compensating for the expropriation in the course of more than seven years.[197] It is not evident that the definitional effects of the term may somehow be conditioned by the following part of paragraph 357, which presents a succinct conclusion in application of the Portugal BIT and introduces a debate of the Luxembourg BIT.

212.  Be that as it may, the "conclusive determination" by the Tribunal is clear to the Committee. The Tribunal has applied and interpreted Article IV of the Portugal BIT in the preceding paragraphs of the Award and states the result of such interpretation in paragraph 357. The fact that it continues its inquiry into the Luxembourg BIT because of the different wording with respect to the lack of payment of Tenaris cannot obscure the conclusions drawn from the application of the Portugal BIT with respect to Talta.

213.  In any event, the Committee has not found an indication that the Tribunal has made use of the Luxembourg Treaty to determine the (un-)lawfulness of Talta's expropriation.

214.  With respect to the alleged non-application of customary international law, the Tribunal noted Venezuela's position in this regard. However, it decided to base its determination as to the unlawfulness of the expropriation due to the lack of compensation in the Treaties.[198]

215.  The Committee notes that both the Portugal and the Luxembourg Treaties provide in Articles VII and 9, respectively, that tribunals have to apply the Treaties and principles of international law. Does that mean that the Tribunal has to explicitly

---

[197] Award, ¶ 356.
[198] Award, ¶¶ 292, 396 and ss.

quote each time both Treaties in their decision? The Committee does not believe so for the following reason.

216. BITs and other treaties are *leges speciales* in relation to principles of international law and, for that matter, customary international law (the distinction is of no relevance in the present case). As such, they are able to derogate from the *leges generales* contained in customary law to the extent that they are not of an imperative character, as clearly expressed in VCLT Article 53. The rules on compensation are not of such imperative character.

217. It would be unnecessary for a tribunal that has determined a legal issue based on a treaty to address it through the prism of *leges generales*. To the extent that a determination based on customary international law yielded a contradicting result, the application of the treaty would take precedence and the examination of the customary law would prove irrelevant and even incorrect. In this sense, principles of customary international law are only relevant in circumstances where the treaty is obscure or leaves gaps.

218. By mentioning Venezuela's position in the Award but basing its decision on the Treaties, the Tribunal has conformed itself to the structure of international law and the provisions of Articles 9 and VII of the Luxembourg and Portugal Treaties, respectively. Precisely, it has not failed to apply the provisions of customary international law, since in light of both Treaties, those provisions are not applicable to determine the lawfulness of the expropriation.

219. The Applicant relies in its argument on *Sempra v. Argentina.* However, the decision supports the Committee's findings. The *ad hoc* committee found that the tribunal had applied customary international law where the BIT had provided otherwise, and had made a fundamental error in determining that customary law "trumps" the BIT.[199] That is perfectly in line with, and supports this Committee's finding. When "[i]n the present case the Tribunal did the opposite; i.e. it adopted the BIT (not the Venezuela-

---

[199] *Sempra v. Argentina*, ¶ 207.

Portugal Treaty) as the primary law to be applied, and failed to apply the rules on customary international law on expropriation,"[200] as submitted by the Applicant, the Tribunal accepted the correct hierarchy.

220. For these reasons, the Committee rejects the request for annulment regarding the issue of expropriation based on the ground of manifest excess of powers.

### (2) Serious Departure from a Fundamental Rule of Procedure

#### a. *The Issue of Burden of Proof and Evidence*

##### i. *Summary of the Parties' Position*

###### 1. *The Applicant*

221. The Applicant bases its request for annulment due to a serious departure from a fundamental rule of procedure on two assertions. Firstly, the Tribunal inverted the burden of proof regarding the effective seat of Tenaris and Talta with the objective to establish jurisdiction.[201] Secondly, the Tribunal "allowed the Claimants to introduce evidence after the 'closure of the files to the Parties' which the Republic could not examine during the Hearing."[202]

222. With regard to the burden of proof, the Applicant asserts that the Tribunal had concluded that Tenaris' and Talta's effective seat was Luxembourg and Portugal, respectively, but not because the Respondents had discharged their burden of proof to this effect. Rather, the Tribunal had "compared the evidence produced by Claimants […] with the evidence presented by the Republic in order to support the Republic's argument that Tenaris and Talta's seat was Argentina […]. In doing so, the Tribunal disregarded the Claimants' burden of proof and reversed it onto the Republic."[203] When assessing the evidence with respect to the relevant criteria for the determination of the seat, i.e. the number of employees, the business operations and the factual management, "the Tribunal considered not what had been effectively

---

[200] Reply, ¶ 157.
[201] Memorial, ¶¶ 91-108; Reply, ¶¶ 31-43.
[202] Memorial, ¶¶ 109-125; Memorial, ¶¶ 45-64.
[203] Memorial, ¶ 104.

demonstrated by Tenaris and Talta, but instead a balance of the scant evidence provided by Claimants with the evidence produced by Venezuela to demonstrate that the **seat** was in Argentina."[204]

223. In that vein, it argues that the Tribunal had concluded that:

- the effective seat was in Luxembourg and Portugal respectively because Venezuela had not sufficiently supported its argument by evidence (which was not its duty) that the seat was in Argentina,
- the effective seat corresponded to the statutory seat because Venezuela had failed to prove (which was not its duty) that business contacts were made from Argentina,
- Talta was a holding company because Venezuela had failed to prove (which was not its duty) that Talta carried out commercial activities of its own outside of its statutory seat.[205]

224. With regard to the Tribunal's allegedly untimely and procedurally inappropriate permission for the Respondents to introduce new evidence at the "eleventh-hour,"[206] the Applicant submits that the Tribunal exercised "a highly irregular procedural misconduct that severely limited its right to defence and eroded its right to be heard"[207] when it allowed Tenaris and Talta to submit documents evidencing the location of the effective seat. It has thus re-opened the proceeding,[208] which it had closed with respect to the submission of new evidence.[209]

225. The Applicant refers to Arbitration Rule 38 and refutes its applicability at the time when the Tribunal granted the Respondents the possibility to introduce new documents. It states, "Arbitration Rule 38 refers to a situation in which the proceedings have been already closed, which is not the situation here."[210]

---

[204] Venezuela's PHB, p. 4 (emphasis in the original).
[205] Memorial, ¶¶ 104-106; Reply, ¶¶ 40-43.
[206] Memorial, ¶ 140.
[207] Memorial, ¶ 119.
[208] Memorial, ¶¶ 117-119.
[209] Tr. D1, pp. 28-30.
[210] Memorial, ¶ 115.

226.    At the same time, the Applicant alleges that the Tribunal had communicated to the Parties that the files were closed after the hearings with respect to evidentiary materials. That said, the Tribunal invited Tenaris and Talta more than a year later to complete the evidence with respect to the effective seat by submitting redacted documents which had been in the Respondents' custody throughout the proceeding. It had done so when it had realized that Venezuela's argument as to the paucity of evidence was pertinent.[211]

227.    The Applicant affirms that it never had an opportunity to rebut this belated evidence and to do so properly during a hearing. Equally, cross-examinations during the hearing had relied on the evidence in the record and could not be extended to the new, untimely documents. "Even though the Tribunal granted Venezuela the opportunity to present its observations on Tenaris and Talta's late submission, in accordance with a calendar of pleadings agreed upon by the parties, the Republic's rights had already been damaged beyond repair."[212]

228.    In particular, the Tribunal did not grant the Republic "an opportunity to complete the record or to add arguments or documents or to question those documents at a hearing."[213]

229.    The Applicant relies on the decision in *Fraport v. Philippines*, where the *ad hoc* committee had found that the tribunal's reliance on evidence, which had been produced after the hearing had taken place and thus could not be considered by the experts, had violated a fundamental principle of procedure.[214]

### 2.   *The Respondents*

230.    With regard to the burden of proof, the Respondents assert that (i) the treatment of evidence and the burden of proof do not amount to a fundamental rule of procedure,[215]

---

[211] Memorial, ¶ 112; Reply, ¶¶ 53-58.
[212] Memorial, ¶ 119.
[213] Reply, ¶ 63; Memorial, ¶ 123.
[214] Reply, ¶¶ 61-62; Venezuela relies on *Fraport AG Frankfurt Airport Services Worldwide v. Republic of Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport AG Frankfurt Airport Services Worldwide (23 December 2010) (hereinafter *Fraport v. Philippines*), ¶¶ 178-247 (A/RLA-61).
[215] Rejoinder, ¶ 14.

and (ii) the Applicant has failed to demonstrate that the Tribunal had reversed the burden at any occasion.

231.    On the contrary, be it on the establishment of the effective seat, the quality of Talta as a holding company, and on the coincidence of the statutory and effective seat, the Tribunal has each time "analyzed the evidence presented by the Claimants and found it to be probative and persuasive. The Tribunal then analyzed the Respondent's evidence and found it wanting."[216]

232.    The Respondents argue that, "[t]hat approach is entirely faithful to the principle that it is for the party alleging a fact to demonstrate its existence."[217]

233.    They state that the Applicant's arguments "are nothing more than a disagreement with the Tribunal's evidentiary determinations", which are entirely in its discretion, and that a corresponding reassessment of the evidence by the Committee is not covered by its authority. Venezuela constantly confuses the burden of proof and the standard of proof, which cannot be alleged to be a rule of procedure.[218]

234.    The Respondents have mustered the case law quoted by the Applicant and agree with their "uncontroversial propositions that: (*i*) matters that are decisive for purposes of establishing jurisdiction must be proven and cannot simply be assumed; and (*ii*) the claimant bears the burden of proof on its jurisdictional allegations." They contend, however, that the Tribunal in the present case did hold Tenaris and Talta to their burden of proof, did rely on evidence and not on assumptions and did find the Respondents' evidence persuasive.[219]

235.    With regard to the alleged untimeliness of the submission of documents on shareholder and board meetings as requested by the Tribunal, the Respondents

---

[216] Rejoinder, ¶¶ 29 and 24-28.
[217] *Croatia v. Serbia*, ¶ 172.
[218] Rejoinder, ¶¶ 26 and 23; Counter-Memorial, ¶¶ 42-43.
[219] Counter-Memorial, ¶¶ 45 and 46; Rejoinder, ¶ 22.

contend that the Tribunal acted within the scope of its competence because of the following reasons.

236. Firstly, Convention Article 43 authorizes the Tribunal to request the production of documents "at any stage of the proceedings" *sua sponte.* Moreover, Arbitration Rule 41 allows the Tribunal at any stage of the proceedings to decide whether the dispute is within its competence and whether procedures related to jurisdictional objections shall be oral or not. The Parties have the inalienable right to be heard but they do not have the right to a hearing.[220]

237. Contrary to Venezuela's allegations, the Respondents argue that the documents only complemented the substantial evidence that they had submitted before the hearing, and the Tribunal relied on both.

238. Secondly, the Respondents assure that Venezuela had sufficient opportunity to comment on the new documents and to submit documents of their own. It is uncontested that the Parties had agreed on a schedule and page-limit for submissions, that both Parties have submitted briefs in two rounds, and that Venezuela simply chose not to add new evidence, together with the briefs. "What this history shows is that all Parties received extensive due process in response to the Tribunal's request."[221]

239. The Respondents refute the Applicant's reliance on *Fraport v. Philippines* because of incomparability of the facts. In *Fraport* the tribunal accepted more than 1900 pages of new evidence after the closing of the proceeding and relied on it without having given the parties an opportunity to make submissions with respect to it.[222] That is the contrary of what happened in the present case as described above.

---

[220] Counter-Memorial, ¶¶ 56-57.
[221] Counter-Memorial, ¶¶ 54-55; Rejoinder, ¶¶ 35-38.
[222] *Fraport v. Philippines*, ¶¶ 219, 227, 230, 236, 244.

## ii.    The Committee's Analysis and Determination

240.    The Committee has carefully read Chapter V.2 of the Award. It disagrees with the Applicant's reading on the burden of proof because the Tribunal did not state what the Applicant alleges. The Committee notes that the Tribunal first presented the evidence submitted by the Respondents in detail, in paragraph 195 to 203 of the Award, and did the same with Venezuela's evidence, in paragraph 204 to 206. It then proceeded to weigh this evidence. The Tribunal found the evidence adduced by Tenaris probative and convincing, contrarily to the Applicant that found it "scant."[223] It is not for the Committee to question the Tribunal's evaluation.

241.    The Tribunal did not state a causal link between Venezuela's insufficient evidence as to Argentina being the effective seat but relied on Tenaris' and Talta's as well as on Venezuela's evidence. It concluded, after an extensive assessment in paragraphs 207-230 of the Award, that "there is no evidence that Tenaris and Talta's Effective Seat are located in Argentina. On the contrary, the evidence points to the fact that the Effective Seat is located in Luxembourg and Portugal, respectively."[224] To the Committee's mind, the Tribunal's operation of balancing the factual allegations and related evidence produced by all Parties, neither constitutes a reversal of the burden of proof nor a departure from a fundamental rule of procedure.

242.    As to the presumption of a coincidence between the statutory and the effective seat in Portuguese law, the Tribunal repeated the experts' opinions to that effect, but did not rely on the presumption because Venezuela had failed to prove that Talta's business was conducted from Argentina. Rather, the Tribunal continued, after having stated the experts' opinion, that "[t]he above having been said, the Tribunal has thoroughly analyzed and assessed the evidence provided by the Parties, and it concludes that it is not persuaded that Tenaris and Talta have their Effective Seat in

---

[223] Venezuela's PHB, p. 4.
[224] Award, ¶ 230.

Argentina, and it understands that their Effective Seats coincide with the Statutory Seats."[225]

243. Again, the Committee does not find a reversal of the burden of proof.

244. As to the qualification of Talta as a holding or commercial company, the Tribunal did not reach its conclusions because Venezuela had not submitted sufficient evidence that it conducted commercial activities outside its statutory seat. Rather, it firstly appraised the evidence presented by both Parties and found that this evidence pointed to a qualification as a holding company, in disagreement with Venezuela's expert's legal analysis of Portuguese law. Secondly, it did not pursue the legal analysis in detail because it found that real activities as a holding company, and not the formal legal qualification, to be decisive. As to the activities, it assessed the evidence produced by Talta and found it probative. It is not the Committee's role to reassess the evidence.

245. Again, the Committee does not find a reversal of the burden of proof.

246. In any event, the Committee recalls that the question of whether the principle of burden of proof is a "fundamental rule of procedure" is still subject to debate. This is even more so based on the fact that the reversal of the burden through the operation of *prima facie* presumptions should also be part of such rule of procedure. As developed in Section IV.A.2 of this Decision, the rules on the burden of proof provide judges and arbitrators with a mechanism to solve situations of *non liquet*. To the Committee's mind, they are not concerned with fundamental procedural propriety and justice.

247. For these reasons, the Tribunal did not violate a fundamental rule of procedure when it assessed the evidence on the effective seats of Tenaris and Talta.

248. With respect to the Tribunal's decision to allow new documents on shareholder and board meeting into the record more than a year after the hearing but before the closure

---

[225] Award, ¶ 208.

of the proceeding in accordance with Arbitration Rule 38, the Committee believes that the Tribunal did not breach due process.

249. In fact, wide experience shows that in the course of deliberations, additional issues of fact and law arise that a conscientious tribunal will try to elucidate by reverting to the parties. This precious option would be curtailed if a tribunal would have to re-open the oral phase of the proceeding each time when asking for additional evidence. The option to ask for additional evidence and give the parties an opportunity to comment on it in writing fits the Convention's and Arbitration Rules' objective to grant wide discretion to tribunals to conduct the proceeding, and to allow them in particular to call upon parties to produce documents at any of its stages.

250. Therefore, the Tribunal had the authority to request the production of documents after the hearings without conducting new oral hearings, as clearly established in Arbitration Rule 41(4).

251. It is a different issue whether a tribunal violates a fundamental procedural rule and due process if it does not afford the parties the opportunity to comment on the request and on the new evidence. The Committee does not have to decide the question as a matter of principle since the Tribunal had not only granted the Parties the opportunity to comment but had sought and received the agreement of the Parties to this effect, including a limitation of pages in two rounds of submissions. The Applicant was not hindered to submit new evidence together with its briefs.

252. The circumstances are thus different from *Fraport,* where no such opportunity had been granted.

253. The Committee does not have to decide the question of whether the Tribunal might have bound itself to the extent that it "expressly declared the file closed as it pertains to evidentiary materials."[226]

---

[226] Memorial, ¶ 109.

254. The Applicant refers to the Tribunal's Procedural Order No. 3, dated 22 July 2015, which reads in its paragraph 8, "the Tribunal will not accept any new documents […] without prior application and the Tribunal's express permission." Unambiguously, the provision limits the rights of the Parties but not the exercise of procedural discretion by the Tribunal.

255. In addition, the Committee notes that the Tribunal closed the proceeding only on 15 November 2016.[227]

256. Therefore, the Tribunal did not violate a fundamental rule of procedure when it called upon Tenaris and Talta to supplement its evidence on the shareholder and board meetings in the course of its deliberations more than a year after the hearing.

### b. The Issue of the Valuation Date of Damages

257. In its Memorial, the Applicant asserts that the Tribunal "seriously departed from a fundamental rule of procedure in its decision on damages, particularly as it pertains to the valuation date adopted for the calculation of the amount of compensation."[228]

258. During the Hearing, the Applicant affirmed that it was not pursuing a request to annul the Award because the Tribunal departed from a rule of procedure when determining the date for the valuation of damages.[229] In its Post Hearing Brief, the Applicant reiterates in one heading that the "tribunal seriously departed from a fundamental rule of procedure and failed to state grounds for its findings on damages and costs," but argues exclusively on the lack of reasons for the determination of the valuation date, without mentioning the ground of Convention Art. 52(1)(d).[230]

259. In light of the Applicant's affirmation during the hearing and the complete lack of argument on a departure from a procedural rule, the Committee will not entertain the initial request.

---

[227] Award, ¶ 46.
[228] Memorial, ¶ 206; Reply, headline before ¶ 167.
[229] Tr. D2, pp. 447-448.
[230] Venezuela's PHB, p. 12.

### c. *The Issue of an Increase of Compensation Awarded to COMSIGUA*

#### i. *Summary of the Parties' Position*

##### 1. *The Applicant*

260. The Tribunal calculated the amount of compensation for COMSIGUA's expropriation by using the DCF method first and then up-grading it after an analysis of alternative approaches such as the 'market multiples approach' and the 'comparable transactions approach'. The alternative approaches had been introduced by the Parties' experts.[231]

261. The Applicant criticizes the method and the result of the calculation and asserts an annullable misconduct of the Tribunal it failed to state reasons for this decision to increase the amount of compensation. It has based its argument predominantly on an alleged lack of reasons.[232] This issue will be addressed at a later stage and in the appropriate context.

262. However, at the end of respective chapters in its submissions, the Applicant contends that:

> "[i]n addition to failing to provide reasons for this holding, the Tribunal seriously departed from fundamental rules of arbitral procedure. This is so because the Tribunal's subjective, unwarranted, unjustified increase of value was never even presented as a possibility by or to the Parties as part of their respective exchanges with the Tribunal."[233]

263. The Applicant devotes paragraphs 259-262 of its Memorial and paragraph 230 of its Reply to the issue. It argues that the Parties or their experts had never requested the blending of several methods of calculations and that the experts were never given the chance to address them. The Applicant was thus deprived of its right to be heard and the Tribunal acted "*extra petita*."

---

[231] Award, ¶¶ 684-754.
[232] Memorial, ¶¶ 244-258; Reply, ¶¶ 207-232.
[233] Memorial, ¶ 259.

## 2. The Respondents

264. The Respondents contend that the Applicant misrepresents the proceeding. The different valuation methods were introduced and widely discussed by the Parties and their experts. The Parties had invited the Tribunal to base its calculation "on a number of different methods presented by the Parties."[234] Thereby, the Parties had set the legal framework, the Tribunal being free to reach its own conclusions, as it is well established in case law.[235]

265. They submit that it is equally well established since the *Chorzów Factory* case that a tribunal may estimate the value of the damage by several methods, including, if necessary, by way – in the words of the Court – "of completing the results of the one by those of the others."[236]

266. The Respondents summarize their argument by stating:

> "It cannot seriously be suggested that the Tribunal denied Venezuela the right to be heard when the Tribunal adopted valuation methodologies that had been presented and debated at length by the Parties and their quantum experts. It was well within the Tribunal's power to decide not to pick one approach or the other, but instead to adopt a hybrid approach based on the arguments and evidence presented by the parties."[237]

### ii. The Committee's Analysis and Determination

267. Before arriving at its own analysis and determination of the amount of compensation, the Tribunal presented the Respondents' proposed methods of calculation of COMSIGUA's value. They are various, although preferably based on the DCF method.[238] Thereafter, the Tribunal presented the Applicant's methods of calculation. They are equally various, with the expert not opposing the DCF method but preferring

---

[234] Rejoinder, ¶ 45.
[235] Counter-Memorial, ¶ 62; Respondents rely on *Klöckner v. Cameroon* and *Caratube v. Kazakhstan*.
[236] *Case Concerning the Factory at Chorzów* (Merits) [1928] PCIJ Series A, No 17, p. 53 (A/CLA-75).
[237] Counter-Memorial, ¶ 61.
[238] Award, ¶¶ 631-661.

a compared transaction approach.[239] None of the Parties insist that one or the other method is exclusive and the Applicant does not allege so.

268. The Award presents the parameters and numbers in detail. The Tribunal based its conclusions on these parameters and numbers. None of them were unknown to the Parties.

269. The Tribunal stated that it "finds no reason to depart from the traditional DCF method" but that nothing prevents it "from contrasting the value obtained with other approaches."[240]

270. The Applicant does not contradict the Tribunal's statement. It does not allege that international law obliges a tribunal to use a specific methodology. However, it seems to assert that the Tribunal was hindered to combine methods to arrive at a fair market value if the Parties had not made a petition in that sense. If that were the assertion, the Committee rejects it. The choice of methodology to determine the fair market value is the prerogative of the tribunal. It does not depend on a "petition" by either party in that sense.

271. Tribunals read and hear the Parties' and experts' opinions. They appraise the material in deliberation and come to conclusions based on this material, which is at the same time the frame of reference. They have discretion to arrange and systematize it, as long as they do not rely on new material, which has not been before the Parties. That is not a "fiat" of a tribunal[241] but the result of a reasoned process. No procedural rule exists that obliges tribunals or courts to present (interim) deliberation findings to the parties and allow them to provide "input from the Parties or their experts."[242]

---

[239] Award, ¶¶ 662-683.
[240] Award, ¶¶ 685, 686, and 705.
[241] Reply, ¶ 233.
[242] Reply, ¶ 233.

68

272.     Therefore, the Committee cannot conclude that the Tribunal has departed from a rule of procedure when it contrasted the DCF method with other methods to calculate the fair market value of COMSIGUA.

### d.   The Issue of Tax Indemnity

#### i.   Summary of the Parties' Position

##### 1.   The Applicant

273.     On 5 August 2016, i.e. almost a year after the Parties' written pleadings, the Tribunal sent a letter to the Parties informing them that during its deliberations it had discussed the potential relevance of Article 5 of the Luxembourg BIT for the issue of taxation of possible compensation, and that the Parties had not referred to this Article in their pleadings. It invited the Parties to comment on the norm, which both Parties did in post-hearing submissions.[243]

274.     The Applicant submits that this conduct of the Tribunal violated a fundamental rule of procedure "not because they were not heard about the point, but rather from the fact that the Tribunal added a new item of claim – including the normative source in the articles of the Venezuela-Luxembourg BIT to those that were the subject of the Parties written and oral submissions."[244] In other words, "it incorporated into its decision a line of argument that was absent from the Parties' pleadings"[245], thus venturing "*extra petita*."[246]

275.     The Applicant opines that the Tribunal was "constrained by the way by which the Parties had decided to unfold the debate,"[247] although it admits that the Tribunal is "not restricted to mere repetition to allegations of the Parties."[248]

---

[243] This is undisputed between the Parties: Memorial, ¶¶ 263-268; Counter-Memorial, ¶ 63.
[244] Memorial, ¶ 264.
[245] Reply, ¶ 236.
[246] Reply, ¶ 240.
[247] Reply, ¶ 241.
[248] Memorial, ¶ 269.

276. By giving "Claimants the line of normative argument that they had not developed before"[249] and by allowing them to supplement their legal argument, the Tribunal affected the "equality of arms as a fundamental rule of procedure", because on other occasions it had not allowed Venezuela to add to its argument when it was allegedly insufficient.[250] Tenaris and Talta "had the burden of proof to establish the jurisdiction of the Tribunal and to support its assertion, both legally and factually."[251]

277. A reference to Article 43 of the Convention and Arbitration Rule 34 is of no avail, since "the text of these rules cited refer to evidentiary material […] and does not refer to legal sources and argument." The provisions do not "allow for any kind of supplementary legal arguments to be introduced by the Tribunal at any stage in the proceedings."[252]

### 2. The Respondents

278. The Respondents argue that the Applicant's assertions are deficient for a number of reasons.

279. Firstly, they submit that the Tribunal had based its decision on the tax issue on Article 4(2) of the Luxembourg BIT and V(1)(c) of the Portugal BIT, i.e. on the proper definition of compensation for expropriation, and that Article 5 "was ultimately irrelevant to the Tribunal's conclusion." Therefore, "Venezuela's argument cannot satisfy Article 52(1)(d)."[253]

280. Secondly, it is uncontested that Venezuela made extensive submissions on the issue and was thus sufficiently heard. There is "no substance to the claimed denial of due process."[254] Furthermore, the Respondents clarify that the tax indemnity pretense was

---

[249] Memorial, ¶ 271.
[250] Memorial, ¶ 271, Reply, ¶¶ 243, 244.
[251] Reply, ¶¶ 242, 243.
[252] Reply, ¶ 247.
[253] Counter-Memorial, ¶¶ 65 and 66; Rejoinder, ¶ 51.
[254] Counter-Memorial, ¶ 67; Rejoinder, ¶ 54.

not introduced after the Tribunal's request for comments on Article 5 of the Luxembourg BIT, but had instead been part of the arbitration from the beginning.[255]

281. Thirdly, nothing hinders a tribunal to ask parties to argue a point that it finds to be potentially relevant during deliberations and "to address the relevance or irrelevance of a provision of a legal instrument, where that instrument has already formed the basis for the Parties' arguments."[256]

## ii. The Committee's Analysis and Determination

282. The Committee recalls that the totality of the Venezuela-Luxembourg BIT was introduced into the record. It is part of the applicable law by agreement of the Parties. By discussing a specific article of the BIT, the Tribunal did not introduce a new normative source.

283. The Committee does not have to decide whether the parties to a dispute are free to agree that one specific provision of a generally applicable international treaty such as a BIT may be declared inapplicable. Even if so, it would be a very unusual situation and would have to be declared explicitly by the parties. The Committee disagrees with the Applicant's opinion that "the way in which the Parties decided to unfold the debate" can be considered an agreement on implied terms constraining the Tribunal in its right and duty to apply the applicable law, i.e. the BIT, in its totality.[257] This is all the more so under the present circumstances, where Tenaris made its disagreement to the non-applicability explicitly known through its post-hearing submission on Article 5, even if that submission came a year after other submissions.

284. The Committee agrees with the Applicant that the issue of interpretation of Article 5 of the BIT is not one of "evidentiary material" but one of "legal arguments."[258] It follows from there that the absence or presence of arguments in this respect are not issues of evidence and (burden of) proof, as alleged by the Applicant.[259] Such issues

---

[255] Counter Memorial, ¶ 67.
[256] Counter-Memorial, ¶ 68; Rejoinder, ¶¶ 56, 57; Tenaris relies on *Klöckner v. Cameroon*, ¶ 91.
[257] Reply, ¶ 241.
[258] Reply, ¶ 247.
[259] Reply, ¶¶ 242-243.

necessarily relate to facts and not to the interpretation of law. Certainly, parties to a dispute have the duty to substantiate their case and to present legal argument. At the end, however, *iura novit curia*: it is the tribunal that knows the law, and it has the authority and duty to apply it irrespective of the parties' positions.

285. The Applicant alleges that the Tribunal privileged Tenaris and Talta and disfavoured Venezuela because repeatedly "faulting the Republic for not having fostered sufficient support for its position and, thus, deciding in favour of the Claimants."[260]

286. The Committee has carefully read the Award, in particular paragraphs 80, 205, 208, 211, 213, 215, 220, 225, 228, 230, 361, 365, 546, and 872 where the Tribunal, according to the Applicant, demonstrates such a violation of the procedural principle of equality of arms. It has found that in all the paragraphs quoted, the Tribunal finds on the evidence of facts. The Committee has not found any indication where the Tribunal has dismissed any of Venezuela's defenses by determining that its legal argument was absent or poorly developed.

287. Tenaris' *petitum* was a compensation for damages for expropriation free of Venezuelan taxes and not for the correct application of the BIT. Therefore, the Tribunal's decision to ascertain Tenaris' claim for compensation based on Articles 4 and 5 of the BIT cannot be described as "*extra petita*" as proposed by the Applicant.[261]

288. The arbitral tribunal is under no fundamental procedural duty to search for the parties' opinion on one or the other legal issue that emerges only during deliberations, after the hearings and parties' submissions, as long as it remains within the frame of the applicable law. It may be considered part of its *nobile officium* to do so. However, under the present circumstances the Committee does not have to venture into this problem since, in fact, the Tribunal did invite the Parties to comment on Article 5 of the BIT. It is evident that it was only able to put the question before the Parties when it had come up during deliberations. Any other conclusion would limit the

---

[260] Memorial, ¶ 271.
[261] Memorial, ¶ 267.

competence of the Tribunal inappropriately and hinder it to accomplish its duty to solve the dispute in application of the applicable law.

289.  Therefore, the Applicant's request to annul the Award for an alleged violation of a fundamental rule of procedure because the Tribunal had invited the Parties to make submissions on Article 5 of the Venezuela-Luxembourg BIT after the hearings and other submissions is rejected.

### e.  The Issue of the Tribunal's Decision on Costs

#### i.  Summary of the Parties' Position

##### 1.  The Applicant

290.  As to the Tribunal´s decision on costs, in its Memorial, the Applicant devotes paragraphs 285 and 286 to the issue of a violation of a fundamental rule of proceeding. In its Reply, the Applicant repeats the headline of the respective section but chooses not to elaborate its thoughts in the text. During the Hearing, the Applicant confirmed its reasoning of the Memorial.[262]

291.  The Applicant contends that the Tribunal:

> "also committed a serious departure from fundamental rules of arbitral procedure. This is so because the Republic never got the chance during the proceeding to address the standard eventually applied by the Tribunal, even though the Parties were requested to file separate simultaneous submissions dealing only with the costs of the proceedings.
>
> Hence, the Tribunal failed to provide the Republic with an opportunity to be heard on this issue and defend itself, irrespective of whether the Tribunal would end up upholding or not the Republic's arguments on the matter. The Tribunal had the duty to abide by the Republic's fundamental due process rights, not taking a decision based on criteria that were not the object of debate between the Parties during the proceedings and, thus, without granting the Republic the opportunity to be heard on the matter."[263]

292.  The Applicant relies on a general statement in *Tidewater v. Venezuela,* where the *ad hoc* committee held that "[t]he right to be heard and to present one's case is one of

---

[262] Tr. D1, p. 150.
[263] Memorial, ¶¶ 285-286 (footnotes omitted).

the fundamental principles of due process. Its violation is a serious departure from a fundamental rule of procedure."[264]

## 2. *The Respondents*

293. The Respondents assert that the Tribunal had invited the Parties to develop their views on the allocation of costs in post-hearing briefs. Both Parties did so. "There is therefore no basis to Venezuela's complaint that it did not have the opportunity to make submissions on the allocation of costs."[265]

294. Moreover, Article 61.2 Convention confers broad discretion on tribunals to apportion costs. They "are under no obligation to submit to the parties an advance draft of their costs submissions […] for comment."[266]

295. In any event, the Applicant has chosen not to rebut to the Respondents' arguments in its Reply. Its request "may therefore be taken as abandoned."[267]

## ii. *The Committee's Analysis and Determination*

296. The Committee notes that it is uncontested between the Parties that the Tribunal afforded them the opportunity to submit their views on the allocation of costs in post hearing briefs and that they made use of this opportunity.

297. The Tribunal has presented the Parties' positions on that issue in paragraphs 832-836 of the Award. In paragraphs 837-856 the Tribunal has developed its determination, not without referring again to the Parties' positions.

298. In light of these steps and considerations undertaken by the Tribunal and of its uncontestable discretion to allocate costs, the Committee does not see an indication that may be interpreted as a departure from a fundamental rule of procedure.

---

[264] *Tidewater v. Venezuela*, ¶ 149.
[265] Counter-Memorial, ¶ 71.
[266] Counter-Memorial, ¶ 72.
[267] Rejoinder, ¶ 58.

299. Therefore, the Committee rejects the Applicant's request to annul the Award because of an alleged violation of a procedural rule.

### (3) Failure to State Reasons

#### a. The Issue of the Claimants' Seats

##### i. Summary of the Parties' Positions

###### 1. The Applicant

300. The Applicant asserts that the Tribunal failed to state the reasons for its assumption that Tenaris and Talta had their seat in Luxembourg and Portugal respectively and that its conclusions were contradictory. The Applicant has put forward most of the arguments together with its contentions on an erroneous application of law and an excess of power. Under the present Section, the Committee only summarizes the arguments to the extent that they have not been presented in Sections IV.A 1 and 2.

301. Firstly, the Tribunal "dismissed the Republic's contention that Tenaris was run from Argentina and Italy and that most of its employees were also there"[268] by holding that:

> "[t]he argument is devoid of force since the (large number) of Argentine workers are hired by Siderca, an Argentine subsidiary of Tenaris, and not by Tenaris itself. The fact that a subsidiary with legal status of its own, located in Argentina, has a large number of employees, is irrelevant for the purposes of determining where the Effective Seat of its headquarters is located."[269]

However, when the Tribunal had to determine the scope of the nationalization decree, it argued in "direct contradiction" with the foregoing that it:

> "has no doubt that Comsigua was an affiliate of Sidor because, as put by Respondent itself, "affiliates" are companies that have the same parent, and, in this case, Comsigua was an affiliate of Sidor, as it belongs to Tenaris and Sidor to Ternium, and both Tenaris and Ternium are a part of the Techint group – their final and common owner."[270]

---

[268] Memorial, ¶ 158; Reply, ¶ 111-114.
[269] Award, ¶ 219.
[270] Award, ¶ 415 (footnotes omitted).

302. The Applicant argues that the Tribunal treated the issue of ultimate ownership differently where it "should have applied the same criteria to both matters, but instead, it took the opposite direction resulting in a manifest, critical contradiction."[271]

303. Secondly, the Tribunal has taken the view that Tenaris' and Talta's accounts are audited by Luxembourgian and Portuguese auditing companies, and that this fact indicates that their effective seats were in Luxembourg and Portugal, respectively. In reality, the Applicant contends, these uncontested facts are but a "mere consequence of compliance with the legal requirement of the place of incorporation and, as such, they are irrelevant for purposes of determining the effective seat of a company. The Tribunal blatantly failed to state reasons as to why simply meeting a requirement of Luxembourgish law was relevant to the determination of Tenaris' *siège social*."[272]

304. The Applicant advances a similar argument with respect to the shareholder meetings: the fact that "they were held in Luxembourg is just a manifestation of Tenaris being incorporated there. It merely supports the fact that Tenaris' statutory seat is located in Luxembourg"[273] but not the effective seat.

305. Thirdly, the Applicant presents as "an egregious example of inconsistent reasoning"[274] the Tribunal's way of determining the status of Talta : although it had conceded that Talta might not meet the legal requirements to be considered a holding company instead of a commercial company, it based its appreciation of the facts indicating the effective seat such as office space and business contacts with third parties on criteria that are only appropriate for holdings.[275] This is "a clear-cut failure to state reasons."[276]

---

[271] Reply, ¶¶ 113.
[272] Reply, ¶ 95; Memorial, ¶ 148.
[273] Reply, ¶ 101.
[274] Memorial, ¶ 154.
[275] Memorial, ¶¶ 150-155; Reply, ¶¶ 95-97.
[276] Memorial, ¶ 154.

## 2. *The Respondents*

306. The Respondents submit that the Tribunal has given extensive reasons for its conclusion that the effective seats of Tenaris and Talta were Luxembourg and Portugal, respectively, and that these reasons were free of contradictions.

307. They argue that "Venezuela's claim is not that the Tribunal failed to state reasons, or stated contradictory or inadequate reasons, but that the Tribunal adopted the *wrong* reasons. That is not a basis for annulment."[277] Specifically, according to the Respondents, "[i]n reality, Venezuela's argument is not that the Tribunal failed to state reasons. Rather, Venezuela takes issue with the Tribunal's assessment of the evidence."[278]

308. They submit that the Tribunal had found that the effective seat was decisive for the determination of the companies' nationality, and that it had developed, after extensively hearing both Parties' experts on the issue, the criteria to define the effective seat. On this basis, it had appraised the evidence presented by the Parties and had come to reasoned and consistent conclusions. Venezuela now complains that the Tribunal had found Tenaris' and Talta's evidence more convincing than Venezuela's. However, it is not for an *ad hoc* committee to reassess the evidence.[279]

309. With respect to the ultimate ownership of the Respondents by the Techint Group, the Respondents assert that:

> "[t]here is no contradiction in recognizing that (i) for the purposes of expropriation, a nationalization decree can (and in this case did) cover an entire group such as the Techint Group, and (ii) for the purposes of jurisdiction, neither the Techint Group nor its Argentine subsidiary Siderca were claimants in the arbitration, so the location of their employees and legal seats were irrelevant in determining the effective seats of the Claimants."[280]

---

[277] Counter-Memorial, ¶ 122.
[278] Counter-Memorial, ¶ 132.
[279] Counter-Memorial, ¶¶ 126-134; Rejoinder, ¶¶ 120-121.
[280] Rejoinder, ¶ 124.

## ii. The Committee's Analysis and Determination

310. In Section IV.B.1.a, the Committee has already determined that the Tribunal had not exceeded its powers by finding that Tenaris and Talta had their effective seats in Luxembourg and Portugal, respectively, and that it had jurisdiction *ratione personae*.

311. It has come to this conclusion after having examined the reasons presented by the Tribunal.

312. The Tribunal presented the following line of reasoning. In a first step – point A, it identified the legal provisions in the ICSID Convention and in the BITs that determine the issue of nationality and seat of a juridical person. It concluded that all provisions required an effective seat rather than the statutory seat to be present, thus following Venezuela's arguments.

313. It then – point B – determined the criteria for such effective seat after an appraisal of the "experts in Luxembourgian and Portuguese Law introduced by both Parties" as (i) the place of the shareholders' and the board of directors' meetings, "the venue being of relevance", (ii) the place of management and (iii) the place where the company's books are maintained and kept.[281]

314. In a further step – point C –, the Tribunal applied the evidence to the criteria, which was a logical consequence, in paragraphs 195-230 of the Award.

315. With respect to the specific contentions formulated by the Applicant, the Tribunal held and concluded in this exercise – point D –:

  - That "for the purposes of determining where the effective seat of its headquarters is located", the number of employees in a subsidiary is irrelevant. The Tribunal has formed an opinion to that specific issue. For a different issue, i.e. the question of whether the Nationalization Decree extended to all members of the Techint Group, including to its subsidiaries, the Tribunal has come to a different conclusion. The Committee is convinced that it is not contradictory when a

---

[281] Award, ¶¶ 192-195.

Tribunal reasons differently for different issues. It disagrees with the Applicant when it opines that the same criteria must be applied for different matters.[282] The reason for establishing the effective seat and the reason determining the scope of an expropriation decree do not wipe each other out but co-exist.

- That Talta was a holding and not a commercial company. It has come to this conclusion by rejecting, with reasons and based on evidence, the Applicant's expert's different opinion, and by reasoning that the formal characterization of Talta in the registry was of less relevance for the determination of the effective seat than its substantive activity, where the evidence shows "that Talta's activity is limited to the holding of interests in other companies."[283] The reasoning is detailed and the Committee will not venture into a reassessment of the evidence, which would be beyond its authority.

- That both Respondents' books were audited and kept in Luxembourg and Portugal, respectively. The Applicant's argument that the Tribunal should have explained why it chose that criterion to determine the effective seat is inappropriate, as much so as the other one according to which it must be explained why the venue of shareholder meetings may be taken into consideration. As noted by the Committee, the Tribunal has explained, after an appraisal of the experts' opinion, that a number of cumulative criteria were relevant to determine the effective seat, one of which is the place of the shareholders' meetings and the place of auditing. It has evaluated these criteria collectively and stated that they all converged to allow the conclusion that the effective seat of Tenaris was Luxembourg and that the effective seat of Talta was Portugal. The Committee cannot but state that the Tribunal has developed these thoughts and conclusions in a reasoned manner.

316. In sum, the Committee sees no problem to follow the Tribunal's reasoning from point A – the identification of the problem – to point D – the conclusion – and finds it not

---

[282] Reply, ¶ 113.
[283] Award, ¶¶ 224-225.

contradictory in and of itself. Therefore, it rejects the Applicant's request to annul the Award for a failure to state reasons.

### b. *The Issue of the Consent to Arbitrate*

#### i. *Summary of the Parties' Positions*

##### 1. *The Applicant*

317. The Applicant contends that the Tribunal, in addition to exceeding its powers when assuming that the consent to arbitrate was perfected before Venezuela's denunciation of the ICSID Convention (as discussed in Section IV.B.1.a), also failed to state the reasons for its decision.

318. With respect to the dispute over Tenaris' expropriation of its investment in TAVSA, the Applicant submits that its expert had presented a profound opinion on Article 9 of the Luxembourg BIT, backed by solid case law, according to which TAVSA's Notice of Dispute, dated 20 November 2009, was defective.[284]

319. Instead of accepting Venezuela's standing offer contained in the BIT, the Notice amended the offer by a reservation of rights to initiate ICSID arbitration proceedings at any time. The Tribunal, the Applicant submits, ignored "the abundance of legal arguments and supporting legal authorities." It expressed its decision "in just one paragraph," without referring or analyzing Venezuela's arguments or explaining "the logical steps followed to reach its conclusion." It did not address the issue of futility of consultations and the notion why they must only be conducted to the extent possible. The Applicant finds even "more troublesome for the validity of the Award that the Tribunal did not explained [sic] why a reservation of the right to provide consent to arbitration was, in fact, an exercise of that right. Even more, the Tribunal expressly recognized that such reservation was never used."[285]

320. Although the Applicant agrees that "tribunals do not have an obligation to address in detail every single assertion in support of an argument presented by the parties, if they

---

[284] Memorial, ¶¶ 168-170.
[285] Memorial, ¶¶ 171 and 172; Reply, ¶¶ 123-128; Tr. D1, pp. 53 ss.

do not address one question that is relevant for understanding its reasoning, they have the obligation to give reasons for not doing so."[286] The Applicant relies on *Libananco v. Turkey*, where the *ad hoc* committee stated:

> "lack of consideration of a question submitted to a tribunal could amount to a failure to state reasons if no reasons are given by the tribunal for not addressing the question and such question would be determinant for understanding the reasoning of the award."[287]

321.   With respect to the claims concerning COMSIGUA, the Applicant asserts that again the Respondents did not accept Venezuela's standing offer to arbitrate before the denunciation of the BIT since it departed significantly from that standing offer, and because it could not accept the offer before the period of consultation had elapsed, i.e. before 2 June 2012. Although Venezuela has presented abundant arguments for this opinion, the Tribunal failed to address them.[288]

322.   The Applicant further alleges that the Tribunal contradicted itself when it confirmed on the one hand that in accordance with the Luxembourg BIT six months have to elapse between the notice of a dispute and its submission, and held on the other hand that "it was preferable to interpret the Luxembourg Treaty as allowing an investor to give at the same time its notice of dispute as well as its consent to arbitration."[289]

### 2.   *The Respondents*

323.   The Respondents submit that the Tribunal has devoted "18 pages and over 100 paragraphs"[290] of reasons to the issue of whether the consent was perfected and that "those reasons may easily be followed from point A to point B."[291] In light of the Tribunal's approach, Venezuela cannot demonstrate that it failed to state reasons or that it argued in a contradictory manner. In reality, Venezuela tries to re-argue the

---

[286] Reply, ¶ 126.
[287] *Libananco Holdings Co. Limited v. Republic of Turkey*, (ICSID Case No. ARB/06/8), Decision on Annulment (22 May 2013), ¶ 192 (A/RLA-73).
[288] Memorial, ¶¶ 174 and 175; Reply, ¶¶ 130-135.
[289] Memorial, ¶ 180.
[290] Counter-Memorial, ¶ 139.
[291] Counter-Memorial, ¶ 154.

case and have its expert's opinion prevail, although the Tribunal had rejected his argumentations in a well-reasoned way.[292]

324. The Respondents argue that the Tribunal did not have to follow a "minimum word requirement"[293] to present its conclusions, but that it has to provide reasons that can be followed, and that it did not have to address every argument submitted by Venezuela explicitly, but had to consider and treat them implicitly. That is what the Tribunal did.[294]

325. In particular, the Respondents assert that the Tribunal has carefully taken the different wording of the Venezuela-Luxembourg and the Venezuela-Portugal BIT into account and has interpreted them in thoroughly appraising the expert opinions presented by both Parties.

326. Specifically, with respect to TALTA's consent to arbitration regarding COMSIGUA, the Respondents sustain that the Tribunal incurred in no contradiction when it applied a different treatment to Talta-Comsigua and Tenaris-Comsigua to determine the date of beginning of negotiations. Precisely, the difference responded to the different language of each applicable BIT. [295]

327. After a careful reasoning, it has rejected the opinion of the Applicant's expert and agreed to the opinion of the Respondents' expert. It submits that with respect to TAVSA, "the Tribunal explained and supported its decision that Tenaris could perfect consent with its notice of arbitration before the negotiation period in the Luxembourg Treaty had elapsed; and the Tribunal similarly explained why the reservation of rights to resort to arbitration prior to the exhaustion of that period did not change the Tribunal's conclusion."[296]

---

[292] Counter-Memorial, ¶¶ 139 and 154 and *passim*; Rejoinder, ¶¶ 125-128; Tr. D1, pp. 217-234.
[293] Counter-Memorial, ¶ 141.
[294] Counter-Memorial, ¶¶ 141 and 142. Tenaris relies on *Aguas v. Argentina*, ¶ 64, and on *Rumeli v. Kazakhstan*, ¶ 84.
[295] Counter Memorial, ¶¶144-148.
[296] Counter-Memorial, ¶ 130.

328.    The Respondents further submit that the Tribunal has distinguished in a reasoned way between the consent and the initiation of arbitration and has explained that the consent could precede the initiation.[297] The clear and consistent reasoning led the Tribunal to decide that consent can be perfected before (the end of) consultations, while the submission of the dispute to arbitration is only admissible after the period of consultations has elapsed.[298]

### ii.    Committee's Analysis and Determination

329.    In Section IV.B.1.b, the Committee has already determined that the Tribunal did not exceed its powers by finding that the consent to arbitrate was perfected before Venezuela's denunciation of the ICSID Convention, and that it had jurisdiction *ratione temporis*.

330.    It has come to this conclusion after having examined the reasons presented by the Tribunal. The Tribunal developed its reasoning and conclusions in paragraphs 59-151 of the Award.

331.    Given Venezuela's denunciation of the ICSID Convention, the Tribunal started by stating in paragraphs 59-64 of the Award that according to Convention Article 72, the consent must have been given before such denunciation, i.e. before 24 January 2012. In light of the circumstantial differences and the different wording in the applicable BITs, the Tribunal stated in paragraph 65 of the Award that "[e]ach Claimant's case and its investment shall be discussed separately."[299]

332.    Consistently with the introductory remarks, the Tribunal continued to analyze Tenaris-TAVSA's, Talta-COMSIGUA's and Tenaris-COMSIGUA's conduct, communications, and expression of consent to ICSID arbitration, and subsumed them under the two applicable BITs.

---

[297] Rejoinder, ¶ 133.
[298] Rejoinder, ¶¶ 134-136.
[299] Award, ¶ 65.

333.    As to Tenaris-TAVSA, after having exposed the Parties' positions and scrutinized numerous letters, minutes of meetings, and the Notice of Dispute, all dated between May 2009 and November 2011, the Tribunal concluded that "the settlement period of six months from the Tenaris and Tavsa Notice of 20 November 2009 had long ago elapsed" when Venezuela denounced the Convention.[300]

334.    As already explained in Section IV.B.1.b of this Decision, the Tribunal found that the Notice, by which they "give their consent to resort to arbitration" under the ICSID Convention" shows a "perfect consistency between the terms of the offer to arbitrate and the terms of Tenaris' acceptance."[301]

335.    The Committee does not find a failure to state reasons in this sequence of arguments.

336.    Once the consent was established, the Tribunal addressed the issue of reservation of rights contained "in the final part of the phrase following Tenaris' consent,"[302] which according to the Applicant modifies the offer and thereby disqualifies the Notice as a valid acceptance. Firstly, the Tribunal stated that Tenaris did observe the six-month consultation period and thus, did not make use of the reserved right. Nevertheless, it then found that "the inclusion of this reservation would not have substantially modified the offer."[303]

337.    The Committee has no difficulty to follow the Tribunal's reasoning: it found that the consent was expressed unequivocally and that the reservation of rights was not meant to alter its content.

338.    In light of the particular evidence in Tenaris-TAVSA, the Tribunal did not consider the need to address Venezuela's expert opinion. That cannot be interpreted as a general unwillingness of the Tribunal to take the expert opinion into consideration. The contrary is convincingly documented by the fact that in the different factual

---

[300] Award, ¶ 81.
[301] Award, ¶ 86.
[302] Award, ¶ 87.
[303] Award, ¶ 90.

84

circumstances of Tenaris-COMSIGUA, it presented and analyzed this opinion in detail.[304]

339.   Therefore, the Committee is unable to find a lack of reasoning when the Tribunal addressed the Applicant's arguments in the context where they were crucial.

340.   As to Talta-COMSIGUA, the Tribunal based its reasoning on the text of Article VIII of the Portugal BIT, which does not require a notice of dispute.[305]

341.   The Tribunal reconstructed the "chronology of events," starting from a first request to negotiate dated 28 June 2010, including a Notice of Dispute of 2 December 2011 that contains an expression of consent to submit the dispute to ICSID arbitration, and ending with the request for arbitration, dated 20 July 2012, i.e. four days before Venezuela's denunciation became effective on 24 July 2012.[306] In light of these unambiguous statements and reference to uncontested dates, the Committee rejects the Applicant's allegation that the Tribunal did not take the beginning of negotiations into account.[307]

342.   The Committee has no difficulty to follow the Tribunal's reasoning to its "point B", where it stated that "[t]he facts are clear: when Talta sent the Comsigua Notice, it had already complied with its obligation to negotiate for six months (and, by then, Venezuela had not yet denounced the Convention). Therefore, Talta validly perfected its consent to arbitrate when it sent the Comsigua Notice on 2 December 2011, prior to the Denunciation."[308]

343.   As to Tenaris-COMSIGUA, the Tribunal found the situation "more complex" because the Luxembourg BIT differs from the one with Portugal: point A.[309] Therefore – and the Committee has no reason to criticize the approach – it devotes some fifty paragraphs to the specific factual and legal circumstances in order to

---

[304] Award, ¶¶ 106-130.
[305] Award, ¶ 95.
[306] Award, ¶ 96.
[307] As alleged in Venezuela's Memorial, ¶ 176.
[308] Award, ¶ 97.
[309] Award, ¶ 100.

establish whether Tenaris had perfected the consent to arbitrate before the denunciation date.[310]

344. Both Parties have presented reports by prominent experts on this issue, reaching contradictory conclusions. The Tribunal presented and analyzed these reports in detail. It re-quoted the relevant provision of the Luxembourg BIT, referred to VCLT Article 31 and presented its own interpretation in accordance with the ordinary meaning of Article 9 of the BIT as well as its context, object and purpose, each time referring back to the experts' opinions. In conclusion, the Tribunal determined that "Article 9 of the Luxembourg Treaty (when correctly interpreted) allows the investor expressing its consent in advance and, at the same time, declaring its choice for ICSID arbitration."[311] In an appendix to this conclusion, the Tribunal discussed a number of decisions which had been cited by the experts and found after an analysis that they were "actually irrelevant as they do not deal with what is actually fundamental" with the case at hand.[312]

345. The Committee finds the Tribunal's reasoning clear, detailed, and consistent, and followed it easily from point A to point B.

346. It has not found a contradiction in paragraph 136 of the Award, as alleged by the Applicant. Paragraph 136 reads in its relevant part:

> "Article 9.2 of the Treaty provides that, after the mandatory notification of a dispute, the investor shall have six months to submit the dispute to any forum of its choice […]. However, the Treaty does not include any prohibition that prevents an investor, at the time of notification of dispute, from expressing its consent and choose arbitration. There is also no indication whatsoever that negotiations should be deemed a condition precedent for the effectiveness of consent."

347. The Committee agrees with the Respondents: the paragraph differentiates between the submission of the dispute to arbitration, which is only admissible after the lapse

---

[310] Award, ¶¶ 100-151.
[311] Award, ¶ 143.
[312] Award, ¶¶ 145-151.

of the consultation period, and the perfection of the consent, which – in the reasoned opinion of the Tribunal – the claimant investor can express before.

348.    In conclusion, the Committee holds that the Tribunal did not fail to state reasons when accepting that the consent to arbitrate was perfected before the denunciation of the ICSID Convention, thereby establishing its competence and the jurisdiction of the Centre.

### c.  The Issue of Expropriation

#### i.    Summary of the Parties' Positions

##### 1.  The Applicant

349.    The Applicant contends that in addition to not applying the Portugal BIT and customary international law (and thus exceeding its powers when discussing the element of payment),[313] the Tribunal also failed to state the reasons why it did not apply the proper law. It develops its case in paragraphs 201-205 of its Memorial and in paragraphs 158-206 of its Reply.[314]

350.    In the initial proceeding, Venezuela had based its argument regarding the legality of the expropriation on both Treaties and on customary international law. The Tribunal reached its final conclusions by quoting both Treaties in the dispositive part of the Award and in a summary, but based its reasons on the Luxembourg BIT only. As such, the Applicant argues that:

> "As a consequence, it is not possible to follow the Tribunal's reasoning or to understand what are the bases for concluding that Article IV of the Venezuela-Portugal Treaty was breached and for not addressing the Republic's defence based on that Treaty as well as on customary rules of international law."[315]

351.    The Applicant believes that the Tribunal's decision may have been different had it addressed the Portugal BIT and the rules of customary law.[316]

---

[313] See Section IV.A.1.a, *supra.*
[314] Cf. also Tr. D1, pp. 84 ss., and D2, pp. 421 ss.
[315] Memorial, ¶ 203; Reply, ¶¶ 160 and 161.
[316] Memorial, ¶ 205.

352. Further, the Applicant notes that the Tribunal did apply customary international law when determining the quantum of compensation but failed to do the same when determining the lawfulness of the expropriation. It argues that such approach is "openly contradictory."[317]

353. Finally, the Applicant asserts – relying on *CMS v. Argentina* – that these lacunae cannot be filled and cured by the Parties or the Committee.[318]

## 2. The Respondents

354. The Respondents refute Venezuela's argumentation in paragraphs 155-157 of its Counter-Memorial and paragraphs 138-147 of its Rejoinder.[319]

355. They assert that the Tribunal had no reason to reconsider the Portugal BIT in its section on the unlawfulness of the expropriation for lack of payment because it had already found such unlawfulness in previous sections. Having found that the Portugal BIT required a guarantee of cumulatively immediate, adequate and effective payment, there was no need to address Venezuela's allegation that it was enough to provide a suitable mechanism since the obligations were "very clearly breached."[320] It was only the Luxembourg BIT that did not require immediate payment. Therefore, the Tribunal correctly concentrated its reasoning on this BIT's provision.[321]

356. Further, the Respondents submit that the Tribunal was under no obligation to examine the rules of customary international law since such approach only reflects:

> "the fact that customary international law applies in cases where treaty text is silent (such as in determining the consequences of a violation of the Treaties), but does not apply where treaty text explicitly deals with an issue (such as the applicable criteria for determining the lawfulness of an expropriation). Different bodies of law rightly apply in different situations."[322]

---

[317] Reply, ¶¶ 162 and 163.
[318] Reply, ¶ 165; *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision on Annulment (25 September 2007), ¶ 97 (A/RLA-57).
[319] Cf. also Tr. D1, pp. 246 ss., and Tr. D2, pp. 524 ss.
[320] Counter Memorial, ¶ 156.
[321] Counter-Memorial, ¶¶ 156 and 157; Rejoinder, ¶¶ 139 and 140.
[322] Rejoinder, ¶ 145.

357.   The Respondents argue that there is no contradiction between this approach and the discussion of rules of customary law in the context of quantum since the Tribunal had applied these rules along with the BITs and found that they would both lead to the <u>same</u> result.[323]

358.   In any event, the Respondents assert, the Tribunal was under no obligation to address every single argument presented by the Parties as long as it addressed the questions put before it. And that is what the Tribunal did.[324]

### ii.   The Committee's Analysis and Determination

359.   The Committee has already found that the Tribunal did not fail to apply the applicable law when it based itself on the Luxembourg BIT in Section VI.4.3.C of the Award.

360.   The Committee has come to this conclusion after examining carefully the totality of Section VI of the Award, and not only its last subsection.

361.   The Tribunal presented the relevant provisions of both BITs and marked the difference. It then presented the difference between the processes of expropriation of the investments in TAVSA and COMSIGUA. In paragraph 357 of the Award, the Tribunal stated that "a delay of more than seven years in the payment of compensation does not constitute "immediate" payment, following the wording of art. IV of the Portugal Treaty." It has gone on to develop specific arguments for the Luxembourg BIT also in reference to Venezuela's alternative argument that "the lack of payment does not make the expropriation unlawful."[325]

362.   The Tribunal referred to paragraphs 298-304 of Venezuela's Counter-Memorial in the original proceeding, dated 24 October 2014, where Venezuela starts by quoting the texts of both BITs, but bases its argument on Article 4 of the Luxembourg BIT

---

[323] Rejoinder, ¶ 144; Award, ¶ 397.
[324] Rejoinder, ¶ 141.
[325] Award, ¶ 357.

when referring to the provisions underlying the *Amoco* case, which are completely different from the Portugal BIT.[326]

363. After having pondered the specificities of the Luxembourg BIT in the context of the COMSIGUA expropriation, the Tribunal summarizes the result of Section VI of the Award by determining that the "expropriation of the property belonging to Tavsa and Comsigua occurred in breach of arts. IV and 4 of the Treaties."[327]

364. The Committee had no difficulty to follow the totality of the Tribunal's argumentation resulting in this conclusion.

365. Further, it does not consider that the Tribunal reasoned contradictorily when it did not base its decision on customary international law, even if it did mention customary law in a different context. As explained in Section IV.B.2.d, the Treaties are the applicable law. Where they foresee a provision with respect to a specific issue, there is no need to examine customary law as well.

366. For these reasons, the Committee finds that the Tribunal did not fail to state the reasons for its decision to find the expropriation unlawful.

### d. The Issue of the Valuation Date for the Determination of Damages

#### i. Summary of the Parties' Positions

##### 1. The Applicant

367. The Applicant asserts that the Tribunal contradicted itself clearly when it characterized the expropriation of both TAVSA and COMSIGUA on the one hand, and fixed the valuation date of the expropriation, on the other hand. In the Applicant's view "[t]his contradiction amounts to a failure to state reasons and warrants the annulment of the Award."[328]

---

[326] Award, ¶¶ 383-385.
[327] Award, ¶ 386.
[328] Memorial, ¶ 225.

368.　It submits[329] that the Tribunal had firstly defined "expropriation" under the BITs in paragraph 317 of the Award as taking place "when the State adopts a measure, in the exercise of any of its sovereign powers, which dispossesses the investor of its investment."[330]

369.　The Applicant documents that on many different occasions the Tribunal had confirmed that the dispossession had taken place after the adoption of Decree-Law No. 6,058, or "Nationalization Decree", dated 30 April 2008, and after President Chavez' announcement of 21 May 2009 on the nationalization of TAVSA and COMSIGUA.[331] With respect to TAVSA, it had found that the "takeover was formalized via the so-called "Record of Transfer" dated 16 November 2009", while "[i]n the case of Comsigua, the transfer of control over the Expropriated Assets was carried out two years later, on 17 June 2011."[332] Likewise, the Tribunal acknowledged that negotiations and meetings on compensation took place in 2009 and 2011, respectively.[333]

370.　In irreconcilable contradiction to its own reasoning, the Tribunal used "another, artificial date of expropriation" for the purposes of its valuation date by relying on the date of the Nationalization Decree, i.e. 30 April 2008. This decision increased the amount of compensation tremendously, although, as previously held by the Tribunal, "no expropriation measure existed yet."[334] The Applicant insists that:

> "[t]here is no place in the Award where a careful and informed reader can find an explanation as to why the expropriation should be deemed to have been configured before the date in which the questioned measure actually had the effect of an expropriation."[335]

371.　In fact, the Applicant alleges, the Nationalization Decree had no effect on the investment and initiated only – in the Tribunal's own appreciation – "a series of

---

[329] Memorial, ¶¶ 209 and 210; Reply, ¶ 177.
[330] Award, ¶ 317.
[331] Memorial, ¶¶ 213-216; Reply, ¶¶ 178-186.
[332] Award, ¶ 331. The Award mentions the date of 17 June 2011 on several other occasions: cf. ¶¶ 332, 333, 344, and 347.
[333] Reply, ¶¶ 184 and 185.
[334] Memorial, ¶ 225; Reply, ¶ 197.
[335] Reply, ¶ 171.

posterior acts of the State [that] gave rise to an expropriation."[336] The Tribunal assumed contradictorily an indirect expropriation for purposes of establishing liability and a direct expropriation for the purposes of establishing the amount of compensation.[337]

372. The Applicant argues that "if the Tribunal considered—as it did—that an indirect expropriation had taken place through the taking of control of the "Expropriated Assets" by Venezuela, and that that taking of control had occurred in 2009 for Tavsa and in 2011 for Comsigua, then it simply could not have found that the valuation date should be April 30, 2008. Conversely, if the Tribunal considered that the expropriation had occurred on April 30, 2008, then it could not have found that the expropriation had consisted in the taking of control, especially when it found that those takings occurred in 2009 (for Tavsa) and 2011 (for Comsigua). Those findings are mutually exclusive, and amount to a complete failure to state grounds on the critical issue of what expropriation, if any, took place, when it occurred, what it consisted in, and what compensation, if any, should be awarded to Claimants."[338]

373. Finally, the Applicant alleges that the Tribunal "lied" when it justified the valuation date for the expropriation of TAVSA by referring to the Applicant's approval of such date. The Applicant quotes its submission in the Counter-Memorial of 21 October 2014 and summarizes that it argued quite the contrary of an acceptance. Rather, it had stated that "the Nationalization Decree could not have any expropriatory effects," which was first acknowledged by the Tribunal, only to be rejected without justification for the fixing of the valuation date.[339]

## 2. *The Respondents*

374. The Respondents submit that the "review of the Award […] shows that the Tribunal did give reasons for choosing a valuation date of 30 April 2008 and rejecting

---

[336] Reply, ¶ 175.
[337] Reply, ¶¶ 187-189; Tr. D1, pp. 124-126.
[338] Venezuela's PHB, pp. 13-14
[339] Reply, ¶¶ 191-197; Venezuela has clarified its position during the Hearing: Tr. D1, pp. 128 ss.

Venezuela's position on that issue, and that those reasons are not in any way contradictory."[340]

375. They assert that the Tribunal based its analysis on Article 4 of the Luxembourg BIT, and Article IV of the Portugal BIT, which both require appraising the value of the investment concerned immediately prior to the adoption or publication of the expropriatory measure.

376. They submit that the expropriation was a process which started with the Nationalization Decree of 30 April 2008, continued by President Chavez' public announcement of 21 May 2009 confirming the nationalization of TAVSA and COMSIGUA, was confirmed by Executory Decree No. 6,796 of 14 July 2009, and finalized by the takeover of TAVSA in 2009 and COMSIGUA in 2011. The Parties and their experts had proposed different dates to mark the first step in this process and thereby the crucial moment for the valuation. Tenaris and Talta had found that the date of the Nationalization Decree was appropriate, while Venezuela had argued in favour of the President's public announcement. The Tribunal weighed the Parties arguments in paragraphs 405-417 of the Award and came to the reasoned conclusion that Tenaris' and Talta's proposal corresponded better to the purpose of the Treaties.[341] With respect to an alleged contradiction, the Respondents submit that both parties agreed that "in view of the Treaties the valuation date should be immediately before *the first relevant State measure*". While the Tribunal found that the last relevant measure adopted by Venezuela was the formal taking of control of TAVSA and COMSIGUA in 2009 and 2011 respectively, it found that the first relevant State measure was the Nationalization Decree. There is no contradiction in that reasoning.[342]

377. In sum, the Respondents argue that the Tribunal's reasoning is straightforward, consistent, and not contradictory. They summarize that:

---

[340] Counter-Memorial, ¶ 158.
[341] Counter-Memorial, ¶¶ 159-162; Rejoinder, ¶¶ 149-153.
[342] Rejoinder, ¶153.

"[o]ne may agree or disagree with the Tribunal's conclusion on this point, but there is no legitimate basis for arguing that these findings are so contradictory that reasons are effectively absent."[343]

378. Finally, the Respondents address "one remaining, unfortunate matter", namely Venezuela's allegation that the Tribunal lied when stating that Venezuela had accepted TAVSA's expropriation had occurred under the Nationalization Decree. To this effect, the Respondents quote from Venezuela's Counter-Memorial of 21 October 2014 and its Post-Hearing Brief of 2 October 2015, where Venezuela states, indeed, that the occupation of TAVSA's facilities "was authorized by Decree 6,058." Therefore, the "Tribunal accurately observed" and reproduced exactly Venezuela's statement.[344]

### ii. *The Committee's Analysis and Determination*

379. In order to understand fully the Tribunal's reasoning, the Committee has to analyze the totality of the Award, including the "factual background" as presented in its Section VI.1. The relevant part starts with paragraph 253, where the Tribunal described the Claimants' account of "two takeovers within the framework of the process aimed at the nationalization of the entire iron and steel sector of the Guyana Province formalized through two Decrees: 6,058 (a.) and 6,796 (b.)."[345] After presenting the Decrees of 2008 and 2009 respectively, the Tribunal goes on to specify the modalities of the takeover that has taken place in 2009 for TAVSA and 2011 for COMSIGUA, "[i]n compliance with the Nationalization Decree and the Executory Decree."[346]

380. In the Committee's mind, there is no doubt that the Tribunal understood the expropriation not as a single act but as a process, as a series of events and measures which started with the Nationalization Decree. That understanding is clearly expressed in paragraph 320 of the Award, where the Tribunal defined the "measures" of expropriation and nationalization, as stated in paragraphs 317 and 318, as

---

[343] Rejoinder, ¶ 153.
[344] Rejoinder, ¶¶ 154-156; Slide 49 of Respondents' Presentation during Hearing, Day 2.
[345] Award, ¶ 253.
[346] Award, ¶ 270 et seq.

"legislative, judicial, or administrative acts adopted by a State, that significantly interfere in the use and enjoyment of the investment, ending up in the annulment of the value thereof, although without depriving the investor of its ownership and control." When paragraph 317 is read in the light of paragraph 320, it is clear that the Tribunal did not contradict itself when finding that the Nationalization Decree was the first administrative act that 'ended up' in the loss of value.

381. In the context of this issue, the Tribunal did not distinguish between a direct and an indirect expropriation. The Committee does not find this approach erroneous.

382. Further, the Committee has the impression that Venezuela's position is not without ambiguity in this respect. It is true that in its Reply Memorial on Annulment and during the Hearing, the Applicant argued that Decree 6,058 "could not have any expropriatory effect."[347] However, this allegation does not correspond to Venezuela's assertions made during the original proceeding before the Tribunal and which the Tribunal quoted in paragraph 405 of its Award, namely paragraphs "284 *et seq.*" of Venezuela's Counter-Memorial, dated 21 October 2014. There, Venezuela confirms that:

- "Decree-Law No. 6,058 establishes that the transformation or transit of the iron and steel industry from a private business concern to state production will take place in various phases" (paragraph 286);
- "Executive Decree No. 6796 is precisely the law that contains such supplementary provisions that will serve to specify the application of provisions in the nationalization procedure applicable to the SIDOR affiliates, among them TAVSA, which it expressly referenced. This Decree reproduces for TAVSA the procedure outlined by Decree-Law No. 6,058" (paragraph 287);
- "in the case of *CEMEX*, in 2008 the Republic nationalized the cement industry under Decree-Law No. 6091, which has a structure and content similar to Decree-Law No. 6,058" (paragraph 295).

---

[347] Reply, ¶ 197; Tr. D1, pp. 128 ss.

383. The Committee cannot but understand these statements as affirming that Venezuela considered the nationalization as a process and that the first measure in this process was Decree-Law No. 6,058, similar to Decree-Law No. 6091, under which the cement industry was nationalized. These assertions do not exclude that additional steps had to follow to implement the process. Further, when reading the statements, the Committee does not understand Venezuela's allegation that the Tribunal lied when stating that Venezuela accepted that TAVSA's expropriation occurred under or by virtue of Decree-Law No. 6,058.

384. The Committee is reinforced in its appreciation of Venezuela's statements by the fact that the Applicant did not opt for a valuation date corresponding to the date of the takeovers but for the date of the day preceding President Chavez' announcement of 21 May 2009, which was followed by Executive Decree No. 6,796, dated 14 July 2009. This Decree was certainly "a consequence of President Chavez' statement of 21 May 2009"[348], but it was at the same time 'supplementary' to Decree No. 6,058.

385. In light of these events and their appreciation by the Tribunal, the Committee does not find any contradiction in its reasoning. It holds that the expropriation is a process, consisting of a "measure", which "shall be construed in the widest way possible" as confirmed by the Treaties that add "the generic plural "measures."[349] This measure "dispossess the investor of its investment", whereby the dispossession is not reducible to a single act.[350] It is true that the Tribunal "distinguishes between the instances of this first Decree and the implementation of the decision by the Republic"[351], but holds at the same time that for purposes of establishing the date when the amount of compensation is to be determined, the first measure influencing on the value of the investment is determinative. The Tribunal found that already the Nationalization Decree had "expropriatory effects"[352] and not only the Executory Decree as asserted by Venezuela. The Tribunal fixed the valuation date accordingly. This line of

---

[348] Memorial, ¶ 214.
[349] Award, ¶ 315.
[350] Award, ¶¶ 317-320.
[351] Reply, ¶ 183.
[352] Award, ¶ 409.

reasoning is detailed in paragraphs 403-417 of the Award, which in turn built on the reasons given in its Section VI.

386. The Committee has no difficulty to follow the Tribunal's reasoning and finds it consistent and not contradictory. Therefore, it cannot annul the Award for lack of reasons with respect to the valuation date.

387. At the same time, the Committee confirms that its findings on the Tribunal's reasoning with respect to the valuation date exclude the appropriateness of the assertion that the Tribunal's consequential calculations of damages and interests are contradictory, as presented in the Applicant's post hearing brief.[353]

### e. The Issue of Price Projections in the Determination of Quantum

#### i. Summary of the Parties' Positions

##### 1. The Applicant

388. The Applicant asserts that the Tribunal contradicted itself when it decided on the source for future price projections in its calculation of damages using the Discounted Cash Flow ("DCF") methodology.[354]

389. It submits that the Parties' experts had proposed different approaches and formulas to calculate price development probabilities. Venezuela's expert had initially proposed to choose as starting point historical prices adjusted by inflation. The Tribunal had rejected the reference to historical prices in favor of a formula that TAVSA and PDVSA had used in their negotiations on the amount of compensation after the expropriation.[355] One of the elements of this formula is the publicly available *Pipe Logix* index. The Tribunal disregarded this index without giving reasons for this deviation, thus changing 70% of the calculation formula, although it was part of exactly this formula that it had endorsed previously.[356] This failure "is severe here

---

[353] Venezuela's PHB, pp. 14-15.
[354] Memorial, ¶ 226; Reply, ¶ 199.
[355] Memorial, ¶¶ 227-230; Reply, ¶ 200.
[356] Tr. D1, pp. 133-134; D2, pp. 448-450.

given that the Republic's expert on quantum had expressly argued against disregarding *Pipe Logix*."[357]

390.    In a further step, the Tribunal executed its decision to disregard the *Pipe Logix* index by replacing it by an index published in *Metal Bulletin Research*, as proposed by theRespondents, against the Applicant's proposal to use the prices published by *Canaccord*.[358] Contrary to its initial decision to disregard historical prices, the Tribunal chose Metal Bulletin Research because it "allegedly reflected better the historical commercial trajectory of TAVSA regarding prices."[359]

391.    The Applicant concludes that:

> "it is impossible for any reader of the Award to appreciate how the Tribunal estimated future prices based on historical data, departing from the notion that such future prices were not to be calculated from historical prices. As explained above, the contradictions in the Tribunal's reasoning amount to having provided no reasoning at all, giving rise to the ground of annulment of the Award contemplated in Article 52(1)(e) of the ICSID Convention."[360]

### 2.    The Respondents

392.    The Respondents refute the Applicant's request and assert that "[t]here is no merit at all to this argument. It is based on a mischaracterization of the Tribunal's reasoning."[361]

393.    They insist that:

> "the Tribunal never declared that historical prices were irrelevant; just that historical prices were not as reliable a projection of future prices as the price formula that the parties had been negotiating. Venezuela's 'contradiction' argument therefore fails at the threshold."[362]

394.    Further, the Respondents submit that contrary to the Applicant's allegation, the Tribunal did give reasons to disregard the *Pipe Logix* index. The Tribunal considered

---

[357] Reply, ¶ 203; Memorial, ¶¶ 231-235.
[358] Memorial, ¶¶ 236-241.
[359] Reply, ¶ 204; Memorial, ¶ 242.
[360] Memorial, ¶ 243.
[361] Counter-Memorial, ¶ 163; Tr. D1, pp. 281-286.
[362] Counter-Memorial, ¶ 166.

the index and found that it "makes price forecasts within a year, which is why it is not valid for making price forecasts into the future."[363] The Respondents argue that it is irrelevant for the request for annulment that the Applicant disagrees with the Tribunal's reasons. The only point that matters is whether it gave reasons, and that is what it did.[364]

395.  Finally, the Respondents contend that the Tribunal gave consistent reasons why it preferred the *Metal Bulletin* over the *Canaccord* index. This had nothing "to do with its relationship to historical prices, but because the Parties agreed, through their conduct and agreements they signed, that it was the preferable index to use when projecting future prices."[365]

### ii.   The Committee's Analysis and Determination

396.  The Committee notes at the outset that it has neither the means nor the authority to reassess the different expert opinions nor the appropriateness of one or the other index for the estimation of future prices. Its role is limited to an examination of the Award with respect to a possible failure to state reasons.

397.  That said, the Committee has scrutinized paragraphs 536-555 of the Award and found that the Tribunal provided detailed and non-contradictory reasons in its determination of the estimation of prices of pipes, each time considering the different Parties' expert opinions.

398.  The Tribunal confronted the experts' proposals as to the manner on how to estimate the prices. It preferred to rely on the approach that TAVSA and PDVSA had used when negotiating the compensation in the real world. In paragraphs 538-540, the Award explains why it considers this approach to be "the best indication of future prices." It is evident that it was not the preferred method because it rejects reliance on historical prices, as the Applicant alleges, but because it was discussed in the negotiations that have taken place between TAVSA and a partner with "wide

---

[363] Award, ¶ 542.
[364] Rejoinder, ¶ 160.
[365] Counter-Memorial, ¶ 168; Rejoinder, ¶ 163.

bargaining power" and because of a plausible assumption that the partners would stick to the formula as agreed upon. There is no question of correct or incorrect expert opinions but of a more or less appropriate method to arrive at plausible estimates.

399. Further, the Tribunal adapted the formula thus established by replacing one index against another, *Pipe Logic* against *Metal Bulletin Research*. The Committee does not venture into the relative qualities of the indices. Rather, it finds that the Tribunal stated its reasons when formulating that "it is necessary to replace the international reference to Pipe Logix with another index."[366] The Tribunal argued that "Pipe Logix, an index that samples global sales of seamless pipes, only makes price forecasts within a year, which is why it is not valid for making price forecasts further into the future."[367] These are reasons. The fact that they contradict Venezuela's expert's proposal do not make them inconsistent.

400. Finally, the Tribunal made a choice between the *Metal Bulletin Research* and *Canaccord* indices and opted for the *Metal Bulletin Research*. The Tribunal gave reasons for this choice in paragraphs 544-555 of the Award. It referred to TAVSA's management forecasts and on commercial agreements, both of which relied on *Metal Bulletin* and not on *Canaccord*, and concluded that "both the forecasts made by Tavsa's management and historical commercial agreements confirm the reliability of the price estimates published by Metal Bulletin Research."[368]

401. In addition, the Tribunal discussed Venezuela's expert's counter-argument in favor of *Canaccord* and opined that:

> "the answer shall be in favor of Metal Bulletin Research, as the foregoing paragraphs have already shown that it is a reference publication in the sector, while Cannacord Adams is an investment bank that publishes prices of the iron and steel industry, as well as other industries […]. Expert Hart has failed to persuade the Arbitral Tribunal that, regardless of its predictive reliability, Canaccord Adams was a price reference publication to hypothetical buyers."[369]

---

[366] Award, ¶ 543.
[367] Award, ¶ 542 (footnotes omitted).
[368] Award, ¶ 551.
[369] Award, ¶ 555.

402. The different quotations demonstrate that the Tribunal has not failed to give reasons for its determination of the price projections. Therefore, the Committee rejects the Applicant's request to annul the Award for this reason.

### f. The Issue of COMSIGUA's Compensation

#### i. Summary of the Parties' Positions

##### 1. The Applicant

403. The Applicant contends that the Tribunal had "fully endorsed DCF as the applicable methodology for the Valuation of COMSIGUA" "in its sufficiency" and as an "exclusive DCF approach", after having considered different other valuation methods and having found them "not consistently reliable."[370] After having calculated the amount of compensation based on its chosen methodology, the Tribunal contrasted the result with the other methods of valuation that it had rejected before and found that the amount arrived at through the DCF method was too low and that therefore, it should be augmented.

404. The Applicant alleges that "the Tribunal states no reason for its decision to increase the amount of compensation once the DCF calculation was completed" and that it has made it "impossible for any impartial and informed reader to understand this move from a DCF calculation to a factoring of other previously dismissed methods."[371]

405. It argues that the comparison of the amount arrived at by the DCF method "with results yielded by other methodologies is in itself problematic, since there is no apparent reason to check an allegedly reliable methodology against other unreliable or less reliable methodologies."[372]

406. Further, it alleges that "shockingly" the Tribunal in weighting the different calculation methods found the compensation paid to Japanese investors an indicator

---

[370] Reply, ¶¶ 208, 209, 215; Memorial, ¶ 251.
[371] Reply, ¶¶ 230, 222; Memorial, ¶¶ 253, 254.
[372] Reply, ¶ 221.

more reliable than other comparators despite the fact that such compensation was lower than the value arrived at through the DFC method.[373]

407.  Further, the Applicant points to an even more "fantastic contradiction" resulting from the irreconcilable difference in valuation of TAVSA and COMSIGUA. It submits that for both investments the Tribunal has applied the DCF methods first, has contrasted the amounts yielded to other methods because they were "on the low end for both companies", and has finally decided to leave the TAVSA amount untouched while increasing the one for COMSIGUA. The Tribunal has failed completely to state the reasons why it treated identical situations differently.[374]

408.  Finally, the Applicant suggests that the erroneous determination of the valuation date has immediate repercussions on the reasoning in the context of the appraisal of damages since the "Award does not allow a reader to calculate the damages to be awarded if the valuation date was not April 30, 2008."[375]

The Respondents

409.  The Respondents submit that the Applicant mischaracterizes the Tribunal's reasoning.

410.  They insist that that the Tribunal did not choose the DCF method to the exclusion of other methods.[376] They refer to the beginning of the Section on the determination of the appropriate method in the Award, where the Tribunal holds:

> "The Arbitral Tribunal finds no reason to depart from the traditional DCF method (1.), which has become a standard in company valuation: in the instant case, the company had a past history and there was a predictability of future cash flows that can be estimated with reasonable accuracy.
>
> This being said, nothing prevents the Arbitral Tribunal from contrasting the value obtained with other approaches (2.)."[377]

---

[373] Reply, ¶¶ 231 and 232.
[374] Tr. D1, pp. 144-147.
[375] Venezuela's PHB, p. 14
[376] Counter-Memorial, ¶¶ 171 and 172; Rejoinder, ¶¶ 165 and 166.
[377] Award, ¶¶ 685 and 686.

411. Thus, the Tribunal did not only endorse the DCF method exclusively from the outset but announced that it would possibly correct the results in contrasting them to other methods. The Tribunal gave consistent reasons for its approach.

412. Further, it is not true, the Respondents assert, that the Tribunal did not give reasons why it found the other methodologies worth considering. In fact, it gave a detailed analysis in paragraphs 705-749.[378]

413. Equally and contrary to the Applicant's allegations, the Tribunal stated the reasons in paragraph 752 of the Award on why and how it weighted the different comparators.[379]

414. Finally, the Respondents argue that "the evaluation of damages is not an exact science, and tribunals are given wide scope to exercise their own judgment in determining the damages owed."[380] They refer to jurisprudence going back as far as the *Chorzów Factory* judgment, where the Permanent Court of International Justice held that courts and tribunals have the power:

> "to ascertain the value to be estimated by several methods, in order to permit of a comparison and if necessary of completing the results of the one by those of the others."[381]

In that context, the Respondents recall that the Venezuelan government had recommended a price of 24 million USD for the purchase of Talta's shares in COMSIGUA, which is not far from the 24.7 million USD ascertained by the Tribunal.[382]

415. The Respondents summarize their argument by stating:

> "One may disagree with the conclusion that the valuation produced by the DCF method resulted in a value that was in the "low range." One may disagree with the Tribunal's decision to use multiple valuation methods in addition to the DCF method. One may disagree with the Tribunal's implementation and weighting of those alternative valuation methods. And one may disagree with the Tribunal's use of the word "contrast" to describe

---

[378] Counter-Memorial, ¶ 177; Rejoinder, ¶ 167.
[379] Counter-Memorial, ¶ 178.
[380] Rejoinder, ¶ 169.
[381] *Case Concerning the Factory at Chorzów* (Merits) [1928] PCIJ Series A, No 17, p. 53 (A/CLA-75).
[382] Rejoinder, ¶ 169.

103

what it was doing when it applied these other valuation methods. But that is all irrelevant at the annulment stage: whether the Tribunal erred is not a basis for annulment. The only relevant question is whether the Tribunal stated its reasons – whether the reader can follow the Tribunal's reasoning from A to B. It cannot seriously be suggested that the Tribunal's Award fails that basic test."[383]

### ii. The Committee's Analysis and Determination

416. In Section IV.B.2.c, the Committee has presented its reasons and determined why it believes that the Tribunal did not depart from a fundamental rule of procedure when it increased the amount of compensation for the expropriation of COMSIGUA after a comparison between the value resulting from calculations performed under the DCF method and other approaches and methods. These "other approaches" (to use a term introduced by the Tribunal as a headline of subsection VII.3.2) were not of the Tribunal's making but introduced by the two Parties and analyzed extensively by the Tribunal.[384]

417. The Committee has come to its conclusion by following the Tribunal's reasoning. The reasons are unfolded in Section VII of the Award, in paragraphs 387 to 402 and 630 to 755.

418. In a first step, the Tribunal referred to Articles 4 of the Luxembourg Treaty and IV of the Portugal Treaty and defined its duty as to determine the "market value" or "real value" of the expropriated property, calculated on the day preceding the valuation date. It stated that the Parties agree that both expressions of value are equivalent.[385]

419. In a second step, the Tribunal determined the market value for TAVSA and for COMSIGUA in Subsections VII.2 and VII.3, respectively. Each time, the Tribunal started by presenting the Parties' positions. They do not object to the DCF method but offer at the same time alternative methods of valuation.

420. For TAVSA, the Tribunal's DCF analysis leads to an amount of the "market value" of 112,345,530 USD, as summarized in paragraphs 603-604 of the Award. In

---

[383] Rejoinder, ¶ 168 (footnotes omitted).
[384] Award, ¶¶ 705-755.
[385] Award, ¶¶ 393 and 394.

paragraphs 605 to 628, the Tribunal contrasted this result to three other approaches, the return on investment, the market multiples and comparable transactions, each time relying on the figures presented by one or the other expert. If found that the comparison led to a result according to which the estimated market value arrived at through the application of the DCF method is "reasonable."[386] Therefore, it confirmed the result.[387]

421. The Applicant does not assert that the Award lacks reasons with respect to TAVSA's valuation, contrarily to the valuation of COMSIGUA.

422. Like for TAVSA, the Tribunal displayed the Parties' methods of valuation of COMSIGUA. It started by pointing out Claimants' experts' opinion in paragraphs 632-663 who "have calculated Comsigua's value based on the discounted cash flow (**1.**); but they have also determined it based on market multiples (**2.**). And, finally, they have given their opinion regarding Comsigua's value implied in other transactions (**3.**)." [388]

423. In paragraphs 664-683 of the Award, the Tribunal presented Venezuela's expert opinion who "does not oppose to the use of the DCF (**1.**) or the market ratios (**2.**) as methods for the calculation of Comsigua's value, but he does question certain hypotheses or parameters used by the counterpart's experts. And, even then, he prefers other forms to calculate the value (**3.**); specifically, the expert analyzes the transaction with the Japanese Shareholders and the purchase price recommendation made by Comsigua's management, but he has also found other measures of Comsigua's value."[389]

424. The Committee quotes these initial summaries of the Parties' experts, which are followed by a detailed analysis of each of their proposed methods and calculations.

---

[386] Award, ¶¶ 611, 622, 626.
[387] Award, ¶ 629.
[388] Award, ¶ 631.
[389] Award, ¶ 664.

The quotes demonstrate that the experts did not advocate the use of one method to the exclusion of another.

425.     The Tribunal accepted this approach in the reasoned belief that it facilitates a calculation that gets as close as possible to the determination of the real market value. The Committee has examined carefully the Award and has not found any indication that the Tribunal considered the results provided by the DCF method determinative or conclusive, to the exclusion of the other methods, which in any event were suggested by the Parties' experts.

426.     On the contrary: the Tribunal started the subsection on its determination of COMSIGUA's value by announcing that it would choose "as its preliminary decision the value method determination." It then opted for the DCF method which none of the experts were opposed to, and which has become the traditional method of valuing enterprises. However, the Tribunal continued to emphasize its discretion to use elements of other methods. The Tribunal reiterated its approach and reasoning in paragraph 705 of the Award as follows:

> "[the Tribunal] has decided to determine Comsigua's value by applying the DCF methodology. But this does not mean that other approaches should not be used to contrast the value obtained. The Tribunal shall analyze these approaches *infra*." [390]

427.     After having explained what it intended to do, it unfolded in a third step its own appreciation of the 'other approaches' in paragraphs 706-749. Consistent with its stated duty to establish the "market value"[391], the Tribunal tested the result arrived at through the DFC method with "market¨ multiples. With the use of these market multiples, the Tribunal found in paragraphs 712-713:

> "… that Comsigua is the last in the line, although close to the benchmark companies. The Arbitral Tribunal would have expected its value to be more centered, as it would have been the case with a multiplier of 1.25x of the BVA and of 2x of the BVE.

---

[390] Award, ¶¶ 705.
[391] See above, ¶ 416.

> Applying a multiplier of 1.25x of the BVA and of 2x of the BVE, it results in a value of Talta's stake in Comsigua of USD 24.06 million and USD 26.08 million."

428. Thus, the Tribunal expressed some misgiving with respect to the value of COMSIGUA resulting from the DFC method in the light of other market benchmarks.

429. The Tribunal then proceeded to evaluate some "Comparable Transactions" in paragraphs 714-.749. As a result, it came to the conclusion that it had identified "different indicative calculations of Comsigua's value, with greater or lesser degree of reliability."[392] It compared the result of these calculations and found firstly that the DCF methods yielded a result that "is in the low range, and therefore, it should be raised", and secondly that the different calculations with their different degree of reliability should be weighted. In assigning the respective weights, the Tribunal noted that it had "accept[ed] the criticism that [the compensation paid to the Japanese shareholders] is no indication of a fair market value, but a forced sale price.."[393]

430. In paragraph 752 of the Award, the Tribunal concluded that the market value of the Respondents' shareholding in COMSIGUA amounted to USD 24,672,357.

431. The Committee finds that the Tribunal stated reasons why it had some doubts that the value arrived at through the DCF method reflected the "market" or "real" value of COMSIGUA. From the findings in the Award, the Committee understands the fact that the Tribunal considered it appropriate to rely also on other valuation means.

432. The Committee has neither the information nor the authority to reassess the weighting exercise nor the experts' figures and parameters and the Tribunal's calculations. However, it is able to state with certainty that the Tribunal stated the reasons why it exercises its uncontestable discretion to evaluate the damage and to calculate the compensation, and that these reasons are not contradictory.

433. The Committee further recognizes that the Tribunal has applied identical methods in assessing TAVSA's and COMSIGUA's values. Based on the experts' figures, it has

---

[392] Award, ¶ 750.
[393] Award, ¶ 752(i).

come to different results. In TAVSA's case, it found that the amount arrived at through the application of the DCF method was reliable to represent the market value. In COMSIGUA's case, the Tribunal found that the results arrived at through the DCF method were not reasonable when contrasted to the results in the comparative methods. These are different results for different circumstances and figures. The Committee does not see any contradiction, whereby the arguments used in the TAVSA context neutralize the ones used in the COMSIGUA context.

434. Therefore, the request to annul the Award for lack of reasons in the context of the determination of COMSIGUA's damage valuation must fail.

### g. *The Issue of the Tax Indemnity*

#### i. *Summary of the Parties' Positions*

##### 1. *The Applicant*

435. The Applicant asserts that the Tribunal based its decision on the tax exemption for the compensation on Article 5 of the Venezuela-Luxembourg BIT. The provision was its "normative support."[394]

436. However, the Tribunal did not give reasons for its application and interpreted it in a way that is "logically flawed."[395] The Applicant argues and requests:

> "The absence of reasons (or, equally, providing arbitrary or inconsistent reasons, which amount to no reasons at all) does not allow an informed reader to understand how the Tribunal moved from the premises to its conclusion regarding tax indemnities. Therefore, this portion of the Award is also annullable by virtue of Article 52(1)(e) of the ICSID Convention."[396]

437. The Applicant alleges that the Tribunal did not state reasons why it restricted the imposition of taxes to the deliverance of "authorizations" instead of interpreting the norm in a "literal, harmonious" way referring to indemnification.[397]

---

[394] Reply, ¶¶ 250-254.
[395] Memorial, ¶ 275.
[396] Memorial, ¶ 277.
[397] Memorial, ¶ 274.

438. The Tribunal's interpretation of Article 5 of the Luxembourg BIT via reference to its preamble, which specifies as its purpose the attraction of investments and the creation of favorable economic conditions, and its effort to justify its erroneous interpretation by a reference to VCLT Article 31, contains a *non sequitur* fallacy. The Tribunal "jumps from a very general assertion contained in the Preamble of the BIT concerning the creation of favorable conditions for investment to the legal conclusion that those general assertions support the interpretation that taxes—otherwise explicitly safeguarded in Article 5 of the BIT—cannot be applied to the amounts of compensation awarded to an alleged foreign investor."[398]

439. Further, the Applicant criticizes the Tribunal for quoting Article 4(c) of the Luxembourg BIT and Article IV(c) of the Portugal BIT first and to "jump immediately thereafter to a conclusion regarding the imposition of taxes on compensation that is not linked in any way to the articles of the Treaty that it cites."[399] "In this way, the Tribunal contradicts itself by establishing as a premise of its reasoning a pair of legal rules but extracting a conclusion that is not derived from those premises but from some different, unrevealed source."[400]

### 2. *The Respondents*

440. The Respondents contend firstly that Convention Article 52(1)(e) is not applicable because the Tribunal did not base its decision on the tax indemnity on Article 5 of the Luxembourg Treaty but on Articles 4 of the Luxembourg and Portugal Treaties, and stated the reasons for a compensation free of taxes in Section IX.2 of the Award. The issue of Article 5 is therefore not result-determinative and cannot justify the annulment.[401]

441. Secondly, the Respondents assert that in and of itself the Tribunal's discussion of Article 5 of the Luxembourg BIT is clear, comprehensive and can be followed. In light of the contradictory French, Spanish and Dutch texts of the BIT, the Tribunal

---

[398] Reply, ¶ 258; Memorial, ¶¶ 275 and 276.
[399] Reply, ¶ 256.
[400] Reply, ¶ 257.
[401] Counter-Memorial, ¶¶ 181 and 182; Rejoinder, ¶ 171.

applied the French version. It interpreted the text as providing that such fees do not refer to the free transfer of compensation but to the issuance of authorizations, an interpretation that is supported by the use of the French term *'taxes',* which the Tribunal rightly considered to be a levy of services provided by the State.[402]

442. Moreover, the Respondents assert that the Applicant mischaracterizes the Tribunal's reasoning when referring to the preamble of the BIT. When doing so, the Tribunal does not rely on an 'unrevealed source' but on VCLT Article 31, as explicitly quoted in paragraph 818 of the Award.[403] Further, the Tribunal referred to the preamble to support its literal interpretation of the term "fees" in Article 5 of the Luxembourg BIT.

443. Finally, the Applicant's argument reveals that it complains about the sufficiency and the content of reasons and not about their absence. Such type of complaint is misplaced in annulment proceedings.[404]

### ii. The Committee's Analysis and Determination

444. The Committee notes that the Tribunal declared at the beginning of the section on taxation (Section IX) that it "shall explain the position of the parties (**1.**) and make a decision (**2.**), thereafter, it shall analyze a specific question: the possible impact of art. 5 of the Luxembourg Treaty (**3.**)."[405]

445. This declaration is straightforward: The Tribunal will decide the taxation issue, and once it has done so, it will examine whether Article 5 of the Luxembourg BIT supports this decision or whether it warrants a correction.

446. In paragraphs 782-792 of the Award, the Tribunal reasons and concludes, after having presented the Parties' arguments in paragraphs 777-781, that "the compensation ordered by the Award shall be net of Venezuelan taxes."[406]

---

[402] Counter-Memorial, ¶¶ 183 and 184; Rejoinder, ¶ 173.
[403] Rejoinder, ¶ 173.
[404] Rejoinder, ¶¶ 174 and 175.
[405] Award, ¶ 776 (emphasis in the original).
[406] Award, ¶ 792.

447.    The Committee finds the Tribunal's reasoning and conclusions to be detailed and consistent. It does not share the Applicant's allegation that they are "self-serving, layman general notions."[407]

448.    In Subsection IX.3 of the Award, the Tribunal checked its decision on the tax exemption against Article 5 of the Luxembourg BIT.

449.    It started by presenting the controversial position of the Parties and then weighed possible contradictory interpretations of Article 5.3.[408] The Tribunal noted a difference in the French, Dutch and Spanish texts. It reasoned that preference should be given to the French text, since Article 12 of the Treaty provides that "while the Spanish, French and Dutch texts are equally authentic, in the event of disagreement, the fact that the negotiations were carried out in French shall be taken into account."[409]

450.    As a next step, the Tribunal interpreted the French text in light of VCLT Article 31.[410] The Committee does not understand the Applicant's allegation that the Tribunal relied on "a pair of rules" and – unrelatedly – on "some different unrevealed source."[411]

451.    In accordance with VCLT Article 31, the Tribunal determined the ordinary meaning of Article 5.3 of the Luxembourg BIT in paragraphs 819-824 of the Award and concluded that:

> "The literal interpretation of the terms used supports the interpretation advanced by Claimants: 'Esto' ('ce') ['this', omitted in the English translation] may only refer to the obligation assumed by the State under Article 5.3, that is, to issue the authorization, but not to the transfers."[412]

> "This literal interpretation is reinforced by the use of the term 'tasas' ('taxes'). There are different types of tax burdens, such as fees.[413] A fee is

---

[407] Reply, ¶ 257.
[408] Award, ¶¶ 800-810.
[409] Award, ¶ 815.
[410] Award, ¶ 818.
[411] Reply, ¶ 257.
[412] Award, ¶ 822.
[413] The Venezuelan law makes a difference between fees and other fiscal charges, such as taxes. *See* Articles 31 and 136 of the 1961 Venezuelan Constitution and Article 13 of the 1994 Venezuelan Organic Tax Code, as effective upon negotiation of the Treaty.

111

> a charge that the taxpayer pays for a service provided by the State. This is the usual meaning of the term 'fee'. The fees mentioned under Article 5.3 may only apply to one taxable fact: the issuance by the Authorities of all necessary administrative authorizations to transfer an investment or the returns thereof abroad. The issuance of an authorization is a public utility, whereas the existence of a transfer could not be taxed, as a transfer is not per se a public utility provided by the State."[414]

452.    Further, the Tribunal determined that the literal interpretation was supported by the 'context, object and purpose' found in the preamble of both Treaties. It held that an interpretation that does not impose tax burdens upon the transfer of compensation is more in line with the purpose of the Treaties.[415]

453.    Finally, the Tribunal added an argument to its interpretation that it distills from the Venezuelan Nationalization Decree as it was applied to the Japanese investors. Article 10 of the Decree exempts the compensation from taxes. The Tribunal held that "the tax exemption expressly recognized under the Nationalization Decree and granted to the Japanese Shareholders is relevant, because it evidences a State behavior consistent with the Arbitral Tribunal's interpretation of Article 5.3 of the Treaty, provided herein."[416]

454.    As a general result, the Tribunal found that Article 5.3 of the Luxembourg BIT did not impact its decision arrived at by applying Article 4 and IV of the BITs, namely that the compensation must be paid net of taxes.

455.    The Committee finds the summary of the Tribunal's reasoning to be comprehensive, mutually reinforcing and free of contradiction. Therefore, the Committee rejects the Applicant's request for a partial annulment of the Award for lack of reasons for the Tribunal's decision to ascertain the compensation net of taxes.

---

[414] Award, ¶¶ 823.
[415] Award, ¶¶ 824-826.
[416] Award, ¶ 829.

112

### h. *The Issue of the Apportionment of Costs*

### i. *Summary of the Parties' Positions*

### 1. *The Applicant*

456.  The Applicant asserts that the Tribunal's allocation of costs "contains a number of serious defects that warrant annulment of the Award."[417]

457.  It argues that firstly, the Tribunal's approach is "completely subjective" and devoid of any citation of "jurisprudence or principles."[418] Secondly, even if tribunals have a certain discretion to apportion costs, they are held to state the reasons for their decision and "should not be allowed to get away with a serious argumentative defect."[419]

458.  The Applicant submits that the Tribunal had decided to adopt the 'cost follow the event' approach. Accordingly, the Tribunal stated that it would take the "degree of success" into account. However, when it had to apply its own standard, the Tribunal failed to take into account that Venezuela had prevailed in the dispute with respect to the appropriate interest rate. The Tribunal had accepted a one-year LIBOR plus 4% rate, in line with Venezuela's expert opinion, instead of the WACC as proposed by Tenaris and Talta. This decision significantly reduced the amount of damages to be paid.

459.  Thus, the Tribunal contradicted the approach it had previously adopted. It did not consider Venezuela's relative success in regards to the interest rate into its overall degree of success, thereby artificially decreasing its rate and increasing its costs. "This contradiction resulted in a meaningful amount of the compensation awarded to Tenaris and Talta which was awarded under terms that warrant annulment of the Award."[420]

---

[417] Memorial, ¶ 280.
[418] Memorial, ¶ 281.
[419] Reply, ¶¶ 264 and 265.
[420] Reply, ¶ 263; Memorial, ¶¶ 282 and 283.

### 2. *The Respondents*

460. The Respondents submit that "Venezuela's argument amounts to nothing more than a disagreement with the Tribunal's application of the "costs follow the event" principle."[421]

461. They argue that the Tribunal stated the reasons why it adopted the "costs follow the event" principle and then stated the reasons how it apportioned the costs according to this principle with respect to the relative success of each Party for the issues of jurisdiction, liability and quantum. When Venezuela criticizes the Tribunal for not taking a sub-issue into account for the apportionment of costs, it does not explain why the latter was obliged to do so. In addition, Venezuela fails to explain why the Tribunal's approach "prevents the reader from following the Tribunal's reasoning from A to B." [422]

462. Finally, Venezuela has failed to explain that the alleged contradiction in the Tribunal's reasoning was "so severe that the two conflicting reasons "cancel each other out so as to amount to no reasons at all."[423]

### ii. *The Committee's Analysis and Determination*

463. The Committee notes that the Tribunal correctly concluded, based on Convention Article 61(2), that "it has discretion to award costs."[424] The Tribunal then explained how it exercised its discretion and why it did so, each time after having presented the Parties' positions and claims.[425]

464. The reasons are detailed. They state why the Tribunal rejected Venezuela's assertion that the Claimants acted in bad faith which should be reflected in the apportionment of the costs (paragraphs 840-842), why the Tribunal accepted the Claimants' proposal to apply the widely used principle "costs follow the event" (paragraphs 843-844), and

---

[421] Rejoinder, ¶ 177; Counter-Memorial, ¶ 187.
[422] Rejoinder, ¶ 177.
[423] Rejoinder, ¶ 177; Respondents quote *Daimler v. Argentina*, ¶ 77.
[424] Award, ¶ 838.
[425] Award, ¶¶ 839-856.

how this principle is applied to the facts and the results of the case (paragraphs 845-846). This is far from being "completely subjective."

465.    The Tribunal determined, in application of the "costs follow the event" principle, that "Claimants are the successful party, as they have seen how the jurisdictional objections were rejected and their principal claim accepted by the Arbitral Tribunal. However, Respondent has also succeeded to some extent, as it has persuaded the Arbitral Tribunal that the applicable compensation was lesser than that claimed."[426]

466.    Having found so, the Tribunal did not apply the principle exclusively and as a mathematical exercise, but took other elements into account, some of which favor the Claimants and some the Respondent. That approach is covered by the Tribunal's wide discretion. Thus, it is not subject to a correction by the Committee.

467.    From this perspective, the Tribunal started by ordering Venezuela to pay the totality of the costs of proceedings irrespective of the "cost follow the event" principle. The reasons are not linked to the relative success of either Party but to Venezuela's decision not to participate in advancing its part of these costs and to the Tribunal's rejection of Venezuela's objections to jurisdiction.[427]

468.    As a next step, the Tribunal decided to reduce the amount of defense expenses claimed by Tenaris and Talta from 6 million USD to 2.8 million USD, again not by applying the "cost follow the event" principle but by holding that 2.8 million USD are reasonable.

469.    When weighing the reasonable defense expenses, the Tribunal considered the complexity of each issue (jurisdiction, liability and quantum), the "assistance provided by counsel," and the level of success in each issue.[428]

470.    The Tribunal applied these criteria to allocate the reasonable defense expenses. It "[took] into consideration the complexity of each of the great issues under discussion

---

[426] Award, ¶ 844.
[427] Award, ¶¶ 846 and 847.
[428] Award, ¶¶ 848-855.

and Claimants' level of success."[429] In its determination of the level of success with respect to quantum, the Tribunal exercised its discretion and took only the principal amounts of compensation into account, as requested by the Claimants and partly ascertained by Venezuela.

471. The Tribunal did not take the ancillary claims into account, such as the final allocation of costs nor the decision on the interest rate. As to the allocation of costs, it ascertained the Claimants' claim for full cost recovery only partly. As to interest, the Tribunal applied a one-year LIBOR plus 4% rate. The Tribunal came to this decision by hearing the Parties' experts on this point and then exercising its discretion. The decision was more in line with Venezuela's expert's opinion although not entirely, since he had proposed a six-month LIBOR plus 2% rate.[430]

472. The Applicant opines that this is "a serious argumentative defect" and an "internal contradiction," and not, as alleged by the Respondents, at best an error in the Tribunal's reasoning, which would not give rise to annulment. It argues that any contradiction "can be re-described as an error, since contradiction is indeed a form of error." Allowing such "artificial re-description" would lead to the result that "contradiction would cease to be an instance of no statement of reasons under Article 52(1)(e) of the ICSID Convention, a notion that runs afoul with a unanimous line of persuasive decisions to the contrary."[431]

473. The Committee disagrees with the Applicant's reasoning. Convention Article 52(1)(e) does not use the term 'contradiction' but allows the annulment of an award if it fails to state the reasons on which it is based. Instances may exist when two reasons in an award neutralize each other with the practical effect of an absence of reasons. The issue is not one of the lexical meaning of the term 'contradiction' and its vicinity to the term 'error'. Rather, the issue is one of an absence of reasons caused by the mutual annihilation of irreconcilable reasons.

---

[429] Award, ¶ 890.
[430] Award, ¶¶ 769-775.
[431] Reply, ¶ 264.

474.     The Committee finds that the Tribunal explained in detail the criteria that led it to exercise its discretion the way it did. While the 'costs follow the event' principle was the *leitmotif*, it differentiated and used additional considerations, without contenting itself to a strictly mathematical exercise. When weighing the relative success of both Parties with respect to quantum, the Tribunal exercised its discretion to take only the principal claim for compensation into account and not the ancillary claims for the payment of interest and of costs as well. In addition, the Tribunal used its discretion to establish the interest rate and had not followed the Parties' experts fully. In both cases, the Tribunal exercised its discretion. It is not for the Committee to correct this.

475.     In any event, even assuming that the Tribunal inadvertently omitted to take into consideration the saving due to the application of an interest rate lower than the one requested by the Claimants, such omission would not have annihilated another reason. At best, it would be an error that does not amount to a failure to state reasons.

476.     For these reasons, the Committee has not found that the Tribunal failed to state the reasons on which it has based its decision on the apportionment of costs to warrant annulment.

## V.     DECISION ON COSTS

477.     The Parties submitted their respective statements for costs on 9 October 2018.

### A.  The Applicant's Statement of Costs

478.     The Applicant seeks to recover "all costs and expenses arising out of these proceedings," including the advanced costs of proceeding, in application of the "principle that costs follow the event" and under the assumption that the Committee will annul the Award. [432]

479.     Venezuela contends that its Application for Annulment was submitted "in good faith and based on facially evident annullable errors."[433] It further argues that "[e]ven in

---

[432] Reply, ¶¶ 274(b) and 273; Tr. D2, p. 465, Venezuela's Costs, ¶ 2.
[433] Venezuela's PHB, ¶; Venezuela's Costs, ¶ 5.

the case that this Committee exercises its discretion not to annul the award, Venezuela should not be punished by an imposition of costs as a result of it exercising a right granted under the Convention."[434]

480. The Applicant's legal costs and expenses are as follows:[435]

| | | |
|---|---|---|
| Legal Costs[436] | USD | 1,505,569.00 |
| Expenses[437] | USD | 21,099.78 |
| Advance Payments | USD | 546,565.45 |
| Lodging Fee | USD | 25,000.00 |
| **Total**: | **USD** | **2,098,234.23** |

## B. The Respondents' Statement of Costs

481. The Respondents request that "Venezuela bear all costs and expenses incurred by the Claimants in connection with the present annulment proceedings, including the fees of the Centre, the costs and fees of the *ad hoc* Committee, and the Claimants' legal fees and expenses", again in application of the "costs follow the event approach" and under the assumption that the Committee will reject Venezuela's annulment application.[438]

482. The Respondents' legal costs and expenses are as follows:[439]

| | | |
|---|---|---|
| Legal Costs | USD | 1,204,176.60 |
| Expenses | USD | 46,776.38 |
| **Total**: | **USD** | **1,250,952.98** |

---

[434] Venezuela's Costs, ¶ 5.
[435] Venezuela's Costs, ¶ 4.
[436] This amount was calculated by adding USD 1,129,155.00 for the legal fees of GST LLP to USD 376, 414 for the legal fees of Foley Hoag LLP.
[437] This amount was calculated by adding USD 17,742.78 for the expenses of GST LLP to USD 3,357 for the expenses of Foley Hoag LLP.
[438] Tr. D1, pp. 326-327; Rejoinder, ¶ 184(b).
[439] Tenaris' Costs, Annex A.

### C. The Costs of the Proceeding

483.   The costs of the annulment proceeding, including the Committee's fees and expenses, ICSID's administrative fees and direct expenses, are as follows:

| | |
|---|---|
| Committee Members' fees and expenses | USD 388,064.04 |
| ICSID's administrative fees | USD   74,000.00 |
| Direct expenses[440] | USD   82,111.01 |
| **Total**: | **USD 544,175.05** |

---

[440] This amount includes meeting-related expenses, court reporting and translation services, and charges relating to the dispatch of this Decision on Annulment (courier, printing and copying).

### D. The Committee's Analysis and Decision

484. According to Convention Article 61(2) and Arbitration Rule 47(1)(j), which are applicable *mutatis mutandis* to annulment proceedings (see Article 52(4) Convention)), the Committee has discretion to determine "how and by whom" the costs and expenses of ICSID, the Committee and the Parties are borne.

485. In accordance with ICSID Administrative and Financial Regulation 14(3)(e), the Applicant was "solely responsible for making the advance payments […] without prejudice to the right of the Committee in accordance with Article 52(4) of the Convention to decide how and by whom expenses incurred in connection with the annulment proceeding shall be paid." The Applicant has paid the advances as requested, amounting to USD 546,565.45.

486. The Committee finds it appropriate to follow *mutatis mutandis* the same approach as the Tribunal. It takes into account the principle that costs should normally follow the event, as well as other circumstances specific to annulment proceedings.

487. With respect to the costs of the proceeding, the Committee is conscious of the fact that in annulment proceedings, conversely to original arbitration proceedings, the applicant has to pay the necessary advances. In case of the rejection of its application, the 'cost follow the event' principle leads to a result that corresponds to another principle of cost allocation according to which 'costs should lie where they fall.' Both principles have their merits and reinforce each other with respect to the costs of the proceeding due to ICSID Administrative and Financial Regulation 14(3)(e). In application of both standards, the Committee decides that the Applicant shall bear the cost of the proceeding given that its Application was rejected.

488. With respect to the Parties' legal fees and expenses, the matter is more complicated, also because the two principles lead to different results.

489. The Committee believes that the remedy of annulment is important to guarantee the legitimacy and acceptability of the ICSID system. There is an objective interest to

assure that awards do not suffer from fundamental defects. In the present case, the Committee has found that the Award was free of such flaws.

490.  Both Parties have greatly assisted the Committee to reach its conclusions through their diligent and efficient written and oral submissions and presentations. For this reason, the Committee agrees with the *ad hoc* committee in *Tenaris I*. It has found in similar circumstances that "the underlying fundamental questions posed by them [the grounds for annulment] justify that each Party shall bear all expenses incurred in connection with its own defence."[441] In line with this argument, the Committee finds it reasonable to extend the application of the principle that costs should lie where they fall to all costs of the present case, and decides that each Party shall bear its own legal costs and expenses.

## VI.  DECISION

491.  For the foregoing reasons, the Committee decides unanimously:

(1)  The Application for Annulment of the Award is rejected;

(2)  Each Party shall bear its own costs and fees; and

(3)  The Applicant shall bear the costs of the annulment proceeding, including the fees and expenses of the Committee and the costs of the Centre.

---

[441] *Tenaris I v. Venezuela* Decision, ¶ 281.

Mr. N. Fernando Piérola Castro
Member of the *ad hoc* Committee
December 21, 2018

Mr. José Antonio Moreno Rodríguez
Member of the *ad hoc* Committee
December 17, 2018

Prof. Dr. Rolf Knieper
President of the *ad hoc* Committee
December 12, 2018

# **EXHIBIT 7**

AO 451  (Rev. 12/12)   Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| TENARIS S.A., et. al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action  No.  18-cv-1371 (CRC) |
| BOLIVARIAN REPUBLIC OF VENEZUELA | ) | |
| *Defendant* | ) | |


### CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)*  __07/17/2020__ .

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court, the time for appeal has expired, and no appeal has been filed or, if one was filed, it is no longer pending.


Date:  __08/16/2023__


*CLERK OF COURT*


Leayrohn L. King   Digitally signed by Leayrohn L. King
Date: 2023.08.16 15:27:43 -04'00'

*Signature of Clerk or Deputy Clerk*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TENARIS S.A. and TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA,** | |
| Petitioners, | Case No. 18-cv-1371 (CRC) |
| v. | |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** | |
| Respondent. | |

<u>**ORDER AND JUDGMENT**</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Judgment is entered in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA against Bolivarian Republic of Venezuela in the amount of $256,375,009.12 USD.  It is further

**ORDERED** that post-judgment interest shall begin to accrue from the date of this judgment pursuant to 28 U.S.C. § 1961.

This is a final appealable Order.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>July 17, 2020</u>

**ECF DOCUMENT**
I hereby attest and certify that this is a printed copy of a document which was electronically filed with the United States District and Bankruptcy Courts for the District of Columbia.

ANGELA D. CAESAR, CLERK

Leayrohn L. King
Digitally signed by Leayrohn L. King
Date: 2023.08.16 14:54:05 -04'00'

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TENARIS S.A., et al.,

           *Petitioners*,

    v.

BOLIVARIAN REPUBLIC OF
VENEZUELA,

           *Respondent*.

Civil Action No. 1:18-cv-01373 (CJN)

## **ORDER**

The Court previously issued an Order, ECF No. 29, granting in part and denying in part Petitioners' Petition to Enforce Arbitration Award.  In accordance with that Order, Petitioners filed a Proposed Order of Judgment, ECF No. 31, which Respondent did not oppose.

Accordingly, it is hereby

**ORDERED** that Judgment is entered in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA against Respondent Bolivarian Republic of Venezuela in the amount of $276,943,766.00 USD.  It is further

**ORDERED** that post-judgment interest shall begin to accrue from the date of this judgment pursuant to 28 U.S.C. § 1961.

This is a final appealable Order

It is so **ORDERED**.

DATE:  August 24, 2021

CARL J. NICHOLS
United States District Judge

1

# EXHIBIT 9

AO 451 (Rev. 12/12)   Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| TENARIS S.A., et. al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action  No.  18-cv-01373 (CJN) |
| BOLIVARIAN REPUBLIC OF VENEZUELA | ) | |
| *Defendant* | ) | |

## CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)*    11/05/2021    .

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court, the time for appeal has expired, and no appeal has been filed or, if one was filed, it is no longer pending.

Date:    08/16/2023

CLERK OF COURT

Leayrohn L. King
Digitally signed by Leayrohn L. King
Date: 2023.08.16 15:26:48 -04'00'

*Signature of Clerk or Deputy Clerk*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TENARIS S.A. and TALTA-TRADING E MARKETING SOCIEDADE UNIPESSOAL LDA,<br><br>          Petitioners,<br><br>   v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>          Respondent. | Civil Action No. 1:18-cv-01373 (CJN) |

## ORDER GRANTING PETITIONERS' MOTION TO ALTER OR AMEND THE JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(e)

Upon consideration of the Motion to Alter or Amend the Judgment under Federal Rule of Civil Procedure 59(e) filed by Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal Lda (together, the "Petitioners"), the Declaration of Elliot Friedman, and the entire record of this case, it is hereby

**ORDERED** that the Petitioners' Motion to Alter or Amend the Judgment under Federal Rule of Civil Procedure 59(e) is **GRANTED**. It is further

**ORDERED** that the judgment entered on August 24, 2021 is hereby **ALTERED** and judgment is accordingly entered in favor of Petitioners Tenaris S.A. and Talta-Trading e Marketing Sociedade Unipessoal LDA against Respondent Bolivarian Republic of Venezuela in the amount of $280,667,040.00 USD. It is further

**ORDERED** that post-judgment interest shall begin to accrue from August 24, 2021 pursuant to 28 U.S.C. § 1961.

It is so **ORDERED**.

1

DATE:  November 5, 2021



_____
CARL J. NICHOLS
United States District Judge

**ECF DOCUMENT**

I hereby attest and certify that this is a printed copy of a document which was electronically filed with the United States District and Bankruptcy Courts for the District of Columbia.

ANGELA D. CAESAR, CLERK

Leayrohn L. King

Digitally signed by Leayrohn L. King
Date: 2023.08.16 15:27:18 -04'00'

# EXHIBIT 10

# Exhibit 28

**LEGISLATIVE GAZETTE**
**BOLIVARIAN REPUBLIC OF VENEZUELA**
**NATIONAL ASSEMBLY**

### THE NATIONAL ASSEMBLY OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

### ORDERS

as follows,

### LAW REFORMING THE STATUTE GOVERNING THE TRANSITION TO DEMOCRACY TO REESTABLISH THE EFFECTIVENESS OF THE CONSTITUTION OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

#### Explanatory Memorandum

Pursuant to Sections 12 and 15 of the Law Reforming the *Statute Governing the Transition to Democracy to Reestablish the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela*, which was approved at the Session of the National Assembly held on January 4, 2022, the term of office of both the National Assembly and the Acting President of the Republic shall terminate 12 months after January 4, 2022.

Said decision was unanimously approved by the Representatives present at the above-referred Session and was published, in compliance with the order of the Acting President, in Legislative Gazette No. 56 of the National Assembly of the Bolivarian Republic of Venezuela on January 5, 2022.

That is to say that, according to what was approved on January 4, 2022 with the unanimous vote of the Representatives present and in compliance with the order of the Acting President, as of January 4, 2023, both the National Assembly elected in 2015 and the Acting President of the Bolivarian Republic of Venezuela shall cease to be in effect, and their positions shall be terminated. This decision reflected the purpose of undertaking the electoral strategy as the most realistic way to bring about political change in our country.

At the time we prepared this Report for the second debate, after the Bill under analysis was approved in the first debate and after having heard the different opinions of the members of the public, scholars, and political leaders, we considered the introduction of this Report to be appropriate, to make it clear that the decision we are discussing today was made with the support of each and every one of us nearly a year ago. Additionally, the provision stated in Section 6 hereof, which reads "for the purposes of this Statute, the

political events held on May 20, 2018, and December 6, 2020, were not legitimate elections. Each and every act resulting from the illegitimate institutional framework derived from the electoral frauds committed on both dates is null and void and ineffective under the terms of Articles 25 and 138 of the Constitution of the Bolivarian Republic of Venezuela" remains unchanged in this proposal. We believe that this clarification is necessary to dispel any doubts about the possibility of mistaking the goal of the Reform we are pursuing with giving up our ongoing struggle to reclaim democracy for the people, who have the right to progress in freedom.

In this sense, we wish to make it clear that the core underlying reason for the legal Reform we are pursuing is to consider that the only institution which is legitimized by the people's vote that remains in place in Venezuela is the National Assembly elected in 2015, which should not cease to function; therefore, we propose to extend its mandate for an additional twelve-month period, taking into account that, in addition to its constitutional powers, it also has the responsibility of safeguarding the Republic's foreign assets, in accordance with Article 333 of the Constitution currently in force.

This Law Reforming the Statute Governing the Transition to Democracy to Reestablish the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela reflects the democratic and political spirit of "returning to the Constitution through the Constitution," and intends to advance, by all means conceivable, the need to ensure the genuine yearning of the Venezuelan nation to go forward towards democracy and development.

In light of the illegitimate and *de facto* exercise of executive powers by the autocratic government, this reform grants to the National Assembly elected on December 6, 2015, special powers to promote the transition to democracy and the protection of state-owned assets under Article 333 of the Constitution currently in force.

The sections read as follows:

### Purpose

**Section 1.** The purpose of this Statute is to create the regulatory framework governing the democratic transition in the Bolivarian Republic of Venezuela.

### Goals

**Section 2.** The goals of the transition to democracy are the full reestablishment of the constitutional order, the recovery of the people's sovereignty through free elections, and the overcoming of the complex

humanitarian emergency, with the purpose of reinstating the system of freedoms, constitutional safeguards and human rights. Every act performed by the entities comprising the Public Administration shall prioritize the recovery of the standard of living of the population, the pursuit of free, fair, and verifiable elections, and the democratic and effective protection of the foreign assets held by the Republic.

**Legal Nature**

**Section 3.** This Statute is a regulatory act which directly and forthwith implements Article 333 of the Constitution of the Bolivarian Republic of Venezuela. The acts performed by the entities comprising the Public Administration aimed at implementing the guidelines established in this Statute are also based on Article 333 of the Constitution and are legally binding for all authorities and public officials, as well as for all individuals.

**Principles**

**Section 4.** The higher values governing this Statute are life, freedom, justice, equality, solidarity, democracy, social responsibility, constitutional supremacy and, in general, the preeminence of human rights, ethics and political pluralism.

**Objectives**

**Section 5.** Based on Article 333 of the Constitution, the objectives of this Statute are:
1. To lay the foundations to initiate the people's process of national reconciliation.
2. To advocate for the restitution of democracy in Venezuela and the full effectiveness of the Constitution.
3. To protect the foreign assets held by the Republic through the Asset Management and Protection Council.

CHAPTER II

USURPATION OF THE PUBLIC ADMINISTRATION AND THE TRANSITORY SCHEME TO REESTABLISH THE EFFECTIVENESS OF THE CONSTITUTION

**Nullity of Usurped Powers**

**Section 6.** For the purposes of this Statute, the political events held on May 20, 2018 and December 6, 2020 shall not be deemed legitimate elections. Each and every act resulting from the illegitimate institutional framework derived from the electoral frauds committed on both dates is null and void and ineffective under the terms of Articles 25 and 138 of the Constitution of the Bolivarian Republic of Venezuela.

**Constitutional Survival**

**Section 7.** For the sake of constitutional survival, the National Legislative Branch shall be exercised by the National Assembly elected on December 6, 2015, which shall take office through the Delegate Commission for up to twelve (12) continuous months as from January 5, 2023.

**Powers**

**Section 8.** The Delegate Commission of the National Assembly shall be empowered:

1.       To prevent the National Legislative Branch from interrupting its operation.

2.       To promote the transition to democracy.

3.       To protect the foreign assets held by the Republic through the Asset Management and Protection Council.

4.       To authorize the provision of the resources necessary to comply with the objectives and purposes of this Law.

5       To seek international financial cooperation from multilateral organizations and countries of the free world in order to initiate the process of democratic transition and to continue the reversal of the humanitarian emergency.

6.       To foster the institutional conditions for the advocacy for the rights and interests of the entities and foreign assets held by the Venezuelan State.

7.       To approve the hiring of firms to audit the administration of state-owned property and resources by the Asset Management and Protection Council.

8.       To approve the budget of the National Assembly and its amendments.

9.       To convene special sessions of the National Assembly, to discuss important issues.

10.       To appoint temporary commissions composed of members of the National Assembly.

11.       To exercise the constitutional control powers vested with the National Assembly.

12.       To promote internally and internationally the organization of free, fair, and verifiable presidential and parliamentary elections, as well as the reestablishment of democracy.

**Asset Management and Protection Council**

**Section 9.** The Asset Management and Protection Council is hereby created. It shall be composed of five members, who shall be appointed by the National Assembly or its Delegate Commission. The coordinator shall be chosen from among the members. Once the members have been appointed, they shall have to approve the council's operating rules. The Asset Management and Protection Council shall be the competent authority for the protection of all foreign property or assets held by the Bolivarian Republic of

Venezuela, participating in the management of the same when it deems convenient. In the exercise of its powers, it shall represent the shares held by the Republic in any of the entities in which the Republic is a shareholder. Likewise, it may appoint or revoke the powers of attorney granted on behalf of the Republic.

The powers of attorney validly granted by the Special Attorney of the Republic shall remain in force and effect as long as the Asset Management and Protection Council decides not to revoke them.

### Effectiveness of the Central Bank of Venezuela Ad Hoc Board of Directors

**Section 10.** The Central Bank of Venezuela Ad Hoc Board of Directors shall remain in effect as an independent and autonomous entity, so that it may continue to exercise the functions necessary to comply with the objectives of this legal reform.

### International Representatives

**Section 11.** The National Assembly or its Delegate Commission may appoint international representatives to act in matters of human rights, migration or humanitarian crisis, and fight against corruption, in multilateral organizations, or democratic protection of assets for the United States of America, the United Kingdom, and/or wherever required. The aforementioned officials may act in matters of organization of and support to Venezuelan migrants and shall be accountable to the National Assembly or the Delegate Commission.

### Parliamentary Acts for the Implementation of this Statute

**Section 12.** The National Assembly or its Delegate Commission shall adopt all the necessary decisions for the implementation of this Statute, in order to allow the effective reestablishment of the Constitution. The provisions of this Statute and any other decisions made in accordance with Article 333 of the Constitution shall be applied preferentially until these goals are achieved.

### Transitory Scheme for PDVSA and its Subsidiaries

**Section 13.** PDVSA and its subsidiaries face potential risks as a result of the usurpation referred to in this Statute; in view of such risks and as long as such situation continues, with the prior authorization of the National Assembly or its Delegate Commission, the Asset Management and Protection Council shall appoint the members of the Petróleos de Venezuela S.A. (PDVSA) Ad Hoc Board of Directors, to exercise the rights to which PDVSA is entitled as a shareholder of PDV Holding, Inc. Likewise, the removal of any member of the Petróleos de Venezuela S.A. (PDVSA) Ad Hoc Board of Directors shall be previously authorized by the National Assembly or its Delegate Commission.

This authority shall be exercised in accordance with the following principles:

1.      The individuals appointed as members of the PDVSA Ad Hoc Board of Directors may be residents of a foreign country, and said Board shall be vested with the same powers as the PDVSA shareholders' meeting and board of directors, for the purpose of taking all necessary actions to appoint the board of directors of PDV Holding, Inc. on behalf of PDVSA as a shareholder of such company. The directors of PDV Holding, Inc. shall proceed to take all the necessary actions to appoint the boards of directors of the company's subsidiaries, including Citgo Petroleum Corporation.

2.      This rule shall apply in preference to any other rule that may be applicable and shall serve as basis for the interpretation of any other formalities required in the Venezuelan legal system and in corporate documents, in order to exercise the representation of PDVSA as shareholder of PDV Holding, Inc.

3.      The directors of PDV Holding, Inc. and its subsidiaries shall guarantee the operational autonomy of these companies, in particular, that of PDVSA. As a consequence of the foregoing, the autonomous business management of PDV Holding, Inc. and its subsidiaries shall be guided by the criteria of commercial efficiency, subject to the monitoring and accountability controls performed by the National Assembly, within the scope of the powers granted unto it, and other applicable monitoring controls.

4.      PDV Holding, Inc. and its subsidiaries shall have no relationship whatsoever with whomever is usurping the public administration of Venezuela today. As long as such usurpation continues, PDV Holding, Inc. and its subsidiaries shall not make any payments or equity contributions to PDVSA.

**Disposal and Management of State-owned Assets**

**Section 14.** Those state-owned assets that have been or are recovered pursuant to this Statute shall be managed and protected by the Asset Management and Protection Council, and shall not be sold, encumbered or disposed of under any title or circumstances, until legitimate authorities of the national public administration are elected through free, fair, and verifiable elections.

PARAGRAPH ONE: The Republic has been in a perpetual state of budgetary readjustment since 2016. As a result of this situation, the National Assembly may issue a special law to regulate financial and budgetary matters, in accordance with Article 187(6), (7) and (8) of the Constitution.

PARAGRAPH TWO: Exceptionally, and once the constitutional principles of efficiency, transparency, solvency, fiscal balance, accountability and responsibility in the exercise of the public office have been verified, the National Assembly or its Delegate Commission may authorize, either in whole or in part, through the relevant procedures set out in the law, the use of public funds, including the ordinary expenses of the National Legislative Branch and the defense of the foreign assets held by the Venezuelan State.

**Publication of this Statute**

**Section 15.** The National Assembly shall notify, as soon as practicable, the contents of this Statute to the Venezuelan Nation, as well as to the international community, including foreign governments, the Secretary-General of the United Nations (UN), the Secretary General of the Organization of American States (OAS), the UN High Commissioner for Human Rights, the Inter-American Commission on Human Rights, the European Union, the African Union, the Organization of Petroleum Exporting Countries, the World Bank, the International Monetary Fund, the Inter-American Development Bank, the Andean Development Corporation or Development Bank of Latin America, and such other entities as it may deem appropriate.

**Exceptional Means of Enactment of this Statute**

**Section 16.** By virtue of the impossibility of accessing the Official Gazette due to the *de facto* government and the usurpation prevailing in Venezuela, this Statute and the decisions to be implemented shall be published by the advertising channels to be determined by the National Assembly for such purposes.

Therefore, the laws and agreements passed by the National Assembly shall be published in the Legislative Gazette in accordance with the Rules of Procedure and Debates as long as the situation described in this section continues. All laws, agreements, and other decisions shall become effective upon their publication in the Legislative Gazette, including publication in digital format. The Official Publications Law shall apply on a supplementary basis.

**Entry into Force**

**Section 17.** According to Section 5 of the Official Publications Law, this is the composite text of the Statute governing the transition to democracy to reestablish the effectiveness of the Constitution of the Bolivarian Republic of Venezuela, which includes the content of this reform that shall become effective after being approved by the National Assembly and published in the Legislative Gazette.

**Residual Clause**

**Section 18.** In order to safeguard the democratic transition, all matters not provided for in this Statute shall be resolved by the National Assembly or the Delegate Commission in accordance with Article 333 of the Constitution.

**Repealing Clause**

**Section 19.** All laws and regulations that go against the spirit, purpose, and motivation of this Statute shall be repealed upon its implementation.

**Survival**

**Section 20.** All appointments of entities and officials by the Acting President shall cease to have effect as of the entry into force of this Law. Only the officers in charge of the Council for the Administration of Expenditure, now called the Asset Management and Protection Council, the Council for the Administration of the Expenditure, Security and Defense of Democracy Program, and the members of the Central Bank of Venezuela Board of Directors shall remain in office.

**Accountability**

**Section 21.** The Office of the Acting President of the Republic shall submit to the Delegate Commission of the National Assembly a detailed accountability and management report, within forty-five (45) days from the entry into force of this Law.

The Special Attorney, the Special Comptroller, the coordinator of the Council for the Administration of Expenditure, the Chairman of the Central Bank of Venezuela Ad Hoc Board of Directors, the Chairman of the PDVSA Ad Hoc Board of Directors, and all officers who until now have had responsibilities in the administration of goods or assets owned by the Republic shall submit an accountability and management report within forty-five (45) days from the entry into force of this Law.

All assets acquired by the Interim Administration with the purpose of conducting the affairs of the government and which belong to the Republic shall be inventoried and surrendered to the Asset Management and Protection Council within ninety (90) days from the entry into force of this Law.

**Transitory Status**

**Section 22.** The Asset Management and Protection Council, the Council for the Administration of the Security and Defense of Democracy Expenditure Program, the PDVSA Ad Hoc Board of Directors and the Central Bank of Venezuela Board of Directors shall remain in operations for a twelve-month period in accordance with the term established for the Statute.

Signed, sealed and delivered in an extraordinary session of the National Assembly held by virtual means by decision of the Board of Directors, pursuant to the provisions of Section 13(4) and Section 56(last part)

**Legislative Gazette** January 3, No. 66                                                      21

of the Rules of Procedure and Debates of the National Assembly, in light of the usurpation that the dictatorship of Nicolás Maduro maintains over the facilities of the Seat of the Federal Congress, on December 30, 2022. 211th anniversary of the Independence and 162nd anniversary of the Federation.

[Signature] **JUAN GERARDO GUAIDÓ MÁRQUEZ**. Chairman of the National Assembly.

[Signature] **JUAN PABLO GUANIPA**. First Deputy Chairman.

[Signature] **CARLOS EDUARDO BERRIZBEITIA**. Second Deputy Chairman.

[Signature] **JOSÉ ANTONIO FIGUEREDO MÁRQUEZ**. Secretary.

[Seal:] BOLIVARIAN REPUBLIC OF VENEZUELA. NATIONAL ASSEMBLY. OFFICE OF THE CHAIRMAN.

Enactment of the **STATUTE GOVERNING THE TRANSITION TO DEMOCRACY TO REESTABLISH THE EFFECTIVENESS OF THE CONSTITUTION OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**, in accordance with the provisions set forth in Articles 213, 233 and 333 of the Constitution of the Bolivarian Republic of Venezuela.

Caracas, December 30, 2022. 211th anniversary of the Independence and 162nd anniversary of the Federation.

Be these presents complied with.

(L.S.)

[Signature] **Juan Guaidó**. **Chairman of the National Assembly.**

**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the original document entitled "Law Reforming the Statute Governing the Transition To Democracy to Reestablish the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela, adopted by the National Assembly of Venezuela, published in the Venezuelan Legislative Gazette No. 66 and dated January 3, 2023," which was written in Spanish.

City of Buenos Aires, May 12, 2023.

THE TR COMPANY TRANSLATION SERVICES

_____

Cynthia Farber

Certified Translator

License recorded on Page 226: Book XV

Buenos Aires Translators' Association

CTPCBA No. 5402

Manuel Ugarte 2187 1º (C1428BSE) Buenos Aires, Argentina
(54.11) 4896 2693
info@thetrcompany.com - www.thetrcompany.com

Sumario

LEY DE REFORMA DEL ESTATUTO QUE RIGE LA TRANSICIÓN A LA DEMOCRACIA PARA
RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE
VENEZUELA

ESTATUTO QUE RIGE LA TRANSICIÓN A LA DEMOCRACIA PARA RESTABLECER LA VIGENCIA DE LA
CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA

LEY DE REFORMA  DE LA LEY ESPECIAL DEL FONDO PARA LA LIBERACIÓN DE VENEZUELA Y
ATENCIÓN DE CASOS DE RIESGO VITAL

LEY ESPECIAL DEL FONDO PARA LA LIBERACIÓN DE VENEZUELA Y ATENCIÓN DE CASOS DE
RIESGO VITAL





**LA ASAMBLEA NACIONAL DE LA REPÚBLICA BOLIVARIANA
DE VENEZUELA**

**DECRETA**

la siguiente,

**LEY DE REFORMA DEL ESTATUTO QUE RIGE LA TRANSICIÓN A LA
DEMOCRACIA PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN
DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**

**PRIMERO.** Se incluye una exposición de motivos, cuyo contenido es el siguiente:

**Exposición de Motivos**

De conformidad con los artículos 12 y 15 de la Ley de Reforma del *Estatuto que Rige
la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la
República Bolivariana de Venezuela*, la cual fue aprobada en Sesión de la Asamblea
Nacional celebrada el día 04 de enero de 2022, la vigencia en el ejercicio de sus
funciones tanto para la Asamblea Nacional como para el Presidente Encargado de
la Presidencia de la República, terminan al cumplirse 12 meses del 04 de enero de
2022.

Dicha decisión fue aprobada por la unanimidad de los Diputados presentes en la
referida Sesión y fue publicada, con el Ejecútese del Presidente Encargado, en la
Gaceta Legislativa N°56 de la Asamblea Nacional de la República Bolivariana de
Venezuela de fecha 05 de enero de 2022.

Es decir, que según lo que ya está aprobado desde el día 04 de enero de 2022, con





el voto unánime de los Diputados presentes y con el respectivo ejecútese del Presidente Encargado, el próximo 04 de enero de 2023, dejarán de tener vigencia, terminarían sus funciones, tanto la Asamblea Nacional electa en el 2015 como la Presidencia Encargada de la República Bolivariana de Venezuela. Esa decisión reflejó el propósito de asumir la estrategia electoral como la vía más realista para producir el cambio político en nuestro país.

Cuando elaboramos este Informe para Segunda discusión, luego de la aprobación en primera discusión del Proyecto de Ley que analizamos, después de haber conocido las diferentes opiniones de la ciudadanía, de juristas y dirigentes políticos, consideramos oportuna la introducción que encabeza este Informe, para dejar constancia de que la decisión que discutimos hoy, se tomó con el apoyo de todos hace casi un año. Y que esta propuesta deja sin modificación alguna, según lo recoge en su Artículo 6, que "a los efectos del presente Estatuto, los eventos políticos celebrados los días 20 de mayo de 2018 y 06 de diciembre de 2020, no fueron elecciones legítimas. Todos los actos emanados de la írrita institucionalidad derivada de los fraudes electorales cometidos en ambas fechas, son nulos e ineficaces en los términos de los artículos 25 y 138 de la Constitución de la República Bolivariana de Venezuela". Puntualización que consideramos necesaria para despejar las dudas sobre la posibilidad de que se confunda el objeto de la Reforma que proponemos, con una entrega de nuestra lucha constante por reconquistar la democracia para un pueblo que tiene derecho a progresar en libertad.

En ese sentido, queremos dejar claro que el motivo fundamental de la presente Reforma legal que proponemos, es considerar que la única institución legitimada por decisión popular que le queda al pueblo venezolano, es la Asamblea Nacional electa en el 2015, la cual no debe dejar de funcionar y por tanto proponemos extenderle su mandato por 12 meses más, asumiendo además de sus atribuciones constitucionales, la función de la protección de los activos de la República que se encuentran en el exterior con fundamento en el Artículo 333 de la Constitución vigente.





La presente Ley de Reforma del Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución Bolivariana de Venezuela recoge el espíritu democrático y político de "volver a la Constitución a través de la Constitución", y se propone promover por todos los medios que le sean posibles, la necesidad de garantizar la aspiración legítima del pueblo venezolano de avanzar hacia la democracia y el desarrollo.

Entendiendo la realidad del ejercicio ilegítimo y de facto del gobierno por parte del régimen autocrático, esta reforma otorga a la Asamblea Nacional electa el 06 de diciembre de 2015, competencias especiales para promover la transición a la democracia y la protección de los activos del Estado al amparo del Artículo 333 de la Constitución vigente.

A continuación, el articulado:

**SEGUNDO**: se mantiene el artículo uno (1) aprobado en primera discusión quedando redactado de la siguiente manera:

### Objeto

**Artículo 1.-** El objeto del presente Estatuto es establecer el marco normativo que rige la transición democrática en la República Bolivariana de Venezuela.

**TERCERO**: se mantiene el articulo dos (2) aprobado en primera discusión quedando redactado de la siguiente manera:

### Fines

**Artículo 2.-** Los fines de la transición a la democracia son el pleno restablecimiento del orden constitucional, el rescate de la soberanía popular a través de elecciones libres y la superación de la emergencia humanitaria compleja, con el propósito de recuperar el sistema de libertades, garantías constitucionales y los derechos humanos. En la actuación de los órganos del Poder Público se dará prioridad a la recuperación del nivel de vida de la población, la procura de elecciones libres, justas





y verificables y a la protección democrática y efectiva de los activos de la República en el extranjero.

**CUARTO**: se mantiene el articulo tres (3) aprobado en primera discusión quedando redactado de la siguiente manera:

### Naturaleza Jurídica

**Artículo 3**.- El presente Estatuto es un acto normativo en ejecución directa e inmediata del artículo 333 de la Constitución de la República Bolivariana de Venezuela. Los actos dictados por los órganos del Poder Público para ejecutar los lineamientos establecidos en este Estatuto también están fundamentados en el artículo 333 de la Constitución y son de obligatorio acatamiento para todas las autoridades y funcionarios públicos, así como para los particulares.

**QUINTO**: se mantiene el articulo cuatro (4) aprobado en primera discusión quedando redactado de la siguiente manera:

### Principios

**Artículo 4**.- Los valores superiores que rigen el presente Estatuto son la vida, la libertad, la justicia, la igualdad, la solidaridad, la democracia, la responsabilidad social, la supremacía constitucional y, en general, la preeminencia de los derechos humanos, la ética y el pluralismo político.

**SEXTO**: se mantiene el articulo cinco (5) aprobado en primera discusión quedando redactado de la siguiente manera:

### Objetivos

**Artículo 5.-** Con fundamento en el artículo 333 de la Constitución, los objetivos del presente Estatuto son:

1.- Sentar las bases para iniciar el proceso ciudadano de reconciliación nacional.

2.- La Defensa por la restitución de la democracia en Venezuela y plena vigencia de la Constitución.

3.- Proteger los activos pertenecientes a la República en el extranjero a través del Consejo de Administración y Protección de Activos.





Capítulo II

DE LA USURPACIÓN DEL PODER PÚBLICO NACIONAL Y DEL RÉGIMEN
TRANSITORIO PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN

**SEPTIMO**: se mantiene el articulo seis (6) aprobado en primera discusión quedando
redactado de la siguiente manera:

**Nulidad de poderes usurpados**

**Artículo 6.-** A los efectos del presente Estatuto, los eventos políticos celebrados los
días 20 de mayo de 2018 y 6 de diciembre de 2020, no fueron elecciones legítimas.
Todos los actos emanados de la írrita institucionalidad derivada de los fraudes
electorales cometidos en ambas fechas son nulos e ineficaces en los términos de
los artículos 25 y 138 de la Constitución de la República Bolivariana de Venezuela.

**OCTAVO**: se mantiene el articulo siete (7) aprobado en primera discusión quedando
redactado de la siguiente manera:

**Continuidad Constitucional**

**Artículo 7.-** La continuidad constitucional del Poder Legislativo Nacional será
ejercida por la Asamblea Nacional electa el 6 de diciembre de 2015, la cual podrá
funcionar a través de la Comisión Delegada, hasta doce (12) meses continuos a
partir del 5 de enero de 2023.

**NOVENO**: se modifica el artículo ocho (8) aprobado en primera discusión quedando
redactado de la siguiente manera:

**Competencias**

**Artículo 8.-** Las competencias de la Comisión Delegada de la Asamblea Nacional
son:

1. Dar continuidad a las funciones del Poder Legislativo nacional.
2. Promover la transición a la democracia.

3. Proteger los activos de la República en el extranjero a través del Consejo de
Administración y Protección de Activos.

4. Autorizar la disposición de los recursos indispensables para cumplir con los
objetivos y fines de esta Ley.





5. Tramitar la cooperación financiera internacional de organismos multilaterales y países del mundo libre a los fines de iniciar el proceso de transición democrática y de proseguir la reversión de la emergencia humanitaria.

6. Procurar las condiciones institucionales para la defensa de los derechos e intereses de los entes y bienes del Estado venezolano en el extranjero.

7. Aprobar la contratación de las empresas que deben auditar la administración de los bienes y recursos públicos por parte del Consejo de Administración y Protección de Activos.

8. Aprobar el presupuesto de la Asamblea Nacional y sus modificaciones.

9. convocar a la Asamblea Nacional a sesiones extraordinarias, cuando así lo exija la importancia de algún asunto.

10. Designar comisiones temporales integradas por miembros de la Asamblea Nacional.

11. Ejercer las funciones de control constitucional atribuidas a la Asamblea Nacional.

12. Promover interna e internacionalmente la realización de elecciones presidenciales y parlamentarias libres, justas y verificables, así como el restablecimiento de la democracia.

**DÉCIMO:** se modifica el artículo nueve (9) aprobado en primera discusión quedando redactado de la siguiente manera:

**Consejo de Administración y Protección de Activos**

**Artículo 9.-** Se crea el Consejo de Administración y Protección de Activos, el cual estará integrado por cinco miembros, designados por la Asamblea Nacional o su Comisión Delegada, dentro de los cuales designará quien cumplirá las funciones de coordinador, quienes una vez instalados, deberán aprobar su reglamento de funcionamiento. El Consejo de Administración y Protección de Activos será el órgano competente para proteger todos los bienes o activos de la República Bolivariana de Venezuela en el Exterior, participando cuando lo estime conveniente en la administración de los mismos. En el ejercicio de sus atribuciones representará las acciones que pertenezcan a la República en cualquiera de los entes en los cuales sea accionista la misma. Asimismo, podrá nombrar apoderados judiciales en representación de la República o revocar los que se hayan otorgados.

Los poderes otorgados válidamente por el Procurador Especial de la República mantendrán su vigencia, mientras el Consejo de Administración y Protección de Activos no los revoque.





**Vigencia de la Junta Ad Hoc del Banco Central de Venezuela**

**UNDÉCIMO**: se incluye un nuevo artículo que pasa a ser el articulo número diez (10) quedando redactado de la siguiente manera:

**Artículo 10.-** Se mantiene la vigencia de la Junta Ad Hoc del Banco Central de Venezuela como ente independiente y autónomo, para que continúe en el ejercicio de las funciones necesarias en el cumplimiento de los objetivos de esta reforma legal.

**DUOCÉCIMO**: se modifica el artículo diez (10) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número once (11):

**Representantes Internacionales**

**Articulo 11.-**

La Asamblea Nacional o su Comisión Delegada podrá designar representantes internacionales que actúen en materias de Derechos Humanos, migración o crisis humanitaria y lucha contra la corrupción, en organismos multilaterales, protección democrática de los activos para Estados Unidos de Norteamérica, Reino Unido, y/o donde sea requerido. Los funcionarios antes mencionados podrán actuar en materia de organización y apoyo a los migrantes venezolanos y deberán rendir cuentas ante la Asamblea Nacional o la Comisión Delegada.

**DECIMOTERCERO:** se mantiene el articulo once (11) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número doce (12):

**Actos parlamentarios para la ejecución del presente Estatuto**

**Artículo 12.-** La Asamblea Nacional o su Comisión Delegada adoptará todas las decisiones necesarias para la implementación del presente Estatuto, a los fines de permitir el restablecimiento efectivo de la Constitución. Hasta tanto se cumplan estos objetivos, se aplicarán de manera preferente las disposiciones del presente Estatuto y las demás decisiones adoptadas en el marco del artículo 333 de la Constitución.

**DECIMOCUARTO:** se modifica el artículo doce (12) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el artículo número trece (13):





**Régimen transitorio de PDVSA y sus filiales**

**Artículo 13.-** Ante los riesgos en que se hallan PDVSA y sus filiales como resultado de la usurpación referida en el presente Estatuto, y mientras persista tal situación, con la autorización previa de la Asamblea Nacional o de su Comisión Delegada, el Consejo de Administración y Protección de Activos, procederá a la designación de los miembros de la Junta de Administración ad-hoc de Petróleos de Venezuela S.A. (PDVSA), para que ejerza los derechos que corresponden a PDVSA como accionista de PDV Holding, Inc. Igualmente la destitución de algún miembro de la Junta de Administración ad hoc de Petróleos de Venezuela S.A. (PDVSA), debe contar con la autorización previa de la Asamblea Nacional o su Comisión Delegada.

Esta atribución se ejercerá de conformidad con los siguientes principios:

1. La Junta de Administración ad-hoc de PDVSA que se designe podrá estar integrada por personas domiciliadas en el exterior y tendrá las atribuciones correspondientes a la asamblea de accionistas y a la junta directiva de PDVSA, a los fines de realizar todas las actuaciones necesarias para designar la junta directiva de PDV Holding, Inc., en representación de PDVSA como accionista de esa sociedad. Los directores de PDV Holding, Inc., procederán a realizar todas las actuaciones necesarias a los fines de designar las juntas directivas de las filiales de esa empresa, incluyendo a Citgo Petroleum Corporation.
2. Esta norma se aplicará de manera preferente a cualquier otra norma aplicable y orientará la interpretación de cualesquiera otras formalidades requeridas en el ordenamiento jurídico venezolano y en documentos corporativos, a los fines de ejercer la representación de PDVSA como accionista de PDV Holding, Inc.
3. Los directores de PDV Holding, Inc. y sus filiales garantizarán la autonomía funcional de esas empresas y en particular de PDVSA. En consecuencia, de lo anterior, la gestión autónoma del giro comercial de PDV Holding, Inc. y sus filiales responderá a criterios de eficiencia comercial, dejando a salvo los mecanismos de control y rendición de cuenta que ejerza la Asamblea Nacional, en el marco de sus atribuciones, y los demás mecanismos de control aplicables.
4. PDV Holding, Inc. y sus filiales no tendrán relación alguna con quienes hoy usurpan los poderes públicos de Venezuela. Mientras persista tal situación de usurpación, PDV Holding, Inc. y sus filiales no realizarán ningún pago o aporte patrimonial a PDVSA.

**DECIMOQUINTO**: se modifica el artículo quince (15) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el artículo número catorce (14):





**Disposición y administración de los activos del Estado**

**Artículo 14.-** Los activos del Estado que hayan sido o sean recuperados bajo la vigencia de este Estatuto, serán administrados y protegidos por el Consejo de Administración y Protección de Activos, y no podrán ser enajenados, gravados o ejecutados por ningún título o en ninguna circunstancia, hasta tanto se elijan autoridades legítimas del poder público nacional mediante la celebración de elecciones libres, justas y verificables.

PARÁGRAFO PRIMERO: En virtud de la situación de reconducción presupuestaria continuada en la que se encuentra la República desde el año 2016, la Asamblea

Nacional podrá dictar una ley especial en materia financiera y presupuestaria, de conformidad con el artículo 187, numerales 6, 7 y 8 de la Constitución.

PARÁGRAFO SEGUNDO: Excepcionalmente, y verificados los principios constitucionales de eficiencia, transparencia, solvencia, equilibrio fiscal, rendición de cuentas y responsabilidad en el ejercicio de la función pública, la Asamblea Nacional o su Comisión Delegada podrá autorizar total o parcialmente, mediante los procedimientos de ley establecidos al efecto, el uso de fondos públicos, incluyendo los gastos ordinarios del Poder Legislativo Nacional y la defensa de los activos del Estado venezolano en el extranjero.

**DECIMOSEXTO**: se mantiene el articulo trece (13) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número quince (15):

**Publicidad del presente Estatuto**

**Artículo 15.-** La Asamblea Nacional comunicará a la mayor brevedad el contenido del presente Estatuto a la Nación venezolana, así como a la comunidad internacional, incluidos los gobiernos extranjeros, el Secretario General de la Organización de Naciones Unidas (ONU), el Secretario General de la OEA, El Alto Comisionado para los Derechos Humanos de la ONU, la Comisión interamericana de Derechos Humanos, la Unión Europea, la Unión Africana, la Organización de Países Exportadores de Petróleo, el Banco Mundial, el Fondo Monetario Internacional, el Banco Interamericano de Desarrollo, la Corporación Andina de Fomento o Banco de Desarrollo de América Latina y los demás que considere pertinentes.

**DECIMOSÉPTIMO**: se mantiene el articulo catorce (14) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número dieciséis (16):

**Medios extraordinarios de promulgación del presente Estatuto**

**Artículo 16.** En virtud de la imposibilidad de acceder a la Gaceta Oficial debido al régimen de facto y a la usurpación que imperan en Venezuela, el presente Estatuto





y las decisiones que se implementen serán publicados en los medios de divulgación que a tales efectos determine la Asamblea Nacional.

A estos efectos, y mientras persiste la situación señalada en este artículo, las Leyes y Acuerdos dictados por la Asamblea Nacional, serán publicadas en la Gaceta Legislativa, de conformidad a lo dispuesto en el Reglamento Interior y de Debates. Las Leyes, Acuerdos y demás decisiones entrarán en vigencia al momento de su publicación en la Gaceta Legislativa, incluso en formato digital. La Ley de Publicaciones Oficiales se aplicará de manera supletoria.

**DECIMOCTAVO** se mantiene el articulo dieciséis (16) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número diecisiete (17):

**Entrada en vigencia**

**Artículo 17**. De conformidad con el artículo 5° de la Ley de Publicaciones Oficiales, el presente es el texto integrado del Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de Venezuela, que incluye el contenido de esta reforma que entrará en vigencia luego de ser aprobada por la Asamblea Nacional y publicada en Gaceta Legislativa.

**DECIMONOVENO:** se mantiene el articulo diecisiete (17) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número dieciocho (18):

**Cláusula residual**

**Artículo 18**. A los fines de asegurar la transición democrática, todo lo no previsto en el presente Estatuto será resuelto por la Asamblea Nacional o la Comisión delegada en aplicación del artículo 333 de la Constitución

**VIGÉSIMO:** se modifica el artículo dieciocho (18) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número diecinueve (19):

**Cláusula derogatoria**

**Artículo 19.-** Con la entrada en vigencia de esta reforma, quedan derogadas todas las leyes o normas que contradigan el espíritu, propósito y razón del contenido del presente Estatuto.

**VIGÉSIMO PRIMERO**: se mantiene el articulo diecinueve (19) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el articulo número veinte (20):





**Continuidad**

**Artículo 20.-** Todos los entes y funcionarios designados por la Presidencia Encargada quedan sin efecto a partir de la entrada en vigor de la presente Ley. Únicamente quedarán en el ejercicio de sus funciones los funcionarios a cargo del Consejo de Administración del Gasto ahora denominado Consejo de Administración y Protección de Activos, Consejo para la Administración del Programa de Gastos, Seguridad y Defensa de la Democracia y los miembros de la Junta Directiva ad hoc del Banco Central de Venezuela.

**VIGÉSIMO SEGUNDO**: se modifica el artículo veinte (20) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el artículo número veintiuno (21):

**Rendición de cuentas**

**Artículo 21.-** La Oficina de la Presidencia Encargada de la República presentará a la Comisión Delegada de la Asamblea Nacional un Informe detallado, con la rendición de la cuenta de su gestión, en un plazo no mayor de cuarenta y cinco días (45) desde la entrada en vigencia de la presente Ley.

El Procurador Especial, el Contralor Especial, el coordinador del Consejo de Administración del Gasto, el Presidente de la Junta Ad Hoc del Banco Central de Venezuela, el Presidente de la Junta Ad Hoc de PDVSA, y todos los funcionarios que han tenido hasta el presente responsabilidades de administración de bienes o activos de la República, deberán hacer su rendición de cuenta en un plazo no mayor a los cuarenta y cinco (45) días desde la entrada en vigencia de la presente Ley.

Todos los bienes adquiridos por el Gobierno Interino para el cumplimiento de sus funciones, los cuales pertenecen a la República, serán inventariados y entregados al Consejo de Administración y Protección de Activos, dentro de los noventa (90) días desde la entrada en vigencia de la presente Ley.

**VIGÉSIMO TERCERO**: se mantiene el artículo veintiuno (21) aprobado en primera discusión quedando redactado de la siguiente manera, pasando a ser el artículo número veintidós (22):

**Transitoriedad**

**Artículo 22.-** El Consejo de Administración y Protección de Activos, el Consejo para la Administración del Programa de Gastos de Seguridad y Defensa de la Democracia, la Junta de Administración ad hoc de PDVSA y la del Banco Central de Venezuela se mantendrán en funcionamiento para el periodo de doce meses de conformidad con la vigencia establecida para el Estatuto.

Dado, firmado y sellado, en sesión extraordinaria de la Asamblea Nacional, celebrada en forma virtual por decisión de la Junta Directiva, de conformidad con lo

Presidente de la Asamblea Nacional





**LA ASAMBLEA NACIONAL DE LA REPÚBLICA BOLIVARIANA
DE VENEZUELA**

**DECRETA**

la siguiente,

**LEY DE REFORMA DEL ESTATUTO QUE RIGE LA TRANSICIÓN A LA
DEMOCRACIA PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN
DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**

**Exposición de Motivos**

De conformidad con los artículos 12 y 15 de la Ley de Reforma del *Estatuto que
Rige la Transición a la Democracia para Restablecer la Vigencia de la
Constitución de la República Bolivariana de Venezuela*, la cual fue aprobada en
Sesión de la Asamblea Nacional celebrada el día 04 de enero de 2022, la vigencia
en el ejercicio de sus funciones tanto para la Asamblea Nacional como para el
Presidente Encargado de la Presidencia de la República, terminan al cumplirse
12 meses del 04 de enero de 2022.

Dicha decisión fue aprobada por la unanimidad de los Diputados presentes en la
referida Sesión y fue publicada, con el Ejecútese del Presidente Encargado, en la
Gaceta Legislativa N°56 de la Asamblea Nacional de la República Bolivariana de
Venezuela de fecha 05 de enero de 2022.

Es decir, que según lo que ya está aprobado desde el día 04 de enero de 2022,
con el voto unánime de los Diputados presentes y con el respectivo ejecútese del
Presidente Encargado, el próximo 04 de enero de 2023, dejarán de tener vigencia,
terminarían sus funciones, tanto la Asamblea Nacional electa en el 2015 como la
Presidencia Encargada de la República Bolivariana de Venezuela. Esa decisión
reflejó el propósito de asumir la estrategia electoral como la vía más realista para
producir el cambio político en nuestro país.

Cuando elaboramos este Informe para Segunda discusión, luego de la aprobación
en primera discusión del Proyecto de Ley que analizamos, después de haber
conocido las diferentes opiniones de la ciudadanía, de juristas y dirigentes
políticos, consideramos oportuna la introducción que encabeza este Informe, para
dejar constancia de que la decisión que discutimos hoy, se tomó con el apoyo de
todos hace casi un año. Y que esta propuesta deja sin modificación alguna, según





lo recoge en su Artículo 6, que "a los efectos del presente Estatuto, los eventos políticos celebrados los días 20 de mayo de 2018 y 06 de diciembre de 2020, no fueron elecciones legítimas. Todos los actos emanados de la írrita institucionalidad derivada de los fraudes electorales cometidos en ambas fechas, son nulos e ineficaces en los términos de los artículos 25 y 138 de la Constitución de la República Bolivariana de Venezuela". Puntualización que consideramos necesaria para despejar las dudas sobre la posibilidad de que se confunda el objeto de la Reforma que proponemos, con una entrega de nuestra lucha constante por reconquistar la democracia para un pueblo que tiene derecho a progresar en libertad.

En ese sentido, queremos dejar claro que el motivo fundamental de la presente Reforma legal que proponemos, es considerar que la única institución legitimada por decisión popular que le queda al pueblo venezolano, es la Asamblea Nacional electa en el 2015, la cual no debe dejar de funcionar y por tanto proponemos extenderle su mandato por 12 meses más, asumiendo además de sus atribuciones constitucionales, la función de la protección de los activos de la República que se encuentran en el exterior con fundamento en el Artículo 333 de la Constitución vigente.

La presente Ley de Reforma del Estatuto que Rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución Bolivariana de Venezuela recoge el espíritu democrático y político de "volver a la Constitución a través de la Constitución", y se propone promover por todos los medios que le sean posibles, la necesidad de garantizar la aspiración legítima del pueblo venezolano de avanzar hacia la democracia y el desarrollo.

Entendiendo la realidad del ejercicio ilegítimo y de facto del gobierno por parte del régimen autocrático, esta reforma otorga a la Asamblea Nacional electa el 06 de diciembre de 2015, competencias especiales para promover la transición a la democracia y la protección de los activos del Estado al amparo del Artículo 333 de la Constitución vigente.

A continuación, el articulado:

**Objeto**

**Artículo 1.-** El objeto del presente Estatuto es establecer el marco normativo que rige la transición democrática en la República Bolivariana de Venezuela.





**Fines**

**Artículo 2.-** Los fines de la transición a la democracia son el pleno restablecimiento del orden constitucional, el rescate de la soberanía popular a través de elecciones libres y la superación de la emergencia humanitaria compleja, con el propósito de recuperar el sistema de libertades, garantías constitucionales y los derechos humanos. En la actuación de los órganos del Poder Público se dará prioridad a la recuperación del nivel de vida de la población, la procura de elecciones libres, justas

y verificables y a la protección democrática y efectiva de los activos de la República en el extranjero.

**Naturaleza Jurídica**

**Artículo 3.-** El presente Estatuto es un acto normativo en ejecución directa e inmediata del artículo 333 de la Constitución de la República Bolivariana de **Venezuela.** Los actos dictados por los órganos del Poder Público para ejecutar los lineamientos establecidos en este Estatuto también están fundamentados en el artículo 333 de la Constitución y son de obligatorio acatamiento para todas las autoridades y funcionarios públicos, así como para los particulares.

**Principios**

**Artículo 4.-** Los valores superiores que rigen el presente Estatuto son la vida, la libertad, la justicia, la igualdad, la solidaridad, la democracia, la responsabilidad social, la supremacía constitucional y, en general, la preeminencia de los derechos humanos, la ética y el pluralismo político.

**Objetivos**

**Artículo 5.-** Con fundamento en el artículo 333 de la Constitución, los objetivos del presente Estatuto son:

**1.-** Sentar las bases para iniciar el proceso ciudadano de reconciliación nacional.

**2.-** La Defensa por la restitución de la democracia en Venezuela y plena vigencia de la Constitución.

**3.-** Proteger los activos pertenecientes a la República en el extranjero a través del Consejo de Administración y Protección de Activos.

Capítulo II

DE LA USURPACIÓN DEL PODER PÚBLICO NACIONAL Y DEL RÉGIMEN TRANSITORIO PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN

**Nulidad de poderes usurpados**

**Artículo 6.-** A los efectos del presente Estatuto, los eventos políticos celebrados los días 20 de mayo de 2018 y 6 de diciembre de 2020, no fueron elecciones legítimas. Todos los actos emanados de la írrita institucionalidad derivada de los fraudes





electorales cometidos en ambas fechas son nulos e ineficaces en los términos de los artículos 25 y 138 de la Constitución de la República Bolivariana de Venezuela.

**Continuidad Constitucional**

**Artículo 7.-** La continuidad constitucional del Poder Legislativo Nacional será ejercida por la Asamblea Nacional electa el 6 de diciembre de 2015, la cual podrá funcionar a través de la Comisión Delegada, hasta doce (12) meses continuos a partir del 5 de enero de 2023.

**Competencias**

**Artículo 8.-** Las competencias de la Comisión Delegada de la Asamblea Nacional son:

1. Dar continuidad a las funciones del Poder Legislativo nacional.
2. Promover la transición a la democracia.

3. Proteger los activos de la República en el extranjero a través del Consejo de Administración y Protección de Activos.

4. Autorizar la disposición de los recursos indispensables para cumplir con los objetivos y fines de esta Ley.

5. Tramitar la cooperación financiera internacional de organismos multilaterales y países del mundo libre a los fines de iniciar el proceso de transición democrática y de proseguir la reversión de la emergencia humanitaria.

6. Procurar las condiciones institucionales para la defensa de los derechos e intereses de los entes y bienes del Estado venezolano en el extranjero.

7. Aprobar la contratación de las empresas que deben auditar la administración de los bienes y recursos públicos por parte del Consejo de Administración y Protección de Activos.

8. Aprobar el presupuesto de la Asamblea Nacional y sus modificaciones.

9. convocar a la Asamblea Nacional a sesiones extraordinarias, cuando así lo exija la importancia de algún asunto.

10. Designar comisiones temporales integradas por miembros de la Asamblea Nacional.

11. Ejercer las funciones de control constitucional atribuidas a la Asamblea Nacional.

12. Promover interna e internacionalmente la realización de elecciones presidenciales y parlamentarias libres, justas y verificables, así como el restablecimiento de la democracia.

**Consejo de Administración y Protección de Activos**

**Artículo 9.-** Se crea el Consejo de Administración y Protección de Activos, el cual estará integrado por cinco miembros, designados por la Asamblea Nacional o su





Comisión Delegada, dentro de los cuales designará quien cumplirá las funciones de coordinador, quienes una vez instalados, deberán aprobar su reglamento de funcionamiento. El Consejo de Administración y Protección de Activos será el órgano competente para proteger todos los bienes o activos de la República Bolivariana de Venezuela en el Exterior, participando cuando lo estime conveniente en la administración de los mismos. En el ejercicio de sus atribuciones representará las acciones que pertenezcan a la República en cualquiera de los entes en los cuales sea accionista la misma. Asimismo, podrá nombrar apoderados judiciales en representación de la República o revocar los que se hayan otorgados.

Los poderes otorgados válidamente por el Procurador Especial de la República mantendrán su vigencia, mientras el Consejo de Administración y Protección de Activos no los revoque.

### Vigencia de la Junta Ad Hoc del Banco Central de Venezuela

**Artículo 10.-** Se mantiene la vigencia de la Junta Ad Hoc del Banco Central de Venezuela como ente independiente y autónomo, para que continúe en el ejercicio de las funciones necesarias en el cumplimiento de los objetivos de esta reforma legal.

### Representantes Internacionales

**Artículo 11.-**

La Asamblea Nacional o su Comisión Delegada podrá designar representantes internacionales que actúen en materias de Derechos Humanos, migración o crisis humanitaria y lucha contra la corrupción, en organismos multilaterales, protección democrática de los activos para Estados Unidos de Norteamérica, Reino Unido, y/o donde sea requerido. Los funcionarios antes mencionados podrán actuar en materia de organización y apoyo a los migrantes venezolanos y deberán rendir cuentas ante la Asamblea Nacional o la Comisión Delegada.

### Actos parlamentarios para la ejecución del presente Estatuto

**Artículo 12.-** La Asamblea Nacional o su Comisión Delegada adoptará todas las decisiones necesarias para la implementación del presente Estatuto, a los fines de permitir el restablecimiento efectivo de la Constitución. Hasta tanto se cumplan estos objetivos, se aplicarán de manera preferente las disposiciones del presente Estatuto y las demás decisiones adoptadas en el marco del artículo 333 de la Constitución.





**Régimen transitorio de PDVSA y sus filiales**

**Artículo 13.-** Ante los riesgos en que se hallan PDVSA y sus filiales como resultado de la usurpación referida en el presente Estatuto, y mientras persista tal situación, con la autorización previa de la Asamblea Nacional o de su Comisión Delegada, el Consejo de Administración y Protección de Activos, procederá a la designación de los miembros de la Junta de Administración ad-hoc de Petróleos de Venezuela S.A. (PDVSA), para que ejerza los derechos que corresponden a PDVSA como accionista de PDV Holding, Inc. Igualmente la destitución de algún miembro de la Junta de Administración ad hoc de Petróleos de Venezuela S.A. (PDVSA), debe contar con la autorización previa de la Asamblea Nacional o su Comisión Delegada.

Esta atribución se ejercerá de conformidad con los siguientes principios:

1. La Junta de Administración ad-hoc de PDVSA que se designe podrá estar integrada por personas domiciliadas en el exterior y tendrá las atribuciones correspondientes a la asamblea de accionistas y a la junta directiva de PDVSA, a los fines de realizar todas las actuaciones necesarias para designar la junta directiva de PDV Holding, Inc., en representación de PDVSA como accionista de esa sociedad. Los directores de PDV Holding, Inc., procederán a realizar todas las actuaciones necesarias a los fines de designar las juntas directivas de las filiales de esa empresa, incluyendo a Citgo Petroleum Corporation.
2. Esta norma se aplicará de manera preferente a cualquier otra norma aplicable y orientará la interpretación de cualesquiera otras formalidades requeridas en el ordenamiento jurídico venezolano y en documentos corporativos, a los fines de ejercer la representación de PDVSA como accionista de PDV Holding, Inc.
3. Los directores de PDV Holding, Inc. y sus filiales garantizarán la autonomía funcional de esas empresas y en particular de PDVSA. En consecuencia, de lo anterior, la gestión autónoma del giro comercial de PDV Holding, Inc. y sus filiales responderá a criterios de eficiencia comercial, dejando a salvo los mecanismos de control y rendición de cuenta que ejerza la Asamblea Nacional, en el marco de sus atribuciones, y los demás mecanismos de control aplicables.
4. PDV Holding, Inc. y sus filiales no tendrán relación alguna con quienes hoy usurpan los poderes públicos de Venezuela. Mientras persista tal situación de usurpación, PDV Holding, Inc. y sus filiales no realizarán ningún pago o aporte patrimonial a PDVSA.

**Disposición y administración de los activos del Estado**

**Artículo 14.-** Los activos del Estado que hayan sido o sean recuperados bajo la vigencia de este Estatuto, serán administrados y protegidos por el Consejo de Administración y Protección de Activos, y no podrán ser enajenados, gravados o ejecutados por ningún título o en ninguna circunstancia, hasta tanto se elijan





autoridades legítimas del poder público nacional mediante la celebración de elecciones libres, justas y verificables.

PARÁGRAFO PRIMERO: En virtud de la situación de reconducción presupuestaria continuada en la que se encuentra la República desde el año 2016, la Asamblea

Nacional podrá dictar una ley especial en materia financiera y presupuestaria, de conformidad con el artículo 187, numerales 6, 7 y 8 de la Constitución.

PARÁGRAFO SEGUNDO: Excepcionalmente, y verificados los principios constitucionales de eficiencia, transparencia, solvencia, equilibrio fiscal, rendición de cuentas y responsabilidad en el ejercicio de la función pública, la Asamblea Nacional o su Comisión Delegada podrá autorizar total o parcialmente, mediante los procedimientos de ley establecidos al efecto, el uso de fondos públicos, incluyendo los gastos ordinarios del Poder Legislativo Nacional y la defensa de los activos del Estado venezolano en el extranjero.

### Publicidad del presente Estatuto

**Artículo 15.-** La Asamblea Nacional comunicará a la mayor brevedad el contenido del presente Estatuto a la Nación venezolana, así como a la comunidad internacional, incluidos los gobiernos extranjeros, el Secretario General de la Organización de Naciones Unidas (ONU), el Secretario General de la OEA, El Alto Comisionado para los Derechos Humanos de la ONU, la Comisión interamericana de Derechos Humanos, la Unión Europea, la Unión Africana, la Organización de Países Exportadores de Petróleo, el Banco Mundial, el Fondo Monetario Internacional, el Banco Interamericano de Desarrollo, la Corporación Andina de Fomento o Banco de Desarrollo de América Latina y los demás que considere pertinentes.

### Medios extraordinarios de promulgación del presente Estatuto

**Artículo 16.** En virtud de la imposibilidad de acceder a la Gaceta Oficial debido al régimen de facto y a la usurpación que imperan en Venezuela, el presente Estatuto y las decisiones que se implementen serán publicados en los medios de divulgación que a tales efectos determine la Asamblea Nacional.

A estos efectos, y mientras persista la situación señalada en este artículo, las Leyes y Acuerdos dictados por la Asamblea Nacional, serán publicadas en la Gaceta Legislativa, de conformidad a lo dispuesto en el Reglamento Interior y de Debates. Las Leyes, Acuerdos y demás decisiones entrarán en vigencia al momento de su publicación en la Gaceta Legislativa, incluso en formato digital. La Ley de Publicaciones Oficiales se aplicará de manera supletoria.

### Entrada en vigencia

**Artículo 17.** De conformidad con el artículo 5° de la Ley de Publicaciones Oficiales, el presente es el texto integrado del Estatuto que rige la transición a la democracia para restablecer la vigencia de la Constitución de la República Bolivariana de





Venezuela, que incluye el contenido de esta reforma que entrará en vigencia luego de ser aprobada por la Asamblea Nacional y publicada en Gaceta Legislativa.

**Cláusula residual**

**Artículo 18.** A los fines de asegurar la transición democrática, todo lo no previsto en el presente Estatuto será resuelto por la Asamblea Nacional o la Comisión delegada en aplicación del artículo 333 de la Constitución

**Cláusula derogatoria**

**Artículo 19.-** Con la entrada en vigencia de esta reforma, quedan derogadas todas las leyes o normas que contradigan el espíritu, propósito y razón del contenido del presente Estatuto.

**Continuidad**

**Artículo 20.-** Todos los entes y funcionarios designados por la Presidencia Encargada quedan sin efecto a partir de la entrada en vigor de la presente Ley. Únicamente quedarán en el ejercicio de sus funciones los funcionarios a cargo del Consejo de Administración del Gasto ahora denominado Consejo de Administración y Protección de Activos, Consejo para la Administración del Programa de Gastos, Seguridad y Defensa de la Democracia y los miembros de la Junta Directiva ad hoc del Banco Central de Venezuela.

**Rendición de cuentas**

**Artículo 21.-** La Oficina de la Presidencia Encargada de la República presentará a la Comisión Delegada de la Asamblea Nacional un Informe detallado, con la rendición de la cuenta de su gestión, en un plazo no mayor de cuarenta y cinco días (45) desde la entrada en vigencia de la presente Ley.

El Procurador Especial, el Contralor Especial, el coordinador del Consejo de Administración del Gasto, el Presidente de la Junta Ad Hoc del Banco Central de Venezuela, el Presidente de la Junta Ad Hoc de PDVSA, y todos los funcionarios que han tenido hasta el presente responsabilidades de administración de bienes o activos de la República, deberán hacer su rendición de cuenta en un plazo no mayor a los cuarenta y cinco (45) días desde la entrada en vigencia de la presente Ley.

Todos los bienes adquiridos por el Gobierno Interino para el cumplimiento de sus funciones, los cuales pertenecen a la República, serán inventariados y entregados al Consejo de Administración y Protección de Activos, dentro de los noventa (90) días desde la entrada en vigencia de la presente Ley.

**Transitoriedad**

**Artículo 22.-** El Consejo de Administración y Protección de Activos, el Consejo para la Administración del Programa de Gastos de Seguridad y Defensa de la Democracia, la Junta de Administración ad hoc de PDVSA y la del Banco Central de Venezuela se mantendrán en funcionamiento para el periodo de doce meses de conformidad con la vigencia establecida para el Estatuto.





Dado, firmado y sellado, en sesión extraordinaria de la Asamblea Nacional, celebrada en forma virtual por decisión de la Junta Directiva, de conformidad con lo previsto en los artículos 13, numeral 4, y 56, último aparte, del Reglamento Interior y de Debates de la Asamblea Nacional, debido a la usurpación que la dictadura de Nicolás Maduro mantiene sobre las instalaciones del Palacio Federal Legislativo, a los 30 días del mes de diciembre de 2022. Años 211° de la Independencia y 162° de la Federación.

**JUAN GERARDO GUAIDÓ MÁRQUEZ**
Presidente de la Asamblea Nacional

**JUAN PABLO GUANIPA**
Primer Vicepresidente

**CARLOS EDUARDO BERRIZBEITIA**
Segundo Vicepresidente

**JOSÉ ANTONIO FIGUEREDO MÁRQUEZ**
Secretario

Promulgación del **ESTATUTO QUE RIGE LA TRANSICIÓN A LA DEMOCRACIA PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**, de conformidad con lo previsto en los artículos 213, 233 y 333 de la Constitución de la República Bolivariana de Venezuela.

En Caracas, a los 30 días del mes de diciembre de dos mil veintidós. Años 211° de la Independencia y 162° de la Federación.

Cúmplase,
(L.S.)

**Juan Guaidó**
**Presidente de la Asamblea Nacional**





## LA ASAMBLEA NACIONAL DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA

### DECRETA

la siguiente,

## LEY ESPECIAL DEL FONDO PARA LA LIBERACIÓN DE VENEZUELA Y ATENCIÓN DE CASOS DE RIESGO VITAL

### CAPÍTULO I

**PRIMERO**: Se mantiene el título aprobado en primera discusión quedando redactado de la siguiente manera: **LEY ESPECIAL DEL FONDO PARA LA LIBERACIÓN DE VENEZUELA Y ATENCIÓN DE CASOS DE RIESGO VITAL**

**SEGUNDO**: Se mantiene el capítulo I aprobado en primera discusión quedando redactado de la siguiente manera:

### CAPÍTULO I

#### Disposiciones Generales

**TERCERO**: Se modifica el artículo 1 aprobado en primera discusión quedando redactado de la siguiente manera:

#### Objeto de la Ley

**Artículo 1.** De conformidad con los artículos 187, numerales 1 y 6 , y 333 de la Constitución de la República Bolivariana de Venezuela, y el artículo 14 del Estatuto que rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela; Y en vista de la prolongación de la usurpación del poder, del cerco económico al Poder Legislativo Nacional legítimo, junto al recrudecimiento de la crisis humanitaria compleja, la presente Ley tiene por objeto autorizar la disposición de los gastos indispensables para cumplir con los objetivos y fines del Estatuto que rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela.

**CUARTO**: Se mantiene el artículo 2 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 2.** Los gastos autorizados por esta Ley, serán sufragados con recursos disponibles de la República Bolivariana de Venezuela y demás entes descentralizados, disponibles en cuentas bancarias en el extranjero. Adicionalmente, la Junta Administradora Ad - hoc del Banco Central de Venezuela podrá transferir recursos a la República para la ejecución de los gastos aquí autorizados, tomando en cuenta las normas que los rigen de conformidad con la Ley del Banco Central de Venezuela.





**QUINTO**: Se mantiene el capítulo II aprobado en primera discusión quedando redactado de la siguiente manera:

## CAPÍTULO II

### De la Autorización de Recursos y su Administración

**SEXTO**: Se mantiene el artículo 3 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 3.** Se autoriza a la Asamblea Nacional para disponer de los recursos a los cuales se refiere el Artículo 2 de esta Ley, hasta por la cantidad de cincuenta y dos millones de dólares de los Estados Unidos Americanos (Us$ 52.000.000.,00) los cuales deberá destinar al cumplimiento del objeto de esta Ley Especial.

**SEPTIMO**: Se mantiene el artículo 4 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 4.** Le corresponde a la Asamblea Nacional, a través del Consejo de Administración Y Protección de Activos, la implementación de los mecanismos administrativos y los trámites necesarios, dentro o fuera del país, que permitan disponer de los recursos cuya utilización le ha sido autorizada.

**OCTAVO**: Se mantiene el artículo 5 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 5.** El monto global autorizado será destinado al financiamiento de los siguientes gastos:  1) Gastos para la defensa y el fortalecimiento del Poder Legislativo Nacional y la Protección Social de sus integrantes, 2) Gastos para la protección y defensa de la democracia 3) Gastos de funcionamiento del Consejo de Administración y Protección de Activos, de la Junta AD-hoc DEL Banco Central de Venezuela y de Petróleos de Venezuela S.A ( PDVSA).

**NOVENO**: Se mantiene el artículo 6 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 6.** El Presupuesto especial referido al monto global autorizado, con la discriminación de las diferentes partidas que lo conforman, formará parte integral de esta ley, una vez aprobado por la Asamblea Nacional o la Comisión Delegada, con la opinión favorable de la Comisión Permanente de Finanzas y Desarrollo Económico de la Asamblea Nacional, al igual que las autorizaciones para la modificación presupuestaria de esas partidas.

Parágrafo Primero: A efectos de la presente Ley, se aplicará de manera preferente, los Reglamentos de la Ley Orgánica de la Administración Financiera del sector Público y la Ley Orgánica de la Contraloría General de la República y el Sistema Nacional de Control Fiscal.

**DÉCIMO**: Se mantiene el artículo 7 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 7.** La Asamblea Nacional o la Comisión Delegada designará El Consejo de Administración y Protección de Activos, integrado por cinco (5) miembros, entre los





cuales se nombrará a su coordinador. Este consejo tendrá entre sus atribuciones las establecidas en el Estatuto que rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela, y la administración de los recursos según lo que procede de acuerdo a esta ley.

**UNDÉCIMO:** Se mantiene el capítulo III aprobado en primera discusión quedando redactado de la siguiente manera:

## CAPÍTULO III

### Del Control del Gasto

**DUODÉCIMO:** Se modifica el artículo 8 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 8.** Corresponde a la Asamblea Nacional o su Comisión Delegada, la aprobación de la contratación de las empresas que deban auditar la administración de los bienes y recursos públicos por parte del Consejo de Administración y Protección de Activos, para garantizar la transparencia y eficacia en el uso de los recursos públicos autorizados por la presente Ley.

**DÉCIMOTERCERO:** Se mantiene el capítulo IV aprobado en primera discusión quedando redactado de la siguiente manera:

## CAPÍTULO IV

### Disposiciones Finales

**DÉCIMOCUARTO:** Se mantiene el artículo 9 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 9.** Dada la prolongación en el tiempo de la usurpación acompañada de la persecución política y del cerco económico al Poder Legislativo Nacional, junto con el recrudecimiento de la crisis humanitaria compleja, y en atención al Artículo 14 del Estatuto que rige la Transición Democrática para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela, se autoriza el monto global de los gastos con fundamento en la presente Ley, de conformidad con los artículos 3 y 5 de la misma.

**DÉCIMOQUINTO:** Se mantiene el artículo 10 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 10.** La Asamblea Nacional comunicará a la mayor brevedad posible el contenido de la presente Ley a la Nación venezolana, así como a la comunidad internacional, incluidos los Gobiernos extranjeros, el secretario General de la Organización de las Naciones Unidas (ONU), el secretario General la Organización de los Estados Americanos (OEA), la Alta Comisionada para los Derechos Humanos de la ONU, la Comisión Interamericana de Derechos Humanos, la Unión Europea, la Unión Africana, la Organización de Países Exportadores de Petróleo, el Banco Mundial, el Fondo Monetario Internacional, el Banco Interamericano de Desarrollo, y la Corporación Andina de Fomento- Banco de Desarrollo de América Latina, así





como a las Agencias gubernamentales o Entidades financieras que tengan relación con los trámites necesarios para la ejecución de la presente Ley.

**DÉCIMOSEXTO:** Se mantiene el artículo 11 aprobado en primera discusión quedando redactado de la siguiente manera:

**Artículo 11.** La presente Ley estará vigente hasta el 31 de diciembre de 2023, o hasta que sea derogada por la Ley de Presupuesto del Ejercicio Fiscal 2023 dictada por la Asamblea Nacional, una vez cese la usurpación de la Presidencia de la República y de la Asamblea Nacional.

**JUAN GERARDO GUAIDÓ MÁRQUEZ**
Presidente de la Asamblea Nacional

**JUAN PABLO GUANIPA**
Primer Vicepresidente

**CARLOS EDUARDO BERRIZBEITIA**
Segundo Vicepresidente

**JOSÉ ANTONIO FIGUEREDO MÁRQUEZ**
Secretario

Promulgación del **ESTATUTO QUE RIGE LA TRANSICIÓN A LA DEMOCRACIA PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**, de conformidad con lo previsto en los artículos 213, 233 y 333 de la Constitución de la República Bolivariana de Venezuela.

En Caracas, a los 30 días del mes de diciembre de dos mil veintidós. Años 211° de la Independencia y 162° de la Federación.

Cúmplase,
(L.S.)

**Juan Guaidó**
**Presidente de la Asamblea Nacional**





**LA ASAMBLEA NACIONAL DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**

**DECRETA**

la siguiente,

**LEY ESPECIAL DEL FONDO PARA LA LIBERACIÓN DE VENEZUELA Y ATENCIÓN DE CASOS DE RIESGO VITAL**

**CAPÍTULO I**

**Disposiciones Generales**

**Objeto de la Ley**

**Artículo 1.** De conformidad con los artículos 187, numerales 1 y 6 , y 333 de la Constitución de la República Bolivariana de Venezuela, y el artículo 14 del Estatuto que rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela; Y en vista de la prolongación de la usurpación del poder, del cerco económico al Poder Legislativo Nacional legítimo, junto al recrudecimiento de la crisis humanitaria compleja, la presente Ley tiene por objeto autorizar la disposición de los gastos indispensables para cumplir con los objetivos y fines del Estatuto que rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela.

**Artículo 2.** Los gastos autorizados por esta Ley, serán sufragados con recursos disponibles de la República Bolivariana de Venezuela y demás entes descentralizados, disponibles en cuentas bancarias en el extranjero. Adicionalmente, la Junta Administradora Ad – hoc del Banco Central de Venezuela podrá transferir recursos a la República para la ejecución de los gastos aquí autorizados, tomando en cuenta las normas que los rigen de conformidad con la Ley del Banco Central de Venezuela.

**CAPÍTULO II**

**De la Autorización de Recursos y su Administración**

**Artículo 3.** Se autoriza a la Asamblea Nacional para disponer de los recursos a los cuales se refiere el Artículo 2 de esta Ley, hasta por la cantidad de cincuenta y dos millones de dólares de los Estados Unidos Americanos (Us\$ 52.000.000.,00) los cuales deberá destinar al cumplimiento del objeto de esta Ley Especial.

**Artículo 4.** Le corresponde a la Asamblea Nacional, a través del Consejo de Administración Y Protección de Activos, la implementación de los mecanismos administrativos y los trámites necesarios, dentro o fuera del país, que permitan disponer de los recursos cuya utilización le ha sido autorizada.

**Artículo 5.** El monto global autorizado será destinado al financiamiento de los siguientes gastos: 1) Gastos para la defensa y el fortalecimiento del Poder Legislativo Nacional y la Protección Social de sus integrantes, 2) Gastos para la protección y defensa de la democracia 3) Gastos de funcionamiento del Consejo de Administración y Protección de Activos, de la Junta AD-hoc DEL Banco Central de Venezuela y de Petróleos de Venezuela S.A ( PDVSA).





**Artículo 6.** El Presupuesto especial referido al monto global autorizado, con la discriminación de las diferentes partidas que lo conforman, formará parte integral de esta ley, una vez aprobado por la Asamblea Nacional o la Comisión Delegada, con la opinión favorable de la Comisión Permanente de Finanzas y Desarrollo Económico de la Asamblea Nacional, al igual que las autorizaciones para la modificación presupuestaria de esas partidas.

Parágrafo Primero: A efectos de la presente Ley, se aplicará de manera preferente, los Reglamentos de la Ley Orgánica de la Administración Financiera del sector Público y la Ley Orgánica de la Contraloría General de la República y el Sistema Nacional de Control Fiscal.

**Artículo 7.** La Asamblea Nacional o la Comisión Delegada designará El Consejo de Administración y Protección de Activos, integrado por cinco (5) miembros, entre los cuales se nombrará a su coordinador. Este consejo tendrá entre sus atribuciones las establecidas en el Estatuto que rige la Transición a la Democracia para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela, y la administración de los recursos según lo que procede de acuerdo a esta ley.

## CAPÍTULO III

### Del Control del Gasto

**Artículo 8.** Corresponde a la Asamblea Nacional o su Comisión Delegada, la aprobación de la contratación de las empresas que deban auditar la administración de los bienes y recursos públicos por parte del Consejo de Administración y Protección de Activos, para garantizar la transparencia y eficacia en el uso de los recursos públicos autorizados por la presente Ley.

## CAPÍTULO IV

**Artículo 9.** Dada la prolongación en el tiempo de la usurpación acompañada de la persecución política y del cerco económico al Poder Legislativo Nacional, junto con el recrudecimiento de la crisis humanitaria compleja, y en atención al Artículo 14 del Estatuto que rige la Transición Democrática para Restablecer la Vigencia de la Constitución de la República Bolivariana de Venezuela, se autoriza el monto global de los gastos con fundamento en la presente Ley, de conformidad con los artículos 3 y 5 de la misma.

**Artículo 10.** La Asamblea Nacional comunicará a la mayor brevedad posible el contenido de la presente Ley a la Nación venezolana, así como a la comunidad internacional, incluidos los Gobiernos extranjeros, el secretario General de la Organización de las Naciones Unidas (ONU), el secretario General la Organización de los Estados Americanos (OEA), la Alta Comisionada para los Derechos Humanos de la ONU, la Comisión Interamericana de Derechos Humanos, la Unión Europea, la Unión Africana, la Organización de Países Exportadores de Petróleo, el Banco Mundial, el Fondo Monetario Internacional, el Banco Interamericano de Desarrollo, y la Corporación Andina de Fomento- Banco de Desarrollo de América Latina, así como a las Agencias gubernamentales o Entidades financieras que tengan relación con los trámites necesarios para la ejecución de la presente Ley.





**Artículo 11.** La presente Ley estará vigente hasta el 31 de diciembre de 2023, o hasta que sea derogada por la Ley de Presupuesto del Ejercicio Fiscal 2023 dictada por la Asamblea Nacional, una vez cese la usurpación de la Presidencia de la República y de la Asamblea Nacional.

**JUAN GERARDO GUAIDÓ MÁRQUEZ**
Presidente de la Asamblea Nacional

**JUAN PABLO GUANIPA**
Primer Vicepresidente

**CARLOS EDUARDO BERRIZBEITIA**
Segundo Vicepresidente

**JOSÉ ANTONIO FIGUEREDO MÁRQUEZ**
Secretario

Promulgación del **ESTATUTO QUE RIGE LA TRANSICIÓN A LA DEMOCRACIA PARA RESTABLECER LA VIGENCIA DE LA CONSTITUCIÓN DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**, de conformidad con lo previsto en los artículos 213, 233 y 333 de la Constitución de la República Bolivariana de Venezuela.

En Caracas, a los 30 días del mes de diciembre de dos mil veintidós. Años 211° de la Independencia y 162° de la Federación.

Cúmplase,
(L.S.)

**Juan Guaidó**
**Presidente de la Asamblea Nacional**

# EXHIBIT 11

# EXHIBIT 49

 

**LEGISLATIVE GAZETTE**



Bolivarian Republic of Venezuela

National Assembly

Caracas – Venezuela

[…]

## THE NATIONAL ASSEMBLY
## OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

**In defense of the Constitution, Democracy and the Rule of Law**

**AGREEMENT RATIFYING THE EXISTENCE OF PETROLEOS DE VENEZUELA S.A.'S AD HOC BOARD OF DIRECTORS TO PROTECT THE FOREIGN ASSETS OF THE BOLIVARIAN REPUBLIC OF VENEZUELA**

### WHEREAS

The National Assembly of the Bolivarian Republic of Venezuela is vested with powers for the protection of Venezuela's state-owned foreign assets.

### WHEREAS

In order to protect Venezuela's state-owned foreign assets, it is necessary that the Asset Management and Protection Council and Petróleos de Venezuela S.A.'s Ad Hoc Board of Directors coordinate actions.

### HEREBY AGREES AS FOLLOWS

**1.** To ratify the existence of Petróleos de Venezuela S.A.'s Ad Hoc Board of Directors under Section 13 of the Statute Governing the Transition to Democracy to Reestablish the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela to guarantee the protection of Venezuela's state-owned foreign assets.

**2.** To call on the Asset Management and Protection Council to make the relevant appointments within Petróleos de Venezuela S.A.'s Ad Hoc Board of Directors in accordance with Section 13 of



**LEGISLATIVE
GAZETTE**



Bolivarian Republic of Venezuela

National Assembly

Caracas – Venezuela

the Statute Governing the Transition to Democracy to Reestablish the Effectiveness of the Constitution of the Bolivarian Republic of Venezuela.

**3.** To urge foreign Governments to continue acknowledging the institutional framework deriving from the National Assembly for the protection of the Bolivarian Republic of Venezuela's assets abroad.

**4.** To publish this agreement.

Entered into, signed and sealed at an online session of the National Assembly held by decision of the Board of Directors and pursuant to Section 13(4) and Section 56 *in fine* of the Rules of Procedure and Debates of the National Assembly, in light of the usurpation that the Nicolás Maduro's dictatorship maintains over the Seat of Congress, on January 26, 2023. 211th Anniversary of the Independence and 163rd Anniversary of the Federation.

[Seal:] BOLIVARIAN REPUBLIC OF VENEZUELA. NATIONAL ASSEMBLY. [Coat of Arms.] OFFICE OF THE PRESIDENT.

[Signature.] Dinorah Figuera Tovar. Chairwoman of the National Assembly.

[Signature.] Marianela Fernández. First Deputy Chairwoman of the National Assembly.

[Signature.] Auristela Vásquez. Second Deputy Chairwoman of the National Assembly.

[Signature.] José Figueredo. Secretary of the National Assembly.

[Signature.] Luis [Illegible]ustos. Deputy Secretary of the National Assembly.



## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the original document entitled "Agreement adopted by the National Assembly of Venezuela on January 26, 2023 ratifying the existence of PDVSA's ad hoc Board for the defense of the foreign assets of Venezuela, published in the Venezuelan Legislative Gazette No. 68 dated February 2, 2023," which was written in Spanish.

City of Buenos Aires, May 12, 2023.

THE TR COMPANY TRANSLATION SERVICES

_____

Cynthia Farber
Certified Translator
License recorded on Page 226:Book XV
Buenos Aires Translators' Association
CTPCBA No. 5402

Manuel Ugarte 2187 1° (C1428BSE) Buenos Aires, Argentina
(54.11) 4896 2693
info@thetrcompany.com - www.thetrcompany.com



Caracas, martes 3 de febrero de 2023  -  Nº 68

Sumario

Acuerdo en ratificación de la existencia de la junta de administración ad-hoc de Petróleos de Venezuela S.A. Para la defensa de los activos de la República Bolivariana de Venezuela en el extranjero.



,

República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

**LA ASAMBLEA NACIONAL
DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**

**En defensa de la Constitución, la Democracia y el Estado de Derecho**

**ACUERDO EN RATIFICACION DE LA EXISTENCIA DE LA JUNTA DE
ADMINISTRACION AD-HOC DE PETROLEOS DE VENEZUELA S.A.
PARA LA DEFENSA DE LOS ACTIVOS DE LA REPUBLICA
BOLIVARIANA DE VENEZUELA EN EL EXTRANJERO**

**CONSIDERANDO**

Que la Asamblea Nacional de la República Bolivariana de Venezuela
ejerce competencias para la protección de activos del Estado venezolano
en el extranjero.

**CONSIDERANDO**

Que para la defensa de los activos del Estado venezolano en el extranjero
es necesaria la coordinación entre el Consejo de Administración y
Protección de Activos y la Junta de Administración ad-hoc de Petróleos de
Venezuela S.A.

**ACUERDA**

**PRIMERO.** Ratificar la existencia de la Junta de Administración ad-hoc de
Petróleos de Venezuela S.A. en los términos del artículo 13 del Estatuto
que Rige la Transición a la Democracia para Restablecer la Vigencia de la
Constitución de la República Bolivariana de Venezuela, a los fines de
asegurar la defensa de los activos del Estado venezolano en el extranjero.

**SEGUNDO:** Exhortar al Consejo de Administración y Protección de Activos
a realizar las designaciones a las que hubiere lugar dentro de la Junta de
Administración ad-hoc de Petróleos de Venezuela S.A., en los términos del
artículo 13 del Estatuto que Rige la Transición a la Democracia para
Restablecer la Vigencia de la Constitución de la República Bolivariana de
Venezuela.

**TERCERO:** Instar a los Gobiernos foráneos a continuar reconociendo la
institucionalidad derivada de la Asamblea Nacional para la defensa de los
activos de la República Bolivariana de Venezuela en el extranjero.

**CUARTO:** Dar publicidad al presente acuerdo.





República Bolivariana de Venezuela
Asamblea Nacional
Caracas - Venezuela

Dado, firmado y sellado en sesión en línea de la Asamblea Nacional, celebrada por decisión de la Junta Directiva y de conformidad con lo previsto en los artículos 13, numeral 4, y 56, último aparte, del Reglamento de Interior y de Debates de la Asamblea Nacional, en razón de la usurpación que la dictadura de Nicolás Maduro mantiene sobre las instalaciones del Palacio Legislativo a los 26 días del mes de enero de 2023. Años 211° de la Independencia y 163° de la Federación.

**Dinorah Figuera Tovar**
**Presidenta de la Asamblea Nacional**

**Marianela Fernández**
**Primera Vicepresidenta de**
**Asamblea Nacional**

**Auristela Vásquez**
**Segunda Vicepresidenta de la**
**Asamblea Nacional**

**José Figueredo**
**Secretario de la Asamblea Nacional**

**Luis Bustos**
**SubSecretario de la Asamblea Nacional**

# EXHIBIT 12

# EXHIBIT 71

**The legitimate National Assembly received the management report issued by the PDVSA ad hoc Board of Directors**

Date: February 24, 2023

**Caracas, February 23, 2023.** The legitimate National Assembly received this Thursday the management report issued by the PDVSA ad hoc Board of Directors, as part of the "Open Parliament" program promoted by the Executive Committee chaired by representative Dinorah Figuera, with Marianela Fernández as first deputy chair and Auristela Vásquez as second deputy chair.

The ad hoc Board of Directors chaired by Horacio Medina submitted its report to the Delegate Commission in a special session.

At the beginning of his presentation, Medina reminded that CITGO's indebtedness is currently at USD 4.8 billion, as a result of the company's irresponsible management during Hugo Chávez Frías' and Nicolás Maduro's administrations.

He added that this changed with the shift towards "responsible investments aimed at recovering the company between 2019 and 2021, which led CITGO to use 93% of its operating capacity to take advantage of the 2022 price boom. In 2022 CITGO refined 780 thousand barrels of crude oil per day."

The chair of the ad hoc board explained that, to date, approximately USD 40 million authorized by the U.S. Treasury Department for litigation expenses have been spent through four licenses granted by the Office of Foreign Assets Control (OFAC). Moreover, in 2019 the OFAC authorized a special USD 70 million disbursement for the payment, under protest, of the interests accrued on the PDVSA 2020 Bonds, to prevent bondholders from foreclosing on the collateral granted on CITGO.

After the presentation, the Representatives present were given the floor. The first to speak was the chair of the legitimate Parliament, Dinorah Figuera, who requested a clarification on the status of the resources held in the Portuguese bank Novo Banco, to which Medina answered that, some days ago, the lawyers representing the ad hoc Board of Directors were unable to appear in trial because they were not acknowledged by Portugal, wherefore those assets are currently at risk of being lost.

Other parliamentarians who participated in the question and answer session were Dignora Hernández, Ramón López and Elias Matta, who complained about the fact that the resources approved for the Board of Directors of PDVSA were not disclosed to the Plenary Session. In answer to this, Medina confirmed that the applicable requests and notifications were filed directly with the Interim Government, wherefore representative Matta asked for a detailed and complete report on these amounts and their respective authorizations.

In turn, representative Alfonso Marquina also adhered to representative Matta's demands regarding the clarification of the authorization for the use of assets belonging to all Venezuelans without due approval from Parliament. He also requested a report on the status of creditors and asked for a detailed account of the status of the debts owed by PDVSA ad hoc in attorneys' fees. Medina stated that no active debts exist so far, "except for those recorded over the third quarter of 2022, which are already being settled."

To conclude, the chair of the legitimate National Assembly, Dinorah Figuera, mentioned that "PDVSA is a relevant  asset for the nation, and that is why it is important to preserve it in the face of the disasters that are the Chavez and Maduro administrations." She also added that, once a detailed report with the requested accounts is available, it will be forwarded to the Finance Committee for analysis and consideration, and another special session will be held with the ad hoc Board of Directors of PDVSA and CITGO.



**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the National Assembly press release titled "AN legitima recibió el informe de gestión de la junta administrativa ad hoc de PDVSA," dated February 23, 2023, which was written in Spanish.

City of Buenos Aires, June 27, 2023.

THE TR COMPANY TRANSLATION SERVICES

_____

Cynthia Farber
Certified Translator
License recorded on Page 226:Book XV
Buenos Aires Translators' Association
CTPCBA No. 5402

Manuel Ugarte 2187 1º (C1428BSE) Buenos Aires, Argentina
(54.11) 4896 2693
info@thetrcompany.com - www.thetrcompany.com



# AN legítima recibió el informe de gestión de la Junta Administrativa ad hoc de PDVSA

Fecha: 24/02/2023

**Caracas, 23 de febrero de 2023.** La legítima Asamblea Nacional, recibió este jueves el informe de gestión de la Junta Administrativa ad hoc de Petróleos de Venezuela S.A. (PDVSA), como parte del programa "Parlamento Abierto" promovido por la Junta Directiva presidida por la diputada Dinorah Figuera, con Marianela Fernández en la primera vicepresidencia y Auristela Vásquez en la segunda vicepresidencia.

La Junta Administrativa ad hoc a cargo de Horacio Medina, presentó su informe ante la Comisión Delegada en una sesión especial.

Al inicio de la presentación Medina recordó que el nivel de endeudamiento de CITGO debido a la gerencia irresponsable de los regímenes de Hugo Chávez Frías y Nicolás Maduro era de $4.800 millones.

Añadiendo que esto se modificó con el cambio de "las inversiones responsables para recuperar a la empresa entre 2019 y 2021, CITGO logró estar 93 % de capacidad operativa para aprovechar el boom de precios de 2022. En 2022 CITGO refino 780 mil barriles de crudo al día".

El encargado de la junta ad hoc explicó que a la fecha, se han ejecutado cerca de $40 millones autorizados por el Departamento del Tesoro de Estados Unidos para gastos de litigios a través de cuatro licencias otorgadas por la Oficina de Control de Bienes Extranjeros (OFAC). Agregando que en el 2019 exisitó una autorización

especial de la OFAC por $70 millones para el pago bajo protesta de intereses de los Bonos PDVSA 2020, para evitar que se ejecutara la garantía de los bonistas sobre CITGO.

Tras finalizar la presentación, se abrió el derecho de palabra a los diputados, iniciando la presidenta del Parlamento legítimo, Dinorah Figuera, quien pidió aclarar la situación de los recursos que se encuentran en el banco portugués Novo Banco a lo que respondió Medina que hace algunos días los abogados que representan la Junta Administrativa ad hoc no pudieron ejercer en un juicio debido a la falta de reconocimiento de ese país, por lo que actualmente esos activos se encuentran en riesgo de perderse.

Otros parlamentarios que participaron en la ronda de preguntas fueron Dignora Hernández, Ramón López y Elías Matta, este último hizo el reclamo ante los recursos aprobados para la Junta Administrativa de PDVSA bajo el desconocimiento de la Plenaria, por lo cual Medina aseguró que las solicitudes y notificaciones fueron directamente hechas al Gobierno Interino; razón por la cual el Parlamentario pidió un informe detallado y completo sobre estos montos y sus respectivas autorizaciones.

Por otra parte, el diputado Alfonso Marquina, también se unió a la exigencia del parlamentario Matta sobre la aclaratoria de la autorización del uso de los activos de todos los venezolanos sin la debida aprobación del Parlamento, a esto sumó la petición de un balance de la situación de los acreedores y pidió durante su intervención detallar el estatus de las deudas que mantiene PDVSA ad hoc con abogados, por lo que Medina aseguró que hasta el momento no se mantiene ninguna deuda activa, "salvo a las del tercer trimestre de 2022 y esas ya están siendo solventadas".

Para concluir, la presidenta de la legítima Asamblea Nacional, Dinorah Figuera, expresó que "PDVSA constituye un activo relevante para la nación, de allí la importancia de preservarlo es ante el desastre de las gestiones de Chávez y Maduro". Agregando que una vez se tenga el informe detallado con las cuentas será remitido a la Comisión de Finanzas para su estudio y consideración y se realizará otra sesión especial con la Junta Administrativa ad hoc de PDVSA y CITGO.

# Noticias Relacionadas

**AN legítima reiteró su apoyo a la celebración de la elección Primaria de oposición**

Fecha: 27/06/2023

# EXHIBIT 13

# EXHIBIT 72

**National Assembly Clarifies CITGO Petroleum Situation**

Date: May 5, 2023

**Journalist: NA Press: / Photographer: NA Press:**

The legitimate National Assembly of Venezuela informed this Saturday morning the situation of CITGO Petroleum, explaining that the generalized practices of corruption, massive expropriations and excessive and irresponsible indebtedness of the Hugo Chávez Frías and Nicolás Maduro's Administrations caused the collapse of the oil industry and the institution of hundreds of lawsuits abroad against Petróleos de Venezuela S.A. (PDVSA) and its subsidiaries.

The legitimate Parliament stressed that Citgo Petroleum Corporation (CITGO) has been one of the most legally challenged PDVSA subsidiaries in the United States, where lawsuits have been brought against it since 2008 by a variety of entities, including Crystallex International Corporation (CRYSTALLEX) and ConocoPhillips Company.

Through a release, the National Assembly detailed that, as of 2019, the Government of Juan Guaidó decided to offer protection to CITGO; therefore, the Government in office and the Special Prosecutor's Office of the Bolivarian Republic of Venezuela proposed a strategy of action in the courts of the United States of America that favored judicial activism over the possibilities of negotiation with the creditors of the Venezuelan State. However, none of the rulings made by the U.S. courts were enforced and none of the creditors of the Venezuelan State were able to collect their claims due to the protection that the Government of the United States of America has conferred unto CITGO since 2009, through executive licenses issued by the Treasury Department.

As a result of the progress of the CRYSTALLEX judgment execution process, the protection granted by the United States Government has changed as per recent License No. 42 providing that foreign creditors invoking the "*alter ego*" doctrine shall be entitled to collect their claims against CITGO after the completion of a potential negotiation process involving and binding upon the Republic of Venezuela.

Therefore, the National Assembly pointed out that the responsibility for drafting and executing the negotiation strategy with foreign creditors lies with the Petróleos de Venezuela Ad Hoc Board of Directors, adding that the legitimate Parliament "urges the Petróleos de Venezuela Ad Hoc Board of Directors to act without delay to preserve CITGO's assets and to seek solutions that do not put at risk the integrity of said foreign assets of the Venezuelan State."

Finally, the legitimate National Parliament called on the U.S. Treasury Department and the U.S. State Department to maintain extensive and adequate safeguards to ensure the pursuit of solutions that preserve the integrity of CITGO without jeopardizing its ownership by the Venezuelan State.



**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate rendition into English of the National Assembly press release titled "AN legitima aclara situacion sobre Citgo Petroleum," dated May 6, 2023, which was written in Spanish.

City of Buenos Aires, June 27, 2023.

THE TR COMPANY TRANSLATION SERVICES

_____

Cynthia Farber
Certified Translator
License recorded on Page 226:Book XV
Buenos Aires Translators' Association
CTPCBA No. 5402

Manuel Ugarte 2187 1º (C1428BSE) Buenos Aires, Argentina
(54.11) 4896 2693
info@thetrcompany.com - www.thetrcompany.com

 

# AN legítima aclara situación sobre CITGO Petroleum

Fecha: 06/05/2023

**Periodista: Prensa An. / Fotografo: Prensa An.**

Desde la legítima Asamblea Nacional de Venezuela se informó la mañana de este sábado la situación de CITGO Petrolum, explicando que las prácticas generalizadas de corrupción, expropiaciones masivas y endeudamiento excesivo e irresponsable de los gobiernos de Hugo Chávez Frías y de Nicolás Maduro causaron el colapso de la industria petrolera y centenares de demandas judiciales en el extranjero en contra de Petróleos de Venezuela S.A. (PDVSA) y de sus empresas filiales.

El Parlamento legítimo aseguró que una de las filiales de PDVSA más perseguida judicialmente ha sido Citgo Petroleum Corporation (CITGO), demandada en tribunales de los Estados Unidos de América desde 2008, entre muchos otros, por Crystallex International Corporation (CRYSTALLEX) y por ConocoPhillips Company.

A través de un comunicado la Asamblea Nacional detalló que a partir de 2019 CITGO pasó a ser resguardada por el Gobierno encargado de Juan Guaidó y entonces el Gobierno encargado y la Procuraduría Especial de la República Bolivariana de Venezuela plantearon una estrategia de actuación en los tribunales de los Estados Unidos de América que privilegió el activismo judicial sobre las posibilidades de negociación con los acreedores del Estado venezolano. Sin embargo, ninguna de las sentencias de los tribunales norteamericanos fue ejecutada ni los acreedores del Estado venezolano cobraron sus acreencias debido a la protección que el

Gobierno de los Estados Unidos de América ha brindado desde 2019 a CITGO, a través de licencias ejecutivas emitidas por el Departamento del Tesoro.

Añadiendo que como consecuencia del avance del proceso de ejecución de la sentencia del caso CRYSTALLEX la protección otorgada por el Gobierno de los Estados Unidos ha cambiado a través de la reciente Licencia No 42 que dispone que los acreedores extranjeros que invocan la tesis del "alter ego" sí pueden cobrar sus acreencias actuando en contra de CITGO después de cumplirse con un eventual proceso de negociación que involucre y vincule a la República de Venezuela.

Por lo que en esté sentido, la Asamblea Nacional señaló que la responsabilidad de formular y ejecutar la estrategia de negociación con los acreedores extranjeros corresponde a la Junta Administradora Ad-Hoc de Petróleos de Venezuela, agregando que el Parlamento legítimo "emplaza a la Junta Administradora Ad-Hoc de Petróleos de Venezuela a actuar sin dilaciones para preservar la propiedad de CITGO y para que busque soluciones que no pongan en riesgo la integridad de dicho activo del Estado venezolano en el extranjero".

Finalmente, el legítimo Parlamento Nacional hizo un llamado al Departamento del Tesoro y al Departamento de Estado de los Estados Unidos para que mantengan la protección, amplia y suficiente, que garantice la búsqueda de soluciones que no comprometan la integridad de CITGO y aseguren que esta continúe siendo propiedad del Estado venezolano.

# Noticias Relacionadas

**AN legítima debatió sobre la visita del Fiscal de la CPI Karim Khan a Venezuela**

Fecha: 13/06/2023



# EXHIBIT 14

 REUTERS®



My View    Following    Saved

Energy | Exploration & Production | Gas

# Venezuela appoints new gas vice president at state company PDVSA

**Reuters**

August 2, 2023 2:06 PM EDT · Updated 14 days ago

  



A Venezuelan flag next to some flags of Venezuela's state oil company PDVSA is pictured near the company's headquarters, in Caracas, Venezuela March 20, 2023. REUTERS/Leonardo Fernandez *Acquire Lice*... **Read more**



**Companies**

Petroleos de Venezuela SA

Follow

CARACAS, Aug 2 (Reuters) - Venezuela has appointed a new vice president at PDVSA who will lead the state company's gas operations, a key move as the South American country negotiates licenses with foreign companies to develop its mostly untapped natural gas reserves. Luis Gonzalez Nuñez was appointed PDVSA's new gas vice president, according to a decree published in official gazette, seen by Reuters on Wednesday. The position was previously held by Juan Santana.



Decades of insufficient investment, contract changes, mismanagement at PDVSA and - more recently - U.S. sanctions have limited the development of Venezuela's gas sector, which could become a large source of revenue for the cash-strapped nation.

Oil Minister Pedro Tellechea, who is also PDVSA's CEO, last month said talks with companies interested in gas projects were progressing, but some terms needed to be finalized so licenses could be issued later this year.

In a separate decree, the government also created a data bank that will handle information about oil and gas activities and reserves and will be able to sell seismic data packs to interested parties.

Reporting by Deisy Buitrago; Editing by Nick Macfie

Our Standards: **The Thomson Reuters Trust Principles.**

**Acquire Licensing Rights** ⧉

## Read Next